# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | |
|---|---|
| STATE OF TEXAS; STATE OF LOUISIANA, | Civ. Action No. 6:21-cv-16 |
| *Plaintiffs*, | |
| v. | |
| The UNITED STATES OF AMERICA; ALEJANDRO MAYORKAS, Secretary of the United States Department of Homeland Security, in his official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TROY MILLER, Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection, in his official capacity; U.S. CUSTOMS AND BORDER PROTECTION; TAE JOHNSON, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TRACY RENAUD, Senior Official Performing the Duties of the Director of the U.S. Citizenship and Immigration Services, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES, | |
| *Defendants*. | |

## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

TABLE OF CONTENTS

Table of Contents .................................................................................................... ii

Table of Authorities ............................................................................................... iii

Introduction ............................................................................................................. 1

Background ............................................................................................................... 1

    I.     Detention of Aliens under the INA ............................................................ 1

    II.    Defendants' Issuance of the Challenged Memoranda ............................... 3

    III.   Defendants' Failure to Detain Criminal Aliens ........................................ 5

Summary of the Argument .................................................................................... 11

Argument ............................................................................................................... 12

    I.     The Memoranda Violate the Administrative Procedure Act ................... 12

         A.     Defendants' Failure to Detain Criminal Aliens Violates Section 1226(c) ......................................................................................... 12

         B.     Defendants' Failure to Detain Aliens with Final Orders of Removal Violates Section 1231(a)(2) ....................................... 18

         C.     The Memoranda Are Arbitrary and Capricious ............................. 19

         D.     The Memoranda Are Procedurally Invalid .................................... 22

    II.    Violating Federal Statutes Is Not Taking Care that the Laws Are Faithfully Executed .............................................................................................. 25

    III.   The Memoranda Violate the Agreements ............................................... 26

    IV.   No Procedural Issue Prevents This Court's Review ............................... 28

         A.     Texas and Louisiana Have Standing .............................................. 28

         B.     The Memoranda Are Final Agency Action .................................... 30

         C.     The Memoranda Are Reviewable ................................................... 31

    V.    Texas and Louisiana Will Suffer Irreparable Harm Absent an Injunction .......... 33

         A.     Plaintiffs Will Incur Financial Costs They Cannot Recover ................... 33

         B.     Increased Criminal Activity Is an Irreparable Injury ................................ 34

         C.     DHS Admits Texas and Louisiana Face Irreparable Injury ..................... 34

    VI.   An Injunction Would Not Harm Defendants or the Public .................... 34

Conclusion ............................................................................................................. 36

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez*,
   138 S. Ct. 2305 (2018)............................................................................................41

*Alafyouny v. Chertoff*,
   No. 3:06-cv-204, 2006 WL 1581959 (N.D. Tex. May 19, 2006)...........................24

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
   458 U.S. 592 (1982)....................................................................................36, 37, 41

*Allentown Mack Sales & Serv., Inc. v. NLRB*,
   522 U.S. 359 (1998)................................................................................................24

*ANR Storage Co. v. FERC*,
   904 F.3d 1020 (D.C. Cir. 2018)..............................................................................28

*Arizona v. United States*,
   567 U.S. 387 (2012)..........................................................................................17, 26

*Armstrong v. Exceptional Child Center, Inc.*,
   575 U.S. 320 (2015)................................................................................................32

*Brock v. Pierce County*,
   476 U.S. 253 (1986)................................................................................................22

*Chamber of Commerce v. Dep't of Labor*,
   885 F.3d 360 (5th Cir. 2018) ..................................................................................27

*City of El Cenizo v. Texas*,
   890 F.3d 164 (5th Cir. 2018) ....................................................................................2

*Czyzewski v. Jevic Holding Corp.*,
   137 S. Ct. 973 (2017)..............................................................................................36

*Dalton v. Specter*
   511 U.S. 462 (1994)................................................................................................31

*Dart v. United States*,
   848 F.2d 217 (D.C. Cir. 1988).................................................................................32

*Demore v. Kim*,
   538 U.S. 510 (2003) ......................................................................................... *passim*

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  140 S. Ct. 1891 (2020)............................................................................27

*Garcia-Maldonado v. Gonzales*,
  491 F.3d 284 (5th Cir. 2007) ..................................................................21

*Green Valley Special Util. Dist. v. City of Schertz*,
  969 F.3d 460 (5th Cir. 2020) (en banc) ..................................................32

*Heckler v. Chaney*,
  470 U.S. 821 (1985)................................................................................40

*Hernandez-Esquivel v. Castro*,
  No. 5:17-cv-564, 2018 WL 3097029 (W.D. Tex. June 22, 2018).........23

*Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*,
  804 F.2d 1390 (5th Cir. 1986) ............................................................40, 41

*Jennings v. Rodriguez* ................................................................17, 18, 39

*Jordan v. De George*,
  341 U.S. 223 (1951)................................................................................20

*In re Joseph*,
  22 I.&N. Dec. 799 (BIA 1999) ..............................................................18

*League of Women Voters of United States v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016)....................................................................42

*Lin v. United States*,
  5:07-cv-26, 2007 WL 951618 (S.D. Tex. Mar. 28, 2007) .....................23

*Lincoln v. Vigil*,
  508 U.S. 182 (1993)................................................................................40

*Make the Rd. N.Y. v. Pompeo*,
  475 F. Supp. 3d 232 (S.D.N.Y. 2020).....................................................31

*Martinez v. Larose*,
  968 F.3d 555 (6th Cir. 2020) ..................................................................23

*Meina Xie v. Kerry*,
  780 F.3d 405 (D.C. Cir. 2015)................................................................22

*Michigan v. EPA*,
  135 S. Ct. 2699 (2015)............................................................................26

*N.Y. Progress & Prot. PAC v. Walsh*,
  733 F.3d 483 (2d Cir. 2013)....................................................................42

*Nat'l Ass'n of Mfrs. v. Dep't of Defense,*
    138 S.Ct. 617 (2018) .................................................................37

*Nielsen v. Preap,*
    139 S. Ct. 954 (2019) ...............................................16, 17, 19, 39

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) ....................................................................22

*Nyabwa v. Dep't of Homeland Sec. Immigration & Customs Enf't Field Office*
    *Dir.,*
    537 F. App'x 451 (5th Cir. 2013) (per curiam) .....................18

*Okoro v. INS,*
    125 F.3d 920 (5th Cir. 1997) ..................................................21

*Omagah v. Ashcroft,*
    288 F.3d 254 (5th Cir. 2002) ..................................................20

*Oyelude v. Chertoff,*
    125 F. App'x 543 (5th Cir. 2005) ...........................................39

*Plyler v. Doe,*
    457 U.S. 202 (1982) .................................................................12

*Prof'ls & Patients for Customized Care v. Shalala,*
    56 F.3d 592 (5th Cir. 1995) ....................................................29

*Pulido-Alatorre v. Holder,*
    381 F. App'x 355 (5th Cir. 2010) (per curiam) .....................21

*Reno v. Catholic Soc. Servs., Inc.,*
    509 U.S. 43 (1993) ...................................................................38

*Reno v. Ma,*
    2000 WL 1784982 (U.S. Nov. 24, 2000) ................................18

*Rodney v. Mukasey,*
    340 F. App'x 761 (3d Cir. 2009) ............................................23

*Simmat v. U.S. Bureau of Prisons,*
    413 F.3d 1225 (10th Cir. 2005) (McConnell, J.) ...................32

*Sw. Elec. Power Co. v. EPA,*
    920 F.3d 999 (5th Cir. 2019) ..................................................28

*Texas v. United States,*
    328 F. Supp. 3d 662 (S.D. Tex. 2018) ...........................29, 37, 41

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) .................................................................28, 29, 38

*Texas v. United States*,
   86 F. Supp. 3d 591 (S.D. Tex. 2015), *aff'd*, 809 F.3d 134 (5th Cir. 2015) ............................37

*Texas v. United States*,
   No. 6:21-cv-3, 2021 WL 247877 (S.D. Tex. Jan. 26, 2021).....................................4, 5, 39, 43

*Texas v. United States*,
   No. 6:21-cv-3, 2021 WL 723856 (S.D. Tex. Feb. 23, 2021).......................................... *passim*

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
   136 S. Ct. 1807 (2016)...................................................................................37

*United States v. Garcia-Rodriguez*,
   640 F.3d 129 (5th Cir. 2011) (per curiam)..........................................................18

*United States v. Garner*,
   767 F.2d 104 (5th Cir. 1985) .......................................................................24

*Zadvydas v. Davis*,
   533 U.S. 678 (2001)............................................................................17, 23, 36

**Statutes**

5 U.S.C.
   § 553(b), (c) ..............................................................................................28
   § 701(a) ....................................................................................................38
   § 701(a)(1) ................................................................................................38
   § 701(a)(2) ............................................................................................39, 40
   § 706.....................................................................................................21, 32
   § 706(1)................................................................................................22, 24
   § 706(2)(A) ...............................................................................................24
   § 706(2)(A), (C) .....................................................................................22, 24

6 U.S.C. § 251 ................................................................................................16

8 U.S.C.
   § 1182(a)(2) ..............................................................................................20
   § 1226(a) ............................................................................................2, 3, 16, 17
   § 1226(c)(1) ........................................................................................ *passim*
   § 1226(c)(1)(B) .....................................................................................20, 27
   § 1226(c)(2) ........................................................................................17, 21
   § 1226(e) ..................................................................................................39
   § 1231(a)(1)(B) ..........................................................................................23
   § 1231(a)(2) ........................................................................................ *passim*
   § 1252(g)..............................................................................................38, 39

