IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS; STATE OF LOUISIANA | : | No. 6:21-cv-16 |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| The UNITED STATES OF AMERICA, ET. AL. | : | |
| | : | |
| Defendants | : | |

AMICUS BRIEF OF ADVOCATES FOR VICTIMS OF ILLEGAL ALIEN CRIME
IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Lorraine G. Woodwark
Attorneys United for Secure America
25 Massachusetts Ave., NW,
Suite 335
Washington, DC 20001
Tel: 202-591-0962
Fax: 202-464-3590
Email: LWoodwark@IRLI.org

Walter S. Zimolong, Esquire
Southern District of Texas Bar
 No. 3633724
Zimolong, LLC
353 West Lancaster Avenue
Suite 300
Wayne, PA 19087
Tel: 215-665-0842
Email: wally@zimolonglaw.com

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ……….................................................................................. iii-iv

INTRODUCTION..............................................................................................................1

ARGUMENT.....................................................................................................................2

    I.    ILLEGAL ALIEN CRIME HAS A DELETERIOUS EFFECT ON OUR NA-TION'S PUBLIC SAFETY AND HEALTH WITHIN THE STATES……...…................................................................................................2

    II.    THE EXECUTIVE IS IGNORING THE CLEAR CONGRESSIONAL MANDATE OF A STATUTE DESIGNED TO COMBAT ILLEGAL ALIEN CRIME………………………………………………………………………… 6

CONCLUSION.................................................................................................................13

i

# TABLE OF AUTHORITIES

**Cases**

*Arizona v. United States*, 567 U.S. 387 (2012) ............................................................. 2

*City of Arlington v. FCC*, 569 U.S. 290 (2013) .............................................................. 9

*Demore v. Hyung Joon Kim*, 538 U.S. 510 (2003) .................................................... 2, 12

*Douglas v. Mukasey*, 2008 WL 3889737 (M.D. Fla. Aug. 20, 2008) ............................ 11

*Fiallo v. Bell*, 430 U.S. 787, 792 (1977) .......................................................................... 6

*Galvan v. Press*, 347 U.S. 522, 530-31 (1954) ............................................................... 6

*Gjergji v. Johnson*, 2016 WL 3645116 (M.D. Fla. May 19, 2016), report and recommendation adopted in part, 2016 WL 3552718 (M.D. Fla. June 30, 2016) .. 11

*Hosh v. Lucero*, 680 F.3d 375 (4th Cir. 2012) .............................................................. 10

*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013) ......................................................... 10

*Lincoln v. Vigil*, 508 U.S. 182 (1993) ............................................................................ 10

*Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001) ................................................................. 10

*Me. Cnty. Health Options v. United States*, 140 S. Ct. 1308 (2020) ............................. 8

*Nyquist v. Mauclet*, 432 U.S. 1, 10 (1977) ..................................................................... 2

*Sylvain v. AG of the United States*, 714 F.3d 150 (3d Cir. 2013) ....................... 1, 7, 10

*Texas v. United States*, 2021 WL 723856 (S.D. Tex. Feb. 23, 2021) .......................... 9

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018) ...................................................................... 9

**Statutes**

8 U.S.C. §1101 ................................................................................................................. 7

8 U.S.C. §1103(a)(3) ........................................................................................................ 9

8 U.S.C. §1182(f) ............................................................................................................. 9

8 U.S.C. §1226(c) .................................................................................................. 1, 7, 8

8 U.S.C.A § 1101(a)(43) ............................................................................................. 12

Section 1226(c) ................................................................................................... 10, 11

## Other Authorities

Dep't Hom. Sec., January 20, 2021 Memorandum ..................................................... 12

Department of Justice, *Immigration, Citizenship, and the Federal Justice System*, 1998-2018 (2021)..............................................................................................................2

Immigration and Customs Enforcement Annotated Reporter (2020) ...........................................................................................................................................4

