**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | |
|---|---|
| _____ ) | |
| STATE OF TEXAS, STATE OF ) | |
| LOUISIANA ) | |
| ) | |
| Plaintiffs ) | |
| v. ) | No. 6:21-cv-00016 |
| ) | |
| UNITED STATES OF AMERICA, *et al.* ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

I.    Statutory framework. ............................................................................................. 2

II.   New guidance memoranda concerning immigration enforcement. ........................ 4

III.  Litigation history .................................................................................................... 6

ARGUMENT ................................................................................................................... 8

I.    Texas and Louisiana Cannot Establish Standing, Let Alone Irreparable Harm. ................ 8

II.   The States' APA Claims Lack Merit. ................................................................... 12

      *A.*    *The States cannot clear four threshold obstacles to their APA claims.* ............... 12

           1.    The challenged action is not "final agency action" subject to APA review. ...... 12

           2.    The challenged action is "committed to agency discretion by law." ................ 14

           3.    Congress has precluded judicial review of these types of decisions. ................ 16

                 *a.*    *APA challenges to DHS's application of enforcement priorities are precluded from review.* ............... 16

                 *b.*    *The States' § 1226(c) challenge is specifically precluded from review.* ..... 18

                 *c.*    *The States' § 1231(a)(2) challenge is likewise specifically precluded.* ..... 20

      *B.*    *The States' APA claims fail on the merits.* ............................................. 22

           1.    The Memoranda are not "contrary to law." ...................................... 22

                 *a.*    *Neither § 1226(c) nor § 1231(a)(2) impose a mandatory duty to detain any noncitizen.* ............... 22

                 *b.*    *The Memoranda do not violate § 1226(c).* ........................................ 26

                 *c.*    *The Memoranda do not violate § 1231(a)(2).* .................................... 27

           2.    DHS's Priority Framework is a reasonable effort to enact the new Administration's immigration priorities. ............................................. 28

           3.    DHS's and ICE's internal guidance on enforcement prioritization is exempt from notice and comment. ............................................................. 33

III.   The Purported Agreements are invalid, unenforceable, and cannot be the basis of relief....36

    A.   *The United States has not waived sovereign immunity for specific enforcement of contracts.*.................................................................................36

    B.   *Mr. Cuccinelli purported to enter into the purported agreements without proper authority.*..............................................................................38

        1.   DHS cannot contract away its sovereign discretion over immigration enforcement.................................................................................38

        2.   DHS lacked statutory authority to enter into the purported agreements.............38

IV.   Texas and Louisiana fail to state an independent claim under the Take Care Clause. ........ 39

V.   An injunction restraining core Article II authority outweighs any harm to the States and undermines the public interest. ............................................................ 41

VI.   Any relief ordered should be narrow. ............................................................... 43

    A.   *The States are not entitled to relief under 5 U.S.C. § 706(1).* ...........................43

    B.   *Any relief should be limited to enforcement actions in Texas and Louisiana.* ..... 45

CONCLUSION.................................................................................... 47

# TABLE OF AUTHORITIES

**Cases**

*Adefemi v. Gonzales*,

    228 F. App'x 415 (5th Cir. 2007) .................................................................. 28

*Aguilar v. ICE*,

    510 F.3d 1 (1st Cir. 2007) ........................................................................... 17

*Ala. Rural Fire Ins. Co. v. Naylor*,

    530 F.2d 1221 (5th Cir. 1976) ..................................................................... 37

*Ali v. Fed. Bureau of Prisons*,

    552 U.S. 214 (2008) ................................................................................... 20

*Amino Bros. Co. v. United States*,

    178 Ct. Cl. 515 (1967) ............................................................................... 38

*Arizona Dream Act Coal. v. Brewer*,

    855 F.3d 957 (9th Cir. 2017) ..................................................................... 26

*Arizona v. United States*,

    567 U.S. 387 (2012) ............................................................................ *passim*

*Armstrong v. Exceptional Child Center, Inc.*,

    575 U.S. 320 (2015) ................................................................................... 40

*Ayuda, Inc. v. Reno*,

    7 F.3d 246 (D.C. Cir. 1993) ....................................................................... 18

*Baker v. Carr*,

    369 U.S. 186 (1962) ................................................................................... 40

*Bennett v. Spear*,

    520 U.S. 154 (1997) ................................................................................... 12

*Biodiversity Assocs. v. Cables*,

    357 F.3d 1152 (10th Cir. 2004) .................................................................. 38

*Block v. Cmty. Nutrition Inst.*,

  467 U.S. 340 (1984)..................................................................................... 16, 18

*Bostock v. Clayton Cty.*,

  140 S. Ct. 1731 (2020).......................................................................................... 21

*Bowen v. Public Agencies Opposed to Social Security Entrapment*,

  477 U.S. 41 (1986)........................................................................................... 28, 38

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,

  419 U.S. 281 (1974).............................................................................................. 29

*Brogan v. United States*,

  522 U.S. 398 (1998).............................................................................................. 21

*CACI, Inc. v. Stone*,

  990 F.2d 1233 (Fed. Cir. 1993)............................................................................ 39

*Califano v. Yamasaki*,

  442 U.S. 682 (1979).............................................................................................. 43

*Campos v. INS*,

  62 F.3d 311 (9th Cir. 1995) ................................................................................. 20

*Commonwealth of Massachusetts v. Mellon*,

  262 U.S. 447 (1923).............................................................................................. 10

*Contributors to Pa. Hosp. v. City of Phila.*,

  245 U.S. 20 (1917)................................................................................................ 38

*Crane v. Johnson*,

  783 F.3d 244 (5th Cir. 2015) ......................................................................... 16, 23

*DaimlerChrysler Corp. v. Cuno*,

  547 U.S. 332 (2006).............................................................................................. 11

*Dalton v. Spencer*,

  511 U.S. 462 (1994)........................................................................................ 40, 41

*Davidson v. Glickman,*

169 F.3d 996 (5th Cir. 1999) ................................................................. 39

*Demore v. Kim,*

538 U.S. 510 (2003) ............................................................................. 19

*Dep't of Commerce v. New York,*

139 S. Ct. 2551 (2019) ......................................................................... 31

*Dep't of Homeland Sec. v. New York,*

140 S. Ct. 599 (2020) ........................................................................... 46

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*

140 S. Ct. 1891 (2020) ......................................................................... 32

*Digital Realty Tr., Inc. v. Somers,*

138 S. Ct. 767 (2018) ........................................................................... 21

*E. Bay Sanctuary Covenant v. Barr,*

934 F.3d 1026 (9th Cir. 2019) ............................................................. 46

*Energy Transfer Partners, L.P. v. FERC,*

567 F.3d 134 (5th Cir. 2009) ............................................................... 13

*Florida v. United States, et al.,*

No. 21-541, Slip Opinion, ECF No. 38, (M.D. Fl. May 18, 2021) ......................... 7, 11, 12, 14

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*

528 U.S. 167 (2000) ........................................................................... 9, 11

*FTC v. Standard Oil Co. of Cal.,*

449 U.S. 232 (1980) ............................................................................. 13

*Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. Dep't of Homeland Sec.,*

490 F.3d 940 (Fed. Cir. 2007) ............................................................. 37

*Gov't of Manitoba v. Bernhardt,*

923 F.3d 173 (D.C. Cir. 2019) ............................................................. 11

*Harris v. Wilters,*

    596 F.2d 678 (5th Cir. 1979) ................................................................. 44

*Heckler v. Chaney,*

    470 U.S. 821 (1985) ................................................... 15, 26, 29, 33

*Hernandez-Avalos v. INS,*

    50 F.3d 842 (10th Cir. 1995) ............................................................ 20

*Holmes v. United States,*

    657 F.3d 1303 (Fed. Cir. 2011) ........................................................ 37

*Hyde v. Selene Fin. LP,*

    No. 4:17-cv-993, 2017 WL 11552846 (N.D. Tex. Dec. 29, 2017) ............................................ 44

*J.E.F.M. v. Lynch,*

    837 F.3d 1026 (9th Cir. 2016) ......................................................... 17

*Jama v. ICE,*

    543 U.S. 335 (2005) .......................................................................... 28

*Jennings v. Rodriguez,*

    138 S. Ct. 830 (2018) ................................................................... 3, 19

*John Doe # 1 v. Veneman,*

    380 F.3d 807 (5th Cir. 2004) ........................................................... 43

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,*

    335 F.3d 357 (5th Cir. 2003) ............................................................. 8

*Knapp v. U.S. Dep't of Agric.,*

    796 F.3d 445 (5th Cir. 2015) ........................................................... 28

*Lane v. Pena,*

    518 U.S. 187 (1996) .......................................................................... 37

*Lexmark Int'l, Inv. v. Static Control Components, Inc.,*

    572 U.S. 118 (2014) .......................................................................... 22

vi

*Lincoln v. Vigil*,

    508 U.S. 182 (1993) .................................................................................. 14, 33

*Lopez v. Davis*,

    531 U.S. 230 (2001) ......................................................................................... 45

*Loughrin v. United States*,

    573 U.S. 351 (2014) ......................................................................................... 21

*Louisiana v. U.S. Army Corps of Eng'rs*,

    834 F.3d 574 (5th Cir. 2016) ........................................................................... 13

*Lujan v. Defs. of Wildlife*,

    504 U.S. 555 (1992) ........................................................................................... 9

*Lujan v. Nat'l Wildlife Fed'n*,

    497 U.S. 871 (1990) ..................................................................................... 8, 21

*Make the Rd. N.Y. v. Pompeo*,

    475 F. Supp. 3d 232 (S.D.N.Y. 2020) ............................................................. 40

*Marsh v. Or. Nat. Res. Council*,

    490 U.S. 360 (1989) ......................................................................................... 28

*Massachusetts v. EPA*,

    549 U.S. 497 (2007) ......................................................................................... 10

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,

    567 U.S. 209 (2012) ......................................................................................... 21

*Mendoza v. Perez*,

    754 F.3d 1002 (D.C. Cir. 2014) ....................................................................... 34

*Merrion v. Jicarilla Apache Tribe*,

    455 U.S. 130 (1982) ......................................................................................... 38

*Mississippi v. Johnson*,

    71 U.S. 475 (1866) ........................................................................................... 40

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,

    463 U.S. 29 (1983) ................................................................................ 32

*Munoz-Rivera v. Wilkinson*,

    986 F.3d 587 (5th Cir. 2021) .............................................................. 30

*N. Am.'s Bldg. Trades Unions v. Occupational Safety & Health Admin.*,

    878 F.3d 271 (D.C. Cir. 2017) ............................................................ 32

*Nat'l Shooting Sports Found., Inc. v. Jones*,

    716 F.3d 200 (D.C. Cir. 2013) ............................................................ 32

*Nielsen v. Preap*,

    139 S. Ct. 954 (2019) ................................................................. *passim*

*Niz-Chavez v. Garland*,

    141 S. Ct. 1474 (2021) ........................................................................ 18

*Norton v. S. Utah Wilderness*,

    *All.*, 542 U.S. 55 (2004) ............................................................... 44, 45

*O'Donnell v. Harris Cty.*,

    892 F.3d 147 (5th Cir. 2018) .............................................................. 43

*Omagah v. Ashcroft*,

    288 F.3d 254 (5th Cir. 2002) .............................................................. 30

*Perez v. Mortg. Bankers Ass'n*,

    575 U.S. 92 (2015) .............................................................................. 33

*Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*,

    324 F.3d 726 (D.C. Cir. 2003) ............................................................ 13

*Reno v. American-Arab Anti-Discrimination Comm. ("AADC")*,

    525 U.S. 471 (1999) .................................................................... *passim*

*Sanders v. United States*,

    252 F.3d 1329 (Fed. Cir. 2001) .......................................................... 37

*Santoyo v. United States*,

    No. 5:16-CV-855-OLG, 2017 WL 6033861 (W.D. Tex. Oct. 18, 2017) .......................... 44, 45

*Stone v. Mississippi*,

    101 U.S. 814 (1880) ................................................................................................... 39

*Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urban Dev.*,

    480 F.3d 1116 (Fed. Cir. 2007) ................................................................................ 37

*Summers v. Earth Island Inst.*,

    555 U.S. 488 (2009) ..................................................................................................... 8

*Texas v. United States*,

    106 F.3d 661 (5th Cir. 1997) .................................................................................... 41

*Texas v. United States*,

    809 F.3d 134 (5th Cir. 2015) .......................................................................... *passim*

*Texas v. United States*,

    328 F. Supp. 3d 662 (S.D. Tex. 2018) ..................................................................... 10

*Texas v. United States*,

    No. 6:21-cv-00003, 2021 WL 723856 (Feb. 23, 2021) ..................................... *passim*

*The Floyd Acceptances*,

    74 U.S. 666 (1868) ................................................................................................... 39

