IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS,
VICTORIA DIVISION

| | |
|---|---|
| STATE OF TEXAS; STATE OF LOUISIANA,<br><br>     Plaintiffs,<br>v.<br><br>The UNITED STATES OF AMERICA; ALEJANDRO MAYORKAS, Secretary of the United States Department of Homeland Security, in his official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TROY MILLER, Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection, in his official capacity; U.S. CUSTOMS AND BORDER PROTECTION; TAE JOHNSON, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TRACY RENAUD, Senior Official Performing the Duties of the Director of the U.S. Citizenship and Immigration Services, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES,<br><br>     Defendants. | Civil Action No. 6:21-cv-00016 |

**MEMORANDUM OF LAW OF IMMIGRATION REFORM LAW INSTITUTE
AS *AMICUS CURIAE* IN SUPPORT OF
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................1

ARGUMENT .......................................................................................................................3

    I.    Legal Standard ................................................................................................3

    II.    Plaintiffs are Likely to Succeed on the Merits ................................................4

    III.    Harm Resulting From Defendants' Enforcement Priorities ..........................10

CONCLUSION ..................................................................................................................14

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Arizona v. United States*,
   567 U.S. 387 (2012) ................................................................................................. 10, 11

*Burgess v. FDIC*,
   871 F.3d 297 (5th Cir. 2017) ............................................................................................ 12

*Clark v. Prichard*,
   812 F.2d 991 (5th Cir. 1987) .............................................................................................. 3

*DHS v. Regents of the U. of Cal.*,
   140 S. Ct. 1891 (2020) ..................................................................................................... 11

*Galvan v. Press*,
   347 U.S. 522 (1954) ......................................................................................................... 10

*Opulent Life Church v. City of Holly Springs, Miss.*,
   697 F.3d 279 (5th Cir. 2012) .............................................................................................. 3

*State of Tex. v. Seatrain Int'l, S. A.*,
   518 F.2d 175, 180 (5th Cir. 1975) ...................................................................................... 3

*Texas v. United States*,
   2021 U.S. Dist. LEXIS 33890, 2021 WL 723856 (S.D. Tex. 2021) .................................. 2

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) ............................................................................................ 12

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ............................................................................................................... 3

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ......................................................................................................... 13

## STATUTES & REGULATIONS

8 C.F.R. § 287.5 ........................................................................................................... 9, 10

8 C.F.R. § 287.5(c) ............................................................................................................ 9

6 U.S.C. § 202 .................................................................................................................5

6 U.S.C. § 251 .................................................................................................................5

8 U.S.C. § 1103(a)(1) ......................................................................................................5

8 U.S.C. § 1182(a) ...........................................................................................................5

8 U.S.C. § 1182(a)(1) ......................................................................................................5

8 U.S.C. § 1182(a)(2) ......................................................................................................6

8 U.S.C. § 1182(a)(3) ......................................................................................................6

8 U.S.C. § 1182(a)(4) ......................................................................................................6

8 U.S.C. § 1182(a)(5) ......................................................................................................6

8 U.S.C. § 1182(a)(6) ......................................................................................................6

8 U.S.C. § 1182(a)(7) ......................................................................................................6

8 U.S.C. § 1182(a)(8) ......................................................................................................6

8 U.S.C. § 1182(a)(9) ......................................................................................................6

8 U.S.C. § 1182(a)(10) ....................................................................................................6

8 U.S.C. § 1226(c) ...........................................................................................................4

8 U.S.C. § 1227 ...............................................................................................................6

8 U.S.C. § 1227(a)(1) ......................................................................................................6

8 U.S.C. § 1227(a)(2) ......................................................................................................6

8 U.S.C. § 1227(a)(3) ......................................................................................................6

8 U.S.C. § 1227(a)(4) ......................................................................................................6

8 U.S.C. § 1227(a)(5) ......................................................................................................6

8 U.S.C. § 1227(a)(6) ......................................................................................................6

