# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 2:21-CV-067-Z |
| | § | |
| JOSEPH R. BIDEN, JR. *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

The Court enters the below-listed findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure after a consolidated hearing and trial on the merits on Plaintiff States Texas and Missouri's various claims against the federal Defendants.[1] For the reasons that follow, the Court **FINDS** and **CONCLUDES** that Plaintiffs are entitled to relief on their APA and statutory claims against Defendants. The Court will therefore enter judgment in favor of Plaintiffs. The Court also crafts injunctive relief to ensure Plaintiffs receive a full remedy.

### I. PROCEDURAL BACKGROUND

Only four months old, this case already has a complicated procedural history. Thus, the Court will quickly summarize the record before entering its findings of fact and conclusions of law.

On April 13, 2021, Plaintiffs filed this suit challenging the temporary suspension of the Migrant Protection Protocols ("MPP"). ECF No. 1. MPP was a program implemented by the

---

[1] Defendants are the United States of America; President Biden in his official capacity; the Department of Homeland Security ("DHS") and DHS Secretary Mayorkas in his official capacity; the United States Customs and Border Protection ("CBP") and Acting Commissioner of CBP Troy Miller in his official capacity; the United States Immigration and Customs Enforcement "ICE" and Acting ICE Director Tae Johnson; and the United States Citizenship and Immigration Services ("CIS") and Acting CIS Director Tracy Renaud in her official capacity.

Department of Homeland Security that returned some aliens temporarily to Mexico during the pendency of their removal proceedings. Specifically, Plaintiffs alleged that DHS's "two-sentence, three-line memorandum" that suspended enrollments in the Migrant Protection Protocols pending review of the program was a violation of the APA, 8 U.S.C § 1225, the Constitution, and a binding agreement between Texas and the federal government. *See* ECF No. 1 at 4; ECF No. 45 (showing the original administrative record to consist solely of the Secretary's January 20 Memorandum without any supporting documentation).

On May 3, Defendants made a motion to transfer this case to the Southern District of Texas. ECF No. 11. On June 3, the Court denied this motion in a written order. *See* ECF No. 47 at 9 ("Defendants' evidence, taken as a whole, does not establish that the convenience of the parties and witnesses will be enhanced by transferring this case.").

On May 14, Plaintiffs moved for a preliminary injunction. ECF No. 30. But before briefing was concluded, DHS completed its review of MPP and issued a new memorandum (the "June 1 Memorandum") that *permanently* terminated MPP.  ECF No. 46. The Court concluded the June 1 Memorandum mooted Plaintiffs' original complaint but allowed Plaintiffs to amend their complaint and file a new motion seeking to enjoin the June 1 Memorandum. *See* ECF No. 52 at 3 ("[T]he January 20 Memorandum expired upon the completion of DHS's review of the program.").

Accordingly, Plaintiffs amended their complaint and renewed their motion for a preliminary injunction.  *See* ECF Nos. 48, 53. On June 22, Defendants filed the administrative record. ECF No. 61. Three days later, Defendants filed their response to Plaintiffs' motion. ECF No. 63. Plaintiffs filed their reply on June 30.

But in addition to opposing Plaintiffs' Motion, Defendants also moved to strike the entire appendix attached to Plaintiffs' Motion because it arguably ran afoul of the "record rule." The

Court expedited briefing on this motion and denied the motion by written order for the reasons stated in ECF No. 76.

Next, the parties agreed with the Court that this case involved mainly questions of law. Accordingly, the parties favored consolidating the preliminary injunction hearing with the trial on the merits pursuant to Fed. R. Civ. P. 65(a)(2). ECF No. 68. The Court ordered the consolidation, provided notice to the parties, and allowed each party to file a supplemental brief before the hearing. *Id.*

Lastly, on July 20, two days before the hearing, Defendants filed a notice of a "corrected administrative record." ECF No. 78. By this notice, Defendants added the 2019 DHS assessment of MPP to the administrative record — even though Defendants knew for at least three weeks that the document was *not* included in the certified administrative record. ECF No. 85 at 2. Plaintiffs moved to strike this last-minute addendum to the administrative record. The Court denied that motion by written order on July 21. ECF No. 85 ("The delay between the government's acquiring knowledge of the missing document and its filing of notice with the Court comes perilously close to undermining the presumption of administrative regularity. But the Court finds the presumption is not overcome in this case.").

On July 22, the Court held a consolidated hearing and bench trial on the merits. The parties filed their proposed findings of fact and conclusions of law on July 27. ECF Nos. 91, 92. The parties also filed supplemental briefs on the scope of relief available to Plaintiffs. ECF Nos. 90, 93. Pursuant to Fed. R. Civ. P. 52(a), the Court may now enter its findings of facts and conclusions of law.

## II.   EVIDENTIARY OBJECTIONS[2]

**1.**     At the bench trial, Defendants made several objections to Plaintiffs' exhibits which the Court deferred ruling upon. Trial Tr. 8–30. The Court now overrules Defendants' objections under Fed. R. Evid. 401 as the exhibits are relevant to Plaintiffs' claims and overrules Defendants' objections under Fed. R. Evid. 403. "Rule 403 assumes a trial judge is able to discern and weigh the improper inferences that a jury might draw from certain evidence, and then balance those improprieties against probative value and necessity. Certainly, in a bench trial, the same judge can also exclude those improper inferences from his mind in reaching a decision." *Gulf States Util. Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. Unit A Jan. 1981).

**2.**     The Court overrules Defendants' privilege objections as to Exhibits A10 and C. The content Defendants seek to protect has been in the public record for months. Even if Defendants were unaware of Exhibit A10 and C at the time the exhibits were published, Defendants have been on notice since June 8, 2021, when Plaintiffs filed their Appendix in Support. ECF No. 54. The Court finds Defendants' privilege objections to be untimely and moot.

**3.**     The Court sustains Defendants' hearsay objections under Fed. R. Evid. 802 as to Plaintiffs' Exhibits A-7, A-9, A-11, A-12, A-13, and A-15 to the extent the information within the exhibits is offered for the truth of the matters asserted.

**4.**     The Court overrules Defendants' objections under Fed. R. Evid. 702 as to Plaintiffs' Exhibits D, E, F, F-1, G, G-1, H, H-1, and I. Defendants object to these exhibits, generally arguing Plaintiffs impermissibly offered expert testimony. *See* ECF No. 92 at 28.  Defendants' objections fail to identify with specificity which declarants and which parts of each exhibit were

---

[2] Citations to Plaintiffs' Appendix in Support, found at ECF No. 54, are labeled App. ###. Citations to the administrative record, found at ECF No. 61, are labeled AR ###.

impermissibly offered. Further, Defendants fail to state with specificity why each declarant is unqualified.

**5.**     Even so, the Court reviewed each declaration and finds Defendants' objections unpersuasive. For example, in reviewing Plaintiffs' Exhibit D, Declaration of Mark Morgan, the Court noted Mark Morgan served as the Acting Commissioner of the United States Customs and Border Patrol from 2019-2021. App. 390. Prior to that service, Mr. Morgan served as the Acting Chief of the United States Immigration and Customs Enforcement. *Id.* Prior to that assignment, Mr. Morgan served twenty years as an FBI agent. *Id.* The Court finds Mr. Morgan more than sufficiently qualified to opine and present testimony in the form of a declaration regarding immigration laws, policies, procedures, and practices.

**6.**     Any objections not previously discussed are overruled.

### III.     FINDINGS OF FACT[3]

**1.**     Because the Court consolidated the hearing on the motion with a trial on the merits, the proper standard for factual findings is the preponderance of the evidence.

### A.  Overview of the relevant statutory framework

**2.**     Section 1225 of Title 8 of the United States Code establishes procedures for DHS to process aliens who are "applicant[s] for admission" to the United States, whether they arrive at a port of entry or cross the border unlawfully. 8 U.S.C. § 1225(a)(1).

---

[3] In preparing this memorandum opinion and order, the Court carefully considered the trial arguments, the record, and the admitted exhibits and applied the standard in this circuit for findings of fact and conclusions of law. *See Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) (discussing standard for findings and conclusions under Rule 52). In accordance with that standard, the Court has not set out its findings and conclusions in "punctilious detail" or "slavishly traced the claims issue by issue and witness by witness, or indulged in exegetics, parsing or declaiming every fact and each nuance and hypothesis." *Id.* The Court instead has limited its discussion to those legal and factual issues that form the basis for its decision. *Id.*

Where appropriate, any finding of fact herein that should more appropriately be regarded as a conclusion of law shall be deemed as such, and vice versa.

3.      An immigration officer must first inspect the alien to determine whether he is entitled to be admitted. § 1225(a)(3). Section 1225(b)(2)(A) provides that, if an immigration officer "determines" that an "applicant for admission" is "not clearly and beyond a doubt entitled to be admitted," then the alien "shall be detained for a proceeding under Section 1229a of this title" to determine whether he will be removed from the United States.

4.      Alternatively, if an alien lacks valid entry documentation or misrepresents his identity, he shall be "removed from the United States without further hearing or review unless" he "indicates either an intention to apply for asylum . . . or a fear of persecution." § 1225(b)(1)(A)(i). If the alien makes such a showing, then he "shall be detained for further consideration of the application for asylum." § 1225(b)(1)(B)(ii). Such an alien then would also be placed in a Section 1229a full removal proceeding. See 8 C.F.R. § 208.30(f).

5.      Under either route, Section 1229a proceedings involve a hearing before an immigration judge with potential review by the Board of Immigration Appeals. 8 U.S.C. § 1229a; 8 C.F.R. § 1003.1. In a full removal proceeding, the government may charge the alien with any applicable ground of inadmissibility, and the alien may seek asylum or any other form of relief or protection from removal to his home country. 8 U.S.C. § 1229a(a)(2), (c)(4).

6.      Most importantly for this case, when DHS places an applicant for admission into a full removal proceeding under Section 1229a, the alien is subject to *mandatory* detention during that proceeding. § 1225(b)(2)(A) ("[I]f the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien *shall be detained* for a proceeding under Section 1229a of this title.") (emphasis added). DHS does retain the discretion to parole certain aliens "for urgent humanitarian reasons or significant public benefit." § 1182(d)(5)(A).

7.      But Congress allows DHS an alternative to mandatory detention in the United States: "In the case of an alien described in [Section 1225(b)(2)(A)] who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, [DHS] may return the alien to that territory pending a proceeding under Section 1229a of this title." § 1225(b)(2)(C). This contiguous-territory-return authority enables DHS to avoid having to detain aliens arriving on land from Mexico (or Canada), and instead allows DHS to temporarily return those aliens to the foreign territory from which they just arrived pending their immigration proceedings.

