United States District Court
Southern District of Texas

**ENTERED**

August 19, 2021

Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

|  |  |  |
|---|---|---|
| The STATE OF TEXAS; and the STATE OF LOUISIANA, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 6:21-cv-00016 |
| The UNITED STATES OF AMERICA; ALEJANDRO MAYORKAS, Secretary of The United States Department of Homeland Security, in his official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TROY MILLER, Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection, in his official capacity; U.S. CUSTOMS AND BORDER PROTECTION; TAE JOHNSON, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TRACY RENAUD, Senior Official Performing the Duties of the Director of the U.S. Citizenship and Immigration Services, in her official capacity; and U.S. CITIZENSHIP AND IMMIGRATION SERVICES, | § § § § § § § § § § § § § § § § § § § § § § § § § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

"No matter how successful Congress might be in crafting a set of immigration laws that would—in theory—lead to the most long-term benefits to the American people, such benefits will not actually occur if those laws cannot be enforced." S. Rep. No. 104-249, at

3 (1996).  That observation comes from a Senate Judiciary Committee Report addressing the problem of alien criminality in the United States.  Similarly, the Supreme Court has stated "deportable criminal aliens who remain[] in the United States often commit[] more crimes before being removed."  *Demore v. Kim*, 538 U.S. 510, 518, 123 S.Ct. 1708, 1715, 155 L.Ed.2d 724 (2003) (citing Hearing on H.R. 3333 before the Subcommittee on Immigration, Refugees, and International Law of the House Committee on the Judiciary, 101st Cong., 1st Sess., 54, 52 (1989)).  These observations, among others, led to the wholesale reform of our Nation's immigration laws in the 1990s.

Now, over two decades later, the States of Texas and Louisiana (the "States") seek to have the Executive Branch (the "Government")[1] adhere to two federal immigration statutes passed during that wholesale reform.  The States want the Government to comply with 8 U.S.C. §§ 1226(c) and 1231(a)(2), which provide that the Government "shall" detain certain aliens when they are released from custody or during their removal period, respectively.[2]  More specifically, the States move for a preliminary injunction to prohibit the Government from implementing two recent immigration memoranda which allegedly instruct Executive Branch officials to violate these laws.[3]  (Dkt. No. 18).

---

[1]     The term "Government" used throughout this Memorandum Opinion and Order refers to the United States, the agencies, and the individuals sued in their official capacity.

[2]     Under Section 1226(c), "the Attorney General *shall* take into custody" certain aliens who have either committed specified offenses or who are otherwise deemed deportable "when the alien is released" from custody.  8 U.S.C. § 1226(c) (emphasis added).  Likewise, Section 1231(a)(2) provides, "the Attorney General *shall* detain the alien" "during [the alien's] removal period."  8 U.S.C. § 1231(a)(2) (emphasis added).

[3]     The States also seek an injunction compelling the Government to comply with the detention mandates in Sections 1226(c) and 1231(a)(2).  (Dkt. No. 18).

These immigration memoranda, issued on January 20 and February 18, 2021 (the "Memoranda"), purport to "prioritize" certain categories of aliens for enforcement action. (Dkt. No. 1-1); (Dkt. No. 1-2).  The States point out that the priority categories enumerated in these Memoranda omit certain others—namely, aliens convicted of serious drug offenses, aliens convicted of crimes of moral turpitude, and aliens subject to a final order of removal.  The States argue that federal law requires the Government to take custody of aliens falling within these overlooked categories, and the Memoranda are grinding these required detentions to a halt.  Unsurprisingly, the Government disagrees and argues that the Executive Branch is simply acting within its discretion.

This case involves the intersection of several areas of administrative and immigration law.  But more fundamentally, the claims made in this case implicate the separation-of-powers framework set forth in our Nation's Constitution.  Put simply, the Government has instructed federal officials that "shall detain" certain aliens means "may detain" when it unambiguously mean *must* detain.  Thus, the Court inquires whether the Executive Branch may direct officials to enforce a law enacted by Congress in a way that is contrary to the plain language of the law.  That inquiry yields a clear answer: it may not.  The Executive Branch may not instruct its officers to enforce a statute in a manner contrary to the law itself.  *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 327, 134 S.Ct. 2427, 2446, 189 L.Ed.2d 372 (2014) ("Under our system of government, Congress makes laws and the President, acting at times through agencies . . . , faithfully executes them.  The power of executing the laws [however] . . . does not include a power to revise clear

statutory terms that turn out not to work in practice." (citing U.S. Const. art. II, § 3) (cleaned up)).

Having considered the pleadings, the record, and the applicable law, the Court finds the States have satisfied the requirements for a preliminary injunction. Accordingly, the States' Motion is **GRANTED**.[4]

## I.   BACKGROUND

At first glance, the background facts of this case are straightforward.   The Government issued two memoranda concerning civil immigration enforcement which the States claim violate two immigration laws.   But upon closer examination, the actions of the Government and the claims by the States are strikingly complex.   Congress did not design our Nation's immigration laws on a whim.   Therefore, to place this case in its proper context and facilitate understanding of the function of Sections 1226(c) and 1231(a)(2), the Court begins by briefly detailing some of the history behind those statutes.[5]

---

[4]   In this Memorandum Opinion and Order, the Court does not address the States' likelihood of success on claims that the Memoranda are unlawful because they violate: (1) the Agreements between Texas and Louisiana and the Department of Homeland Security ("DHS"); and (2) the Constitution's requirement that the President "take Care that the Laws be faithfully executed."   (Dkt. No. 1 at ¶¶ 122–31).   In withholding a ruling on these claims, the Court is mindful that to succeed on their Motion, the States need only demonstrate a substantial likelihood of success on "at least one" claim, which they have.   *See Texas v. United States*, 86 F. Supp. 3d 591, 672 (S.D. Tex. 2015), *aff'd*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided court*, ____ U.S. ____, 136 S.Ct. 2271, 195 L.Ed.2d 638 (2016) (*mem.*).   Moreover, given the significance of the substantial interests at stake in this case, the Court finds it to be in the interest of justice to rule after all Parties have an opportunity to make a complete presentation on the merits of these claims.   *See id.* at 677.   Similarly, the Court defers ruling on the States' request for an injunction to compel agency action unlawfully withheld pursuant to Section 706(1) of the Administrative Procedure Act.   *See* footnote 61; *see also* (Dkt. No. 1 at 28); (Dkt. No. 18 at 26).

[5]   In outlining the extensive background and history involved in this case, the factual statements made herein (except where the Court is discussing a factual dispute) should be

(continue)

A.     HISTORY OF SECTIONS 1226(C) AND 1231(A)(2)

The United States has long welcomed and benefited from immigration.[6]  The

Nation has, however, borne costs due to illegal immigration and the criminal conduct of

illegal aliens.  *See* Juliet Stumpf, *The Crimmigration Crisis: Immigrants, Crime, and Sovereign*

*Power*, 56 Am. U. L. Rev. 367, 380–81 (2006).  Congress in the 1990s was not blind to those

concerns.  As a legislative report from 1995 mentions, "[a]lthough immigrants to the

United States have been, and continue to be, predominantly hard working and law

abiding, there appears to be a growing criminal class among immigrants, especially

among those here illegally."  S. Rep. No. 104-48, at 7 (1995).  Indeed, Congress directly

linked illegal immigration with crime.  The same legislative report provides:

> The fact that many criminal aliens have entered the U.S.
> illegally helps explain why so many aliens are involved in
> crime[.] [T]heir illegal situation conveys an "outlaw" status,
> often leading them into the shadowy realms of criminal
> lifestyles.  The point was made succinctly in Congressional
> testimony by a former Commissioner of the INS, "[t]hose
> entering the United States illegally have no legitimate
> sponsors and are prohibited from holding jobs.  Thus,
> criminal conduct may be the only way to survive."

*Id.* at 5.

Yet throughout much of its history, the United States had neither the means nor

the ability to curb illegal immigration or alien criminality.  Indeed, "[f]or much of this

---

considered as findings of fact regardless of any heading or lack thereof.  Similarly, the legal
conclusions, except where the Court discusses the various competing legal theories and positions,
should be taken as conclusions of law regardless of any label or lack thereof.

[6]     *See generally* John F. Kennedy, *A Nation of Immigrants* (1958); Andrea Barton, *Sitting on
Ellis Island: The Fate of Disparate Immigration Policies in the Wake of the Guantanamo Bay Cases*, 23
Notre Dame J.L. Ethics & Pub. Pol'y 233, 237 (2009).

country's history there has been no comprehensive body of immigration law and no laws at all addressing criminal aliens." *Id.* at 10. Despite the enactment of the Immigration and Nationality Act in 1952—and numerous immigration bills signed into law in the subsequent decades—these issues were "dealt with . . . mostly as an afterthought." *Id.* at 12. Prior to the 1990s, "no major immigration legislation ha[d] focused exclusively on the problem of criminal aliens." *Id.* And although there were attempts to solve the problem of illegal immigration and alien criminality, change happened in a "piecemeal fashion." *Id.* It is unsurprising, therefore, that the time leading up to the enactment of Sections 1226(c) and 1231(a)(2) has been regarded by the Supreme Court as a time of "wholesale failure by [the Executive Branch] to deal with increasing rates of criminal activity by aliens." *Demore*, 538 U.S. at 518, 123 S.Ct. at 1714 (citations omitted); *see also Zadvydas v. Davis*, 533 U.S. 678, 698, 121 S.Ct. 2491, 2503, 150 L.Ed.2d 653 (2001). The Executive Branch's failures at that time led to costs and consequences borne by the states, the citizens of this country, and its legal immigrants. *See Demore*, 538 U.S. at 518–21, 123 S.Ct. at 1714–16; S. Rep. No. 104-48, at 1–2 (1995).

Congress's observations led to significant statutory reform in the federal detention of criminal aliens. Following numerous reports about the high rate of abscondment and recidivism among criminal aliens and the corresponding costs and negative effects, "Congress enacted 8 U.S.C. § 1226, requiring the Attorney General to detain a subset of deportable criminal aliens pending a determination of their removability." *Demore*, 538 U.S. at 521, 123 S.Ct. at 1716. Section 1226(c)(1) reads:

The Attorney General *shall take into custody* any alien who—

    (A)  is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,

    (B)  is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,

    (C)  is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence[d][7] to a term of imprisonment of at least 1 year, or

    (D)  is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

*when the alien is released*, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

8 U.S.C. § 1226(c)(1) (emphases added) (footnote added).  And to buttress this detention mandate, Congress in Subsection (2) provided detailed instructions on the narrow circumstances under which the Attorney General could release a detained illegal alien.

The Attorney General *may* release an alien described in paragraph (1) *only if* the Attorney General decides pursuant to section 3521 of Title 18 that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, *and* the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property *and* is likely to appear for any scheduled proceeding.  A decision relating to such release shall take place in accordance with a procedure

---

[7]    The text of the statute says "sentence;" however, the Court notes it should probably be "sentenced."

> that considers the severity of the offense committed by the
> alien.

*Id.* § 1226(c)(2) (emphases added).

Congress's efforts to protect the states, citizens, and legal immigrants from criminal illegal aliens through the INA during the 1990s were not confined to Section 1226(c).  Through other statutes, too, "Congress explicitly expanded the group of aliens subject to mandatory detention."  *Zadvydas*, 533 U.S. at 698, 121 S.Ct. at 2503 (citing Antiterrorism and Effective Death Penalty Act of 1996, § 439(c), 110 Stat. 1277; Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Div. C, §§ 303, 305, 110 Stat. 3009–585, 3009–598 to 3009–599; 8 U.S.C. § 1226(c); and 8 U.S.C. § 1231(a)).  That expansion is evident in 8 U.S.C. § 1231(a)(2), which outlines the Attorney General's discretion regarding the detention of illegal aliens who have been ordered removed:

> During the removal period, the Attorney General *shall detain* the alien. *Under no circumstance* during the removal period shall the Attorney General release an alien who has been found inadmissible under section 1182(a)(2) or 1182(a)(3)(B) of this title or deportable under section 1227(a)(2) or 1227(a)(4)(B) of this title.

8 U.S.C. § 1231(a)(2) (emphases added).

In view of the historical context and text of Sections 1226(c) and 1231(a)(2), Congress designed these two provisions to curtail the effects of illegal immigration and the concomitant concerns of alien criminality.  But, as the Senate Judiciary Committee Report mentioned earlier admits, these statutory policies are futile if the "laws cannot be enforced."  S. Rep. No. 104-249, at 3 (1996).

8

### B.    DETENTIONS IN PRACTICE

Previously, in *Texas v. United States*, the Court provided an in-depth overview of the immigration removal process. ____ F. Supp. 3d ____, ____, 2021 WL 2096669, at *4–9 (S.D. Tex. Feb. 23, 2021) (hereinafter "*Texas I*").  That discussion touched upon parts of the detention process for aliens subject to removal proceedings, *id.* at *5, and aliens subject to final orders of removal, *id.* at *8–9.  Given the specific focus on detentions in this Motion for Preliminary Injunction, it is appropriate to more fully discuss the detention process for aliens subject to Sections 1226 and 1231.

To start, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009-546, created a uniform procedure for deporting aliens or denying them entry into the United States.  The detention and removal process under Section 240 of the Immigration and Nationality Act ("240 proceedings") commences when DHS files a Notice to Appear ("NTA") against an alien or noncitizen—who are designated as "respondents"—in immigration court.  *Matter of S-O-G- & F-D-B-*, 27 I. & N. Dec. 462, 465 (2018); *see* 8 C.F.R. § 1003.14; Jennifer Williams, *The Potential Implications of the Supreme Court's Decision in* Pereira v. Sessions *on Prosecutions for Illegal Reentry Under 8 U.S.C. § 1326*, 67 DOJ J. Fed. L. & Prac. 141 (2019); *see also* (6:21-cv-3, Dkt. Nos. 82 at 12, 82-1 at 5, 83 at 14).  Federal law then gives the Attorney General—and immigration judges by extension of DOJ's internal organizational structure—discretion on whether such an alien may continue to be detained during the proceedings or released on bond or conditional parole pursuant to Section 1226(a).  8 U.S.C. § 1226(a).

For criminal aliens, however, the start of the process is a bit different.  Such aliens are taken into custody by officers within the Executive Branch (*i.e.*, Immigration and Customs Enforcement ("ICE") agents) in generally three ways: an ICE arrest; in execution of detainers after a local police stop, *see* 8 C.F.R. § 287.7(a) (2011); or after completion of incarceration for a prior criminal conviction, *see* 8 C.F.R. § 287.5(c) (2016).  *See* Gerard Savaresse, *When Is When?: 8 U.S.C. § 1226(c) and the Requirements of Mandatory Detention*, 82 Fordham L. Rev. 285, 302 (2013).  Of the three, immigration detainers are particularly important:

> The Executive branch uses immigration detainers to control the release of non-citizens from state prisons and local jails. When federal immigration officials learn that a state or local law enforcement agency has custody of a non-citizen targeted for immigration proceedings or investigation, they issue a detainer to give notice to state or local officials that the federal government intends to take custody of the non-citizen upon release.  The form detainer notice issued by federal immigration officials directs the recipient that federal regulations require the recipient agency to detain the non-citizen for a brief period of time after the non-citizen would otherwise be released from custody.[8]  Absent the ability to issue detainers, immigration enforcement officials would have to be present at the gates of the state or local detention facility to apprehend the non-citizen upon release.

---

[8]    Federal regulations permit the temporary detention of certain incarcerated aliens at DHS's request for a period not to exceed 48 hours "in order to permit assumption of custody" of the detainee by DHS.  8 C.F.R. § 287.7(d).  Note at least one state court determined that beyond the 48-hour mark, state authorities must release the incarcerated aliens "[i]f the federal government *fails to apply* federal law and take custody of [the criminal aliens] within the time limit set by federal regulations."  *Ochoa v. Bass*, 2008 OK CR 11, ¶ 19, 181 P.3d 727, 733 (emphasis added).

Christopher N. Lasch, *Enforcing the Limits of the Executive's Authority to Issue Immigration Detainers*, 35 Wm. Mitchell L. Rev. 164, 165 (2008) (footnote added) (citations omitted).[9]

In the past, ICE and DHS have been known to "screen" state prison and local jail populations for criminal aliens who may be subject to Section 1226(c). *Id.* at 177 (citing U.S. Immigration and Customs Enforcement, Secure Communities: A Comprehensive Plan to Identify and Remove Criminal Aliens (Mar. 28, 2008), not available online (Aug. 2, 2021)). This screening takes place, at least in some circumstances, without cooperation from state and local authorities. *See, e.g.*, *State v. Reyes-Armenta*, No. M2004-00419-CCA-R3-CD, 2004 WL 2804898, at *2 (Tenn. Crim. App. 2004) ("The codefendants were then taken to the Sumner County Jail for processing. The officers had made no attempt to contact federal immigration officials; however, Agent Robert Kinghorn, an immigration officer, happened to be at the Sumner County jail and issued detainers on the defendants."). Additionally, in the past, "DHS's practice appears to be to place a detainer as soon as DHS learns of a potentially deportable prisoner—in many cases before conviction, close in time to the alien's arrest." Lasch, *supra*, at 178.

Once the alien is in mandatory custody pursuant to Section 1226(c), an NTA may be issued, formally beginning the immigration removal proceedings. Mark Noferi,

---

[9]     The importance of detainers aside, note that "[t]here are certainly other mechanisms available to assist in implementing the federal apprehension of criminal aliens." *Id.* at 175. For instance, written agreements between the Executive Branch and states and local governments pursuant to 8 U.S.C. § 1357(g) may permit state and local law enforcement "to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens across State lines to detention centers)." 8 U.S.C. § 1357(g). In another example, the Executive Branch may also enter an "inter-governmental service agreement" with local and state jails to authorize such detention centers to house prisoners on behalf of DHS. Lasch, *supra*, at 175.

*Cascading Constitutional Deprivation: The Right to Appointed Counsel for Mandatorily Detained Immigrants Pending Removal Proceedings*, 18 Mich. J. Race & L. 63, 83 (2012). Because certain criminal aliens are required to be detained, a Notice of Custody Determination ("Form I-286") may also be issued.  *Id.* (citing 8 C.F.R. § 231.1(g)(1) (2011)). The Form I-286 explains an ICE officer's determination that an alien is subject to mandatory detention because the alien falls within certain categories of Section 1226(c). *Id.*  For such aliens, "the NTA's removal charge will commonly be the [Form I-286] charge justifying mandatory detention."  *Id.*

While in detention, the criminal alien is entitled to a "*Joseph* hearing."  *Id.* at 63, 85–86; *see Matter of Joseph*, 22 I. & N. Dec. 799 (BIA 1999).  The hearing is the detainee's only chance to challenge the mandatory nature of his or her detention.  *Joseph*, 22 I. & N. Dec. at 800; Noferi, *supra*, at 85–86; Savaresse, *supra*, at 303.  The point of the *Joseph* hearing is to determine whether the detainee challenging mandatory detention was "properly included" within a mandatory detention category; that is, the categories enumerated in Section 1226(c).  *See Joseph*, 22 I. & N. Dec. at 800; Savaresse, *supra*, at 303.  If the detainee prevails, he or she is entitled to a bond determination.  *See Joseph*, 22 I. & N. Dec. at 808–09.

The detention process is similar for aliens with final orders of removal, *i.e.*, those who exhausted the removal proceedings and were found to be deportable.  *See* 8 U.S.C. § 1231(a)(2).  Criminal aliens who were initially detained under Section 1226(c) must remain in ICE custody as their removals are processed.  *See* 8 U.S.C. §§ 1226(c)(2) and 1231(a)(2).  As for the aliens with final orders of removal who are not currently in ICE

custody, ICE sends a "Bag-and-Baggage" letter requiring the aliens to report to an ICE facility for detention and deportation. *Qian Gao v. Gonzales*, 481 F.3d 173, 175 (2d Cir. 2007); *Bermudes-Cardenas v. Gonzales*, 184 F. App'x 406, 407 (5th Cir. 2006) (per curiam). An alien who fails to report is classified by ICE and the circuit courts as a "fugitive." *See, e.g.*, *Giri v. Keisler*, 507 F.3d 833, 834–36 (5th Cir. 2007). Once an alien is in custody, ICE takes the lead in coordinating their removal from the country. *See Texas I*, ____ F. Supp. 3d at ____, 2021 WL 2096669, at *9.

### C.   THE JANUARY 20 MEMORANDUM

More than two decades after Congress changed the way this country approached the issues of illegal immigration and alien criminality, the current Administration set forth its views advocating a different approach from its predecessor. *See* Revision of Civil Immigration Enforcement Policies and Priorities, Exec. Order No. 13,993, 86 Fed. Reg. 7051 (Jan. 20, 2021) ("[The current] Administration will *reset* the policies and practices for enforcing civil immigration laws to align enforcement with [certain] values and priorities." (emphasis added)).

Once the current Administration assumed power on January 20, 2021, it wasted no time issuing its first memorandum on civil immigration enforcement (the "January 20 Memorandum"). (Dkt. No. 1-1). The January 20 Memorandum, signed by Acting DHS Secretary David Pekoske, announced changes to the enforcement of the Nation's immigration laws. (Dkt. No. 1-1). The January 20 Memorandum begins by acknowledging the current issues the federal government is encountering in enforcing immigration laws, noting the United States "faces significant operational challenges at

the southwest border as it is confronting the most serious global public health crisis in a century." (*Id.* at 2). The January 20 Memorandum goes on to say, "in light of those unique circumstances," DHS must substantially increase "resources to the border in order to ensure safe, legal and orderly processing, to rebuild fair and effective asylum procedures that respect human rights and due process, to adopt appropriate public health guidelines and protocols, and to prioritize responding to threats to national security, public safety, and border security." (*Id.*) In Section A, the January 20 Memorandum calls for a "Department-wide review of policies and practices concerning immigration enforcement[.]" (*Id.* at 3). In Section B, the January 20 Memorandum articulates "interim enforcement priorities [that] shall go into effect on February 1, 2021 and remain in effect until superseded by revised priorities developed in connection with the" Department-wide review. (*Id.* at 3–4). Pending completion of the Department-wide review, the January 20 Memorandum lists three DHS enforcement priorities:

1) **National security.** Individuals who have engaged in or are suspected of terrorism or espionage, or whose apprehension, arrest and/or custody is otherwise necessary to protect the national security of the United States.

2) **Border security.** Individuals apprehended at the border or ports of entry while attempting to unlawfully enter the United States on or after November 1, 2020, or who were not physically present in the United States before November 1, 2020.

3) **Public safety.** Individuals incarcerated within federal, state, and local prisons and jails released on or after the issuance of this memorandum who have been convicted of an "aggravated felony," as that term is defined in section 101(a)(43) of the Immigration and Nationality Act

14

> at the time of conviction, and are determined to pose a
> threat to public safety.

(*Id.* at 3).  The January 20 Memorandum then qualifies its prioritization scheme by stating,

"[w]hile resources should be allocated to the priorities enumerated above, nothing in this

memorandum prohibits the apprehension or detention of individuals unlawfully in the

United States who are not identified as priorities herein."  (*Id.* at 4).

In Section C, the January 20 Memorandum orders a temporary pause on removals

of noncitizens, with some exceptions.[10]    (*Id.* at 4–5).   Specifically, the January 20

Memorandum directs "an immediate pause on removals of any noncitizen with a final

order of removal . . . for 100 days[.]"   (*Id.* at 4).   The January 20 Memorandum justifies

this pause by pointing to DHS's "limited resources," which it claims "must be prioritized

to . . . provide sufficient staff and resources to enhance border security and conduct

immigration and asylum processing at the southwest border fairly and efficiently" and

---

[10]    The January 20 Memorandum excludes from the 100-day pause any alien with a final
removal order who:

1)  According to a written finding by the Director of ICE, has engaged in or is
    suspected of terrorism or espionage, or otherwise poses a danger to the
    national security of the United States; or

2)  Was not physically present in the United States before November 1, 2020;
    or

3)  Has voluntarily agreed to waive any rights to remain in the United States,
    provided that he or she has been made fully aware of the consequences of
    waiver and has been given a meaningful opportunity to access counsel prior
    to signing the waiver; or

4)  For whom the Acting Director of ICE, following consultation with the
    General Counsel, makes an individualized determination that removal is
    required by law.

(Dkt. No. 1-1 at 4–5) (footnote omitted).

to "comply with COVID-19 protocols to protect the health and safety of DHS personnel and those members of the public with whom DHS personnel interact." (*Id.*). Further, the January 20 Memorandum states, the pause is necessary for DHS to "ensure that [its] removal resources are directed to [its] highest enforcement priorities." (*Id.*).

This Court partially enjoined the January 20 Memorandum on January 26 with a temporary restraining order, *Texas v. United States*, ____ F. Supp. 3d ____, 2021 WL 247877 (S.D. Tex. Jan. 26, 2021), and again on February 23 with a preliminary injunction, *Texas I*, ____ F. Supp. 3d ____, 2021 WL 2096669. Specifically, this Court enjoined Section C of the January 20 Memorandum, which paused removals of aliens with a final order of removal for 100 days. *Texas I*, ____ F. Supp. 3d at ____, 2021 WL 2096669, at *52. In doing so, this Court explicitly left intact Section B of the January 20 Memorandum, which enumerates DHS's "enforcement priorities" going forward. (*Id.*). Section B is a subject of this litigation. (Dkt. No. 1-1 at 3–4).

### D.   THE FEBRUARY 18 MEMORANDUM

On February 18, 2021, five days before the preliminary injunction was signed in *Texas I*, ICE Acting Director Tae D. Johnson issued the February 18 Memorandum to all ICE employees. (Dkt. No. 1-2). The February 18 Memorandum became "effective[] immediately" and controls to the extent it conflicts with the January 20 Memorandum. (*Id.* at 2). Designed to implement Section B of the January 20 Memorandum,[11] the February 18 Memorandum broadly delineates six "revisions":

---

[11]   The January 20 Memorandum provides that "the Acting Director of ICE shall issue operational guidance on the implementation of these priorities." (Dkt. No. 1-1 at 4).

1) authorization to apprehend presumed priority noncitizens in at-large enforcement actions without advance approval;

2) the inclusion of current qualifying members of criminal gangs and transnational criminal organizations as presumed enforcement priorities;

3) authorization to apprehend without prior approval other presumed priority noncitizens who are encountered during enforcement operations;

4) how to evaluate whether a noncitizen who is not a presumed priority nevertheless poses a public safety threat and should be apprehended;

5) the further delegation of approval authority; and

6) the importance of providing advance notice of at-large enforcement actions to state and local law enforcement.

(*Id.* at 2–3).

Relevant to this case, the February 18 Memorandum lists three "criteria defining cases that are presumed to be priorities." (*Id.* at 5). The first priority category is national security.

A noncitizen is *presumed* to be a national security enforcement and removal priority if: 1) he or she has engaged in or is suspected of engaging in terrorism or terrorism-related activities; 2) he or she has engaged in or is suspected of engaging in espionage or espionage-related activities; or 3) his or her apprehension, arrest, or custody is otherwise necessary to protect the national security of the United States.

(*Id.*) (emphasis in original). The second priority category is border security.

A noncitizen is *presumed* to be a border security enforcement and removal priority if: 1) he or she was apprehended at the border or a port of entry while attempting to unlawfully enter the United States on or after November 1, 2020; or 2) he or she

> was not physically present in the United States before
> November 1, 2020.

(*Id.*) (emphasis in original).  And the final priority category is public safety.

> A noncitizen is *presumed* to be a public safety enforcement and
> removal priority if he or she poses a threat to public safety
> and: 1) he or she has been convicted of an aggravated felony
> as defined in section 101(a)(43) of the INA; or 2) he or she has
> been convicted of an offense for which an element was active
> participation in a criminal street gang, as defined in 18 U.S.C.
> § 521(a), or is not younger than 16 years of age and
> intentionally participated in an organized criminal gang or
> transnational criminal organization to further the illegal
> activity of the gang or transnational criminal organization.

(*Id.* at 5–6) (emphasis in original).

In addition to the three enforcement priorities, the February 18 Memorandum explains, "[o]fficers and agents need not obtain preapproval for enforcement or removal actions that meet the above criteria for presumed priority cases"—*i.e.*, the three enforcement priorities—"beyond what existing policy requires and what a supervisor instructs."  (*Id.* at 6).  By contrast, preapproval is required for enforcement or removal actions that do not fall under the three enforcement priorities.  (*Id.* at 7).  But there are certain exceptions.  The February 18 Memorandum, for example, posits that there are circumstances when "the demands of public safety will make it impracticable to obtain preapproval for an at-large enforcement action."  (*Id.*).  But this is "generally . . . limited to situations where a noncitizen poses an imminent threat to life or an imminent substantial threat to property."  (*Id.*).

### E.    PROCEDURAL BACKGROUND

The States filed this case on April 6, 2021.  (Dkt. No. 1).  In its six-count Complaint,

the States allege the January 20 and February 18 Memoranda are unlawful because they

violate:

1)    the Administrative Procedure Act's ("APA") proscription of actions that are "not in accordance with law" and "in excess of . . . authority" by transgressing a statutory duty of DHS to detain certain individuals pursuant to 8 U.S.C. § 1226(c) (Count I) and 8 U.S.C. 1231(a)(2) (Count II);[12]

2)    the APA's proscription of actions that are "arbitrary [and] capricious" (Count III);[13]

3)    the APA's requirement that agency rules be subject to notice and comment (Count IV);[14]

4)    the Agreement between the States and DHS (Count V);[15] and

5)    the Constitution's requirement that the President "take Care that the Laws be faithfully executed" (Count VI).

(Dkt. No. 1 at ¶¶ 94–131).

On April 27, 2021, the States filed a Motion for Preliminary Injunction moving to

enjoin the implementation and enforcement of the January 20 and February 18

---

[12]    5 U.S.C. § 706(2)(A), (C).

[13]    5 U.S.C. § 706(2)(A).

[14]    5 U.S.C. § 553.

[15]    As this Court noted in *Texas I*, DHS, "U.S. Customs and Border Protection . . ., U.S. Immigration and Customs Enforcement . . ., and U.S. Citizenship and Immigration Services . . . entered into a Memorandum of Understanding Between Texas and DHS concerning certain aspects of the nation's immigration laws."  ___ F. Supp. 3d at ____, 2021 WL 2096669, at *1; *see also* (Dkt. No. 1-3).  "The Agreement was finalized on January 8, 2021 — just 12 twelve days before the transition from the Trump Administration to the Biden Administration."  *Texas I*, ___ F. Supp. 3d at____, 2021 WL 2096669, at *1; *see also* (Dkt. No. 1-3).  DHS and the Louisiana Department of Justice entered into a nearly identical agreement, which was also finalized on January 8, 2021. (Dkt. No. 1-4).

Memoranda. (Dkt. No. 18 at 43). The Government filed a Response in opposition, (Dkt. No. 42), to which the States filed a Reply. (Dkt. No. 51). Several amicus briefs have also been filed in support of and in opposition to the Motion. (Dkt. No. 25); (Dkt. No. 48); (Dkt. No. 49). The Motion is now ripe for review.

## II.   JURISDICTION AND JUDICIAL REVIEW

Before addressing the merits, this Court must consider the threshold issues of whether the States have standing to bring this action and whether the APA allows this Court to review the Memoranda challenged by the States. The States contend they have standing, and their claims are reviewable. (Dkt. No. 18 at 35–40). The Government disagrees. (Dkt. No. 48 at 22–36). Based on the following, the Court finds the States have standing and their claims are reviewable.

### A.   STANDING

Article III of the Constitution confines judicial power to "Cases" and "Controversies." U.S. Const. art. III, § 2. "For a legal dispute to qualify as a genuine case or controversy, at least one plaintiff must have standing to sue." *Dep't of Com. v. New York*, ____ U.S. ____, ____, 139 S.Ct. 2551, 2565, 204 L.Ed.2d 978 (2019). A plaintiff has standing to sue only where it satisfactorily shows it "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 856, ____, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992); *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 608, 107 L.Ed.2d 603 (1990)); *see also Barber v. Bryant*, 860 F.3d 345, 352 (5th

Cir. 2017).  In short, injury, traceability, and redressability comprise the "irreducible constitutional minimum" of standing.  *Spokeo*, 578 U.S. at ___, 136 S. Ct. at 1547 (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136).

Under certain circumstances, states like Texas and Louisiana are not "normal litigants."  *Massachusetts v. EPA*, 549 U.S. 497, 518, 127 S.Ct. 1438, 1454, 167 L.Ed.2d 248 (2007).  Where a state alleges a defendant violated a congressionally accorded procedural right which affected the state's "quasi-sovereign" interests, that state is afforded "special solicitude" in its quest to establish standing.  *Id.* at 520–21, 127 S.Ct. at 1454–55; *Texas v. United States*, 809 F.3d 134, 151–55 (5th Cir. 2015) , *aff'd by an equally divided court*, ____ U.S. ____, 136 S.Ct. 2271, 195 L.Ed.2d 638 (2016) (*mem.*) (hereinafter "*Texas DAPA*").  Specifically, a state armed with special solicitude can more easily satisfy the traceability and redressability elements of the traditional standing inquiry.  *Massachusetts*, 549 U.S. at 520–21, 127 S.Ct. at 1454–55; *Texas DAPA*, 809 F.3d at 151–55.