La. R.S. 14:34.7 ....................................................................................................... 8

La. R.S. 14:37.4 ....................................................................................................... 8

La. R.S. 14:43.1 ....................................................................................................... 8

La. R.S. 14:81 .......................................................................................................... 8

La. R.S. 40:967(C)(2) .............................................................................................. 8

**Other Authorities**

8 C.F.R. § 287.7 ...................................................................................................... 2

42 C.F.R. § 440.255(c) .......................................................................................... 12

*Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens;*
*Conduct of Removal Proceedings; Asylum Procedures*, 62 Fed. Reg. 10,312-
01, 10,323 (Mar. 6, 1997) ................................................................................. 3

National Institute of Justice, Measuring Recidivism (Feb. 20, 2008),
https://nij.ojp.gov/topics/articles/measuring-recidivism#statistics; ................. 11

Procedures for the Detention and Release of Criminal Aliens by the Immigration
and Naturalization Service and for Custody Redeterminations by the
Executive Office for Immigration Review, 63 Fed. Reg. 27,441-01, 27,442,
1998 WL 248023 (May 19, 1998) ................................................................... 18

U.S. Const. art. II, § 3 ............................................................................................ 31

**INTRODUCTION**

To protect the American people, Congress mandated that the executive branch detain dangerous criminal aliens. Section 1226(c) of the Immigration and Nationality Act ("INA") requires Defendants to detain aliens convicted of serious drug offenses and crimes of moral turpitude. And Section 1231(a)(2) requires Defendants to detain aliens with final orders of removal.

But Defendants have disregarded these non-discretionary duties. Instead, they have issued two unlawful agency memoranda, which, as implemented, prohibit federal officials from following federal law. Applying these memoranda instead of congressional commands, Defendants have refused to take custody of criminal aliens set to be released from criminal custody.

What's worse, Defendants provided no legitimate justification for their new policy of refusing to detain criminal aliens. And they have also failed to follow the notice-and-comment procedures required by the Administrative Procedure Act ("APA") and agreements the Department of Homeland Security ("DHS") signed only a few months ago.

Because Defendants' failure to detain dangerous criminal aliens will irreparably injure Texas and Louisiana, Plaintiffs respectfully request that the Court prohibit Defendants from implementing the challenged memoranda and compel them to take custody of aliens covered by Sections 1226(c) and 1231(a)(2).

**BACKGROUND**

## I.       Detention of Aliens under the INA

Sometimes, the INA makes detention of aliens discretionary. In Section 1226(a), for example, it provides that "an alien *may* be arrested pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a) (emphasis added).

But other times, the INA makes detention of aliens mandatory. In Section 1226(c), for

1

example, it provides that "[t]he Attorney General *shall* take into custody any alien who" has committed certain criminal offenses. *See id.* § 1226(c)(1) (emphasis added). And in Section 1231(a)(2), the INA further provides that "the Attorney General *shall* detain" an alien with a final order of removal "[d]uring the removal period." *Id.* § 1231(a)(2) (emphasis added).

When U.S. Immigration and Customs Enforcement ("ICE") takes custody of an alien who is already in the custody of another law enforcement agency, it does so through a detainer request. *See* Ex. D ¶¶ 17, 19; 8 C.F.R. § 287.7. "An ICE detainer is a written request to state or local officials, asking them (1) to notify [DHS] as soon as practicable before an alien is released and (2) to maintain custody of the alien for up to 48 hours beyond the preexisting release date so that DHS may assume custody." *City of El Cenizo v. Texas*, 890 F.3d 164, 174 (5th Cir. 2018).

Detainer requests serve multiple important purposes. First, "[d]etainers reduce potential risks to ERO officers, removable aliens, and the general public by allowing arrests to be made in secure custodial settings as opposed to at-large in communities." Ex. N at 17; *see* Ex. D ¶ 17. Second, "[t]he use of detainers also conserves scarce government resources." Ex. N at 17; *see* Ex. D ¶ 17. Third, detainers "allow[] ICE ERO to assume custody of criminal aliens before they have an opportunity to reoffend." Ex. N at 17; *see* Ex. D ¶ 17. ICE uses these detainer requests regardless of whether it is exercising discretion under Section 1226(a) or following the statutory commands in Sections 1226(c) and 1231(a)(2).

Congress mandated detention of criminal aliens "against a backdrop of wholesale failure by the INS to deal with increasing rates of criminal activity by aliens." *Demore v. Kim*, 538 U.S. 510, 518 (2003). Congress considered evidence "that, after criminal aliens were identified as deportable, 77% were arrested at least once more and 45%—nearly half—were arrested multiple times before their deportation proceedings even began." *Id.* And there was "evidence that one of

2

the major causes of the INS' failure to remove deportable criminal aliens was the agency's failure to detain those aliens during their deportation proceedings." *Id.* at 519. One problem was that "[o]nce released, more than 20% of deportable criminal aliens failed to appear for their removal hearings." *Id.*

The solution was "requiring the Attorney General to detain a subset of deportable criminal aliens pending a determination of their removability." *Id.* at 521 (citing Section 1226). In addition to mandates, Congress provided "budget enhancements" that allowed for "increased detention to ensure removal." INS & EOIR, *Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures*, 62 Fed. Reg. 10,312-01, 10,323 (Mar. 6, 1997).

## II.   Defendants' Issuance of the Challenged Memoranda

Defendants have issued two memoranda undermining that statutory solution. These memoranda—issued without notice and comment or sufficient rationales—are preventing Defendants from complying with their statutory duty to detain certain aliens.

On January 20, 2021, the acting Secretary of DHS issued a memorandum announcing three changes. *See* Ex. A ("January 20 Memorandum"). First, it called for a "Department-wide review of policies and practices concerning immigration enforcement." *Id.* at 2. Second, it established "interim enforcement priorities." *Id.* at 2–3. Third, it "direct[ed] an immediate pause on removals . . . for 100 days." *Id.* at 3.

In a previous case, this Court enjoined enforcement of that "pause on removals." *See Texas v. United States*, No. 6:21-cv-3, 2021 WL 723856, at *45 (S.D. Tex. Feb. 23, 2021) (preliminary injunction opinion); *Texas v. United States*, No. 6:21-cv-3, 2021 WL 247877, at *3 (S.D. Tex. Jan. 26, 2021) (TRO opinion). Defendants did not appeal.

But this case concerns the second aspect of the January 20 Memorandum—the interim

enforcement priorities and how their implementation has led Defendants to cease detaining dangerous criminal aliens. Those interim enforcement priorities apply to supposedly "discretionary enforcement decisions, including deciding . . . whom to detain or release." Ex. A at 2.

The January 20 Memorandum limits DHS's interim enforcement priorities as follows:

1. **National security.** Individuals who have engaged in or are suspected of terrorism or espionage, or whose apprehension, arrest and/or custody is otherwise necessary to protect the national security of the United States.

2. **Border security.** Individuals apprehended at the border or ports of entry while attempting to unlawfully enter the United States on or after November 1, 2020, or who were not physically present in the United States before November 1, 2020.

3. **Public safety.** Individuals incarcerated within federal, state, and local prisons and jails released on or after the issuance of this memorandum who have been convicted of an "aggravated felony," as that term is defined in section 101(a) (43) of the Immigration and Nationality Act at the time of conviction, and are determined to pose a threat to public safety.

*Id.* at 3.

DHS does not prioritize detention of criminal aliens with final orders of removal, criminal aliens convicted of drug offenses, or criminal aliens convicted of crimes of moral turpitude.

On February 18, 2021, the Acting Director of ICE issued a memorandum providing further "guidance" on the interim enforcement priorities. *See* Ex. B ("February 18 Memorandum"). Like the January 20 Memorandum, the February 18 Memorandum addresses "whether to issue a detainer" and "whether to assume custody of a noncitizen subject to a previously issued detainer." Ex. B at 3.

On its face, the memorandum establishes a two-tier system. First, it establishes three "priority categories" nearly identical to those from the January 20 Memorandum. Ex. B at 4–5. Aliens in those categories are "presumed" to be proper subjects of enforcement action.

Second, the February 18 Memorandum provides that aliens outside the "priority"

4

categories are "presumed" *not* to be proper subjects of enforcement action. Ex. B at 3–4. According to the February 18 Memorandum, "[a] civil enforcement or removal action that does not meet the above criteria for presumed priority cases will require preapproval" from supervisors. *Id.* at 5. Thus, honoring any existing detainer or imposing a new one on a "non-priority" alien will require preapproval from the Field Office Director or Special Agent in Charge. That hurdle will, as a practical matter, prevent ICE officers from detaining criminal aliens who do not fit within the February 18 Memorandum's three categories. *See* Ex. D ¶ 36.

### III.    Defendants' Failure to Detain Criminal Aliens

Defendants' implementation of the January 20 and February 18 Memoranda precludes them from taking custody of criminal aliens, even when detention is required by statute. In a sharp departure from past practice, Defendants have already rescinded detainer requests for numerous criminal aliens.

During the first two months of the Biden Administration, ICE rescinded detainer requests for 68 inmates held by the Texas Department of Criminal Justice ("TDCJ") based on new "enforcement priorities." Ex. C ¶ 7; *see id.* ¶ 11. That is a dramatic departure from prior agency practice. During the same period one year earlier, ICE did not issue any similar detainer rescissions to TDCJ. *See id.* ¶ 9, Ex. 2.