## MISCELLANEOUS

Jack Martin & Eric Ruark, Federation for American Immigration Reform, The Fiscal Burden of Illegal Immigration on Unites States Taxpayers, (Feb. 2011) ...................................................................................................................................6

Kris W. Kobach, Reinforcing the Rule of Law: What States Can and Should Do to Reduce Illegal Immigration, 22 Geo. Immigr. L.J. 459, 462 (2008)..............................................................................................................................4

John Binder, *Three-Time Deported Illegal Alien Accused of Stabbing Attack in Florida,* Breitbart.com (March 11, 2021) ......................................................... 4

Vinny Vella, *A would be car thief tried to kill a police officer who stopped him, Montgomery County DA says,* Philadelphia Inquirer, (Mar. 11, 2021) …………………………………………………………………………………………..4

Joshua Rhett Miller, *Man in devil mask allegedly killed girlfriend and sister, wore innards around neck*, N.Y. Post (October 28, 2020)……………………………………..5

Bob Price, *Twice-Deported Honduran Charged With Sexual Assault of Pre-Teen Girl*, Brietbart.com (September 19, 2020)……………………………………………………5

# INTRODUCTION

Congress has issued the Department of Homeland Security (DHS) a clear mandate that it detain criminal aliens, and the executive cannot ignore this mandate based on a policy disagreement. Yet, in both Executive Order 13993—a revision of Civil Immigration Enforcement Policies—and a DHS memorandum dated January 20, 2021, in which the agency purports to exercise discretion whether to detain criminal aliens, the executive has done just that, placing its own policy preferences over the law of the land.

Texas and Louisiana rely on the federal government for a critical law enforcement role: enforcement of our nation's immigration laws. One law enforcement role provided by the federal government is the detention of criminal aliens pending deportation as required by Section 1226(c) of the Immigration and Naturalization Act (INA). 8 U.S.C. §1226(c). That section was added by Congress in 1996 to combat rising illegal alien crime and "to keep dangerous aliens off the streets." *Sylvain v. AG of the United States*, 714 F.3d 150, 159 (3d Cir. 2013). In Section 1226(c), Congress *mandates* that a criminal alien shall be detained. Section 1226(c) divested DHS' predecessor, INS, of any discretion over which aliens to detain or which to detain and release on bond. That discretion existed before Section 1226(c) was added to the INA and Congress found that that discretion was one of the primary factors for increasing rates of illegal alien crime. *Demore v. Hyung Joon Kim*, 538 U.S. 510, 518-519 (2003). Due to the Executive Branch's outright violation of Congress' federal immigration law mandates, the Court should grant the plaintiff's motion.

ARGUMENT

I.  ILLEGAL ALIEN CRIME HAS A DELETERIOUS EFFECT ON OUR NATION'S PUBLIC SAFETY AND HEALTH WITHIN THE STATES.

Illegal alien crime has a deleterious effect on our nation's public safety and public health. Texas and Louisiana, like all states, depend on the federal government to ameliorate these impacts because the states cannot do it themselves. *See Arizona v. United States*, 567 U.S. 387 (2012). When ICE and DHS are making arrests, they are performing a core law enforcement function on which the states rely. If the federal government abandons its duties, states cannot not step in to fill the void. *Nyquist v. Mauclet*, 432 U.S. 1, 10 (1977) ("Control over immigration and naturalization is entrusted exclusively to the Federal Government, and a State has no power to interfere").

In 2020, ICE arrested 103,603 illegal aliens, *approximately 90% of whom had prior criminal convictions or pending criminal charges*. ICE ANN. REP. (2020)[1]. Those arrested included 4,067 known or suspected gang members, including 675 members of MS-13.