*Thompson v. N. Am. Stainless, LP*,

    562 U.S. 170 (2011) ................................................................................................. 21

*Town of Castle Rock v. Gonzales*,

    545 U.S. 748 (2005) ..................................................................................... 22, 23, 24

*Town of Chester, N.Y. v. Laroe Estates, Inc.*,

    137 S. Ct. 1645 (2017) ............................................................................................. 46

*Trump v. Hawaii*,

    138 S. Ct. 2393 (2018) ............................................................................................. 29

*Tucson Airport Auth. v. Gen. Dynamics Corp.*,

    136 F.3d 641 (9th Cir. 1998) ................................................ 37

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,

    136 S. Ct. 1807 (2016) ................................................ 12, 13

*U.S. Dep't of Labor v. Kast Metals Corp.*,

    744 F.2d 1145 (5th Cir.1984) ................................................ 36

*U.S. Telecom Ass'n v. F.C.C.*,

    359 F.3d 554 (D.C. Cir. 2004) ................................................ 39

*U.S. Trust Co. of N.Y. v. New Jersey*,

    431 U.S. 1 (1977) ................................................ 38, 39

*United States ex rel. Knauff v. Shaughnessy*,

    338 U.S. 537 (1950) ................................................ 4

*United States v. Fausto*,

    484 U.S. 439 (1988) ................................................ 16, 17

*United States v. Gonzalez*,

    520 U.S. 1 (1997) ................................................ 20

*United States v. Jones*,

    131 U.S. 1 (1889) ................................................ 37

*United States v. King*,

    395 U.S. 1 (1969) ................................................ 38

*United States v. Vasquez-Benitez*,

    919 F.3d 546 (D.C. Cir. 2019) ................................................ 15, 24, 28

*United States v. Winstar Corp.*,

    518 U.S. 839 (1996) ................................................ 37

*Valley v. Rapides Parish Sch. Bd.*,

    118 F.3d 1047 (5th Cir. 1997) ................................................ 41

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,

    435 U.S. 519 (1978) ............................................................................ 45

*Whitman v. Am. Trucking Ass'ns*,

    531 U.S. 457 (2001) ............................................................................ 39

*Whitmore v. Arkansas*,

    495 U.S. 149 (1990) .............................................................................. 8

*Winter v. Nat. Res. Def. Council, Inc.*,

    555 U.S. 7 (2008) .................................................................................. 8

*Zadvydas v. Davis*,

    533 U.S. 678 (2001) ................................................................... *passim*

*Zolicoffer v. U.S. Dep't of Justice*,

    315 F.3d 538 (5th Cir. 2003) ............................................................. 44

**Statutes**

5 U.S.C. § 553(b)(3)(A) ............................................................................ 33

5 U.S.C. § 553(b)(A) .......................................................................... 34, 36

5 U.S.C. § 701(a)(1) ................................................................................. 16

5 U.S.C. § 701(a)(2) ................................................................................. 14

5 U.S.C. § 702 .......................................................................................... 21

5 U.S.C. § 704 ................................................................................... 12, 37

5 U.S.C. § 706(1) ..................................................................................... 43

6 U.S.C. § 202(5) ......................................................................... 12, 16, 18

8 U.S.C. § 1101(a)(3) ............................................................................... 21

8 U.S.C. § 1103(a)(3) .................................................................... 15, 16, 21

8 U.S.C. § 1225(b)(1) ................................................................................. 2

8 U.S.C. § 1226 ..................................................................................... 3, 4

8 U.S.C. § 1226(c)(1) ................................................................................. 3

8 U.S.C. § 1226(c)(2)............................................................................................... 3

8 U.S.C. § 1226(e) .................................................................................................. 18

8 U.S.C. § 1229(a) ............................................................................................. 2, 18

8 U.S.C. § 1229a(a) ................................................................................................ 2

8 U.S.C. § 1229a(a)(2) ............................................................................................ 2

8 U.S.C. § 1231(a) .................................................................................................. 3

8 U.S.C. § 1231(a)(1)(B) ..................................................................................... 3, 27

8 U.S.C. § 1231(a)(1)(C) ........................................................................................ 3

8 U.S.C. § 1231(a)(2) .................................................................................... 3, 24, 25

8 U.S.C. § 1231(a)(3) ............................................................................................ 24

8 U.S.C. § 1231(h) ........................................................................................... 20, 22

8 U.S.C. § 1252 ..................................................................................................... 16

8 U.S.C. § 1252(a)(2)(A) ....................................................................................... 17

8 U.S.C. § 1252(a)(5) ....................................................................................... 2, 16

8 U.S.C. § 1252(b)(9) ............................................................................................ 17

8 U.S.C. § 1357(d) ................................................................................................. 44

28 U.S.C. § 1346(a)(2).......................................................................................... 37

**Regulations**

8 C.F.R. § 239.1 ..................................................................................................... 2

8 C.F.R. § 287.7(a)............................................................................................. 4, 44

8 C.F.R. § 1003.6(a) ............................................................................................... 2

8 C.F.R. § 1208.31(e) ............................................................................................. 2

8 C.F.R. § 1240.12 ................................................................................................. 2

8 C.F.R. § 1003.1(b) .............................................................................................. 2

*Continued Detention of Aliens Subject to Final Orders of Removal,*

    66 Fed. Reg. 56,967 (Nov. 14, 2001).............................................................. 27

Exec. Order No. 13,993, Revision of Civil Immigration Enforcement Policies and Priorities,

86 Fed. Reg. 7051 (Jan. 25, 2021) ............................................................................ 31

## INTRODUCTION

The Department of Homeland Security ("DHS"), like all Executive agencies, must operate with finite resources to accomplish its mission. In fulfilling its charge to enforce U.S. immigration laws, DHS cannot arrest, detain, and remove all noncitizens unlawfully present in or otherwise removable from the United States. Thus, during every Presidential Administration, and as directed by Congress, DHS invariably must determine how to prioritize its limited resources in furtherance of national security, border security, and public safety.

This case concerns the exercise of DHS's longstanding discretion over the enforcement of immigration laws. Soon after President Biden took office, DHS issued memoranda calling on immigration officials to focus their enforcement resources on those noncitizens who, in DHS's judgment, pose the greatest risk to the safety of the American public ("presumed priorities"). Importantly, although DHS instructed its officials to focus enforcement actions against presumed priorities, it authorized actions against other noncitizens who immigration officers judge to warrant use of ICE's limited resources ("other priorities").

Nevertheless, the States of Texas and Louisiana ("the States") bring suit and seek a preliminary injunction, arguing that DHS's enforcement priorities conflict with statutory provisions that, in their view, unconditionally require the arrest and detention of entire classes of noncitizens, regardless of individualized circumstances. In making this request, the States rely heavily on this Court's previous decision to enjoin DHS's pause on the execution of final orders of removal, but this Court explicitly found that its injunction in that case did not "enjoin[] DHS [] from refocusing its priorities." *See Texas v. United States*, No. 6:21-cv-00003, 2021 WL 723856, at *50 (Feb. 23, 2021). Here, Texas and Louisiana are asking this Court to do just that, but the text of the relevant statutory provisions, applicable case law, the nature of the challenged memoranda, and the realities of immigration enforcement—like all forms of law enforcement at every level of government—belie the States' claims. Further, the States' request to enjoin interim guidance that is designed, in part, to inform DHS's more permanent set of enforcement priorities would inopportunely short-circuit DHS's policymaking efforts.

1

At bottom, the States ask this Court to superintend the day-to-day operations of DHS. This Court should refuse that extraordinary request for a preliminary injunction against Executive priorities in the sensitive area of immigration law and national security and should not interfere with DHS's efforts to prioritize national security, border security, and public safety.

## BACKGROUND

### I.    Statutory framework.

The Immigration and Nationality Act ("INA") establishes the framework for arresting, detaining, and removing noncitizens who are unlawfully present or otherwise removable in the United States. A "principal feature of th[is] removal system is the broad discretion exercised by immigration officials." *Arizona v. United States*, 567 U.S. 387, 396 (2012).[1]

The removal process typically begins when DHS, in its discretion, initiates a removal proceeding against a noncitizen. *See* 8 U.S.C. § 1229(a); 8 C.F.R. § 239.1; *see also, e.g.*, 8 U.S.C. §§ 1225(b)(1); 1228(b); 1187(b)(2); 1231(a)(5); 8 C.F.R. § 1208.31(e) (instances of more limited proceedings in specific circumstances). DHS has discretion to choose which charges of removability to pursue, *see* 8 U.S.C. § 1229a(a)(2), and an immigration judge ultimately determines whether the alien is removable on those grounds, and if so, whether to enter an order of removal, *see* 8 U.S.C. § 1229a(a); 8 C.F.R. § 1240.12. A noncitizen subject to a removal order may file an appeal before the Board of Immigration Appeals ("BIA"), 8 C.F.R. §§ 1003.1(b), 1240.15, and the removal order is stayed pending the appeal, 8 C.F.R. § 1003.6(a). If the BIA dismisses the appeal, the noncitizen may then petition for review in a federal court of appeals, and request a further stay of removal pending review. 8 U.S.C. § 1252(a)(5). Once an order of removal is final, *see id.* § 1101(a)(47)(B), and absent a stay, the noncitizen is subject to removal, *see id.* §§ 1231(a)(1)(A), (a)(B)(ii). "At each stage" of this removal process, "the Executive has discretion to abandon the endeavor." *Reno v. American-Arab Anti-Discrimination Comm. ("AADC")*, 525 U.S. 471, 483 (1999).

---

[1] Internal quotation marks and citations are omitted throughout this brief, unless otherwise stated.

This case concerns 8 U.S.C. §§ 1226 and 1231. Section 1226 sets forth the framework for "arresting and detaining" noncitizens present in the United States once removal proceedings have commenced. *Jennings v. Rodriguez*, 138 S. Ct. 830, 837 (2018). Section 1226 "distinguishes between two different categories of aliens." *Id.* Section 1226(a) applies generally to all removable noncitizens and allows the government "to issue warrants for their arrest and detention pending removal proceedings." *Id.* at 846. Section 1226(c) specifically covers noncitizens "who fall[] into one of [several] enumerated categories involving criminal offenses and terrorist activities," *id.*, and notes that DHS "shall take" these noncitizens "into custody . . . when [they are] released" from criminal confinement. 8 U.S.C. § 1226(c)(1).[2] Importantly, § 1226(c) does not envision that covered noncitizens will always be arrested *immediately* following their release. *See Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019) (§ 1226(c)'s instruction that officials "shall act" upon the release of covered noncitizens is meant to "exhort [DHS] to act quickly," but does not preclude arrests "well after their release").

Once a removal order becomes final, § 1231(a) sets out DHS's detention authority. 8 U.S.C. § 1231(a). Section 1231 sets a "removal period" of 90 days that begins when the removal order becomes "administratively final," judicial review staying the removal concludes, or the noncitizen "is released from [criminal or non-immigration] detention or confinement," whichever comes later. *Id.* § (a)(1)(B)(i)-(iii). Section 1231(a)(2) authorizes detention during the removal period and mandates it for certain criminal aliens. *Id.* § 1231(a)(2). Congress, however, "doubt[ed]" that "all reasonably foreseeable removals could be accomplished" within the 90-day period, *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001), and so § 1231 permits—but does not require—detention and removal after the expiration of the removal period. *Id*.; *see* 8 U.S.C. §§ 1231(a)(1)(C), (a)(6). Generally, outside those authorities, the noncitizen may be released on an order of supervision. *Id*. § 1231(a)(3).

---

[2] This provision also states that DHS "may release [these] alien[s]" in circumstances not relevant here. 8 U.S.C. § 1226(c)(2). The States are not claiming that noncitizens apprehended under § 1226(c) are being released due to DHS's new guidance, and so § 1226(c)(2) is not implicated in this case.

To take custody of removable noncitizens, DHS may use a number of enforcement tools, including immigration detainers. Through a detainer, DHS notifies a State or locality that DHS intends to take custody of a removable noncitizen detained by the State or locality upon his or her release, and asks the State or locality to (1) notify DHS of the noncitizen's release date; and (2) hold the noncitizen for up to 48 hours, until DHS can take custody. *See* 8 C.F.R. § 287.7(a) (describing notification of release), (d) (describing temporary detention request); ICE Policy No. 10074.2: Issuance of Immigration Detainers by ICE Immigration Officers ¶ 2.7, *available at* https://www.ice.gov/sites/default/files/documents/Document/2017/10074-2.pdf (last visited May 17, 2021) ("ICE Policy No. 10074.2"). Since April 2, 2017, ICE detainers must now be accompanied by a signed administrative warrant of arrest issued under 8 U.S.C. §§ 1226 or 1231(a), and may be issued only to noncitizens arrested for criminal offenses and whom immigration officers have probable cause to believe are removable. *See* ICE Policy No. 10074.2 ¶¶ 2.4-2.6. The 2017 policy further provides that should ICE officers determine not to take custody of a noncitizen, the officers must immediately rescind the detainer. *Id.* ¶ 2.8.

## II.   New guidance memoranda concerning immigration enforcement.

On January 20, 2021, the then-Acting Secretary of Homeland Security issued a memorandum titled "Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities." *See* Ex. A (the "Pekoske Memo"). The Pekoske Memo made note of DHS's inherent resource limitations and the "significant operational challenges" it faces due to the COVID-19 pandemic, and, in light of these considerations, called upon DHS "components to conduct a review of policies and practices concerning immigration enforcement." *Id.* at 1. Consistent with longstanding historical practice, Acting Secretary Pekoske instructed DHS components to develop recommendations concerning, among other things, "policies for prioritizing the use of enforcement personnel, detention space, and removal assets" and "policies governing the exercise of prosecutorial discretion." *Id.* at 2.

The Pekoske Memo also adopted two interim measures. First, since DHS is subject to "limited resources," and "cannot respond to all immigration violations," the Pekoske Memo

identifies three broad "priority" groups of noncitizens that DHS components should focus on when rendering "a range" of "discretionary enforcement decisions, including deciding" whom to "arrest" and "detain." *Id.* These priority groups are:

1. **National security.** Individuals who have engaged in or are suspected of terrorism or espionage, or whose apprehension, arrest and/or custody is otherwise necessary to protect the national security of the United States.

2. **Border security.** Individuals apprehended at the border or ports of entry while attempting to unlawfully enter the United States on or after November 1, 2020, or who were not physically present in the United States before November 1, 2020.

3. **Public safety.** Individuals incarcerated within federal, state, and local prisons and jails released on or after the issuance of this memorandum who have been convicted of an "aggravated felony," as that term is defined in section 101(a) (43) of the [INA] at the time of conviction, and are determined to pose a threat to public safety.

*Id.* The Pekoske Memo clarified, however, that "nothing" therein "prohibits the apprehension or detention of" other noncitizens "who are *not* identified as priorities." *Id.* at 3 (emphasis added). It also calls on "the Acting Director" of U.S. Immigration and Customs Enforcement ("ICE") to "issue operational guidance on the implementation" of this priority framework. *Id.*

The Pekoske Memo also instituted a second interim measure for one-hundred days: a "pause on removals of any noncitizen with a final order of removal," subject to a few exceptions. *Id.* The Pekoske Memo explained that this removal pause would allow DHS to first review its policies and adopt modifications that may "ensure that [its limited] resources are directed to [DHS's] highest enforcement priorities." *Id.*

On February 18, 2021, ICE issued a memorandum to operationalize the enforcement priorities in the Pekoske Memo. *See* Ex. B (the "ICE Interim Guidance," and together with the Pekoske Memo, the "Memoranda"). The ICE Interim Guidance confirms that "ICE operates in an environment of limited resources," and "necessarily must prioritize" certain "enforcement and

removal actions over others" in order to "most effectively achieve [its] mission" of "national security, border security, and public safety." *Id.* at 2-3. The guidance then catalogues the three priority groups identified in the Pekoske Memo, and notes that, at ICE's request, DHS agreed to include "qualifying members of criminal gangs and transnational criminal organizations" in the list of priority groups. *Id.* at 1, 4-5 (hereinafter, the priority group provisions in the Memoranda will be referred to as the "Priority Framework").