8 U.S.C. § 1321(a)(2) .................................................................................................... 4

8 U.S.C. § 1357 ............................................................................................................. 9

8 U.S.C. § 1357(a)(4) .................................................................................................... 9

U.S. CONST. art. II, § 3 ................................................................................................ 13

## **MISCELLANEOUS**

Executive Order 13993, Revision of Civil Immigration Enforcement
    Policies and Priorities, 86 Fed. Reg. 7051 (Jan. 25, 2021) .................................... 1

Proclamation 10142, Termination of Emergency With Respect to the
Southern Border of the United States and Redirection of Funds Diverted
to Border Wall Construction, 86 Fed. Reg. 7225 (Jan. 27, 2021) ............................. 1

## INTRODUCTION

On his first day in office, President Biden immediately began dismantling programs and policies designed to secure the nation's borders and enforce the Immigration and Nationality Act ("INA"). For example, President Biden issued Executive Order 13993, 86 Fed. Reg. 7051 (Jan. 25, 2021), revising immigration enforcement priorities, and Proclamation 10142, 86 Fed. Reg. 7225 (Jan. 27, 2021), terminating border wall construction. In addition, the Department of Homeland Security ("DHS") announced the termination of the Migrant Protection Protocols ("MPP") program, otherwise known as the "Remain in Mexico" policy. *See* DHS Press Release: *DHS Statement on the Suspension of New Enrollments in the Migrant Protection Protocols Program*, available at: https://www.dhs.gov/news/2021/01/20/dhs-statement-suspension-new-enrollments-migrant-protection-protocols-program (last visited May 12, 2021). DHS also issued a memorandum entitled "Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities," dated January 20, 2021 (the "January Memo"), in which it announced an immediate 100-day pause of all removals and extremely narrow immigration enforcement priorities. *See* Exhibit ("Ex.") A (attached to Plaintiffs' Motion for a Preliminary Injunction ("PI Motion")).

This case involves the enforcement priorities established by the January Memo, which drastically restricts enforcement actions that immigration officers can take. In section A of the January Memo, the acting Secretary ordered a Department-wide review of policies and practices concerning immigration

1

enforcement. *Id.* at 2. In section B, the acting Secretary established interim enforcement priorities focused on National Security, Border Security, and Public Health. *Id.* In section C, the acting Secretary announced an immediate 100-day pause of all removals, subject to narrow exceptions. *Id.* at 3.

On January 26, 2021, this Court entered a nationwide temporary restraining order against the 100-day stay of removals, and on February 23, the court converted the TRO into a preliminary injunction. *Texas v. United States*, 2021 U.S. Dist. LEXIS 33890, *9, *147-48, 2021 WL 723856 (S.D. Tex. 2021). The government continued to follow its enforcement priorities.

On February 18, 2021, the Acting Director of Immigration and Customs Enforcement ("ICE") issued an interim guidance memorandum in support of the January Memo. Ex. B ("February Memo"). This memorandum largely reiterated the enforcement priorities set forth in the January 20 Memo. Ex. B at 4-5. Although the February 18 Memo stressed that "the interim priorities do not require or prohibit the arrest, detention, or removal of any noncitizen," *id.* at 3, it requires an immigration officer to make a written justification for a proposed enforcement action and to receive preapproval from a Field Office Director or Special Agent in Charge before the officer may take an enforcement action against a non-priority alien. *Id.* at 6. Thus, prior to the issuance of the February Memo, an immigration officer had the authority conferred by the INA and the implementing regulations to take enforcement actions against any individual who is present in the United States in violation of the immigration laws. After the issuance of the February Memo,

however, an immigration officer must seek permission from a supervisor in writing before enforcing the law. These actions signaled to potential border crossers that the government was no longer acting to secure our border and resulted in the ongoing surge of migrants at the Southern border.