### B.  MPP was created to combat an influx of illegal aliens during the Trump administration

8.      In 2018, the southern border of the United States experienced an immigration surge and a resulting "humanitarian and border security crisis." AR 186; App. 005. Federal officials encountered an approximately 2,000 inadmissible aliens each day in 2018. App. 005. By May 2019, that number had increased to 4,800 aliens crossing the border daily. AR 682.

9.      The resulting influx of immigrants had "severe impacts on U.S. border security and immigration operations." App. 302. But most aliens lacked meritorious claims for asylum — "only 14 percent of aliens who claimed credible fear of persecution or torture were granted asylum between Fiscal Year 2008 and Fiscal Year 2019." App. 005. With so many "fraudulent asylum claims," "[t]he dramatic increase in illegal migration" was "making it harder for the U.S. to devote appropriate resources to individuals who [were] legitimately fleeing persecution." App. 302–03.

10.     The influx did not just divert resources from legitimate asylum seekers, but illegal aliens with *meritless* asylum claims were being released into the United States. "[M]any of these individuals . . . disappeared into the country before a judge denie[d] their claim and simply bec[a]me fugitives." App. 303. "Between Fiscal Year 2008 and Fiscal Year 2019, 32 percent of

aliens referred to [the Executive Office for Immigration Review] absconded into the United States and were ordered removed *in absentia*." App. 005.

11.     In response, the Trump Administration implemented a program known as the Migrant Protection Protocols. On December 20, 2018, the Secretary of Homeland Security announced the MPP program, under which DHS would begin the process of invoking the authority provided at § 1225(b)(2)(C).[4] This statutory authority allows DHS to return to Mexico certain third-country nationals — *i.e.*, aliens who are not nationals or citizens of Mexico — arriving in the United States from Mexico for the duration of their removal proceedings under 8 U.S.C. § 1229a. AR 151.

12.     The goal of MPP was to ensure that "[c]ertain aliens attempting to enter the U.S. illegally or without documentation, including those who claim asylum, will no longer be released into the country, where they often fail to file an asylum application and/or disappear before an immigration judge can determine the merits of any claim." App. 303–04.

13.     The same day, the United States obtained the Government of Mexico's agreement to temporarily permit "entry of certain foreign persons from within the United States who have entered that country through a port of entry or who have been apprehended between ports of entry and interviewed by the authorities of migration authorities of that country, and have received a notice to attend a hearing before a judge." AR 149.

14.     On January 25, 2019, DHS issued guidance for implementation of MPP. Three days later, DHS began implementing MPP, initially in San Diego, California, then El Paso, Texas, and Calexico, California, and then nationwide. AR 155, 156, 684.

15.     Under the issued guidance, DHS officers determined whether aliens were amenable to the MPP process. If they were, the DHS officer could issue a Notice to Appear (NTA), place the alien

---

[4] Section 235(b)(2)(C) of the Immigration and Nationality Act (INA)

8

into a removal proceeding under Section 1229a, and then return the alien to Mexico to await

removal proceedings *unless* the alien affirmatively demonstrated a fear of persecution or torture in

Mexico. AR 161.

**16.** Certain categories of noncitizens were not amenable to MPP: unaccompanied alien

children — as defined in 6 U.S.C. § 279(g); citizens or nationals of Mexico; noncitizens processed

for expedited removal under 8 U.S.C. § 1225(b)(1); noncitizens "in special circumstances";

returning lawful permanent residents seeking admission; noncitizens with an advance parole

document or in parole status; noncitizens with known physical or mental health issues; noncitizens

with a criminal history or a history of violence; noncitizens of interest to the Government of

Mexico or the United States; any noncitizen who demonstrated that they are more likely than not

to face persecution or torture in Mexico; and other noncitizens at the discretion of the Port Director

or Border Patrol counterpart. AR 161.

**17.** On February 12, 2019, U.S. Immigration and Customs Enforcement issued guidance on

MPP to its field offices, in anticipation of expansion of MPP across the border. AR 165–70. After

June 7, 2019, DHS began constructing temporary structures at the southern border in Brownsville

and Laredo, Texas, to hold immigration hearings for noncitizens subject to MPP, and notified

Congress of their completion in August 2019. These temporary facilities functioned as virtual

courtrooms, with immigration judges appearing by video connection from their courthouses within

the United States. AR 208, 684.

### C.  The Department of Homeland Security found MPP to be effective

**18.** Upon review, DHS found MPP to be effective. In its October 28, 2019, Assessment of the

Migrant Protection Protocols, DHS stated that "MPP has demonstrated operational effectiveness."

AR 683. DHS noted that it had "returned more than 55,000 aliens to Mexico under MPP" and that

"MPP has been an indispensable tool in addressing the ongoing crisis at the southern border and restoring integrity to the immigration system." *Id.*

19.     Specifically, DHS found "[s]ince a recent peak of more than 144,000 in May 2019, total enforcement actions . . . have decreased by 64% through September 2019." *Id.* Moreover, DHS found "[b]order encounters with Central American[5] families — who were the main driver of the crisis and comprise a majority of MPP-amenable aliens — have decreased by approximately 80%." *Id.*

20.     Additionally, DHS stated "although MPP is one among many tools that DHS employed in response to the border crisis, DHS has observed a connection between MPP implementation and decreasing enforcement actions at the border — including a rapid and substantial decline in apprehensions in those areas where the most amenable aliens have been processed and returned to Mexico pursuant to MPP." *Id.*

21.     In addition to finding MPP effective at deterring border encounters and decreasing the number of illegal aliens present in the United States, DHS also found that "MPP is restoring integrity to the [immigration] system." *Id.* As examples of this restoration, DHS found that "MPP returnees with meritorious claims can be granted relief or protection within months, rather than remaining in limbo for years while awaiting immigration court proceedings in the United States." *Id.* at 684. And "MPP returnees who do not qualify for relief or protection are being quickly removed from the United States. Moreover, aliens without meritorious claims — which no longer constitute a free ticket into the United States — are beginning to voluntarily return home." *Id.*

22.     DHS did recognize that there were some flaws in the original implementation of MPP. On October 25, 2019 — just three days before releasing its assessment of MPP — DHS released the

---

[5] These countries are also sometimes referred to as the "Northern Triangle." The Northern Triangle countries are Guatemala, Honduras, and El Salvador.

Migrant Protection Protocols Red Team Report. AR 192. This report found several issues and recommended improvements — but not termination — of MPP. Some of these improvements included standardizing documents and protocols to ensure aliens received a fair process and hearing on their claims. AR 192–201.

23.     MPP also faced legal challenges. In *Wolf v. Innovation Law Lab*, a district court enjoined the implementation of MPP. 366 F. Supp. 3d 1110 (N.D. Cal. 2019). The Ninth Circuit stayed that injunction, but a separate panel affirmed the injunction on the merits. 951 F.3d 1073 (9th Cir. 2020). The Ninth Circuit then granted a stay as far as the district court's injunction applied outside the territorial limits of the Ninth Circuit but otherwise denied the government's request for a stay. 951 F.3d 986 (9th Cir. 2020).

24.     But the Supreme Court stayed the injunction in full granting the Trump Administration a legal victory. 140 S. Ct. 1564 (Mar. 11, 2020). The Supreme Court also granted certiorari. 141 S. Ct. 617 (Oct. 19, 2020).  The case was later dismissed from the merits docket as moot. *Wolf*, 2021 WL 2520313, at *1 (June 20, 2021) (citing *United States* v. *Munsingwear, Inc.*, 340 U.S. 36 (1950)).

25.     But throughout the legal challenges, DHS found MPP was meeting its intended goals. AR 554. First, DHS found "MPP provides a streamlined pathway for aliens to defensively apply for protection or relief from removal, while upholding *non-refoulement* obligations through screenings of fear in Mexico." *Id.* Second, DHS found "MPP provides a pathway for aliens to proceed efficiently through the U.S. immigration court processes, as compared to non-detained dockets." *Id.* at 555. Third, DHS found "MPP decreases the number of aliens released into the interior of United States for the duration of their U.S. removal proceedings." *Id.* And fourth, DHS found "MPP implementation contributes to decreasing the volume of inadmissible aliens arriving

in the United States on land from Mexico — including those apprehended between the [ports of

entry].” *Id.*

**26.**     By December 31, 2020, DHS had enrolled 68,039 aliens in the MPP program. *Id.*[6] DHS

concluded its review of MPP and found it to be a “cornerstone” of DHS’s efforts to restore integrity

to the immigration system:

> These unprecedented [immigration] backlogs have strained DHS resources and
> challenged its ability to effectively execute the laws passed by Congress and deliver
> appropriate immigration consequences: those with meritorious claims can wait
> years for protection or relief, and those with non-meritorious claims often remain
> in the country for lengthy periods of time.
>
> This broken system has created perverse incentives, with damaging and far-
> reaching consequences for both the United States and its regional partners. In Fiscal
> Year 2019, certain regions in Guatemala and Honduras saw 2.5% of their
> population migrate to the United States, which is an unsustainable loss for these
> countries.
>
> MPP is one among several tools DHS has employed effectively to reduce the
> incentive for aliens to assert claims for relief or protection, many of which may be
> meritless, as a means to enter the United States to live and work during the
> pendency of multi-year immigration proceedings. Even more importantly, MPP
> also provides an opportunity for those entitled to relief to obtain it within a matter
> of months. MPP, therefore, is a cornerstone of DHS’s ongoing efforts to restore
> integrity to the immigration system — and of the United States’ agreement with
> Mexico to address the crisis at our shared border.
>
> AR 687.

---

[6] The COVID-19 pandemic accounted for the markedly fewer aliens enrolled in MPP in 2020. Due to the pandemic,
MPP removal proceedings began to be postponed on April 22, 2020. AR 466. Additionally, beginning in March 2020,
DHS assisted in the enforcement of Title 42 — a statutory provision not relevant to this suit — to expel certain
amenable noncitizens from Mexico and the Northern Triangle countries back to Mexico, and certain amenable
noncitizens from other countries to their countries of origin if Mexico will not accept them, with limited exceptions.
AR 621–22, 631. Title 42 expulsions accounted for 102,234 and 111,175 repatriations in 2020 and the first quarter of
2021. AR 660.

**D. During the transition period, the outgoing Trump Administration entered into an Agreement with Texas and warned the incoming Biden Administration of the dangers of ending MPP**

*1. DHS and Texas enter into an Agreement*

27.     Shortly before leaving office, the Trump Administration entered into a Memorandum of Understanding (the "Agreement") between Texas and DHS. App. 317–26.  The Agreement was finalized on January 8, 2021. *Id.* at 325.