Here, the States assert they have standing under the traditional inquiry *and* because they are owed special solicitude.  (Dkt. No. 18 at 35–37).  The Government counters that the States fail all three prongs of the traditional inquiry, and they are not entitled to special solicitude because they do not assert a proper quasi-sovereign interest.  (Dkt. No. 42 at 22–25 & n.5).  Based on the following, the Court finds the States have satisfied the traditional inquiry and, regardless, are owed special solicitude which would satisfy any doubts.

1.       **Injury in Fact**

The States' first task is to establish an injury in fact.  A plaintiff satisfies that burden where it shows it suffered "an invasion of a legally protected interest" that is "concrete," "particularized," and "actual or imminent, not conjectural or hypothetical."  *Spokeo*, 578 U.S. at ____, 136 S.Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136).  An alleged injury is sufficiently concrete if it is "*de facto*," meaning it "actually exist[s]" and is not merely "abstract."  *Id.* (alteration added) (citations omitted).   An alleged injury is sufficiently particularized if it "affect[s] the plaintiff in a personal and individual way." *Id.* (alteration added) (quoting *Lujan*, 504 U.S. at 560 n.1, 112 S.Ct. at 2136 n.1).  And lastly, an alleged injury is sufficiently actual or imminent, respectively, if the plaintiff suffers "continuing, present adverse effects" or demonstrates he "will soon expose *himself* to the injury" through "concrete plans" demonstrating his injury is "*certainly* impending." *Lujan*, 504 U.S. at 564 & n.2, 112 S.Ct. at 2138 & n.2 (emphases in original) (citations omitted).

The States assert the Memoranda will injure two basic interests: their financial interests and their interest as *parens patriae* in protecting their citizens from criminal aliens.  (Dkt. No. 35–37).  As it pertains to their financial interests, the States claim the Memoranda will require them to spend more on detention facilities and several public benefits and services.  (*Id.* at 35–36).  Regarding the States' interest as *parens patriae*, the States allege the Memoranda will result in an increase in crime from aliens within their borders, thus harming their citizenries' physical and economic well-being.  (*Id.* at 37).

The Government does not seriously refute the Memoranda will result in "a drop" in immigration enforcement actions. (Dkt. No. 42 at 23). Nor could it. For example, Texas has put forth undisputed evidence that, during just the first two months following the issuance of the January 20 Memorandum, ICE rescinded detainers for 68 aliens housed within Texas's detention facilities. (Dkt. No. 19-3 at 5). That's 68 more rescinded detainers than during the same period the year prior. (*Id.* at 3, 8) (showing no detainers were dropped from January 20, 2020, to March 20, 2020). Of note, the list includes aliens who were convicted of possessing over fifty pounds of a narcotic, manufacturing over 400 grams of methamphetamine, theft, intoxication assault with a vehicle, and the sexual assault of a child. (*Id.* at 6–7). And at least six had received a final order of removal. (*Id.* at 5). Importantly, current ICE officials "attribute" the Government's sharp decline in maintaining detainers "to the new 'enforcement priorities' established by the [M]emoranda during the Biden Administration."[16] (Dkt. No. 46 at ¶ 17).

Rather than challenge the suffocating effect of the Memoranda on federal detentions of criminal aliens, the Government counters that any drop in detentions is of

---

[16]   This statement comes directly from the Chief of Staff of the Texas Department of Criminal Justice. (Dkt. No. 46 at 2). It is unclear whether the "ICE officials" quoted by the Chief of Staff made this statement in a capacity excluding the statement from the rule against hearsay. *See* Fed. R. Evid. 801(d)(2). But even if hearsay, this Court may rely on the statement at the preliminary injunction phase. *See Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993) ("[A]t the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence."). The Government has made no showing that this testimony is otherwise unreliable, and the Court finds none itself. Rather, the sworn affidavit from the Chief of Staff under penalty of perjury possesses sufficient indicia of reliability as to the statement of the ICE officials. The Court therefore accepts as fact, at the preliminary injunction phase, the testimony of the Chief of Staff regarding the statement of current ICE officials.

no real consequence to the States.  It argues, even if the Memoranda cause detentions to decline, the States' theories of injury rely on a "speculative chain of events involving independent actions by third parties." (Dkt. No. 42 at 23).  Specifically, the Government asserts the States would incur increased financial expenses and exposure to crime only if two conditions are satisfied: (1) the aliens who would have otherwise been detained commit crimes or choose to use public benefits and services; *and* (2) those aliens do so at a higher rate than the noncitizens who *are* removed as a result of the Memoranda.  (*Id.* at 23–24).

The Government's concern over the causal chain of events involving third-party action is noteworthy but out-of-turn.  These concerns pertain to the "fairly traceable" prong of the traditional standing inquiry.  *See Dep't of Com.*, ____ U.S. at ____, 139 S.Ct. at 2565–66 (finding "traceability . . . satisfied" where the plaintiffs' theory "relies . . . on the predictable effect of Government action on the decisions of third parties"); *Texas DAPA*, 809 F.3d at 156–60 (finding a plaintiff–state's financial injury was "fairly traceable" to the independent conduct of third-party aliens); *see also California v. Texas*, ____ U.S. ____, ____, 141 S.Ct. 2104, 2116–17 (2021) (finding "an individual's decision to enroll [in] Medicaid" was not "fairly traceable" to the Affordable Care Act's "minimum essential coverage provision" (alteration added)).  Therefore, although the Government's third-party causation concerns will need to be addressed, the Court reserves its analysis on those issues for discussion of the traceability of the States' alleged injuries.  For now, the Court inquires whether the States have presented a cognizable injury to their financial interests or interests as *parens patriae*.  *See also Lujan*, 504 U.S. at 564 & n.2, 112 S.Ct. at 2138 & n.2

(explaining "imminence" is shown where a plaintiff "will soon expose *himself* to the injury" through "concrete plans" demonstrating his injury is "*certainly* impending" (emphases in original) (citations omitted)); *cf. Dep't of Com.*, ____ U.S. at ____, 139 S.Ct. at 2565 (sidestepping the reliance of the plaintiff-states' "future" injuries upon independent decisions of third-party aliens to underreport in a census and holding the injuries were sufficiently "concrete and imminent" because the plaintiff–states demonstrated, "*if* noncitizen households are undercounted by as little as 2%[,] . . . they will lose out on federal funds that are distributed on the basis of state population" (emphasis added)). They have.

a.    Financial Injuries

Between the States, Texas marshals the lion's share of state-specific evidence concerning injury.   *Compare* (Dkt. Nos. 19-5–19-9) *with* (Dkt. No. 19-12).   The Court therefore focuses its attention on Texas's evidence.   *See Texas DAPA*, 809 F.3d at 155 (same).   Texas's alleged financial injury affects three categories of its public fisc: Texas's detention system, public education services, and healthcare-related costs.   (Dkt. No. 18 at 35–36).   Texas asserts that in these three categories it will incur unanticipated costs due to the "rushed implementation" of the Memoranda which "deprived [it] of the ability to adjust[] [its] policies in light of the federal shift."   (*Id.* at 41).

To begin, Texas has alleged injury to a legally protected interest.   *See Spokeo,* 578 U.S. at ____, 136 S.Ct. at 1548.   Texas complains it will incur additional costs to its public fisc because of an unlawful and sudden shift in federal immigration policy.   (Dkt. No. 18 at 35).   Theories of injury to state or local financial interests predicated on the actions of

the federal government are not novel.  *See, e.g.*, *Clinton v. City of N.Y.*, 524 U.S. 417, 430–31, 118 S.Ct. 2091, 2099, 141 L.Ed.2d 393 (1998) (finding sufficient for standing purposes a local government's claim to suffering injury to its "borrowing power, financial strength, and fiscal planning"); *Texas DAPA*, 809 F.3d at 152–53 (finding sufficient for standing purposes several states' claims to suffering injury to their public fiscs); *see also Sch. Dist. of City of Pontiac v. Sec'y of the U.S. Dep't of Educ.*, 584 F.3d 253, 261–62 (6th Cir. 2009).  And such financial harm is particularly acute in the context of federal immigration enforcement, where states have "an interest in mitigating the potentially harsh economic effects of *sudden shifts* in population."  *Plyler v. Doe*, 457 U.S. 202, 228, 102 S.Ct. 2382, 2400, 72 L.Ed.2d 786 (1982) (emphasis added); *see id.* at n.23 (explaining, because the Constitution deprives states of any "direct interest in controlling entry into this country, . . . unchecked unlawful migration might impair the State's economy generally, or the State's ability to provide some important service"); *Texas DAPA*, 809 F.3d at 152–54; *see also Arizona v. United States*, 567 U.S. 387, 397, 132 S.Ct. 2492, 2500, 183 L.Ed.2d 351 (2012) (acknowledging states "bear[] many of the consequences of unlawful immigration"); *DHS v. Regents of the U. of Cal.*, ____ U.S. ____, ____, 140 S.Ct. 1891, 1913, 207 L.Ed.2d 353 (2020) (finding a sudden shift in the government's immigration policy was arbitrary and capricious in part because the government "failed to address whether there was legitimate reliance" on the former immigration policy (quotation omitted)).  In sum, the financial injuries incurred by states from "sudden shifts" in their population due to federal immigration policies are not nebulous.  *Plyler*, 457 U.S. at 228, 102 S.Ct. at 2400.  Rather, they are among the "serious and well recognized" vintage of legally protected

interests. *Massachusetts*, 549 U.S. at 521, 127 S.Ct. at 1455.  By requesting equitable relief from the impact of the Memoranda on its public fisc, then, Texas appropriately seeks judicial shelter.

The remaining inquiries as to Texas's alleged financial injury concerns whether it is sufficiently concrete, particularized, and actual or imminent.  *Spokeo*, 578 U.S. at ____, 136 S.Ct. at 1548.  The Government does not contest that Texas's alleged injury is particularized to Texas, and the Court finds that it is.  Texas can therefore establish an injury in fact for its financial injury if it is both concrete and actual or imminent.

Texas asserts a financial injury in the form of added costs to its detention system. Texas states the Memoranda will lead to an unanticipated rise in criminal activity from aliens the federal government would otherwise detain.  (Dkt. No. 18 at 15–16, 35–36).  On average, Texas spends $62.34 per day per inmate in its detention facilities.  (Dkt. No. 19-6 at 3–4).  In 2018, Texas detained 8,951 criminal aliens for a total of 2,439,110 days, costing $152,054,117.[17]  (*Id.*).  If even one alien not detained due to the Memoranda recidivates, Texas's costs "will increase" in accordance with its current cost per inmate.  (*Id.* at 4); *cf. Dep't of Com.*, ____ U.S. at ____, 139 S.Ct. at 2565.

The Court finds Texas's claimed injury from unanticipated detention costs is sufficiently concrete and imminent.  The harm is concrete because Texas incurs real financial costs in detaining criminal aliens.  And the harm is imminent because Texas

---

[17]   As the Court discusses *infra*, the federal government reimbursed Texas for a miniscule fraction of its costs for detaining criminal aliens as part of a statutorily mandated program that seeks to help states with the burden of incarcerating criminal aliens.  *See* 8 U.S.C. § 1231(a)(1)(A).

currently operates a detention system holding criminal aliens and plans to continue doing so in the future.[18]

> b.   *Parens Patriae* Injury

In addition to its financial injury, the States assert they have been injured in their interests as *parens patriae*.  (Dkt. No. 18 at 37).  The Government counters that the States are precluded from bringing a *parens patriae* action against the federal government.  (Dkt. No. 42 at 24 & n.5).  Based on the following, the Court concludes the States properly lay claim to a *parens patriae* injury.

"*Parens patriae* means literally 'parent of the country.'"  *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 600, 102 S.Ct. 3260, 3265, 73 L.Ed.2d 995 (1982) (quoting Black's Law Dictionary 1003 (5th ed. 1979)).  The concept derives from the English constitutional system.  *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 257, 92 S.Ct. 885, 888, 31 L.Ed.2d 184 (1972).  As that system developed, the Crown retained certain "duties and powers" referred to as the "royal prerogative."  *Id.* (citation omitted).  For example, as the "father of the country," the King served as the guardian of persons with legal disabilities.  *Id.* (internal quotations omitted).  When the United States achieved independence, "the prerogatives of the crown devolved upon the people of the States."  *Wheeler v. Smith*, 50 U.S. (9 How.) 55, 78, 13 L.Ed. 44 (1850).  That is, "[t]he State, as a sovereign," became "the *parens patriae*."  *Id.*  Like the King before them, the states were

---

18   Because the States have put forth sufficient evidence to demonstrate a concrete and imminent injury regarding Texas's detention costs and *parens patriae*, *see infra* II.A.1., the Court need not address the States' alleged financial injuries arising from unanticipated education and healthcare-related expenses.

now responsible for acting "in the interests of humanity" and "for the prevention of injury to those who cannot protect themselves." *Late Corp. of the Church of Jesus Christ of Latter-Day Saints v. United States*, 136 U.S. 1, 57, 10 S.Ct. 792, 808, 34 L.Ed. 478 (1890).

Once vested in the states, the scope of a *parens patriae* action under American law "greatly expanded." *Hawaii*, 405 U.S. at 257, 92 S.Ct. at 889. The first such expansion is noteworthy. Coincidentally, in a previous dispute between the States in this case, Louisiana sought through a *parens patriae* action to enjoin Texas from continuing a trade embargo that was allegedly injuring Louisiana's economy. *Louisiana v. Texas*, 176 U.S. 1, 3–4, 11–12, 20 S.Ct. 251, 251–52, 254, 44 L.Ed. 347 (1900). Texas's lead health official had cinched the spigot on all commerce flowing between the city of New Orleans and the State of Texas "under the guise of a quarantine against yellow fever." *Id.* at 11, 20 S.Ct. at 254. A standing issue arose because Louisiana had simultaneously invoked the Supreme Court's original jurisdiction, which required a "controversy arising directly between" the states as sovereigns, *and* asserted an interest as *parens patriae*, which had traditionally been a tool for a state to vindicate "the grievances of particular individuals" within its borders. *Id.* at 16, 20 S.Ct. at 256. To reconcile this seeming conflict, the Court determined Louisiana had properly stated an interest as *parens patriae* in protecting "her citizens at large" from economic harm due to Texas's quarantine regulations. *Id.* at 19, 20 S.Ct. at 257. This interest, reasoned the Court, stemmed in part from the fact that Louisiana, as a state, held no right under the Constitution to regulate "the freedom of interstate commerce." *Id.* Although the Supreme Court ultimately held Louisiana lacked standing for other reasons, *id.* at 22–23, 20 S.Ct. at 258–59, the case is considered the first

to expand the notion of *parens patriae* to a state's interest in protecting its citizens' interests broadly.  *See Snapp*, 458 U.S. at 602, 102 S.Ct. at 3266.

Perhaps unsurprisingly, the concept of a *parens patriae* action to vindicate the rights of a state's citizens-at-large proved popular.  *See id.* at 603, 102 S.Ct. at 3266–67 (listing cases brought by various states during the early 20th century).  And not long after *Louisiana v. Texas*, Justice Holmes referred to a state's interests in such broader matters as "quasi-sovereign" interests.  *See Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237, 27 S.Ct. 618, 619, 51 L.Ed. 1038 (1907).  The term stuck.  *See, e.g., North Dakota v. Minnesota*, 263 U.S. 365, 374, 44 S.Ct. 138, 139, 68 L.Ed. 342 (1923); *Georgia v. Pa. R. Co.*, 324 U.S. 439, 447, 450, 65 S.Ct. 716, 721, 722, 89 L.Ed. 1051 (1945).  And before long, the doctrine evolved to the point that the Supreme Court determined quasi-sovereign interests to be not simply a branch of traditional *parens patriae* actions, but the *sine qua non* of *parens patriae* actions. *See Snapp*, 458 U.S. at 602, 102 S.Ct. at 3266.  ("[T]o have [*parens patriae*] standing, the State *must* express a quasi-sovereign interest[.]" (alteration and emphasis added)).

But lending this workable term to the abstract concept of a state's interest in its citizenry did not resolve all questions regarding *parens patriae* standing.  Namely, the referent "quasi-sovereign interest," without more, proved useless in settling whether a state's injury is sufficiently "concrete" for purposes of Article III standing.  *Id.*  After all, a quasi-sovereign interest itself is nothing more than a "judicial construct" that does "not lend itself to a simple or exact definition."  *Id.* at 601, 102 S.Ct. at 3265.  On its surface, the term clearly was crafted to help distinguish from a state's "sovereign interests, proprietary interests, or private interests."  *Id.* at 602, 102 S.Ct. at 3266.  And an inch

30

deeper, the term represented "a set of interests that the State has in the well-being of its populace." *Id.* But those broad contours alone, absent further granularity, "risk[ed] being too vague to survive the standing requirements" of the Constitution. *Id.*

Recognizing this concreteness issue, the Supreme Court in *Alfred L. Snapp & Son* took it upon itself to hammer out, as best it could, the notion of a quasi-sovereign interest. 458 U.S. 592, 102 S.Ct. 3260. While at once conceding that "the articulation of such interests is a matter for case-by-case development," the Supreme Court nevertheless provided "two general categories" into which characteristics of a true quasi-sovereign interest may fall.

"First, a State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general. Second, a state has a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system." *Id.* at 607, 102 S.Ct. at 3269. Regarding the first category, the Supreme Court further elaborated, "[o]ne helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the state standing to sue as *parens patriae* is whether the injury is one that the state, if it could, would likely attempt to address through its sovereign lawmaking powers." *Id.* And regarding the latter, the Supreme Court explained, "federal statutes creating benefits or alleviating hardships create interests that a State will obviously wish to have accrue to its residents." *Id.*

Building on this rubric, the Fifth Circuit has concluded that a state's claim to a "quasi-sovereign" interest for standing purposes is sufficient when the state seeks to "protect[] its citizens from criminal activity." *Castillo v. Cameron County*, 238 F.3d 339, 351

(5th Cir. 2001) (citing *Snapp*, 458 U.S. at 602, 102 S.Ct. at 3260).  In *Castillo*, Texas sought to overturn a federal district court's injunction which permitted a local County Sheriff to refuse to incarcerate alleged parole violators to reduce the county's jail population.  238 F.3d at 343–47.  To prove standing in that circumstance, Texas was required to show, among other things, it had a "personal stake" in the outcome.  *Id.* at 350–51.  The panel held that Texas satisfied this showing in part by alleging a valid quasi-sovereign interest in protecting its citizens from criminal activity.  *Id.* at 351.  As a result of the injunction, the panel explained, "parole violators who should be incarcerated remain[ed] free, potentially increasing the level of criminal activity."  *Id.*  Although fully aware that "the concept of quasi-sovereign standing 'risks being too vague to survive the standing requirements of Article III,'" the panel found that Texas's interest in protecting its citizens from increased criminal activity "[fell] within the category of 'a quasi-sovereign interest in the health and well–being — both physical and economic — of its residents in general.'" *Id.* (quoting *Snapp*, 458 U.S. at 602, 102 S.Ct. 3260).

Bearing these principles in mind, the Court now turns to the States' basis for *parens patriae* standing in this case.  The States assert a quasi-sovereign interest in protecting their citizens' physical and economic well-being "from crime caused by [the Government's] failure to detain criminal aliens."  (Dkt. No. 18 at 37).  As it pertains to "criminal activity" in general, *Castillo* resolves that the States here possess a quasi-sovereign interest in protecting their citizens.  238 F.3d at 351.

As it pertains to the criminal activity of "aliens" specifically, the States' interests are perhaps stronger than the circumstances presented in *Castillo*.  Whereas in *Castillo* the

State of Texas sought to protect its citizens from criminal activity in an area of law over which the State retained extensive authority—the procedure for detaining alleged parole violators—here the States retain *no* authority over the detention of criminal aliens upon their release from state prison and during the pendency of their removal proceedings. That is, the injury to the States' quasi-sovereign interest in protecting their citizens from criminal aliens is especially severe here because the States' hands are tied, in effect, when it comes to federal immigration policy. *See* U.S. Const. art. I, § 8, cl. 4 (conferring upon Congress the Power "[t]o establish an uniform Rule of Naturalization"); *Arizona*, 567 U.S. at 394–95, 132 S.Ct. at 2498 (holding that a state law "authorizing state officers to decide whether an alien should be detained for being removable . . . violates the principle that the removal process is entrusted to the discretion of the Federal Government" (citations omitted)).

By seeking relief for an injury to their populace from which they have no constitutional mode of recourse, the States align themselves with the rationale employed by the Supreme Court to support the first expansion of *parens patriae* standing in *Louisiana v. Texas*. Just as Louisiana once sought "vindication of the freedom of interstate commerce" that was "not committed" to it by the Constitution, here the States seek protection from an effect of a federal immigration policy that the States possess no constitutional authority to change.[19] *Louisiana*, 176 U.S. at 19, 20 S.Ct. at 257; *see also Snapp*,

---

[19] The fact that an expansion of *parens patriae* to citizens-at-large in *Louisiana v. Texas* was determined in a case involving the Supreme Court's original jurisdiction does not restrict the scope of quasi-sovereign interests in non-original jurisdiction cases. If anything, the opposite is
(continue)

458 U.S. at 608, 102 S.Ct. at 3269.  Accordingly, the Court holds that the States possess a quasi-sovereign interest in protecting their citizens-at-large from the criminal activity of aliens subject to mandatory detention under federal law.

The Government contends that the States nevertheless are barred from bringing a *parens patriae* action "against the federal government."  (Dkt. No. 42 at 24).  For this proposition the Government relies exclusively upon *Massachusetts v. Mellon*, where the Supreme Court denied *parens patriae* standing to a state suing the federal government to protect its citizens from the "operation of" a federal statute called the Maternity Act.  262 U.S. 447, 479, 485–86, 43 S.Ct. 597, 598, 600, 67 L.Ed. 1078 (1923).  A critical feature of the Supreme Court's rationale was that the state had not identified any "rights of the state falling within the scope of the judicial power," such as "quasi sovereign rights."  *Id.* at 485, 43 S.Ct. at 600.  These twin aspects of *Mellon*—the challenge to the "operation of federal statutes" and the state's lack of an identifiable "right"— were later acknowledged by the Supreme Court as the defining characteristics of its bar on *parens patriae* actions *vis-à-vis* the federal government.  *See Massachusetts*, 549 U.S. at 520 n.17, 127 S.Ct. at 1455 n.17; *Georgia*, 324 U.S. at 447, 65 S.Ct. at 721 (holding that Georgia could bring a *parens patriae* action to protect a quasi-sovereign interest because, unlike *Mellon*, it did not seek "to protect her citizens from the *operation of* federal statutes" and it possessed "rights . . . based on federal [anti-trust] laws" (emphasis added)).  And a long train of federal courts

---

true.  *See Snapp*, 458 U.S. at 603 n.12, 102 S.Ct. at 3267 n.12; *id.* at 611–12, 102 S.Ct. at 3270–71 (Brennan, J., concurring) (explaining on constitutional grounds that the Court might be more "restrictive" as to the types of interests a state can assert in a *parens patriae* action when the Court's original jurisdiction is invoked as compared to typical federal suits).

have applied or mirrored the Supreme Court's careful circumscription of *Mellon* to hold that a state may bring a *parens patriae* action against the federal government where it does not challenge the operation of a federal statute and it asserts a proper right.  *See, e.g.*, *Texas v. United States*, 328 F. Supp. 3d 662, 696–98 (S.D. Tex. 2018); *See Texas v. United States*, 86 F. Supp. 3d 591, 625–28 (S.D. Tex. 2015), *aff'd*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided court*, ____ U.S. ____, 136 S.Ct. 2271, 195 L.Ed.2d 638 (2016) (*mem.*); *New York v. Sebelius*, No. 1:07-cv-1003, 2009 WL 1834599, at *12–13 (N.D.N.Y. June 22, 2009); *Puerto Rico Pub. Hous. Auth. v. U.S. Dep't of Hous. & Urban Dev.*, 59 F. Supp. 2d 310, 326 (D.P.R. 1999); *Kansas v. United States*, 748 F. Supp. 797, 802 (D. Kan. 1990); *City of New York v. Heckler*, 578 F. Supp. 1109, 1122–25 (E.D.N.Y. 1984); *Abrams v. Heckler*, 582 F. Supp. 1155, 1159 (S.D.N.Y. 1984).

The *parens patriae* injury set forth by the States safely navigates this well-trodden distinction from the *Mellon* rule.  The States do not challenge the operation of any federal statute.  Rather, they primarily challenge the Executive Branch's putative refusal to enforce certain immigration statutes which, they claim, should benefit their citizenries. (Dkt. No. 1 at 21–24).  The States allege that the Executive Branch's policy of non-enforcement infringes upon rights they derive from the APA.  (*Id.* at 21–27).  Specifically, the States claim that the federal government's policy creating a categorical refusal to enforce certain immigration statutes is an unlawfully withheld agency action, contrary to law, arbitrary and capricious, procedurally defunct, and constitutionally injurious.  By asserting these federal statutory rights, the States have not presented this Court with "abstract questions of political power."  *Cf. Mellon*, 262 U.S. at 485, 43 S.Ct. at 600.  Rather,

the States have demonstrated concrete injuries to their quasi-sovereign interests as *parens patriae*.  *See Castillo*, 238 F.3d at 351; *see also Snapp*, 458 U.S. at 608, 102 S.Ct. at 3269; *Louisiana*, 176 U.S. at 19, 20 S.Ct. at 257; *see also Texas*, 328 F. Supp. 3d at 697–98 (finding the state had "demonstrated a concrete injury to its quasi-sovereign interest in the economic well-being of its citizens" in a *parens patriae* action against the federal government (quotation omitted)).  The Court therefore concludes that the States have demonstrated a cognizable *parens patriae* injury.

### 2.    Traceability

The States must next establish a "fairly traceable link" between their injuries and the Government's allegedly unlawful action.  They can establish this link with "no more than *de facto* causality."  *Dep't of Com.*, ____ U.S. at ____, 139 S.Ct. at 2566 (quoting *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.)).  That is to say, a federal plaintiff need not demonstrate that the defendant's actions are "the very last step in the chain of causation."  *Bennett v. Spear*, 520 U.S. 154, 169–70, 117 S.Ct. 1154, 1164, 137 L.Ed.2d 281 (1997); *see also Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734–35, 128 S.Ct. 2759, 2769, 171 L.Ed.2d 737 (2008).

Both States' injuries depend on the future behavior of criminal aliens whom the Government would otherwise detain.  Regarding Texas's detention costs injury, the States argue the Memoranda will cause a significant number of criminal aliens who otherwise would have been detained by the federal government to be detained again or longer in Texas.  (Dkt. No. 18 at 16, 18, 35–37).  Regarding the States' *parens patriae* injury, the States urge that the Memoranda will lead to a significant number of criminal aliens

who would otherwise have been detained by the federal government causing harm—both physical and economic—to their respective citizenries. (*Id.* at 37). Thus, at their core, both States' injuries depend upon criminal aliens behaving unlawfully in the future.

The Government contends that whether the aliens who would have otherwise been taken into custody will commit crimes is speculative. (Dkt. No. 42 at 23). The Government further contends that, even if the States can make this showing, they must also prove that those aliens would commit crimes at a higher rate than the aliens who *are* removed because of the Memoranda. (*Id.*).

Regarding the Government's first concern, the Supreme Court has traditionally denied standing wherever the traceable link between the government's action and the plaintiff's injury depends in part on the future behavior of third parties. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413, 133 S.Ct. 1138, 1150, 185 L.Ed.2d 264 (2013) ("[W]e have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment."). This tradition is especially firm where, as here with the States' asserted injuries, it is alleged that the third parties' future behavior will be unlawful. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105, 103 S.Ct. 1660, 1666–67, 75 L.Ed.2d 675 (1983).

That said, the Supreme Court embraces standing theories dependent on third parties' future behavior under certain circumstances. In *Department of Commerce*, for instance, the Supreme Court traced a governmental action to aliens' future unlawful behavior where evidence established a likelihood that aliens have "historically" behaved in a certain manner. ____ U.S. at ____, 139 S.Ct. at 2566. This type of evidence, the

Supreme Court concluded, demonstrated that traceability was not "mere speculation," but rather, the product of a "predictable effect of Government action on the decisions of third parties." *Id.* (citations omitted). Similarly, in *Davis v. Federal Election Commission*, the Supreme Court traced a governmental action to the future behavior of the plaintiff's political opponent where evidence showed that "most candidates" had behaved in a certain manner and there was "no indication" the opponent would do otherwise. 554 U.S. at 734–35, 128 S.Ct. at 2769; *see also Texas DAPA*, 809 F.3d at 156 (finding a traceable link between DAPA and aliens' likelihood of obtaining driver's licenses where driving was a "practical necessity" for residents of the state). From these cases, it becomes apparent that an injury may be traced through third-party behavior to governmental action where the plaintiff demonstrates individuals similarly situated to the third party have a propensity to engage in the relevant behavior.

Considering this principle, the link between the States' alleged harm and the Memoranda is virtually unassailable. As mentioned, the undisputed evidence demonstrates that the Memoranda are *already* causing a dramatic increase in the volume of criminal aliens released into the public. The States further present evidence suggesting that criminal aliens, as a group, have a strong propensity to recidivate. (Dkt. No. 18 at 15–16). Indeed, the States submit evidence from a Texas Sheriff's Office showing that a group of 209 recently held criminal alien inmates with detainers had a recidivism rate of 73.68%. (Dkt. No. 19-5 at 3). The States also submit a 2018 study from the United States Department of Justice's Bureau of Justice Statistics showing that state offenders generally recidivate at 44% within the first year following release, 68% within the first three, 79%

within the first six, and 83% within the first nine.  (Dkt. No. 19-20 at 1).  And these weren't one-time recidivists.  The same study shows, during the nine-year period following release, there were on average five arrests per released *prisoner*.  (*Id.*).

This foregoing evidence confirms what the Supreme Court and Congress have long acknowledged: "deportable criminal aliens who remain[] in the United States often commit[] more crimes before being removed."  *Demore*, 538 U.S. at 518, 123 S.Ct. at 1715 (citing Hearing on H.R. 3333 before the Subcommittee on Immigration, Refugees, and International Law of the House Committee on the Judiciary, 101st Cong., 1st Sess., 54, 52 (1989)); *see also Zadvydas*, 533 U.S. at 713–14, 121 S.Ct. at 2511 (Kennedy, J., dissenting) (warning of the "risk to the community posed by the mandatory release" of criminal aliens when accounting for "statistical studies showing high recidivism rates for released aliens").

These facts and precedents should come as no surprise to the Government. Congress and the Executive have long provided financial aid to states to ameliorate the strain criminal aliens place on state detention facilities.  Through the State Criminal Alien Assistance Program ("SCAAP"), the federal government partially reimburses states for costs associated with detaining criminal aliens.[20]  (Dkt. No. 19-2 at 2–4).  For example, in 2018 the federal government through SCAAP reimbursed Texas $14,657,739 of the total $152,054,117 Texas spent on detaining criminal aliens.  (*Id.* at 4).  Although amounting to less than 10% of Texas's actual costs in 2018, SCAAP payments demonstrate that the

---

[20]   Notably, the statutory basis for SCAAP resides near one of the detention statutes at issue in this case, 8 U.S.C. § 1231(i).

federal government has long acknowledged that states like Texas incur financial harm as a direct result of the unlawful behavior of criminal aliens.

In sum, the States present evidence of criminal alien and state felon recidivism through a Texas Sheriff and the DOJ's own dataset, Supreme Court precedent citing the congressional record making similar findings as to criminal aliens, and the existence of the SCAAP program.  Considering this substantial evidence, the Court is not persuaded that the link between the States' injuries and criminal aliens being released is "speculative" as the Government suggests.  The Court finds that criminal aliens "historically" recidivate.  *See Dep't of Com.*, ____ U.S. at ____, 139 S.Ct. at 2566.

Next, the Government asserts that the risk of criminal aliens committing further crimes is insufficient for the States to trace their injuries to the Memoranda.  (Dkt. No. 42 at 23).  Rather, the Government hypothesizes that "it is possible" the Memoranda's reprioritization "will result in a net reduction in crimes."  (*Id.*).  This argument fails in three respects.