Defendants have also rescinded detainer requests for a host of violent and dangerous criminal aliens. ICE refused to take custody of a criminal alien who sexually assaulted a child and another convicted of stalking. *See* Ex. C, Ex. 1. ICE has even refused to detain three aliens convicted of evading arrest—despite the obvious risk they will not show up for immigration proceedings. *See id.* ICE also rescinded detainers on aliens convicted of tampering with forging a government financial instrument, theft, and impersonating a public servant. *See id.* At least six of those 68 inmates have final orders of removal already entered against them. *See* Ex. C ¶ 13.

One major category of rescinded detainers was for drug offenders. In only two months, ICE rescinded thirty-one such detainers. *See* Ex. C ¶ 11. The offenses included a range of drugs, including cocaine, methamphetamines, and marijuana, and a range of activity, from possession to manufacture and delivery. *See* Ex. C, Ex. 1. Defendants are not simply ignoring low-level drug offenses related to personal use. Four of the convictions for marijuana possession involved at least *fifty pounds* of the drug. *See id.* "None of these inmates were convicted of only a single offense involving possession for one's own use of 30 grams or less of marijuana and sentenced to TDCJ." Ex. C ¶ 11.

Rescinding detainer requests is not the only problem. Defendants are also failing to issue detainer requests in the first instance. *See id.* ¶ 14. As a result, criminal aliens who would have received a detainer request during the Trump Administration had they already been in state custody will not be receiving a detainer request under the Biden Administration. *See id.*; Ex. I ¶ 8.

The story in Louisiana is similar. The Louisiana Department of Public Safety and Corrections (LDP&C) has identified four individuals who should have been kept in mandatory federal detention but were not. *See* Ex. L. ICE cancelled a pending detainer on Jose Salazar, a Honduran national and a sex offender who was convicted of violating La. R.S. 14:81, indecent behavior with juveniles, and La. R.S. 14:43.1, sexual battery. *See id.* ¶¶ 8–9. According to LDPS&C records, ICE informed the State that "ICE will not be taking the subject into custody" due to his health conditions after it determined "he is under total care for all life functions." *Id.* ¶ 10. "Louisiana advised that Salazar was not subject to supervision because he had served his full sentence, and that his only requirement would be to register as a sex offender. Instead of taking him into its own custody and control, ICE has left him a ward of the State 'until his death or recovery.'" *Id.*

Axel Reyes Amador was convicted of violating La. R.S. 40:967(C)(2), possession of a schedule II controlled dangerous substance (Fentanyl). *See id.* ¶ 12. ICE issued a detainer and initially took custody of Amador, but ICE released him almost immediately. Instead of being removed from the United States, Amador remains in Louisiana, subject to the State's supervision by probation and parole. *See id.* ¶ 13.

Genaro Rojo was convicted of violating La. R.S. 14:34.7, aggravated second degree battery. He, like Amador, was initially taken into ICE custody and then immediately released. He is still in Louisiana, subject to State supervision by probation and parole. *See id.* ¶ 14. Similarly, Angel Mayorga Barrios, who was convicted of violating La. R.S. 14:37.4, aggravated assault with a firearm, was taken and then released by ICE. Still in Louisiana, Barrios is subject to supervision by LDPS&C probation and parole. *See id.* ¶ 15.

These shifts—both rescinding detainers and failing to issue them—are attributable "to the new 'enforcement priorities' established by [the January 20 and February 18] memoranda," as ICE officials have acknowledged to TDCJ. Ex. C ¶ 15. And the change in ICE policy is categorical. ICE is not making individualized, case-by-case determinations. *See* Ex. D ¶¶ 29, 36. Instead, ICE is treating the "enforcement priorities" as hard-and-fast limits on who to detain. *See id.*

The January 20 and February 18 Memoranda have radically reduced the number of "initial book-ins" resulting from ICE enforcement and removal operations. In FY2020, ICE was averaging about 10,000 initial book-ins per month, until the pandemic hit. *See* Ex. Q, Detention EOFY2020, ICE Initial Book-Ins by Arresting Agency and Month: EOFY2020. As ICE has previously explained, initial book-ins "began to decline sharply in April 2020, coinciding with changes resulting from the global pandemic." *See* Ex. N at 6. During the pandemic, ICE had between 5,000 and 7,000 initial book-ins per month. *See* Ex. Q, Detention EOFY2020, ICE Initial Book-Ins by

Arresting Agency and Month: EOFY2020. This level of activity continued in FY2021. From October 2020 through January 2021, ICE continued to have between 5,000 and 7,000 initial book-ins per month. *See* Ex. R, Detention FY21 YTD, ICE Initial Book-Ins by Arresting Agency and Month: FY2021 YTD.

But after the January 20 and February 18 Memoranda took effect, initial book-ins plummeted. Since then, ICE initial book-ins have numbered only about 2,000 per month. *See* Ex. R, Detention FY21 YTD, ICE Initial Book-Ins by Arresting Agency and Month: FY2021 YTD (February: 1,985; March: 2,343; Part of April: 914).

This dramatic decrease in federal detention leaves many criminal aliens free. In FY2020, "approximately 90% of those aliens arrested by ICE had criminal convictions and/or pending charges." Ex. S at 5. There is simply no way for ICE to so significantly reduce its initial book-ins without allowing many dangerous criminal aliens at large in American communities.

Defendants' failure to detain criminal aliens is imposing significant costs on Plaintiffs and their citizens. In some cases, Defendants' refusal to take custody of criminal aliens leads to those aliens being released into local communities. *See, e.g.*, Ex. C, Ex. 1 (showing TDCJ inmates released on particular dates). If a criminal alien has completed his sentence, state or local authorities may not have authority to detain him, even though Congress mandated that federal immigration authorities do so. But the issue is not limited to TDCJ. Defendants' implementation applies also to criminal aliens held by the United States, other States, and local governments.

Criminal aliens in Texas and Louisiana, no matter where they were originally held, impose significant costs on the States. Consider the costs of crime. Recidivism was a major concern animating Congress's decision to make detention mandatory. *See Demore*, 538 U.S. at 518–19. It remains a problem today. Among released prisoners, 68% are re-arrested within 3 years, 79%

within 6 years, and 83% within 9 years.[1] When the Tarrant County Sheriff's Office recently analyzed inmates with immigration detainers, it found a recidivism rate of 73.68%. Ex. E ¶ 8. "No matter how one looks at it, a significant portion of criminal aliens and state offenders 'historically' recidivate." *Texas*, 2021 WL 723856, at *16. Indeed, ICE itself acknowledges that detainers are useful for avoiding recidivism. *See* Ex. N at 17 ("The use of detainers . . . allows ICE ERO to assume custody of criminal aliens before they have an opportunity to reoffend."). And the problem is not limited by State borders. More than 15% of prisoners released in one State will be re-arrested in another State. *See* Ex. T at 4, Table 2.

That recidivism imposes significant costs on Texans, not only because of the irreparable harm resulting from criminal activity but also because of the significant financial cost of the criminal justice system. Texas spends large sums of money incarcerating criminal aliens. *See* Ex. F ¶ 6. In fact, Texas housed over 8,500 undocumented aliens in 2017–2018. *Id*. At a cost of $62.34 per alien per day, the cost to Texas's prison system totals about $150 million per year. *See id.* But the federal government reimburses only a fraction of that, less than 10% for 2017–2018. *See id.* ¶ 7. As one TDCJ official explained, "to the extent the number of aliens in TDCJ custody increases, TDCJ's unreimbursed expenses will increase as well." *Id.* ¶ 8. Similarly, States incur costs monitoring criminal aliens on probation or parole. *See* Ex. L ¶¶ 18–19.

As the Supreme Court mandated in *Plyler v. Doe*, Texas provides public education to children of illegal aliens. 457 U.S. 202, 230 (1982). The annual cost of educating unaccompanied alien children—a subset of illegal aliens eligible for public education—costs Texas tens of millions of dollars per year. *See* Ex. H ¶ 4 (estimating costs of $31.32 million (FY 2016), $63.13 million

---

[1] National Institute of Justice, Measuring Recidivism (Feb. 20, 2008), https://nij.ojp.gov/topics/articles/measuring-recidivism#statistics; *see also* Ex. T.

(FY 2017), $53.05 million (FY 2018), $42.73 million (FY 2019), $112.10 million (FY 2020) and $26.71 million (FY 2021)). The Associate Commissioner for School Finance/Chief School Finance Officer at the Texas Education Agency "anticipate[s] that the total costs to the State of providing public education to [unaccompanied alien children] will rise in the future to the extent that the number of [unaccompanied alien children] enrolled in the State's public school system increases." Ex. H ¶ 8.

In addition, Texas funds three healthcare programs that require significant expenditures to cover illegal aliens; the Emergency Medicaid Program, the Family Violence Program, and the Texas Children's Health Insurance Program. *See* Ex. G ¶ 9. Texas is required by federal law to include illegal aliens in its Emergency Medicaid Program. *See* 42 C.F.R. § 440.255(c). Between 2007 and 2019, Texas spent an estimated $62–$90 million annually on Medicaid services for illegal aliens, including an estimated $80 million dollars in SFY 2019. *See* Ex. G ¶ 9. Additionally, Texas spends over a million dollars per year providing services to illegal aliens though its Family Violence Program. Ex. G ¶ 10. Texas also spends millions of dollars per year on the Children's Health Insurance Program for perinatal coverage for illegal aliens, including an estimated $38 million dollars in 2013, and $6 million in 2019. *Id.* ¶ 11

Texas also incurs costs for uncompensated care provided by state public hospital districts to illegal aliens. Between 2006 and 2008, these estimated costs ranged from $597 million to $717 million. Ex. G ¶ 12. And these figures will only increase over time and with the reduction in detainer issuance. As the Chief Data and Analytics Officer at Texas's Health and Human Services Commission attested, "the total costs to the State of providing such services and benefits to undocumented immigrants will continue to reflect trends to the extent that the number of undocumented immigrants residing in Texas increases or decreases each year." Ex. G ¶ 13.