The Texas Department of Public Safety keeps statistics on the impact of illegal alien crime specific to Texas.  Using DHS' own statistics, the Department of Public Safety found that 300,000 illegal aliens, **who DHS had previously identified as being in the country illegally**, committed crimes, including major felonies, in the State of

---

[1] https://www.ice.gov/doclib/news/library/reports/annualreport/iceReportFY2020.pdf

2

Texas between June 1, 2011 to January 31, 2021. According to the Texas Department of Public Safety:

> "According to DHS status indicators, over 334,000 criminal aliens have been booked into local Texas jails between June 1, 2011 and January 31, 2021, of which over 228,000 were classified as illegal aliens by DHS. [b]etween June 1, 2011 and January 31, 2021, these 228,000 illegal aliens were charged with more than 368,000 criminal offenses which included arrests for 681 homicide charges; 42,698 assault charges; 6,950 burglary charges; 45,557 drug charges; 590 kidnapping charges; 18,662 theft charges; 28,892 obstructing police charges; 2,050 robbery charges; 4,505 sexual assault charges; 5,651 sexual offense charges; and 3,871 weapon charges."

Texas Criminal Illegal Alien Crime Data, https://www.dps.texas.gov/section/crime-records-service/texas-criminal-illegal-alien-data.

In Louisiana, According to U.S. Customs and Border Protection, just within the first few months of 2021, the rate of crime by noncitizens has almost tripled. After 2016, the number of crimes committed by illegal aliens steadily declined. After, January 20, 2021, the crime rate sharply increased.

While these statistics are staggering enough, they likely underreport the true number of crimes illegal aliens commit in Texas each year and the true count is likely much higher. The Department of Public Safety's statistics count only those illegal aliens that "had an encounter with DHS that resulted in their fingerprints being entered into the DHS IDENT database." *Id.* As the report notes, "[f]oreign nationals who enter the country illegally and avoid detection by DHS, but are later arrested by local or state law enforcement for a state offense will not have a DHS response in

3

regard to their lawful status and do not appear in these counts." *Id*. The statistics also only count state level offense committed by illegal aliens not federal crimes.

Moreover, the most recent study on the topic indicates approximately 90 percent of MS-13 gang members in the United States are illegal aliens.[2] And almost 17% of the federal prison population consists of non-US citizens.[3] In 2018, arrests of illegal aliens represented over two thirds of all federal arrests.[4]

What happens when our immigration laws are not enforced? On March 11, 2021, illegal alien Reynaldo Figueroa-Ardon, a Honduran national, got into an altercation with a Pennsylvania police officer who was trying to detain him for breaking into cars. He wrestled away the officer's firearm, held it to the officer's head, and pulled the trigger three times. Luckily, there was no round in the chamber and the officer's life was spared.[5]

In another case on March 7, 2021, three-time deported illegal alien Obduliu Godines, a Mexican national, tried to kill his neighbor in Collier County, Florida, by stabbing him. Godines allegedly kicked open his neighbor's door and said, "I'm going to kill you" before lunging towards the man with a knife.[6]

In Louisiana, on October 20, 2020, Oscar Urias, 23, an illegal alien from El Salvador, killed his 31-year-old girlfriend, Elizabeth Tornabene, and her 15-year-old sister in a vicious

---

[2] Kris W. Kobach, Reinforcing the Rule of Law: What States Can and Should Do to Reduce Illegal Immigration, 22 Geo. Immigr. L.J. 459, 462 (2008)
[3] https://www.bop.gov/about/statistics/statistics_inmate_citizenship.jsp
[4] Department of Justice, *Immigration, Citizenship, and the Federal Justice System*, 1998-2018 (2021). https://www.bjs.gov/content/pub/pdf/icfjs9818.pdf
[5] https://www.inquirer.com/news/reynaldo-figueroa-ardon-attempted-murder-police-whitemarsh-township-20210311.html
[6] https://www.breitbart.com/politics/2021/03/11/three-time-deported-illegal-alien-accused-of-stabbing-attack-in-Florida/

4

onslaught. Urias then chased his brother and Tornabene's sister from the home, ultimately catching up to her inside a garage down the street where he fatally stabbed her — after a homeowner desperately tried to keep him outside as he tried to bust in, NOLA.com reported. The homeowner spotted Urias leaving his garage with parts of the girl's innards around his neck, with other remains later recovered from his driveway[7].