Furthermore, the ICE Interim Guidance reiterates that the Priority Framework does not "prohibit the arrest, detention, or removal of *any* noncitizen." *Id.* at 3 (emphasis added). Enforcement actions against other priorities are permissible when justified by "all relevant facts and circumstances," including the nature of any prior criminal convictions and the agency's limited resources. *Id.* The guidance requires that ICE officials secure "preapproval" of "enforcement or removal actions" against other priority persons to ensure that resources are spent pursuing priority cases. *Id.* at 6. However, it acknowledges that, "[i]n some cases, exigent circumstances and the demands of public safety will make it impracticable to obtain preapproval." *Id.* Thus, in these circumstances, the ICE Interim Guidance allows agents to "conduct the enforcement action and then request approval . . . within 24 hours." *Id.* The guidance also includes a general catch-all provision allowing agents to submit "requests to exercise . . . individualized discretion" in certain cases, if it is "in the interest[] of law and justice." *Id.* Finally, the guidance clarifies that its provisions "will remain in effect" only until the agency institutes "new enforcement guidelines." *Id.* at 1.

## III.   Litigation history.

Shortly after January 20, 2021, Texas brought suit in this Court, asserting a number of claims against one aspect of the Pekoske Memo: the 100-day removal pause. *See Texas v. United States*, No. 21-cv-3, ECF No. 1 (S.D. Tex. Jan. 22, 2021). Texas sought both a temporary restraining order and a preliminary injunction against the removal pause, which the court granted on January 26, 2021, and February 23, 2021, respectively. *See Texas*, No. 21-cv-3, ECF Nos. 16, 85 (S.D. Tex. Jan. 22, 2021). The removal pause has since expired. *See* Dep't. of Homeland Sec.,

DHS Statement on the Expiration of 100-day Removal Pause, *available at* https://www.dhs.gov/news/2021/05/06/dhs-statement-expiration-100-day-removal-pause (last visited May 17, 2021).[3]

In addition, Florida, Arizona, and Montana have brought lawsuits challenging the removal pause and the Priority Framework. *Florida v. United States, et al.*, No. 21-541 (M.D. Fl. Mar. 8, 2021); *Arizona, et al. v. DHS, et al.*, No. 21-186. (D. Az. Feb. 3, 2021) (Arizona and Montana). Florida filed a motion for a preliminary injunction against the Priority Framework, which the court denied on the day of this filing. *See* Ex. G, *Florida v. United States, et al.*, No. 21-541, ECF No. 38 (M.D. Fl. May 18, 2021) ("Florida Slip Op."). Meanwhile, Arizona and Montana sought a preliminary injunction against the now-lapsed removal pause, which the Court denied as moot. However, the Court requested further briefing to the extent Arizona and Montana are challenging the Priority Framework. *Arizona, et al. v. DHS, et al.*, No. 21-186, ECF No. 46 (D. Az. Apr. 13, 2021). This challenge remains pending with oral argument scheduled for May 27, 2021. *Id*.

Here, Texas and Louisiana brought suit on April 6, 2021, challenging the Priorities Framework (Part B of the Pekoske Memo and the ICE Interim Guidance). *See* Compl., ECF No. 1. Three weeks later—and more than three months after issuance of the Pekoske Memo and two months after the issuance of the ICE Interim Guidance—Texas and Louisiana moved to preliminarily enjoin the Priority Framework. *See* Mot. for Prelim. Inj. ECF No. 18 ("PI Mot."). In their motion, the States assert claims under the APA and the Take Care Clause.

In addition, the States bring a claim for a breach of purported agreements, one between DHS and Texas, and the other between DHS and Louisiana. Twelve days prior to President Biden's inauguration, a subordinate political official in DHS signed these purported agreements. *See* Ex. J., ECF No. 19-10, Ex. K, ECF No. 19-11. They seek to give individual states oversight over nationwide immigration policy by DHS providing individual states 180 days' notice before "taking

---

[3] The May 6, 2021 statement also noted, "DHS is actively working on the final priority guidelines discussed in the January 20, 2021 memorandum." *See id*.

*any action* or making *any decision* that could reduce immigration enforcement, increase the number of removable or inadmissible aliens in the United States, or increase immigration benefits or eligibility for benefits for removable or inadmissible aliens." *See id.* (same for Louisiana). On February 2, 2021, DHS sent letters to both Texas and Louisiana, noting that these purported agreements are unenforceable and non-binding. *See* Ex. C, DHS Letter to Texas; Ex. d, DHS Letter to Louisiana.

## ARGUMENT

To obtain preliminary injunctive relief, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that a balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008). "[A] preliminary injunction is 'an extraordinary remedy' which should only be granted if the party seeking the injunction has 'clearly carried the burden of persuasion' on all four requirements." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003).

## I.   Texas and Louisiana Cannot Establish Standing, Let Alone Irreparable Harm.

Texas and Louisiana fail to establish that they suffer any injury-in-fact as a result of the Memoranda, much less irreparable harm. Further, given that DHS must inevitably prioritize certain enforcement actions over others in light of resources constraints, it is speculative that a favorable ruling would remedy the alleged injuries.

To establish standing to "seek injunctive relief, a plaintiff must show that" it "is under threat of suffering" an "actual and imminent" injury caused by "the challenged action," and that "a favorable judicial decision will prevent" that injury. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). The "threatened injury must be *certainly impending* to constitute injury in fact"; allegations of "possible future injury do not satisfy . . . Art. III." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (emphasis added). "[W]hen the plaintiff is not [itself] the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). Additionally, to

establish redressability, a plaintiff must show that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

Here, the States' injury theories all stem from their allegations that the Priority Framework will result in a net decrease in enforcement actions against noncitizens covered by §§ 1226(c) and 1231(a)(2), thus resulting in an increase in crime, and an increase in the use of public education and public health resources. *See* PI Mot. 28-30; 33-34. The States' theories pile one layer of speculation onto another, and thus fall short of establishing standing.

The States' principal theory is that the Memoranda will increase crime in their States, resulting in increased costs. But this theory relies on a speculative chain of events involving independent actions by third parties, and does not show that any injury is "*certainly* impending." First, even assuming that the Priority Framework will result in a drop in immigration enforcement actions, the States' theory hinges on the unsupported allegation that the noncitizens spared from enforcement actions due to the Memoranda will not only commit crimes but will commit crimes that require *more* resources than those who are apprehended as priorities under the Memoranda but who would not otherwise have been apprehended. *See id.* at 8-9. But it is possible that the Priority Framework—which exists to focus resources on those who, in DHS's judgment, pose the greatest risk to public safety—will result in a net reduction in crimes, and particularly a reduction in the more severe crimes that would impose additional costs on Texas and Louisiana.

To support their theory, the States rely on a handful of discrete anecdotes concerning certain noncitizens with criminal records who were spared from enforcement actions, allegedly due to the Priority Framework. *See id.* at 5-7. These anecdotes, however, say nothing of whether the Priority Framework will result in an *overall* increase in costs for Texas and Louisiana.[4]

---

[4] In *Texas v. United States*, the Fifth Circuit noted that a Court may consider "offsetting benefits that are of the same type and arise from the same transaction as the costs." 809 F.3d 134, 155 (5th Cir. 2015), as revised (Nov. 25, 2015). Here, the offsetting "benefits"—the apprehension, due to the Memoranda's prioritization scheme, of certain noncitizens likely to pose a threat to society—is "of the same type" as

Similarly, the States also, in passing, invoke a *parens patriae* theory, *see id.* at 30, but states cannot bring a *parens patriae* action against the federal government.[5] *See Commonwealth of Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923) ("[I]t is no part of" a State's "duty or power to enforce" its citizens' "rights in respect of their relations with the federal government. In that field it is the United States, and not the state, which represents them as *parens patriae*.").[6]

The States' injury theories regarding health care and education costs suffer from similar defects. *See* PI Mot. 9-10. Namely, they again rely on an unsupported assertion that those who will be spared from enforcement actions will choose to utilize public health care and education resources to a degree greater than those who would otherwise have remained in Texas and Louisiana and utilized their resources, but for the Memoranda. But the States make little attempt to show that the specific noncitizens who may be spared from enforcement actions will, for example, require medical care, be unable to finance this medical care, and specifically choose to rely on public health resources as a result—much less that those noncitizens will do so at a higher rate than the noncitizens who are removed as a result of the Memoranda.[7]

_____

Plaintiffs' alleged injury (the non-apprehension of other noncitizens who may commit crimes) and arise from the same event (the Memoranda).

[5] The States rely on a line of case law holding that *Mellon* does not prevent states from bringing suit to invoke their own rights. But those cases held only that states may sue when they are alleging injuries inflicted upon the states. For example, the States cite to *Texas v. United States*, 328 F. Supp. 3d 662, 691 (S.D. Tex. 2018), which in turn relied upon the Supreme Court's decision in *Massachusetts v. EPA*. In the latter, Massachusetts adequately alleged that the federal government's inaction would produce environmental consequences, "swallow[ing] Massachusetts' coastal land," and so Massachusetts "alleged a particularized injury in its capacity as a landowner." *Massachusetts v. EPA*, 549 U.S. 497, 520-22 (2007). Here, the States have not alleged an injury to a similar quasi-sovereign interest.

[6] Texas and Louisiana cannot rely on this Court's previous removal-pause decision, with which Defendants respectfully disagree, to support their standing theories. For example, in concluding that Texas had adequately established its crime-based injury, the Court noted that Texas's theory was "straightforward," since, due to the removal pause, "the aliens the government normally removes would remain," and "a significant portion of criminal aliens and state offenders 'historically' recidivate." *See* 2021 WL 723856, at *13, 16. But, here, the Priority Framework does not require that a specific, broad group—all otherwise-removable noncitizens—"remain" in Texas or Louisiana. To the contrary, this framework sets a priority scheme for enforcement, calling on ICE personnel to focus their resources on persons likely to pose the greatest threat to public safety.

[7] The States, citing again to *Massachusetts v. EPA*, argue that states are entitled to special solicitude in the standing analysis. But *Massachusetts* did not relieve states of their obligation to establish a cognizable

Finally, the States fail to show that their injuries would "likely" be redressed by a favorable decision. *Laidlaw*, 528 U.S. at 181.  At most, the States could secure an order enjoining certain portions of each Memorandum. *See infra* section VI.b. However, due to resource constraints, *every* Administration must prioritize certain enforcement actions over others; the only question is *how* it prioritizes. *See Arizona v. United States*, 567 U.S. 387, 396 (2012) ("A principal feature of the removal system is the broad discretion exercised by immigration officials. . . . Federal officials . . . must decide whether it makes sense to pursue removal at all" based on the "equities of an individual case."). The States make no attempt to show that, if the Court enjoins the Memoranda, the resulting prioritization scheme would result in a decrease in crime levels within their States, or the number of noncitizens who use health care or education resources at the States' expense. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006) (finding "redressability [that] requires speculat[ion]" is insufficient to support standing). Indeed, it is possible that the result of any injunction would be that relevant immigration personnel would be "left with only very general guidance—or no guidance at all—on the exercise of their discretion." *See* Ex. F, Declaration of Thomas Decker, Acting Assistant Director for Field Operations for Enforcement and Removal Operations (ERO) component of ICE, ¶ 12 (May 18, 2021). Thus, it is purely speculative that a favorable ruling would address any of the States' alleged injuries.[8]

Accordingly, none of the States' injury theories are sufficient to establish standing, much less an irreparable harm sufficient to justify the extraordinarily relief they seek here.

---

injury in fact. *See Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 182 (D.C. Cir. 2019) (noting that, in *Massachusetts v. EPA*, the State was "entitled to 'special solicitude' because" it had 'a quasi-sovereign interest in 'preserv[ing] its sovereign territory,'" but it still demonstrated "its own harm to establish an injury-in-fact."). Even in *Texas v. United States*, on which Plaintiffs rely, the Fifth Circuit found that Texas had shown that "DAPA would have a major effect on the states' fiscs." 809 F.3d at 152, as revised (Nov. 25, 2015).

[8] The court in Florida found that the State had established standing in that case, but it acknowledged that "[w]hether such injury is redressable by a favorable ruling [ ] is not as clear." *See* Florida Slip Op. at 18. Ultimately, it found redressability only as to "procedural rights." *Id.* Here, the only procedural right that the States could conceivably pursue is to notice and comment, but that claim fails for the same reason as why there is no final agency action, i.e. no rights or obligations flow from the Memoranda. *See infra* section II.b.3.

## II.  The States' APA Claims Lack Merit.

The States' APA claims are without merit. Fundamentally, the States challenge DHS's judgment in setting priorities for immigration enforcement. *See* Pekoske Memo at 2; ICE Interim Guidance at 4-5; *see also* 6 U.S.C. § 202(5) (authorizing the Secretary to set national immigration enforcement priorities). But, like a chief prosecutor's decision to prioritize bank robberies above pickpockets, such decisions are not subject to judicial review, are not required to undergo public comment, and are entitled to substantial deference.

### A.  The States cannot clear four threshold obstacles to their APA claims.

"Even the APA—potentially the most versatile tool available to an enterprising state— imposes a number of limitations." *Texas*, 809 F.3d at 161. Three limitations bar the States' APA claims in this case. First, the Priority Framework does not constitute "final agency action" because it does not determine rights or obligations, but rather structures internal agency procedures and priorities. 5 U.S.C. § 704. Second, enforcement prioritization is a matter committed to agency discretion by law. *Id.* § 701(a)(2). Third, Congress has set out a reticulated review scheme for immigration enforcement actions and has precluded review outside that structure. *Id.* § 701(a)(1).

### 1.  The challenged action is not "final agency action" subject to APA review.

Only "final agency action" is subject to judicial review under the APA. 5 U.S.C. § 704. Agency action is "final" under the APA only if it both is "the consummation of the agency's decisionmaking process" and also determines "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 178 (1997); *see also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016). But the Priority Framework does not determine or alter any individual noncitizen's rights or obligations, nor is it an action "from which legal consequences will flow," *Hawkes*, 136 S. Ct. at 1813. It is therefore not subject to judicial review under the APA. *See Florida* Slip Op. at 19-22.

The Priority Framework sets out procedures for and the manner in which ICE will take enforcement actions—some of which may result in later "final agency action" subject to review through the INA. It is only those later, final agency actions—*e.g.*, the issuance of a final order of removal—that "alter" a noncitizen's "legal rights or obligations" or create "legal consequences."