## ARGUMENT

### I. Legal Standard

The standard for deciding whether to issue a preliminary injunction is the same standard used to issue a temporary restraining order. *See Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987). That standard requires a movant to show (1) a likelihood of success on the merits, (2) that the movant is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in the movant's favor, and (4) that an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 288 (5th Cir. 2012). "The party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated before a temporary restraining order or preliminary injunction can be granted." *Clark*, 812 F.2d at 993. "[N]one of the four prerequisites has a fixed quantitative value," however. *State of Tex. v. Seatrain Int'l, S. A.*, 518 F.2d 175, 180 (5th Cir. 1975). "Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *Id.*

## II.    Plaintiffs are Likely to Succeed on the Merits

As Plaintiffs have demonstrated in their motion for a preliminary injunction, the immigration enforcement priorities established in the January and February Memos are contrary to law, arbitrary and capricious, and procedurally invalid. *See* Plaintiffs' Motion for Preliminary Injunction ("PI Motion") at 12-25. In their PI Motion, Plaintiffs focus largely on how the enforcement priorities run afoul of statutory provisions mandating the detention of criminal aliens pending removal proceedings and during the removal period. *See id.* at 12-19; *see also* 8 U.S.C. §§ 1226(c), 1231(a)(2). But the enforcement priorities established by the Memos restrict immigration officers from taking many other enforcement actions authorized by the INA. In the February Memo, these restricted actions include: issuing a detainer; issuing, serving, filing, or cancelling a Notice to Appear; stopping, questioning, or arresting a noncitizen for an immigration violation; deciding whether to detain or release an alien from custody; deciding whether to grant deferred action; and executing a removal order. Ex. B at 3. The enforcement priorities as implemented in the February Memo restrict immigration officers from taking enforcement actions against the vast majority of immigration violators. Indeed, in fiscal year 2020, "90 percent of ICE ERO's administrative arrests were for aliens with criminal convictions or pending criminal charges while the remaining 10 percent were other immigration violators." U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations, Fiscal Year 2020 Enforcement and Removal Operations Report ("2020 ICE Report") at 13, available

at: https://www.ice.gov/doclib/news/library/reports/annual-report/eroReportFY2020.pdf, (last visited May 12, 2021). In fiscal year 2018, criminal aliens constituted 87 percent of all ICE interior removals. *See id.* at 14 (Figure 9). Yet even though 87-90 percent of all ICE interior removals are criminal aliens, in at least fiscal year 2018, only 15 percent of the interior removals were aggravated felons. *See* Center for Immigration Studies, *Biden Freezes ICE; Suspends 85% of Criminal Alien Deportations* ("CIS Analysis"), available at: https://cis.org/Vaughan/Biden-Freezes-ICE-Suspends-85-Criminal-Alien-Deportations (last visited May 12, 2021). In other words, the vast majority of aliens arrested and removed by ICE are criminal aliens, yet aggravated felons make up only about 15 percent of total ICE interior removals.

The INA establishes a comprehensive and uniform immigration system governing who may enter and remain in the United States and charges the Secretary of the DHS "with the administration and enforcement" of "laws relating to the immigration and naturalization of aliens" except to the extent that the law "relate[s] to the powers, functions, and duties conferred upon" other executive branch officers. 8 U.S.C. § 1103(a)(1); *see also* 6 U.S.C. §§ 202, 251 (listing immigration-related duties for which the DHS Secretary is responsible).

The INA specifies many classes of aliens who are removable from the United States. Section 1182(a) of Title 8 of the United States Code describes classes of aliens who are ineligible for admission to the United States. These include: aliens with communicable diseases (§ 1182(a)(1)), aliens who have been convicted of

specified crimes (§ 1182(a)(2)), aliens who are a threat to national security (§ 1182(a)(3)), aliens who are likely to become a public charge (§ 1182(a)(4)), alien workers who would adversely affect the wages and working conditions of American workers (§ 1182(a)(5)), aliens who are present in the United States without being admitted or who enter the United States by fraud or misrepresentation (§ 1182(a)(6)), aliens who do not possess a valid entry document (§ 1182(a)(7)), aliens who are permanently ineligible for citizenship due to draft evasion (§ 1182(a)(8)), aliens who apply for admission within a certain period after being removed (§ 1182(a)(9)), and various other aliens such as polygamists, unlawful voters, and individuals who renounced U.S. citizenship in order to avoid taxes (§ 1182(a)(10)).