28.     The Agreement purportedly established "a binding and enforceable commitment between DHS and Texas," in which Texas agreed to "provide information and assistance to help DHS perform its border security, legal immigration, immigration enforcement, and national security missions." *Id.* at 319.  In return, DHS agreed "to consult Texas and consider its views before taking any action, adopting or modifying a policy or procedure, or making any decision that could:

(1)     reduce, redirect, reprioritize, relax, or in any way modify immigration enforcement;

(2)     decrease the number of ICE agents performing immigration enforcement duties;

(3)     pause or decrease the number of returns or removals of removable or inadmissible aliens from the country;

(4)     increase or decline to decrease the number of lawful, removable, or inadmissible aliens;

(5)     increase or decline to decrease the number of releases from detention;

(6)     relax the standards for granting relief from return or removal, such as asylum;

(7)     relax the standards for granting release from detention;

(8)     relax the standards for, or otherwise decrease the number of, apprehensions or administrative arrests;

(9)     increase, expand, extend, or in any other way change the quantity and quality of immigration benefits or eligibility for other discretionary actions

for aliens; or

(10)    otherwise negatively impact Texas.

In case of doubt, DHS will err on the side of consulting with Texas." *Id.* at 319.

**29.**    To enable this consultation process, the Agreement requires DHS to "[p]rovide Texas with 180 days' written notice . . . of any proposed action" subject to the consultation requirement. *Id.* at 320. That would give Texas "an opportunity to consult and comment on the proposed action." *Id.* After Texas submitted its views, "DHS will in good faith consider Texas's input and provide a detailed written explanation of the reasoning behind any decision to reject Texas's input before taking any action" covered by the Agreement. *Id.*

**30.**    The parties agree DHS did not follow these procedures when it issued the June 1 Memorandum. But DHS did send a letter that purported to terminate the Agreement "effective immediately" on February 2, 2021. *Id.* at 347–48. Texas avers that the termination letter also did not comply with the Agreement and chose to interpret a letter as a notice of intent to terminate. ECF No. 53 at 21. Accordingly, even under Texas's view, the Agreement is only "binding until August 1, 2021." *Id.*

### 2.   *The Biden Administration was warned of the consequences of terminating MPP*

**31.**    During the latter half of 2020, the Biden transition team met with career staff from DHS. According to Mark Morgan — who is former Acting Commissioner of CBP, former Acting Director of ICE, and Marine — CBP "career employees . . . fully briefed the Biden transition officials on the importance of MPP and the consequences that would follow a suspension of MPP." App. 399. Morgan stated: "transition personnel were specifically warned that the suspension of the MPP, along with other policies, would lead to a resurgence of illegal aliens attempting to illegally enter our [southwest border]." *Id.* And officials were also "warned smuggling organizations would

exploit the rescission and convince migrants the U.S. borders are open. They were warned the increased volume was predictable and would overwhelm Border Patrol's capacity and facilities, as well as HHS facilities." *Id.*

### E.  The Biden Administration first suspended, then terminated MPP.

**32.**     The incoming Biden Administration (1) knew MPP had been found effective by DHS as a matter of policy, (2) knew MPP had been successfully defended in court, and (3) had received warnings about the consequences that would attend the repealing of MPP. But the Biden Administration suspended new enrollments in MPP on its first day in office. On January 20, 2021, the Acting Secretary of DHS wrote that "[e]ffective January 21, 2021, the Department will suspend new enrollments in the Migrant Protection Protocols (MPP), pending further review of the program. Aliens who are not already enrolled in MPP should be processed under other existing legal authorities." AR 581.

**33.**     Since that day, DHS has not offered a single justification for suspending new enrollments in the program during the period of review. Indeed, when the original administrative record was filed prior to the June 1 Memorandum's issuance, it contained only a single document — the January 20 Memorandum. *See* ECF No. 45. There was no cost-benefit analysis or any sort of reasoned decisionmaking for a court to review.

**34.**     But the flaws of the January 20 Memorandum were mooted when DHS completed its review and issued the June 1 Memorandum that terminated the MPP program. AR 1–7; ECF No. 52 at 3 ("[T]he January 20 Memorandum expired upon the completion of DHS's review of the program.").

35.     In the June 1 Memorandum, DHS Secretary Mayorkas found that his "review confirmed that MPP had mixed effectiveness in achieving several of its central goals and that the program experienced significant challenges." AR 3.

36.     In particular, Secretary Mayorkas made several conclusions. First, the Secretary "determined that MPP does not adequately or sustainably enhance border management in such a way as to justify the program's extensive operational burdens and other shortfalls." *Id.*

37.     Second, the Secretary was concerned that MPP did not ensure that aliens waiting in Mexico were able to attend their immigration proceedings. "The focus on speed was not always matched with sufficient efforts to ensure that conditions in Mexico enabled migrants to attend their immigration proceedings."  *Id.* at 4. The Secretary noted that "[i]n particular, the high percentage of cases completed through the entry of *in absentia* removal orders (approximately 44 percent, based on DHS data) raises questions for me about the design and operation of the program." *Id.*

38.     Third, the Secretary found that MPP was "intended to reduce burdens on border security personnel and resources, but over time the program imposed additional responsibilities that detracted from the Department's critically important mission sets." *Id.* The Secretary also added that "[a] number of the challenges faced by MPP have been compounded by the COVID-19 pandemic." *Id.* The Secretary concluded by stating "as a result, any benefits the program may have offered are now far outweighed by the challenges, risks, and costs that it presents." *Id.*

39.     The June 1 Memorandum contained no discussion or analysis of DHS's previous assessment that MPP removed "perverse incentives" and decreased the number of aliens attempting to illegally cross the border.

40.     The June 1 Memorandum contained no discussion or analysis regarding DHS's ability to fulfill its statutory obligation to detain certain classes of aliens in the absence of MPP.

**F.  The termination of MPP has and will continue to increase the number of aliens being released into the United States and has and will continue to impose harms on Plaintiff States Texas and Missouri**

*1.  The termination of MPP increases the number of aliens present in the United States*

**41.**     First, Defendants' termination of MPP necessarily increases the number of aliens present in the United States regardless of whether it increases the absolute number of would-be immigrants. MPP authorized the return of certain aliens to Mexico. Without MPP, Defendants are forced to release and parole aliens into the United States because Defendants simply do not have the resources to detain aliens as mandated by statute. App. 307 ("[R]esource constraints during the [May 2019] crisis, as well as other court-ordered limitations on the ability to detain individuals, made many releases inevitable."); App. 330 n.7 ("Continued detention of a migrant who has more likely than not demonstrated credible fear is not in the interest of resource allocation.").

**42.**     Second, the termination of MPP has contributed to the current border surge. DHS previously acknowledged that "MPP implementation contribute[d] to decreasing the volume of inadmissible aliens arriving in the United States on land from Mexico." AR 555. MPP removed the "perverse incentives" which enticed aliens with "a free ticket into the United States." AR 684, 687; Trial Tr. 147:23–25 (Defense counsel: "I think it's fair to say that [MPP] probably deterred some individuals from coming to the United States.").

**43.**     Since MPP's termination, the number of enforcement encounters on the southwest border has skyrocketed. Defendants' data shows encounters jumping from 75,000 in January 2021, when MPP was suspended, to about 173,000 in April 2021, when this case was filed. AR 670. Since then, encounters have continued to increase: CBP data shows nearly 189,000 encounters occurred in June 2021. U.S. Customs and Border Protection, *Southwest Land Border Encounters*, CBP

(Aug. 3, 2021), https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters; FRE 201.[7]

**44.**     Even if the termination of MPP played *no* role in the increasing number of migrants, the lack of MPP as a tool to manage the influx means that more aliens will be released and paroled into the United States as the surge continues to overwhelm DHS's detainment capacity.

**45.**     Texas is a border state. But Missouri also faces an increased number of aliens due to the termination of MPP. Statistically, for every 1,000 aliens who remain unlawfully in the United States, fifty-six end up residing in Missouri. App. 006.

> *2.  Texas and Missouri have suffered injuries because of the increased numbers of aliens present in their states*
>
> a.  Driver's Licenses

**46.**     As a result of the termination of MPP, some aliens who would have otherwise been enrolled in MPP are being released or paroled into the United States and will obtain Texas driver's licenses.

---

[7] Moreover, the Court takes judicial notice of the sworn statement of David Shahoulian, Assistant Secretary for Border and Immigration Policy at DHS — filed in the District Court of the District of Columbia in Title 42 related litigation. ECF No. 113-1 at 7–9, No. 1:21-CV-100-EGS (D.D.C. Aug. 2, 2021) (emphasis added). The Court finds David Shahoulian is a "source[] whose accuracy cannot reasonably be questioned." FRE 201.

In May and June 2021, for example, CBP recorded over 180,000 and 188,000 encounters, respectively, at the southwest border . . . These constitute the highest numbers of monthly encounters recorded by CBP in more than twenty years, including during previous surges when the Department was not constrained by COVID-19 capacity considerations. As noted above, due to COVID-19-related guidance, border facilities are currently expected to operate at only 25 to 50 percent capacity, depending on individual facility infrastructure and facility type.

Based on preliminary data, the number of border encounters continued to increase in July 2021. Over the first 29 days of July, CBP encountered an average of **6,779** individuals per day, including 616 unaccompanied children and 2,583 individuals in family units. Overall, according to preliminary data, CBP is likely to have encountered about 210,000 individuals in July, the highest monthly encounter number since Fiscal Year 2000. July also likely included a record number of unaccompanied child encounters, exceeding 19,000, and the second-highest number of family unit encounters, at around 80,000.
. . .
Based on current trends, the Department expects that total encounters this fiscal year are likely to be **the highest ever recorded**.

AR555; AR587–588. Texas provides driver's licenses to aliens so long as their presence in the United States is authorized by the federal government. App. 426. Each additional customer seeking a Texas driver's license imposes a cost on Texas. App. 427.

**47.**     Because "driving is a practical necessity in most of" Texas, "there is little doubt that many" aliens present in Texas because of MPP's termination would apply for driver's licenses. *Texas v. United States*, 809 F.3d 134, 156 (5th Cir. 2015). The Chief of the Texas Department of Public Safety's Driver License Division gave estimates of the costs of providing additional driver's licenses. App. 428.

**48.**     Missouri likewise faces a cost of verifying lawful immigration status for each additional customer seeking a Missouri driver's license. App. 006.

> b.   Education

**49.**     Some school-age child aliens who would have otherwise been enrolled in MPP are being released or paroled into the United States. AR423; AR431; AR496; AR547; AR617. Texas estimates that the average funding entitlement for 2021 will be $9,216 per student in attendance for an entire school year. App. 440. For students qualifying for bilingual education services, it would cost Texas $11,432 for education per child for attendance for an entire school year. *Id.* The total costs to Texas (and Missouri) of providing public education for illegal alien children will rise in the future as the number of illegal alien children present in the State increases. App. 442.