First, evidence already in the record demonstrates that the Government is not just refusing to detain its newly deprioritized categories of criminal aliens, but even the "prioritized" variety.  For instance, in Texas alone, some of the 68 individuals whose detainers were dropped were serving time for an "aggravated felony," a supposedly prioritized category.  *Compare* (Dkt. No. 19-3 at 6–7) *with* 8 U.S.C. § 1101(a)(43) (defining "aggravated felony" under the INA).

Second, the Government provides no support for its contention that its enforcement of the prioritized categories of criminal aliens will exceed any decline in

enforcement of the deprioritized categories.  The Government's subjective belief cannot overcome the States' evidence demonstrating to the contrary.

Finally, even if the Government *could* demonstrate that increased enforcement in the prioritized categories might displace a drop in the total number of detained aliens resulting from the deprioritized categories, this "offset" would be irrelevant as a matter of law.  The "standing analysis is not an accounting exercise."  *Texas DAPA*, 809 F.3d at 156 (internal quotation omitted).  Absent a "tight[] nexus" between the alleged "benefits" and the "costs" of the Memoranda, there can be no "offset."  *Id.*  Here, other than what it noted in the Memoranda, the Government makes no showing that the resources it previously used for enforcement of the deprioritized categories are now being allocated to boost enforcement of the prioritized categories.  And the evidence put forward by the States regarding a drop in enforcement actions—even for prioritized aliens—makes that "possibility" unlikely.  Accordingly, there is no connection between the results of enforcement of prioritized categories and the results of enforcement of deprioritized categories.

The Court further notes that the number of aliens who would otherwise be detained in the entire United States is relevant to estimating the impact of the Memoranda on the States in this case.  The Fifth Circuit made clear in *Texas DAPA* that injury to a state can flow from the fact that aliens are "free to move among states."  809 F.3d at 188.  Indeed, the States proffer evidence showing that "more than 50,000 noncitizens moved into Texas from another U.S. State in 2019."  (Dkt. No. 18 at 42) (citing Dkt. No. 19-21); *see also* (Dkt. No. 51 at 35) (citing Dkt. Nos. 19-21–19-23).  Given the Fifth Circuit's

acknowledgement of this interstate migration principle and the data provided by the States, the prospect that criminal illegal aliens falling within the deprioritized categories of the Memoranda who are not detained elsewhere in the Nation could move to the States' territories—thereby amplifying their injuries—is not mere "conjecture," as the Government posits. *See* (Dkt. No. 42 at 61).

Considering the foregoing, the Court holds that the States have established a traceable link between their injuries and the challenged Memoranda. The Memoranda are already leading to an increased volume of criminal aliens released into Texas who otherwise should have been detained by the federal government. Criminal aliens and state offenders have a demonstrable propensity to recidivate. The Memoranda will therefore cause a traceable injury to the States' financial and *parens patriae* interests.

### 3.   Redressability

The States must next demonstrate that their requested relief would remedy their harm. The "redressability" element of the standing to sue doctrine requires a plaintiff to demonstrate "a substantial likelihood that the requested relief will remedy the alleged injury in fact." *El Paso Cnty. v. Trump*, 982 F.3d 332, 341 (5th Cir. 2020) (cleaned up). The States' request for relief does that.

The States request two forms of injunctive relief. First, they ask this Court to *restrain* the Government from "enforcing and implementing the policies described" in Section B of the January 20 Memorandum and the February 18 Memorandum. (Dkt. No. 18-1 at 2). This Court will refer to this requested relief as the "negative injunction." Second, the States ask this Court to *order* the Government to comply with "the mandatory

duty" to "take into custody" and "detain" aliens covered by 8 U.S.C. §§ 1226(c)(1) and 1231(a)(2), respectively, and to "refrain from releasing" aliens covered by Section 1226(c)(1) except as permitted by Section 1226(c)(2).  (*Id.*).  The Court will refer to this requested relief as the "positive injunction."  The positive injunction relates directly to the States' Count I claim that the Government is "unlawfully withholding and unreasonably delaying agency action" pursuant to 5 U.S.C. § 706(1).  (Dkt. No. 1 at 23). The States further seek to implement both the negative and positive injunctions nationwide.  (Dkt. No. 18-1 at 2).

Assuming, as the Court must for purposes of standing, that the States are "correct on the merits of [their] claims," either form of requested relief is substantially likely to remedy the States' alleged injuries.  *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019). Regarding the requested positive injunction, it is perhaps self-evident that an order compelling the federal government to take criminal aliens into custody and detain them pursuant to the relevant statutes would relieve the States from harm they anticipate from the criminal behavior of criminal aliens.  Requiring an agency action, the withholding of which is causing injury, will logically alleviate that injury.  Notably, the Government offers no clear argument to the contrary regarding the benefit of a positive injunction. (Dkt. No. 42 at 25).

But even if the Court were to grant only the requested negative injunction, then, too, the States are substantially likely to obtain reprieve.  Namely, the federal government would be *required* to act in conformance with the standards set by Congress in Sections 1226(c) and 1231(a)(2) as interpreted by this Court.  The Government does not quibble

43

with the notion that, under Congress's standards, the States' injuries would be redressed. Rather, the Government argues that, if the Memoranda are enjoined, the States are unable to show that "the resulting *prioritization scheme*" will "result in a decrease in crime levels" within the States' boundaries.  (Dkt. No. 42 at 25) (emphasis added).  The Government's argument misses the mark for two reasons.

First, this argument suggests the Memoranda were issued in a vacuum in which no prior policy concerning the detention of criminal aliens ever existed.  Of course, such a suggestion is demonstrably false: the Government's own affidavits demonstrate that the United States has "had policies guiding such exercise since as early as 1909."  (Dkt. No. 42-6 at 6); (Dkt. No. 42-5 at 8).

Second, the Court's concern over redressability in an APA case such as this cuts not to the executive-level policy which would be applied in the absence of the faulty one, but rather, whether *Congress*'s express standards—both for the immigration laws challenged and the procedural standards allegedly discarded—if followed, would provide the States recourse.  *See Texas DAPA*, 809 F.3d at 161.  By nullifying the constraints flowing from the Memoranda's "prioritization," this Court would require that agency to return to or pursue a specific standard for exercising its discretion within the bounds set by Congress.  The States have supplied evidence demonstrating that in times past, such an exercise of discretion led to significantly fewer criminal aliens who are not in custody and roaming their streets.  (Dkt. No. 19-3 at 5).  The Government's inability to refute this evidence is telling.  It suggests that conformance with the strictures set by Congress in Sections 1226(c) or 1231(a)(2) as practiced prior to the issuance of the Memoranda would

result in a reduction of the volume of criminal aliens moving freely within the interior of the States.

Accordingly, the Court finds that, regardless of which form it takes, the injunctions sought by the States would redress their injuries flowing from the Memoranda. The States have standing under the traditional inquiry.

### 4.      Special Solicitude

Even if the States could not satisfy the traditional standing inquiry, they are entitled to special solicitude which also enables them to satisfy the standing requirement. The Supreme Court in *Massachusetts v. EPA* determined that states are owed special solicitude wherever they assert a congressionally bestowed procedural right and the governmental action at issue affects the state's quasi-sovereign interests. 549 U.S. at 519–20, 127 S.Ct. at 1454–55. The Fifth Circuit has acknowledged that the holding in *Massachusetts* applies to procedural claims under the APA. *Texas DAPA*, 809 F.3d at 152–55. Specifically, the Fifth Circuit in *Texas DAPA* granted the state special solicitude where it sought judicial review of an immigration policy memorandum which imposed "direct, substantial pressure" on a state's "lawmaking authority" — that is, pressure to change its laws subsidizing driver's licenses for aliens. *Id.*

The States are likewise owed special solicitude here. The States seek judicial review of immigration policy memoranda which they allege constitute final agency action, and they assert that the resulting policies cause injury to Texas's public fisc because its budget for detention facilities "has been set months or years in advance." (Dkt. No. 18 at 41). Additionally, and as discussed above, the States have shown they

possess a quasi-sovereign interest in protecting their citizenries from the unlawful activity of criminal aliens. The Government's sole argument in opposition is that special solicitude still requires an injury in fact. (Dkt. No. 42 at 24–25 n.7). But this argument falls short because, as detailed in this Memorandum Opinion and Order, *see supra* II.A.1., the States have demonstrated an injury in fact. Accordingly, the States have satisfied their burden to demonstrate they are entitled to special solicitude in the standing inquiry.

In *Massachusetts*, a state armed with special solicitude was permitted to establish causation between the EPA's decision not to regulate certain greenhouse gas emissions and the state's interest in protecting its physical territory. 549 U.S. at 523–24, 127 S.Ct. at 1456–57. As detailed above, the links between the States' injuries and the Memoranda here are not perceptibly frailer than in *Massachusetts* and likely are firmer. *See also Lujan*, 504 U.S. at 572 n.7, 112 S.Ct. at 2142 n.7 ("The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy."). The States have standing under the special solicitude inquiry. Accordingly, the Court finds it has jurisdiction to consider the States' claims.[21]

---

[21]   In sum, having concluded that the States have standing, the Court must exercise jurisdiction. *See Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404, 5 L.Ed. 257 (1821) (noting that federal courts "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given"); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126, 134 S.Ct. 1377, 1386, 188 L.Ed.2d 392 (2014) (resolving doctrinal tension that had developed with a federal court's "virtually unflagging" obligation to "hear and decide cases within its jurisdiction" (internal quotation omitted)).

### B.   JUDICIAL REVIEW

The Court must next determine whether the States' claims are reviewable before turning to the merits of the Motion.  *Lexmark*, 572 U.S. at 128, 134 S.Ct. at 1387–88.  In so doing, the Court narrows the focus to the States' APA claims.  The APA imposes four general requirements that must be satisfied before a federal court can review agency action.  *See Bennett*, 520 U.S. 154, 117 S.Ct. 1154.  To start, no statute may bar judicial review.  *Id.* at 175, 117 S.Ct. at 1167; 5 U.S.C. § 701(a)(1).  Next, the new guidance outlined in the February 18 Memorandum must constitute a "final agency action."  *Bennett*, 520 U.S. at 175, 117 S.Ct. at 1167; 5 U.S.C. § 704.  Third, the new guidance must not be "committed to agency discretion by law."  *Bennett*, 520 U.S. at 175, 117 S.Ct. at 1167; 5 U.S.C. § 701(a)(2).  Finally, the States must show that their injuries are within the "zone of interests" to be protected by the statutes allegedly violated by the Government.  *Bennett*, 520 U.S. at 163, 117 S.Ct. at 1161; 5 U.S.C. § 702.  The Court finds that the States have met each of these requirements.

### 1.   <u>Statutory Bars to Judicial Review</u>

Under the APA, an action may not proceed when another statute precludes judicial review.  5 U.S.C. § 701(a)(1).  With respect to immigration, Congress enacted "many provisions . . . aimed at protecting the Executive's discretion from the courts[.]"  *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 486, 119 S.Ct. 936, 945, 142 L.Ed.2d 940 (1999).  Banking on this, the Government contends that Sections 1252, 1231(h), and 1226(e) protect the Executive Branch's discretion from the States' claims before this Court.  (Dkt. No. 42 at 30–35).  The Court will address each in turn.

First, the Government makes the same arguments it articulated in *Texas I* that 8 U.S.C. § 1252(a)(5) and (b)(9) bar judicial review of the States' APA claims.  (*Id.* at 30–31); *see also* (6:21-cv-3, Dkt. No. 83 at 27).[22]  The States disagree arguing that the provisions are irrelevant to this case because they apply "only with respect to review of an order of removal under subsection (a)(1)."  (Dkt. No. 51 at 27–28) (quotations omitted).  As in *Texas I*, the Court agrees with the States and incorporates by reference its decision on the issue in that case.  ____ F. Supp. 3d at ____, 2021 WL 2096669, at *29–30 & n.42; *see also Nielsen v. Preap*, ____ U.S. ____, ____, 139 S.Ct. 954, 962, 203 L.Ed.2d 333 (2019) (holding that Section 1252(b)(9) does not preclude judicial review of respondents' challenge to the Government's detention authority under Section 1226 because respondents "are not asking for review of an order of removal; they are not challenging the decision to detain them in the first place or to seek removal as opposed to the decision to deny them bond hearings; and they are not even challenging any part of the process by which their removability will be determined" (quotations omitted)); *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016) ("[W]hile [Sections 1252(a)(5) and 1252(b)(9)] limit *how immigrants* can

---

[22]   Section 1252(a)(5) provides in relevant part: "Notwithstanding any other provision of law (statutory or non-statutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter, except as provided in subsection (e)."  8 U.S.C. § 1252(a)(5).

Section 1252(b)(9) states in part: "Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section."  8 U.S.C. § 1252(b)(9).

challenge their removal proceedings, they are not jurisdiction-stripping statutes that, by their terms, foreclose *all* judicial review of agency actions.  Instead, the provisions channel *judicial review over final orders of removal to the courts of appeals*."(emphases added)).

Next, the Government, again repeating its stance in *Texas I*, argues that any of the States' claims brought under Section 1231 are precluded from judicial review by Subsection (h).  (Dkt. No. 42 at 34); *see also* (6:21-cv-3, Dkt. No. 83 at 30–32).  Section 1231(h) provides that "[n]othing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person."  8 U.S.C. § 1231(h).  In this case, the Government rehashes its prior argument in *Texas I* that the meaning of "party" in Section 1231(h) includes the States.  This time around, it argues that because Black's Law Dictionary defines the word "party" as "one by or against whom a lawsuit is brought," the Court was in error when it concluded that "party" in that section narrowly means "alien in a removal proceeding."  (*Id.* at 34–35); *see also Texas I*, \_\_\_\_ F. Supp. 3d at \_\_\_\_, 2021 WL 2096669, at *23–28.  For their part, the States unsurprisingly agree that the Court got it right the first time around and succinctly agrees with the Court's disposition.  (Dkt. No. 51 at 28–29).  The Court agrees with the States.

Although the Government is correct in arguing that "party" may have a broad dictionary definition, statutory construction is more complex. On the surface, the plain meaning of "party" in Section 1231(h)—even when accounting for the dictionary definition—could refer to (1) any party *to the removal proceedings* or (2) *any* party to *any* proceeding. *See Texas I*, \_\_\_\_ F. Supp. 3d at \_\_\_\_, 2021 WL 2096669, at *24.  This potential

for multiple meanings of "party" in Section 1231(h) does not necessarily render the text ambiguous; if "all but one of the meanings" of the word *party* in Section 1231(h) can be "ordinarily eliminated by context," that remaining meaning is correct.[23] *Deal v. United States*, 508 U.S. 129, 132–33, 113 S.Ct. 1993, 1996–97, 124 L.Ed.2d 44 (1993) (superseded by statute on other grounds). The well-established process for interpreting a text with *potential* ambiguity focuses on "text, context, structure, and history." *See Texas v. EPA*, 983 F.3d 826, 836 (5th Cir. 2020). "Statutory language has meaning only in context." *Texas I*, ____ F. Supp. 3d at ____, 2021 WL 2096669, at *24 (quoting *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 415, 125 S.Ct. 2444, 2449, 162 L.Ed.2d 390 (2005)). While a dictionary can illuminate the "core meanings of a term," "the meanings of common words (which typically have multiple definitions) must be determined in the context in which they appear." *Texas*, 983 F.3d at 837 n.2 (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 418–19 (2012)). In short, the Court in *Texas I* conducted an in-depth analysis of the term "party," the statute, and the history of the statutory scheme and, having done so, the Court determined that "party" in Section 1231(h) means "alien in a removal proceeding." *See Texas I*, ____ F. Supp. 3d at ____, 2021 WL 2096669, at *23–28. The Government has offered nothing to convince the Court that its analysis and conclusion in *Texas I* were in error.

---

[23] The Court in *Texas I* held that Section 1231(h) was unambiguous. ___ F. Supp. 3d at ____, 2021 WL 2096669, at *26 & n.4. Hence, the Court did not find *Chevron* deference applied to the Government's preferred interpretation of Section 1231(h). *Id.* The Court adopts that reasoning by reference here. The Court additionally notes that the Government, like in *Texas I*, fails to invoke any claim to *Chevron* deference with respect to Section 1231(h) in its Response to this Motion.

Thus, the Court adopts its prior reasoning and conclusion in *Texas I* with respect to

Section 1231(h).

Lastly, the Government contends that Section 1226(e) bars the States' claims as

they relate to Section 1226(c).  (Dkt. No. 42 at 32–33).  Section 1226(e) provides:

> The Attorney General's discretionary judgment regarding the
> application of this section shall not be subject to review.  No
> court may set aside any action or decision by the Attorney
> General under this section regarding the detention or release
> of any alien or the grant, revocation, or denial of bond or
> parole.

8 U.S.C. § 1226(e).  The Government insists that determinations under Section 1226(c) are

discretionary because the federal government "may detain a noncitizen under § 1226 —

under either subsection (a) or subsection (c) — only 'pending a decision' on removal."

(Dkt. No. 42 at 32).  According to the Government, "[d]etention authority is thus

contingent on the Secretary's separate, predicate, and discretionary decision to

commence removal proceedings in the first instance, by issuing a notice to appear."  (*Id.*)

(citations omitted).

Voicing their disagreement, the States allege that Subsection (e) is irrelevant to the

action since it applies only to discretionary decisions to detain *individual* aliens and not

to lawsuits on the Government's detention authority.  (Dkt. No. 18 at 39); (Dkt. No. 51 at

28).  And because Section 1226(c) imposes a mandatory duty to detain, as the States argue,

it follows that Section 1226(e) does not apply to Subsection (c).  (*Id.*); *see infra* II.B.3.a.  The

Court agrees with the States.

The Supreme Court has clearly stated that Subsection (e)'s limitation "applies only to 'discretionary' decisions about the 'application' of § 1226 to *particular cases*." *Preap*, ____ U.S. at ____, 139 S.Ct. at 962 (emphasis added). Section 1226(e), therefore, "does not block lawsuits over 'the extent of the Government's detention authority under the 'statutory framework' as a whole.'" *Id.* (quoting *Jennings v. Rodriguez*, ____ U.S. ____, ____, 138 S.Ct. 830, 841, 200 L.Ed.2d 122 (2018) (quoting *Demore*, 538 U.S. at 517, 123 S.Ct. at 1714)). Indeed, "Section 1226(e) . . . deals with challenges to operational decisions, rather than to the legislation establishing the framework for those decisions." *Parra v. Perryman*, 172 F.3d 954, 957 (7th Cir. 1999). So, for instance, Subsection (e) poses no hurdle for a respondent who challenges the statutory framework that permits his detention without bail under Section 1226. *See Demore*, 538 U.S. at 517, 123 S.Ct. at 1714. Section 1226(e) does not preclude challenges to the Government's alleged authority to detain certain aliens without a bond hearing under Sections 1225(b), 1226(a), and 1226(c). *Jennings*, ____ U.S. at ____, 138 S.Ct. at 839, 841. It also does not bar habeas corpus petitions. *See Parra*, 172 F.3d at 957. Further, Subsection (e) does not prevent plaintiffs from questioning whether the Government has the power under Section 1226(c) to detain certain aliens despite failing to detain the aliens *immediately after* they were released as required by Section 1226(c). *Preap*, ____ U.S. at ____, 139 S.Ct. at 961–62; *see also infra* II.B.4. Thus, Section 1226(e) does not prohibit parties from "disput[ing] the *extent of the statutory authority* that the Government claims." *Preap*, ____ U.S. at ____, 139 S.Ct. at 962 (emphasis added).

Here, the States' claims against the Government clearly "dispute the extent of the statutory authority that the Government claims." *See id.* In their Complaint, the States allege the Government does not have any discretion under Section 1226(c) to determine whether certain aliens must be detained when released from custody. *See* (Dkt. No. 1 at ¶¶ 35, 37–38, 94–101); *see also* (Dkt. No. 18 at 39). In effect, "the general extent of the Government's authority under § 1226(c) is precisely the issue here." *Preap*, ____ U.S. at ____, 139 S.Ct. at 962. Thus, "because the extent of the Government's detention authority is not a matter of 'discretionary judgment,' 'action,' or 'decision,'" this case "falls outside of the scope of § 1226(e)." *Jennings*, ____ U.S. at ____, 138 S.Ct. at 841.

Accordingly, the Court concludes Sections 1252(a)(5) and (b)(9), 1231(h), and 1226(e) do not preclude the States' claims. There are no statutory bars to reviewing these claims.

## 2.   <u>Final Agency Action</u>

The Court next considers whether the enforcement priorities set forth in the January 20 and February 18 Memoranda constitute "final agency action" subject to judicial review. *See* 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."). "Under the APA, an aggrieved party may file suit in a federal district court to obtain review of any final agency action for which there is no other adequate remedy in a court." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, ____ U.S. ____, ____, 138 S.Ct. 617, 626, 199 L.Ed.2d 501 (2018) (citing 5 U.S.C. § 704) (internal quotations omitted). The States and the Government agree on the standard used to determine whether an agency action is

"final."  *See* (Dkt. No. 18 at 37–38); (Dkt. No. 42 at 26).   That standard requires two conditions to be satisfied.  *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 1129, ____, 136 S.Ct. 1807, 1813, 195 L.Ed.2d 77 (2016).   "First, the action must mark the consummation of the agency's decisionmaking process — it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Id.* (citing *Bennett*, 520 U.S. at 177–78, 117 S.Ct. at 1168).   The Parties disagree whether the Memoranda constitute final agency action.  (Dkt. No. 18 at 37–38); (Dkt. No. 42 at 26–28). The Court finds that they do for the following reasons.

a.   The Consummation of the Agency's Decision-Making Process

The first condition that must be satisfied for a court to find that an agency's action is final is that the action constitutes "the consummation of the agency's decisionmaking process."  *Hawkes Co.*, 578 U.S. at ____, 136 S.Ct. at 1813.  A consummation of this decision-making process is present when the action is "definitive [in] nature" rather than "advisory in nature."  *Id.*  The Court finds the Memoranda easily satisfy this condition.

As an initial matter, the text of the February 18 Memorandum indicates the Memoranda are the consummation of DHS's decision-making process.  It states, "[t]his interim guidance is effective *immediately*."  (Dkt. No. 19-2 at 2) (emphasis added). Moreover, the February 18 Memorandum states, "[i]t applies to *all* U.S. Immigration and Customs Enforcement (ICE) Directorates and Program Offices, and it covers enforcement actions, custody decisions, the execution of final orders of removal, financial expenditures, and strategic planning."  (*Id.*) (emphasis added).  The immediacy and

definite nature of the application of this guidance to *all* enforcement actions and custody decisions made by *all* ICE Directorates and Program Offices strongly suggest the agency's decision is final.  *See Hawkes Co.*, 578 U.S. at ____, 136 S.Ct. at 1813.

The Government attempts to overcome these indicia of final agency action by arguing "the Secretary retains the discretion to change or abandon these policies at any time[.]" (Dkt. No. 42 at 27).  This argument stems from the February 18 Memorandum, which states, "[t]his interim guidance will remain in effect until Secretary Mayorkas issues new enforcement guidelines," which will occur "only after consultation with the leadership and workforce of ICE, U.S. Customs and Border Protection, and other Department of Homeland Security (Department) agencies and offices."  (Dkt. No. 19-2 at 2).  The Government's argument is unpersuasive.  The mere fact that an agency *says* an action is not final because it maintains "discretion" to alter a policy is insufficient to *render* an action nonfinal.  *See Hawkes Co.*, 578 U.S. at ____, 136 S.Ct. at 1814 ("The Corps may revise an approved [jurisdictional determination] within the five-year period based on 'new information.'  That possibility, however, is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal." (citation omitted)); *Sackett v. EPA*, 566 U.S. 120, 127, 132 S.Ct. 1367, 1372, 182 L.Ed.2d 367 (2012) ("The mere possibility that an agency might reconsider in light of 'informal discussion' and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal.").

Here, the Government's insinuation that agency action is not final simply because the agency says so, would produce the absurd result of precluding judicial review of *any*

policy that the agency says is not final.  Indeed, if such a rule were followed, then an agency could avoid judicial review of its action in perpetuity simply by labeling its action as "interim" or "temporary" and stating that the agency maintains the ability to repeal or revise it in the future.  In fact, this case demonstrates how an agency could potentially tie the judiciary's hands if the agency's action is not final simply because the agency says it is not.

In this case, the February 18 Memorandum took effect immediately upon issuance. (Dkt. No. 19-2 at 2).  The Memorandum states it would "remain in effect until Secretary Mayorkas issues new enforcement guidelines."  (*Id.*).  It also states Secretary Mayorkas "anticipate[d] issuing these guidelines in less than 90 days," meaning the new guidance would be issued before May 19, 2021.  (*Id.*).  But that did not happen.  *See* (Dkt. No. 63 at 3–4).  In fact, in a separate challenge to the February 18 Memorandum, the Government represented to the district court that it "currently expect[s] that the Secretary will issue new immigration priorities in the beginning of July."  *Arizona v. Dep't of Homeland Sec.*, No. 2:21-cv-00186-SRB, 2021 WL 2787930 (D. Ariz. June 7, 2021), Dkt. No. 85 at 2.  Once again, the new guidance was not released.  *See* (Dkt. No. 63 at 3–4).  The Government now projects "the Secretary will issue new immigration enforcement priorities by the end of August or the beginning of September."  (Dkt. No. 63 at 3–4).  Notably, the Government "caution[s] that this is *only* [*its*] *current expectation*."  (*Id.* at 4) (emphasis added).  In other words, the Government's expectation could once again change, and the issuance of the new guidance could be delayed even longer.  Thus, a purely subjective definition of nonfinality would be awfully convenient for the Government—but that is not what the

law provides.  Rather, because the agency-wide application of this guidance has an immediate and definite nature, it objectively demonstrates the agency's decision is indeed final.  *See Hawkes Co.*, 578 U.S. at \_\_\_\_, 136 S.Ct. at 1813.  The Court therefore finds that the Memoranda satisfy the first condition.

b.    Rights, Obligations, and Legal Consequences

The second condition that must be satisfied for a court to find that an agency's action is final is that the challenged action must be one by which rights or obligations have been determined, or from which legal consequences will flow.  *See Hawkes Co.*, 578 U.S. at \_\_\_\_, 136 S.Ct. at 1813.  The Government argues the Memoranda do not satisfy this condition because the Memoranda do not change DHS's legal obligation to enforce the law in the manner prescribed in Sections 1226(c) and 1231(a)(2).  (Dkt. No. 42 at 26–28).  The Government also argues the Memoranda do not "change any person's legal status, confer any legal benefits, or have any 'legal consequences.'"  (*Id.* at 27).  Stated differently, the Government contends the Memoranda do not affect the rights or obligations of the States, aliens, or any other person or entity.  In support, the Government points to the February 18 Memorandum, which states that the Memorandum does not "create any right or benefit, substantive or procedural, enforceable at law."  (*Id.* at 27) (citing (Dkt. No. 19-2 at 8)).  But once again, what the Memoranda say and do are different.  The Court finds the Memoranda satisfy the second condition.

First, the Government's assertion that the Memoranda do not alter DHS's legal obligations to detain certain aliens under Sections 1226(c) and 1231(a)(2) is demonstrably false.  In deciphering the meaning of Sections 1226(c) and 1231(a)(2) below, *see infra*

57

II.B.3.a., the Court goes to great lengths to discuss what obligations those statutory provisions create for DHS.  In sum, Section 1226(c) obligates DHS to detain *all* aliens who fall within the ambit of that provision *when they are "released" from state custody*.  Section 1231(a)(2) requires DHS to detain *all* aliens with final orders of removal "*during the removal period*."

The Memoranda require something quite different.  Specifically, the February 18 Memorandum effectively substitutes a prioritization scheme in place of the enforcement mandates set forth in these statutory provisions.  This new scheme creates two categories of aliens who are required to be detained: priorities and nonpriorities.  *See* (Dkt. No. 19-2 at 4–7).  It also sets forth a requirement that ICE agents obtain preapproval to detain aliens who are deemed nonpriorities.  (*Id.* at 7).  The plain meaning of Sections 1226(c) and 1231(a)(2) allows for neither this specific prioritization scheme nor its preapproval process; they simply require DHS to detain *all* aliens described therein at a certain time or for a specific duration.  Because the Memoranda *require* DHS to enforce the law in a different way than what Sections 1226(c) and 1231(a)(2) prescribe, the Memoranda constitute a change in DHS's legal obligations.  Such a change weighs in favor of classifying the Memoranda as final agency action.  *See Texas*, 86 F. Supp. 3d at 648–49 (finding that DAPA is a final agency action, in part, because "[a]s evidenced by the mandatory language throughout the DAPA Memorandum requiring USCIS and ICE to take certain actions, the Secretary's Directive clearly establishes the obligations of the DHS and assigns specific duties to offices within the agency").

Next, the Government contends the Memoranda do not alter the rights or obligations of the States or aliens in the country.  The Court disagrees.  Based on the record before the Court, the Memoranda affect Texas's legal obligation to provide Emergency Medicaid to certain noncitizens.  "Emergency Medicaid is a *federally required* program *jointly funded* by the federal government and the *states*."  (Dkt. No. 19-7 at ¶ 7) (emphases added).  Illegal aliens are eligible to participate in this program.  *See* (*Id.*); 8 U.S.C. § 1611(b)(1)(A).  An alien in Texas who is eligible for Emergency Medicaid and presently in state custody can benefit from the program after being released.[24]  Texas is therefore legally obligated to bear part of the cost of Emergency Medicaid for aliens who qualify for the program and are not detained by ICE after being released from state custody.

But as should be clear by now, not all aliens released from state incarceration are returned to society.  And that is because of Sections 1226(c) and 1231(a)(2).  Again, pursuant to Section 1226(c), DHS is *required* to detain *all* aliens who have committed certain serious offenses *as soon as* they are released from state custody.  And per Section 1231(a)(2), DHS is *required* to detain certain aliens during their removal period.  Instead, because of the Memoranda, DHS is no longer detaining all of these aliens as soon as they are released from state custody or during their removal periods.  Texas will therefore have a legal obligation to share the cost of providing Emergency Medicaid to aliens who

---

[24]    Indeed, even the Executive Branch in a website has stated that incarcerated individuals may apply for Medicaid coverage in their respective states and thereafter be eligible for benefits after release from custody.  *See* HealthCare.gov, *Health coverage for incarcerated people*, https://www.healthcare.gov/incarcerated-people/.

qualify for the program and, under the Memoranda, are not detained by ICE after being released from state custody.[25]

As for the rights of aliens, another district court has already concluded the Memoranda affect the rights of certain aliens presently detained.  *See Hussein S.M. v. Garland*, No. CV 21-348 (JRT/TNL), 2021 WL 1986125, at *3 (D. Minn. May 18, 2021).  As this Court noted in *Texas I*, "an [alien] who has been detained for six months may be entitled to release if 'it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future.'"  ____ F. Supp. 3d at ____, 2021 WL 2096669, at *31 (quoting *Zadvydas*, 533 U.S. at 701, 121 S.Ct. at 2505).  In *Hussein S.M.*, a detained alien with a final of order of removal filed a petition for a writ of habeas corpus to secure his release from detention.  2021 WL 1986125, at *1.  The district court granted the petition, relying on the civil immigration enforcement priorities set forth in the

---

[25]   The Court is also concerned that the Memoranda affect the States' legal obligation to provide a public-school education to certain noncitizens following their release from juvenile detention.  For example, Texas is required by both federal and state law to provide noncitizen children with a public-school education.  *See generally Plyler*, 457 U.S. 202, 102 S.Ct. 2382 (holding that a Texas statute that withheld state funds for educating children who were not "legally admitted" was unconstitutional); *see also LeClerc v. Webb*, 419 F.3d 405, 416 (5th Cir. 2005) ("In . . . *Plyler*, the [Supreme] Court employed a heightened level of rational basis review to invalidate a Texas law that denied primary public education to children of illegal aliens."); *Texas v. United States*, 106 F.3d 661, 666 (5th Cir. 1997) ("[T]he State's public education expenditures for the children of undocumented aliens are required by the equal protection clause[.]" (citing *Plyler*, 457 U.S. 202, 102 S.Ct. 2382)).  This obligation would necessarily include juveniles released from the custody of the Texas Juvenile Justice Department ("TJJD") who are not detained by ICE because of the Memoranda.  *See* (Dkt. No. 19-9 at ¶ 7) ("As Chapter 25, Texas Education Code, requires a child to attend school and as *Plyler* . . . prohibits denying undocumented children of illegal immigrants the right to attend public school, to the extent ICE does not take custody of non-citizen juveniles set to be released from TJJD custody, it is my understanding that those non-citizen juveniles who have not already received their General Educational Development or high school diploma attend Texas public schools after being released.").  The Court is interested in further briefing on this issue at the next stage of this litigation.