Louisiana also faces increased healthcare expenses. To take one dramatic example, ICE's refusal to take custody of a criminal alien has left him a ward of the State. *See* Ex. L ¶ 10.

But even when criminal aliens are not released into society, Defendants' refusal to detain them imposes serious costs on States. In some circumstances, Texas has to detain criminal aliens to protect the public because Defendants refuse to do so. For example, when a criminal alien is considered for parole in Texas, the existence of a detainer is a relevant consideration. After the Biden Administration rescinded detainer requests for certain criminal aliens set to be released on parole, the Texas Board of Pardons and Paroles considered those new circumstances, and for more than twenty criminal aliens, concluded that parole was no longer appropriate. *See* Ex. C, Ex. 1 ("Vote withdrawn by BPP"); Ex. C ¶ 8 (explaining the process). Keeping such criminal aliens in custody, as opposed to paroling them to allow for prompt removal from the United States, is financially costly for Texas taxpayers. *See* Ex. F. ¶ 6. But when the federal government fails to detain criminal aliens who need to be detained, Texas will incur those costs.

## SUMMARY OF THE ARGUMENT

Defendants are violating the law. The INA requires Defendants to take custody of various criminal aliens when they are released from criminal custody. "The Attorney General *shall* take into custody any alien who" "is deportable" or "is inadmissible by reason of having committed" specified offenses, including drug crimes and crimes of moral turpitude, "when the alien is released." 8 U.S.C. § 1226(c)(1) (emphasis added). The INA also provides that Defendants "*shall* detain" aliens with final orders of removal "[d]uring the removal period," which begins upon their release from criminal custody. 8 U.S.C. § 1231(a)(2) (emphasis added).

But Defendants have disregarded Congress's commands. Instead, they have implemented arbitrary and capricious memoranda designed to prevent compliance with their non-discretionary duties. What is more, Defendants issued these memoranda without going through the required

notice-and-comment process.

Nothing precludes this Court's review of Defendants' unlawful actions. Texas and Louisiana have standing because they face financial harm and because their citizens face an increased risk of crime from recidivist criminal aliens. The Memoranda are final agency action reviewable under the APA, but even if they were not, this Court would have the equitable authority to issue appropriate relief.

Plaintiffs' harms are irreparable, Defendants have no legitimate interest in enforcing unlawful memoranda, and the public interest requires enforcement of the INA and the APA. For these reasons, the Court should grant Plaintiffs' motion for a preliminary injunction. Plaintiffs respectfully request that Defendants be prohibited from implementing the January 20 and February 18 Memoranda and that they be compelled to take custody of criminal aliens covered by Sections 1226(c) and 1231(a)(2).

### ARGUMENT

## I.     The Memoranda Violate the Administrative Procedure Act

The January 20 Memorandum and the February 18 Memorandum violate the Administrative Procedure Act by: (1) violating a statutory command to take custody of dangerous criminal aliens; (2) violating a separate statutory command to take custody of aliens with final orders of removal, (3) failing to engage in reasoned decisionmaking; and (4) issuing a substantive rule without notice-and-comment rulemaking. Any one of these grounds is independently sufficient to set aside the unlawful agency actions.

### A.     Defendants' Failure to Detain Criminal Aliens Violates Section 1226(c)

Under the January 20 and February 18 Memoranda, Defendants reject a statutory requirement to take dangerous criminal aliens into custody. By releasing detainer requests (or simply never issuing them) for aliens convicted of serious crimes, Defendants are again violating

a non-discretionary duty. The INA requires Defendants to take certain criminal aliens into custody.

### 1. The INA Imposes a Non-Discretionary Duty to Detain Dangerous Criminal Aliens

In general, the INA gives the executive branch discretion regarding the detention of aliens. Section 1226(a) provides that "an alien *may* be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a) (emphasis added). If the executive branch detains an alien under Section 1226(a), it also "may release the alien" with few conditions. *Id.* § 1226(a)(2).

But the executive branch *must* detain aliens who have committed certain serious crimes. Section 1226(c) provides that "[t]he Attorney General *shall* take into custody any alien who" "is inadmissible" or "is inadmissible by reason of having committed" specified offenses "when the alien is released." 8 U.S.C. § 1226(c)(1) (emphasis added).[2] "[T]he Secretary's obligation to detain criminal aliens applies "as soon as covered aliens [are] released from criminal custody." *Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019).

And almost all such aliens must remain in custody. For criminal aliens detained under Section 1226(c), release is available "only if" (1) it is "necessary" for witness protection, (2) "the alien will not pose a danger to the safety of other persons or of property," and (3) the alien "is likely to appear for any scheduled proceeding." 8 U.S.C. § 1226(c)(2). As a result, Section 1226(c) "mandates detention of certain criminal aliens during the removal proceedings and for the subsequent 90-day removal period." *Zadvydas v. Davis*, 533 U.S. 678, 698 (2001).

Thus, Congress created a comprehensive scheme that—in some instances—explicitly limits executive discretion. While Section 1226(a) "gives the Secretary broad discretion as to" the

---

[2] Congress later transferred this obligation to the Secretary of Homeland Security. *See* 6 U.S.C. § 251; *Texas v. United States*, No. 6:21-cv-3, 2021 WL 723856, at *5 (S.D. Tex. Feb. 23, 2021).

detention of ordinary aliens, Section 1226(c)'s "job is to subtract some of that discretion when it comes to the arrest and release of criminal aliens." *Preap*, 139 S. Ct. at 966. "The Secretary *must* arrest those aliens guilty of a predicate offense." *Id.*; *see also Arizona v. United States*, 567 U.S. 387, 456–57 (2012) (Alito, J., concurring in part and dissenting in part) (describing Section 1226(c) as leaving "the Executive no discretion but to take the alien into custody" "[i]n many, if not most, cases involving aliens who are removable for having committed criminal offenses" ).

Courts routinely recognize this distinction. In *Jennings v. Rodriguez*, for example, the Supreme Court distinguished Section 1226(a)'s permissive "default rule" from Section 1226(c)'s mandatory requirements. 138 S. Ct. 830, 837–38 (2018). "Section 1226(a) creates a default rule for those aliens by permitting—but not requiring—the Attorney General to issue warrants for their arrest and detention pending removal proceedings." *Id.* at 846. Section 1226(c), by contrast, "mandates detention." *Id.* It "obligates the Attorney General to 'take into custody' certain aliens." *Id.* at 849. And then "together with § 1226(a), § 1226(c) makes clear that detention of aliens within its scope must continue 'pending a decision on whether the alien is to be removed from the United States.'" *Id.* at 846. Once that decision has been made, a criminal alien subject to a final order of removal remains in detention. *See* 8 U.S.C. § 1231(a)(2).

Similarly, the Fifth Circuit agrees that Section 1226(c) not only authorizes detention but "mandates that the Attorney General take into custody aliens who are deportable for having committed certain crimes." *Nyabwa v. Dep't of Homeland Sec. Immigration & Customs Enf't Field Office Dir.*, 537 F. App'x 451 (5th Cir. 2013) (per curiam). Section 1226(c)(1) "provid[es] that the Attorney General is *required* to take aliens who have committed felonies into custody." *United States v. Garcia-Rodriguez*, 640 F.3d 129, 133 (5th Cir. 2011) (per curiam) (emphasis added).

Indeed, the executive branch itself has previously recognized the mandatory nature of

1226(c). *See In re Joseph*, 22 I.&N. Dec. 799, 802 (BIA 1999) ("The statute prescribes mandatory detention for certain aliens, including those who are deportable by reason of having committed aggravated felonies."); Procedures for the Detention and Release of Criminal Aliens by the Immigration and Naturalization Service and for Custody Redeterminations by the Executive Office for Immigration Review, 63 Fed. Reg. 27,441-01, 27,442, 1998 WL 248023 (May 19, 1998) (noting "a clear intention that aliens removable from the United States on the basis of a crime be detained, except in very limited circumstances"); Brief for the Petitioners, *Reno v. Ma*, 2000 WL 1784982, at \*27–28 (U.S. Nov. 24, 2000) (characterizing Section 1226(c) as providing for "mandatory detention" and distinguished other provisions under which detention is "discretionary rather than mandatory").

Congress chose this approach because giving the executive branch more discretion had proven unwise. "[I]n adopting § 1226(c), Congress had before it evidence suggesting that permitting discretionary release of aliens pending their removal hearings would lead to large numbers of deportable criminal aliens skipping their hearings and remaining at large in the United States unlawfully." *Demore*, 538 U.S. at 528. And Congress considered previous criminal convictions "relevant to future dangerousness." *Id.* at 525 n.9 (citing *Zadvydas*, 533 U.S. at 714 (Kennedy, J., dissenting)). But prior executive officials had failed to properly detain such dangerous aliens. "Congress adopted [Section 1226(c)] against a backdrop of wholesale failure by the INS to deal with increasing rates of criminal activity by aliens." *Demore*, 538 U.S. at 517–18. Addressing this problem required making Section 1226(c) mandatory.

Whether to restrict executive discretion through Section 1226(c) was Congress's decision to make. "It is undisputed that Congress may mandate that the Executive Branch detain certain noncitizens during removal proceedings or before removal." *Preap*, 139 S. Ct. at 973 (Kavanaugh,

J., concurring). Defendants cannot alter Congress's command by memorandum.