In September 2020, Jose Martinez-Lopez, a twice deported Honduran national, was arrested in Houston for allegedly sexually assaulting a 13-year-old girl. He reportedly tried to cut the girl's throat with a box cutter. He then locked the girl in a room and tried to set fire to it.[8]

These horrific crimes represent only a slice of the thousands of crimes illegal aliens commit each year. There is one thing these crimes have in common; they would not have happened if these individuals were not in the country illegally.

Then there is the fiscal toll of illegal alien crime. One study pegged the fiscal damage of illegal alien crime at over $8 billion, much of that sustained by the states[9]. That study indicated that Texas' share of that total was **over $8.8 billion**.

DHS's abdication of its duties will surely make these statistics increase and Texas will again be left picking up the pieces. The State of Texas and her citizens pay the price for these crimes in the form of the victim's emotional toll and the tax dollars

---

[7] https://nypost.com/2020/10/28/louisiana-man-killed-2-wounded-siblings-in-gruesome-machete-attack/

[8] https://www.breitbart.com/border/2020/09/16/twice-deported-honduran-charged-with-sexual-assault-of-pre-teen-girl/

[9] Jack Martin & Eric Ruark, Federation for American Immigration Reform, The Fiscal Burden of Illegal Immigration on United States Taxpayers, (Feb. 2011) https://www.fairus.org/sites/default/files/2017-08/USCostStudy_2010.pdf

spent processing the accused through the justice system and ultimately incarcerating them in Texas prisons.

>   II.   **THE EXECUTIVE IS IGNORING THE CLEAR CONGRESSIONAL MANDATE OF A STATUTE DESIGNED TO COMBAT ILLEGAL ALIEN CRIME.**

Congress enjoys almost exclusive authority to establish immigration policy. *Galvan v. Press*, 347 U.S. 522, 530-31 (1954) ("The power of Congress over the admission of aliens and their right to remain is necessarily very broad, touching as it does basic aspects of national sovereignty, more particularly our foreign relations and the national security."); *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) ("…over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens.").

Congress exercised that authority in 1996 and amended the Immigration and Naturalization Act, 8 U.S.C. §1101, et. seq., when it passed 8 U.S.C. §1226(c). That statute was designed primarily to do one thing and that is "to keep dangerous aliens off the streets." *Sylvain v. AG of the United States,* 714 F.3d 150, 159 (3d Cir. 2013). "Congress adopted this provision against a backdrop of wholesale failure by the INS to deal with increasing rates of criminal activity by aliens." *Demore at* 518. Therefore, Congress designed Section 1226(c) to serve an important public interest of combating criminal activity committed by illegal aliens.

Section 1226(c) is clear, unequivocal, and mandatory in that criminal aliens *shall be* detained. The text of 8 U.S.C. §1226(c) reflects Congress' intent in which DHS *shall* detain criminal aliens:

6

> **"(c) Detention of criminal aliens.**
> **(1)** Custody. The Attorney General shall take into custody any alien who—
> **(A)** is inadmissible by reason of having committed any offense covered in section 212(a)(2),
> **(B)** is deportable by reason of having committed any offense covered in section 237(a)(2)(A)(ii), (A)(iii), (B), (C), or (D),
> **(C)** is deportable under section 237(a)(2)(A)(i) on the basis of an offense for which the alien has been sentence [sentenced] to a term of imprisonment of at least 1 year, or
> **(D)** is inadmissible under section 212(a)(3)(B) or deportable under section 237(a)(4)(B), when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense."