The framework does not itself change any person's legal status, confer any legal benefits, or have any "legal consequences." It is thus similar to the prosecutor's policy of focusing on bank robberies—such a policy of course does not make pickpocketing legal or allow a pickpocket to avoid prosecution. Indeed, both the Pekoske Memo and the ICE Interim Guidance expressly advise that they do not "create any right or benefit, substantive or procedural, enforceable at law." Pekoske Memo at 4; ICE Interim Guidance at 7.[9]

The Memoranda at issue here are thus unlike the agency action at issue in *Hawkes*. There, the agency's "jurisdiction determination" had true "legal" consequences: the grant or denial of "a five-year safe harbor from [civil enforcement] proceedings" and a "limit[]" on "potential liability." 136 S. Ct. at 1814. Not so here, where no noncitizen can invoke either memorandum to evade an enforcement action. Indeed, the Secretary retains the discretion to change or abandon these policies at any time—underscoring that they establish no rights or obligations. Moreover, the Priority Framework is explicit that it does not exempt any noncitizen from enforcement action.

To be sure, the Priority Framework may have downstream consequences. Perhaps DHS will take enforcement action against one noncitizen it otherwise would not have, and perhaps DHS will defer enforcement action against a different noncitizen it otherwise might not have. But "any such consequences are practical, as opposed to legal, ones." *Louisiana v. U.S. Army Corps of Eng'rs*, 834 F.3d 574, 583 (5th Cir. 2016); *see also Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 732 (D.C. Cir. 2003). And it is only *legal* consequences that establish finality for purposes of the APA. Thus, for example, the decision to initiate an enforcement action is the quintessential example of non-final agency action, notwithstanding that it will have the immediate practical effect of requiring the target to participate in related proceedings. *See, e.g.*, *Energy Transfer Partners, L.P. v. FERC*, 567 F.3d 134, 141 (5th Cir. 2009); *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 241 (1980). The Priority Framework

---

[9] The States contend that a separate "case review process" alters noncitizens' rights. PI Mot. 31. That argument is meritless: that process establishes no substantive right or benefit, but merely sets up a channel for noncitizens and their representatives to communicate with ICE officials.

here is further removed even from that: it does not itself initiate (or terminate) any proceeding but instead merely sets internal procedures for doing so in discrete cases.

This Court previously found that Section C of the Pekoske Memo concerning the removal pause "alter[ed] DHS's obligation under § 1231(a)(1)(A) to remove" certain noncitizens. *See* 2021 WL 723856, at *32. Defendants respectfully disagree, but even to the extent Congress has imposed a mandatory and enforceable duty on DHS to take certain enforcement actions, *but see infra* section II.B.1.a, nothing in the Priority Framework alters that duty. Quite the contrary, it simply "clarif[ies] how DHS will carry forth its statutory obligations." *See id.* More specifically, the framework provides that ICE will focus its attention on the most serious and pressing cases for enforcement, while calling on all ICE personnel to "exercise their discretion thoughtfully" with regard to other cases to ensure that each enforcement action "constitutes a justified allocation of limited resources." ICE Interim Guidance at 3, 6. Such a policy that guides officers and agents in their duties is not "final agency action" subject to APA review.

### 2. The challenged action is "committed to agency discretion by law."

The APA precludes review "of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Texas*, 809 F.3d at 165 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)); *see* 5 U.S.C. § 701(a)(2). The establishment of enforcement priorities—determining where limited resources will be committed, and in what order—is a decision exempt from judicial review. *See* Florida Slip Op. at 22-23.

The States contend that the Priority Framework is reviewable because it countermands a statutory duty. Defendants dispute that the statutes set out the specific mandatory duty the States assert. *See infra* section II.B.1.a (explaining that "shall" does not displace enforcement discretion). Congress has not required DHS to issue or execute detainers for every noncitizen a state wishes to have removed. The States appear to ignore that the authority to detain under § 1226(c) "springs from subsection (a)," *Nielsen v. Preap*, 139 S. Ct. 954, 966 (2019). Accordingly, detention under § 1226(c) is authorized only "pending a decision" on removal; the Secretary undeniably "has broad discretion to 'decide whether it makes sense to pursue removal at all,'" *Texas*, 809 F.3d at 165-66

(quoting *Arizona*, 567 U.S. at 396); *see also id.* at 167-68. And, by the same token, detention under § 1231 is authorized only when there is a significant likelihood of removal in the reasonably foreseeable future. *Zadvydas*, 533 U.S. at 699-700 ("if removal is not reasonably foreseeable" detention is not "authorized by statute"); *see also United States v. Vasquez-Benitez*, 919 F.3d 546, 552 (D.C. Cir. 2019).

Regardless, the Priority Framework simply establishes enforcement priorities. It does not direct ICE officials to cease detaining any particular noncitizen subject to either § 1226(c) or § 1231(a)(2). Indeed, among the top priorities ICE will pursue are those noncitizens "convicted of an aggravated felony" who are a threat to public safety and those engaged in terrorism—categories that overlap substantially with those subject to § 1226(c) and § 1231(a)(2). Congress instructed the Secretary to establish national immigration enforcement priorities, *see* 8 U.S.C. § 1103(a)(3); the Secretary has done so, and nothing in § 1226(c) or § 1231(a)(2) precludes the Secretary from prioritizing the most serious offenders *within* those categories. Consistent with this prioritization scheme, the Priority Framework "do[es] not require or prohibit the arrest, detention, or removal of any noncitizen," but instead directs "officers and agents . . . to exercise their discretion thoughtfully" after consideration of "all relevant facts and circumstances." ICE Interim Guidance at 3.

To the extent the States contend that DHS has erred in its prosecutorial judgment with respect to specific cases, they are not challenging the Priority Framework, but are instead challenging specific nonenforcement decisions made on a case-by-case basis with regard to specific noncitizens. But the Complaint includes no claims targeted at these downstream decisions. Any amendment to include these claims would be futile, of course, because the Executive's "[r]efusals to take enforcement steps" are presumptively not subject to judicial review. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). Whether to enforce a law in a particular instance or set of instances "involves a complicated balancing of a number of factors which are peculiarly within [the Executive's] expertise," including "whether agency resources are best spent on this violation or another" and "whether the particular enforcement action requested best fits the agency's overall

policies." *Id.* The exercise of prosecutorial discretion is inherent to the Executive power that the Constitution confers on the President. "In fact, the Supreme Court has recognized that the concerns justifying criminal prosecutorial discretion are 'greatly magnified in the deportation context.'" *Crane v. Johnson*, 783 F.3d 244, 247 (5th Cir. 2015) (quoting *AADC*, 525 U.S. at 490). It would be an improper exercise of the judicial function to displace the Executive's prosecutorial judgment and superintend the day-to-day operations of DHS.

Congress vested the Secretary with broad discretion to set immigration enforcement priorities. 6 U.S.C. § 202(5); 8 U.S.C. § 1103(a)(3). The Secretary has exercised that discretion here to focus agency resources first on what he determined to be the most important cases, while permitting other enforcement actions when justified by the specific facts. This Court lacks jurisdiction to review the establishment of enforcement priorities.

3.    Congress has precluded judicial review of these types of decisions.

Consistent with the broad discretion afforded DHS in immigration enforcement, Congress enacted "*many* provisions . . . aimed at protecting the Executive's discretion from the courts." *AADC*, 525 U.S. at 490. Those provisions preclude judicial review in this case.

a.    *APA challenges to DHS's application of enforcement priorities are precluded from review.*

An action cannot proceed under the APA when another statute precludes judicial review. 5 U.S.C. § 701(a)(1). "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984). A detailed mechanism for review of some claims by some plaintiffs is "strong evidence that Congress intended to preclude [other types of plaintiffs] from obtaining judicial review." *United States v. Fausto*, 484 U.S. 439, 448 (1988).

Congress has set out a detailed statutory review scheme for claims pertaining to the INA. *See* 8 U.S.C. § 1252; *id.* § 1229. That review scheme is the exclusive means of judicial review and precludes statutory claims that do not fall within its parameters. *See, e.g.*, *id.* § 1252(a)(5) ("For

purposes of this chapter, in every provision that limits or eliminates judicial review or jurisdiction to review, [those terms] include . . . review pursuant to any other provision of law (statutory or nonstatutory)"). Section 1252(b)(9) channels judicial review of all "decisions and actions leading up to or consequent upon final orders of deportation," including "non-final order[s]," into one proceeding exclusively before a court of appeals. *AADC*, 525 U.S. at 483, 485 (A separate—and even more limited—scheme governs judicial review of expedited orders of removal. *See* 8 U.S.C. § 1252(a)(2)(A); *id.* § 1252(e).) This provision circumscribes district court jurisdiction over "*any* issue—whether legal or factual—arising from *any* removal-related activity," which "can be reviewed *only* through the [statutorily defined] process." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1029-31 (9th Cir. 2016); *see Aguilar v. ICE*, 510 F.3d 1, 9 (1st Cir. 2007) (similar). That includes "policies-and-practices challenges," *J.E.F.M.*, 837 F.3d at 1035, arising from any "action taken or proceeding brought to remove an alien," 8 U.S.C. § 1252(b)(9), whether or not the challenge is to an actual final order of removal or whether there even is a final order at all, *J.E.F.M.*, 837 F.3d at 1032. Thus, § 1252(b)(9) is an "unmistakable zipper clause" that means "no judicial review in deportation cases unless this section provides judicial review." *AADC*, 525 U.S. at 482-83.

The claims here "arise[] from" "action[s] taken or proceeding[s] brought to remove an alien." 8 U.S.C. § 1252(b)(9). The States challenge what they allege to be DHS's practice regarding detention of noncitizens "pending a decision" on removal, *id.* § 1226(a), and "[d]uring the removal period," *id.* § 1231(a)(2). Because § 1252 provides the sole mechanism for review of all "decisions and actions leading up to or consequent upon final orders of deportation," *AADC*, 525 U.S. at 485, and because the States cannot invoke § 1252, their claims necessarily fail.

This Court previously, and correctly, recognized that a state could not bring claims like these through § 1252, as that provision "focus[es] on an individual's appeal of a final order of removal and any related challenges." *Texas,* 2021 WL 723856, at *30. But the Court then held that Texas could nonetheless pursue its claims, contrary to applicable Supreme Court precedent. As Justice Scalia explained in *Fausto*, when Congress provides for review by specific plaintiffs, but not by others, the excluded plaintiffs cannot obtain judicial review. 484 U.S. at 448. That is

precisely what Congress did here. In *Block*, for example, Congress provided a specific review scheme for "dairy handlers" but said nothing at all about "consumers." 467 U.S. at 346-47. This did not mean that milk consumers could resort to the APA to challenge the agency action; it meant they could not challenge the action at all. *Id.* at 347. Here, by providing a detailed and limited review scheme for noncitizens' claims, Congress has implicitly precluded claims by other persons or entities, including by States, under the APA or otherwise. *Cf. Ayuda, Inc. v. Reno*, 7 F.3d 246, 250 (D.C. Cir. 1993) (holding that organizational plaintiff could not challenge INS policies "that bear on an alien's right to legalization"). Accordingly, the Court's earlier observation that the INA provides review only for noncitizens, far from making *Fausto* "irrelevant here," 2021 WL 723856, at *31 n.42, confirms that *Fausto* (and *Block*) are directly on point.

> b.   *The States' § 1226(c) challenge is specifically precluded from review.*

In addition, Congress expressly precluded judicial review over the States' § 1226-related claim. Congress provided that the Secretary's "discretionary judgment regarding application of this section shall not be subject to review." 8 U.S.C. § 1226(e). Here, the Secretary's determinations under § 1226(c) are discretionary since he may detain a noncitizen under § 1226—under either subsection (a) or subsection (c)—only "pending a decision" on removal. Detention authority is thus contingent on the Secretary's separate, predicate, and discretionary decision to commence removal proceedings in the first instance, by issuing a notice to appear. *See id.* § 1229(a); *see also Niz-Chavez v. Garland*, 141 S. Ct. 1474, 182 (2021) ("A notice to appear serves as the basis for commencing a grave legal proceeding" and "is like an indictment in a criminal case").

The policy the States challenge here—which does not dictate which noncitizens ICE may detain, but instead simply establishes internal procedures that help ICE target its resources—is still deeper within the Secretary's discretion. Put otherwise, Congress vested the Secretary with discretion to decide who to pursue for removal in the first instance, 8 U.S.C. § 1229(a), and accordingly, whom to detain, *id.* § 1226(a); Congress also vested the Secretary with discretion to set "national immigration enforcement polices and priorities," 6 U.S.C. § 202(5); and Congress

also provided that such decisions "shall not be subject to judicial review," 8 U.S.C. § 1226(e). The Court therefore lacks jurisdiction to review the Secretary's discretionary decision to structure immigration enforcement priorities as he has here.

To be sure, the Supreme Court has held that this section does not preclude a habeas petitioner from challenging either the constitutionality of the statutory scheme or that his detention is not authorized by that scheme. *Demore v. Kim*, 538 U.S. 510, 517 (2003). That is so because Congress must speak more clearly when it seeks to preclude constitutional claims or to preclude habeas review. *Id.* In subsequent cases, a plurality of the Court similarly found jurisdiction over constitutional challenges to the statutory framework or to claims contending that detention was *not* authorized by that framework. *Preap*, 139 S. Ct. at 962 (plurality); *Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018) (plurality). *But see Preap*, 139 S. Ct. at 974-75 (Thomas, J., concurring in part) (finding that § 1226(e) bars even those claims); *Jennings*, 138 S. Ct. at 858 n. 6 (Thomas, J., concurring in part) (same). Here, the States' APA claims are neither constitutional claims nor habeas claims; nor are the States arguing that the Secretary lacks the power to detain certain noncitizens under § 1226(c).[10] The "text of the statute contains no [similar] exception" for APA claims, *Preap*, 139 S. Ct. at 975 (Thomas, J., concurring in part). Because the claims here do not implicate the special rules of construction related to constitutional and habeas claims, § 1226(e) precludes review.

Importantly, this Court need not decide whether this subsection would preclude review of a policy that, for example, categorically prohibited detention of noncitizens within the ambit of § 1226(c), or some significant subset of these noncitizens. That hypothetical policy is not before the Court, as the policy here merely sets priorities that guide the allocation of law enforcement resources.

---

[10] The States bring a Take Care Cause claim but that is just an effort to constitutionalize their statutory claim for which there is no independent cause of action. *See infra*, section IV.