Section 1227 of Title 8 of the United States Code defines certain classes of aliens who are deportable (that is, removable) from the United States. These classes of aliens include: aliens who were inadmissible at the time of entry, have violated the terms of their status (visa overstays), participated in human smuggling, or engaged in marriage fraud (§ 1227(a)(1)), aliens who have been convicted of specified crimes (§ 1227(a)(2)), aliens who fail to comply with registration requirements, falsify immigration documents, or falsely claim citizenship (§ 1227(a)(3)), aliens who are a threat to national security or have engaged in terrorist activities (§ 1227(a)(4)), aliens who have become a public charge (§ 1227(a)(5)), and aliens who unlawfully vote in the United States (§ 1227(a)(6)).

Under the February Memo, immigration officers are restricted from taking any enforcement action against most of these classes of inadmissible or deportable aliens. According to one analysis, in fiscal year 2018 (the latest year for which data were available), "only about 15 percent of the criminal aliens removed from the interior in 2018" were aggravated felons, and "88 percent of all interior deportations" were classified as "not aggravated felons" by the government. *See* CIS Analysis. Aliens removed by ICE "include both aliens arrested by ICE ERO in the interior of the country" (interior deportations or removals) and aliens "who are apprehended by CBP and subsequently turned over to ICE ERO for removal." 2020 ICE Report at 18.[1] According to the 2020 ICE Report, aliens removed who are known or suspected gang members make up approximately two percent of total removals. *See id.* at 19, 21 (compare Figures 19 and 21, depicting total ICE removals and ICE removals of gang members, respectively). The number of terrorist removals is statistically small. *See id.* at 23 (Figure 22, showing that between 31 and 58 terrorists were removed during the past three years).

---

[1] Although the government publishes data relating to the numbers and types of criminal aliens removed from the United States, it does not generally distinguish aggravated felons from other criminal aliens. *See* 2020 ICE Report at 14-16, 23-24. The vast majority of interior deportations consist of criminal aliens because ICE has long prioritized the removal of criminal aliens. *See id.* at 13 ("ICE remains committed to directing its enforcement resources to those aliens posing the greatest risk to public safety and security threats to the United States. As a result, the majority of aliens arrested by ICE ERO are convicted criminals, followed by those with pending criminal charges at the time of arrest. In FY 2020, 90 percent of ICE ERO's administrative arrests were for aliens with criminal convictions or pending criminal charges while the remaining 10 percent were other immigration violators.").

The January and February Memos are remarkable in how narrowly they define interim enforcement priorities and reflect the government's conscious decision to not enforce the vast majority of the immigration laws. The only aliens identified as enforcement priorities under the February Memo consist of: 1) terrorists, spies, or other national security risks; 2) recent arrivals (defined as those aliens who enter or attempt to enter the United States on or after November, 1, 2020); and 3) aggravated felons or criminal gang members who pose a risk to public safety. Ex. B at 4-5. The February Memo permits immigration officers to exercise their discretion in taking enforcement actions against aliens who fall within one of the three priority categories, but requires preapproval by a Field Office Director or Special Agent in Charge before any enforcement action may be taken against an alien who falls outside those priority categories. *Id.* at 5-6. By limiting enforcement priorities to terrorists, spies, aggravated felons, and gang members, the government is consciously refusing to enforce the law against the vast majority of aliens unlawfully present in the United States. Put another way, even though 90 percent of removals prior to the January and February Memos involved criminal aliens, under the enforcement priorities established by those Memos, about 85 to 88 percent of those criminal aliens will no longer be subject to enforcement action.