> c.   Healthcare

**50.**     Some aliens who would have otherwise been enrolled in MPP are being released or paroled into the United States and will use state-funded healthcare services or benefits in Texas and Missouri. AR555; AR587–588; App. 006. Texas funds three healthcare programs that require significant expenditures to cover illegal aliens: the Emergency Medicaid Program, the Family

Violence Program, and the Texas Children's Health Insurance Program. App. 450. Texas is required by federal law to include illegal aliens in its Emergency Medicaid Program. 42 C.F.R. § 440.255(c). Texas also incurs costs for uncompensated care provided by state public hospital districts to illegal aliens. App. 452. The total costs to the State will increase as the number of aliens within the state increases. *Id.*

**51.**   Missouri is similarly situated. App. 006.

> d.  Law enforcement and correctional costs

**52.**   Some aliens who would have otherwise been enrolled in MPP are being released or paroled into the United States and will commit crimes in Texas and Missouri. AR555; AR587–588; App. 006; App. 362–63; App. 372; App. 388. In one year alone, the Texas Department of Criminal Justice housed 8,951 illegal alien criminals for a total of 2,439,110 days at a cost of over $150 million, with less than $15 million reimbursed by the federal government. App. 460. "[T]o the extent the number of aliens in [Texas Department of Criminal Justice] custody increases, TDCJ's unreimbursed expenses will increase as well." App. 460.

**53.**   Some aliens who would have otherwise been enrolled in MPP are victimized by human traffickers in Texas. App. 406; App. 418. Aliens "are particularly susceptible to being trafficked." App. 419. Increasing the number of aliens "present in the United States, including those claiming asylum, is likely to increase human trafficking." App. 423; App. 409. Missouri is likewise a destination and transit State for human trafficking of migrants from Central America who have crossed the border illegally. App. 409–410.

**54.**   Human trafficking causes fiscal harm to Texas and Missouri. App. 418–19.

e.  *Parens patriae*

**55.**    Aliens who would have otherwise been enrolled in MPP are being paroled into the United States. App. 307; App.330 n.7; AR 183–84. Aliens paroled into the United States are eligible for work authorization thereby increasing the supply of workers by some amount. App. 337; App. 555. Some aliens who would have otherwise been enrolled in MPP will work for employers in Texas or Missouri. AR 555; AR 587–88; App. 362–63; App. 372; App. 388.

## IV.    CONCLUSIONS OF LAW

The Court's opinion proceeds in the following order: (1) the Court finds that it has jurisdiction and Plaintiffs have established standing; (2) the Court concludes there are no other jurisdictional or procedural hurdles to judicial review of Plaintiffs' claims; (3) the Court proceeds to the merits of Plaintiffs' APA and statutory claims; (4) and then the Court declines to address the merits of Plaintiffs' constitutional and Agreement-based claims.

### A.  Plaintiffs have standing

**1.**    Federal courts are courts of limited jurisdiction which possess only that power authorized by Constitution and statute. *Xitronix Corp. v. KLA-Tencor Corp.*, 916 F.3d 429, 435 (5th Cir. 2019). "The requirement that jurisdiction be established as a threshold matter spring[s] from the nature and limits of the judicial power of the United States and is inflexible and without exception." *Id.* (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998)).

**2.**    "[T]he states have the burden of establishing standing," *Texas*, 809 F.3d at 150, by showing "(1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

21

3.      "Each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation" *Lujan v. Defender of Wildlife*, 504 U.S. 555, 561 (1992). "And at the final stage, those facts (if controverted) must be 'supported adequately by the evidence adduced at trial.'" *Id.* (quoting *Gladstone, Relators v. Village of Brentwood,* 441 U.S. 91, 115 n. 31 (1979)).

4.      Here, the Court consolidated the preliminary injunction hearing with trial on the merits, so the preponderance of evidence standard applies. *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 968 F.3d 357, 367 (5th Cir. 2020).

> 1.  *Texas and Missouri have suffered harms that are concrete, non-speculative, and are traceable to Defendants' conduct — and are redressable.*

5.      First, Texas and Missouri have both shown that they have suffered and will continue to suffer "concrete and particularized" injuries attributable to Defendants' actions. *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007).

6.      Plaintiffs have established that the termination of MPP will increase the cost of providing driver's licenses to aliens released and paroled into the United States, inflicting on the States an actual and imminent injury. *See Texas*, 809 F.3d at 155 ("[L]icenses issued to beneficiaries would necessarily be at a financial loss.").

7.      Second, Plaintiffs' injuries are fairly traceable to the actions of Defendants. As stated above, the termination of MPP necessarily increases the number of aliens released and paroled into the United States and the Plaintiff States specifically.

8.      Paroled and released aliens seeking to obtain driver's licenses is the "the predictable effect of Government action on the decisions of third parties." *Dep't of Commerce v. New York*, 139 S.

Ct. 2551, 2566 (2019); *Texas,* 809 F.3d at 156 ("[T]here is little doubt that many [aliens] would [apply for driver's licenses] because driving is a practical necessity in most of the state.").

9.      Third, the Court has the power to redress Plaintiffs' injuries. The APA allows the Court to "set aside agency action . . . [that is] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. Additionally, injunctive relief authorizing DHS officers to return aliens to Mexico via the MPP program pending the resolution of their asylum claims would decrease the number of aliens paroled and released into the United States and into Plaintiff States specifically. Consequently, the amount of fiscal injury suffered by Plaintiffs would decrease.

10.     Accordingly, the Court finds Plaintiffs have more likely than not established Article III standing under the driver's license theory of injury approved by applicable Fifth Circuit precedent.[8]

11.     The same line of reasoning applies to the increased healthcare costs, education costs, and enforcement and correctional costs that Plaintiffs will suffer because of the termination of MPP.

### 2.   Plaintiffs have not established parens patriae standing

12.     Texas and Missouri have not established by a preponderance of the evidence that they are entitled to *parens patriae* standing.

13.     *Parens patriae* is a type of standing that allows a state to sue a defendant to protect the interests of its citizens. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 600 (1982).

---

[8] Even if Missouri has failed to establish standing, it does not prevent the Court from proceedings to the merits because Texas has standing. *See, e.g.*, *Texas v. United States*, No. 1:18-CV-00068, 2021 WL 3025857, at *18 (S.D. Tex. July 16, 2021) (Hanen, J.) ("Texas has standing. Since one of the Plaintiff States has standing, this Court need not analyze the standing of any other plaintiff."); *Massachusetts*, 549 U.S. at 518.

14.     Preliminarily, in *Alfred L. Snapp*, the Supreme Court stated "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." *Id.* at 610 n. 16 (citing *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923)). This so-called *Mellon* bar does not sweep as widely as it may seem. In *Massachusetts v. EPA*, the Supreme Court crafted a distinction: "There is a critical difference between allowing a State 'to protect her citizens from the operation of federal statutes' (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)." 549 U.S. at 520 n. 17 (citing *Georgia v. Pennsylvania R. Co.,* 324 U.S. 439, 447 (1945)).

15.     Here, Texas is asserting rights *under* the INA rather than attempting to protect its citizens from the *operation* of the INA. Accordingly, the *Mellon* bar does not apply. *See, e.g.*, *Texas v. United States*, 328 F. Supp. 3d 662, 694–98 (S.D. Tex. 2018).

16.     "To have [*parens patriae*], standing the State must assert an injury to what has been characterized as a 'quasi-sovereign' interest, which is a judicial construct that does not lend itself to a simple or exact definition." *Alfred L. Snapp*, 262 U.S. at 601. The Supreme Court then articulated two general categories of "quasi-sovereign" interests: a state has an interest "in the health and well-being — both physical and economic — of its residents in general" and a state has an "interest in not being discriminatorily denied its rightful status within the federal system." *Id.* at 607.

17.     Plaintiffs aver that they have standing under the first category because they allege the termination of MPP forces their citizens to compete in distorted labor markets in which it is more difficult to obtain a job. ECF No. 53 at 27–28. The Court finds this is a valid "quasi-sovereign" interest. *Texas*, 328 F. Supp. 3d at 698.

18.      Plaintiffs fail, however, to prove by a preponderance of the evidence that the termination of MPP caused or will cause a distorted labor market. Plaintiffs' entire argument rests on the proposition that "the basic economic law of supply and demand applies to the labor market, so an increase in the supply of illegal aliens authorized to work will harm the employment prospects of Texans and Missourians competing with them." ECF No. 53 at 28. There are no citations to studies, articles, analyses, or anything else that would allow the Court to conclude that the termination of MPP has distorted Texas's or Missouri's labor markets. *See, e.g.*, *Texas v. United States*, No. 1:18-CV-068, 2021 WL 3025857, at \*15 (S.D. Tex. July 16, 2021) (discussing the addition of 114,000 work-eligible individuals who "Texas employers are financially incentivized under the [Affordable Care Act] to hire.").

19.      Plaintiffs' simple invocation of the law of supply and demand is not enough for the Court to conclude that Plaintiffs carried their burden at the *merits* stage.

### 3.  *Plaintiffs are entitled to special solicitude*

20.      Texas and Missouri are entitled to special solicitude because "States are not normal litigants for the purposes of invoking federal jurisdiction." *Massachusetts v. EPA*, 549 at 518.

21.      The Fifth Circuit has identified two additional factors that must be present in a case for States to be entitled to special solicitude: the presence of a procedural right to challenge agency action and the invasion of a "quasi-sovereign" interest. *Texas*, 809 F.3d at 152–53.

22.       First, the Fifth Circuit has already held that the APA provides Texas the procedural right needed for special solicitude. *Id.* at 152 ("The Clean Air Act's review provision is more specific than the APA's, but the latter is easily adequate to justify 'special solicitude' here.").

23.      Second, the termination of MPP "affects the states' 'quasi-sovereign' interests by imposing substantial pressure on them to change their laws, which provide for issuing driver's licenses to

some aliens and subsidizing those licenses." *Id.* at 153. As the Supreme Court noted: "When a State enters the Union, it surrenders certain sovereign prerogatives." *Massachusetts v. EPA*, 549 at 519. Like Massachusetts, Texas and Missouri surrendered their power over immigration when they joined the Union. *See Arizona v. United States*, 567 U.S. 387, 394–400 (2012). Plaintiffs States, like Massachusetts, "now rely on the federal government to protect their interests." *Texas*, 809 F.3d at 154.

24.    Accordingly, "[t]hese parallels confirm that [the termination of MPP] affects the states 'quasi-sovereign' interests." *Id.*

25.    As a result, although unnecessary to the Court's finding of standing, the Court finds Texas and Missouri are entitled to special solicitude in its standing analysis.