January 20 Memorandum and later reaffirmed in the February 18 Memorandum. *Id.* at

*3. Because the alien in *Hussein S.M.* did not fall within one of the priority groups, the

district court found "his removal is *unlikely to be imminent* despite ongoing removal

enforcement." *Id.* (emphasis added). In short, *Hussein S.M.* demonstrates the

Memoranda directly affect an alien's right to be free from prolonged detention. The

Court therefore concludes the Memoranda affect the rights of and have significant legal

consequences for detained aliens with final orders of removal.

In sum, the Court finds the Memoranda are the consummation of DHS's decision-

making process and determine certain rights and legal obligations. Therefore, the Court

concludes the Memoranda constitute final agency action under Section 704 of the APA.[26]

### 3.   Committed to Agency Discretion by Law

In determining whether an agency action is reviewable, the Court must also

determine whether the "agency action is committed to agency discretion by law." 5

U.S.C. § 701(a)(2). Accordingly, the Court now inquires whether the implementation of

the new guidelines found in the Memoranda is "committed" to the Government's

discretion by law.

The APA embodies a "basic presumption of judicial review." *Lincoln v. Vigil*, 508

U.S. 182, 190, 113 S.Ct. 2024, 2030, 124 L.Ed.2d 101 (1993) (quoting *Abbott Labs. v. Gardner*,

387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967)). But this is "just" a

---

[26]   A district court in Florida concluded the February 18 Memorandum is unreviewable under the APA because it did not constitute final agency action. *Florida. v. United States*, No. 8:21-CV-541-CEH-SPF, 2021 WL 1985058, at *9 (M.D. Fla. May 18, 2021). The Court respectfully disagrees with this conclusion for the reasons set forth herein.

presumption. *Lincoln,* 508 U.S. at 190, 113 S.Ct. at 2030. "'[R]eview is not to be had' in

those rare circumstances where the relevant statute 'is drawn so that a court would have

no meaningful standard against which to judge the agency's exercise of discretion.'" *Id.*

at 191, 113 S.Ct. at 2031 (quoting *Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 1655,

84 L.Ed.2d 714 (1985)). Where there is no meaningful standard to apply, "the statute

('law') can be taken to have 'committed' the decisionmaking to the agency's judgment

absolutely." *Lincoln,* 508 U.S. at 191, 113 S.Ct. at 2031 (quoting *Heckler,* 470 U.S. at 830,

105 S.Ct. at 1655).

One category of administrative decisions that courts "traditionally have regarded

as 'committed to agency discretion'" is relevant to this discussion. *Id.* (citation omitted).

Namely, "an agency's decision not to institute enforcement proceedings." *Id.* (citing

*Heckler,* 470 U.S. at 831, 105 S.Ct. at 1655–56). Non-enforcement decisions, however, are

only "presumptively unreviewable." *Heckler,* 470 U.S. at 832–33, 105 S.Ct. at 1656. The

Supreme Court has outlined a narrow but clear roadmap to overcoming that

presumption and a second, less–traveled path. As for the first: "the presumption may be

rebutted where the substantive statute has provided guidelines for the agency to follow

in exercising its enforcement powers." *Id.* As for the second: it may be "justifiably . . .

found that the agency has 'consciously and expressly adopted a general policy' that is so

extreme as to amount to an abdication of its statutory responsibilities." *Id.* at 833 n.4, 105

S.Ct. at 1656 n.4 (quoting *Adams v. Richardson,* 480 F.2d 1159, 1162 (D.C. Cir. 1973) (en

banc)). Although the Supreme Court has not (yet) found this latter type of "abdication,"

it has nevertheless instructed that any such inquiry should focus on "the statute

conferring authority on the agency," which "might indicate that such decisions were not 'committed to agency discretion.'" *Heckler*, 470 U.S. at 833 n.4, 105 S.Ct. at 1656 n.4; *see also Texas DAPA*, 809 F.3d at 166–67.

In this case, the Government argues the States' claims are unreviewable because the new guidelines contained in the February 18 Memorandum are committed to agency discretion by law.  More precisely, the Government argues: (1) the substantive statutes in question, Sections 1226(c) and 1231(a)(2), do not set out the specific mandatory duties the States assert, that is, the duty to detain certain aliens subject to those two sections; (2) even if these statutes establish mandatory duties, the new guidelines "simply establish[] enforcement priorities" since they do "not direct ICE officials to cease detaining any particular noncitizen subject to either § 1226(c) or § 1231(a)(2)"; and (3) assuming the first two arguments fail, the Executive Branch may, in effect, dispense with a congressional mandate because "[t]he exercise of prosecutorial discretion is inherent to the Executive power that the Constitution confers on the President."  (Dkt. No. 42 at 28–30).  Opposing the Government's suppositions, the States contend that, although the Government wields tremendous discretion in this area of immigration law, Sections 1226(c) and 1231(a)(2) limit this discretion by mandating the detention of certain aliens when they are released or during the removal period.  (Dkt. No. 51 at 29–30).  The Court now turns to each of these arguments.

a.  Whether "Shall" Means "Must"

The Government first argues that "shall" in Sections 1226(c) and 1231(a)(2) does not impose any mandatory duties or guidelines for the Government to follow.  The Court

disagrees.  Under Section 1226(c), "the Attorney General *shall* take into custody" certain aliens who have either committed specified offenses or who are otherwise deemed deportable under the INA "when the alien is released" from custody.  8 U.S.C. § 1226(c) (emphasis added).  Likewise, Section 1231(a)(2) provides, "the Attorney General *shall* detain the alien" "during [the alien's] removal period."  8 U.S.C. § 1231(a)(2) (emphasis added).

Recent Supreme Court precedent establishes "shall" means "must" in these sections.  In *Johnson v. Guzman Chavez*, the Supreme Court noted "detention is mandatory" during an alien's removal period, as prescribed by Section 1231(a)(2). ____ U.S. ____, ____, 141 S.Ct. 2271, 2281 (2021) (citing 8 U.S.C. § 1231(a)(2)).  And under Section 1226(c), "detention is mandatory and release is permitted in very limited circumstances" "[f]or certain criminal aliens and aliens who have connections to terrorism."  *Id.* at ____ n.2, 141 S.Ct. at 2280 n.2 (citing 8 U.S.C. § 1226(c)).  In light of *Guzman Chavez*, it seems there is no dispute that Sections 1226(c) and 1231(a)(2) are mandatory.

This is not surprising.  *Guzman Chavez*'s holding follows the well-established principle that Sections 1226(c) and 1231(a)(2) mandate the detention of certain aliens at specific points in time.  *See Preap*, ____ U.S. at ____, 139 S.Ct. at 959 (finding under Section 1226(c) certain criminal aliens "*must* be arrested when 'they are released' from custody on criminal charges and . . . *must* be detained without a bond hearing until the question of their removal is resolved" (citing 8 U.S.C. § 1226(c)) (emphasis added)); *Jennings*, ____ U.S. at ____, 138 S.Ct. at 835 ("§ 1226(c) makes clear that detention of aliens within its

scope *must* continue 'pending a decision' on removal" (citing 8 U.S.C. § 1226(c)) (emphasis added)); *Zadvydas*, 533 U.S. at 683, 121 S.Ct. at 2495 ("After entry of a final removal order and during the 90-day removal period, however, aliens *must* be held in custody." (citing 8 U.S.C. § 1231(a)(2)) (emphasis in original)); *Demore*, 538 U.S. at 521, 123 S.Ct. at 1716 (noting Section 1226 "*requir[ed]* the Attorney General to detain a subset of deportable criminal aliens pending a determination of their removability" (emphasis added)); *Hosh v. Lucero*, 680 F.3d 375, 377, 381 (4th Cir. 2012) ("Section 1226(c) *requires* the mandatory federal detention, without the possibility of bond, of certain deportable criminal aliens '*when*' those aliens are released from other custody." (emphases added)); *Rodney v. Mukasey*, 340 F. App'x 761, 764 & n.3 (3d Cir. 2009) (per curiam) (interpreting "shall" in Section 1231(a)(2) to mean the Attorney General "*must*" detain the alien for a certain period (emphasis added)); *Khotesouvan v. Morones*, 386 F.3d 1298, 1300 (9th Cir. 2004) (observing that, in *Demore*, the Supreme Court "approved the *mandatory* detention of a criminal alien during removal proceedings under 8 U.S.C. § 1226(c) even in the absence of an individualized finding that the alien was unlikely to appear for his removal hearing if released on bond" (emphasis added)); *Prieto-Romero v. Clark*, 534 F.3d 1053, 1059 & n.4 (9th Cir. 2008) (noting that detention under Section 1231(a)(2) is *mandatory*); *Nyonton v. Brackett*, No. 18-CV-481-PB, 2019 WL 1082203, at *2 (D.N.H. Mar. 7, 2019) (holding Section 1231(a)(2) is "crystal clear" in mandating the detention of aliens subject to Section 1231, especially with respect to individuals "who have been found inadmissible because of a controlled substance violation"); *Louisaire v. Muller*, 758 F. Supp. 2d 229, 235 (S.D.N.Y. 2010) (explaining that, while Section 1226(a) provides ICE

with the discretion to detain any alien pending a decision in removal proceedings, "[a]liens who have been convicted of certain enumerated offenses, however, including drug crimes . . . *are subject to mandatory detention*" pursuant to Sections 1226(c)(1)(B), 1227(a)(2)(B), and INA § 126(c) (emphasis added)).

Accordingly, the Court concludes, following *Guzman Chavez* and the foregoing overwhelming precedent, the word "shall" means "must" in Sections 1226(c) and 1231(a)(2). Consequently, the Government is required to detain certain criminal aliens and aliens with final orders of removal at certain points in time to comply with those statutes.

Despite the Supreme Court's clear interpretation of Sections 1226(c) and 1231(a)(2), the Government nevertheless argues that *Guzman Chavez* and, by extension, all other related court rulings are irrelevant here. The Government contends *Guzman Chavez* "did not address the Department of Homeland Security's discretion whether to detain individuals covered by 8 U.S.C. § 1226(c) and 8 U.S.C. § 1231(a)(2)." (Dkt. No. 67 at 1). "Rather," according to the Government, *Guzman Chavez* "addressed under which authority certain individuals were detained and whether such individuals were entitled to bond hearings." (*Id.*). In short, the Government argues the Court should disregard *Guzman Chavez*'s statements on Sections 1226(c) and 1231(a)(2) — and the numerous court holdings that precede *Guzman Chavez* — because those were not central to the case's holding and thus were dicta that need not be followed. The Court disagrees.

*Guzman Chavez*'s treatment of Sections 1226 and 1231 were central to its holding. The case's key question was whether certain aliens could be released on bond while

petitioning for relief from removal.  That question was necessarily answered by analyses of both sections—analyses that included looking at the mandatory nature of Sections 1226(c) and 1231(a)(2)'s detention provisions.  The respondents in *Guzman Chavez*—aliens who were detained following their unlawful reentrance into the United States after previously being removed—sought release on bond while they were pursuing relief from removal.  *Guzman Chavez*, ____ U.S. at ____, 141 S.Ct. at 2280.  The respondents argued that Section 1226, which generally conferred discretion to the Government to detain aliens, provided them an avenue to be released on bond.  *Id.* at ____, 141 S.Ct. at 2283–84.  However, the Government in that action contended that Section 1231, which mandates detention of aliens with orders of removal, applied to the respondents, effectively requiring their detention to be *without* bond.  *Id.*; *see also* Brief for Petitioner, *Johnson v. Guzman Chavez*, ____ U.S. ____, 141 S.Ct. 2271 (2021) (No. 19-897), 2020 WL 4938065.  The Supreme Court was thus required to determine which INA provision applied to the respondents.  This task necessitated a finding as to whether, and in what circumstances, detention was mandatory under the relevant statutes.  *See Guzman Chavez*, ____ U.S. at ____, 141 S.Ct. at 2280–82.

*Guzman Chavez* ultimately held Section 1231 applies to the respondents since they had effectively been ordered removed through the reinstatement of their previous orders of removal.  *See id.* at ____, 141 S.Ct. at 2287–91.  In reaching this conclusion, the Supreme Court compared Section 1226, which, again, applies to the arrest and detention of an alien "pending a decision on whether the alien is to be removed from the United States," *id.* at ____, 141 S.Ct. at 2281, with Section 1231, which applies to an alien ordered removed, *id.*

In the Supreme Court's discussion of Section 1226, it noted "DHS," pursuant to that provision, "*may* arrest and detain the alien," pending that alien's removal decision. *Id.* Such an alien "may generally apply for release on bond or conditional parole." *Id.* Nevertheless, the Supreme Court probed further, stating "there is one exception" to this general rule: for certain criminal aliens, "*detention is mandatory*" under Section 1226(c). *Id.* at ____ n.2, 141 S.Ct. at 2280 n.2 (citing 8 U.S.C. § 1226(c)) (emphasis added). Like Section 1226(c)'s exception, the Supreme Court stated Section 1231's detention is "mandatory" precisely because of Section 1231(a)(2). *Guzman Chavez,* ____ U.S. at ____, 141 S.Ct. at 2281 (citing 8 U.S.C. § 1231(a)(2)). Thus, *Guzman Chavez*'s interpretation of Sections 1226(c) and 1231(a)(2) as mandating detention was essential to the case's holding.

Tellingly, the Government itself admitted during briefing in *Guzman Chavez* that Section 1226(c) imposed a mandatory duty to detain certain criminal aliens.[27] The Government explained, although "Section 1226(a) makes detention discretionary," "a separate provision, Section 1226(c), *makes an exception* to that general rule, providing that the government 'shall' take into custody and not release certain criminal aliens." Brief for Petitioner, 2020 WL 4938065, at *5 (No. 19-897) (emphasis added). The Government also argued in its reply brief that the Supreme Court's "intervention" in *Guzman Chavez* would "determine[] whether Section 1226(c)—which provides for the *mandatory* detention of certain criminal aliens—applies to aliens who have reinstated orders of

---

[27]    As another Texas court said of a similar change in litigation position, "[b]ut that was then, and this is now." *Texas v. United States*, 340 F. Supp. 3d 579, 611 (N.D. Tex. 2018), *aff'd in part, vacated in part, remanded*, 945 F.3d 355 (5th Cir. 2019), *rev'd and remanded sub nom. California v. Texas*, 141 S.Ct. 2104 (2021).

removal and are in withholding-only proceedings."  Reply Brief for Petitioner, *Johnson v. Guzman Chavez*, ____ U.S. ____, 141 S.Ct. 2271 (2021) (No. 19-897) 2020 WL 3124376, at *7 (emphasis added).  Likewise, with respect to Section 1231(a)(2), the Government stated it had "long read" the statute "to *require* the detention of terrorist and *criminal* aliens." Reply Brief for Petitioner, *Johnson v. Guzman Chavez*, ____ U.S. ____, 141 S.Ct. 2271 (2021) (No. 19-897) 2020 WL 7249055, at *17 & footnote (emphases added).  Thus, in conjunction with *Guzman Chavez*, the Court takes the Government at its word and finds "shall" means "must" in Sections 1226(c) and 1231(a)(2) with respect to the detention of certain criminal aliens.

Second, even if the clear principles delineated in *Guzman Chavez*, *Preap*, *Zadvydas*, and the like are dicta, they are persuasive, nonetheless.  As the Fifth Circuit has noted, "[i]t is well established in this circuit that, although we are 'not bound by dicta, even of [this court,] [d]icta of the Supreme Court are, of course, another matter.'"  *Peake v. Ayobami (In re Ayobami)*, 879 F.3d 152, 154 n.3 (5th Cir. 2018) (quoting *Campaign for S. Equal. v. Bryant*, 791 F.3d 625, 627 n.1 (5th Cir. 2015)).[28]  Thus, the Court follows the Fifth Circuit

---

[28]    Likewise, the Eleventh Circuit concluded, "dicta from the Supreme Court is not something to be lightly cast aside."  *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006) (collecting cases with similar findings) (quoting *Peterson v. BMI Refractories*, 124 F.3d 1386, 1392 n.4 (11th Cir. 1997)).  Indeed, "Supreme Court dicta have a weight that is greater than ordinary judicial dicta as prophecy of what that Court might hold," so this Court cannot "blandly shrug them off because they were not a holding."  *See United States v. Montero-Camargo*, 208 F.3d 1122, n.17 (9th Cir. 2000) (en banc) (citations omitted).  Other circuits agree.  *See McCoy v. Mass. Inst. of Tech.*, 950 F.2d 13, 19 (1st Cir. 1991) ("[F]ederal appellate courts are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings, particularly when, as here, a dictum is of recent vintage and not enfeebled by any subsequent statement."); *United States v. Bell*, 524 F.2d 202, 206 (2d Cir. 1975) (considering that dicta "must be given considerable weight and cannot be ignored in the resolution of [a] close question"); *Oyebanji v. Gonzales*, 418 F.3d 260,
(continue)

and its sister circuits and defers to *Guzman Chavez*, *Preap*, *Zadvydas*, and other related Supreme Court precedent even if the statements on Sections 1226(c) and 1231(a)(2) in those cases were dicta, as the Government contends.  The Court is not free to treat Supreme Court dicta as cavalierly as the Government suggests.  Accordingly, the Court applies the caselaw discussed above and holds that the "shall" found in Sections 1226(c) and 1231(a)(2) means "must," imposing on the Government a duty to detain certain criminal aliens and those with final orders of removal when released and during the removal period, respectively.

Arguments about dicta aside, the Court's own statutory interpretation of Sections 1226(c) and 1231(a)(2) also leads to the conclusion that "shall" means "must" in those sections.  *See* Scalia & Garner, *supra*, at 53 ("*Every* application of a text to particular circumstances entails interpretation." (emphasis added)).

---

264–65 (3d Cir. 2005) ("[A]s a lower federal court, we are advised to follow the Supreme Court's 'considered dicta.'" (quoting *McCoy*, 950 F.2d at 19)); *Wynne v. Town of Great Falls*, 376 F.3d 292, 298 n.3 (4th Cir. 2004) ("[A]s we and our sister circuits have frequently noted, . . . carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative." (internal quotation marks omitted) (quoting *Sierra Club v. EPA*, 322 F.3d 718, 724 (D.C. Cir. 2003))); *United States v. Marlow*, 278 F.3d 581, 588 n.7 (6th Cir. 2002) (noting that lower courts are "obligated to follow Supreme Court dicta, particularly where there is not substantial reason for disregarding it, such as age or subsequent statements undermining its rationale" (citing *Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996))); *Nichol v. Pullman Standard, Inc.*, 889 F.2d 115, 120 n.8 (7th Cir. 1989) (noting that lower courts "should respect considered Supreme Court dicta"); *McDonough v. Anoka County*, 799 F.3d 931, 942 (8th Cir. 2015) ("[F]ederal courts . . . are not 'free to limit Supreme Court opinions precisely to the facts of each case.'  Instead, federal courts 'are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings[.]'" (quoting *City of Timber Lake v. Cheyenne River Sioux Tribe*, 10 F.3d 554, 557 (8th Cir. 1993))); *Bangor Hydro–Elec. Co. v. FERC*, 78 F.3d 659, 662 (D.C. Cir. 1996) ("It may be dicta, but Supreme Court dicta tends to have somewhat greater force-particularly when expressed so unequivocally.").

"The task of statutory interpretation begins and, if possible, ends with the language of the statute." *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 486 (5th Cir. 2013). "When the language is plain, [the court] 'must enforce the statute's plain meaning, unless absurd.'" *Id.* (quoting *In re Nowlin*, 576 F.3d 258, 261–62 (5th Cir. 2009)); *see also BedRoc Ltd. v. United States*, 541 U.S. 176, 183, 124 S.Ct. 1587, 1593, 158 L.Ed.2d 338 (2004) ("The preeminent canon of statutory interpretation requires [the court] to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'" (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992))). "A statute is ambiguous if it is susceptible of more than one accepted meaning." *United Servs. Auto. Ass'n v. Perry*, 102 F.3d 144, 146 (5th Cir. 1996). Multiple accepted meanings do not exist merely because a statute's "authors did not have the forethought expressly to contradict any creative contortion that may later be constructed to expand or prune its scope." *Moore v. Hannon Food Serv., Inc.*, 317 F.3d 489, 497 (5th Cir. 2003). Thus, as before, regarding interpreting Section 1231(h), the Court must initially determine whether "all but one of the meanings" of the word "shall" in Sections 1226(c) and 1231(a)(2) is "ordinarily eliminated by context." *Deal,* 508 U.S. at 132–33, 113 S.Ct. at 1996–97.

For this analysis, the Court applies "the traditional means of statutory interpretation, which include the text itself, its history, and its purpose." *Bellum v. PCE Constructors, Inc.*, 407 F.3d 734, 739 (5th Cir. 2005) (citation omitted). Put differently, the Court must initially "look first to the word's ordinary meaning," *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 407, 131 S.Ct. 1885, 1891, 179 L.Ed.2d 825 (2011),

since "[s]tatutory language has meaning only in context." *Graham Cnty.*, 545 U.S. at 415, 125 S.Ct. at 2449 (citing *Leocal v. Ashcroft*, 543 U.S. 1, 9, 125 S.Ct. 377, 382, 160 L.Ed.2d 271 (2004)). Only "when traditional methods of statutory construction fail to reveal a provision's meaning" may the Court "conclude that it is ambiguous." *Perry*, 102 F.3d at 147.

"[T]he word 'shall' usually connotes a requirement." *Maine Cmty. Health Options v. United States*, ____ U.S. ____, ____, 140 S.Ct. 1308, 1320, 206 L.Ed.2d 764 (2020); *see also* Scalia & Garner, *supra*, at 112 ("When drafters use *shall* and *may* correctly, the traditional rule holds—beautifully."). The Supreme Court has nonetheless cautioned, "[a]s against the government, the word 'shall,' when used in statutes, is to be construed as 'may,' unless a contrary intention is manifest." *Railroad Co. v. Hecht*, 95 U.S. 168, 170, 24 L.Ed. 423 (1877).

This need for legislative intent to demonstrate "shall" should be construed as "must" against the government is present in Supreme Court jurisprudence. In *Texas I,* this Court identified *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005), a Supreme Court case upon which the Government relies, (6:21-cv-3, Dkt. No. 82 at 19); (6:21-cv-3, Dkt. No. 83 at 25–26, 34); (6:21-cv-16, Dkt. No. 42 at 36–38), as an apt example of the need for legislative intent to determine that "shall" connotes a requirement. *See Texas I,* ____ F. Supp. 3d at ____, 2021 WL 2096669, at *33. In *Castle Rock,* the respondent claimed her due process rights were violated because a police department refused to enforce restraining orders despite language printed on the orders themselves stating that an "officer shall arrest" a restrained person where probable cause of a

violation was evident. 545 U.S. at 754, 759, 125 S.Ct. at 2802, 2805. The Supreme Court, however, found "the presence of seemingly mandatory legislative commands" like "shall" could not automatically impose a "true mandate" against the police. *Id.* at 760–61, 125 S.Ct. at 2805–06. What was needed—and lacking in *Castle Rock*—was "some stronger indication" from the legislature. *Id.* at 761, 125 S.Ct. at 2806. Such an "indication" was not present because the "shall" used in the restraining orders was "not perceptibly more mandatory than" other state statutes using the word "shall" where the police force was traditionally accorded discretion. *Id.*; *see also Chicago v. Morales*, 527 U.S. 41, 61–62 n.32, 119 S.Ct. 1849, 1861 n.32, 144 L.Ed.2d 67 (1999) (noting that interpreting "shall" as mandatory in the context of police action "flies in the face of common sense that all police officers must use some discretion in deciding when and where to enforce city ordinances").

With the foregoing in mind, this Court in *Texas I* previously explained how a "stronger indication" from Congress may be gleaned. In *Richbourg Motor Co. v. United States* and *Escoe v. Zerbst*, the Supreme Court noted one "indication" sufficient to conclude that the word "shall" in a statute imposes an obligation upon the Government is present when the statute's manifest purpose is to protect the public or private interests of innocent third parties. *See Richbourg Motor Co. v. United States*, 281 U.S. 528, 533–34, 50 S.Ct., 385, 387–88, 74 L.Ed. 1016 (1930); *Escoe v. Zerbst*, 295 U.S. 490, 494, 55 S.Ct. 818, 820, 79 L.Ed. 1566 (1935); *see also Texas I*, ____ F. Supp. 3d at ____, 2021 WL 2096669, at *34. The Court finds it appropriate to reiterate its explanations of these cases here.

In *Richbourg Motor Co.*, the Supreme Court expressly found reason to avoid the rule in *Hecht* where a statute provided that an officer "shall" take possession of a vehicle used in the act of transporting liquor.  281 U.S. at 533–34, 50 S.Ct. at 387–88.  After noting that the statute in question was "in form mandatory throughout," the Court explained it "detail[ed] . . . successive steps to be taken, which, if followed, [led] unavoidably to forfeiture under that section . . . , *with the important consequence of protecting the interests of innocent third persons*."  *Id.* (emphasis added).  These qualities of the relevant text, the Supreme Court explained, "suggests a definite purpose to make the protection effective" by imposing a mandatory duty.  *Id.*

Five years after *Richbourg Motor Co.*, the Supreme Court in *Escoe* concluded that any doubt regarding the mandatory nature of a statutory "shall" is "dispelled when we pass from the words alone *to a view of ends and aims*."  295 U.S. at 492–93, 55 S.Ct. at 819–20 (emphasis added).  In *Escoe*, the relevant statute appeared to require a trial court to bring a probationer to court to revoke his probation.  *Id.*  The Supreme Court determined, because it was "[c]lear[] [that] the end and aim of an appearance before the court must be to enable an accused probationer to explain away the accusation," the presentment of the probationer was "necessary, or so the Congress must have thought, to protect the individual against malice or oppression."  *Id.* at 493, 55 S.Ct. at 820.  Thus, *Escoe* concluded the "shall" in the relevant statute was "mandatory in meaning as well as mandatory in form."  *Id.* at 494, 55 S.Ct. at 820.  Leaving no doubt, the Supreme Court stated, "[s]tatutes are not [optional] when to put them in that category would result in serious impairment of the public or the private interests that they were intended to protect."  *Id.*; *see also Ralpho*

*v. Bell*, 569 F.2d 607, 627–28 & n.149 (D.C. Cir. 1977) (applying *Escoe* to "prefer a construction" of mandatory language in a statute guiding governmental officials' discharge of duties "that bestows the benefits of the Act on those for whom it was chiefly intended").

Given the caselaw, the key in this case is whether Sections 1226(c) and 1231(a)(2) demonstrate a purpose to protect public or private interests. If so, the word "shall," as used in both sections, would connote a requirement against the Government in the manner envisioned by *Richbourg Motor Co.* and *Escoe*. Based on the following, the Court finds that the statutes do indeed demonstrate such a purpose.

The Supreme Court in *Demore* clearly explains that the purpose of Section 1226(c) was to protect third-party interests: that of the states, citizens, and legal immigrants of this country. Essentially, Section 1226(c) was enacted "against a backdrop of wholesale failure by the INS [ICE's predecessor] to deal with increasing rates of criminal activity by aliens." *Demore*, 538 U.S. at 518, 123 S.Ct. at 1714. "INS' near-total inability to remove deportable criminal aliens imposed" overpopulation in federal and state prisons, caused monetary costs, took away immigration opportunities that could have been provided to others, and increased crime in the Nation's communities. *Id.* at 518–20, 123 S.Ct. at 1714–15. Crucially, "Congress also had before it evidence that one of the major causes of the INS' failure to remove deportable criminal aliens was the agency's failure to detain those aliens during their deportation proceedings." *Id.* at 519, 123 S.Ct. at 1715. Before Section 1226, "[t]he Attorney General at the time had broad discretion to conduct individualized bond hearings and to release criminal aliens from custody during their removal

proceedings when those aliens were determined not to present an excessive flight risk or threat to society." *Id.* (citing 8 U.S.C. § 1252(a) (1982 ed.)). Thus, to alleviate these issues, Congress "enacted 8 U.S.C. § 1226, *requiring* the Attorney General to detain a subset of deportable criminal aliens pending a determination of their removability." *Id.* at 521, 123 S.Ct. at 1716 (emphasis added). Given *Demore*'s findings, the purpose of Section 1226 is to protect the public and private interests of third parties, namely, the states, the citizens, and legal immigrants of the United States.

Considering the context and purpose of Section 1226, it is no wonder why Subsection (c) "subtract[s]," from the discretion given to the Government in Section 1226(a). *See Preap*, ____ U.S. at ____, 139 S.Ct. at 966. In fact, it does more than that. Subsection (c) also subtracts from the general "broad discretion" that the Attorney General originally had prior to the enactment of Section 1226. *See Demore*, 538 U.S. at 521, 123 S.Ct. at 1716. "Shall" in Section 1226(c), therefore, must be construed to mean "must."

Like Section 1226(c), Section 1231(a)(2) was enacted to protect public and private interests of the states and the people of the United States. As the Supreme Court noted in *Zadvydas*, "protecting the community from dangerous aliens" is a "statutory purpose" of that section. 533 U.S. at 697, 121 S.Ct. at 2502. What's more, Section 1231 "is part of a statute that has as its basic purpose effectuating an alien's removal," a purpose related to the community's protection. *Id.* Coupled with *Demore*'s detailed explanation of the burdens criminal aliens impose on both the country and its people when the Government fails to deport them, 538 U.S. at 518–20, 123 S.Ct. at 1714–15, it is evident that Section 1231(a)(2)'s purpose was to similarly protect the states, the citizens, and legal immigrants'

interests against the harmful effects the Government's failure to remove certain aliens would bring about.

Additionally, numerous federal courts—including this Court—have recognized *other* parts of Section 1231 use "shall" as a mandatory command. *See Shuaibu v. Gonzales*, 425 F.3d 1142, 1144 (8th Cir. 2005) (interpreting the "shall" in Section 1231(b)(1)(C) to mean the Attorney General "must" attempt to remove the alien to certain countries); *Kim Ho Ma v. Ashcroft*, 257 F.3d 1095, 1115 (9th Cir. 2001) (interpreting "shall" in Section 1231(a)(3) to mean all aliens ordered released "must" comply with supervision requirements); *Texas I*, ____ F. Supp. 3d at ____, 2021 WL 2096669, at *32–37 (analyzing Section 1231(a)(1)(A) and holding the "shall" in that provision imposes a mandate on the Government to deport aliens with final orders of removal within 90 days). These interpretations of "shall" as mandatory in other parts of Section 1231 are yet further indication the "shall" in Section 1231(a)(2) bears the same meaning, because "a word or phrase is presumed to bear the same meaning throughout a text." Scalia & Garner, *supra*, at 170; *see also Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232, 127 S.Ct. 2411, 2417, 168 L.Ed.2d 112 (2007) ("A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning."). Thus, for all these reasons, the "shall" in Section 1231(a)(2) necessarily means must.

The Government does not disagree that Congress enacted Sections 1226(c) and 1231(a)(2) to protect public or private interests. Rather, the Government demurs that a statutory purpose of protecting third parties, as held in *Richbourg Motor Co.* and *Escoe*,

is not a "stronger indication," per *Castle Rock*, to make "shall" mandatory against any governmental actor. (Dkt. No. 42 at 36–38); *see Richbourg*, 281 U.S. at 533–34, 50 S.Ct., at 387–88; *Escoe*, 295 U.S. at 493–94, 55 S.Ct. at 820; *Castle Rock*, 545 U.S. at 761, 125 S.Ct. at 2806. In making this argument, the Government reasons that the "protection of a third party" rationale *cannot* serve as a stronger indication because, it claims, the very "statute [in *Castle Rock*] concerned enforcement of restraining orders entered to benefit a 'protected person.'" (*Id.* at 37–38) (emphasis omitted) (quoting *Castle Rock*, 545 U.S. at 758–59, 125 S.Ct. at 2804–05). In doing so, however, the Government ignores the Supreme Court's holdings in *Richbourg Motor Co.* and *Escoe. See* (*Id.* at 36–39). In short, the Government implies that *Castle Rock* overruled *Richbourg Motor Co.* and *Escoe sub silentio*. That argument fails.

As an initial matter, this Court cannot ignore *Richbourg Motor Co.* and *Escoe* where the Supreme Court or the Fifth Circuit has not expressly instructed it to do so. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 1921–22, 104 L.Ed.2d 526 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."); *Lopez v. City of Hous.*, Civil Action No. H-09-0420, 2009 WL 1456487, at *15 (S.D. Tex. May 22, 2009) (Lake, J.) ("[I]t is well established that a federal district court must generally apply an interpretation of law articulated by its circuit court of appeals." (quoting *Perez v. Brown & Williamson Tobacco Corp.*, 967 F. Supp.