> ## 2. Defendants Are Failing to Take Custody of Aliens Covered by Section 1226(c)

Contrary to Section 1226(c), Defendants are refusing to take custody of aliens convicted of serious crimes. The statute unequivocally requires detention of aliens who commit drug offenses or crimes of moral turpitude. Yet Defendants have rescinded detainer requests for many such aliens in TDCJ custody.

To begin, consider drug offenses. Section 1226(c)(1) refers to 8 U.S.C. § 1182(a)(2), which covers "any alien convicted of . . . a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance." *Id.* § 1182(a)(2)(A)(i)(II); *see also id.* § 1226(c)(1)(B) (citing *id.* § 1227(a)(2)(B)). Despite this, Defendants have refused to take custody of numerous drug offenders. *See supra* Background Part III; Ex. C ¶ 11.

Additionally, Section 1226(c) requires Defendants to detain aliens convicted of crimes of moral turpitude. Section 1226(c)(1) refers to 8 U.S.C. § 1182(a)(2), which covers "any alien convicted of . . . a crime involving moral turpitude (other than a purely political offense)." *Id.* § 1182(a)(2)(A)(i)(I); *see also id.* § 1226(c)(1)(B) (citing *id.* § 1227(a)(2)(A)).

"Crimes including dishonesty or lying as an essential element involve moral turpitude." *Omagah v. Ashcroft*, 288 F.3d 254, 260 (5th Cir. 2002); *see also Jordan v. De George*, 341 U.S. 223, 227 (1951) ("Without exception, federal and state courts have held that a crime in which fraud is an ingredient involves moral turpitude."). But Defendants have refused to take custody of aliens convicted of impersonating a public servant, fraudulent use or possession of identification, tampering with government records, forging governmental financial instruments, and tampering with physical evidence. *See* Ex. C, Ex. 1.

Evading arrest with a vehicle is a crime of moral turpitude. *See Pulido-Alatorre v. Holder*, 381 F. App'x 355, 358–59 (5th Cir. 2010) (per curiam) (upholding INS's determination that "intentional flight with a vehicle" is a crime involving moral turpitude because of the "conscious disregard of a substantial and unjustifiable risk"). But despite the clear requirement of Section 1226(c)(1), Defendants have not only failed to detain but also rescinded detainer requests for at least three aliens convicted of evading arrest by use of a vehicle. *See* Ex. C, Ex. 1.

The Fifth Circuit "agree[s] with the BIA's conclusion that the failure to stop and render aid after being involved in an automobile accident is the type of base behavior that reflects moral turpitude." *Garcia-Maldonado v. Gonzales*, 491 F.3d 284, 290 (5th Cir. 2007). Yet, Defendants have dropped a detainer request for an alien who did just that. *See* Ex. C, Ex. 1 ("accident involving death").

Similarly, "the crime of theft is one involving moral turpitude." *Okoro v. INS*, 125 F.3d 920, 926 (5th Cir. 1997). But Defendants rescinded a detainer request for an alien convicted of stealing property worth thousands of dollars. *See* Ex. C, Ex. 1 ("theft prop >=$2,500<$30k").

In light of this evidence, it is indisputable that Defendants are refusing to take custody of criminal aliens covered by Section 1226(c). And when Defendants do take custody of covered criminal aliens, they at least sometimes release those aliens, *see* Ex. L ¶¶ 13–15, despite the statutory prohibition on release, *see* 8 U.S.C. § 1226(c)(2).

### 3.    Defendants Are Violating the APA

Section 706 of the APA provides that "a reviewing court shall hold unlawful and set aside agency action . . . found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C). Because the January 20 and February 18 Memoranda violate the INA, they are substantively unlawful under the APA. *See, e.g.*, *Texas*, 2021 WL 723856, at *45.

Moreover, Defendants are unlawfully withholding or unreasonably delaying agency action. *See* 5 U.S.C. § 706(1). Taking custody of criminal aliens is "a *discrete* agency action that [Defendants are] *required* to take." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Because Section 1226(c) "clearly reins in the agency's discretion," Defendants' failure to follow it triggers Section 706(1). *Meina Xie v. Kerry*, 780 F.3d 405, 408 (D.C. Cir. 2015). Just as a federal court can compel an agency to comply with a "statutory command that the Secretary 'shall' act within 120 days," so can this Court compel Defendants to comply with the statutory command to take custody of criminal aliens. *Brock v. Pierce County*, 476 U.S. 253, 260 n.7 (1986).

### B.   Defendants' Failure to Detain Aliens with Final Orders of Removal Violates Section 1231(a)(2)

Under the January 20 and February 18 Memoranda, Defendants are also refusing to take aliens with final orders of removal into custody. *See* Ex. C ¶ 13. By rescinding detainer requests (or simply refraining from issuing them) for aliens with final orders of removal, Defendants are violating a non-discretionary duty imposed by statute.

Section 1231(a)(2) provides that Defendants "shall detain" aliens "[d]uring the removal period." 8 U.S.C. § 1231(a)(2). For aliens in criminal custody with final orders of removal that have not been stayed by a court, the removal period begins on "the date the alien is released from detention or confinement." 8 U.S.C. § 1231(a)(1)(B).

Thus, Defendants are obligated to detain aliens with final orders of removal when they are released from TDCJ custody. But instead of detaining criminal aliens with final orders of removal, Defendants have *rescinded* detainer requests for at least six such aliens in TDCJ custody since the February 18 Memorandum. *See* Ex. C ¶ 13.

There is no doubt that this statutory duty is non-discretionary. In *Zadvydas*, the Supreme Court explained that "[a]fter entry of a final removal order and during the 90-day removal

period, . . . aliens *must* be held in custody." 533 U.S. at 683 (citing 8 U.S.C. § 1231(a)(2)) (emphasis added). This Court has previously recognized that Section 1231(a)(2) is mandatory and that Defendants do not have discretion to decline detention. *See Texas*, 2021 WL 723856, at *36 (rejecting as "unavailing" federal defendants' argument against "reading 'shall' as mandatory in the first sentence" of Section 1231(a)(2)). Nor does the INA allow Defendants to delay detention. "[T]he statute by its own language mandates immediate detention." *Lin v. United States*, 5:07-cv-26, 2007 WL 951618, at *3 (S.D. Tex. Mar. 28, 2007) (citing 8 U.S.C. § 1231(a)(2)).

Other courts agree that Section 1231(a)(2) is mandatory. *See, e.g.*, *Martinez v. Larose*, 968 F.3d 555, 560 (6th Cir. 2020) ("§ 1231(a)(2) provides for mandatory detention of the alien during the 90-day removal period."); *Rodney v. Mukasey*, 340 F. App'x 761, 764 (3d Cir. 2009) (explaining that "the Attorney General must detain" an alien "under Section 1231(a) and that such custody is "mandatory"); *Hernandez-Esquivel v. Castro*, No. 5:17-cv-564, 2018 WL 3097029, at *3 (W.D. Tex. June 22, 2018) ("Detention during the removal period here, in other words, is mandatory."); *Alafyouny v. Chertoff*, No. 3:06-cv-204, 2006 WL 1581959, at *9 (N.D. Tex. May 19, 2006) ("Section 1231(a)(2) . . . provides that the government has no discretion and must detain the alien without exception during the ninety-day removal period.").

Defendants' violation of Section 1231(a)(2) establishes a clear substantive violation of the APA. *See* 5 U.S.C. § 706(2)(A), (C). And Defendants' failure to take custody of aliens with final orders of removal represents "agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

### C.    The Memoranda Are Arbitrary and Capricious

The APA prohibits agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Federal administrative agencies are required to engage in reasoned decisionmaking. "Not only must an agency's decreed result be

within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998). "[W]hile the arbitrary and capricious standard of review is highly deferential, it is by no means a rubber stamp." *United States v. Garner*, 767 F.2d 104, 116 (5th Cir. 1985). This Court recently explained the standard for arbitrary-and-capricious review in *Texas*, 2021 WL 723856, at *40.

Defendants' Memoranda are arbitrary for multiple reasons. First, the Memoranda failed to consider the risks of recidivism among criminal aliens who are not detained. Recidivism was a major concern animating Congress's decision to make detention mandatory, and criminal aliens pose serious recidivism problems. *See Demore*, 538 U.S. at 518–19. And ICE itself agrees that detainers are central to avoiding recidivism. *See* Ex. N at 17 ("The use of detainers . . . allows ICE ERO to assume custody of criminal aliens before they have an opportunity to reoffend.").

Second, the Memoranda ignore the effects non-detention will have on future removal efforts. Congress found these considerations important enough to justify enacting statutes like Section 1226(c), but Defendants have unjustifiably disregarded them. As the Supreme Court noted in *Demore*, "[p]rior to the enactment of § 1226(c), when the vast majority of deportable criminal aliens were not detained during their deportation proceedings, many filed frivolous appeals in order to delay their deportation." 538 U.S. at 530 n.14. Failing to detain criminal aliens will increase the number of "frivolous appeals" designed "to delay . . . deportation." *Id.* But the Memoranda provide no justification for incurring such costs.

Similarly, when Defendants release aliens into the United States, those aliens often abscond. *See Texas*, 2021 WL 723856, at *19. ICE operates an "Alternatives to Detention" program "for a small subset of eligible aliens" who "must be thoroughly vetted" to determine whether they are "likely to comply with the terms of the program." Ex. O at 11. But even with all

of those safeguards in place, the "absconder rate" was 26.9% for family units and 12.3% for individuals in 2019. *Id.* The absconder rate was even worse in 2020: 39% for family units and 21% for individuals. Ex. N at 12. For criminal aliens, absconding is even more likely. *See* Ex. D ¶ 37.