8 U.S.C.A. § 1226(c)[10].

When Congress passed section 1226(c), it knew what it was facing, increasing illegal alien crime that INS was not combatting. When Section 1226(c) was passed, "Congress also had before it evidence that one of the major causes of the INS' failure to remove deportable criminal aliens was the agency's failure to detain those aliens during their deportation proceedings." *Demore*, 538 U.S. at 519. That evidence included illegal aliens being the fastest growing segment of the prison population, a failure of INS to locate criminal aliens, quick re-entry by deported aliens, and a 77% recidivism rate among aliens awaiting deportation.

Congress identified INS' failure to detain criminal aliens and the Attorney General's discretion to release criminal aliens from custody on bond pending their deportation hearings as causes of increased illegal alien crime. Therefore, Congress used the word "shall" for a reason: to make clear that detainment of criminal aliens

---

[10] The Attorney General's obligations have been transferred to DHS. 8 U.S.C. §1103(a)(1) ("The Secretary of Homeland Security shall be charged with the administration and enforcement of...all other laws relating to the immigration and naturalization of aliens. "*Clark v. Martin*, 543 U.S. 371, 375, n. 1; *Ulysse v. Dep't of Homeland Sec.*, 291 F. Supp. 2d 1318 (M.D. Fla. 2003)

7

was mandatory and remove any discretion of the Attorney General to refuse to detain criminal aliens. *Me. Cnty. Health Options v. United States*, 140 S. Ct. 1308 (2020) ("[T]he word 'shall' usually connotes a requirement.") It did not use the terms may, can, shall *not*, or the phrase "if the current administration's policy is in accord." Indeed, if it used those words or that phrase, it would not have achieved much of its policy goal; to keep illegal aliens off the streets. Nor would it have addressed the perceived cause of rising illegal alien crime; the discretion to detain aliens.

It is true that the executive enjoys a certain amount of discretion on issues of immigration and enforcement procedures. *See* 8 U.S.C. §1103(a)(3); 8 U.S.C. §1182(f); *Trump v. Hawaii*, 138 S. Ct. 2392, 2408 (2018) ("§ 1182(f) grants the President broad discretion to suspend the entry of aliens into the United States.") But that discretion, particularly as it relates to the INA, is not unbounded. The President and an executive agency cannot override express mandates in the INA. *Id.* at 2411; *Texas v. United States*, 6:21-CV-00003, 2021 WL 723856, at *37 (S.D. Tex. Feb. 23, 2021) ("Whatever 'inherent authority' the Executive may have in the area of immigration, that authority, along with the executive Power, does not include the authority to 'suspend' or 'dispense with' Congress's exercise of legislative Powers in enacting immigration laws.") (citations omitted).

It has long been the law that when the intent of Congress is clear on the face of a statute, an agency is divested of authority to issue rules in contravention of that statute. *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give

8

effect to the unambiguously expressed intent of Congress.") And "federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreements with Congress," *In re Aiken Cnty.,* 725 F.3d 255, 260 (D.C. Cir. 2013) nor are they "free simply to disregard statutory responsibilities" when Congress has circumscribed agency discretion. *Lincoln v. Vigil,* 508 U.S. 182, 193, (1993)

DHS is ignoring the clear text of the statute. Congress left no room for executive or agency discretion when it comes to detaining criminal aliens. Numerous circuit and district courts are in accord. In reviewing Section 1226(c) they have found its requirement regarding the detention of criminal aliens is *mandatory. Sylvain,* 714 F.3d at 159 ("Congress adopted the *mandatory-detention* statute against a backdrop of rising crime by deportable aliens."); *Hosh v. Lucero*, 680 F.3d 375, 377 (4th Cir. 2012) ("Title 8, United States Code, Section 1226(c) requires the *mandatory* federal detention, without the possibility of bond, of certain deportable criminal aliens 'when' those aliens are released from other custody."); *Mapp v. Reno*, 241 F.3d 221, 224 (2d Cir. 2001) ("Section 1226(c), provides for *mandatory detention* of criminal aliens such as Mapp."); *Douglas v. Mukasey*, 208-CV-272-FTM-99DNF, 2008 WL 3889737, at *2 (M.D. Fla. Aug. 20, 2008) ("The statue *requires* the Attorney General to take into custody and detain aliens with certain enumerated criminal convictions pending removal proceedings."); *Gjergji v. Johnson*, 3:15-CV-1217-J-34MCR, 2016 WL 3645116, at *2 (M.D. Fla. May 19, 2016), report and recommendation adopted in part, 3:15-CV-1217-J-34MCR, 2016 WL 3552718 (M.D. Fla. June 30, 2016).