> c.   *The States' § 1231(a)(2) challenge is likewise specifically precluded.*

Section 1231 similarly precludes judicial review of the States' challenge based on that section. The States contend that § 1231(a)(2) requires DHS to detain *all* noncitizens during the statutory removal period. Setting aside whether that interpretation is correct, *see infra* at section II.B.a (explaining why the Memoranda are not contrary to law), the States simply cannot enforce that provision. Congress provided, in no uncertain terms, that "nothing in [§ 1231] shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States." 8 U.S.C. § 1231(h). Whatever the meaning of § 1231(a)(2), it is not subject to judicial enforcement, by Texas, by Louisiana, or by "any party." Section 1231(h), like its statutory ancestor, "makes clear that Congress intended that *no one* be able to bring suit to enforce" it.[11] *Hernandez-Avalos v. INS*, 50 F.3d 842, 844 (10th Cir. 1995).

This Court previously concluded otherwise, interpreting the term "party" to refer only to "the alien involved in the immigration removal proceeding." 2021 WL 723856, at *27. Respectfully, that interpretation is in error. To start, the Court's interpretive analysis jumped straight to statutory context without first considering ordinary meaning. The word "party" means "one by or against whom a lawsuit is brought." PARTY, *Black's Law Dictionary* (11th ed. 2019). Narrowing this well-understood term to mean only an "alien in a removal proceeding" is "inconsistent with the statute's language" because it ignores that "read naturally, the word 'any' has an expansive meaning, that is, 'one or some *indiscriminately of whatever kind*.'" *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218-19 (2008) (Thomas, J.) (quoting *United States v. Gonzalez*, 520 U.S. 1, 5 (1997)) (emphasis added). It therefore undermines the statutory text to transform the

---

[11] In the expedited proceedings of the earlier litigation, this Court stated that the Tenth Circuit's construction of this identical statutory language in *Hernandez-Avallos* was dicta. But the petitioners in that case had brought a mandamus action; they did not bring or attempt to bring a cause of action under the statute itself. To reject their claims, then, it was insufficient to conclude that the statutory provision precluded a private cause of action directly under the statute; the claims at issue were not of that nature. 50 F.3d 842, 844 (10th Cir. 1995); *see also Campos v. INS*, 62 F.3d 311, 314 (9th Cir. 1995) (explaining that the statute must do more than bar a direct cause of action because no court had ever inferred a direct cause of action under the statute). The Tenth Circuit's considered holding has substantial persuasive force.

term "*any* party"—which Texas and Louisiana, as plaintiffs in this lawsuit surely are—to mean only "*certain* parties." Moreover, Congress used the word "alien" throughout the INA, and throughout § 1231 in particular, and assigned it a specific statutory meaning. *See* 8 U.S.C. § 1101(a)(3). "[W]hen Congress includes particular language in one section of a statute but omits it in another," courts "presume[] that Congress intended a difference in meaning." *Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 777 (2018) (quoting *Loughrin v. United States*, 573 U.S. 351, 358 (2014)). By using the term "any party" in § 1231(h) instead of "the alien," as is used throughout the rest of § 1231, Congress meant something broader.

This Court looked to the statutory history that preceded the adoption of § 1231(h) to conclude otherwise. No doubt that Congress was mainly concerned with litigation by noncitizens seeking to enforce § 1231's provision. But Congress often adopts statutory language that captures more than the specific problem that concerns it. Thus, "it is not, and cannot be, our practice to restrict the unqualified language of a statute to the particular evil that Congress was trying to remedy—even assuming that it is possible to identify that evil from something other than the text of the statute itself." *Brogan v. United States*, 522 U.S. 398, 403 (1998); *see also Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1749 (2020) (Gorsuch, J.) (similar). The legislative history to which the Court previously pointed only confirms this understanding. As the Court observed, the relevant Conference Report noted that § 1231(h) "is intended, *among other things*, to prohibit the litigation of claims by aliens who have been ordered removed from the U.S. that they be removed at a particular time or to a particular place." *See* 2021 WL 723856, at *28 (emphasis added) (quoting H.R. REP. NO. 104-828, at 219) (Conf. Rep.) (1996)). Accordingly, although the Court is correct that § 1231(h) precludes a noncitizen in a removal proceeding from enforcing any provision of § 1231, § 1231(h) is not limited to that scenario. That provision thus applies here to bar the States' claims.

Finally, for similar reasons, the States do not come within the relevant zone-of-interests. An APA plaintiff must show that it is "aggrieved . . . within the meaning of a relevant statute," 5 U.S.C. § 702, meaning the plaintiff "may not sue unless he 'falls within the zone of interests sought

to be protected by the statutory provision whose violation forms the legal basis for his complaint,'" *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 177 (2011) (quoting *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 883 (1990)); *see also Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). Whether a plaintiff is within the zone-of-interests is a question answered "using traditional tools of statutory interpretation." *Lexmark Int'l, Inv. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014). As explained above, Congress was clear that no entity can enforce § 1231, and therefore no entity is within the "zone-of-interests" of § 1231. *See* 8 U.S.C. § 1231(h).

      B.    *The States' APA claims fail on the merits.*

          1.    <u>The Memoranda are not "contrary to law."</u>

Even if the States could pursue their APA claims, they would fail on the merits. The States principally contend that DHS has a non-discretionary duty under §§ 1226(c)(1) and 1231(a)(2) to apprehend all noncitizens who have committed certain criminal offenses or who are subject to final orders of removal. PI Mot. 12; *see id.* 13-19. Setting aside the impossibility of such a mandate, neither section should be construed to displace DHS's traditional prosecutorial discretion. But even if they did, the Memoranda would not violate those statutes because they simply establish priorities for ICE enforcement and do not prohibit ICE from taking custody of any noncitizen. Nothing in either § 1226(c) or § 1231(a)(2) precludes DHS from prioritizing, including within those categories, certain noncitizens over others.

          a.    *Neither § 1226(c) nor § 1231(a)(2) impose a mandatory duty to detain any noncitizen.*

The States contend that Congress has imposed an unconditional, judicially-enforceable mandate on DHS to detain noncitizens "who have committed certain serious crimes," PI Mot 13, and to "detain aliens with final orders of removal when they are released from [state] custody," *Id.* at 18. Each of these contentions rests on two statutes' use of the word "shall." But the States' argument ignores a longstanding principle of law: the word "shall," standing alone, does not displace the Executive's inherent and unreviewable authority to exercise enforcement discretion. Rather, the "deep-rooted nature of law-enforcement discretion" persists "even in the presence of

seemingly mandatory commands." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005). In *Castle Rock*, a statute provided that law enforcement "shall arrest . . . or . . . seek a warrant" for the arrest of any violator of a restraining order, but the Supreme Court rejected the notion this imposed a mandatory duty because to be "a true mandate of police action would require some stronger indication" of legislative intent than the bare "shall." *Id.*

So too here. Nothing provides the "stronger indication" necessary to displace enforcement discretion. Quite the opposite: The statutory and practical context here confirm that neither statute imposes a mandate. *See Crane*, 783 F.3d at 247 (explaining that "the concerns justifying criminal prosecutorial discretion are 'greatly magnified in the deportation context.'" (quoting *AADC*, 525 U.S. at 490)). For one, resource constraints, relations with local authorities, and the fundamental difficulty of determining ex ante whether a particular noncitizen's conviction triggers the statutory criteria all make it practically impossible to detain every noncitizen whose detention is directed by § 1231(a)(2) or § 1226(c). The Supreme Court recognized this in *Preap* when it held that the authority to detain under § 1226(c) persisted beyond the initial release from state custody. *See* 139 S. Ct. at 969. That is, the Supreme Court's binding interpretation of § 1226 indicates Congressional awareness that the Secretary would be unable to detain all such noncitizens and an express grant of authority to act at some later date—in some cases years later.

When this Court earlier interpreted § 1231(a)(1) as imposing a mandatory and enforceable duty to remove noncitizens with final orders of removal within 90 days, it rejected the reading of *Castle Rock* that Defendants offer here. *See Texas*, 2021 WL 723856, at *3. Defendants respectfully submit that that earlier, non-binding decision made in an expedited posture was incorrect. In that case, this Court crafted an "exception" that is not only absent from precedent but is directly contradicted by *Castle Rock* itself. Indeed, this Court correctly recognized that precedent required "some stronger indication" than a naked "shall" for a statute to displace an executive's enforcement discretion. *Id.* at *34. It erred, though, in concluding that such an indication existed when "the statute's manifest purpose is to protect the public or private interests of innocent third parties." *Id.* at *35. This analysis contravenes *Castle Rock*: the statute there concerned enforcement

23

of *restraining orders* entered to benefit a "protected person." 545 U.S. at 758-59. It is difficult to conceive a statute whose purpose is more manifestly the protection of "innocent third parties." Yet the Supreme Court held that that statute necessarily still preserved enforcement discretion. *Id.* at 761. With this understanding of the doctrine described in *Castle Rock*, it is apparent that both § 1226(c) and § 1231(a)(2) are similarly not mandatory.

Although various courts have described the statutes at issue here as "mandatory," Defendants are aware of *no* case purporting to enforce any such mandate against the United States or its agencies. Additionally, those cases typically involve the habeas context, where the United States invokes the statute to justify continued detention of the petitioner. It is in this context that courts observe anything mandatory about these statutes; whether the statutes create an enforceable mandate on the government to detain *all* covered noncitizens is not at issue in these cases and any statements to that effect are pure dicta. The Supreme Court's decision in *Preap*, for example, concerned a habeas class action by noncitizens who fell within § 1226(c)(1)'s ambit but sought bond hearings to secure their release during their removal proceedings. The Supreme Court held that because the petitioners fell within § 1226(c)(1), they were not entitled to release *at all* and so a bond hearing was unwarranted.

Thus, neither § 1226(c) nor § 1231(a)(2) erect an unconditional blanket detention requirement. *Preap* itself demonstrates that the Secretary still acts lawfully when he does not immediately detain a noncitizen covered by § 1226(c), but instead first detains such a noncitizen only *years* later. And § 1231(a) makes detention mandatory once certain noncitizens are taken into custody for removal, but only for the initial 90-day removal period, *see* 8 U.S.C. § 1231(a)(2); after that period, the government "may"—not must—detain the alien. 8 U.S.C. § 1231(a)(3), (6). Even so, it is indisputable that the Executive "may . . . decline to execute a final order of deportation." *AADC*, 525 U.S. at 483-84. Section 1231(a), however, only authorizes detention "[s]o long as ICE detains the alien for the permissible purpose of effectuating his removal." *Vasquez-Benitez*, 919 F.3d at 552. Therefore, where DHS has exercised its discretion not to effectuate the removal of specific noncitizens, § 1231(a) cannot mandate arrest; rather it does not

apply at all. *Zadvydas*, 533 U.S. at 699-700 ("if removal is not reasonably foreseeable" detention is not "authorized by statute").[12]

Moreover, even where § 1231(a)(2) applies, it only prohibits *release* of certain criminal and terrorist noncitizens, once detained, within the 90-day removal period, not for noncitizens in general. The relevant provision contains two sentences: "During the removal period, the [Secretary of Homeland Security] shall detain the alien. Under no circumstance during the removal period shall the [Secretary] release [certain terrorist and criminal aliens]." 8 U.S.C. § 1231(a)(2). Again, a statute directing enforcement, even one using the word "shall," still preserves the Executive's inherent authority to exercise enforcement discretion absent a "stronger indication" of intent to impose a true mandate. *See Castle Rock*, 545 U.S. at 761. The States contend that § 1231(a)(2) *requires* DHS to detain *all* noncitizens during the removal period, PI Mot. 18, but § 1231(a)(2) lacks that stronger indication of intent: reading "shall" to impose a mandate in the first sentence of § 1231(a)(2) to arrest all noncitizens with removal orders would render superfluous the far more compulsory language in the second sentence ("*[u]nder no circumstance* during the removal period shall the [Secretary] release [certain terrorist and criminal aliens]").[13]

No authority cited by the States displaces or even purports to displace the Executive's longstanding discretion in enforcement matters. The statutes, notwithstanding their use of the word "shall," do not impose an enforceable, mandatory duty on the Secretary. *See Castle Rock*, 545 U.S. at 761.

---

[12] The States' reliance on this Court's statement in *Texas*, 2021 WL 723856, at *36, that § 1231(a)(2) "mandates the act of detaining," is misplaced. The Court made this statement in the context of addressing whether "shall" means "must" in § 1231(a)(1)(A). The Court did not hold that § 1231(a)(2), which was not at issue in that litigation, erects a blanket requirement to detain. At most, the Court observed that "it *could* easily be said that the prohibition on releasing certain aliens demonstrates that Congress assumed all aliens would be detained." *Id.* (emphasis added). But the Court did not have before it the arguments presented here and did not address the serious constitutional concerns that would arise if § 1231(a)(2) were read to mandate detention even of noncitizens DHS has determined in its discretion not to remove or else cannot remove.

[13] The States do not allege that Defendants are violating any statutory mandate related to the release of such noncitizens during the removal period.

> b.     *The Memoranda do not violate § 1226(c).*

Of course, even if § 1226(c) did create a mandatory duty, the Priority Framework still would not violate it. The Memoranda do not prohibit the arrest or detention of any noncitizen. They merely prioritize—for now—enforcement actions against certain noncitizens based on public safety and national security considerations. Immigration officers may still arrest and detain other noncitizens while the Priority Framework remains in place, as warranted. *See* ICE Interim Guidance. Again, the Supreme Court in *Preap* recognized that, in § 1226(c), Congress did not expect DHS to immediately arrest all noncitizens covered by that provision. *See* 139 S. Ct. at 969; *see also id.* at 973 (Kavanaugh, J., concurring). Indeed, in *Preap* some plaintiffs were arrested "several years" after they were released from state criminal confinement. *Id.* at 961.

The States protest that the Priority Framework prevents DHS from taking custody of noncitizens "convicted of serious crimes" covered by § 1226(c)(1). PI Mot. 16; *see id.* at 16-17. But, again, while the Memoranda prioritize enforcement actions involving certain criminal acts by noncitizens, including a significant overlap with those covered by § 1226(c)(1), the Memoranda expressly permit apprehension of *other* criminal noncitizens—including all described in § 1226(c)(1). Officials simply need to request preapproval to carry out such an enforcement action when there are no exigent circumstances and concerns regarding public safety that would make it impracticable to obtain preapproval. Requiring some supervisory accountability does not amount to a *prohibition* on the arrest of any noncitizen, nor does it prevent officers from arresting and detaining the relevant noncitizen in the future. The Memoranda simply create a prioritization scheme; they do not insulate noncitizens from enforcement actions. Accordingly, the Memoranda are consistent with § 1226(c).