In addition, the preapproval process established by the February Memo contradicts the INA and implementing regulations. The INA establishes the powers of immigration officers, which include the authority to take certain actions without

warrant, to administer oaths and take evidence, and to detain aliens in specified situations. *See* 8 U.S.C. § 1357. The applicable regulations grant certain authorized immigration officers the "[p]ower and authority to interrogate[;] [to] patrol the border[;] to arrest[;] to conduct searches[;] to execute warrants[;] [and] to carry firearms." 8 C.F.R. § 287.5. Authorized officers are those "who have successfully completed basic immigration law enforcement training" and generally include:

> border patrol agents; air and marine agents; special agents; deportation officers; CBP officers; immigration enforcement agents; supervisory and managerial personnel who are responsible for supervising the activities of those officers listed in this paragraph; and immigration officers who need the authority to arrest persons under [8 U.S.C. § 1357(a)(4)] in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner of CBP, the Assistant Secretary/Director of ICE, or the Director of the USCIS.

8 C.F.R. § 287.5(c).

The February Memo, however, severely limits this authority by requiring immigration officers to seek pre-approval for non-priority enforcement actions, as well as instituting a new level of review for such decisions. The February Memo provides that "[a]ny civil immigration enforcement or removal actions that do not meet the . . . criteria for presumed priority cases will require preapproval." Ex. B at 6. Furthermore, such approval, if obtained, only applies to the alien it references and does not extend to any aliens "encountered during an [approved] operation if" the aliens are not in one of the priority categories. *Id.* Thus, immigration officers who previously had the authority to interrogate and arrest aliens without a warrant

9

have been stripped of such authority and may now only exercise it in "exigent circumstances." *Id.* at 6.

Such officers are also prevented from taking enforcement actions against aliens with final orders of removal who do not meet DHS's priority criteria. *Id.* Any officer who takes an enforcement action against a non-priority alien without the preapproval required by the new DHS policy must subsequently submit paperwork for such approval. *Id.* It is unclear what consequences will follow should such retroactive preapproval be denied. Thus, these new procedures are not supported by the INA and are in direct conflict with current regulations, which authorize immigration officers to conduct enforcement and removal operations without first obtaining preapproval. *See* 8 C.F.R. § 287.5.

## III. Harm Resulting From Defendants' Enforcement Priorities

Against this backdrop of drastically restrictive enforcement priorities, Plaintiff States have little recourse but to ask this Court to enjoin Defendants to enforce the law. Although the various States and local communities throughout the country bear many of the consequences of illegal immigration, federal law regulating immigration largely preempts any State or local laws aimed at addressing those consequences. *See Arizona v. United States*, 567 U.S. 387, 397 (2012) (acknowledging that States bear consequences of unlawful immigration); *Galvan v. Press*, 347 U.S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are . . . entrusted exclusively to Congress . . . ."). Not only are States and localities prevented from legislating with respect to

10

immigration, State officials are largely prevented from enforcing federal immigration laws. *See Arizona*, 567 U.S. at 407-10 (describing the limited circumstances in which State officers may perform the functions of an immigration officer). Thus, States are powerless to address the consequences of illegal immigration if the federal government refuses to enforce the immigration laws.

Plaintiffs have shown that the enforcement priorities established by the January and February Memos will cause harm sufficient both for standing and for a preliminary injunction. *See* PI Motion at 28-30, 33-34. Plaintiffs have shown that they will incur costs related to the detention of criminal aliens, the education of unaccompanied minors, healthcare and other social services costs for illegal aliens, and costs related to increased criminal activity due to recidivism of criminal aliens released from detention. *See id.* at 28-30.