### B.  There are no jurisdiction or procedural hurdles to judicial review

#### 1.  The termination of MPP is final agency action

26.    The APA states that "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704. In the Fifth Circuit, "whether an agency action is final is a jurisdictional issue, not a merits question." *Peoples Nat'l Bank v. Office of the Comptroller of the Currency of the U.S.*, 362 F.3d 333, 336 (5th Cir. 2004). "The Supreme Court has long taken a pragmatic approach to finality." *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) (internal marks omitted).

27.    Agency action is "final" only if it both (1) "consummate[es] the agency's decisionmaking process" and (2) determines "rights or obligations" or produces "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

28.    The June 1 Memorandum meets both *Bennett* standards and is thus an action amenable to judicial review.

**29.**     First, the parties do not contest that the June 1 Memorandum marks the consummation of the decisionmaking process. AR 002 (The June 1 Memorandum was published after the Secretary "completed the further review undertaken pursuant to Executive Order 14010.").

**30.**     Second, the June 1 Memorandum produces legal consequences and determines rights and obligations. *EEOC*, 933 F.3d at 445 ("[W]hether the agency action binds the *agency* indicates whether legal consequences flow from that action.").

**31.**     The June 1 Memorandum had the immediate legal consequence of "terminating the MPP program." AR 002.

**32.**     The June 1 Memorandum had the immediate legal consequence of rescinding "the Memorandum issued by Secretary Nielsen dated January 25, 2019 entitled 'Policy Guidance for Implementation of the Migrant Protection Protocols,' and the Memorandum issued by Acting Secretary Pekoske dated January 20, 2021 entitled 'Suspension of Enrollment in the Migrant Protection Protocols Program.'" AR 007.

**33.**     The June 1 Memorandum directed "DHS personnel, *effective immediately*, to take all appropriate actions to terminate MPP, including taking all steps necessary to rescind implementing guidance and other directives issued to carry out MPP." *Id.* (emphasis added).

**34.**     Moreover, the June 1 Memorandum determined rights and obligations. The June 1 Memorandum prevents DHS line officers from using MPP, a tool that was previously available to them. "Where agency action withdraws an entity's previously-held discretion, that action alters the legal regime, binds the entity, and thus qualifies as final agency action." *EEOC*, 933 F.3d at 442 (quoting *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 56 (D.C. Cir. 2016)).

**35.**     Accordingly, the June 1 Memorandum constitutes final agency action.

## 2. *No statute precludes judicial review*

**36.**     Judicial review is presumptively available under the APA "except to the extent that statutes preclude judicial review." 5 U.S.C 701(a)(1); *Texas*, 809 F.3d at 163 ("[T]here is a 'well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action,' and we will accordingly find an intent to preclude such review only if presented with 'clear and convincing evidence.'") (quoting *Reno v. Catholic Soc. Servs., Inc.,* 509 U.S. 43, 63–64 (1993)).

**37.**     "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Id.* at 164 (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984)).

**38.**     First, 8 U.S.C. § 1252(g) does not preclude judicial review.

**39.**     Section 1252(g) states that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."

**40.**     Texas and Missouri are not bringing this case on "behalf of any alien." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) ("We have previously rejected as 'implausible' the Government's suggestion that § 1252(g) covers 'all claims arising from deportation proceedings' or imposes 'a general jurisdictional limitation.'") (quoting *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999)). This is further confirmed by the fact that the remedy ordered by the Court in this case does not affect the status of any alien or immigration proceeding.

**41.**     Second, 8 U.S.C. § 1252(b)(9) does not preclude judicial review.

42. Section 1252(b)(9) states: "Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from *any action taken or proceeding* brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this Section." (emphasis added). This Section functions as a limit on where aliens can seek judicial review of their immigration proceedings.

43. But the Supreme Court has recently stated: "As we have said before, § 1252(b)(9) does not present a jurisdictional bar where those bringing suit are not asking for review of an order of removal, the decision to seek removal, or the process by which removability will be determined." *Regents*, 140 S. Ct. at 1907 (quoting *Jennings v. Rodriguez*, 138 S. Ct. 830, 841, 875–76 (2018) (plurality opinion) (internal marks omitted)). "And it is certainly not a bar where, as here, the parties are not challenging any removal proceedings." *Id.*

44. Third, 8 U.S.C. § 1252(f)(1) does not preclude judicial review.

45. Section 1252(f)(1) states: "No court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter."

46. But this section does not apply because Plaintiffs are not seeking to *restrain* Defendants from enforcing Section 1225. Plaintiffs are attempting to make Defendants *comply* with Section 1225.

47. Fourth, 8 U.S.C. § 1252(a)(2)(B)(ii) does not preclude judicial review.

48. Section 1252(a)(2)(B)(ii) states: "no court shall have jurisdiction to review . . . any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the

Secretary of Homeland Security, other than the granting of relief under Section 1158(a) of this title."

49.     But Plaintiffs are not challenging the substantive exercise of the Attorney General's discretion. Instead, they are challenging whether the government complied with its legal obligations under the APA in terminating MPP. *See e.g.*, *Nora v. Wolf*, No. 20-0993, 2020 WL 3469670, at *7 (D.D.C. June 25, 2020) ("But Claim One does not take on the individual decisions made to return each plaintiff to Mexico; it is directed at an agency decision – the decision to "expand" MPP implementation to Tamaulipas."); *E.O.H.C. v. Sec'y U.S. Dep't of Homeland Sec.*, 950 F.3d 177, 191 (3d Cir. 2020) (same); *Cruz v. Dep't of Homeland Sec.*, No. 19-CV-2727, 2019 WL 8139805, at *4 (D.D.C. Nov. 21, 2019) (same).

50.     This reading of the statute is further confirmed by Section 1252(a)(2)(B)(ii)'s title: "**Denials of discretionary relief**." This title indicates the objective of the statute is to prevent aliens from challenging the federal government's refusal to grant discretionary relief. *Texas*, 809 F.3d at 164.

51.     Lastly, the overall structure of the INA does not evidence a clear intent by Congress to preclude judicial review. *Texas*, 809 F.3d at 163. Congress's choice to expressly preclude certain types of claims does not show by "clear and convincing evidence" that Congress also meant to implicitly preclude all *other* types of claims. *Id.*; *see Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018) (An "express exception . . . implies that there are no other[s]"); ANTONIN SCALIA & BRYAN A. GARNER, *Reading Law* 107 (2012) ("Negative-Implication Canon[:] The expression of one thing implies the exclusion of others (*expressio unius est exclusio alterius*).").

52.     Accordingly, no statute or statutory scheme precludes judicial review of Plaintiffs' APA claim.

> 3.  *The termination of MPP is not an agency action committed to agency discretion by law*

**53.**   The APA precludes review "of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Texas*, 809 F.3d at 165 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)); 5 U.S.C. § 701(a)(2).

**54.**   Section 1225(b)(2)(c) states: "In the case of an alien described in subparagraph (A) who is arriving on land . . . from a foreign territory contiguous to the United States, [DHS] *may* return the alien to that territory pending a proceeding under Section 1229a of this title." (emphasis added). But the mere presence of the word "may" does not place the agency's actions outside of the ambit of judicial review. *Regents*, 140 S. Ct. at 1905 ("The dispute before the Court is not whether DHS may rescind DACA. All parties agree that it may. The dispute is instead primarily about the procedure the agency followed in doing so.").

**55.**   Rather, "[t]o honor the presumption of review, [courts] read the exception in § 701(a)(2) quite narrowly, confining it to those rare administrative decisions traditionally left to agency discretion." *Id.* (internal citations omitted).

**56.**   First, this limited category of unreviewable actions includes an agency's decision not to institute enforcement proceedings. *Id.* (citing *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985)). But the decision to terminate MPP "is more than a non-enforcement policy." *Regents*, 140 S. Ct. at 1907. Although the termination of MPP *itself* does not confer affirmative benefits, the interaction between the termination of MPP and the lack of detention capacity necessarily means more aliens will be released and paroled into the Plaintiff States. And parole *does* create affirmative benefits for aliens such as work authorization. App. 337; *Texas*, 809 F.3d at 167 ("Likewise, to be reviewable agency action, DAPA *need not directly confer* public benefits.") (emphasis added).

57.     Moreover, the MPP program is not about enforcement proceedings *at all*. Any alien eligible for MPP has already been placed into enforcement proceedings under Section 1229a. The only question MPP answers is *where* the alien will *be* while the federal government pursues removal — in the United States or in Mexico.

58.     Second, under Fifth Circuit precedent, agency decisions are "completely unreviewable under the committed to 'agency discretion by law' exception" if "the statutory scheme, taken together with other relevant materials, provides absolutely no guidance as to how that discretion is to be exercised." *Texas*, 809 F.3d at 168.

59.     The INA provides guidance as to how DHS should exercise its discretion "according to the general requirements of reasoned agency decisionmaking." *New York*, 139 S. Ct. at 2569. Section 1225 imposes mandatory-detention obligations on Defendants. § 1225(b)(2)(A) ("[T]he alien shall be detained"); AR 682 ("The law provides for mandatory detention of aliens who unlawfully enter the United States between ports of entry if they are placed in expedited removal proceedings."). To avoid violating Section 1225's obligations, DHS must use its authority to return aliens to Mexico when an influx of aliens exceeds DHS's detention capacity. These statutory obligations provide courts guidance on how DHS's contiguous-territory-return authority should be exercised.

60.     DHS does not *have* to use this authority; it could always detain every alien required by Section 1225. But if it is incapable of detaining such a large number, then the statute implicitly demands, or, at the very least, directs DHS use its authority to return certain aliens to Mexico.

61.     Accordingly, the decision to terminate MPP is "not one of those areas traditionally committed to agency discretion." *New York*, 139 S. Ct. at 2568.

*4.  Plaintiffs are within the zone of interests of the INA*

**62.**   "Because the states are suing under the APA, they 'must satisfy not only Article III's standing requirements, but an additional test: The interest they assert must be arguably within the zone of interests to be protected or regulated by the statute that they say was violated.'" *Texas*, 809 F.3d at 162 (quoting *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak,* 132 S. Ct. 2199, 2210 (2012) (internal marks omitted)).

**63.**   "That 'test . . . is not meant to be especially demanding' and is applied 'in keeping with Congress's 'evident intent' when enacting the APA 'to make agency action presumptively reviewable.'" *Id.* "The Supreme Court 'has always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff.'" *Id.*   "The test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.*

**64.**   First, the Court concludes that the proper scope of the zone-of-interest inquiry is the entirety of the INA. *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 401 (1987) ("In considering whether the "zone of interest" test provides or denies standing in these cases, we first observe that the Comptroller's argument focuses too narrowly on 12 U.S.C. § 36, and does not adequately place § 36 in the overall context of the National Bank Act."). The Court is "not limited to considering the statute under which respondents sued, but may consider any provision that helps us to understand Congress' overall purposes." *Id.* And, historically, the Fifth Circuit's "treatment of APA claims in the immigration context [] considers the INA as a whole." *Texas v. United States*, No. 6:21-CV-003, 2021 WL 2096669, at *22 (S.D. Tex. Feb. 23, 2021); *Texas*, 809 F.3d at 193 n. 80.