920, 925 (S.D. Tex. 1997) (Jack, J.))).  The Court did not disregard those cases in *Texas I*, nor will it disregard them here.[29]

But even if the Court could ignore *Richbourg Motor Co.* and *Escoe*, *Castle Rock* is easily distinguishable from this case.  The state statute ostensibly mandating the police to enforce restraining orders in *Castle Rock* was drafted upon a background of "[a] well established tradition of police discretion" that "ha[d] long coexisted with apparently mandatory arrest statutes."  *Castle Rock*, 545 U.S. at 760, 125 S.Ct. at 2805–06 (citing 1 ABA Standards for Criminal Justice 1-4.5, commentary, pp. 1–124 to 1–125 (2d ed. 1980)).  A similar tradition is not present with respect to Sections 1226(c) and 1231(a)(2).  As explained above, it was precisely the federal government's "wholesale failure" "to deal

---

[29]    The Court also notes that its decision in *Texas I* did not rely entirely on the protection of "public or private interests" rationale explained in *Richbourg Motor Co.* and *Escoe* to support its finding of a "stronger indication" that the "shall" in 8 U.S.C. § 1231(a)(1)(A) connoted a requirement.  *See Texas I*, ____ F. Supp. 3d at ____, 2021 WL 2096669, at *34–35.  Instead, the Court performed a full statutory interpretation of the word "shall" in Section 1231(a)(1)(A) and relied on numerous precedents in the Fifth Circuit and sister circuits demonstrating the mandatory nature of that word.  *Id.* at *33–38 (noting the Court had examined "the text, context, statutory history, and precedent demonstrating that 'shall' means *must* in section 1231(a)(1)(A)" (emphasis in original)).  In contrast to that comprehensive analysis, the Government's current lone attack on the Court's prior synthesis of the rules from *Hecht*, *Castle Rock*, *Richbourg Motor Co.*, and *Escoe* is lacking.  Nevertheless, despite the in-depth analysis the Court undertook in *Texas I*, a district court in Arizona arrived at a different conclusion, holding that "shall" does not mean "must" in 8 U.S.C. § 1231(a)(1)(A).  *Arizona*, 2021 WL 2787930, at *9–10.  That court's rationale was that the legislative intent required for Section 1231(a)(1)(A) to be mandatory—per *Castle Rock*—was not present.  *Id.*  The court based its holding on (a) the statutory scheme which apparently contemplated removals of aliens outside the 90-day period, (b) the Government's broad discretion to remove aliens at any stage of the removal process, and (c) some legislative history showing that the 90-day period contemplated in the section was intended to be "merely" a "target" date "rather than a statutory mandate."  *Id.*  Therefore, according to the *Arizona* court, "shall" did not mean "must" in Section 1231(a)(1)(A).  *Id.*  Like the Government in this case, the district court neither cited to nor discussed *Richbourg Motor Co.* and *Escoe*.  This Court respectfully disagrees with the court in *Arizona* and the Government, having thoroughly probed the statutory text, the purpose of the statutes, and legislative history of Sections 1231(a)(1)(A) in *Texas I*, and Sections 1226(c) and 1231(a)(2) in this Memorandum Opinion and Order.

with increasing rates of criminal activity by aliens" that prompted Congress to *limit* the Executive's discretion in such matters by enacting Section 1226.  *See Demore*, 538 U.S. at 518, 123 S.Ct. at 1714.  Such specific legislative intent, backed by Supreme Court acknowledgment, was not present in the statute interpreted in *Castle Rock*.  *Cf.* 545 U.S. at 760–61, 125 S.Ct. at 2805–06.

Furthermore, the Government's contention that Sections 1226(c) and 1231(a)(2) do not confer a mandatory duty against the Government goes against an analysis of the statutes' text within the whole statutory scheme.  The Supreme Court has noted that "[t]he word 'may' customarily connotes discretion" and that such a "connotation is particularly apt where . . . 'may' is used in contraposition to the word 'shall.'"  *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 346, 125 S.Ct. 694, 703, 160 L.Ed.2d 708 (2005) (citing *Haig v. Agee*, 453 U.S. 280, 294 n.26, 101 S.Ct. 2766, 2775 n.24, 69 L.Ed.2d 640 (1981)).  That principle proved crucial in *Jama*, where the Supreme Court held that because Section 1231(b)(2) of the INA states that the Attorney General "shall remove" an alien to a designated country, it would be inappropriate to read as mandatory another provision explaining that the Attorney General "may" disregard the designation if certain circumstances arise.  *Id.*  This principle applies to this case as well.

Section 1231(a)(2) states that the Attorney General "shall" detain certain aliens "during the removal period," which is defined to be a period of 90 days when an alien is ordered removed.  8 U.S.C. § 1231(a)(1)–(2).  Before Section 1231(a)(2), Subsection (a)(1)(C) provides that the removal period "shall" be extended beyond 90 days if certain circumstances arise, and the alien "may" remain in detention during that extended

period. *Id.* § 1231(a)(1)(C). Again, it would be absurd if Section 1231(a)(2)—with its use of "shall"—is read to provide merely discretionary authority to the Government to detain people during the removal period when Section 1231(a)(1)(C)—using "may"—clearly provides discretion to the Government to detain people *after* the initial 90-day removal period.

Likewise, Section 1226(c) clearly juxtaposes "may" and "shall" so that there is no ambiguity as to whether the "shall" used in 1226(c)(1) imposes a mandatory duty. Subsection (c)(1) states that the Attorney General "shall" detain certain aliens "when the alien is released." 8 U.S.C. § 1226(c)(1). Just right after that, Subsection (c)(2) notes that the Attorney General "may" release aliens described in Subsection (c)(1) "only if" certain circumstances are present. *Id.* § 1226(c)(2). As such, for Subsection (c)(2) to have any meaning, Subsection (c)(1) must be read as a mandate: the Attorney General *must* detain aliens when released and such aliens *may* be released *only if* certain situations call for it. If Subsection (c)(1) is not interpreted in this way, then Subsection (c)(2)—the release provision—loses its significance. It would be superfluous for Congress to state how certain aliens may be released—per Subsection (c)(2)—if the Government was meant to initially have the discretion to decide which criminal aliens to detain in the first place. This analysis of the two statutes within the overall scheme indeed tracks how the Supreme Court and other federal courts have construed Sections 1226(c) and 1231(a)(2), as described more fully above.

b.  Whether  "Prioritization"  Contravenes  Congressional Mandates

Having concluded that "shall" means "must" in Sections 1226(c) and 1231(a)(2), the Court turns to the Government's second argument in support of its assertion that the new guidelines in the February 18 Memorandum are committed to agency discretion by law.  That is, regardless of the relevant sections' mandatory nature, the new guidelines "simply establish[] enforcement priorities" because they do "not direct ICE officials to cease detaining any particular noncitizen."  (Dkt. No. 42 at 28–29).  Put differently, the Government argues that the guidelines do not *actually* stop detentions and, instead, merely prioritize who gets detained first.  As a result,  the Government concludes that the guidelines do not contravene the statutes.  *See* (*Id.*).  Thus, in essence, the Government argues that it has discretion to determine the *timing* of when certain aliens should be detained—if not the discretion to determine *who* gets detained.  This argument fails as well.

Although the Government describes the February 18 Memorandum as only a reprioritization of immigration enforcement priorities, a review of the Memorandum itself establishes that it is more than that.  *See Texas DAPA*, 809 F.3d at 171–72 ("Although the DAPA Memo facially purports to confer discretion, the district court determined that nothing about DAPA genuinely leaves the agency and its employees free to exercise discretion." (cleaned up)).  The new guidelines violate the statutory commands of Sections 1226(c) and 1231(a)(2) which are: to detain certain aliens "when the alien is released," per Section 1226(c), or "during the removal period," per Section 1231(a)(2).

The Government opines that the February 18 Memorandum "directs 'officers and agents . . . to exercise their discretion thoughtfully' after consideration 'of all relevant facts and circumstances'" concerning the arrest, detention, or removal of criminal illegal aliens. (Dkt. No. 42 at 29) (alteration in original) (citing Dkt. No. 42-2 at 4). That statement demonstrates that the new guidelines wade into areas that are not committed to agency discretion. *See* (*Id.*). Because "shall" means "must" in Section 1226(c), the Executive Branch is required to detain criminal aliens who have committed "*any* offense covered in section 1182(a)(2)," "*any* offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D)," or *any* alien who "is deportable under section 1227(a)(2)(A)(i)," "inadmissible under section 1182(a)(3)(B)," or "deportable under section 1227(a)(4)(B)."   8 U.S.C. § 1226(c)(1)(A)–(D) (emphases added).  This leaves no room for the Executive's agent to "thoughtfully" exercise discretion. *See* (Dkt. No. 42 at 29).  And crucially, to protect the public, Congress mandated that *any* alien falling under any of these categories must be detained "when the alien is released" from state custody. *Id.*  Likewise, Section 1231(a)(2) requires both the detention of aliens who possess orders of removal *and* aliens who have been found "inadmissible under section 1182(a)(2)," "1182(a)(3)(B)," or "deportable under section 1227(a)(2) or 1227(a)(4)(B)."[30]  *Id.* § 1231(a)(2).  And, like Section 1226(c),

---

[30]   In *Texas I*, the Government argued that Section 1231(a)(1)(A)'s use of the word "shall" could not have meant "must" because at least one other "shall" in Section 1231 is not mandatory (at least according to the Government). *Texas I*, ____ F. Supp. 3d at ____, 2021 WL 2096669, at *35. That other "shall" is apparently in Section 1231(a)(2) which reads, as stated earlier: "During the removal period, the Attorney General shall detain the alien.  Under no circumstance during the removal period shall the Attorney General release an alien who has been found inadmissible under [certain circumstances]."  *Id.*  The Government contended that reading "shall" as mandatory in the first sentence of Section 1231(a)(2) would make the second sentence
(continue)

Congress in Section 1231(a)(2) mandated the timing of such detention: the aliens must be detained "during the removal period." *Id.*

Because of the clear mandates set forth in Sections 1226(c) and 1231(a)(2), determining whether and when an alien should be detained is not a decision committed to agency discretion. And by prioritizing the detention of some aliens over others, the Government has effectively conferred upon itself discretion as to the timing of detention—discretion it does not have. Put differently, the Government has assumed a discretionary power that Congress has explicitly foreclosed. Such a maneuver is impermissible. *See Util. Air Regul. Grp.*, 573 U.S. at 327, 134 S.Ct. at 2446 ("Under our system of government, Congress makes laws and the President, acting at times through agencies like EPA, 'faithfully execute[s]' them. The power of executing the laws necessarily includes both authority and responsibility to resolve some questions left open by Congress that arise during the law's administration. But it does not include a power to revise clear statutory terms that turn out not to work in practice." (alteration in

---

superfluous. *Id.*; *see also* (6:21-cv-3, Dkt. No. 82 at 21); (6:21-cv-3, Dkt. No. 83 at 34). The Court found the argument unpersuasive, finding that there was a distinction between the two clauses. *Id.* As the Court held, the first clause of Section 1231(a)(2) mandates the act of detaining. *Id.* (citing *Rodney*, 340 F. App'x at 764). The second clause, on the other hand, prohibits the release of certain individuals. *Id.* Thus, the Attorney General may in some circumstances "release" those whom he has "detain[ed]." *See* 8 U.S.C. § 1231(a)(2). Section 1231 itself prescribes the conditions through which an alien—who is presumably presently detained—may pursue a "stay" and a "release." *Id.* § 1231(c)(2)(A), (C). In fact, it could easily be said that the prohibition on releasing certain aliens demonstrates that Congress assumed *all* aliens would be detained—because they "shall" be. Thus, the Court concluded in *Texas I* that the Government's "textual" argument failed. In this case, the Government briefly restates its argument from *Texas I* in an attempt to persuade the Court to change its disposition. *Texas I*, ____ F. Supp. 3d at ____, 2021 WL 2096669, at *35; *see also* (Dkt. No. 42 at 39). The Court remains unpersuaded and adopts its prior conclusions from *Texas I* as discussed in this footnote.

original) (citation omitted) (citing U.S. Const. art. II, § 3)); *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 462, 122 S.Ct. 941, 956, 151 L.Ed.2d 908 (2002) (finding that an agency lacked authority "to develop new guidelines or to assign liability in a manner inconsistent with" an "unambiguous statute").

"Congress does not draft legislation *in the expectation* that the Executive will blow through the deadlines it sets." *Preap*, ____ U.S. at ____ n.6, 139 S.Ct. at 969 n.6 (emphasis in original). In this case, Section 1226(c)'s "when . . . released" language "clarifies when the duty to arrest is triggered: upon release from criminal custody." *Id.* at ____, 139 S.Ct. at 969. And as a logical extension of that reasoning, Section 1231(a)(2)'s "during the removal period" language also clarifies when a duty to arrest is triggered: when the alien is provided with a final order of removal.[31] *See* 8 U.S.C. § 1231(a)(1)–(2). In sum, Congress has clearly specified when the *duty* to detain is *triggered*: when the alien is released as provided by Section 1226(c) and during the removal period for Section 1231(a)(2). *When* that duty to detain is triggered is not left for the agency to decide. Thus, choosing to detain certain aliens "when . . . released," *see* Section 1226(c), or "during the removal period," *see* Section 1231(a)(2), over others who are mandated to be detained at those specific points in time is not left to agency discretion. Indeed, it is a violation of the clear letter of the law. *See Util. Air Regul. Grp.*, 573 U.S. at 327, 134 S.Ct. at 2446.

---

[31] For criminal aliens in state custody, the 90-day period does not start until they are released from state confinement. *See* 8 U.S.C. § 1231(a)(1)(B)(iii).

c.      Whether the Executive may "Dispense" with Laws

Finally, the Government argues that the Memoranda are committed to agency discretion because "[t]he exercise of prosecutorial discretion is inherent to the Executive power that the Constitution confers on the President" and that such "discretion" is "greatly magnified" in the immigration law context.  (Dkt. No. 42 at 29–30) (citing *Reno*, 525 U.S. at 490, 119 S.Ct. at 946).  As this Court stated in *Texas I*, "whatever 'inherent authority' the Executive may have in the area of immigration, that authority—along with the executive Power—does not include the authority to 'suspend' or 'dispense with' Congress's exercise of legislative Powers in enacting immigration laws."  ____ F. Supp. 3d at ____, 2021 WL 2096669, at *36.  The Government's suggestion that the Executive's discretion is so significant that it may, in effect, dispense with laws has significant implications for the separation-of-powers system enshrined in the Constitution.  The subject is therefore worth addressing, albeit briefly, at this early stage in the litigation. However grand the Executive's discretion might be in enforcing immigration laws, the Constitution does not empower the Executive to set forth a policy that, in effect, dispenses with a congressional immigration mandate.[32]

---

[32]      This proposition does not include circumstances in which the President is asked to enforce a law that is unconstitutional or, more specifically, a law that usurps Executive authority. *See* Brett M. Kavanaugh, *Our Anchor for 225 Years and Counting: The Enduring Significance of the Precise Text of the Constitution*, 89 Notre Dame L. Rev. 1907, 1911 (2014); Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power to Execute the Laws*, 104 Yale L.J. 541, 621–22 (1994). After all, the Constitution commands that, "[b]efore he enter on the Execution of his Office, [the President] shall take the following Oath or Affirmation: —'I do solemnly swear (or affirm) that I will faithfully execute the Office of President of the United States, *and will to the best of my Ability, preserve, protect and defend the Constitution of the United States*.'"   U.S. Const. art. II, § 1, cl. 8 (emphasis added).  The Government, however, does not assert that Sections 1226(c) or 1231(a)(2) are unconstitutional.  *See* (Dkt. No. 42).

Concern over the Executive's power to dispense with laws dates back to before the founding of this Nation.  The Framers of the Constitution were well aware of how the English Crown had abused the dispensing power a century prior to the ratification of the Constitution.  *See* Michael W. McConnell, *The President Who Would Not Be King: Executive Power Under the Constitution* 118 (2020) (concluding that the Framers addressed the royal "prerogatives of suspending or dispensing with the laws" in the Take Care Clause "[g]iven that the Committee [of Detail] explicitly dealt with virtually every one of the royal prerogatives, and especially the notorious prerogatives that had animated the overthrow of Charles I and James II"); Michael Stokes Paulsen, Steven G. Calabresi, Michael W. McConnell & Samuel L. Bray, *The Constitution of the United States* 317 (Robert C. Clark et al. eds., 2d ed. 2013) (opining that the President's duty to "'take care that the laws be faithfully executed' . . . means that the president is not permitted to dispense with or suspend statutes the way King James II did before the Glorious Revolution of 1688"); Robert J. Delahunty & John C. Yoo, *Dream On: The Obama Administration's Nonenforcement of Immigration Laws, the DREAM Act, and the Take Care Clause*, 91 Tex. L. Rev. 781, 797–98 & n.95, 804–09 (2013) (detailing how the "suspending power" was abused by English Monarchs, such as James II, and how that history influenced Americans in limiting "[t]he executive Power"); *see also* Randy Barnett & Evan Bernick, *The Letter & The Spirit: A Unified Theory of Originalism*, 107 Geo. L. J. 1, 20–21 (2018) (contending the Founding Fathers constructed the new American government as a fiduciary of We the People, "bound by fiduciary duties to *honor the law*, . . . *remain loyal to the public interest*, . . . and *account for violations of these duties*." (emphasis added) (citations and quotations omitted)).  As a

prime example, King James II dispensed with the Test Acts,[33] which effectively barred Catholics from holding government or military office, "to create an enlarged standing army under the control of Catholic officers . . . and . . . put Catholic peers in key positions in the Privy Council and the government" because he did "[n]ot trust[] Protestant militias and gentry to protect him from rebellion[.]"  McConnell, *supra*, at 116; *see also* Zachary S. Price, *Enforcement Discretion and Executive Duty*, 67 Vand. L. Rev. 671, 691 (2014) ("King James enraged Protestants in Parliament by using his suspending and dispensing powers to exempt officials from statutory restrictions on office holding by Catholics and Protestant dissenters."); Delahunty & Yoo, *supra*, at 805–06 ("James began using his dispensing power extensively to override the Test Acts, filling offices with his fellow Roman Catholics.").  This decision angered many Englishmen[34] and played a significant role in igniting the Glorious Revolution, which resulted in William III and Mary II replacing James II on the throne.  Delahunty & Yoo, *supra*, at 807.  Although no longer on

---

[33]    Specifically, the First Test Act, enacted in 1673, "was designed to ensure that anyone holding public office, whether civil or military, would denounce the Roman Catholic doctrine of transubstantiation and receive the Anglican sacrament.  Parliament's intention was to exclude Roman Catholics, who could not conscientiously take these tests, from holding public office more than temporarily."  Delahunty & Yoo, *supra*, at 805–06.  The Second Test Act, enacted in 1678, "made certain exceptions (including one for the King himself), but essentially continued this exclusionary policy."  *Id*. at 806.

[34]    This ire towards James II's use of the dispensing power is best captured in the English Bill of Rights, which says:

> Whereas the late King James the Second, by the assistance of divers evil counsellors, judges and ministers employed by him, did endeavour to subvert and extirpate the Protestant religion and the laws and liberties of this kingdom;

> By assuming and exercising a power of dispensing with and suspending of laws and the execution of laws without consent of Parliament[.]

The Bill of Rights, 1 W. & M., c. 1 (1689).

the throne, James II had already left his mark on the future powers of the Crown. Indeed, the English Bill of Rights of 1689 barred William III and Mary II and all future monarchs from suspending or dispensing with laws.[35]

By 1776, Americans had developed a similar sentiment about the dispensing power as had the English in 1689. *See* Price, *supra*, at 692. Notably, one of the grievances against King George III articulated in the Declaration of Independence[36] was that he "often withheld assent from laws passed by colonial legislatures unless the laws included a suspension clause allowing him to halt their execution." Brief for the Cato Institute, Professor Randy E. Barnett & Professor Jeremy Rabkin as Amici Curiae Supporting Respondents at 5–6, *United States v. Texas*, ____ U.S. ____, 136 S.Ct. 2271, 195 L.Ed.2d 638 (2016) (mem) (per curiam) (citing Leonard Woods Labaree, *Royal Government in America: A Study of the British Colonial System Before 1783*, at 224–27, 256–68 (1934)). This "allowed the king not only to dispense with the implementation of statutes, but also to force changes to their content—an essentially legislative power." *Id.* at 5–6; *see also* Declaration of Independence ¶¶ 3–4.

---

[35]     Specifically, the English Bill of Rights of 1689 provides: "[T]he pretended power of suspending the laws or the execution of laws by regal authority without consent of Parliament is illegal" and that "the pretended power of dispensing with laws or the execution of laws by regal authority, as it hath been assumed and exercised of late, is illegal." The Bill of Rights, 1 W. & M., c. 2 (1689).

[36]     These grievances are as follows:

He has refused his Assent to Laws, the most wholesome and necessary for the public good; He has forbidden his Governors to pass Laws of immediate and pressing importance, unless suspended in their operation till his Assent should be obtained; and when so suspended, he has utterly neglected to attend to them.

Declaration of Independence ¶¶ 3–4.

Prior to the United States Constitution's ratification, states were aware of this sentiment and crafted state constitutions of their own that barred the Executive from exercising the suspending or dispensing power. *See* Price, *supra*, at 692 ("Drawing from this English model, several states during the American revolutionary period adopted constitutions including prohibitions on executive suspension of laws."); Steven G. Calabresi, Sarah E. Agudo & Kathryn L. Dore, *State Bills of Rights In 1787 and 1791: What Individual Rights Are Really Deeply Rooted In American History and Tradition?*, 85 S. Cal. L. Rev. 1451, 1534–35 (2012) (explaining that, at the time of the founding, "state constitutions . . . had constitutional clauses restricting the power to suspend or dispense with laws to the legislature"); *cf.* Gordon S. Wood, *The Origins of Vested Rights in the Early Republic*, 85 Va. L. Rev. 1421, 1425–26 (1999) (noting that, "[i]n the 1760s and 1770s, during the crisis that eventually tore apart the British empire, the American colonists had this long English heritage of popular rights to draw upon," including the English Bill of Rights, which "declared illegal certain actions of the crown, including its dispensing with laws"). By 1787, six states—Delaware, Maryland, Massachusetts, North Carolina, New Hampshire, and Virginia—had state constitutions containing provisions barring the Executive from exercising the suspending or dispensing power. *See* Del. Const. of 1776 Decl. of Rights, § 7 ("That no power of suspending laws, or the execution of laws, ought to be exercised unless by the Legislature."); Md. Const. of 1776 Decl. of Rights, § VII ("That no power of suspending laws, or the execution of laws, unless by or derived from the Legislature, ought to be exercised or allowed."); Mass. Const. of 1780 pt. 1, art. XX ("The power of suspending the laws, or the execution of the laws, ought never to be exercised but by the

legislature, or by authority derived from it, to be exercised in such particular cases only as the legislature shall expressly provide for."); N.H. Const. of 1784 pt. 1, art. XXIX ("The power of suspending the laws, or the execution of them, ought never to be exercised but by the Legislature, or by authority derived therefrom, to be exercised in such particular cases only as the Legislature shall expressly provide for."); N.C. Const. of 1776 Decl. of Rights, § V ("That all powers of suspending laws, or the execution of laws, by any authority, without consent of the Representatives of the people, is injurious to their rights, and ought not to be exercised."); Va. Const. of 1776 Bill of Rights, § 7 ("That all power of suspending laws, or the execution of laws, by any authority, without consent of the representatives of the people, is injurious to their rights and ought not to be exercised."); *see also* Calabresi, Agudo & Dore, *supra,* at 1534.  This number soon grew to eight after Pennsylvania added a provision prohibiting the Executive from suspending or dispensing with laws to its constitution in 1790, and Vermont, which already had such a provision in its constitution, became a state in 1791.[37]  *See* Pa. Const. of 1790 art. IX, § 12 ("That no power of suspending laws shall be exercised, unless by the legislature, or its authority."); Vt. Const. of 1786 Decl. of Rights, § XVII ("The power of suspending laws, or the execution of laws ought never to be exercised, but by the Legislature, or by

---

[37]   Not all states ratified constitutions at the time of the founding.  Indeed, "two states, Connecticut and Rhode Island, retained their Colonial Charters issued by King Charles II and did not try to write new state constitutions or declarations of rights" at this time.  Calabresi, Agudo, & Dore, *supra*, at 1543; *see also Narragansett Indian Tribe of R.I. v. State,* 667 A.2d 280, 280 (R.I. 1995) ("Rhode Island's first constitution was adopted in 1842 . . . ."); *Moore v. Ganim,* 660 A.2d 742, 772 (Conn. 1995) (Peters, C.J., concurring) ("Of the thirteen original states, Connecticut was the second to last to adopt a written state constitution, failing to do so until 1818.").

authority derived from it, to be exercised in such particular cases only as the Legislature shall expressly provide for."); *see also* Calabresi, Agudo & Dore, *supra,* at 1535.

Although the Constitution does not contain a provision of its own explicitly prohibiting the Executive from dispensing with laws,[38] it in no way sanctions such action by the Executive for at least two reasons.  First, the Constitution separates power among three branches, vesting executive power *exclusively* in the President and legislative power *exclusively* in Congress.  *See* U.S. Const. art. I, § 1; U.S. Const. art. II, § 1; U.S. Const. art. III, § 1; *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483, 130 S.Ct. 3138, 3146, 177 L.Ed.2d 706 (2010) ("Our Constitution divided the 'powers of the new Federal Government into three defined categories, Legislative, Executive, and Judicial.'" (quoting *INS v. Chadha*, 462 U.S. 919, 951, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317 (1983))); *see also* The Federalist No. 47 (James Madison) ("The accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny."); Montesquieu, *Spirit of the Laws* bk. XI, ch. 6, pp. 151–52 (O. Piest ed., T. Nugent transl. 1949) ("When the legislative and executive powers are united in the same person . . . there can be no liberty; because apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical

---

[38]   In fact, "[a]t the Constitutional Convention, the delegates unanimously rejected a proposal to grant the President suspending authority."  *See* Price, *supra*, at 693.  The First Congress did, however, have an opportunity to bar the President from possessing such power in the Bill of Rights but failed to do so, "despite proposals from several state ratifying conventions that the Constitution be amended to include such a provision."  *Id.* at 694.  But "any negative inference from Congress's failure to act on these proposals seems weak."  *Id.*  Instead, "[i]t seems more likely that James Madison and other members of the First Congress failed to include an antisuspension provision in the Bill of Rights precisely because they thought the Constitution already made it clear enough that the President lacked such powers."  *Id.*

manner."). Dispensing of laws is, in effect, a *legislative* power. *See Kendall v. U.S. ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 612–13, 9 L.Ed. 1181 (1838); *United States v. Smith*, 27 F. Cas. 1192, 1230 (C.C.D.N.Y. 1806) (stating that the President does not have the dispensing power, in part, because only Congress has "dominion" over the laws—*i.e.*, the legislative power); *see also* Del. Const. of 1776 Decl. of Rights, § 7; Md. Const. of 1776 Decl. of Rights, § VII; Mass. Const. of 1780 pt. 1, art. XX; N.H. Const. of 1784 pt. 1, art. XXIX; N.C. Const. of 1776 Decl. of Rights, § V; Va. Const. of 1776 Bill of Rights, § 7; Pa. Const. of 1790 art. IX, § 12; Vt. Const. of 1786 Decl. of Rights, § XVII. As such, the Executive does not possess this power. *See Kendall*, 37 U.S. (12 Pet.) at 612–13 (stating that giving the President the dispensing power "would be clothing the President with a power entirely to *control the legislation of congress*, and paralyze the administration of justice" (emphasis added)); *Smith*, 27 F. Cas. at 1230 ("The president of the United States cannot control the statute, nor dispense with its execution, and still less can he authorize a person to do what the law forbids[.]"); *cf. Clinton*, 524 U.S. at 438, 118 S.Ct. at 2103 ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587, 72 S.Ct. 863, 867, 96 L.Ed. 1153 (1952) ("In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.").

Second, the dispensing power conflicts with the Executive's *duty* to *faithfully* execute the laws. *See* U.S. Const. art. II, § 3. In vesting the executive power in the

President,[39] the Constitution requires the President to channel that power to perform

certain duties and prescribes how he or she is to carry out those duties.[40]  *See id.*  One of

those duties, contained in the Take Care Clause, is that "he *shall take Care*[41] that the Laws

be *faithfully*[42] executed[43] . . . ."[44]  *Id.* (emphasis added) (footnotes added); *see Morrison v.*

*Olson*, 487 U.S. 654, 689–90, 108 S.Ct. 2597, 2618, 101 L.Ed.2d 569 (1988) ("The analysis

contained in our removal cases is designed . . . to ensure that Congress does not interfere

---

[39]  "The executive Power shall be vested in a President of the United States of America."
U.S. Const. art. II, § 1.

[40]  "He shall from time to time give to the Congress Information of the State of the Union,
and recommend to their Consideration such Measures as he shall judge necessary and expedient;
he may, on extraordinary Occasions, convene both Houses, or either of them, and in Case of
Disagreement between them, with Respect to the Time of Adjournment, he may adjourn them to
such Time as he shall think proper; he shall receive Ambassadors and other public Ministers; he
shall take Care that the Laws be faithfully executed, and shall Commission all the Officers of the
United States."  U.S. Const. art. II, § 3.

[41]  "*Care*: Regard; charge; heed in order to protection and preservation."  Samuel Johnson,
*A Dictionary of the English Language* (1755).
https://johnsonsdictionaryonline.com/1755/care_ns.

"*Care*: Charge or oversight, implying concern for safety and prosperity."  Noah Webster,
*American Dictionary of the English Language* (1828).
http://webstersdictionary1828.com/Dictionary/care.

[42]  "*Faithfully*: Without failure of performance; honestly; exactly."  Johnson, *supra.*
https://johnsonsdictionaryonline.com/1755/faithfully_adv.

"*Faithfully*: With strict adherence to allegiance and duty."  Webster, *supra.*
http://webstersdictionary1828.com/Dictionary/faithfully.

[43]  "*Execute*: To put in act; to do what is planned or determined."  Johnson, *supra.*
https://johnsonsdictionaryonline.com/1755/execute_va.

"*Execute*: To carry into effect; as, to execute law or justice."  Webster, *supra.*
http://webstersdictionary1828.com/Dictionary/execute.

[44]  As stated above, the Court, at this time, declines to weigh in on the merits of the States'
separate claim that the Memoranda violate the Take Care Clause.  *See* footnote 4.  However, the
Court is interested in further briefing on this claim at the next stage of this litigation.  In addition
to any issues the Parties would like to bring to the Court's attention, the Parties should focus part
of their briefing on whether the States can bring a Take Care Clause claim independent of or in
conjunction with their APA claims.

with the President's exercise of the 'executive power' and his *constitutionally appointed*

*duty* to 'take care that the laws be faithfully executed' under Article II." (emphasis added)

(footnote omitted)); *United States v. Valenzuela-Bernal*, 458 U.S. 858, 863, 102 S.Ct. 3440,

3444, 73 L.Ed.2d 1193 (1982) ("The Constitution imposes on the President the *duty* to 'take

Care that the Laws be faithfully executed." (emphasis added) (quoting U.S. Const. art. II,

§ 3)); *Myers v. United States*, 272 U.S. 52, 117, 47 S.Ct. 21, 25, 71 L.Ed. 160 (1926) ("Mr.

Madison and his associates in the discussion in the House dwelt at length upon the

necessity there was for construing article 2 to give the President the sole power of removal

in his responsibility for the conduct of the executive branch, and enforced this by

emphasizing his *duty expressly declared* in the third section of the article to 'take care that

the laws be faithfully executed.'" (emphasis added)); *see also Seila L. LLC v. Consumer Fin.*

*Prot. Bureau*, ____ U.S. ____, ____, 140 S.Ct. 2183, 2228, 207 L.Ed.2d 494 (2020) (Kagan, J.,

concurring in part) ("To begin with, the provision—'he shall take Care that the Laws be

faithfully executed'—speaks of *duty*, not power." (emphasis added) (quoting U.S. Const.

art. II, § 3)); Letter from George Washington to Alexander Hamilton[45] (Sept. 7, 1792) (on

file with the National Archives) ("It is my *duty* to see the Laws executed: to permit them

to be trampled upon with impunity would be repugnant to it; nor can the Government

longer remain a passive spectator of the contempt with which they are treated."

(emphasis added)); Letter from John Adams to Roger Sherman[46] (July 18, 1789) *reprinted*

*in* 6 *The Works of John Adams, Second President of The United States* 427, 429–30 (Charles

---

[45]   https://founders.archives.gov/documents/Washington/05-11-02-0040.

[46]   https:// https://founders.archives.gov/documents/Adams/99-02-02-0682.