Third, the Memoranda do not discuss the costs that they will impose on States. The Supreme Court has recognized that States "bear[] many of the consequences of unlawful immigration" and that "[t]he problems posed to the State by illegal immigration must not be underestimated." *Arizona v. United States*, 567 U.S. 387, 397, 398 (2012). Failing to discuss the impact on States is particularly egregious because DHS has previously acknowledged that Texas and Louisiana are "directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement." Ex. J § II; Ex. K § II. As discussed above, in this case, the costs to Texas and Louisiana are substantial. *See supra* Background Part III; *see also infra* Argument Parts IV.A, V.

Defendants have a "clear and obvious responsibility to consider the relevant factors," which in this case include "Texas's [and Louisiana's] expenses and costs stemming from" their policies. *Texas*, 2021 WL 723856, at *42. Failing to consider important aspects of a problem renders that policy arbitrary and capricious. *See Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015) ("[A]gency action is lawful only if it rests 'on a consideration of the relevant factors.'").

Perhaps because the Memoranda did not consider any of the issues listed above, they also did not consider more limited policies that would have retained congressionally mandated detention of criminal aliens and aliens with final orders of removal. The Supreme Court recently held that a DHS immigration action was arbitrary and capricious because it was issued "'without any consideration whatsoever' of a [more limited] policy." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1912 (2020) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.*

*State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983)). Here, the Memoranda "show[] no cognizance of this possibility." *Id.* at 1912 n.6.

Finally, what explanation the Memoranda do provide cannot justify the policies chosen. The February 18 Memorandum explains the prioritization of aliens who have committed "aggravated felonies" as "track[ing] Congress's prioritization of aggravated felonies for immigration enforcement actions." Ex. B at 4 n.6. But that does not explain Defendants' choices. Although Congress prioritized aggravated felonies by mandating detention of aliens who have committed such crimes, *see* 8 U.S.C. § 1226(c)(1)(B) (citing 8 U.S.C. § 1227(a)(2)(A)(iii)), it did the same for drug offenses and crimes of moral turpitude, *see id.* § 1226(c)(1)(A) (citing *id.* § 1182(a)(2)(A)(i)), as well as aliens with final orders of removal, *see id.* § 1231(a)(2).

The very reason the February 18 Memorandum provides for prioritizing aggravated felonies also supports prioritizing drug offenses, crimes of moral turpitude, and final orders of removal. But without explanation, ICE excluded latter categories from its list of priorities and effectively prohibited detention of those aliens. "Illogic and internal inconsistency are characteristic of arbitrary and unreasonable agency action." *Chamber of Commerce v. Dep't of Labor*, 885 F.3d 360, 382 (5th Cir. 2018). ICE's priorities are "paradoxical" in a way that "signals arbitrary and capricious agency action." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1016 (5th Cir. 2019). And it provided no "'reasoned analysis' to justify the disparate treatment of regulated parties that seem similarly situated." *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018).

### D.     The Memoranda Are Procedurally Invalid

If Defendants wanted to issue the challenged memoranda, they were required to do so through notice-and-comment rulemaking. *See* 5 U.S.C. § 553(b), (c). Because they did not, the Memoranda should be "held unlawful and set aside" as issued "without observance of procedure required by law." *Id.* § 706(2)(D).

The January 20 and February 18 Memoranda are subject to notice-and-comment rulemaking because they are substantive or legislative rules. The APA exempts "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice" from notice-and-comment procedures, *id.* § 553(b)(A), but those exceptions "must be narrowly construed." *Texas*, 809 F.3d at 171.

Interpreting the exceptions narrowly "protects the vital interests notice and comment is intended to protect." *Texas*, 2021 WL 723856, at *43. "[N]otice and comment ensures those affected by a proposed rule have a voice in the rule-making process and assists the agency in crafting rules that better account for the costs and benefits of agency action." *Id.* "[S]tates like Texas offer a unique perspective on illegal immigration issues that, if voiced through notice and comment, can assist an agency in rules addressing these issues." *Id.* But Defendants dispensed with notice-and-comment procedures altogether, and Texas and Louisiana were unable to offer their perspectives.

As this Court has noted, "[a]gencies have never been able to avoid notice and comment simply by mislabeling their substantive pronouncements." *Texas*, 2021 WL 723856, at *44 (quoting *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019)). "On the contrary, courts have long looked to the contents of the agency's action, not the agency's self-serving label, when deciding whether statutory notice and comment demands apply." *Id.* Courts must be "mindful but suspicious of the agency's own characterization." *Texas*, 809 F.3d at 171.

Substantive rules are those that (1) impose rights and obligations, and (2) do not leave the agency and its decisionmakers free to exercise discretion. *See id.*; *Texas*, 2021 WL 723856, at *44. "These factors are not treated like different elements of a cause of action, both of which must be proved; but instead a 'matter of judgment is involved in distinguishing between rules however

discretionary in form, that effectively circumscribe administrative choice.'" *Texas v. United States*, 328 F. Supp. 3d 662, 731 (S.D. Tex. 2018) (citing *Am. Bus Ass'n v. United States,* 627 F.2d 525, 530 (D.C. Cir. 1980)).

"[W]herever an agency's decisionmakers are stripped of the ability to make 'individualized' determinations for each case, it is doubtful that the policy in question is a 'general statement.'" *Texas*, 2021 WL 723856, at *46 (quoting *Prof'ls & Patients for Customized Care v. Shalala,* 56 F.3d 592, 596–97 (5th Cir. 1995)). In this case, the January 20 and February 18 Memoranda strip federal officers of the ability to make individualized determinations. The February 18 Memorandum claims to establish mere "presumptions," but in practice, the multi-step review process required to overcome the presumptions makes them irrebuttable. *See* Ex. D ¶¶ 35–36. That is why ICE has suddenly started disregarding statutory commands it previously followed. Ex. C ¶¶ 14–15.

Moreover, even if the Memoranda left federal officers with meaningful discretion, they would still affect rights and obligations. By purporting to transform a non-discretionary statutory duty to take custody of criminal aliens into a discretionary choice, the Memoranda has substantive legal consequences. Failing to detain criminal aliens makes removal less likely, *see Demore*, 538 U.S. at 518, and any policy that "alleviates [] individuals of any 'risk of deportation'" has "a legal consequence." *Texas*, 2021 WL 723856, at *45.

The Memoranda also are not "rule[s] of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(3)(A). The Memoranda are substantive under the substantial impact test for three reasons. First, they "significantly impact[]" criminal aliens who would otherwise be detained. *Texas*, 2021 WL 723856, at *47. Second, they "impact[] DHS's statutory obligation to" detain

criminal aliens. *Id.* Third, they have "a significant impact on the States in which [criminal aliens] reside." *Id.*

The January 20 and February 18 Memoranda are also substantive because they impose more than "derivative, incidental, or mechanical burdens" and because they "change[] the substantive standards by which" Defendants decide whether to enforce the immigration laws. *Id.* at *48 (internal quotation marks omitted).

## II.    Violating Federal Statutes Is Not Taking Care that the Laws Are Faithfully Executed

The President and those who work for him in the Executive Branch are obligated to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. The Memoranda violate that constitutional obligation.

As explained above, the Memoranda contradict 8 U.S.C. § 1226(c) and 8 U.S.C. § 1231(a)(2). Preventing officers from following statutory mandates, by definition, falls short of faithfully executing the laws. It is true that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Dalton v. Specter* 511 U.S. 462, 473 (1994). But while "[t]he *Dalton* Court made clear that not every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution, [it] by no means found that action in excess of statutory authority can *never* violate the Constitution or give rise to a constitutional claim." *Make the Rd. N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 258 (S.D.N.Y. 2020) (quoting *Sierra Club v. Trump*, 929 F.3d 670, 696 (9th Cir. 2019)) (other internal citations and quotation marks omitted). Where a claim is not "that the President simply did not fully comply with a congressionally prescribed process, . . . [but is] that the President's actions affirmatively displaced a congressionally mandate[], [it implicates] constitutional separation of powers concerns not present in *Dalton*, [and] are thus appropriately considered as constitutional claims subject to judicial review." *Make the Rd. N.Y.*, 475 U.S. at 258–59. Plaintiffs' claim here

is that the Memoranda constitute a wholesale repudiation of Congress's commands in the INA.

Of course, the Court can address Defendants' violation of these statutory provisions under the APA, as discussed above. *See supra* Part I.A–B. And a violation of the Constitution is also a violation of the APA—indeed, the Take Care Clause provides an independent basis that the Memorandum is contrary to law. *See* 5 U.S.C. § 706. But even if the APA did not provide a cause of action in this case, Texas's constitutional claim under the Take Care Clause would independently present the same merits question.

Federal courts have long exercised the power to enjoin federal officers from violating the Constitution. *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327–28 (2015) (discussing "a long history of judicial review of illegal executive action, tracing back to England"). Plaintiffs have a cause of action "at equity." *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 475 (5th Cir. 2020) (en banc). "Equity thus provides the basis for relief—the cause of action, so to speak"—when a plaintiff seeks prospective relief for a constitutional violation committed by a federal official. *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1232 (10th Cir. 2005) (McConnell, J.). As a result, even if the Court concluded that the APA did not provide an avenue for review, it would not affect Plaintiffs' right to relief on their constitutional claim. *See Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) (explaining that the APA's reviewability limitation in Section 701 "serves only to take away what the APA has otherwise given—namely, the APA's own guarantee of judicial review"—"not repeal the review of ultra vires actions that was recognized long before" the APA); *Simmat*, 413 F.3d at 1233 n.9 (allowing the plaintiff's constitutional claim to proceed even though he "appear[ed] to concede that his claim does not satisfy the APA's requirement of 'final agency action'").