Congress' command to DHS in Section 1226(c) is clear. So is its intent "to keep dangerous aliens off the streets." *Sylvain,* 714 F.3d at 159. That is not happening. DHS's January 20 memorandum simply ignores Congress's mandate in Section 1226(c) and places a virtual halt on all detentions of criminal aliens. Instead of detaining all criminal aliens and getting them "off the streets" as Congress intended, DHS is detaining only those illegal aliens (1) who are currently in jail, (2) who will be released after January 1, 2021, (3) who have committed an "aggravated felony,"[11] as that term is defined in the INA, *and* (4) who "are determined to pose a threat to public safety." Dep't Hom. Sec., January 20, 2021 Memorandum, 2. All other illegal alien criminals get a pass, including criminals released from jail after January 20, 2021 who have committed crimes other than "aggravated felonies." Even criminal aliens convicted of aggravated felonies would get a pass if it were "determined [they] pose [no] threat to public safety." DHS incorrectly describes detention under section 1226(c) as a "discretionary enforcement decision" *Id.* Congress expressly revoked any discretion to detain criminal aliens when it passed Section 1226(c). *Demore*, at 519. Neither the text of the statute nor the intent of Congress confers any discretion on DHS over which criminal aliens to detain and which to allow to roam free.

In sum, under the pretext of discretion, both the Executive Office and DHS are circumventing a Congressional mandate and exercising discretion that Congress has

---

[11] The INA, 8 U.S.C.A § 1101(a)(43), defines "aggravated felony" to include rape, murder, sexual abuse of a minor, drug trafficking, illegal firearms trafficking, money laundering, certain firearms offenses, a crime of violence punishable by a term of imprisonment more than a year, theft, burglary, ransom, child pornography, prostitution, espionage, fraud, counterfeiting a passport, perjury, bribery of a witness, and failure to appear before a court related to a felony charge.

not granted it. Accordingly, the Court should enjoin the Executive Office and DHS's unlawful actions.

For the foregoing reasons, the Court should grant the preliminary injunction.

## CONCLUSION

Based on the foregoing, amicus respectfully requests that the Court grant the State of Texas' and State of Louisiana's requested relief.

Dated: May 10, 2021

Respectfully submitted,

*/s/ Walter S. Zimolong, Esq.*
Walter S. Zimolong, Esquire
Southern District of Texas Bar No. 3633724
wally@zimolonglaw.com
353 West Lancaster Avenue, Suite 300
Wayne, PA 19087
(215) 665-0842

*/s/ Lorraine G. Woodwark, Esq.*
Lorraine G. Woodwark, Esquire
Attorneys United for a Secure America (AUSA)
25 Massachusetts Avenue NW, Ste 335
Washington, D.C. 20001
(202) 591-0962
LWoodwark@IRLI.org

*Counsel for Amicus Curiae,*
*Advocates for Victims of Illegal Alien*
*Crime (AVIAC).*

CERTIFICATE OF SERVICE

      I hereby certify the foregoing has been filed electronically and is available for viewing and downloading from the Electronic Case Filing System of the United States District Court for the Southern District of Texas.  I further hereby certify that, in accordance with Fed. R. Civ. P. 5, service has been made upon counsel of record via ECF.

Date:  May 10, 2021                                                    */s/ Walter S. Zimolong, Esquire*