If the States' concern is that ICE is not detaining *every* noncitizen covered by § 1226(c), then their issue is not with the Priority Framework but with the very idea of prosecutorial discretion. Resource limitations mean that DHS has *never* been able to arrest all noncitizens and the States do not assert that DHS was accomplishing this insurmountable task before the Memoranda were issued. *Cf. Arizona Dream Act Coal. v. Brewer*, 855 F.3d 957, 976 (9th Cir.

2017) ("Congress has not appropriated sufficient funds to remove all . . . undocumented aliens."). DHS will inevitably have to prioritize certain noncitizens over others, *see Chaney*, 470 U.S. at 831, and the Memoranda merely provide guidance on which noncitizens to prioritize. The States' contrary position would mandate that DHS detain low and high-level priorities alike, rendering impossible the Secretary's ability to carry out Congress's charge that he establish national immigration enforcement policies and priorities and jeopardizing DHS's ability to prioritize enforcement actions against noncitizens posing the greatest threat.

c. *The Memoranda do not violate § 1231(a)(2).*

The States' claim with respect to § 1231(a)(2) fails for similar reasons. Even if that provision could be read to impose an unconditional command to take custody of all noncitizens with final removal orders, the Memoranda do not prohibit the arrest or detention of any noncitizen, but merely prioritize—for now—certain enforcement actions, while permitting enforcement actions beyond the enforcement presumed priorities on a case-by-case basis. *See* ICE Interim Guidance at 6.

The States nevertheless contend that the Priority Framework will prevent the arrest and detention of certain noncitizens whose removal period begins "the date the alien is released from [state] detention or confinement," 8 U.S.C. § 1231(a)(1)(B)(iii), and who are covered by § 1231(a)(2) but are not identified as presumed priorities in the Memoranda. The States contend that any such delay contravenes § 1231(a)(2)'s purported mandate of "immediate" detention without "delay," PI Mot. 19. But just as with § 1226(c), § 1231(a)(2)'s provision stating that DHS "shall" detain covered aliens as of "the date the alien is released" does not realistically contemplate—and certainly does not command—the *immediate* arrest of all covered noncitizens. *See Preap*, 139 S. Ct. at 969; *see also id*. at 973 (Kavanaugh, J., concurring). The Priority Framework identifies those for whom immediate arrest is presumptively "a justified allocation of ICE's limited resources" but expressly authorizes officials to seek immediate detention in other cases, when justified. ICE Interim Guidance at 3.

DHS has thus long understood § 1231(a)(2) to allow DHS to prioritize the detention of certain terrorist and criminal noncitizens once arrested, and the first sentence to authorize but not require the detention of other aliens. *See, e.g.*, *Continued Detention of Aliens Subject to Final Orders of Removal*, 66 Fed. Reg. 56,967, 56,969 (Nov. 14, 2001). Consistent with that understanding, the Supreme Court has explained that § 1231(a) only "mandates detention of *certain criminal aliens*" during the removal period. *Zadvydas*, 533 U.S. at 698 (emphasis added). Were it otherwise, then DHS would have to detain every noncitizen, even if removal ultimately proved impossible. "Removal decisions . . . implicate our relations with foreign powers and require consideration of changing political and economic circumstances." *Jama v. ICE*, 543 U.S. 335, 348 (2005). Congress thus intended for DHS to retain flexibility to account for the "dynamic nature of relations with other countries," *Arizona*, 567 U.S. at 397, and "to avoid removals that are likely to ruffle diplomatic feathers, or simply to prove futile." *Jama*, 543 U.S. at 348.[14] A corollary of that necessary flexibility is the authority to prioritize which cases that DHS will pursue for actual removal, and accordingly those noncitizens that ICE will detain pending removal. The Memoranda simply establish the priorities that ICE will use; they do not violate any statutory mandate in § 1231.

2. DHS's Priority Framework is a reasonable effort to enact the new Administration's immigration priorities.

The States also cannot establish that the Priority Framework is arbitrary and capricious. "The arbitrary and capricious standard is highly deferential." *Knapp v. U.S. Dep't of Agric.*, 796 F.3d 445, 453 (5th Cir. 2015); "[T]he reviewing court must consider whether the decision was

---

[14] To name just two examples: no noncitizen can be removed without procuring travel documents from his or her native country, but many countries refuse to issue such travel documents until a noncitizen's judicial appeals are fully exhausted, which often is years after release from state or local custody. *See, e.g.*, *Adefemi v. Gonzales*, 228 F. App'x 415, 416 (5th Cir. 2007). Even with travel documents, removal may be inappropriate because "[t]he foreign state may be mired in civil war, complicit in political persecution, or enduring conditions that create a real risk that the alien or his family will be harmed upon return." *Arizona*, 567 U.S. at 396-97. But were the States correct, then DHS must detain such noncitizens even though foreign affairs concerns mean there is "no significant likelihood of removal in the reasonably foreseeable future." *Zadvydas*, 533 U.S. at 701. Section 1231(a)(2) does not require that perverse result, and the Constitution forbids it. *Id.* at 699-700; *see also Vasquez-Benitez*, 919 F.3d at 552.

based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989); *see Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned"). *Cf. Trump v. Hawaii*, 138 S. Ct. 2393, 2418 (2018) ("For more than a century, this [Supreme] Court has recognized that the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'"). Here, Defendants considered the relevant factors and reached a reasonable decision.

Again, consistent with historical practice, the Memoranda call on immigration officials to focus their limited resources on noncitizens who pose the greatest risk to national security and border security and public safety, while still providing flexibility for those officials to take enforcement actions other noncitizens with criminal records based on individual circumstances. *See* Pekoske Memo at 2; ICE Interim Guidance at 2-6. That is what law enforcement officers do day-to-day—prioritize the most serious offenses. Additionally, the Memoranda seek to institute temporary practices that limit close contact among those involved in the immigration enforcement process in light of the COVID-19 pandemic. *See, e.g.,* Pekoske Memo at 1, 3. The ICE Interim Guidance also explains that, in addition to resource constraints and health concerns, ICE's enforcement actions are guided by "the responsibility to ensure that eligible noncitizens are able to pursue relief from removal under immigration laws," and the United States' "relationship with[] sovereign nations." ICE Interim Guidance at 2. These justifications are sufficient to survive arbitrary and capricious review. *See*, *e.g.*, *Chaney*, 470 U.S. at 842 (Marshall, J., concurring) ("a decision not to enforce that is based on valid resource-allocation decisions will generally not be arbitrary, [and] capricious") (quoting 5 U.S.C. § 706(2)(A)).

None of the States' contrary arguments hold water. First, the States argue that the Defendants cannot justify the Priority Framework because the Defendants' choice to prioritize aggravated felons would also support, *inter alia*, prioritizing noncitizens' final orders of removal. PI Mot. 22. But, of course, the Priority Framework provides a clear, rational justification for

prioritizing noncitizens who were convicted of aggravated felonies over the more than one million noncitizens with final orders of removal: the former category presumptively presents a more significant threat to public safety. *See*, *e.g.*, ICE Interim Guidance.[15]

Second, the States are incorrect that the Defendants failed to consider the effects of recidivism in issuing the Priority Framework. In crafting a hierarchy of priorities, DHS specifically focused on the degree of threat to public safety that different criminal noncitizens presented, as evaluated by "the extensiveness, seriousness, and recency of the criminal activity," balanced against mitigating circumstances. *See, e.g.,* ICE Interim Guidance at 5. Though the Memoranda do not use the term "recidivism," DHS weighed the threat to public safety from criminal noncitizens reoffending in prioritizing certain noncitizens for removal. *See, e.g., id*. at 4-5 ("A noncitizen is *presumed* to be a public safety enforcement and removal priority if he or she poses a threat to public safety and: 1) he or she has been convicted of an "aggravated felony" or 2) "he or she has been convicted" of an offense for which an element was active participation in a criminal street gang, or, in other circumstances, has "intentionally participated" in the furtherance of a gang or transnational criminal organization's illegal activity. Moreover, when making individualized determinations about which other priorities should be subject to enforcement actions, immigration officers can consider public interest factors, which could include risk of recidivism. *Id*. at 6 (instructing officers to consider "the nature and recency of the noncitizen's convictions," "the type and length of sentences imposed," and ICE's "limited resources," and "other relevant factors").

Third, the States ignore the context in which ICE operates when they suggest that Defendants failed to consider the effects of non-detention of noncitizens under § 1226(c) on future removals of those noncitizens. Because ICE "operates in an environment of limited resources," the agency "has always prioritized, and necessarily must prioritize, certain enforcement and removal

---

[15] So too when compared with crimes involving moral turpitude. While certainly unlawful, some such crimes, for example use of an unauthorized social security number, *Munoz-Rivera v. Wilkinson*, 986 F.3d 587, 591 (5th Cir. 2021), or conspiracy to obtain, possess, and use illegal immigration documents, *Omagah v. Ashcroft*, 288 F.3d 254, 261 (5th Cir. 2002), present less of a direct threat to public safety than committing an aggravated felony.

actions over others." ICE Interim Guidance at 2. The Priority Framework directs immigration officers to focus their limited resources on noncitizens who present a public safety threat, a category which will overlap with § 1226(c). *See supra* section II.B.1. To the extent that a noncitizen is not a presumed priority but falls under § 1226(c), immigration officers still are required to make an individualized determination, subject to an organized approval process, about whether to detain and remove that individual. *See,* ICE Interim Guidance at 6. Thus, for the noncitizens who, in ICE's view, need to be removed, the Priority Framework allows for enforcement and removal actions against such individual. *Id*.

The States' contrary argument conflates their statutory theory of 1226(c) with their policy preference that ICE maximize the raw number of removals. But "the Executive has discretion to abandon the endeavor" of removing a noncitizen at "each stage" of the removal process, and for any reason—whether "for humanitarian reasons or simply for its own convenience." *AADC*, 525 U.S. at 483-84; *see also id.* at 484 (noting that the Executive "may decline to institute proceedings, terminate proceedings, or decline to execute a final order of deportation" (quoting 6 C. Gordon, S. Mailman, & S. Yale–Loehr, Immigration Law and Procedure § 72.03 [2][h] (1998))). The current Administration is engaged in a "reset [of] policies and practices for enforcing civil immigration laws" to align with its priorities of "protect[ing] national and border security, address[ing] the humanitarian challenges at the southern border, and ensur[ing] public health and safety." Exec. Order No. 13,993, Revision of Civil Immigration Enforcement Policies and Priorities, 86 Fed. Reg. 7051 (published Jan. 25, 2021). The Priority Framework is "based on [those] sensible priorities," Pekoske Memo at 2 (listing "national security," "border security," and "public safety"), and "a court may not set aside an agency's policymaking decision solely because it might have been prompted by an Administration's priorities." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019). "[P]olicymaking is not a rarified technocratic process" unaffected by the responsible choices of an Administration's politically accountable officials. *Id*.

Fourth, the States are wrong to argue that DHS was required to expressly evaluate the costs to each State in the Priority Framework. Federal immigration policy implicates "trade, investment,

tourism, [] diplomatic relations for the entire Nation," and "human concerns." *Arizona*, 567 U.S. at 395-96. Although immigration policy may be "importa[nt]" to States, Plaintiffs cite to no authority indicating that DHS had to conduct an exhaustive analysis for each affected party. *See id.* at 397.[16] But assuming DHS were held to this standard, it *did* consider how the Priority Framework would impact public safety, which is the most significant source of "costs" to which the States point.[17] PI Mot. 9. The Priority Framework focuses DHS's limited resources on enforcement actions against the most significant threats to public safety, which should reduce the costs from crime to the States.

Fifth, the States suggest without elaboration that DHS did not consider more limited alternatives in enacting the Priority Framework. PI Mot. 21-22. An agency need not "consider all policy alternatives in reaching decision." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983). "[W]hen an agency" changes its policy, it need only "consider the alternative[s] that are within the ambit of the existing [policy]." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020); *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013) ("an agency must consider . . . reasonably obvious alternative[s]" that are "significant and viable"). Here, the States fail to identify a single policy alternative that is "within the ambit of existing policy" or otherwise "obvious," "significant and viable" that Defendants failed to consider, other than the ones listed above. *See* PI Mot. 21. That alone dooms their claim. *Cf. N. Am.'s Bldg. Trades Unions v. Occupational Safety & Health Admin.*, 878 F.3d 271, 305-06 (D.C. Cir. 2017) ("[T]he force of the evidence and argument that [the agency] must offer to defend its choice will vary with the force of the proponent's evidence and argument.").

---

[16] This Court previously noted that "Texas's expenses and costs" stemming from a change in federal immigration policy were an "important aspect of the problem DHS is trying to solve" and so the agency was obligated to consider them. *Texas v. United States*, No. 6:21-cv-3, ECF No. 85 at 83. Respectfully, Defendants suggest that the factors that the Supreme Court identified in *Arizona v. United States* are more appropriate. *See* 567 U.S. at 395-96.

[17] As to their other alleged costs, as discussed above, the States have not provided evidence that, for example, the Priority Framework will increase the number of children residing in their territory.

The States' argument here is especially unavailing given that these are *interim* priorities. One purpose of the Interim Guidance is to collect data to inform DHS's final immigration enforcement priorities. ICE Interim Guidance at 5. Moreover, the ICE Interim Guidance has a more expansive set of presumed priorities (seemingly the policy outcome that the States favor) than did Section B of the Pekoske Memo, ICE Interim Guidance at 1 (adding qualifying members of criminal gangs as presumed priorities, among other changes), which underscores how the Defendants are actively reviewing the enforcement priorities with an eye toward enacting more effective policy.

Ultimately, the States are dissatisfied with the policy judgments made by DHS. But this is not a basis for finding the Memoranda arbitrary and capricious. Plaintiffs cannot show that the Memoranda constitute a "clear error of judgment," and the Memoranda thus satisfy the "highly deferential" arbitrary and capricious standard.

3. <u>DHS's and ICE's internal guidance on enforcement prioritization is exempt from notice and comment.</u>

The Memoranda are likewise exempt from the APA's notice and comment requirement. First, this requirement does not apply to "general statements of policy," 5 U.S.C. § 553(b)(3)(A), which "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power," *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993). By contrast, rules that must generally be adopted through notice-and-comment are those that have the force and effect of law, and create legally enforceable rights or obligations. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). Here, the Memoranda are quintessential policy statements: they announce how and when DHS components will pursue (or forbear from) enforcement—a decision "generally committed to an agency's absolute discretion." *Chaney*, 470 U.S. at 831. But they do not alter the rights or obligations of any person. Further, even if the Court concludes that the Memoranda are not general statements of policy, the Memoranda are instead procedural rules because they inform internal resource allocation. The APA also exempts procedural rules from notice-and-comment,

*see* 5 U.S.C. § 553(b)(A), in order to "ensure that agencies retain latitude in organizing their internal operations," *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014).