The DHS's enforcement priorities will result in a marked increase in the illegal alien population within Plaintiff States because ICE will only take enforcement actions against terrorists, spies, aggravated felons, and gang members. As noted above, of all interior deportations in fiscal year 2020, 90 percent involved criminal aliens, but only 15 percent involved aggravated felons and about two percent involved gang members. *See* CIS Analysis; 2020 ICE Report. Accordingly, under the restrictive enforcement priorities established by the February Memo, enforcement actions against the remaining 83 percent of removable aliens will all but cease. Such a sudden and drastic shift in policy will impose a sudden increase in detention, education, and healthcare costs for Plaintiff States. *See DHS v. Regents*

11

*of the U. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (finding that a sudden shift in the government's immigration policy was arbitrary and capricious in part because the government "failed to address whether there was legitimate reliance" on the former immigration policy (internal quotation omitted)).

In order to qualify for an injunction, Plaintiffs need only demonstrate "a substantial threat of irreparable injury if the injunction is not issued." *Texas v. United States*, 809 F.3d 134, 150 (5th Cir. 2015). For their injury to be sufficiently "irreparable," Plaintiffs need only show it "cannot be undone through monetary remedies." *Burgess v. FDIC*, 871 F.3d 297, 304 (5th Cir. 2017). Plaintiffs have met this burden here. Further, Defendants will suffer no harm if an injunction is granted. Even if Defendants would incur additional detention or enforcement costs due to an injunction, such costs are mandated by statute and should not be weighed against the harm Plaintiff States are suffering due to Defendants non-enforcement policies.

Finally, the Court should grant Plaintiffs' motion in order to reinforce the rule of law and the constitutional separation of powers. Under separation-of-powers principles, it falls to Congress to make the laws, to the Executive to enforce the laws faithfully, and to the judiciary to interpret the laws. Under that division of authority, this Court clearly must reject the interim guidance:

> With all its defects, delays and inconveniences, men have discovered no technique for long preserving free government except that the Executive be under the law, and that the law be made by parliamentary deliberations.

12

> Such institutions may be destined to pass away. But it is the duty of the Court to be last, not first, to give them up.

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 655 (1952). Justice Jackson put *Youngstown* within a "judicial tradition" beginning with Chief Justice Coke's admonishing his sovereign that "[the King] is under God and the Law." *Id.* at 655 n.27 (interior quotation marks omitted).

The restrictions on the enforcement actions immigration officers are authorized to take under the February Memo do not only apply to the detention and removal of criminal aliens. Rather, the restrictions apply to "decision[s] to issue, serve, file, or cancel a Notice to Appear" (the charging document in removal proceedings), as well as "to a broad range of other discretionary enforcement decisions, including" immigration stops and arrests, detentions and releases, and the termination of removal proceedings against facially removable aliens. Unless the court enjoins the enforcement priorities, there will be little or no immigration enforcement, or even removal proceedings, involving a broad swath of facially removable aliens for the foreseeable future. By instituting such drastically reduced enforcement, Defendants have consciously failed to "take Care that the Laws be faithfully executed," U.S. CONST. art. II, §3.

## CONCLUSION

For the foregoing reasons, Plaintiffs' request for a preliminary injunction should be granted.

Respectfully submitted on May 13, 2021,

/s/ *Matt A. Crapo*
MATT A. CRAPO
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
matt.crapo@pm.me
litigation@irli.org

*Counsel for Amicus Curiae*
*Immigration Reform Law Institute*

14

## CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2021, a true and accurate copy of the foregoing document was sent by FedEx, overnight service, addressed as follows:

Nathan Ochsner
Clerk of Court
312 S. Main St., Room 406
Victoria, Texas 77901

I further certify that on May 13, 2021, I emailed a true and accurate copy of the foregoing document to the following email addresses for counsel of record:

Counsel for Plaintiffs:
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
ryan.walters@oag.texas.gov
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

Counsel for Defendants:
Adam.Kirschner@usdoj.gov
Daniel.Hu@usdoj.gov
Brian.C.Rosen-Shaud@usdoj.gov
Kuntal.Cholera@usdoj.gov

Counsel for *Amicus* Advocates for Victims of Illegal Alien Crime (AVIAC):
wally@zimolonglaw.com
LWoodwark@IRLI.org

/s/ Matt Crapo
MATT A. CRAPO