65.     Here, Plaintiffs are seeking to require the Secretary to engage in reasoned decisionmaking under the APA before the Secretary terminates MPP requiring the state to choose between "spending millions of dollars to subsidize driver's licenses or changing its statutes." *Id.*

66.     The INA and Section 1225 in particular protect the states' interest by mandating the detention or return to Mexico of aliens who would otherwise impose costs on the states.

67.     Accordingly, "[t]he interests the states seek to protect fall within the zone of interests of the INA." *Texas*, 809 F.3d at 193.

### C.  The termination of MPP violated the APA

68.     The APA prohibits agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This means "[f]ederal administrative agencies are required to engage in reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (internal marks omitted). To do so, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* at 43.

69.     Review under the APA's arbitrary and capricious standard is "highly deferential." *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 904 (5th Cir. 1983). District courts must "accord the agency's decision a presumption of regularity" and "are prohibited from

34

substituting [the court's] judgment for that of the agency." *United States v. Garner*, 767 F.2d 104, 116 (5th Cir. 1985).

**70.** "Because the central focus of the arbitrary and capricious standard is on the rationality of the agency's 'decisionmaking,' rather than its actual decision, '[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'" *Garner*, 767 F.2d at 116 (quoting *State Farm*, 463 U.S. at 50). This "record rule" normally dictates that "the grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943).

**71.** But courts allow extra-record evidence when it is necessary to determine whether the agency "considered all the relevant factors." *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 285 (D.C. Cir. 1981).[9]

**72.** If a court finds that an administrative agency failed to engage in reasoned decisionmaking, the reviewing court "shall hold unlawful and set aside" such "agency action, findings, and conclusions" as arbitrary and capricious.  5 U.S.C. § 706(2)(A).

> *1. DHS ignored critical factors*

**73.** "Agency action is lawful only if it rests on a consideration of the relevant factors." *Michigan*, 576 U.S. at 750 (internal marks omitted). Although the June 1 Memorandum claims that Defendants "reviewed all relevant evidence and weighed the costs and benefits of" their decision, AR 006, an agency merely "[s]tating that a factor was considered, however, is not a substitute for considering it." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986). Courts "do not defer to the agency's conclusory or unsupported suppositions." *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010).  Rather, the Court "must

---

[9] See ECF No. 76 at 11–12. There, the Court discussed the applicable exceptions to the "record rule" and found that Plaintiffs may submit extra-record evidence on its APA claims.

make a "searching and careful" inquiry to determine if [DHS] actually *did* consider [the relevant factors]. *Getty*, 805 F.3d at 155 (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)) (emphasis in original).

**74.**     Defendants failed to consider several critical factors.

**75.**     First, the Secretary failed to consider several of the main benefits of MPP. As the Court stated above in the findings of fact, DHS had previously found that "aliens without meritorious claims — which no longer constitute[d] a free ticket into the United States — [were] beginning to voluntarily return home." AR 684. DHS also found that MPP addressed the "perverse incentives" created by allowing "those with non-meritorious claims . . . [to] remain in the country for lengthy periods of time." AR 687.

**76.**     The June 1 Memorandum never once mentions these benefits. At the very least, the Secretary was required to show a reasoned decision for discounting the benefits of MPP. Instead, the June 1 Memorandum does not address the problems created by false claims of asylum or how MPP addressed those problems. Likewise, it does not address the fact that DHS previously found that "approximately 9 out of 10 asylum claims from Northern Triangle countries are ultimately found non-meritorious by federal immigration judges," App. 303, and that MPP discouraged such aliens from traveling and attempting to cross the border in the first place.  AR 687.

**77.**     To be sure, DHS could have determined, "in the particular context before it, that other interests and policy concerns outweigh[ed] any [benefits MPP had]. Making that difficult decision was the agency's job, but the agency failed to do it." *Regents*, 140 S. Ct. at 1914.

**78.**     By ignoring its own previous assessment on the importance of deterring meritless asylum applications without "a reasoned analysis for the change," Defendants acted arbitrarily and capriciously. *State Farm*, 463 U.S. at 42.

**79.**     Second, the Secretary also failed to consider the warnings by career DHS personnel that "the suspension of the MPP, along with other policies, would lead to a resurgence of illegal aliens attempting to illegally" cross the border. App. 399.[10] This is all the more important because the Secretary had the opportunity to see if the warnings were predictive because the Secretary suspended enrollments in MPP on January 20, 2021. From that date until June 1, 2021 when MPP was permanently terminated, the Secretary had the opportunity to observe the ever-increasing number of border encounters. U.S. Customs and Border Protection, *Southwest Land Border Encounters*, CBP (Aug. 3, 2021), https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters. But the Secretary never discussed the rise in border encounters in the June 1 Memorandum or discussed why the warnings by career DHS personnel were misguided or incorrect even as the data appeared to show that the career officials were, in fact, prescient.

**80.**     Third, the Secretary failed to consider the costs to Plaintiffs and Plaintiffs' reliance interests in the proper enforcement of federal immigration law. The Court has already found that the states face fiscal harm from the termination of MPP. But the fact that Plaintiffs suffer fiscal injuries does not indicate the June 1 Memorandum is arbitrary and capricious. Rather, it is the fact that the agency did *not* consider the costs to the States *at all*.

**81.**     Fiscal burdens on states are "one factor to consider" — even if the agency could conclude that "other interests and policy concerns outweigh" those costs. *Regents*, 140 S. Ct. at 1914 (listing possible valid reliance interests, including damage to a state's coffers; "State and local governments could lose $1.25 billion."). But once again, even though "[m]aking that difficult decision was the agency's job, [] the agency failed to do it." *Id.*

---

[10] The briefing materials from the career officials were not part of the administrative record.

82.     Moreover, the Secretary failed to address whether the States had any "reliance interests" in the ongoing implementation of MPP. "When an agency changes course, as DHS did here, it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Id.* at 1913 (*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016)). "It would be arbitrary and capricious to ignore such matters." *Id.* (quoting *Encino Motorcars*, 136 S. Ct. at 1800).

83.     Fourth, the Secretary also failed to meaningfully consider more limited policies than the total termination of MPP. "When an agency rescinds a prior policy its reasoned analysis must consider the alternatives that are within the ambit of the existing policy." *Regents*, 140 S. Ct. at 1913 (quoting *State Farm*, 463 U.S. at 51) (internal marks omitted). The entirety of the Secretary's reasoning in not modifying MPP is contained in a single sentence: "I also considered whether the program could be modified in some fashion, but I believe that addressing the deficiencies identified in my review would require a total redesign that would involve significant additional investments in personnel and resources." AR 005. The Secretary does not identify a single example of what a modified MPP would look like or what kind of investment would be needed to modify or scale back MPP. Courts "do not defer to the agency's conclusory or unsupported suppositions." *United Techs. Corp.*, 601 F.3d at 562.

         *2.   DHS's given reasons were arbitrary*

84.     On the other hand, one of the key reasons the Secretary gave for terminating for MPP is arbitrary. In discounting the expeditious pace at which MPP completed removal proceedings, the Secretary stated:

It is certainly true that some removal proceedings conducted pursuant to MPP were completed more expeditiously than is typical for non-detained cases, but this came with certain significant drawbacks that are cause for concern. The focus on speed was not always matched with sufficient efforts to ensure that conditions in Mexico enabled migrants to attend their immigration proceedings. In particular, the high percentage of cases completed through the entry of *in absentia* removal orders (approximately 44 percent, based on DHS data) *raises questions for me* about the design and operation of the program.

AR 004 (emphasis added).

85.    Certainly, the June 1 Memorandum was concerned about the rate of *in absentia* removals, which were around 44 percent under MPP. And that concern was a key factor in the Secretary's decision to terminate MPP.

86.    But the June 1 Memorandum never provides any reason why DHS determined that *in absentia* removals resulted from aliens abandoning *meritorious* asylum claims when DHS previously concluded that *in absentia* removals were a result of aliens abandoning *meritless* claims. AR 684 ("Moreover, aliens without meritorious claims . . . are beginning to voluntarily return home."). Instead, the June 1 Memorandum states only that this data "raises questions." AR 004. But it is the Secretary's job to answer such questions. *Regents*, 140 S. Ct. at 1914.

87.    It is true that "the APA "imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 141 S. Ct. 1150, 1160 (2021). But it is also true that the agency must *actually reach* some sort of conclusion. *State Farm*, 463 U.S. at 52 (("Rescission of [agency action] would not be arbitrary and capricious simply because there was no evidence in direct support of the agency's *conclusion* . . . the agency must then exercise its judgment in moving from the facts and probabilities on the record *to a policy conclusion*.") (emphasis added).

88.    Merely noting the presence of "questions" provides no "justification for rescinding [MPP] before engaging in a search for further evidence" that could answer those questions. *Id.*; *see also*

*Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 44 (D.C. Cir. 2020) (finding agency action arbitrary when the agency "took no position whatsoever on the actual effects that a [policy change] would have").

89.     Besides assuming without evidence that the 44% *in absentia* rate was attributable to MPP, the Secretary never explained why 44% is itself an unacceptably high number. The June 1 Memorandum does not consider any relevant comparator for determining whether the rate of in absentia removal orders under MPP was unusually high. *See State Farm*, 463 U.S. at 43 ("[T]he agency must examine the relevant data.").

90.     The federal government's data shows similarly high rates of *in absentia* removals *prior to* implementation of MPP. Executive Office for Immigration Review, Adjudication Statistics: *Comparison of* In Absentia *Rates*, https://www.justice,gov/eoir/page/file/1153866/download. For example, the *in absentia* rate was 42% in 2015 and 43% in 2017. *Id.* Failing to exam the relevant data is arbitrary and capricious. Again, "the agency must examine the relevant data." *State Farm*, 463 U.S. at 43.