Francis Adams ed., 1851) (stating that it is the President's "*duty* to take Care that the Laws be faithfully executed" (emphasis added)); Saikrishna B. Prakash, *Faithless Execution*, 133 Harv. L. Rev. F. 94, 97 (2020) ("The *duty* to see the laws faithfully executed implies that the President has the power—the executive power—to see the laws faithfully executed." (emphasis added)); Brett M. Kavanaugh, *Our Anchor for 225 Years and Counting: The Enduring Significance of the Precise Text of the Constitution*, 89 Notre Dame L. Rev. 1907, 1911 (2014) ("To be sure, the President has the *duty* to take care that the laws be faithfully executed." (emphasis added)).

Given this duty to take care that the laws are faithfully executed, the Constitution's system of separation-of-powers, and the treatment of the dispensing power in American history and tradition, the Court is hard pressed, at this early stage of the litigation, to see how the Government can suggest that the Constitution confers upon the Executive the "discretion" to ignore clear congressional commands contained in Sections 1226(c) and 1231(a)(2). *See Kendall*, 37 U.S. (12 Pet.) at 612–13 ("It was urged at the bar, that the postmaster general was alone subject to the direction and control of the President, with respect to the execution of the duty imposed upon him by this law, and this right of the President is claimed, as growing out of the obligation imposed upon him by the constitution, to take care that the laws be faithfully executed.  This is a doctrine that cannot receive the sanction of this court.  It would be vesting in the President a *dispensing power*, which has no countenance for its support in any part of the constitution . . . .  To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the constitution, and

entirely inadmissible." (emphasis added)); *Little v. Barreme*, 6 U.S. (2 Cranch) 170, 177–78 (1804) (stating that, because the President has the "high duty . . . to 'take care that the laws be faithfully executed,'" he must enforce a law in accordance with congressional commands where Congress has "prescribed . . . the manner in which [the] law shall be carried into execution"); *Smith*, 27 F. Cas. at 1230 ("The president of the United States cannot control the statute, *nor dispense with its execution*, and still less can he authorize a person to do what the law forbids.  If he could, it would render the execution of the laws dependent on his will and pleasure; which is a doctrine that has not been set up, and will not meet with any supporters in our government." (emphasis added)); *see also Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 435, 110 S.Ct. 2465, 2477, 110 L.Ed.2d 387 (1990) (White, J., concurring) ("The Executive Branch *does not have the dispensing power* on its own[.]" (emphasis added) (citing *Kendall*, 37 U.S. (12 Pet.) at 613)); *United States v. Midwest Oil Co.*, 236 U.S. 459, 505, 35 S.Ct. 309, 325, 59 L.Ed. 673 (1915) (Day, J., dissenting) ("The Constitution does not confer upon [the President] any power to enact laws or to suspend or repeal such as the Congress enacts." (citing *Kendall*, 37 U.S. (12 Pet.) at 613)); McConnell, *supra*, at 119 ("The Dispensing Power must not be confused with the exercise of prosecutorial discretion.  The executive decision not to prosecute a particular person or class of persons for actions in violation of the law does not give them the legal right to violate the law."); Paulsen, Calabresi, McConnell & Bray, *supra*, at 317; Joseph Story, *Commentaries on the Constitution of the United States* 316 (Quid Pro Brooks 2013) (1833) ("[T]he duty imposed upon [the President] to take care, that the laws be faithfully executed, follows out the strong injunctions of his oath of office, that he will 'preserve,

protect, and defend the constitution.'  The great object of the executive department is to accomplish this purpose; and without it, be the form of government whatever it may, it will be utterly worthless for offence, or defence; for the redress of grievances, or the protection of rights; for the happiness, or good order, or safety of the people."); Kavanaugh, *supra*, at 1911 ("To be sure, the President has the duty to take care that the laws be faithfully executed.  That certainly means that the Executive has to follow and comply with laws regulating the executive branch—at least unless the President deems the law unconstitutional, in which event the President can decline to follow the statute until a final court order says otherwise.  In other words, the Executive does have to follow laws *regulating the executive branch*." (emphasis added)); Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power To Execute the Laws*, 104 Yale L.J. 541, 620 (1994) (noting that the "Committee of Detail [may have] added the requirement that the President 'take care' that the laws be 'faithfully' executed" out of a "desire to prevent the President from declaring that his executive power granted him the ability not only to enforce federal law, but also to suspend federal law or suspend the execution of it"); Delahunty & Yoo, *supra*, at 797–98 & n.95, 804–09; Christopher N. May, *Presidential Defiance of 'Unconstitutional' Laws: Reviving the Royal Prerogative*, 21 Hastings Const. L.Q. 865, 873–74 (1994) ("The duty to execute the laws faithfully means that the President may not—whether by revocation, suspension, dispensation, inaction, or otherwise—fail to honor and enforce statutes to which he or his predecessors have assented, or which may have been enacted over his objection." (footnotes omitted)); Henry P. Monaghan, *The Protective Power of the Presidency*, 93 Colum. L. Rev. 1, 18 n.80 (1993) (quoting William Rawle, *A View of the*

*Constitution of the United States of America* 148–49 (2d ed. 1829), for the proposition that the Take Care Clause "declares what is [the President's] *duty*" and that "[h]e is *bound* to enforce" the laws (first alteration in original) (emphases added)); William P. Marshall & Saikrishna B. Prakash, *Common Interpretation: Article II, Section 3*, National Constitution Center[47] ("At a minimum, the [Take Care] Clause means that the President may neither breach federal law *nor order his or her subordinates to do so*, for defiance cannot be considered faithful execution. *The Constitution also incorporates the English bars on dispensing or suspending the law*, with some supposing that the Clause itself prohibits both." (emphases added)).

Instead, the Executive—and thus, the Attorney General or the Secretary of DHS—must exercise any discretion accorded to it by statute in the manner which Congress has prescribed. *See Util. Air Regul. Grp.*, 573 U.S. at 327, 134 S.Ct. at 2446; *Vigil*, 508 U.S. at 193, 113 S.Ct. at 2032 ("[A]n agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes."); *Heckler*, 470 U.S. at 832–34, 105 S.Ct. at 1656–57; *see also Regents*, ____ U.S. at ____, 140 S.Ct. at 1926 (Thomas, J., concurring in part) ("It is axiomatic that an administrative agency's power . . . is limited to the authority granted by Congress." (alteration in original) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988))).

---

[47]   https://constitutioncenter.org/interactive-constitution/interpretation/article-ii/clauses/348?aff_id=1000.

Accordingly, the Executive Branch, including its agencies, may not dispense with a clear congressional mandate under the guise of exercising "discretion."

        d.     <u>The Memoranda are not Committed to Agency Discretion</u>

In sum, the Court finds that Sections 1226(c) and 1231(a)(2) impose mandatory detention at specific points in time for certain aliens.  The Executive Branch may neither alter these statutory obligations through reprioritization nor dispense with them.  Accordingly, the Court concludes that the detention of certain aliens subject to Sections 1226(c) and 1231(a)(2) is not committed to agency discretion.

        4.     <u>**Zone of Interests**</u>

The States must next show that their injuries are within the "zones of interest" the two laws were intended to protect.  Congress has placed limits on *how* the Executive may be sued for violating the law and *who* can do it.  Congress, through the APA, has provided a cause of action for those seeking redress against the federal government for violating other federal laws.  *See* 5 U.S.C. §§ 702, 706.  But Congress has limited the availability of an APA cause of action to those who allege an injury that is "arguably" within the "zone of interests" to be protected or regulated by the relevant statutes.  *Collins v. Mnuchin*, 938 F.3d 553, 573–74 (5th Cir. 2019), *aff'd in part, vacated in part, rev'd in part sub nom. Collins v. Yellen*, ____ U.S. ____, 141 S.Ct. 1761 (2021); *see also Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224, 132 S.Ct. 2199, 2210, 183 L.Ed.2d 211 (2012) (hereinafter "*Match-E*") (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970)).

The zone of interests test is not "especially demanding" in the APA context. *Collins*, 938 F.3d at 574 (quoting *Lexmark*, 572 U.S. at 130, 134 S.Ct. at 1389).  Indeed, the Supreme Court has "conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff."  *Lexmark*, 572 U.S. at 130, 134 S.Ct. at 1389 (quoting *Match-E*, 567 U.S. at 225, 132 S.Ct. at 2210).  The zone of interests test "'forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that' Congress authorized that plaintiff to sue."  *Collins*, 938 F.3d at 574 (quoting *Lexmark*, 572 U.S. at 130, 134 S.Ct. at 1389).

Importantly, the relevant statute in whose zone of interests the plaintiff's injury must reside "is to be determined not by reference to the overall purpose of the Act in question," but rather, "by reference to the particular provision of law upon which the plaintiff relies."  *Bennett*, 520 U.S. at 175–76, 117 S.Ct. at 1167.  In other words, a court must review those "substantive provisions" of law that the plaintiff relies on for "the gravamen" of its complaint.  *Id.*

In this case, the States essentially bring three APA claims asserting that the Government violated federal law: (1) the Memoranda are contrary to Sections 1226(c) and 1231(a)(2) of the INA, (Dkt. No. 1 at ¶¶ 94–107); (2) the policy set forth in the Memoranda is arbitrary and capricious, (*id.* at ¶¶ 108–17); and (3) the Government was required but failed to follow notice and comment procedures in issuing the Memoranda, (*id.* at ¶¶ 118–121).

As in *Texas I,* the Government solely—and narrowly—maintains that "the States do not come within the relevant zone-of-interests" because "no entity can enforce § 1231" because Subsection (h) bars any party from enforcing Section 1231 against the Government.[48]  (Dkt. No. 42 at 35–36); *see* (6:21-cv-3, Dkt. No. 83 at 30–32); *Texas I*, ____ F. Supp. 3d at ____, 2021 WL 2096669, at *22–23.  For their part, the States briefly address the Government's suppositions, arguing they "fit within the zone of interests both because [the Government is] wrong about Section 1231(h) and for the reasons this Court has already explained" in *Texas I.*  (Dkt. No. 51 at 29) (citing *Texas I*, ____ F. Supp. 3d at ____, 2021 WL 2096669, at *23–29).  The Court agrees with the States.

For starters, the Government cannot refute the States' position that their injuries are within the zones of interests of Sections 1226(c) and 1231(a)(2), particularly in light of this Court's discussions of *Demore* and *Zadvydas* concerning the development and purpose of Sections 1226 and 1231.  *See supra* I.A, II.B.1 & II.B.3.  This discussion makes clear that Sections 1226(c) and 1231(a)(2)—and indeed the INA itself, *see Texas DAPA*, 809 F.3d at 163 & n.80—were enacted to protect and benefit the states, the citizens of this country, and the legal immigrants of the United States.  *See supra* I.A, II.B.1 & II.B.3.  As such, the injuries the States suffer due to the Memoranda, *see supra* II.A.1–4, fall within the relevant statutes' zones of interests.  *See Texas DAPA*, 809 F.3d at 163 (finding that

---

[48]    In so doing, the Government essentially foregoes any zone-of-interest challenge on the States' other APA claims, that is, those based on Section 1226(c) and those which are arguably not based on any of the statutes in question (*i.e.*, the arbitrary and capricious and notice and comment claims).

Texas satisfies the zone-of-interest test as a result of the same injuries that give Texas Article III standing).

The Government, indeed, does not dispute that the States' injuries fall within Sections 1226(c) and 1231(a)(2)'s zones of interests. Rather, the Government focuses its attention on Section 1231(h), in essence arguing that because Subsection (h) bars parties from enforcing Section 1231, any injury stemming from violations of the section does not fall within the statute's zone of interests. *See* (Dkt. No. 42 at 35–36). But, as explained earlier, Section 1231(h) does not bar the States' claims. *See supra* II.B.1; *Texas I*, ____ F. Supp. 3d at ____, 2021 WL 2096669, at *29–30 & n.42. Thus, the Government's lone contention fails. The Court finds that the States' injuries fall within the zones of interest of Sections 1226(c) and 1231(a)(2).

## III.   DISCUSSION OF PRELIMINARY INJUNCTION

Having determined the Court has jurisdiction over the action and nothing precludes judicial review under the APA, the Court now turns to the merits of the States' Motion for Preliminary Injunction.

### A.   LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Benisek v. Lamone*, ____ U.S. ____, ____, 138 S.Ct. 1942, 1943, 201 L.Ed.2d 398 (2018) (quotation omitted). Indeed, the decision to grant a preliminary injunction is "to be treated as the exception rather than the rule." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). Thus, "[i]n each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or

withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S.Ct. 365, 376, 172 L.Ed.2d 249 (2008) (quotation omitted). And in determining whether injunctive relief is proper, "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.*

A preliminary injunction "issue[s] only where (1) there is a substantial likelihood that the movant will prevail on the merits; (2) there is a substantial threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to the defendant; and (4) the granting of the preliminary injunction will not disserve the public interest." *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987). As such, "[t]he party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated" in order for a preliminary injunction to be granted. *Id.*

Note, however, that "none of the four prerequisites has a fixed quantitative value." *Texas v. Seatrain Int'l, S. A.*, 518 F.2d 175, 180 (5th Cir. 1975). "Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *Id.* (citing *Siff v. State Democratic Exec. Comm.*, 500 F.2d 1307 (5th Cir. 1974)). For instance, "a preliminary injunction does *not* follow as a matter of course from a plaintiff's showing" of the first element, "a likelihood of success on the merits." *Benisek*, _____ U.S. at _____, 138 S.Ct. at 1943–44 (emphasis added). Thus, federal courts must consider whether the movant has established the three other elements as well for a preliminary injunction to issue. *Id.* at _____, 138 S.Ct. at 1944.

B.   APPLICATION

1.   <u>Substantial Likelihood of Success on the Merits</u>

a.   <u>Counts I & II: Contrary to Law</u>

As described above, the Court determined that "shall" in Sections 1226(c) and 1231(a)(2) means "must."  *See supra* II.B.3.a.  This conclusion means that the Attorney General must detain certain aliens subject to those sections.  The Court also found that both statutes mandate detention of certain aliens at specific points in time: for Section 1226(c), the Attorney General is required to detain certain aliens "when the alien is released from custody," while for Section 1231(a)(2), the Attorney General is obligated to detain certain aliens "during the removal period."  The policy contained in the Memoranda effectively dispenses with these mandates by conferring discretion to the Government to independently decide who will be detained and when—if ever— detention of those individuals might occur.  This guidance therefore is wholly contrary to Sections 1226(c) and 1231(a)(2).   Thus, the States have demonstrated a substantial likelihood of success on Counts I & II.

b.   <u>Count III: Arbitrary and Capricious</u>

The States argue that the Government's Memoranda establishing new guidelines and priorities for the detention of certain aliens are arbitrary and capricious because they "failed to consider important aspects of a problem."  (Dkt. No. 18 at 28).  Specifically, the States allege that the Memoranda: (1) "failed to consider the risks of recidivism among criminal aliens who are not detained;" (2) "ignore the effects non-detention will have on future removal efforts," especially on the costs that delays in deportation often produce

and the rate of abscondment of released aliens; (3) "do not discuss the costs that [the new guidance] will impose on [the] States;" (4) "did not consider more limited policies that would have retained congressionally mandated detention of criminal aliens and those with final orders of removal;" and (5) "do[] not explain Defendants' choice[]"of prioritizing the detention of aliens who have aggravated felonies over others who have committed drug offenses and crimes of moral turpitude or those with final orders of removal.   (*Id.* at 27–29).   The Government disagrees with the States' contentions. Countering the States point-by-point, the Government argues that it "considered the relevant factors and reached a reasonable decision." (Dkt. No. 42 at 42–47).   Reviewing these assertions, the Court finds the States have demonstrated a substantial likelihood of success in establishing that the policy set forth in the Memoranda is arbitrary and capricious as alleged in Count III.

The APA prohibits agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."   5 U.S.C. § 706(2)(A).   With that in mind, federal administrative agencies are required to engage in "reasoned decisionmaking." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374, 118 S.Ct. 818, 826, 139 L.Ed.2d 797 (1998) (internal quotation omitted).   This necessarily means that "[n]ot only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be *logical and rational*." *Id.* (emphasis added).   More specifically, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a '*rational connection between the facts found and the choice made*.'"   *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*

*Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962)) (emphasis added).

When final agency action is challenged as arbitrary and capricious, "[t]he reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989) (internal quotations omitted). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43, 103 S.Ct. at 2867. If a court finds that an administrative agency failed to engage in reasoned decision-making, the reviewing court "shall hold unlawful and set aside" such "agency action, findings, and conclusions" as arbitrary and capricious. 5 U.S.C. § 706(2)(A).

"Because the central focus of the arbitrary and capricious standard is on the rationality of the agency's 'decisionmaking,' rather than its actual decision, '[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'" *United States v. Garner*, 767 F.2d 104, 116–17 (5th Cir. 1985) (quoting *State Farm*, 463 U.S. at 50, 103 S.Ct. at 2870). As such, "the grounds upon which an administrative order must be judged are those upon which the record discloses that its

action was based." [49]  *SEC v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626

(1943).  The administrative record need only "indicate[] the determinative reason for the

final action taken," *Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106

(1973), and courts may "uphold a decision of less than ideal clarity if the agency's path

may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419

U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974).

Finally, the Court is mindful that the arbitrary and capricious standard is "highly

deferential."  *Garner*, 767 F.2d at 116.  Courts must "accord the agency's decision a

presumption of regularity" and "are prohibited from substituting [the courts'] judgment

for that of the agency."  *Id.* (citation omitted).  But "while the arbitrary and capricious

standard of review is highly deferential, it is by no means a rubber stamp."  *Id.*  Based on

---

[49]   In a status conference with the Parties on July 2, 2021, the Court asked whether the Government intended to file the administrative record for review.  The Government declined stating that it was unnecessary at this stage of the litigation.  (July 2, 2021, Status Conference, 10:00–10:15 A.M.).  For their part, the States did not oppose the Government's position, and, instead, told the Court that it could dispose of the pending Motion for Preliminary Injunction without the full administrative record in hand.  *Id.*  In effect, the Parties agreed that the full administrative record is not necessary for the Court to rule on the arbitrary and capricious claim at this time.

"A court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record."  *Dep't of Com.*, ____ U.S. at ____, 139 S.Ct. at 2556 (citing *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)).  As such, the Court will limit its inquiry to the findings, conclusions, and explanations provided in the February 18 Memorandum for its review.  In addition, because the Court is ruling on a motion for preliminary injunction, the Court merely needs to determine "if there is a substantial likelihood that" the States "will prevail on the merits" of their arbitrary and capricious claim.  *Prichard*, 812 F.2d at 993.  It follows, therefore, that the disposition of the arbitrary and capricious claim, at this stage, is not final.  Indeed, for at least one other district court, the lack of an administrative record was not a barrier for that court to rule on an arbitrary and capricious claim at this stage.  *See Nat'l Fed'n of Indep. Bus. v. Perez*, No. 5:16-CV-00066-C, 2016 WL 3766121, at *23 & n.8, 28–29 (N.D. Tex. June 27, 2016).

the following, the Memoranda fail to indicate that the Government engaged in reasoned decision-making, thereby rendering them arbitrary and capricious.

At their core, the Memoranda reprioritize certain classes of aliens for immigration enforcement action.  In the February 18 Memorandum specifically, the Government states that it is establishing enforcement and removal guidelines with respect to immigration enforcement and removal priorities pursuant to the January 20 Memorandum.[50]  *See* (Dkt. No. 19-2 at 5).  As discussed above, if a criminal illegal alien falls under a category deemed to be a priority, no preapproval is required for an enforcement or removal action.  On the other hand, if the criminal illegal alien does not fall under any of the categories, an enforcement or removal action "will require preapproval."  (*Id.* at 7).  The Memorandum states that "ICE operates in an environment of limited resources," and thus, "ICE has always prioritized, and necessarily must prioritize, certain enforcement and removal actions over others."  (*Id.* at 3).  In addition to "resource constraints," "several other factors," according to the Memorandum, "render ICE's mission particularly complex." These factors include "ongoing litigation in various fora; the health and safety of the ICE workforce and those in its custody, particularly during the current COVID-19 pandemic; the responsibility to ensure that eligible noncitizens are able to pursue relief from removal under the immigration laws; and the requirements of, and relationships with, sovereign

---

[50]    To the extent the January 20 Memorandum's 100-day pause on removals and that Memorandum's corresponding administrative record are implicated in this action, the Court adopts its reasoning in *Texas I* and finds that the Government failed to engage in reasoned decision-making.  ____ F. Supp. 3d at ____, 2021 WL 2096669, at *38–42.  Thus, the Court adopts and incorporates by reference its prior decision that the January 20 Memorandum's 100-day pause is arbitrary and capricious.

nations, whose laws and expectations can place additional constraints on ICE's ability to execute final orders of removal." (*Id.*).  Given these considerations, the Memorandum states that the Government "must exercise its well-established prosecutorial discretion and prioritize its limited resources to most effectively achieve that mission." (*Id.* at 4).

As described here, the February 18 Memorandum indeed enumerates quite a few factors that make the Government's "mission particularly complex" in this field.  But the Memorandum itself does not directly state whether these factors were considered while the Government was actually formulating the guidance in question.  Assuming they were considered and were the bases for the new guidance, *see Pitts*, 411 U.S. at 143, 93 S.Ct. at 1244, the February 18 Memorandum (along with its predecessor, the January 20 Memorandum) still does not demonstrate reasoned decision-making.  The February 18 Memorandum does not disclose how or why any of these enumerated factual considerations are connected to the policies the Government ultimately pursued.  In short, both Memoranda fail to establish any rational connection or logical link between any of these factors and the new guidance.  *See State Farm*, 463 U.S. at 43, 103 S.Ct. at 2866.

First, the February 18 Memorandum does not offer even a brief explanation of how "ongoing litigation in various fora" affected the Government's decision-making in promulgating the new guidance.  It is simply a vague and conclusory statement.  Did the Government mean to say that *Texas I* or other pending cases were considered when crafting the new guidance?  If so, how did the disposition of *Texas I* or other cases affect the reprioritization?  Those questions have yet to be answered.

Second, the Government's stated responsibility and desire to ensure that eligible aliens may be afforded relief from removal is commendable but likewise lacks any rational connection with the new guidance.  The new guidance reprioritizes the detention and deportation of criminal illegal aliens.  But the February 18 Memorandum does not explain how or why prioritizing, for instance, the detention or deportation of "border security risks" (aliens who entered the country on or after November 1, 2020) over aliens who have drug offenses or crimes of moral turpitude would ensure that eligible noncitizens will obtain relief in their own removal proceedings.  There does not seem to be any connection between reprioritizing the detention and removal of certain aliens to whether other aliens may be afforded legally authorized relief from deportation.  The February 18 Memorandum does not shed light on this disconnect.

Third, although the Court acknowledges as a general matter that interactions and relationships with other sovereign nations "may place constraints" on the Government's ability to "execute final orders of removal," *see* (Dkt. No. 19-2 at 4), there is no rational link between any of these factual constraints to the reprioritization scheme the Government has chosen to pursue.  For example, do these international relationships make it more inefficient to deport aliens with drug offenses over so-called "national security risks" or "border security risks"?  If so, what are the facts that justify such conclusions?  Those questions are also unanswered.  Like the considerations described above, the Memorandum does not state any facts or findings with respect to why international relations apparently factored in the Government's decision-making.

Lastly, the Government's written concern for the health and safety of ICE workers in the midst of the COVID-19 pandemic is not rationally relevant to the new guidance. Will COVID-19 infections among the ICE workforce be substantially reduced if the Government prioritizes the deportation of one category of criminal illegal aliens over another?  How does reprioritization alleviate those health concerns, if any?  On these points the February 18 Memorandum is, unfortunately, silent.

The Court further notes that, out of all these considerations, the cursory use of the COVID-19 pandemic to justify the new guidance comes across as implausible. Throughout the last year, institutions, including federal and state governments, have used the pandemic to rationalize policies found to be unlawful or unconstitutional.  *See*, *e.g.*, *Chrysafis v. Marks*, ____ U.S. ____, 2021 WL 3560766 (U.S. Aug. 12, 2021) (enjoining the part of New York's COVID Emergency Eviction and Foreclosure Prevention Act that precluded landlords from contesting a tenant's self-certification of financial hardship on the grounds that "no man can be a judge in his own case" (quoting *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955))); *Tandon v. Newsom*, ____ U.S. ____, 141 S.Ct. 1294, 209 L.Ed.2d 355 (2021) (per curiam) (enjoining California officials from enforcing occupancy limits on at-home religious exercise in response to COVID-19 when other policies treated comparable secular activities that did not pose a lesser risk of transmission more favorably); *Roman Cath. Diocese v. Cuomo*, ____ U.S. ____, 141 S.Ct. 63, 208 L.Ed.2d 206 (2020) (per curiam) (enjoining the Governor of New York from enforcing occupancy limits on religious services in response to COVID-19 that would have violated the Free Exercise Clause of the First Amendment); *Capitol Hill Baptist Church v. Bowser*,

496 F. Supp. 3d 284, 289 (D.D.C. 2020) (finding that the District's COVID-19-related prohibition of religious gatherings of more than 100 people, even those with appropriate precautions, substantially burdens the plaintiff's exercise of religion in violation of the Religious Freedom Restoration Act). And now the Government has added immigration to the mix.

The Government used the pandemic to reason that the January 20 Memorandum's 100-day pause on removals—the precursor to the February 18 Memorandum—was borne out of reasoned decision-making. *See Texas I*, ____ F. Supp. 3d at ____, 2021 WL 2096669, at *40. But, as the Court noted in *Texas I*, the U.S. Department of Health and Human Services Centers for Disease Control and Prevention ("CDC"), on October 13, 2020, authorized the CDC Director "to suspend the right to introduce persons into the United States" because of the COVID-19 pandemic. *See Texas I*, ____ F. Supp. 3d at ____, 2021 WL 2096669, at *40 & n.46 (citing CDC, *Order Suspending Introduction of Certain Persons Where a Communicable Disease Exists*, (Mar. 20, 2020), available at https://bit.ly/3736Lue (updated Oct. 2020)). The relevant CDC Order "applies to persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a land or coastal Port of Entry (POE) or Border Patrol station at or near the United States borders with Canada or Mexico, subject to [certain] exceptions." *Id.* Considering the CDC Order, the Government's new guidance is puzzling. The new guidance effectively introduces and keeps more people—specifically, criminal illegal aliens—in the Nation's communities. But, per the CDC Order, the COVID-19 pandemic would likely justify a different course of action. Throughout this time, the Government

has not introduced any further papers or discussed anything in the February 18 Memorandum that show it is following different health guidelines related to COVID-19 that speak to the safety of introducing aliens into the country and its communities. The February 18 Memorandum likewise does not grapple with or otherwise explain how the new guidelines are consistent with these CDC policies. Thus, like in *Texas I*, the Government's consideration of the COVID-19 pandemic not only is implausibly connected to the new guidance, it also "runs counter to the evidence before the agency." *See State Farm*, 463 U.S. at 43, 103 S.Ct. at 2867. In other words, the Government cannot use the pandemic as a blanket reason—devoid of explanation—to justify its choices, especially when these choices run afoul of another agency's published health directives.[51]

"[A]gency action must be based on *non-arbitrary*, *relevant* factors." *Judulang v. Holder*, 565 U.S. 42, 55, 132 S.Ct. 476, 485, 181 L.Ed.2d 449 (2011) (internal quotation omitted) (emphasis added). In this case, the factors apparently considered in the February 18 Memorandum and its predecessor, the January 20 Memorandum, are, after a thorough review, arbitrary and irrelevant to the new guidance. The link between the new guidance and the factors enumerated are so contradictory to the evidence and "implausible" that the States' challenge cannot be said to be differing policy preferences

---

[51]    The Court acknowledges it could be argued that, considering the transmissibility of COVID-19, the Executive Branch has chosen to detain fewer aliens to minimize the spread of the virus in detention facilities where it could not ensure proper safety precautions. But it could also be argued (and the CDC Report the Court describes above strongly suggests) that allowing certain aliens—those who would be detained but for the Memoranda—to be released within communities during the pandemic would exacerbate COVID-19's community spread. Regardless, the Memoranda fail to logically link the Executive Branch's bare COVID-19 justifications to the new guidance such that the Court can conclude the Memoranda were borne of reasoned decision making.

or views. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16, 129 S.Ct. 1800, 1811, 173 L.Ed.2d 738 (2009) (explaining that when an agency's "new policy rests upon factual findings that contradict those which underlay its prior policy[,] or when its prior policy has engendered serious reliance interests that must be taken into account, [i]t would be arbitrary or capricious to ignore such matters," and "[i]n such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy" (internal citation omitted)); *State Farm*, 463 U.S. at 43, 103 S.Ct. at 2867 ("Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies: 'We may not supply a reasoned basis for the agency's action that the agency itself has not given.'" (quoting *Chenery*, 332 U.S. at 196, 67 S.Ct. at 1577)); *Huawei Techs. USA, Inc. v. Fed. Commc'ns Comm'n*, 2 F.4th 421, 452 (5th Cir. 2021) (explaining that, when considering an agency's cost-benefit analysis in the scope of the arbitrary and capricious standard, the Court's "job 'is not to undertake [its] own economic study, but to determine whether the [agency] 'has established in the record a reasonable basis for its decision'" (quoting *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 251 (5th Cir. 1989))); *Sierra Club v. EPA*, 939 F.3d 649, 664 (5th Cir. 2019) ("The agency must 'articulate a satisfactory explanation for its action including a

rational connection between the facts found and the choice made.'" (quoting *State Farm*, 463 U.S. at 43, 103 S.Ct. at 2866)); *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019) (noting the Court must "ensure that the agency examined the relevant data and articulated a satisfactory explanation for its action, and assess whether the agency's decision was based on a consideration of the relevant factors" (quoting *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 723 (5th Cir. 2013) (cleaned up)).  Thus, the Court finds that the Government failed to engage in the reasoned decision-making required by law.

What's more, while the Government argues it actually did consider certain relevant factors in crafting the new guidelines (thus engaging in reasoned decision-making), the Court finds that the Government's briefs actually establish that it *did not* consider those factors.   To begin with, "*[p]ost hoc* rationalizations offered by the Government's counsel are irrelevant."  *Univ. of Texas M.D. Anderson Cancer Ctr. v. Dep't of Health & Hum. Servs.*, 985 F.3d 472, 475 (5th Cir. 2021) (citing *State Farm*, 463 U.S. at 50, 103 S.Ct. [at 2870]).  Therefore, this Court finds it inappropriate to consider each of the Government's arguments in their briefing that were not included in the Memoranda.  Even assuming they were relevant, however, the Government's in-brief explanations are meritless.

First, the Government states that it considered the prospect of recidivism when crafting the new guidance found in the February 18 Memorandum.  (Dkt. No. 42 at 44).  Specifically, the Government alleges that "DHS weighed the threat to public safety from criminal noncitizens reoffending in prioritizing certain noncitizens for removal." (*Id.*).  In support, the Government cites to passages from the February 18 Memorandum that,

according to the Government, (a) "focused on the degree of threat to public safety" the "different criminal noncitizens presented," which, apparently, is akin to considering the risk of recidivism; and (b) allowed immigration officers, in making "individualized determinations" for enforcement and removal, to "consider public interest factors, which include the risk of recidivism."  *See* (*Id.* at 44).  These points miss the mark entirely.

With respect to the first, the Government's decision to "focus[] on the degree of threat to public safety" establishes that the Government either did not consider the risk of recidivism or created a policy contrary to the evidence before it.  In their claim, the States argue that, in choosing which policy to pursue, the Government did not consider the risks of recidivism of *all* criminal aliens.  *See* (Dkt. No. 18 at 44).  Indeed, the Supreme Court has stated that "*deportable* criminal aliens who remained in the United States"— notably *not* a certain subset or category of such aliens—"often committed more crimes before being removed."  *Demore*, 538 U.S. at 518, 123 S.Ct. at 1715 (emphasis added); *see also Zadvydas*, 533 U.S. at 713–714, 121 S.Ct. at 2511 (Kennedy, J., dissenting) (discussing rates of recidivism for released criminal aliens and their threat to public safety, noting the "high recidivism rates for released aliens").  Despite the Supreme Court's recognition of the risks deportable criminal aliens pose, the February 18 Memorandum requires prioritization of criminal aliens who *both* pose a threat to public safety *and* have had a prior aggravated felony conviction or criminal gang affiliation.  *See* (Dkt. No. 19-2 at 5–6).  The States correctly point out that by prioritizing certain aliens, the Memorandum "omit[s] aliens" who are solely "threats to public safety," in other words, potential recidivists.  (Dkt. No. 51 at 14).  Nothing in the February 18 Memorandum explains that

criminal illegal aliens who are only "threats to public safety" are at a much lower risk of recidivism compared to criminal aliens who have had prior felonies or criminal gang convictions.  Put differently, the new guidelines do not establish that the Government considered recidivism since the reprioritization leaves so many other "deprioritized" criminal illegal aliens free to recidivate—to harm the public.   And crucially, the Government has not rebutted or clarified the well-established concept that *all* criminal illegal aliens or "deportable aliens pose high risks of recidivism."  *See Demore*, 538 U.S. at 518, 123 S.Ct. at 1715.  Instead, the February 18 Memorandum, without any support or evidence, implements new guidelines stemming from an idea that it is merely *some* criminal illegal aliens—those with aggravated felonies and criminal gang affiliations— who have a much higher risk of recidivism.  Such a *conclusion* is without any foundation in the record and shows that the Government either failed to consider recidivism as a factor in its decision-making or it explained its decision in a manner which contradicts the evidence before it.  *See State Farm*, 463 U.S. at 43, 103 S.Ct. at 2867.