## III.    The Memoranda Violate the Agreements

The January 20 and February 18 Memoranda are also invalid because they did not go

through the notice-and-consultation procedures required by Agreements that DHS negotiated and signed with Texas and Louisiana.

Recognizing the importance of cooperation between federal and state agencies, DHS has signed immigration-related agreements with multiple States, including Texas and Louisiana. *See* Ex. J (the "Texas Agreement"); Ex. K (the "Louisiana Agreement") (collectively, the "Agreements"). The Agreements establish a binding and enforceable commitment. *See* Ex. J § II; Ex. K § II.

Generally, the Agreements provide that "Texas [and Louisiana] will provide information and assistance to help DHS perform its border security, legal immigration, immigration enforcement, and national security missions in exchange for DHS's commitment to consult Texas [and Louisiana] and consider [their] views before taking" certain administrative actions. Ex. J § II; *see* Ex. K § II. DHS must "[c]onsult with Texas [and Louisiana] before taking any action or making any decision that could reduce immigration enforcement" or "increase the number of removable or inadmissible aliens in the United States." Ex. J § III.A.2; *see* Ex. K § III.A.2. That "includes policies, practices, or procedures which have as their purpose or effect . . . decreasing the number of or criteria for detention of removable or inadmissible aliens from the country." Ex. J § III.A.2.d; *see* Ex. K § III.A.2.d.

To enable this consultation process, the Agreements require DHS to "[p]rovide Texas [and Louisiana] with 180 days' written notice . . . of any proposed action" subject to the consultation requirement. Ex. J § III.A.3; *see* Ex. K § III.A.3. That gives the States "an opportunity to consult and comment on the proposed action." *Id*. After they submits their views, "DHS will in good faith consider Texas's [and Louisiana's] input and provide a detailed written explanation of the reasoning behind any decision to reject Texas's [or Louisiana's] input before taking any action"

covered by the Agreements. *Id.*

But DHS did not comply with these requirements before promulgating either the January 20 Memorandum or the February 18 Memorandum. How to redress DHS's breach is addressed in the Agreements themselves. "Any [aggrieved] party shall . . . be entitled (in addition to any other remedy to which it may be entitled in law or in equity) to injunctive relief, including specific performance, to enforce such obligations, and if any action should be brought in equity to enforce any of the provisions of [these] Agreement[s]." Ex. J § VI; *see* Ex. K § VI.

To be sure, DHS purported to terminate the Texas Agreement "effective immediately" by letter on February 2, 2021, Ex. M, but DHS's letter did not comply with the provision of the agreement governing termination. A party must "provid[e] 180 days' notice of intent to terminate," so "[t]he termination will be effective 180 days after the written termination request was submitted." Ex. J § XV. As a result, the Texas Agreement remains binding until August 1, 2021. In any event, DHS has not attempted to terminate the Louisiana Agreement.

## IV.    No Procedural Issue Prevents This Court's Review

Defendants cannot avoid this Court's review.

### A.    Texas and Louisiana Have Standing

Defendants' violations of federal law concretely injure Texas and Louisiana. *See supra* Background Part III. The shift represented by the January 20 and February 18 Memoranda will increase the number of criminal aliens imposing costs on the States (as opposed to in federal custody or removed from the United States). *See* Exs. F, G, H, L. This increase in the number of criminal aliens will injure Plaintiffs, including in ways that this Court has already recognized.

This Court has previously held that "Texas incurs real financial costs in detaining criminal aliens" and that "the harm is imminent because Texas is currently operating a detention system that holds criminal aliens and has demonstrated plans to continue doing so in the future." *Texas*,

2021 WL 723856, at *12. The same is true for Louisiana. *See* Ex. L ¶¶ 3, 7.

This Court has also recognized Texas's standing based on the costs of providing a federally mandated education to illegal aliens. "Texas incurs real financial costs in providing public education to unaccompanied children. And the harm is imminent because Texas is currently providing public education to unaccompanied children and demonstrates plans to continue doing so in the future." *Texas*, 2021 WL 723856, at *12; *see* Ex. H ¶ 8. When Defendants fail to take custody of juvenile aliens set to be released by the Texas Juvenile Justice Department, those aliens who have not yet graduated attend Texas public schools. *See* Ex. I ¶¶ 7–8.

Texas is also financially injured through its funding of other public benefits and services, including healthcare. *See* Ex. G ¶ 13. For FY2019, Texas spent roughly $80 million from the Emergency Medicaid program, $1 million from the Family Violence Program, and $6 million from the Children's Health Insurance Program on illegal aliens. *See id.* ¶¶ 9–11. For this case, the Texas Health and Human Services Commission has provided more recent estimates and a more fulsome explanation for those estimates than was provided in *Texas*, 2021 WL 723856, at *13. *See* Ex. G ¶ 10, Ex. 2. HHSC's estimates are reliable (and indeed relied upon by the Texas Legislature, *see id.* ¶ 5), but even if they were significantly off, it would not affect Texas's standing. As long as Texas spends *some* money, it has established an injury in fact. "For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017).

Finally, the increase in criminal activity attributable to Defendants' failure to detain criminal aliens is an injury in fact. The Supreme Court has recognized that "deportable criminal aliens who remained in the United States often committed more crimes before being removed." *Demore*, 538 U.S. at 518; *see also Zadvydas*, 533 U.S. at 713 (Kennedy, J., dissenting) (discussing

"statistical studies showing high recidivism rates for released aliens"). Indeed, that is why Congress mandated their detention. *See Demore*, 538 U.S. at 525 n.9 (noting that Congress considered previous criminal convictions "relevant to future dangerousness"). This injures Texas and Louisiana not only because of increased law-enforcement and detention costs but also as *parens patriae*. Each State has a quasi-sovereign interest "in the well-being of its populace." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 602 (1982). That includes an interest in protecting its citizens "well-being—both physical and economic"—from crime caused by Defendants' failure to detain criminal aliens. *Id.* at 607. Because Texas and Louisiana are "asserting rights under federal law rather than attempting to protect [teir] citizens from the operation of federal statutes," they can bring *parens patriae* claims against federal defendants. *Texas*, 328 F. Supp. 3d at 697; *see also Texas v. United States*, 86 F. Supp. 3d 591, 625–26 (S.D. Tex. 2015), *aff'd*, 809 F.3d 134 (5th Cir. 2015).

In any event, "[e]ven if [the States] could not carry [their] burden under the regular standing inquiry," they are "entitled to special solicitude and thus can easily satisfy the standing elements." *Texas*, 2021 WL 723856, at *20. Texas and Louisiana are "owed special solicitude" because they "assert[] a congressionally bestowed procedural right and the government action at issue affects [their] 'quasi-sovereign' interests." *Id.* (citing *Massachusetts v. EPA*, 549 U.S. 497, 519–20 (2007)); *see also Texas*, 809 F.3d at 152–55.

## B.    The Memoranda Are Final Agency Action

"Under the APA, an aggrieved party may file suit in a federal district court to obtain review of any final agency action for which there is no other adequate remedy in a court." *Nat'l Ass'n of Mfrs. v. Dep't of Defense*, 138 S.Ct. 617, 626 (2018) (citing 5 U.S.C. § 704). To be final, "[f]irst, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. Second, the action must be one by which rights or

obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016) (citing *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

The January 20 and February 18 Memoranda satisfy both conditions. First, they are the consummation of Defendants' decisionmaking process because they have already gone into effect. *See* Ex. B ("effective immediately"); Ex. A ("shall go into effect on February 1, 2021"); *Texas*, 2021 WL 723856, at *32. Second, they purport to alter not only Defendants' legal obligation to detain certain aliens but also those aliens' rights. *See Texas*, 2021 WL 723856, at *32. For example, Defendants now provide a two-layer "case review process" that allows aliens to request "a detention case review" to determine whether "their case does not align with ICE's enforcement, detention, and removal priorities." Ex. P.

## C.    The Memoranda Are Reviewable

The Memoranda and Defendants' failure to take custody of criminal aliens are reviewable under the APA. *See* 5 U.S.C. § 701(a). "[T]here is a 'well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action,' and [courts] will accordingly find an intent to preclude such review only if presented with 'clear and convincing evidence.'" *Texas v. United States*, 809 F.3d 134, 163 (5th Cir. 2015) (quoting *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 63–64 (1993)). Accordingly, Defendants bear a "heavy burden." *Id.* Raising "substantial doubt" about reviewability is not enough to overcome "the general presumption favoring judicial review of administrative action." *Id.*

No "statutes preclude judicial review" under 5 U.S.C. § 701(a)(1). In previous cases, Defendants have relied on 8 U.S.C. § 1252(g), but that provision does not apply because this case is not brought "by or on behalf of any alien." 8 U.S.C. § 1252(g); *see Texas*, 2021 WL 247877, at *3. Nor does this case "aris[e] from" a "decision or action . . . to commence proceedings,

31

adjudicate cases, or execute removal orders against any alien." 8 U.S.C. § 1252(g). On the contrary, it arises from Defendants' failure to take custody of criminal aliens.