This Court's opinion preliminarily enjoining DHS's pause on removals illustrates how the internal enforcement guidance at issue here is exempt from notice-and-comment. As this Court noted, the starting point, although not the end point, is how the agency characterized its policy. *See* 2021 WL 723856, at *44. DHS characterizes these Memoranda as general statements of policy. *See id*. Then, in looking beyond the characterization, this Court found that the Fifth Circuit instructs district courts to examine overlapping criteria of whether the policy "(1) impose[s] any rights and obligations and (2) genuinely leaves the agency and its decisionmakers free to exercise discretion." *Id.* (quoting *Texas*, 809 F.3d at 171). Here, the internal guidance on enforcement priorities does not impose rights and obligations, and it genuinely leaves decisionmakers free to exercise discretion. Accordingly, the internal guidance at issue is best characterized as a general statement of policy.

The States first argue that the internal guidance "strip[s] federal officers of the ability to make individualized determinations," PI Mot. 24, but the policies at issue explicitly do the opposite. First, Section B of the Pekoske Memo merely enumerates enforcement priorities and unequivocally states that "nothing in this memorandum prohibits the apprehension or detention of individuals unlawfully in the United States who are not identified as priorities herein." *See* Pekoske Memo at 3. Second, the Acting ICE Director emphasized in the Interim Guidance that "[a]s a preliminary matter, it is vitally important to note that the interim priorities do not require or prohibit the arrest, detention, or removal of any noncitizen" and that "officers and agents are expected to exercise their discretion thoughtfully." *See* ICE Interim Guidance at 3.

Prioritizing enforcement actions against presumed priorities—those who pose a risk to national security, border security, and public safety—merely means that "[e]nforcement and removal actions that meet the criteria described below are presumed to be a justified allocation of ICE's limited resources," while actions against other priorities "may also be justified, but [] subject to advance review." *Id*. The comparison to a prosecutor's priorities is helpful here as well: a line

prosecutor could justify to his boss going after a serial pickpocket, or an armed pickpocket, even if it did not fall within the chief prosecutor's established priorities.[18] This case is therefore distinguishable from this Court's decision in the removal pause litigation, where this Court found that "the 100-day pause leaves little if any room for 'individualized' determinations." *See* 2021 WL 723856, at *46. Here, the guidance, by definition, provide just that: *guidance* to make individualized determinations.

Likewise, the States are wrong that the prioritization guidance imposes rights and obligations. Again, this consideration overlaps with whether there is room for individualized decisionmaking. *See id.* at *44. Here, no individual is immune from enforcement actions per the terms of the Priority Framework, just as no pickpocket would be immune from prosecution under a policy that required internal approval to bring such cases. The ICE Interim Guidance is explicit that there is no prohibition on any "arrest, detention, or removal of any non-citizen." *See* ICE Interim Guidance at 3. The Priority Framework is thus distinct from what this Court found with the removal pause, which it determined had the legal consequence of alleviating noncitizens from the risk of deportation. *See* 2021 WL 723856, at *45. Accordingly, the Priority Framework does not create substantive rights and still leaves room for individualized discretion, and, therefore, is properly characterized as a general statement of policy exempt from notice-and-comment.

But even if this Court views the prioritization guidance as "binding" in some sense, the agency's effort to prioritize enforcement actions is still exempt from notice and comment because

---

[18] The States claim that the advance review process makes the presumptions "irrebuttable." PI Mot. 24. Remarkably, to make this point, the States rely on a declaration of a *former* ICE Director with *no* first-hand knowledge of the development or implementation of the Priority Framework. That declaration, made with no knowledge of the relevant facts, should be entirely disregarded as it is outside the administrative record. But should the Court seek information outside the administrative record, the far more pertinent evidence is in the declaration that a *current* ICE official offered more than a month earlier in a related case stating that "[s]ince the effective date of the [ICE Interim Guidance], law enforcement actions have *regularly* been approved in other priority cases; examples range from non-aggravated felon sexual predators, individuals with warrants from foreign governments identified by an INTERPOL issued 'Red Notice', and individuals with violent criminal convictions such as aggravated assault." *See* Ex. E, Decl. of Peter Berg ¶ 9, ECF No. 23-3, *Florida v. United States*, No. 21-541 (M.D. Fl. Mar. 23, 2021) (emphasis added). The Priority Framework is thus being implemented as it reads, and preapproval is both sought and granted in cases outside the presumed priorities.

it would then be a procedural rule. *See Texas*, 809 F.3d at 176 (a "binding rule is not required to undergo notice and comment if it is one 'of agency organization, procedure, or practice'") (quoting 5 U.S.C. § 553(b)(A)). The States misapply the "substantial impact test" in claiming that the Memoranda are "substantive" rather than procedural. *See* PI Mot. 24-25. In the Fifth Circuit, "the substantial impact test is the primary means by which [a court would] look beyond the label 'procedural' to determine whether a rule is of the type Congress thought appropriate for public participation." *U.S. Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 (5th Cir.1984) *accord Texas*, 809 F.3d at 176. In other words, the question is whether the agency action "modifies substantive rights and interests" of the public. *Kast Metals*, 744 F.2d at 1153. As explained above, the prioritization guidance does not modify any substantive rights or interests. Further, for the reasons the States' statutory argument is wrong, *see supra* section II.B.1, it does not "impact DHS's statutory obligations." *See* PI Mot. 24-25 (quoting 2021 WL 723856, at *47). Finally, for the reasons that States cannot demonstrate standing, let alone irreparable harm, *see supra* section I, there is not a significant impact on the States. *See id.* at 25 (citing 2021 WL 723856, at *47).

In sum, the States cannot show likelihood of success on their notice-and-comment claim.

## III. The Purported Agreements are invalid, unenforceable, and cannot be the basis of relief.

The States also suggest that Defendants violated so-called agreements that Ken Cuccinelli purported to enter on DHS's behalf by issuing the Memoranda without allowing the States a 180-day period to review and comment on the proposed policy. *See* PI Mot. 26-28. This argument fails because this Court lacks jurisdiction to set aside the Memoranda on this basis, and Mr. Cuccinelli lacked authority to enter into the purported agreements.

### A. The United States has not waived sovereign immunity for specific enforcement of contracts.

The Court need not address whether these purported agreements are valid, because the relief the States seek here is improper and this Court lacks jurisdiction to void the challenged Memoranda on the basis of these purported agreements. What the States are seeking is specific performance of the purported agreements' requirement that DHS abstain from making any policy

adjustments until a 180-day period of conferral has lapsed. *See* PI Mot. 27. But specific performance is unavailable against the federal government. A waiver of sovereign immunity must be enacted by statute, be construed in the Government's favor, and unambiguously extend to the type of relief sought. *Lane v. Pena*, 518 U.S. 187, 192 (1996). The Fifth Circuit, and others, have recognized that the United States has not waived sovereign immunity for contract claims seeking specific performance. *Ala. Rural Fire Ins. Co. v. Naylor,* 530 F.2d 1221, 1229-30 (5th Cir. 1976); *see Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. Dep't of Homeland Sec.*, 490 F.3d 940, 945 (Fed. Cir. 2007); *see also United States v. Jones*, 131 U.S. 1, 18 (1889) (Tucker Act did not authorize specific performance against the federal government).

The States cannot rely on the APA to circumvent this basic principle. For agency action to be subject to APA review, there must be "no other adequate remedy in a court." 5 U.S.C. § 704. Here, to the extent the purported agreements are enforceable at all for the amount the States suggest is at issue,[19] the Tucker Act provides the proper remedy—in the Court of Federal Claims. *See Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 480 F.3d 1116, 1128 (Fed. Cir. 2007). At most, if there were a valid contract, the States might possess a contract claim for money damages, because "damages are always the default remedy for breach of contract." *Sanders v. United States*, 252 F.3d 1329, 1334 (Fed. Cir. 2001) (quoting *United States v. Winstar Corp*., 518 U.S. 839, 885 (1996) (plurality opinion)); *accord Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011). The Tucker Act "impliedly forbids declaratory and injunctive relief and precludes a § 702 waiver of sovereign immunity" under the APA, as any duty to consult the States, "if it exists, derives from the contract[s]." *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 646-47 (9th Cir. 1998); *see also United States v. King*, 395 U.S. 1, 3 (1969) (recognizing that

---

[19] *See* Compl. ¶¶ 64, 67, 74-78 (alleging millions of dollars of expenditures for services provided to unlawful noncitizens). *Contra* 28 U.S.C. § 1346(a)(2) (allowing plaintiff to bring claims for breach of contract against the United States in district court only if plaintiff alleges damages not more than $10,000).

the Supreme Court has repeatedly acknowledged that the Court of Federal Claims only has jurisdiction over claims for monetary relief).

    B.   *Mr. Cuccinelli purported to enter into the purported agreements without proper authority.*

        1.   <u>DHS cannot contract away its sovereign discretion over immigration enforcement.</u>

Further, the provision that the States try to rely upon, abstaining from making changes to immigration enforcement priorities until a State has exercised a 180-day comment period, lies beyond the power of contract. An outgoing administration cannot contract away the federal government's plenary power over the enforcement of immigration law. *See Biodiversity Assocs. v. Cables*, 357 F.3d 1152, 1172 (10th Cir. 2004) ("The executive branch does not have authority to contract away the enumerated constitutional powers of Congress or its own successors . . . ."); *see also U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 23 (1977) ("[T]he Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty.").

A long line of authority establishes that "[t]he Government cannot make a binding contract that it will not exercise a sovereign power." *Amino Bros. Co. v. United States*, 178 Ct. Cl. 515, 525, 372 F.2d 485, 491, *cert. denied*, 389 U.S. 846 (1967). In *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 52 (1986), the Supreme Court reaffirmed that "we have declined in the context of commercial contracts to find that a 'sovereign forever waives the right to exercise one of its sovereign powers unless it expressly reserves the right to exercise that power in' the contract." (quoting *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148 (1982)); *see also Contributors to Pa. Hosp. v. City of Phila.*, 245 U.S. 20 (1917). Despite the assertion that DHS contracted away the sovereign's right to alter Federal immigration policy, DHS could not and did not do so.

        2.   <u>DHS lacked statutory authority to enter into the purported agreements.</u>

Further, the States fail to identify any permissible statutory authority that contemplates DHS entering into a contract to grant states such power to delay and review agency policy decisions. Indeed, it has long been a principle of federal government contract law that an individual

entering a contract on behalf of the federal government must have statutory authority to do so: "Our statute books are filled with acts authorizing the making of contracts with the government through its various officers and departments, but, in every instance, the person entering into such a contract must look to the statute under which it is made, and see for himself that his contract comes within the terms of the law." *The Floyd Acceptances*, 74 U.S. 666, 680 (1868); *see also CACI, Inc. v. Stone*, 990 F.2d 1233, 1237 (Fed. Cir. 1993) ("[T]here cannot be a contract when the government agent lacks actual authority to create one."); *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 23 (1977) ("[T]he Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty."); *Stone v. Mississippi*, 101 U.S. 814, 817 (1880) ("[T]he legislature cannot bargain away the police power of a State."). None of the statutory authorities cited in the agreement provides the authority for the agreement that the States purportedly entered with DHS; all applicable statutes preserve federal prerogatives.[20]

Not only were the purported agreements executed without statutory authority, they run afoul of the subdelegation doctrine. *U.S. Telecom Ass'n v. F.C.C.*, 359 F.3d 554, 565 (D.C. Cir. 2004), ("subdelegations to outside parties are assumed to be improper absent an affirmative showing of congressional authorization"). Had Congress intended to authorize such extraordinary agreements, it certainly would have done so expressly with unmistakable clarity. *Cf. Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). The purported agreements are therefore unauthorized by statute.

## IV.   Texas and Louisiana fail to state an independent claim under the Take Care Clause.

The States also assert that the Priority Framework violates the Take Care Clause, Art. II, § 3, because it violates §§ 1226(c) and 1231(a)(1)(A). *See* PI Mot. 25-26. That assertion collapses into their argument that the Acting Secretary's and Acting ICE Director's enforcement prioritization exceed their statutory authority, and is flatly contradicted by the Supreme Court's

---

[20] Relatedly, an agency cannot use its contracting authority to circumvent the constraints of the Administrative Procedure Act (APA) by constraining the agency from making future changes to immigration policy. Any such constraint would be a legislative rule that binds an agency, subject to the requirements of the APA. *See, e.g.*, *Davidson v. Glickman*, 169 F.3d 996, 999 (5th Cir. 1999).

admonishment in *Dalton v. Specter* that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." 511 U.S. 462, 473 (1994). As demonstrated above, however, the Memoranda—far from being incompatible with the statute—are firmly supported by foundational principles concerning the exercise of enforcement discretion, and a long history recognized by the Supreme Court.

The Take Care Clause, nevertheless, cannot a furnish basis for affirmative relief in an Article III court. For the Judicial Branch to superintend how the President performs his executive functions would express a "lack of the respect due" to the Nation's highest elected official. *Baker v. Carr*, 369 U.S. 186, 217 (1962). Indeed, the Supreme Court has recognized that "the duty of the President in the exercise of the power to see that the laws are faithfully executed" "is purely executive and political," and not subject to judicial direction. *Mississippi v. Johnson*, 71 U.S. 475, 499 (1866). But, *Armstrong v. Exceptional Child Center, Inc.*, on which Texas inexplicably relies, *see* PI Mot. 26, confirms that "the Supremacy Clause is not the source of any federal rights, and certainly does not create a cause of action." *See* 575 U.S. 320, 324 (2015).

The States try to circumvent this controlling authority by citing an out-of-circuit district court case that was not even addressing a Take Care Clause claim. *See* PI Mot. 25 (citing *Make the Rd. N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 258 (S.D.N.Y. 2020)). There, the district court found that a presidential proclamation was reviewable as a potential constitutional separation of powers violation. But that decision contravenes the Supreme Court's decision in *Dalton*. As *Dalton* explained, almost any challenge to the President's exercise of discretion under a statute could be recast as an allegation that the President violated the Constitution by exceeding Congress's grant of discretion. 511 U.S. at 472. The States also argue that they can bring the claim as an APA action for a constitutional claim or as an independent action, but both are unavailing. *See* PI Mot. 26. The Take Care Clause is directed at the President. Yet, an APA action is unavailable against the President, and, independent of the APA, longstanding precedent stands for the straightforward proposition that an injunction cannot run against the President. *See Franklin*, 505 U.S. at 796, 800-

40

801. In any event, the States' action is against other executive branch officials and they have already brought other statutory claims that these officials exceeded their statutory authority.