91.     In their briefing, Defendants posit a new theory not mentioned in the June 1 Memorandum. ECF No. 63 at 32–33; *but see Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1014 (5th Cir. 2019) (A court "may uphold agency action only on the grounds that the agency invoked when it took the action."). Defendants argue that 44 percent of MPP cases resulted in *in absentia* removal orders, while only 11 percent of non-MPP cases resulted in *in absentia* orders during the same time period. *Id.* at 33. And the disparity between MPP and non-MPP *in absentia* removal orders is evidence of the ineffectiveness of the program in deterring fraudulent claims. *Id.*

92.     But even if the Court considered this argument, it is not persuasive. A higher rate of *in absentia* removal is consistent with DHS's findings that MPP reduced the "perverse incentives" to

pursue meritless asylum applications. There is nothing in the record that provides any analysis or reasoning explaining how higher *in absentia* removals resulted from aliens abandoning meritorious, rather than unmeritorious, asylum claims as DHS had previously found. AR 684 ("Moreover, aliens without meritorious claims — which no longer constitute a free ticket into the United States —  are beginning to voluntarily return home."); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009) ("If the "new policy rests upon factual findings that contradict those which underlay its prior policy," the agency must offer "a reasoned explanation . . . for disregarding facts and circumstances that underlay . . . the prior policy.").

93.     Another of the Secretary's stated conclusions is arbitrary. In the June 1 Memorandum, the Secretary justified, in part, terminating MPP because of the court closures caused by the COVID-19 pandemic:

> As immigration courts designated to hear MPP cases were closed for public health reasons between March 2020 and April 2021, DHS spent millions of dollars each month to maintain facilities incapable of serving their intended purpose. Throughout this time, of course, tens of thousands of MPP enrollees were living with uncertainty in Mexico as court hearings were postponed indefinitely. As a result, any benefits the program may have offered are now far outweighed by the challenges, risks, and costs that it presents.

94.     The Secretary's reasoning is without any merit. Even according to the June 1 Memorandum, immigration courts were reopened by the end of April 2021. *Past* problems with *past* closures are irrelevant to the decision to *prospectively* terminate MPP in June 2021. This is especially true when the Secretary admits DHS had maintained the facilities during the pandemic.

### 3. DHS failed to consider or acknowledge the effect terminating MPP would have on its compliance with Section 1225

95.     As detailed more below, the June 1 Memorandum failed to consider the effect terminating MPP would have on DHS's ability to detain aliens subject to *mandatory* detention under Section 1225.

96.   DHS had previously recognized that "[t]he law provides for mandatory detention of aliens who unlawfully enter the United States between ports of entry if they are placed in expedited removal proceedings." AR 682. But "resource constraints during the crisis, as well as other court-ordered limitations on the ability to detain individuals, made many releases inevitable." *Id.*

97.   MPP addressed the resource problem by reducing the number of aliens DHS would have to detain by returning certain aliens to Mexico. *Id.*; AR 687. In terminating MPP, the Secretary was required to consider whether DHS could meet its statutory obligation to detain aliens seeking asylum without MPP as a tool. This the Secretary did not do.

98.   Not once did the June 1 Memorandum discuss DHS's mandatory-detention obligation. In fact, a perusal of the *entire* administrative record shows *zero* evidence of DHS's detention capacity. Trial Tr. 114 (DHS counsel: "the [administrative] record doesn't contain *any* information about detention capacity.") (emphasis added). By "fail[ing] to consider an important aspect of the problem," the Secretary acted arbitrarily and capriciously. *State Farm*, 463 U.S. at 43.

99.   For the above stated reasons, Defendants' termination of MPP was arbitrary and capricious and in violation of the APA. Accordingly, the Court concludes that Plaintiffs' APA claim is meritorious.

### D.  The termination of MPP causes Defendants to violate Section 1225

100.   The Court begins by quickly re-summarizing the relevant statutory framework.

101.   Section 1225 provides that if an immigration officer determines that an alien subject to expedited removal *does not* have a credible fear of persecution, the alien "*shall be detained* pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed." 8 U.S.C. § 1225(b)(1)(B)(iii)(IV) (emphasis added).

**102.** An alien subject to expedited removal and determined by an immigration officer to have a credible fear of persecution "*shall be detained* for further consideration of the application for asylum." § 1225(b)(1)(B)(ii) (emphasis added).

**103.** An alien seeking admission and not subject to expedited removal, whom an examining immigration officer determines is not clearly and beyond a doubt entitled to be admitted, "*shall be detained*" for removal proceedings. § 1225(b)(2)(A) (emphasis added).

**104.** Aliens who are not subject to expedited removal and arrive on land from a foreign territory contiguous to the United States may be returned by the government to that territory pending asylum proceedings as an alternative to detention. § 1225(b)(2)(C); AR 682.

**105.** MPP used this statutory authority to return aliens to Mexico pending their removal proceedings. AR 682.

**106.** Accordingly, Section 1225 provides the government two options vis-à-vis aliens seeking asylum: (1) mandatory detention; or (2) return to a contiguous territory. Failing to detain or return aliens pending their immigration proceedings violates Section 1225.[11]

**107.** Without MPP, Defendants only remaining option under Section 1225 is mandatory detention. But DHS admits it does not have the capacity to meet its detention obligations under Section 1225 because of "resource constraints." AR 682; App. 330 n. 7 ("Continued detention of

---

[11] DHS does have the discretion to parole some aliens. But parole is available "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Nor is parole intended "to replace established refugee processing channels." App. 336. By enacting the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Congress "specifically narrowed the executive's discretion" to grant parole due to "concern that parole . . . was being used by the executive to circumvent congressionally established immigration policy." *Cruz-Miguel v. Holder*, 650 F.3d 189, 199 & n.15 (2d Cir. 2011). Any class-wide parole scheme that paroled aliens into the United States simply because DHS does not have the detention capacity would be a violation of the narrowly prescribed parole scheme in section 1182 which allows parole "only on a *case-by-case* basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A) (emphasis added). *See also* AR 184 ("The number of asylum seekers who will remain in potentially indefinite detention pending disposition of their cases will be almost entirely a question of DHS's detention capacity, and *not whether the individual circumstances* of individual cases warrant release or detention,' [according to UT law professor Steve] Vladeck.") (emphasis added).

a migrant who has more likely than not demonstrated credible fear is not in the interest of resource allocation or justice.").

108.    Under *these particular* circumstances, where Defendants cannot meet their detention obligations, terminating MPP necessarily leads to the systemic violation of Section 1225 as aliens are released into the United States because Defendants are unable to detain them.

109.    Accordingly, the Court concludes that Plaintiffs' statutory claim is meritorious as well.

### E.  The Court does not need to decide Plaintiffs' Take Care Clause claim

110.    Because the Court will grant Plaintiffs full relief on their APA and statutory claims, there is no further relief related to the June 1 Memorandum that the Court can grant.

111.    Where the Court has made a full disposition of the case without addressing a constitutional claim, it will not address the issue. *See Matal v. Tam*, 137 S. Ct. 1744, 1755 ("We have often stressed that it is important to avoid the premature adjudication of constitutional questions and that we ought not to pass on questions of constitutionality unless such adjudication is unavoidable.") (internal marks and citations omitted).

### F.  The Agreement with Texas has expired and is therefore moot.

112.    Because the Court will grant Plaintiffs full relief on their APA and statutory claims, there is no further relief related to the June 1 Memorandum that the Court can grant.

113.    Any further agency action responsive to this opinion shall take place after August 1, 2021, which is when Texas agrees the Agreement was terminated. Therefore, the Agreement will not apply to any new agency action either.

114.    The Court accordingly dismisses this claim as moot.

## V.    REMEDIES

**115.**    Having found Plaintiffs' APA and statutory claims are meritorious, it is the Court's remaining task to craft to proper relief.

### A.  Vacatur and Remand

**116.**    The APA provides that "[t]he reviewing court *shall* . . . hold unlawful and *set aside* agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (emphasis added).

**117.**    As a textual matter,[12] the mandatory language of the APA has led courts to make remand and vacatur the default remedy for agency action that violates the APA. *United Steel v. Mine Safety and Health Admin.*, 925 F.3d 1279, 1287 (D.C. 2019); *Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 945 (N.D. Tex. 2019) ("[D]istrict courts have a duty to vacate unlawful agency actions."). Remand, without vacatur, is only "generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Tex. Assoc. of Mfrs. v. US Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389–90.

**118.**    The D.C. Circuit considers two factors when deciding whether to remand without vacatur: "(1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." *United Steel*,

---

[12] Defendants aver that "nothing in section 706(2)'s text specifies whether a rule, if found invalid, should be set aside on its *face* or *as applied* to the challenger." ECF No. 93 at 11. And Defendants further argue the Court should adopt the narrower "as-applied" reading of the statute and only set aside agency action as to the named Plaintiffs. But that argument is in error. "The APA empowers courts to determine *rule validity*, not just whether the *application* of the rule is valid." Mila Sohoni, *The Power to Vacate a Rule*, 88 GEO. WASH. L. R. 1120, 1133 (2019); *see also* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933, 1012 (2018) ("T]he APA and these organic statutes go further by empowering the judiciary to act directly against the challenged agency action. This statutory power to 'set aside' agency action is more than a mere non-enforcement remedy. It is a veto-like power that enables the judiciary to formally revoke an agency's rules, orders, findings, or conclusions — in the same way that an appellate court formally revokes an erroneous trial-court judgment."). The question of whether courts should extend relief beyond the named litigants *in the APA context* is a question of *severability*, not a question of whether the APA authorizes such relief — it does. Mitchell, *supra*, at 1013.

925 F.3d at 1287; *accord Cent. & S. W. Servs., Inc. v. E.P.A.*, 220 F.3d 683, 692 n.6 (5th Cir. 2000) ("EPA gave ample reasons for its application of the Rule to the members of the regulated community in general. It simply failed to explain why it refused to grant the national variance to the electric utilities. We conclude that it would be disruptive to vacate application of the Rule to other segments of the industry.").

119.    Under the first prong, the Court finds that the deficiencies in the June 1 Memorandum are serious and are unlikely to be resolved on a simple remand. As the Court has found, Defendants failed to consider the main benefits of MPP: (1) MPP deterred aliens, especially from the Northern Triangle, from attempting to illegally cross the border, (2) MPP allowed DHS to avoid systemic violation of Section 1225's detention requirements, and (3) MPP reduced the burden on states caused by tens of thousands of aliens being released.

120.    Moreover, DHS *knew* of these failings when it issued the June 1 Memorandum because Plaintiffs first brought suit on April 13, 2021 — nearly two months earlier. DHS had the opportunity to consider Plaintiffs' suit and engage in reasoned decisionmaking to avoid the flaws the Court has identified in this opinion.

121.    Additionally, the June 1 Memorandum is not only arbitrary and capricious for a lack of reasoned decisionmaking, but it is also substantively unlawful because, in these circumstances, termination of MPP causes Defendants to systemically violate Section 1225. It will continue to be unlawful to terminate MPP until DHS has the capacity and willingness to detain immigrants claiming asylum under Section 1225.