Moreover, it is irrelevant whether immigration officers have the capability, pursuant to the February 18 Memorandum, to "consider public interest factors" that "could" include the risk of recidivism.  *See* (Dkt. No. 42 at 44).  Arbitrary and capricious review calls for the Court to examine the rationality of agency decision-making and not the actual decision.  *Garner*, 767 F.2d 104 at 116.  Even if the new guidelines give some leeway to immigration officers to consider "public interest factors," this does not establish that the Government considered the risk of recidivism when crafting the new guidelines.  As the Government frankly admits, the Memoranda "do not use the term

'recidivism'" anywhere.  (Dkt. No. 42 at 44).  The February 18 Memorandum is, thus, devoid of any references to recidivism or other statements tending to show that the risk of recidivism that criminal illegal aliens pose was considered when drafting the new policy.

Second, the Government asserts that it has limited resources and must prioritize certain enforcement and removal actions under Section 1226(c).  (*Id.* at 45).  But, as the States point out, this contention "dodges the key issue" of whether the Government actually considered the effects of the new guidelines to costs of delaying deportations and the overall rate of abscondment of criminal illegal aliens.  (Dkt. No. 51 at 15); (Dkt. No. 18 at 27–28).  The costs of the non-detainment of criminal aliens are substantial.  For instance, in the past, "when the vast majority of deportable criminal aliens were not detained during their deportation proceedings, many filed frivolous appeals in order to delay their deportation."  *Demore*, 538 U.S. at 530 n.14, 123 S.Ct. at 1721 n.14.  Even "[c]ourt ordered release" itself "cannot help but encourage dilatory and obstructive tactics by aliens."  *Zadvydas*, 533 U.S. at 713, 121 S.Ct. 2491 (Kennedy, J., dissenting).  "An alien ordered deported also has less incentive to cooperate or to facilitate expeditious removal when he has been released, even on a supervised basis, than does an alien held at an [ICE] detention facility."  *Id.*  And following this line, a Senate Report from 1995 noted that "[d]elays" in deportation "can earn criminal aliens more than work permits and wages — if they delay long enough they may even obtain U.S. citizenship."  S. Rep. No. 104–48, at 2 (1995).  The costs from non-detainment rival the costs of abscondment.  The same Senate Report found that "[o]ver 20 percent of nondetained criminal aliens fail to appear for

deportation proceedings." *Id.*  This Court, as well, found the rate of abscondment to be substantial even for aliens who have been "thoroughly vetted" in order for them to be placed in an "alternative to detention program." *Texas I*, ____ F. Supp. 3d at ____, 2021 WL 2096669, at *19.  Even in light of these effects and costs, the February 18 Memorandum is silent on whether these were considered while crafting the new guidelines.  The Court, therefore, finds that the Government failed to consider this relevant factor.

Third, the Government argues that, with regard to the additional costs the States will incur, "the States are wrong to argue that DHS was required to expressly evaluate the costs to each State," and, regardless, the Government "did consider how the Priority Framework would impact public safety . . . which should reduce the costs from crime to the States." (Dkt. No. 42 at 45–46).  Rephrased, the Government argues that state costs and expenses are not relevant factors, but, nevertheless, the February 18 Memorandum indirectly considered them since it factored in the new guidelines' impact to public safety.  The Government is incorrect on both issues.

State costs and expenses are, indeed, relevant factors.  That was the case in *Texas I*, *see* ____ F. Supp. 3d at ____, 2021 WL 2096669, at *41, and the Government takes issue with the Court's prior holding, *see* (Dkt. No. 42 at 46 & n.16).  Thus, to be clear, a more descriptive analysis of the caselaw is in order.

As stated earlier, an "agency rule would be arbitrary and capricious" if the relevant agency "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43, 103 S.Ct. at 2867.  The Supreme Court has noted that immigration "ha[s] a discernable impact on traditional state concerns," owing to the fact that

"unchecked unlawful migration might impair the State's economy generally, or the State's ability to provide some important service." *Plyler*, 457 U.S. at 228, n.23, 102 S.Ct. at 2400, n.23 (citing *DeCanas v. Bica*, 424 U.S. 351, 354–56, 96 S.Ct. 933, 935–36, 47 L.Ed.2d 43 (1976)).  Indeed, immigration policy is important to the states since they "bear[] many of the consequences of unlawful immigration." *Arizona*, 567 U.S. at 397, 132 S.Ct. at 2500. Obviously, as *Plyler* noted, some of those problematic consequences stem from a newly promulgated immigration policy's effect on the state's economy and its services; in other words, state costs and expenses. *See Texas DAPA*, 809 F.3d at 153 (holding that Texas had standing to challenge the federal government's DAPA policy in part because the policy "would have a major effect on the states' fiscs, causing millions of dollars of losses in Texas alone" and "would enable beneficiaries to apply for driver's licenses, and many would do so, resulting in Texas's injury").  In *Regents*, for instance, the Supreme Court held that the federal government's recission of its DACA policy was arbitrary and capricious in part because the government failed to consider the loss of state and local tax revenue stemming from the policy's rescission. ____ U.S. at ____, 140 S.Ct. at 1914.  Along with a few other concerns, the Supreme Court characterized the loss of local and state tax revenue as "noteworthy," but "not necessarily dispositive." *Id.*  Nevertheless, the Supreme Court found that the federal government needed to *consider* that factor—along with many others—and weigh them all together to ultimately decide whether to retain DACA or not. *Id.*  As in this case, "[m]aking that difficult decision was the agency's job, but the agency failed to do it." *Id.*

Further, the Supreme Court has indicated that, in the context of immigration policy, an agency's approach to decision-making "must be tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system." *Judulang*, 565 U.S. at 55, 132 S.Ct. at 485.   One broad purpose of immigration law and policy is to minimize the costs and expenses related to the presence of illegal aliens in the country.   *See Demore*, 538 U.S. at 530 n.14, 123 S.Ct. at 1721 n.14 (noting that "prior to the enactment of 8 U.S.C. § 1226(c)," a vast majority of deportable criminal aliens were free during their deportation proceedings and many filed frivolous appeals to delay deportation); *Hernandez-Avalos v. INS*, 50 F.3d 842, 847 (10th Cir. 1995) (noting 8 U.S.C. § 1252(i) (1986) was enacted "to ease financial burdens on federal, state and local prisons resulting from lengthy detention of aliens awaiting deportation"); *Giddings v. Chandler*, 979 F.2d 1104, 1109 (5th Cir. 1992) (noting that the main purpose of Section 1252(i) was to "reduc[e] prison overcrowding and cost to the government"); *Prieto v. Gluch*, 913 F.2d 1159, 1165 (6th Cir. 1990) (explaining that Section 1252(i) was enacted because there was a concern in Congress with prison overcrowding in "local and State jails").   While the Government is correct that immigration policy "affect[s] trade, investment, tourism, and diplomatic relations," among other things, *see* (Dkt. No. 42 at 46, n.16) and *Arizona*, 567 U.S. 387 at 395, 132 S.Ct. at 2498, that list of considerations is not exhaustive.   Therefore, the Court finds the Government's argument that it need not consider the States' costs and expenses stemming from the new guidelines to be without merit.

Likewise, the Court finds that the Memoranda did not consider the States' costs and expenses even though, according to the Government, DHS considered the new

guidelines' impact to public safety.  In fact, the Memoranda did not consider or failed to substantially consider the new guidelines' effects on public safety.  Indeed, both Memoranda are devoid of explanation as to how or why prioritizing the detention or deportation of some criminal illegal aliens, while effectively delaying the detention or deportation of and releasing so many other criminal illegal aliens, positively impact public safety.  Moreover, the Memoranda provide no indication that any relevant data or facts were considered in ultimately concluding that the public will be safer by releasing more criminal illegal aliens into communities from detention while fewer are detained or deported.  *See State Farm*, 463 U.S. at 43, 103 S.Ct. at 2866 (explaining that an agency "must examine the relevant data" in order to explain its policy choices).

Additionally, even if the Government did consider public safety, the Memoranda—and the February 18 Memorandum most crucially—do not state or explain how that consideration connects with concerns regarding state costs and expenses.  The Government in its brief argues that, by focusing its "limited resources" on enforcement actions against "the most significant threats to public safety," the Memoranda "should reduce the costs from crime to the States."  (Dkt. No. 42 at 46).  Leaving aside that the new guidelines practically provide for the non-detention of many criminal illegal aliens who are not within the ambit of any of the prioritized categories, the Government's assertion still fails.  "[T]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."  *Chenery*, 318 U.S. at 87, 63 S.Ct. at 459.  And the Memoranda bear no thought or indication as to whether the new prioritization scheme minimizes and limits state costs due to crime.

Next, the Government argues that, contrary to the States' allegations, DHS "need not 'consider all policy alternatives in reaching [its] decision.'"  (Dkt. No. 42 at 46) (citing *State Farm*, 463 U.S. at 51, 103 S.Ct. at 2870).  Instead, the Government states that "it need only 'consider the alternative[s] that are within the ambit of the existing [policy].'"  (*Id.*) (quoting *Regents*, _____ U.S. at _____, 140 S.Ct. at 1913).  In this case, per the Government, "the States fail to identify a single policy alternative" that would be "within the ambit of existing policy," or would otherwise be "obvious," "significant and viable."  (*Id.*) (citing *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013)).  The Court disagrees with the Government's contentions.

The States do propose that, instead of the prioritization scheme found in the February 18 Memorandum, the Government should have considered policies "that would have retained congressionally mandated detention of criminal aliens and aliens with final orders of removal."  (Dkt. No. 18 at 28).  The foregoing is simply asking that the Government follow the law.[52]  Of course, such policies are "within the ambit of existing policy."  After all, the February 18 Memorandum states that its reprioritization scheme "covers enforcement actions, custody decisions, the execution of final orders of removal, financial expenditures, and strategic planning," (Dkt. No. 19-2 at 2), and congressional statutes mandating the detention of aliens go to the explicit focus of the

---

[52]   Not only that, the States' proposed limited policies are "obvious," "significant," and "viable" to this Court.  *See Jones*, 716 F.3d at 215.  It is incredibly obvious that a "reprioritization policy" that still effectuates and follows the law on detention and removals is more limited than the new guidelines.  And surely, following laws should be significantly viable for the Executive Branch given it is *required* by the Constitution to enforce such laws.  U.S. Const. art. II, §§ 1, 3.

Memorandum. *See State Farm*, 463 U.S. at 51, 103 S.Ct. at 2871. But despite all this, the February 18 Memorandum never considered the limited policies the States proposed. It failed to discuss how a policy enabling the Government to detain all criminal illegal aliens subject to congressional mandates compares with the opted-for guidelines. It did not even state whether the new guidelines even considered *any* other policy. In short, the Government did not grapple with or provide any alternatives when it was required to do so. *See Regents*, ____ U.S. at ____, 140 S.Ct. at 1913 ("*State Farm* teaches that when an agency rescinds a prior policy its reasoned analysis *must* consider the 'alternative[s]' that are 'within the ambit of the existing [policy].'" (citing *State Farm*, 463 U.S. at 51, 103 S.Ct. 2856) (emphasis added)). "That omission alone" makes the new guidelines arbitrary and capricious. *Regents*, ____ U.S. at ____, 140 S.Ct. at 1913.

Lastly, the States argue that the February 18 Memorandum failed to rationally explain why criminal illegal aliens who have committed aggravated felonies or who are affiliated with criminal gangs are prioritized over other criminal illegal aliens and aliens with final orders of removal. (Dkt. No. 18 at 29). The Government responds that the Memorandum "provides a clear, rational justification for prioritizing" such aliens. (Dkt. No. 42 at 43–44). As the Government writes, "the former category presumptively presents a more significant threat to public safety." (*Id.*). In mandating the detention of criminal aliens convicted of serious drug offenses, crimes of moral turpitude, and some other specified offenses, *see* 8 U.S.C. § 1226(c), as well as aliens with final orders of removal during the removal period, *see* 8 U.S.C. § 1231(a)(2), Congress did not differentiate among certain "types" or "categories" of deportable and detainable persons.

These laws plainly mandate the detention of *all* the deportable criminal aliens subject to the relevant statutes.   The new guidelines directly go against these congressional mandates, opting instead to prioritize certain criminal illegal aliens' detention and deportation over others because of an assertion that such aliens "presumptively present[] a more significant threat to public safety" than "one million noncitizens with final orders of removal," (Dkt. No. 42 at 44), and—necessarily—other criminal aliens with convictions for drug offenses or crimes of moral turpitude.   But the February 18 Memorandum does not ground this otherwise unsupported assertion.   It does not even explain or state how it considered, compared, and ultimately concluded that criminal illegal aliens of a certain category must be prioritized over others.   Despite Sections 1226(c) and 1231(a)(2), nowhere in the February 18 Memorandum do the new guidelines even contemplate the prioritization of these "other" criminal illegal aliens.   As the States correctly surmise, "[t]he very reason the February 18 Memorandum provides for prioritizing aggravated felonies also supports prioritizing drug offenses, crimes of moral turpitude, and final orders of removal."   (Dkt. No. 18 at 29).   Without more explanation grounded on relevant data and facts, it is unknown why the priorities were implemented in that way.   The new guidance, therefore, indeed appears to be the product of arbitrary and capricious decision-making.

In sum, the Government's failure to rationally explain and connect the basis for the new guidance, along with the Government's failure to consider certain relevant factors and alternative policies, establish that there is a substantial likelihood that the reprioritization is an arbitrary and capricious policy.   As the above discussion shows, the

Government certainly did not engage in reasoned decision-making as required by the APA.  The Court therefore finds that the States have established a substantial likelihood of success on this claim.

c.    <u>Count IV: Notice and Comment Rulemaking</u>

The States' next claim is similar to one Texas raised in *Texas I*.  *See Texas I*, ____ F. Supp. 3d at ____, 2021 WL 2096669, at *42–47.  In *Texas I*, this Court enjoined Section C of the January 20 Memorandum, in part, because Section C did not undergo notice and comment as required by the APA.  *See id.*  In this case, the States ask this Court to enjoin Section B of the January 20 Memorandum and the February 18 Memorandum for the same reason.  The States argue that "[t]he January 20 and February 18 Memoranda are subject to notice and comment rulemaking because they are substantive or legislative rules." (Dkt. No. 18 at 30).  The Government disagrees, raising nearly identical arguments to those it raised in *Texas I.  See* (Dkt. No. 42 at 47).  Namely, the Government contends that the Memoranda are exempt from the APA's notice and comment requirement as "general statement[s] of policy" or, alternatively, as "procedural rules."  (*Id.*).  For the following reasons, the Court disagrees with the Government's characterizations of the Memoranda and finds that the States have a substantial likelihood of success on the merits of their procedural APA claim.

<u>Rulemaking under 5 U.S.C. § 553</u>

As in *Texas I*, no Party disputes that the Memoranda are rules of some kind and, therefore, that the rulemaking provisions of the APA apply.[53]  *See* (Dkt. No. 18); (Dkt. No. 42); *see also* ___ F. Supp. 3d at ____, 2021 WL 2096669, at *42.  Nor does any Party contend that the Memoranda underwent any notice and comment.  (*Id.*).  The question, then, is whether the Memoranda are the type of rules that *should* have undergone notice and comment but did not.

The Court begins with an overview of the APA's notice and comment requirement and the exceptions thereto.  The APA requires rules to undergo notice and comment unless they are exempt.  *See* 5 U.S.C. § 553.[54]  Section 553 sets forth two such categories of exemptions to the notice and comment requirement, one of which is relevant to this case. *Id.* § 553(b).  That category exempts "interpretative rules, *general statements of policy*, or *rules of* agency organization, *procedure*, or practice" from notice and comment.  *Id.* § 553(b)(A) (emphases added).  Thus, if an agency proposes a rule that is either a general

---

[53]   "'[R]ule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency[.]"  5 U.S.C. § 551(4).

[54]   Specifically, the APA requires that "[g]eneral notice of proposed rule making *shall* be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law."  *Id.* § 553(b) (emphasis added).  And that notice *shall* contain "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved."  *Id.*  The APA also requires an agency to "give interested persons an opportunity to participate in the rule making," *id.* § 553(c), and that the "publication or service of a substantive rule shall be made not less than 30 days."  *Id.* § 553(d).

statement of policy or a procedural rule, the agency is not required to conduct notice and comment on the proposed rule.  *See id.*

The Fifth Circuit has made clear that exemptions to the notice and comment requirement "must be narrowly construed."  *Texas DAPA,* 809 F.3d at 171.  A narrow reading of the exemptions safeguards the vital interests notice and comment is intended to protect.  *See Dep't of Lab. v. Kast Metals Corp.*, 744 F.2d 1145, 1153 n.17 (5th Cir. 1984) ("Section 553 was enacted to give the public an opportunity to participate in the rule-making process.  It also enables the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those who are regulated." (quotations omitted)).  Indeed, notice and comment ensures that those affected by a proposed rule have a voice in the rule-making process and assist the agency in crafting rules that better account for the costs and benefits of agency action.  *See id.* at 1153.  *But see id.* ("Inevitably, in determining whether the APA requires notice and comment rulemaking, the interests of agency efficiency and public input are in tension.").

In harmony with the Fifth Circuit's warning to narrowly construe exemptions to APA's procedural strictures, the Supreme Court has recognized that states like Louisiana and Texas offer important perspectives on illegal immigration issues.  *See Arizona*, 567 U.S. at 397, 132 S.Ct. at 2500 ("The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States."); *see also Texas DAPA*, 809 F.3d at 163. States can assist an agency in crafting rules addressing important immigration issues. Mindful of the importance of notice and comment in this context, the Court now considers whether the reprioritization scheme contained within the Memoranda is

exempt from the notice and comment requirement as either a general statement of policy or as a procedural rule.

## General Statement of Policy

The Court first considers whether the Memoranda are general statements of policy. If so, notice and comment is not required. *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995); *see also* 5 U.S.C. § 553(b)(A). "In analyzing whether an agency pronouncement is a statement of policy or a substantive rule, the starting point is the agency's characterization of the rule." *Shalala,* at 596. As in *Texas I*, the Court would likely be convinced that the Memoranda are general statements of policy if it could rely on the Government's characterization of the Memoranda alone. *See Texas I*, ____ F. Supp. 3d at ____, 2021 WL 2096669, at *43. Both the Government in its brief and the Memoranda themselves declare that the Memoranda are mere statements of policy. (Dkt. No. 42 at 47–49); (Dkt. No. 19-1); (Dkt. No. 19-2). Indeed, the January 20 Memorandum explicitly declares that it "should be considered Department-wide *guidance*[.]" (Dkt. No. 19-1 at 2) (emphasis added). The January 20 Memorandum also states that the "guidelines and priorities" contained therein "are not intended to, do not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party[.]" (*Id.* at 5).

The February 18 Memorandum contains similar language. It begins by declaring that it "establishes interim *guidance*[.]" (Dkt. No. 19-2 at 2) (emphasis added). The February 18 Memorandum goes on to say that "[t]hese guidelines and priorities are not intended to, do not, and may not be relied upon to create any right or benefit, substantive

or procedural, enforceable at law by any party in any administrative, civil, or criminal

matter." (*Id.* at 8).

But an agency's characterization of its rule is just that—its *own* characterization.

Indeed, "[a]gencies have never been able to avoid notice and comment simply by

mislabeling their substantive pronouncements.  On the contrary, courts have long looked

to the *contents* of the agency's action, not the agency's self-serving *label*, when deciding

whether statutory notice-and-comment demands apply." *Azar v. Allina Health Servs.*,

____ U.S. ____, ____, 139 S.Ct. 1804, 1812, 204 L.Ed.2d 139 (2019) (emphasis in original).

The Fifth Circuit, too, cautions courts to be "mindful but suspicious of the agency's own

characterization." *Texas DAPA*, 809 F.3d at 171 (quotation omitted).  The Fifth Circuit

therefore demands more of a district court than simply taking an agency at its word when

determining whether the challenged rule is a general statement of policy or a substantive

rule requiring notice and comment.  *See Shalala*, 56 F.3d at 596 ("The label that the

particular agency puts upon its given exercise of administrative power is not, for [this

court's] purposes, conclusive; rather, it is what the agency does in fact.").

Specifically, the Fifth Circuit instructs district courts to also "evaluate two criteria

to distinguish policy statements from substantive rules: whether the rule (1) impose[s]

any rights and obligations and (2) genuinely leaves the agency and its decision-makers

free to exercise discretion." *Texas DAPA*, 809 F.3d at 171 (quotation omitted).[55]  The Fifth

---

[55]    The Fifth Circuit and the D.C. Circuit have emphasized that "unless a pronouncement
acts prospectively, it is a binding norm.  Thus . . . a statement of policy may not have a present
effect[.]" *Shalala*, 56 F.3d at 595; *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1046 (D.C. Cir. 1987).
(continue)

Circuit has acknowledged that "[t]here is some overlap in the analysis of those prongs because if a statement denies the decisionmaker discretion in the area of its coverage . . . then the statement is binding and creates rights or obligations." *Id.* (cleaned up). Moreover, these "criteria" are merely intended to guide a court in "fathom[ing] the interpretative/legislative distinction." *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987). In other words, "[t]hese factors are not treated like different elements of a cause of action, both of which must be proved; but instead a matter of judgment is involved in distinguishing between rules however discretionary in form, that effectively circumscribe administrative choice." *Texas*, 328 F. Supp. at 730 (citing *Am. Bus Ass'n v. United States*, 627 F.2d 525, 530 (D.C. Cir. 1980)).[56] The Court now weighs these criteria to determine whether the Memoranda are general statements of policy or substantive rules requiring notice and comment.

The Court first considers whether the Memoranda impose any rights or obligations. *See Texas DAPA*, 809 F.3d at 171. In doing so, the Court is mindful that "a substantive rule—or a legislative-type rule, is one that affects individual rights and

---

Here, the February 18 Memorandum states that "[t]his interim guidance is effective *immediately*." (Dkt. No. 19-2 at 2) (emphasis added).

The Fifth Circuit cautions, however, that the "binding effect, *not the timing*, . . . is the essence of criterion one." *Shalala*, 56 F.3d at 595 (emphasis added). Thus, the "[m]ere pronouncements of what the agency intends, whether for the present or for the future, which do not have a binding effect, are properly classified as interpretative rules." *Cmty. Nutrition Inst.*, 818 F.2d at 946 n.4. This caveat is of no consequence here because the Court finds that the Memoranda have a binding effect due to their effect on the rights and obligations described.

[56]   In describing the criteria for determining whether a rule is a general statement of policy or a substantive rule requiring notice and comment, the Fifth Circuit has relied on the D.C. Circuit. *See Shalala*, 56 F.3d at 595 nn.15–16 (citing *Cmty. Nutrition Inst.*, 818 F.2d at 943, and *Am. Bus Ass'n*, 627 F.2d at 529).

obligations." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302, 99 S.Ct. 1705, 1718, 60 L.Ed.2d 208 (1979) (citation and quotation omitted) (cleaned up). "This characteristic is an important touchstone for distinguishing those rules that may be 'binding' or have the 'force of law.'" *Id.* (citation omitted).

At the outset, it is worth noting that the Court has extensively described how the Memoranda affect rights and obligations in its analysis on whether the Memoranda constitute final agency action. *See supra* II.B.2. As a review, the Memoranda affect rights and obligations in at least three ways. First, the February 18 Memorandum commands that DHS abdicate its obligations under Sections 1226(c) and 1231(a)(2) to detain *all* aliens within the ambit of those provisions and that the detention occur *at* or *for* a specified time. *Compare* §§ 1226(c) and 1231(a)(2) *with* (Dkt. No. 19-2 at 4–7).

Second, the Memoranda also create financial obligations for Texas that would not have existed but for the Memoranda. Based on the record, Texas will be required *by law* to bear some of the cost of providing Emergency Medicaid to eligible aliens who fall within the ambit of Sections 1226(c) or 1231(a)(2). *See supra* II.B.2.b. The legal obligation to provide these aliens with these services would not exist if deprioritized aliens were taken into federal custody at the time of their release from state custody as mandated by Section 1226(c), or if they were detained during the removal period, as required by Section 1231(a)(2).

Finally, as described above, the Memoranda affect the rights of some aliens already in detention. *See supra* II.B.2.b. As another court has already found, the Memoranda make a nonpriority alien's removal "unlikely to be imminent." *See Hussein S.M.*, 2021

133

WL 1986125, at *3.  This status, in turn, entitles certain aliens to release from detention.  *See id.*; *see also Zadvydas*, 533 U.S. at 701, 121 S.Ct. at 2505.  That is an effect on rights.

For these reasons, the Court finds that the Memoranda affect the rights and obligations of those within the Memoranda's regulatory sphere—DHS, the states, and certain aliens.  This consideration weighs against finding that the Memoranda are general statements of policy.

Next, the Court considers whether the Memoranda give the agency and its decisionmakers sufficient discretion to be considered a general statement of policy.  They do not.

"General statements of policy" are those "statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."  *Lincoln*, 508 U.S. at 197, 113 S.Ct. at 2034 (quotations omitted).  The Fifth Circuit has described the inquiry for determining whether a rule gives an agency and its decisionmakers sufficient discretion to be classified as a general statement of policy:

> The key inquiry . . . is the extent to which the challenged policy leaves the agency free to exercise its discretion to follow or not to follow that general policy in an individual case, or on the other hand, whether the policy so fills out the statutory scheme that upon application one need only determine whether a given case is within the rule's criteria. As long as the agency remains free to consider the individual facts in the various cases that arise, then the agency action in question has not established a binding norm.

*Shalala*, 56 F.3d at 596–97 (citing *Ryder Truck Lines, Inc. v. United States*, 716 F.2d 1369, 1377 (11th Cir. 1983), *cert. denied*, 466 U.S. 927, 104 S.Ct. 1707, 80 L.Ed.2d 181 (1984)).  Applying

this inquiry to the Memoranda, the Court is of the opinion that the amount of discretion they afford is insufficient for them to be classified as general statements of policy.

The core feature of the Memoranda is their prioritization of immigration enforcement actions for some classes of aliens to the exclusion of others. The Memoranda state explicitly that "[e]nforcement and removal actions [against aliens who fall within] the [priority groups] described . . . are *presumed* to be a justified allocation of ICE's limited resources." *See, e.g.*, (Dkt. No. 19-2 at 4–6) (alterations added) (emphasis added). And although the February 18 Memorandum purports to say that actions against nonprioritized aliens "may also be justified" and that "the interim priorities do not require or prohibit the arrest, detention, or removal of any noncitizen," an agent's discretion in this regard appears so constrained as to be illusory. (*Id.* at 4). Specifically, the February 18 Memorandum stipulates that "[a]ny civil immigration enforcement or removal actions that do not meet the above criteria for presumed priority cases *will require* preapproval from the [Field Office Director (FOD)] or [Special Agent in Charge (SAC)]." (*Id.* at 7) (emphasis added). The preapproval constraint *greatly* constricts the normal discretion ICE agents enjoy while exercising their statutory and regulatory duties on behalf of the agency. *See* (Dkt. No. 19-4 at ¶ 29) ("This policy requires field agents to obtain special permission before engaging in routine enforcement."); *cf.* 8 U.S.C. § 1357; 8 C.F.R. § 287.5. Put differently, agents now need the approval of a FOD or SAC to conduct otherwise routine enforcement operations. (Dkt. No. 19-2 at 7); (Dkt. No. 19-4 at ¶ 29).

Moreover, the Memorandum details a mandatory process for receiving such preapproval.  Indeed, "[i]n deciding to undertake an enforcement action or removal, the agent or officer *must* consider, in consultation with his or her leadership, the nature and recency of the noncitizen's convictions, the type and length of sentences imposed, whether the enforcement action is otherwise an appropriate use of ICE's limited resources, and other relevant factors."  (Dkt. No. 19-2 at 7) (emphasis added).  "In requesting . . . preapproval, the officer or agent *must* raise a written justification *through the chain of command*, explaining why the action otherwise constitutes a justified allocation of limited resources, and identify the date, time, and location the enforcement action or removal is expected to take place."  (*Id.*) (emphases added).  In other words, an agent or officer seeking to detain an alien or conduct other enforcement actions is required to consider certain factors in determining whether to conduct the proposed enforcement action, put this justification in writing, work this written justification through a chain of command and, most importantly, wait for approval to conduct what would otherwise be a routine enforcement action.  *See* (*Id.*); (Dkt. No. 19-4 at ¶ 29).

If this cumbersome preapproval requirement and process were not enough in general to limit the agents' usual discretion, the February 18 Memorandum goes even further by expressly describing two specific scenarios in which an agent's decision-making power is greatly reduced.  First, the February 18 Memorandum states that "[t]he approval to carry out an enforcement action against a particular noncitizen will not authorize enforcement actions against other [nonprioritized] noncitizens encountered

during an operation."[57]  (Dkt. No. 19-2 at 7).  Simply put, the February 18 Memorandum flatly denies agents the ability to exercise discretion over non-preapproved, nonprioritized aliens "during an operation."  Second, the February 18 Memorandum limits agency discretion in detaining and conducting other enforcement actions against nonpriority aliens where exigent circumstances exist.  *See* (Dkt. No. 19-2 at 7).  To be sure, the Memorandum allows for detention of, and other enforcement actions against, nonpriority aliens without preapproval when obtaining such preapproval would be "impracticable."  (*Id*.).  And while the Memorandum acknowledges that "it is impossible to preconceive all such circumstances" in which obtaining preapproval may be impracticable, it nevertheless states that circumstances where obtaining preapproval is impracticable "generally will be *limited* to situations where a noncitizen poses an imminent threat to life or an imminent substantial threat to property."  (*Id*.) (emphasis added).  Yet, even in these circumstances, the February 18 Memorandum requires approval, albeit after the enforcement action is conducted.  (*Id*.).  Specifically, the agent is *required*, within 24 hours of the enforcement action having been conducted, to "explain the exigency, where and when the enforcement activity took place, and whether the

---

[57]  Specifically, the February 18 Memorandum states: "The approval to carry out an enforcement action against a particular noncitizen will not authorize enforcement actions against other noncitizens encountered during an operation if those noncitizens fall outside the presumption criteria identified above."  (Dkt. No. 19-2 at 7).  In such circumstances, "[a]n approval to take an enforcement action against any other noncitizen encountered who is not a presumed priority must be separately secured as described above."  (*Id*.).

noncitizen is currently detained." (*Id.* at 7 n.7).[58]  Once again, in a situation in which the

agent's discretion is likely at its zenith—where exigent circumstances exist—the February

18 Memorandum severely restricts the agent's ability to exercise it.

In light of these policies, it is perhaps no surprise that the States provide evidence

suggesting that ICE agents and officers will treat the Memorandum as a list of

instructions rather than mere guidance.  *See* (Dkt. No. 19-4 at ¶ 36).  Specifically, a former

Acting Director of ICE with more than 32 years of service in the agency testified that, "[a]s

a practical matter, ICE officers are likely to treat the 'priorities' as categorical rules rather

than presumptions to be rebutted on a case-by-case basis." (*Id.* at ¶ 29).  Also

unsurprisingly, there is evidence in the record tending to show that these "categorical

rules" in the February 18 Memorandum are already hampering enforcement actions and

will continue to deter agents and officers from exercising their discretion in determining

whether to conduct enforcement actions in the future.  *See* (Dkt. No. 19-3 at 3–8); (Dkt.

No. 46 at ¶ 17); *cf. Texas DAPA*, 809 F.3d at 173 (assessing how DAPA has been applied

in practice in determining whether it conferred sufficient discretion to be considered a

general policy statement).

In addition to limiting the discretion of individual ICE agents and officers, the

Memoranda also restrict the discretion of entire ICE field offices.  *See* (Dkt. No. 19-2 at 6);

(Dkt. No. 42-2 at 6).  Specifically, the February 18 Memorandum states that "ICE will

---

[58]    And "when the location of a proposed or completed enforcement action is a courthouse, . . . or a sensitive location, . . . that should be explicitly highlighted in the request." (*Id.* at 7 n.7) (citations omitted).

require field offices to coordinate their operations and obtain preapproval for enforcement and removal actions that do not meet the above criteria for presumed priority cases." (*Id.*). In other words, the Memoranda not only require individual agents and officers to receive preapproval before conducting enforcement actions against aliens falling outside the three priority groups; they also appear to bind *the field offices themselves* to the preapproval process delineated in the February 18 Memorandum.

For these reasons, the Court finds that the amount of discretion that the February 18 Memorandum confers to the agency and its decisionmakers in conducting routine enforcement actions weighs against classifying the Memorandum as a general statement of policy. Weighing this factor along with the rights and obligations affected, the Court concludes that the Memoranda do not constitute a general statement of policy.

Procedural Rule

Even if the February 18 Memorandum is not a general statement of policy, it may nevertheless be exempt from notice and comment if it is a rule "of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A); *see also Texas DAPA*, 809 F.3d at 176. The Government does not assert that the February 18 Memorandum is a rule of DHS organization or practice; rather, the Government contends that it is one of agency procedure. (Dkt. No. 42 at 47–50). The Fifth Circuit employs two tests to determine whether a rule is one of agency procedure. *See Texas DAPA*, 809 F.3d at 176–77; *see also Texas*, 328 F. Supp. 3d at 728. Here, both tests yield the same conclusion: the Memoranda do not constitute a procedural rule that is exempt from the APA's notice and comment requirement.

The first test used by the Fifth Circuit to determine whether a rule is procedural is the "substantial impact test." *See Texas DAPA*, 809 F.3d at 176. This test "is the primary means by which [the court] look[s] beyond the label 'procedural' to determine whether a rule is of the type Congress thought appropriate for public participation." *Id.* (citing *Kast Metals*, 744 F.2d at 1153). "An agency rule that modifies substantive rights and interests can only be nominally procedural, and the exemption for such rules of agency procedure cannot apply." *Texas DAPA*, 809 F.3d at 176 (quoting *Kast Metals Corp.*, 744 F.2d at 1153).

In making this determination, the question is not "whether the rule is 'substantive' or 'procedural,' but rather whether the rule will have a 'substantial impact' on those regulated." *Phillips Petroleum Co. v. Johnson*, 22 F.3d 616, 620 (5th Cir.), *modified on reh'g*, 36 F.3d 89 (5th Cir. 1994), for text, *see* No. 93-1377, 1994 WL 484506 (5th Cir. Sept. 7, 1994). This distinction makes good sense, as "the notice and comment provisions 'were designed to assure fairness and mature consideration of rules of general application,'" *Phillips Petroleum Co.*, 22 F.3d at 620 (quoting *NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 764, 89 S.Ct. 1426, 1429, 22 L.Ed.2d 709 (1969)), and to "afford an opportunity for 'the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those regulated.'" *Phillips Petroleum Co.*, 22 F.3d at 620 (quoting *Texaco, Inc. v. Federal Power Comm'n*, 412 F.2d 740, 744 (3d Cir. 1969)).

In determining whether the rule will have a "substantial impact" on those regulated, the Court may consider whether the rule creates legal or financial obligations for the plaintiff and whether the rule restricts the discretion of agency officials. *See Texas DAPA*, 809 F.3d at 176 (concluding DAPA "undoubtedly [satisfies the substantial impact]

test—conferring lawful presence on 500,000 illegal aliens residing in Texas forces the state to choose between spending millions of dollars to subsidize driver's licenses and amending its statutes"); *Phillips Petroleum Co.*, 22 F.3d at 620 (concluding the rule at issue was not procedural because, in part, "[t]he rule narrowly restrict[ed] the discretion of MMS officials in determining the value of NGLP's" and "[i]t foreclose[d] other valuation methods by prescribing binding valuation criteria"); *see also Texas*, 328 F. Supp. 3d at 728 (concluding DACA is not a procedural rule, having found it "undoubtedly satisfies [the substantial impact] test because it has forced the states to spend money on various social services costs, which are clearly modif[ications] of substantive rights" (quotation omitted)).  If the rule has a substantial impact on "the regulated industry, or an important class of the members or the products of that industry," then "notice and opportunity for comment should first be provided" because "[t]he exemption of § 553(b)(A) from the duty to provide notice by publication does not extend to those procedural rules that depart from existing practice and have a substantial impact on those regulated." *Phillips Petroleum Co.*, 22 F.3d at 620.

Considering these criteria, the Memoranda satisfy the substantial impact test. First, as discussed above, the Memoranda affect at least one of Texas's legal obligations. *See supra* II.B.2.b.  Specifically, they affect Texas's legal and financial obligations to partially fund Emergency Medicaid to aliens who fall within the ambit of Sections 1226(c) or 1231(a)(2) but, pursuant to the Memoranda, are not detained by ICE when they are released from state custody or during the removal period.  The Memoranda also have a substantial impact because, as just described, they limit the discretion exercised by ICE

field offices, agents, and officers. In sum, the February 18 Memorandum mandates a process for ICE field offices and agents to follow for obtaining preapproval to detain aliens the Memoranda deem to be nonpriorities. This mandatory policy restricts DHS from exercising discretion and conducting routine enforcement actions against aliens the Memoranda classify as nonpriorities. This curtailment of agency discretion in conducting routine civil immigration enforcement actions is yet another substantial impact the Memoranda have on those they regulate.

Finally, the Memoranda have a substantial impact on certain aliens already in detention. As discussed above, *see supra* II.B.2.b, and as another district court's ruling demonstrates, the Memoranda make certain nonpriority aliens' removal "unlikely to be imminent," thus entitling some of those aliens to be released from detention. *Hussein S.M.*, 2021 WL 1986125, at *3; *Zadvydas*, 533 U.S. at 701, 121 S.Ct. at 2505. Considering the many ways the Memoranda affect rights and obligations, it is clear that the Memoranda have a substantial impact and, therefore, the substantial impact test weighs against classifying the Memoranda as procedural rules.

The second test for determining whether a rule is procedural asks the Court to weigh two considerations. First, the Court must consider the "effect on those interests ultimately at stake in the agency proceeding." *Texas DAPA*, 809 F.3d at 176 (citing *Nat'l Sec. Couns. v. CIA*, 931 F. Supp. 2d 77, 107 (D.D.C. 2013)) (quotation omitted). "Hence, agency rules that impose 'derivative,' 'incidental,' or 'mechanical' burdens upon regulated individuals are considered procedural, rather than substantive." *Texas DAPA*, 809 F.3d at 176 (citing *Nat'l Sec. Couns.*, 931 F. Supp. 2d at 107). This consideration clearly

weighs against characterizing the Memoranda as procedural rules, given that the Court has already found that the Memoranda affect the rights and obligations of Texas, DHS, and certain aliens. *See supra* II.B.2.b.

Second, the Court must assess whether the Memoranda affect the substantive standards by which DHS determines whether to detain certain aliens. *See Texas DAPA*, 809 F.3d at 176–77 ("[R]ules are generally considered procedural so long as they do not 'change the substantive standards by which the [agency] evaluates' applications which seek a benefit that the agency has the power to provide." (quotation omitted)). Here, the Memoranda alter the substantive standards by which DHS determines whether and when to detain certain aliens by departing from the plain statutory requirements in Sections 1226(c) and 1231(a)(2) and effectively replacing them with new standards for making such determinations. As discussed above, Section 1226(c) requires DHS to detain aliens falling within the ambit of that provision when they are released from state custody. *See supra* II.B.3.a. Section 1231(a)(2) requires DHS to detain an alien with a final order of removal during the removal period. *See supra* II.B.3.a. The Memoranda, however, require DHS to do something different, setting forth a prioritization scheme that declares some aliens falling within the ambit of Section 1226(c) and 1231(a)(2) as enforcement "priorities" and others also falling within those same statutory categories as "nonpriorities." *See* (Dkt. No. 19-2 at 4–7). And to detain nonpriorities, the February 18 Memorandum *requires* ICE agents to obtain preapproval. *See* (*Id.* at 7). No such prioritization scheme or preapproval process exists in Sections 1226(c) and 1231(a)(2). Rather, these provisions plainly require DHS to detain *all* aliens who meet the

enumerated statutory criteria and that DHS detain them at or during the time stated in the provisions. *See* 8 U.S.C. §§ 1226(c), 1231(a)(2). Thus, the Memoranda change the "substantive standards by which [DHS] evaluates" whether or not to detain an alien who falls within the ambit of Section 1226(c) and 1231(a)(2). *See Texas DAPA*, 809 F.3d at 177 ("DAPA establishes the substantive standards by which the agency evaluates applications which seek a benefit that the agency purportedly has the power to provide — a critical fact requiring notice and comment." (cleaned up)). Therefore, this test also weighs against classifying the Memoranda as procedural rules.

<u>Texas Has Met Its Burden on Its Procedural APA Claim</u>

In sum, the Court finds that the Memoranda do not constitute a rule that is exempt from the notice and comment requirements of Section 553. The Memoranda are not general statements of policy because they have a binding effect insofar as they presently affect certain rights and obligations and do not afford sufficient discretion to DHS and its decisionmakers. Likewise, the Memoranda are not procedural rules because they have a significant impact on DHS, the states, and certain aliens. Therefore, the Court finds Texas has shown a substantial likelihood of success on the merits of its procedural APA claim.

## 2. <u>Irreparable Harm</u>

In addition to demonstrating a substantial likelihood of success on the merits, the States must demonstrate "a substantial threat of irreparable injury if the injunction is not issued." *Texas DAPA*, 809 F.3d at 150. Put another way, the States must show they are "*likely* to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20, 129 S.Ct. at 374 (emphasis added). For an injury to be sufficiently "irreparable," the

States need only show the injury "cannot be undone through monetary remedies." *Burgess v. FDIC*, 871 F.3d 297, 304 (5th Cir. 2017) (quoting *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981)).

The States argue their injuries are irreparable because they will incur financial costs that are unrecoverable.  (Dkt. No. 18 at 40–41); (Dkt. No. 51 at 31).  The States also argue they will suffer irreparable harm because non-detention will result in increased crime.  (*Id.*).  In response, the Government contends there is no irreparable harm because "there is not a significant impact on the States."  (Dkt. No. 42 at 50).  The Court concludes the States have demonstrated they are likely to suffer irreparable harm for the following reasons.

As discussed in this Court's standing analysis, the States have presented evidence demonstrating the Memoranda cause financial harm in the form of increased costs for detention facilities.  *See supra* II.A.1.a.  The States have also demonstrated the Memoranda harm their interests as *parens patriae* because of an increase in criminal activity resulting from the Memoranda's implementation.  *See supra* II.A.1.b.  The Court found these two injuries were concrete, imminent, and traceable to the Memoranda.  The Court also concludes the threat of injuries to the States is "likely" as that term is used by the Supreme Court.  *See Winter*, 555 U.S. at 20, 129 S.Ct. at 374.

There is also no indication the States can recover for their injuries.  Indeed, there is no immediately discernable theory under which a state can "pierce the federal government's usual sovereign immunity or contrive a remedial cause of action sufficient to recover from its budgetary harm."  *Texas I*, ____ F. Supp. 3d at ____, 2021 WL 2096669,

at *47.  To that point, no Party has suggested the States can recover any of their likely financial injuries here.  And the Fifth Circuit rebuffed an attempt by Texas in the late 1990s to force the federal government to pay medical, educational, and criminal justice expenditures caused by immigration.  *See Texas*, 106 F.3d at 663–64 ("The State of Texas and its political subdivisions . . . appeal a Fed.R.Civ.P. 12(b)(6) dismissal of their complaint seeking declaratory and injunctive relief which would require that the United States pay the educational, medical, and criminal justice expenses allegedly incurred as a result of the presence of undocumented or illegal aliens in Texas.  Concluding that the complaint raises questions of policy rather than colorable claims of constitutional or statutory violations, we affirm.").  Thus, any financial injury is irreparable.  *See Burgess*, 871 F.3d at 304.

As for injuries to the States' interests as *parens patriae*, the Supreme Court has determined that "law enforcement and public safety interests" can constitute irreparable harm.  *See Maryland v. King*, 567 U.S. 1301, 1303, 133 S.Ct. 1, 3, 183 L.Ed.2d 667 (2012) (granting a stay of a judgment after finding Maryland experienced ongoing irreparable harm because it was enjoined from effectuating a statute that assisted government officials in investigating crimes and arresting violent offenders).  Here, law-enforcement and public-safety interests underlie the States' *parens patriae* injuries.  Accordingly, the States have demonstrated they are "likely to suffer irreparable harm in the absence of preliminary relief."  *See Benisek*, ____ U.S. at ____, 138 S.Ct. at 1944.

### 3.    The Balance of Equities and the Public's Interest

Having concluded the States have satisfied the first two elements for obtaining a preliminary injunction, the Court must now determine whether "the threatened injury outweighs any harm that may result from the injunction to the non-movant" and whether "the injunction will not undermine the public interest." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051, 1056 (5th Cir. 1997); *accord Gonzales v. Mathis Indep. Sch. Dist.*, 978 F.3d 291, 294 (5th Cir. 2020).   Federal courts have considered the balance-of-equities and public-interest elements together as they overlap considerably.  *Texas DAPA*, 809 F.3d at 187; *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 694 n.36 (N.D. Tex. 2016).   And because the Government is the nonmoving party, these two elements "merge." *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 1762, 173 L.Ed.2d 550 (2009); *accord Texas DAPA*, 809 F.3d at 187.

In weighing the equities, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24, 129 S.Ct. at 376.  As for determining whether an injunction will undermine the public interest, a court should consider the public interests that may be injured and those that may be served by granting or denying a preliminary injunction. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 997–98 (8th Cir. 2011) (citing *Davis v. Mineta*, 302 F.3d 1104, 1116 (10th Cir. 2002), *abrogated on other grounds by Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276 (10th Cir. 2016); *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011)).

The States argue the Government has no interest in the implementation and enforcement of the unlawful policy contained in the Memoranda. (Dkt. No. 18 at 41–42). The States contend the public interest is furthered when the Executive Branch follows congressional mandates. *See* (*Id.* at 42); (Dkt. No. 51 at 31–32). In response, the Government characterizes any injunction as a restraint on "core Article II authority" which "outweighs any harm to the States and undermines the public interest." (Dkt. No. 42 at 55). In the Government's view, an injunction would inhibit its ability to prioritize limited resources, cause confusion within the Executive Branch, and impede any effort to draft final guidance. (*Id.* at 55–56). The Government also contends the public interest is served when it has the ability "to prioritize national security, border security, and public safety." (*Id.* at 57). Considering these arguments, the Court finds the States have the upper hand.

Notably, without a preliminary injunction, the States will be "threatened with substantial harm" to their state budgets and interests as *parens patriae*. *See Burwell*, 227 F. Supp. 3d at 694. As discussed earlier, the Court is unpersuaded by the Government's claim that the States' injuries are "speculative." *See* (Dkt. No. 42 at 22–23). Instead, the Court has found the States' injuries from costs relating to detention facilities and increased criminal activity are traceable to the implementation of the Memoranda. *See supra* II.A.2.

Although the States face substantial harm from the implementation of the Memoranda, the Government nevertheless attempts to show that the harm it faces is worse. The Government, however, postulates harms "that are less substantial" and

"vague." *See Texas DAPA*, 809 F.3d at 186. Specifically, the Government makes much of an injunction's supposed harm to the Executive Branch's authority. *See* (Dkt. No. 42 at 55–56). Although it is true that the Executive Branch retains vast discretion in immigration enforcement, *see Arizona*, 567 U.S. at 396, 132 S.Ct. at 2499; *Reno*, 525 U.S. at 490, 119 S.Ct. at 946, that discretion ebbs when Congress sets forth a statutory mandate. Indeed, "[i]t is undisputed that Congress may *mandate* that the Executive Branch detain certain noncitizens during removal proceedings or before removal." *Preap*, ____ U.S. at ____, 139 S.Ct. at 973 (Kavanaugh, J., concurring) (emphasis added). Sections 1226(c) and 1231(a)(2) do just that: they *require* the Executive Branch to detain certain aliens at or for a specified time.[59] Any harm to the Government is therefore exaggerated and should be addressed to Congress.

The Government next complains that an injunction would create inefficiency because it would inhibit the Executive Branch's ability to prioritize limited resources.[60] (Dkt. No. 42 at 55–56). The Court is unpersuaded. First, in at least one case, the Fifth Circuit has concluded that any inefficiency resulting from an injunction inhibiting the Executive's ability to prioritize certain immigration-enforcement actions is "outweighed

---

[59]    The Government implicitly invokes prosecutorial discretion with respect to any harm an injunction may cause its Article II authority. *See* (Dkt. No. 42 at 55). This argument does not warrant much discussion. Indeed, the Court has already extensively discussed the extent of the Executive's discretion in enforcing a law when a clear congressional mandate is in place. *See supra* II.B.3.

[60]    Relatedly, the Government argues that an injunction would harm it by dismantling the two-step process ICE currently undergoes to determine whether to detain an alien in state custody. *See* (Dkt. No. 42 at 56). Sections 1226(c) and 1231(a)(2) already mandate which aliens must be detained and the time at or for which the Government must detain the alien.

by the major financial losses [that] states face." *See Texas DAPA*, 809 F.3d at 187.  Here, the Court, in its standing analysis, has already found the Memoranda will result in significant financial losses for the States.  *See supra* II.A.1.a.  Second, the Government overestimates the effect of an injunction on the Executive's limited resources.  Rather than dictate the use of resources, the injunction precludes the Executive Branch from instructing officials to act in a manner contrary to a clear congressional mandate.  In other words, the Government remains free to expend its resources in a *lawful* manner.

To this point, "the public is served when the law is followed," *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013), and the public will be served if the Executive Branch is enjoined from implementing and enforcing a policy that instructs officials to violate a congressional command.  *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."); *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d. 1211, 1221 (D.C. Cir. 1981) (collecting cases) ("[T]he public interest in enforcement of the immigration laws is significant."); *cf. Nken*, 556 U.S. at 436, 129 S.Ct. at 1762 ("There is always a public interest in prompt execution of removal orders[.]").  The public interest is particularly strong here because, as fully described earlier, Sections 1226(c) and 1231(a)(2) are statutes that Congress enacted for the benefit of the United States, its citizens, and its legal immigrants.  *See supra* I.A.; *Demore*, 538 U.S. at 518–21, 123 S.Ct. at 1714–16; *Zadvydas*, 533 U.S. at 697, 121 S.Ct. at 2502.

Finally, the Government argues an injunction would result in confusion inside the Executive Branch because immigration officials will be left with little to no guidance on

how to exercise their enforcement discretion.  (Dkt. No. 42 at 56).  Relatedly, the Government also theorizes that injunctive relief would impede its effort to draft final guidance.  (*Id.* at 56–57).  These arguments are puzzling because, with or without an injunction in place, the Government is free to craft new guidance or instruct Executive Branch officials to act in a certain manner *so long as such guidance and instructions comport with the law* (*i.e.*, congressional mandates).

Given the discussion above, the Court concludes the potential harms to the States arising out of the Memoranda outweigh any potential harms to the Government.  The Court also concludes the public interest is served, rather than undermined, by an injunction.  Thus, the States have satisfied all four elements for a preliminary injunction.

### C.  SCOPE OF RELIEF

The States have satisfied the standard for a preliminary injunction.  This conclusion raises two additional inquiries: the geographic scope of the injunction as well as the nature of the injunctive remedy.  The Court addresses each in turn.

#### 1.  Geographic Scope

The States request a nationwide injunction.  (Dkt. No. 18 at 42–43).  The Court has expressed its substantial skepticism of nationwide injunctions.  *Texas*, ____ F. Supp. 3d at ____, 2021 WL 247877, at *6–7; *see also Texas I*, ____ F. Supp. 3d at ____, 2021 WL 2096669, at *50–51.  Indeed, nationwide injunctions of executive actions are an area of fierce disagreement in the courts and in legal academia.  *See id.*  But, as with any case, this Court is bound by applicable Fifth Circuit precedent in determining whether a nationwide scope for an injunction is appropriate.  That precedent explains that a federal district

court, under "appropriate circumstances," has authority "to issue a nationwide injunction." *Texas DAPA*, 809 F.3d at 188.  One such appropriate circumstance is when a nationwide injunction is necessary is to ensure uniformity in immigration policies as prescribed by federal law.  *Id.* at 187–88; *see also E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 987 (9th Cir. 2020) ("[C]ases implicating immigration policy have a particularly strong claim for uniform, nationwide relief." (citation omitted)).   Another such circumstance is when "there is a substantial likelihood that a geographically-limited injunction would be ineffective because [the] beneficiaries [of the unlawful policy] would be free to move among states." *Texas DAPA*, 809 F.3d at 188.

The Court finds both circumstances exist here.  First, the Memoranda affect national immigration policy, which is designed to be uniform.  *See id.* at 187–88.  Second, given what has been detailed in the Court's standing analysis, a geographically limited injunction is insufficient to protect the States from irreparable harm because aliens not detained pursuant to the Memoranda in other states are able to move to Texas and Louisiana.  *See supra* II.A.2 & II.A.3; *see also Texas DAPA*, 809 F.3d at 188.  The States submitted evidence showing that "more than 50,000 noncitizens moved into Texas from another U.S. State in 2019."  (Dkt. No. 18 at 42) (citing Dkt. No. 19-21); *see also* (Dkt. No. 51 at 35) (citing Dkt. Nos. 19-21–19-23).   Accordingly, a nationwide injunction is appropriate. *See Texas DAPA*, 809 F.3d at 187–88; *see also Texas I*, \_\_\_\_ F. Supp. 3d at \_\_\_\_, 2021 WL 2096669, at *50–51.

The Government offers a handful of arguments in opposition to issuing a nationwide injunction.  None carry the day.

First, the Government argues nationwide relief is inappropriate because lawsuits concerning the Memoranda in other jurisdictions have been unsuccessful.  (Dkt. No. 42 at 60).  This misses the point.  In determining the appropriate scope of an injunction, the Court's task is to fashion a remedy that prevents the plaintiffs *in this case* from suffering irreparable harm.  *See ODonnell v. Harris County*, 892 F.3d 147, 163 (5th Cir. 2018) ("When crafting an injunction, district courts are guided by the Supreme Court's instruction that 'the scope of injunctive relief is dictated by the extent of the violation established.'" (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S.Ct. 2545, 2558, 61 L.Ed.2d 176 (1979)); *see also Dep't of Homeland Sec. v. New York*, ____ U.S. ____, ____, 140 S.Ct. 599, 600, 206 L.Ed.2d 115 (2020) (Gorsuch, J., concurring in the grant of a stay) ("Equitable remedies, like remedies in general, are meant to redress the injuries sustained by a *particular plaintiff in a particular lawsuit*.  When a district court orders the government not to enforce a rule against the plaintiffs in the case before it, the court redresses the injury that gives rise to its jurisdiction in the first place." (emphasis added)); *ODonnell v. Goodhart*, 900 F.3d 220, 224 (5th Cir. 2018) ("The district court must narrowly tailor an injunction to remedy the *specific action* which gives rise to the order." (emphasis added) (quoting *John Doe # 1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004))).  In concluding the States are entitled to injunctive relief, this Court has determined, based on Fifth Circuit precedent and the record before it, that a nationwide injunction is appropriate to prevent the States from suffering irreparable harm.

Next, the Government argues nationwide relief is generally ill-advised because, in effect, any attempt by the Government to create a new federal policy is thwarted by "a

single successful challenge" to the policy, even if other challenges to the policy are unsuccessful.  (Dkt. No. 42 at 60) (quoting *Dep't of Homeland Sec.*, ____ U.S. at ____, 140 S.Ct. at 601 (Gorsuch, J., concurring in the grant of a stay)).  Frankly, the Court shares these concerns.  Nonetheless, the Court, in fashioning a proper remedy, is bound by precedent, *see Texas DAPA*, 809 F.3d at 187–88, and "must narrowly tailor an injunction to remedy the *specific action* which gives rise to the order," *Goodhart*, 900 F.3d at 224 (emphasis added) (quoting *Veneman*, 380 F.3d at 818); *see also Dep't of Homeland Sec.*, ____ U.S. at ____, 140 S.Ct. at 600 (Gorsuch, J., concurring in the grant of a stay).  The Court therefore finds the Government's argument unpersuasive.

Third, the Government attempts to distinguish this case from *Texas DAPA* and *Texas I* by asserting that this case involves *individual* detention decisions rather than a blanket policy pausing enforcement actions against aliens.  (Dkt. No. 42 at 60).  To be sure, individual enforcement decisions are "inherently discretionary and non-uniform," *Texas I*, ____ F. Supp. 3d at ____, 2021 WL 2096669, at *51, but the States are not challenging individual enforcement decisions.  Rather, the States, like the plaintiffs in *Texas DAPA* and *Texas I*, are challenging a blanket policy.  *See Texas DAPA*, 809 F.3d at 146–49; *Texas I*, ____ F. Supp. 3d at ____, 2021 WL 2096669, at *30.  Specifically, the States are challenging the Memoranda, which implement and enforce a blanket policy regarding the detention of certain aliens—a policy that contravenes congressional mandates.  Accordingly, the Government's argument that this case is distinguishable from *Texas I* and *Texas DAPA* falls short.

Finally, the Government argues that, because the States' injuries are supposedly premised on detainers in Texas and Louisiana, an injunction limited in geographic scope to the boundaries of those two states will sufficiently protect them from any irreparable harm they may suffer due to the Memoranda. (Dkt. No. 42 at 60–61). The Court disagrees for two reasons. First, the Government incorrectly asserts that the States' injuries are premised on detainers when the States' injuries are, in fact, premised on the increased costs to their detention systems and their interests as *parens patriae*. *See* (Dkt. No. 1 at 15–16); (Dkt. No. 18 at 15–16, 18, 35–37). Second, in arguing that the geographic scope of the injunction should be limited to the boundaries of Texas and Louisiana, the Government ignores that, if aliens are not detained in other states, those aliens can migrate to Texas and Louisiana thus causing them harm. *See Texas DAPA*, 809 F.3d at 188 (recognizing that "there is a substantial likelihood that a geographically-limited injunction would be ineffective because" the beneficiaries of the unlawful policies "would be free to move among states"). Indeed, the evidence produced in this case regarding the migration patterns of aliens to Texas and from other states buttresses this point. *See supra* II.A.2 & II.A.3; (Dkt. No. 19-21 at 5–7); (Dkt. No. 19-22 at 5–7, 14); (Dkt. No. 19-23 at 2). The Government's argument is therefore meritless.

Thus, for the foregoing reasons, the States are entitled to a nationwide injunction.

### 2.   <u>Remedy</u>

As stated above, "the scope of injunctive relief is dictated by the extent of the violation established." *ODonnell*, 892 F.3d at 163 (quoting *Califano*, 442 U.S. at 702, 99 S.Ct. at 2558); *see also Goodhart*, 900 F.3d at 224 ("The district court must narrowly tailor

an injunction to remedy the specific action which gives rise to the order." (quoting *Veneman*, 380 F.3d at 818)).  Since the States have satisfied the four elements required for a preliminary injunction, the Court finds that it is appropriate to enjoin the Executive Branch from implementing and enforcing the Memoranda.  Specifically, the Court enjoins (1) Section B of the January 20 Memorandum, and (2) the sections from the February 18 Memorandum entitled "Civil Immigration Enforcement and Removal Priorities" and "Enforcement and Removal Actions: Approval, Coordination, and Data Collection." (Dkt. No. 1-2 at 4–8).  These sections implement and enforce a policy that directly contravenes congressional mandates.  As stressed above, agency policies that contravene congressional mandates are unlawful—plain and simple.  *See Util. Air Regul. Grp.*, 573 U.S. at 327, 134 S.Ct. at 2446; *Barnhart*, 534 U.S. at 462, 122 S.Ct. at 956.  Moreover, the States have met their burden to show a substantial likelihood that the Memoranda's policy prioritizing the detention of certain aliens over others is arbitrary and capricious and fails to comply with the APA's notice and comment requirement.  The Court therefore enjoins the implementation and enforcement of these sections.[61]

## IV.  CONCLUSION

Although this case involves many issues of administrative and immigration law, its core concerns whether the Executive Branch may implement a policy that directly

---

[61]   The States also request that the Court issue a positive injunction to compel agency action unlawfully withheld.  (Dkt. No. 18 at 25–26); (Dkt. No. 51 at 33).  The Government is opposed. (Dkt. No. 42 at 57–61).  Under the APA, a "reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  The Court reserves ruling on this issue until later in the litigation.

conflicts with laws that Congress enacted.  The answer is no.  In the end, through all their detailed explanations of the Executive's seemingly unending discretion, the Government substantially undervalues the People's grant of "legislative Powers" to Congress.

Because the States have demonstrated that there is a substantial likelihood that portions of the Memoranda direct Executive Branch officials to act in a way that is contrary to Sections 1226(c) and 1231(a)(2), those sections of the Memoranda cannot stand and are hereby enjoined.  Additionally, the Court enjoins the sections of the Memoranda described above because the States have demonstrated a substantial likelihood that the policy concerning detention of certain aliens set forth in the Memoranda is arbitrary and capricious under the APA and the Memoranda fail to comply with the APA's notice and comment requirement.

For the foregoing reasons, the Court **GRANTS** the States' Motion for Preliminary Injunction.  (Dkt. No. 18).  Therefore, it is hereby **ORDERED** that:

1. Defendants and all their respective officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with them are hereby **ENJOINED** and **RESTRAINED** from enforcing and implementing the policies described in:

    a. Section B of the January 20 Memorandum entitled "Interim Civil Enforcement Guidelines." (Dkt. No. 1-1 at 3–4);

    b. The section entitled "Civil Immigration Enforcement and Removal Priorities" in the February 18 Memorandum. (Dkt. No. 1-2 at 4–6); and

    c.    The section entitled "Enforcement and Removal Actions: Approval, Coordination, and Data Collection" in the February 18 Memorandum.[62]  (Dkt. No. 1-2 at 6–8).

2. This Preliminary Injunction is granted on a nationwide basis and prohibits enforcement and implementation in every place the Government has jurisdiction to enforce and implement the January 20 and February 18 Memoranda.

3. This Preliminary Injunction shall remain in effect pending a final resolution of the merits of this case or until a further Order from this Court, the United States Court of Appeals for the Fifth Circuit, or the United States Supreme Court.

To ensure compliance with this Preliminary Injunction, the Court further

**ORDERS** the following:

1. By September 3, 2021, the Government must file with the Court the legal standard it is abiding by with respect to the detention of aliens covered by or subject to 8 U.S.C. § 1226(c)(1)(A)–(D) given the Court's injunction of the Memoranda at issue in this lawsuit.  The information should state with specificity what guidance, protocols, or standards control the detention of these aliens in light of the fact that the Memoranda have been enjoined.

2. By September 3, 2021, the Government must file with the Court the legal standard it is abiding by with respect to the detention of aliens covered by or subject to 8 U.S.C. § 1231(a)(2) given the Court's injunction of the Memoranda at issue in this lawsuit.  The information should state with specificity what guidance, protocols, or standards control the detention of aliens in light of the fact that the Memoranda have been enjoined.

3. Starting in September 2021, the Government must file with the Court on the 5th day of each month a report stating the number of aliens known to the Government, who are covered by or subject to 8 U.S.C. § 1226(c)(1)(A)–(D), who were released from custody during the previous month, and whom ICE did not detain immediately upon their release.

---

[62]   This Memorandum Opinion and Order does not prohibit the Government from carrying out or adhering to the February 18 Memorandum's subsections entitled "Notice of At-Large Enforcement Actions" and "Weekly Reporting of All Enforcement and Removal Actions."

For each of these aliens, provide under seal the alien's last known residence or address and the offense for which the alien had been incarcerated.

Additionally, for each alien not detained, the Government shall make and retain a contemporaneous record of the reason why the alien was not detained and the individual who made that specific determination.

4.      Starting in September 2021, the Government must file with the Court on the 5th day of each month a report stating the number of aliens in their removal period as defined in 8 U.S.C. § 1231(a)(1).  Of those, provide the number who were not detained pursuant to 8 U.S.C. § 1231(a)(2).

For each of these aliens not detained, provide under seal the alien's last known residence or address.

Additionally, for each alien not detained, the Government shall make a contemporaneous record of the reason why the alien was not detained and the individual who made that specific determination.

This Memorandum Opinion and Order does not prohibit the Government from carrying out or adhering to the January 20 Memorandum's sections entitled "A. Comprehensive Review of Enforcement Policies and Priorities" and "D. No Private Right Statement."[63]  This Memorandum Opinion and Order also does not prohibit the Government from carrying out or adhering to the February 18 Memorandum's sections entitled "Purpose," "Background," "Questions," and "No Private Right Statement."

No security bond is required under Federal Rule of Civil Procedure 65(c).

It is SO ORDERED.

---

[63]     This Court previously enjoined Section C of the January 20 Memorandum.  *See Texas I*, ___ F. Supp. 3d at ____, 2021 WL 2096669, at *52.

Signed on August 19, 2021.

**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**