Nor does Section 1226(e) bar this suit. First, that "limitation applies only to 'discretionary' decisions about the 'application' of § 1226 to particular cases." *Preap*, 139 S. Ct. at 962 (plurality op.). Section 1226(e) "does not block lawsuits over 'the extent of the Government's detention authority under the "statutory framework" as a whole.'" *Id.* (quoting *Jennings*, 138 S. Ct. at 841); *see also Demore*, 538 U.S. at 516–17; *Oyelude v. Chertoff*, 125 F. App'x 543, 546 (5th Cir. 2005). Here, Plaintiffs challenge Defendants' claimed authority to decline detention of covered criminal aliens. "Because the extent of the Government's detention authority is not a matter of 'discretionary judgment,' 'action,' or 'decision,'" this case "falls outside of the scope of § 1226(e)." *Jennings*, 138 S. Ct. at 841. Second, this case is not about "the detention . . . of any alien." 8 U.S.C. § 1226(e). It is about unlawful policies regarding the detention of aliens generally. *See Preap*, 139 S. Ct. at 962 (contrasting "the 'application' of § 1226 to particular cases" with "the general extent of the Government's authority under § 1226(c)"). In any event, even if Section 1226(e) did apply, it would bar only claims under Section 1226, not Plaintiffs' other claims.

Refusing to comply with non-discretionary statutory duties is not "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). "[T]he Executive—and thus, the Attorney General or the Secretary of DHS—must exercise any discretion accorded it by statute *in the manner which Congress has prescribed*." *Texas*, 2021 WL 723856, at *38. "Congress did not set agencies free to disregard legislative direction in the statutory scheme that the agency administers." *Heckler v. Chaney*, 470 U.S. 821, 833 (1985).

All of Plaintiffs' claims are reviewable for the reasons explained above. But even if Section 701(a)(2) barred certain claims, it would not preclude the Court from considering Counts IV (based

on a lack of notice-and-comment rulemaking), V (based on the Agreements), and VI (based on the Take Care Clause). Plaintiffs' claims based on the Agreements and the Constitution are properly before the Court even without the APA, so Section 701 is not an obstacle. And Plaintiffs' argument that Defendants were "required to abide by the familiar notice-and-comment rulemaking provisions of the APA" presents a procedural claim "quite apart from the matter of substantive reviewability." *Lincoln v. Vigil*, 508 U.S. 182, 195 (1993) (considering whether the agency should have used notice-and-comment rulemaking after holding that the substance of the agency's decision was discretionary and unreviewable).

## V.  Texas and Louisiana Will Suffer Irreparable Harm Absent an Injunction

Texas and Louisiana face irreparable injuries. "To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986). Instead, "[t]he plaintiff need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Id.* (footnote omitted).

### A.  Plaintiffs Will Incur Financial Costs They Cannot Recover

Defendants are forcing Texas and Louisiana to expend additional resources on criminal aliens, as explained above. *See supra* Part IV.A. That injury is irreparable because Texas and Louisiana cannot recover those costs from the federal government. *See Texas*, 2021 WL 723856, at *48 ("[N]o Party has suggested that Texas could recover any of its likely financial injury here, and the Court cannot conceive of any path for Texas to pierce the federal government's usual sovereign immunity or contrive a remedial cause of action sufficient to recover from its budgetary harm."); *Texas*, 328 F. Supp. 3d at 737 (explaining that the State's financial injury was irreparable because "there is no source of recompense").

### B.     Increased Criminal Activity Is an Irreparable Injury

In addition, the increased criminal activity caused by Defendants' unlawful actions will be irreparable. Violations of state law are irreparable injuries to the State's sovereign interest in "creat[ing] and enforc[ing] a legal code." *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 601. That is why "the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018). Criminal activity also causes irreparable harm to the well-being of Texas and Louisiana citizens.

### C.     DHS Admits Texas and Louisiana Face Irreparable Injury

DHS has already acknowledged that policies like those in the January 20 and February 18 Memoranda cause Texas and Louisiana significant harm. "Texas, like other States, is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement. Such changes can impact Texas's law enforcement, housing, education, employment, commerce, and healthcare needs and budgets." Ex. J § II. DHS admitted the same was true for Louisiana. Ex. K § II.

Indeed, DHS has specifically admitted that "a decrease or pause on apprehensions or administrative arrests" would "result in concrete injuries to Texas." Ex. J § II(3). Again, the same is true for Louisiana. *See* Ex. K § II(3).

Texas and Louisiana face particular harm because the rushed implementation of the January 20 and February 18 Memoranda deprived them of the ability to adjusting their policies in light of the federal shift. As DHS itself has acknowledged, "[t]he harm to Texas is particularly acute where its budget has been set months or years in advance and it has no time to adjust its budget to respond to DHS policy changes." Ex. J § II; *see also* Ex. K § II (same for Louisiana).

## VI.     An Injunction Would Not Harm Defendants or the Public

Defendants face no harm from a preliminary injunction. They have no legitimate interest

in the implementation of unlawful memoranda. *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."); *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (recognizing that government officials "do[] not have an interest in the enforcement of an unconstitutional law"). But even if Defendants had a legitimate interest in the Memoranda, they face no substantial prejudice from a delayed implementation. DHS has already recognized that any costs from delaying new policies is outweighed by the benefits of consultation and more reasoned decisionmaking. *See* Ex. J § II; Ex. K § II.

Further, the public interest strongly favors Plaintiffs. "'[T]he public is served when the law is followed,' and the public will indeed be served if DHS is enjoined from suspending the law." *Texas*, 2021 WL 723856, at *51 (quoting *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013)). And "[t]he public interest is 'always' served by the execution of removal orders." *Id.* (quoting *Nken v. Holder*, 556 U.S. 418, 436 (2009)).

## VII.    The Injunction Should Apply Nationwide

The injunction should govern Defendants' conduct nationwide, not just in Texas and Louisiana. As this Court held in an earlier case, nationwide relief is appropriate because "the Fifth Circuit's precedent in this area is applicable and controlling." *Texas*, 2021 WL 723856, at * 53; *see also Texas*, 2021 WL 247877, at *7–8. A geographically limited injunction would be improper because federal immigration law must be uniform. *See Texas*, 809 F.3d at 187–88. It would also be "ineffective because [aliens] would be free to move among states." *Id.* at 188. According to the Census Bureau, more than 50,000 noncitizens moved into Texas from another U.S. State in 2019. *See* Ex. U (showing almost 3 million noncitizens residing in Texas and that 1.8% of them moved from another State within the last year). This is in keeping with a previous analysis by the Texas

State Demographer finding that "domestic migration accounts for almost 40 percent of the growth in the State's foreign-born population." Ex. V at 1; *see also* Ex. W (showing net migration to Texas from other States).

CONCLUSION

The State of Texas and the State of Louisiana respectfully request that the Court preliminarily enjoin Defendants from implementing the January 20 and February 18 Memoranda.

Date: April 27, 2021                      Respectfully submitted.

KEN PAXTON                          */s/Patrick K. Sweeten*
Attorney General of Texas            PATRICK K. SWEETEN
                                     Deputy Attorney General for Special Litigation
BRENT WEBSTER                        *Attorney-in-Charge*
First Assistant Attorney General     Texas Bar No. 00798537
                                     Southern District of Texas Bar No. 1829509
JUDD E. STONE II
Solicitor General                    WILLIAM T. THOMPSON
                                     Deputy Chief, Special Litigation Unit
                                     Texas Bar No. 24088531
                                     Southern District of Texas Bar No. 3053077

                                     RYAN D. WALTERS
                                     Special Counsel, Special Litigation Unit
                                     Texas Bar No. 24105085
                                     Southern District of Texas Bar No. 3369185

                                     OFFICE OF THE ATTORNEY GENERAL
                                     SPECIAL LITIGATION UNIT
                                     P.O. Box 12548 (MC-009)
                                     Austin, Texas 78711-2548
                                     Tel.: (512) 936-1414
                                     Fax: (512) 936-0545
                                     patrick.sweeten@oag.texas.gov
                                     will.thompson@oag.texas.gov
                                     ryan.walters@oag.texas.gov

                                     **COUNSEL FOR PLAINTIFF STATE OF TEXAS**

JEFF LANDRY
LOUISIANA ATTORNEY GENERAL

*/s/Elizabeth B. Murrill*
ELIZABETH B. MURRILL
Solicitor General
JOSEPH S. ST. JOHN
Deputy Solicitor General

LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third St.
Baton Rouge, LA 70804
(225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

**COUNSEL FOR PLAINTIFF STATE OF LOUISIANA**

## CERTIFICATE OF WORD COUNT

I certify that the total number of words in Plaintiff's Motion for Preliminary Injunction, exclusive of those sections designated for omission, is 11,331 as registered by Microsoft Word.

*/s/Patrick K. Sweeten*
PATRICK K. SWEETEN

## CERTIFICATE OF CONFERENCE

I certify that on April 26, 2021, I conferred with counsel for Defendants, who represented that Defendants are opposed to this motion.

*/s/Patrick K. Sweeten*
PATRICK K. SWEETEN

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on April 27, 2021, which automatically serves all counsel of record who are registered to receive notices in this case. I further certify that I served the individuals listed below via electronic mail on April 27, 2021.

Adam Kirschner
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
Washington, D.C. 20530
Adam.Kirschner@usdoj.gov

Daniel D. Hu
Assistant United States Attorney
Chief, Civil Division
Southern District of Texas
1000 Louisiana, Suite 2300
Houston, TX 77002
E-mail: Daniel.Hu@usdoj.gov

Brian C. Rosen-Shaud
Trial Attorney
United States Department of Justice
Email: Brian.C.Rosen-Shaud@usdoj.gov

Kuntal Cholera
Trial Attorney
United States Department of Justice
Email: Kuntal.Cholera@usdoj.gov

/s/Patrick K. Sweeten
PATRICK K. SWEETEN