Regardless, the Acting Secretary and the Acting ICE Director faithfully—and vigorously—executed the immigration laws by ensuring DHS's limited resources are utilized for the highest priority criminal noncitizens. "Real or perceived inadequate enforcement of immigration laws does not constitute a reviewable abdication of duty." *Texas v. United States*, 106 F.3d 661, 667 (5th Cir. 1997). This is a proper act of discretion, not a failure to enforce immigration law. *See id.*

## V.    An injunction restraining core Article II authority outweighs any harm to the States and undermines the public interest.

Texas and Louisiana cannot establish that they will suffer an injury that outweighs the harm that their requested relief inflicts on the Defendants and the public interest. *See Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997). As discussed above, the States cannot show irreparable harm. *See, supra* section I. Their requested injunction, however, would impose a significant burden on the United States, and so the Court should deny the States' motion.

In arguing that "Defendants face no harm from a preliminary injunction," PI Mot. 34-35, the States ignore the realities of immigration enforcement. The federal government "has exercised prosecutorial discretion and had policies guiding such exercise since as early as 1909," Decker Decl. ¶ 10, and, accordingly, an injunction here would be a severe burden on core Article II authority by "invad[ing] a special province of the Executive." *See AADC*, 525 U.S. at 489. As noted by the Acting Assistant Director for Field Operations for the Enforcement and Removal Operations of ICE, there are a number of ways an injunction would harm ICE, and ultimately the public. *See* Decker Decl. ¶¶ 6-15. Primarily, an injunction would inhibit ICE's ability to prioritize its use of limited resources. *See id.* ¶¶ 7-11. That includes "re-tasking personnel to support operations in the Southwest Border," including a significant increase in several enumerated activities. *Id.* ¶ 11. Notably, in preliminarily enjoining DHS's pause on removals, this Court found that its injunction did not enjoin DHS "from refocusing its priorities." *See* 2021 WL 723856, at

41

*50 (finding that "crucially, the injunction itself [of the pause on removals] does not enjoin or impair DHS's ability to focus on southwest border reinforcement and the COVID-19 pandemic"). But an injunction here would do just that. *See* Decker Decl., ¶¶ 10-11.

In addition, an injunction would cause other operational harms. An injunction here would cause confusion amongst ICE's workforce. *See* Decker Decl. ¶¶ 12-14. "Absent clear priorities, ERO immigration officers may be left with only very general guidance—or no guidance at all— on the exercise of their discretion." *Id*. ¶ 12. Further, "[a]ny potential policy or operational confusion due to an injunction could additionally harm ICE's relationship with state and local stakeholders." *Id*. ¶ 13. Importantly, the mandatory injunction that Texas and Louisiana seek—a mandatory duty to detain all individuals covered by 8 U.S.C. §§ 1226(c) and 1231(a)(2)—is not even operationally feasible. *See* Decker Decl. ¶¶ 7-8. For example, the States' requested injunction may require "significant ICE bedspace and personnel which does not currently exist," and so "[c]ompliance . . . would likely require expansion of these resources beyond those currently budgeted and allocated by Congress." *Id.* ¶ 7.

Furthermore, this injunction would also require DHS to alter its practices with respect to enforcement actions. Indeed, when "an officer encounters a noncitizen in a state or local jail who has been convicted of a crime," she or he first determines whether "probable cause exists as to removability." *Id.* ¶ 8. ICE *only then* conducts the "legal analysis" necessary to "determin[e] whether that individual is subject to 8 U.S.C. § 1226(c)(1) or 8 U.S.C. § 1231(a)(2)." *Id.* Thus, "Plaintiffs' requested relief" would require "ICE . . . to first determine the immigration and criminal history status . . . of each noncitizen it encounters," and then assess "whether these noncitizens subject to detention under either section 1226(c) or section 1231(a)(2)," a process that "would require a massive influx of investigative and operational resources." *Id.*

Finally, an injunction here would impede DHS's deliberative process in drafting final guidance. *See* Decker Decl. ¶ 15. Again, the challenged Memoranda set interim priorities until DHS concludes its review and issues final prioritizations. "The interim guidance issued by Acting Director Johnson seeks to facilitate a dialogue between ICE's field offices, senior leadership, and

DHS HQ, about what DHS's immigration enforcement priorities should be, and how they should be implemented." *See id*.

As for the public interest, allowing the federal government to prioritize national security, border security, and public safety, certainly serves the public. In the end, the federal government has discretion to determine whether particular enforcement actions are ultimately in the public interest, considering both opportunity costs and second-order consequences. *See Arizona*, 567 U.S. at 395 (noting how "[i]mmigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws"); *id*. at 396 (and "human concerns."). It may be that Texas and Louisiana disagree with DHS's prioritization of certain public safety threats and its utilization of its limited resources, but the federal government—not Texas or Louisiana—is charged with enforcing immigration laws. An injunction that interferes with that assessment is unwarranted in any circumstance.

**VI.   Any relief ordered should be narrow.**

"When crafting an injunction, district courts are guided by the Supreme Court's instruction that "'the scope of injunctive relief is dictated by the extent of the violation established.'" *O'Donnell v. Harris Cty.,* 892 F.3d 147, 163 (5th Cir. 2018) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Thus, a "district court abuses its discretion if it does not 'narrowly tailor an injunction to remedy the specific action which gives rise to the order.'" *Id.* (quoting *John Doe # 1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004)). Accordingly, even if this Court were to grant the States a preliminary injunction, it should limit the injunction both in scope and geography. It should refuse the States' request to issue a mandatory injunction under 5 U.S.C. § 706(1), and, additionally, it should limit any injunction to Texas and Louisiana.

*A.    The States are not entitled to relief under 5 U.S.C. § 706(1).*

To this extent the States are able to prevail in their motion, they are not entitled to relief under 5 U.S.C. § 706(1), which, under limited circumstances, allows for an order "compel[ling] agency action unlawfully withheld." *Contra* PI Mot. 18, 19 (arguing that, pursuant to 5 U.S.C.

§ 706(1) this Court should issue a mandatory injunction compelling DHS to take custody of individuals covered by 8 U.S.C. §§ 1226(c) and 1231(a)(2)). The States have not met their high burden for such a mandatory injunction. *See Harris v. Wilters*, 596 F.2d 678, 680 (5th Cir. 1979)) ("Only in rare instances is the issuance of a mandatory preliminary injunction proper."), *accord Hyde v. Selene Fin. LP*, No. 4:17-cv-993, 2017 WL 11552846, at *2 (N.D. Tex. Dec. 29, 2017) ("when a plaintiff seeks a preliminary injunction, there is a heavier burden on plaintiff to establish that injunctive relief is appropriate"). A "claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis in original). As explained above, DHS retains prosecutorial discretion at every step of the removal process concerning whether to arrest, detain, or remove any specific noncitizen. *AADC*, 525 U.S. at 483-84. Here, a mandatory injunction is particularly inappropriate because it "would likely require expansion of [ICE's] resources beyond those currently budgeted and allocated by Congress" and is otherwise "unreasonably and unduly burdensome, if not entirely impossible." *See* Decker Decl. ¶ 7.

In any event, to the extent §§ 1226(c)(1) and 1231(a)(2) require some discrete agency action, they do not require DHS to issue *detainers* in particular. *Contra* PI Mot. 12; *see id.* at 16, 17 (arguing that such detainers are mandatory and presumably what should be ordered under § 706(1)). "Filing a detainer is an *informal* procedure in which [DHS] informs prison officials that a person is subject to deportation and requests that officials give [DHS] notice of the person's death, impending release, or transfer to another institution." *Zolicoffer v. U.S. Dep't of Justice*, 315 F.3d 538, 540 (5th Cir. 2003) (emphasis added). Section 1357(d)—the only provision of the INA explicitly mentioning detainers—provides only that in certain circumstances involving noncitizens arrested for controlled substance violations, DHS should "promptly determine whether or not to issue such a detainer." *See* 8 U.S.C. § 1357(d). The regulation codifying DHS's detainer authority more broadly—provides only that authorized officers "*may* at any time issue a Form I-247, Immigration Detainer-Notice of Action, to any other Federal, State, or local law enforcement agency . . . ." 8 C.F.R. § 287.7(a) (emphasis added); *see also Santoyo v. United States*, No. 5:16-

CV-855-OLG, 2017 WL 6033861, at *3 (W.D. Tex. Oct. 18, 2017) ("The statutory and regulatory authorities that regulate the issuance of ICE detainer requests do not mandate their issuance, but provide that defined categories of officers may issue them when, in the officer's judgment, certain circumstances are present.").

And, because the decision to issue a detainer request is discretionary, nothing requires DHS to maintain a detainer it has previously issued. Indeed, current policy provides that "after issuing an immigration detainer . . . ICE may determine that it will not assume custody of the subject" and that "[i]n these cases, the ICE immigration officer must cancel the immigration detainer as soon as such determination is made." ICE Policy No. 10074.2 ¶ 2.8. Accordingly, nothing in the INA, its implementing regulations, or applicable policies requires DHS to issue detainers or to maintain those detainers for any particular noncitizens once issued.

Moreover, if DHS may decline to detain or remove individual noncitizens on a case-by-case basis, *see id.*, settled principles of administrative law dictate that DHS may do so through broad policies applicable in individual cases. *See Lopez v. Davis*, 531 U.S. 230, 243-44 (2001). Indeed, the "discrete agency action" requirement exists "to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve," *Norton*, 542 U.S. at 66, and thus forecloses "broad programmatic attack[s]," *id.* at 65, on how an agency "discharge[s] [its] multitudinous duties." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 543 (1978). That is especially so in the immigration context where "flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950).

Accordingly, regardless of whether this Court ultimately agrees with Texas and Louisiana on the merits, it should reject their invitation to issue a mandatory injunction.

B.    *Any relief should be limited to enforcement actions in Texas and Louisiana.*

Further, as this Court has previously expressed "deep skepticism of nationwide injunctions in general," it should limit any relief here to enforcement actions that take place in the plaintiff

states: Texas and Louisiana. 2021 WL 723856, at *51. Nationwide relief that would affect those who are not parties to this case would exceed this Court's authority under Article III and violate longstanding equitable doctrine. "Article III of the Constitution limits the exercise of the judicial power to 'Cases' and 'Controversies.'" *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). Given that three other states have sought preliminary injunctions in two other jurisdictions, and that one of which has already been denied, it is particularly appropriate to limit relief in this case. *See E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1030 (9th Cir. 2019) (finding that several lawsuits brought challenging the same government action counsels against a nationwide injunction to allow the issue to percolate in the lower courts). As Justice Gorsuch recently warned: "If a single successful challenge is enough to stay the challenged rule across the country, the government's hope of implementing any new policy could face the long odds of a straight sweep, parlaying a 94-to-0 win in the district courts into a 12-to-0 victory in the courts of appeal." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600-01 (2020) (Gorsuch, J. concurring).

In arguing for a nationwide injunction, Texas and Louisiana misapply this Court's analysis in issuing the preliminary injunction of the removal pause. *See* PI Mot. 35-36. In that case, this Court found the Fifth Circuit's analysis controlling as applied to the facts of that case, but the facts of this case are different. First, this Court found that Fifth Circuit precedent promoting uniformity of immigration law applied to a blanket policy pausing removals, but it also agreed with Defendants that individual removal decisions "are indeed inherently discretionary and non-uniform." *See* 2021 WL 723856, at *52. That is the case here. As described above, the Priority Framework requires individualized determinations. Accordingly, the purported need for uniformity in immigration is inapplicable here where there is inherently non-uniformity. Second, this Court found that Texas had made a sufficient showing that a more localized nationwide injunction would be ineffective because of the potential movement between states. *See id.* But the States' claim of injury here is premised on the application of detainers within Texas and Louisiana. *See* Exhibits C and L to PI Mot. (ECF Nos. 19-3 and 19-12) (providing examples within Texas

and Louisiana). The States have not relied on anything beyond conjecture that they would suffer any injury if the injunction is limited to Texas and Louisiana. Further, basic logic dictates that an individual would be unlikely to move to Texas or Louisiana if he or she would be more likely to be subject to an enforcement action if he or she resided in those jurisdictions. Accordingly, due to the differences from the previous litigation concerning the removal pause, the States cannot rely on that decision in support of a nationwide injunction.

In the end, Article III and equitable principles, including respect for sister courts, dictate that any injunction should be no broader than necessary to address the purported harm that would occur absent a preliminary injunction. This Court should limit any potential injunction both by scope and geography.

## CONCLUSION

For the reasons stated herein, the States' motion for a preliminary injunction should be denied.

Dated: May 18, 2021                    Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General


BRIGHAM J. BOWEN
Assistant Branch Director

 /s/ Adam D. Kirschner
ADAM D. KIRSCHNER
Attorney-in-charge
IL Bar. No. 6286601
Senior Trial Counsel
BRIAN C. ROSEN-SHAUD
ME Bar No. 006018
MICHAEL F. KNAPP
CA Bar No. 314104
KUNTAL CHOLERA
DC Bar No. 1031523
Trial Attorneys
United States Department of Justice

Civil Division, Federal Programs Branch
Tel: (202) 353-9265
Fax: (202) 616-8460
Email: Adam.Kirschner@usdoj.gov
        Brian.C.Rosen-Shaud@usdoj.gov
        Michael.F.Knapp@usdoj.gov
        Kuntal.Cholera@usdoj.gov

Mailing Address:
Post Office Box 883
Washington, D.C. 20044

Courier Address
1100 L Street NW, Room 11020
Washington, D.C. 20005

EREZ REUVENI
CA Bar No. 264124
Assistant Director
U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
202-307-4293 (telephone)
Email: Erez.R.Reuveni@usdoj.gov

*Counsel for Defendants*


DANIEL DAVID HU
Assistant United States Attorney
Chief, Civil Division
State Bar No. 10131415
S.D. I.D. 7959
Southern District of Texas
1000 Louisiana, Suite 2300 Houston, TX 77002
Tel: (713) 567-9000
Fax: (713) 718-3300
Daniel.Hu@usdoj.gov

*Local Counsel*

48

**CERTIFICATE OF COMPLIANCE**

I certify that the total number of words in this motion, exclusive of the matters designated for omission, is 17,959 as counted by Microsoft Word.

*/s/ Adam D. Kirschner*

ADAM D. KIRSCHNER

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on May 18, 2021.

*/s/ Adam D. Kirschner*
ADAM D. KIRSCHNER

49