122.    Under the second prong, the Court finds vacatur will not be unduly disruptive. In their supplemental briefs addressing remedies, Defendants emphasizes the "chaos" and "disruptive consequences" that would follow vacatur of the June 1 Memorandum. ECF Nos. 70, 93 at 4–7

("An order interfering with DHS's termination of MPP, or otherwise requiring DHS to reinstitute the program, would wreak havoc on the Administration's approach to managing migration in the region, including by undermining the Government's ability to engage in the delicate bilateral (and multilateral) discussions and negotiations required to achieve a comprehensive solution."). The government further states "restarting MPP would 'come at tremendous opportunity cost,' 'draw resources from other efforts,' 'create doubt about the reliability of the United States as a negotiating partner,' 'hamstring the Federal Government's ability to conduct the foreign policy discussions' necessary to manage migration, and 'have significant resource implications and be damaging to our national and economic security.'" *Id.*

123.     But these problems are entirely self-inflicted. "Such inconveniences are common incidental effects of injunctions, and the government could have avoided them by delaying preparatory work until the litigation was resolved." *Texas*, 809 F.3d at 187. Here, Texas filed suit challenging the suspension of enrollments in MPP on April 13, 2021, which is nearly two months *before* DHS purported to terminate the program entirely in the June 1 Memorandum. DHS "could have avoided" any disruptions by simply informing Mexico that termination of MPP would be subject to judicial review "until the litigation was resolved." *Id.*[13] Mexico is capable of understanding that DHS is required to follow the laws of the United States which includes the APA and INA.

124.     And, as evidenced by Defendants' briefs, DHS seemingly relies on the premise that it *actually terminated* MPP back in January 2021 and has been dismantling the program ever since

---

[13] The Court notes that only slightly more than two months has passed between the issuance of the June 1 Memorandum and the Court's *final* disposition of this case on the merits.

then, even though the January 20 Memorandum only purported to suspend the enrollment of aliens in MPP.[14]

125.    DHS argues, in a brief dated July 7, 2021, that it began acting "to unwind MPP and its infrastructure," *before* the June 1 Memorandum terminating MPP, which is only two months old. ECF No. 70 at 8 ("[N]ew initiatives" to replace MPP have been "in place for nearly *six months*."). Similarly, in the same brief, Defendants stated that re-implementing MPP would be difficult because MPP "had been terminated for *some* time." *Id.* at 9 (emphasis added)

126.    Again, in the same brief, Defendants argues that "Mexico had already begun taking action to redeploy resources." *Id.* at 9. But Defendants' citation shows that Mexico was redeploying resources already by April 28, a month *before* DHS issued the June 1 Memorandum. ECF No. 64 at 14. In another portion, Defendants state MPP began being wound down on "February 11, 2021." *Id.* at 17–18.   Defendants also state that vacatur would nullify "more than four months of diplomatic and programmatic engagement," ECF No. 70 at 11, even though MPP had only been terminated for one month when that brief was submitted.

127.    In other words, DHS's apparent argument is that MPP has been in the process of termination for *months*, far preceeding the actual issuance of the June 1 Memorandum, and it is simply *too late* for a court to vacate their actions. But if the decision to terminate MPP was made far in advance of the June 1 Memorandum, that reduces the entire June 1 Memorandum into *post hoc* arguments for a decision that was already made. *Compare* ECF No. 64 at 5 ("Upon completion of the required review, the Secretary announced his decision to terminate MPP [on June 1, 2021.]") *with id.* at 17 ("[T]he U.S. government announced the wind-down of the MPP policy on February 11, 2021.").

---

[14] There is no question that the January 20, 2021 Memorandum would have been found to be arbitrary and capricious as there is *no* administrative record or any stated basis for agency action for the Court to review. *See* ECF No. 45.

**128.**    Additionally, DHS's arguments also only relate to the effect vacatur would have on its diplomatic engagements with foreign countries.[15] ECF No. 70 at 7–11.

**129.**    DHS's reliance on the effects of foreign affairs is unpersuasive. DHS's first duty is to uphold *American* law. It cannot just point at diplomatic efforts as an excuse to not follow the APA or fulfill its statutory obligations.

**130.**    Accordingly, Plaintiffs are entitled to vacatur and remand because the June 1 Memorandum violates the APA and is in substantive violation of Section 1225.

### B.  Injunctive Relief is warranted

**131.**    "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. *eBay Inc. v. MercExchange, LLC.*, 547 U.S. 388, 391 (2006). The four factors are: "(1) that [Plaintiffs have] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.*

**132.**    Regarding the first factor, as discussed in the Section on standing, *supra* § IV.A.1, Plaintiffs have shown that they are suffering ongoing and future injuries as a result of the termination of MPP.

---

[15] At various points, Defendants argue that the Court is unable to redress Plaintiffs' injuries because any relief would be dependent on Mexico's cooperation. *See, e.g.*, ECF No. 913 at 10–11.  This is not correct. The United States initiated MPP unilaterally pursuant to U.S. law, not pursuant to bilateral agreement or treaty with Mexico. App. 307. The program was then "implemented and expanded . . . through ongoing discussions with Mexico." *Id.* In other words, MPP was adopted and launched unilaterally, just as it was later terminated unilaterally. App.307; *see also* App.303. And even if Mexico's cooperation may be required to return an alien who has already been admitted, nothing prevents DHS from refusing to admit asylum applicants at ports of entry in the first place — before they ever enter the United States.

133.    Regarding the second factor, Texas and Missouri are unable to recover the additional expenditures from the federal government. *Texas*, 2021 WL 2096669, at *48 ("[N]o Party has suggested that Texas could recover any of its likely financial injury here, and the Court cannot conceive of any path for Texas to pierce the federal government's usual sovereign immunity or contrive a remedial cause of action sufficient to recover from its budgetary harm."); *see also Texas*, 328 F. Supp. 3d at 737 (deeming an injury irreparable because "there [was] no source of recompense").

134.    Regarding the third and fourth factors,[16] the ongoing and future injuries sustained by Plaintiffs outweigh any harms to Defendants as Defendants have no "interest in the perpetuation of unlawful agency action." *League of Women Voters of United States, v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Rather, there is a "public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994).

135.    Moreover, the public interest favors Plaintiffs because the public has an "interest in stemming the flow of illegal immigration." *United States v. Escobar*, No. 2:17-CR-529, 2017 WL 5749620 at *2 (S.D. Tex. Nov. 28, 2017) (citing *United States v. Martinez–Fuerte*, 428 U.S. 543, 556–58 (1976)). And the public has interest in the enforcement of immigration laws, including Section 1225. Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 115, 100 Stat 3359, 3384 (1986) ("[T]he immigration laws of the United States should be enforced vigorously and uniformly.")

---

[16] Federal courts may consider the third and fourth together as they overlap considerably.  *Texas*, 809 F.3d at 187; *Nken v. Holder*, 556 U.S. 418, 435 (2009) ("Once an applicant satisfies the first two factors [for a stay of an alien's removal pending judicial review], the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest. These factors merge when the Government is the opposing party.").

**136.**    Lastly, the Supreme Court has cautioned that a district court vacating an agency action under the APA should not issue an injunction unless an injunction would "have [a] meaningful practical effect independent of its vacatur." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010).

**137.**    Here, an injunction is warranted for two reasons. First, an injunction is needed to prevent the continued systemic violation of Section 1225. Second, Defendants have indicated that, *even if* the June 1 Memorandum were declared invalid, they would not necessarily return any aliens to Mexico. ECF No. 63 at 9 ("Reinstating MPP would not *require* DHS to return anyone to Mexico.") (emphasis in original). ECF No. 92 at 47 ("DHS retains discretion to . . . release *all* noncitizens inspected for admission under Section 1225(b)(2)(A) or arrested while present in the United States under Section 1226.") (emphasis added).

**138.**    Defendants are correct in stating that this Court does not have the power to tell a DHS line officer which individual aliens are amenable to MPP and must be enrolled. But Defendants are *incorrect* in arguing this Court has no power to enjoin a "blanket policy" that removes all discretion from line officers to utilize MPP. *Texas*, 2021 WL 2096669, at *51 ("But this injunction does not enjoin *individual* removal decisions. As described above, it enjoins a *blanket* policy that is contrary to law. The Government makes much of its discretion in individual matters . . .. But nothing in this preliminary injunction changes that."); ECF No. 63 at 9 ("Reinstating MPP . . . would merely authorize line-level officers to [return aliens to Mexico] in their discretion.").

**139.**    Lastly, Fifth Circuit precedent dictates that, in immigration related cases, proper relief includes nationwide injunctions. A geographically limited injunction would be improper because federal *immigration* law must be uniform. *Texas*, 809 F.3d at 187–88; *see also Texas*, 2021 WL 2096669, at *52; *Texas*, 2021 WL 247877, at *7–8. Furthermore, a geographically limited

injunction would likely "be ineffective because [aliens] would be free to move among states." *Id.* at 188.

**140.** Accordingly, the Court will grant the narrowest injunction possible that afford Plaintiffs full relief on their claims.

### VI. CONCLUSION

For the reason stated above, the Court finds that Plaintiffs have proven their APA and statutory claims by the preponderance of the evidence. Accordingly, it is **ORDERED**:

1. Defendants and all their respective officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with them are hereby **PERMANENTLY ENJOINED** and **RESTRAINED** from implementing or enforcing the June 1 Memorandum.

2. The June 1 Memorandum is **VACATED** in its entirety and **REMANDED** to DHS for further consideration.

3. Defendants are **ORDERED** to enforce and implement MPP *in good faith* until such a time as it has been lawfully rescinded in compliance with the APA **and** until such a time as the federal government has sufficient detention capacity to detain all aliens subject to mandatory detention under Section 1255 without releasing any aliens *because of* a lack of detention resources.

4. To ensure compliance with this order, starting September 15th, 2021, the Government must file with the Court on the 15th of each month, a report stating (1) the total monthly number of encounters at the southwest border; (2) the total monthly number of aliens expelled under Title 42, Section 1225, or under any other statute; (3) Defendants' total detention capacity as well as current usage rate; (4) the total monthly number of "applicants for

admission" under Section 1225; (5) the total monthly number of "applicants for admission" under Section 1225 *paroled* into the United States; and (6) the total monthly number of "applicants for admission" under Section 1225 released into the United States, *paroled or otherwise*.

5.   This injunction is granted on a nationwide basis.

6.   Nothing in this injunction requires DHS to take any immigration or removal action nor withhold its statutory discretion towards any individual that it would not otherwise take.

7.   The Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this permanent injunction.

8.   The Court **STAYS** the applicability of this opinion and order for **7 days** to allow the federal government time to seek emergency relief at the appellate level.

**SO ORDERED.**

August 13, 2021.

_____

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE