UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | |
|---|---|
| STATE OF TEXAS, STATE OF LOUISIANA | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) No. 6:21-cv-00016 |
| UNITED STATES OF AMERICA, *et al.* | ) ) |
| Defendants. | ) ) ) |

DECLARATION OF MARC A. RAPP

I, Marc Rapp, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

**PERSONAL BACKGROUND**

1. I am currently employed by the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO), as the Assistant Director for the Law Enforcement Systems and Analysis (LESA) division. I have held this position since January 31, 2021. I previously held the same position from May 2013 until May 2015. Prior to rejoining LESA, I served as the Deputy Attaché for Removals at the ICE Attaché Office in Rome, Italy from September 2016 until January 2021. During my tenure at ICE ERO, I have also served as the Deputy Assistant Director for Domestic Operations from May 2015 until September 2016, the Deputy Assistant Director for the Secure Communities Program from January 2009 until May 2013, and the Unit Chief for the Criminal Alien Program from November 2007 until January 2009. I have been employed by

ICE, and its predecessor agency, the former Immigration and Naturalization Service, since November 1994.

2. As the Assistant Director, I am responsible for the effective and proficient performance of LESA units, including the Statistical Tracking Unit, Data Quality and Integrity Unit, Strategy and Operational Analysis Unit, Information Technology Management Unit, and the Deployment and Transformation Unit.

3. LESA is responsible for helping inform the development of ERO strategies and supporting continuous enhancement of ERO business processes to execute those strategies. Through data collection and analysis and technology and process improvements, LESA delivers tools, studies, and recommendations to assist ICE's decision-making and planning (strategic, business, and operational). LESA studies ICE's operations and resources (personnel, processes, technology, and infrastructure) to find areas for continuous improvement. LESA's five operational units ensure the right resources are in the right place, and that agency-wide, ICE is making informed decisions.

4. I am familiar with this Court's August 19, 2021 opinion and order imposing reporting requirements to ensure compliance with the preliminary injunction issued the same day. I am also familiar with this Court's August 23, 2021 order modifying those reporting requirements as well as the administrative stay orders issued by this Court and the Fifth Circuit Court of Appeals on August 23 and August 25, 2021, respectively.

**ICE PRACTICES NATIONWIDE**

5. As an operational program of ICE, ERO is responsible for the planning, management, and direction of broad programs relating to the supervision, detention, and removal of noncitizens from the United States under U.S. immigration laws. ERO's statutory responsibilities

include the detention, as appropriate, of noncitizens during the pendency of proceedings to determine whether they will be removed from the United States, as well as noncitizens subject to administratively final removal orders, pending their removal from the United States.

### INTEROPERABILITY AND IMMIGRATION DETAINERS

6. ICE ERO typically learns that a possible foreign national has been taken into federal, state, local, or tribal criminal custody through an automated nationwide federal information-sharing program referred to as Federal Bureau of Investigation (FBI)/DHS Interoperability. After an individual is fingerprinted during the booking process, his or her fingerprints are sent to the FBI, after which they are automatically transmitted to DHS's Automated Biometric Identity System (IDENT). If there is a match in IDENT, information about that individual is automatically sent to ICE in near-real time as a biometric Immigration Alien Query (IAQ).

7. ICE ERO additionally receives information and data from federal, state, local, tribal, and international law enforcement agencies when they manually submit biographic inquiries to the ICE Law Enforcement Support Center (LESC) regarding the immigration status of presumed foreign nationals who have been arrested or are under investigation. These biographic inquiries are referred to as biographic IAQs. The IAQ process is facilitated through direct connectivity to and from the law enforcement community and ICE using the secure International Justice and Public Safety Network (NLETS).[1]

8. Upon receipt of both biographic and/or biometric IAQs, ICE conducts research in federal data repositories to determine, where possible, the immigration status of the individual and

---

[1] Originally, NLETS was the National Law Enforcement Telecommunications System. The name has since changed, but the former acronym is still used.

3

transmits a response, called an Immigration Alien Response (IAR). Biographic IARs are transmitted from ICE to the State Identification Bureau and/or the requesting law enforcement agency – through NLETS. Biometric IARs are transmitted back through the Interoperability process. ICE ERO also transmits a copy of the IAR to the ICE ERO field office responsible for the geographic area in which the law enforcement agency has jurisdiction through Alien Criminal Response Information Management System (ACRIMe) Field, a web-based application designed to help users at the ICE ERO Pacific Enforcement Response Center (PERC) and ERO field offices process IARs. The use of these information-sharing formats ensures agency security due to the sensitive nature of the information provided to, and from, ICE.

9. For cases that are processed via biometric interoperability, a range of different databases are employed, including:

    a. ACRIMe System, which contains information extracted from ten separate DHS and Department of Justice (DOJ) databases;

    b. The Department of State Consular Consolidated Database (CCD); and

    c. TECS.[2]

10. Based on this research, ICE personnel make enforcement decisions regarding whether to place detainers on individuals in criminal custody. Detainers are an important public safety tool ICE officers frequently use to ensure that federal, state, and local law enforcement agencies managing jails and prisons around the country are aware of ICE's interest in taking custody of removable noncitizens in their custody. ICE detainers are non-binding requests by ICE for the receiving law enforcement agency to both: (1) notify ICE as early as

---

[2] No longer an acronym, TECS is the updated and modified version of the former Treasury Enforcement Communications System.

practicable, at least 48 hours, if possible, before a removable noncitizen is released from criminal custody; and (2) maintain custody of the noncitizen for a period not to exceed 48 hours beyond the time the noncitizen would otherwise have been released to allow ICE to assume custody.  ICE issues detainers, using DHS Form I-247A, Immigration Detainer – Notice of Action, where it has probable cause to believe an individual is a removable noncitizen.

11. In some cases, officers at the responsible ICE ERO field office process and issue detainers.  In other cases, officers at the PERC reviewing cases for field offices nationwide may lodge a detainer with an administrative warrant.  It is important to note that not all detainers are processed using the information contained in ACRIMe and that information can be extracted directly from the databases listed above or obtained by an in-person interview(s) conducted by the field office.  In cases in which officers at the PERC process and deliver the detainer to the local law enforcement agency, the responsible field office will receive copies of the IAR, any other documents produced, and officer case comments via ACRIMe Field.  The local field office will then await notification from the local law enforcement agency that the individual is being released, relying on local protocols to research the case via available databases, and review of the paper A-File when possible, to determine if enforcement action is appropriate as a matter of law and discretion.

12. Due at least in part to the fact that ICE must rely upon and independently verify information reported by state and local databases, it is exceedingly difficult, if not impossible, to maintain and track certain data in a single centralized data repository.  This is further complicated by numerous state and local laws and policies which restrict ICE access to facilities and databases.

13. As of August 29, 2021, approximately 96,689 detainers issued between fiscal years 2018 and 2021 are currently active. But because ICE detainers are merely requests, an increasing number of jurisdictions are not cooperating with ICE and are not honoring ICE detainers. Many state and local law enforcement agencies decline to notify ICE of an upcoming release, even when a detainer has been lodged. This may be due to information-sharing restrictions in state, local laws/ordinances, or as a matter of policy. As of July 19, 2021, 463 jails were identified as uncooperative, impacting 19 field offices, and 156 were identified as providing limited cooperation, impacting 11 field offices. Even in jurisdictions willing to cooperate with ICE, some law enforcement agencies may be apprehensive about honoring detainers or otherwise working with ICE given their potential exposure to civil liability for holding individuals on detainers and the costs incidental to immigration-related detention and litigation. There are also many instances in which ICE is notified about a release after it has already occurred, or notification of an individual's release from custody is made on such short notice that ICE is unable to travel to the law enforcement agency to make an arrest immediately upon release. There are also instances when ICE lodges a detainer in one jurisdiction, and a noncitizen is later transferred to another jurisdiction that fails to notify ICE of the noncitizen's release.

14. ICE officers can "lift," or cancel, detainers in the system if they are no longer considered active. Reasons for lifting a detainer range from the noncitizen being transferred to ICE and booked into ICE custody, to more unusual circumstances such as an individual dying before being released from state criminal custody. ICE's database currently provides a total of nine different detainer "lift codes" designed to record the lifting of the detainer and the reason behind it. Guidance has been provided to officers explaining each of the lift codes, when

they should be used, and how to record lodging and lifting detainers in ICE systems of record. With a growing number of law enforcement entities not honoring detainers, the reasons why a detainer may be lifted has grown beyond the existing lift codes, resulting in an increased use of a generic catch-all code that was initially intended to only capture uncommon or unforeseen lift reasons. When this code is selected, the specific reason for lifting the detainer is not captured.

15. In order to capture the information requested by the Court, ERO would have to make system modifications adding more lift codes to the system to minimize the use of the generic catch-all category, as well as issue guidance to its approximately 6,100 officers nationwide to ensure accurate reporting. This would require additional time for development.

16. In addition, when a state or local law enforcement agency releases a noncitizen without notifying ICE of the release, the requirement to lift the detainer may not be known for an extended period of time. ICE often remains unaware of the release until the noncitizen is subsequently encountered again, possibly months or years later. The detainer lift code that is entered after the subsequent encounter would be the only record available of a possible non-arrest at the time of release. As a result, monthly reporting provided to this Court may include individuals released prior to the reporting period, but whose release only came to the attention of ICE during the previous month.

17. For these reasons, ICE is generally unable to statistically report with precision the exact number of individuals who were released from state or local criminal custody in any given month, and who were not immediately detained by ICE. Absent clarification or modification of the court's reporting requirements, I believe it is unlikely that ICE would be able to provide full and accurate reporting consistent with those requirements.

18. Based on my current understanding of systems capabilities, I believe ICE maintains a contemporaneous record of the name of an officer who lifts a detainer.

### CUSTODY DETERMINATIONS

#### 8 U.S.C. § 1226(c)

19. Where ICE officers have determined that they have the legal authority to lodge a detainer against an individual, ICE officers generally do not assess, and record, at that time what statutory authority will govern the individual's immigration detention.

20. The immigration laws generally provide the agency with a period of 48 hours from the time of arrest to make a custody determination. During the custody determination process, ICE assesses whether the noncitizen should be detained or released, and if released, any conditions of release that should be imposed. It is *subsequent* to taking custody, that an ICE officer must consider whether an individual in ICE custody is subject to 8 U.S.C. § 1226(c) and its restrictions on release. The custody determination for noncitizens detained pursuant to 8 U.S.C. § 1226 is documented on DHS Form I-286, Notice of Custody Determination, which informs the noncitizen if he or she will be detained or released, and if released, any conditions on such release. It also provides the noncitizen with the opportunity to request an immigration judge review of the custody determination. It does not, however, include a formal determination of whether the noncitizen is specifically subject to 8 U.S.C. § 1226(c).

21. An officer's determination whether a detained individual is subject to 8 U.S.C. § 1226(c) is often a complicated inquiry that may entail additional investigation and analysis, including, but not limited to, obtaining additional documents (*e.g.*, the record of conviction, charging instrument, written plea agreement, transcript of plea colloquy, jury instructions, or any explicit factual finding by the trial judge). And, due to the legal complexity of applying

grounds of removability based on state convictions, officers also routinely have to consult with agency counsel before a custody decision can be made. In addition, I am told that case law in this area can often change and a state conviction that would render a noncitizen subject to 8 U.S.C. § 1226(c) at the time the detainer was placed may no longer subject a noncitizen to 8 U.S.C. § 1226(c) when ICE is notified of release. I also understand that variations in case law are such that a conviction may give rise to grounds of removability (and potentially trigger 8 U.S.C. § 1226(c)) in one jurisdiction but not in another. Because these complexities require case-by-case review and local coordination, ICE rarely knows in advance whether a noncitizen would be covered by 8 U.S.C. § 1226(c) should ICE take custody. In fact, I have been informed that while individuals subject to 8 U.S.C. § 1226(c) are not eligible for release on bond, they are eligible for what to is referred to as a "*Joseph* hearing" in which an immigration judge will determine whether he or she is "properly included" in the scope of 8 U.S.C. § 1226(c). *See* 8 C.F.R. § 1003.19(h)(2)(i)(D).

22. Rather than broadly reporting all noncitizens released from criminal custody who are covered by or subject to specific custody requirements, which is likely impossible given the limitations described above, ICE may be able to introduce new system modifications to draw from reasonably accessible ICE data that may be collected through automated queries to identify individuals: (1) for whom an immigration detainer had been lodged by ICE; (2) who are potentially subject to charges of removability listed in 8 U.S.C. § 1226(c)(1)(A)-(D), based on information drawn from accessible ICE data; (3) for whom ICE had actual knowledge the previous month that he or she was released from criminal custody; and (4) who were not detained by ICE immediately upon their release from criminal custody.

23. Those system modifications would enable ICE to provide much, but not all, of the information included in paragraph 3 of the Court's initial reporting order. ICE will rely on the removal charges available in ICE data systems associated with a noncitizen when assessing whether or not a noncitizen may be subject to 8 U.S.C. § 1226(c). This requires that the officers who are recording the lifting of the detainer correctly link that case to any prior encounters ICE has had with the noncitizen. ICE will provide guidance reminding officers to properly link these cases in the system so that the information on removal charges can be captured accurately for reporting purposes. In addition, ICE is proposing to modify existing detainer lift codes and add new ones in its system of record. These steps will also require additional guidance and training for officers to ensure they are used for the intent designed. Although ICE would be unable to report "determinations" regarding the applicability of 8 U.S.C. § 1226(c), as such determinations would not have been made at the time the decision is made whether to lift a detainer it can provide reporting on the individuals who have been charged with removability, or against whom a detainer has been lodged, based upon grounds of removability included in 8 U.S.C. § 1226(c)(1)(A)-(D). This data set may be over-inclusive because it may include, for example, individuals who have previously been described in 8 U.S.C. § 1226(c)(1)(A)-(D) but who may have received post-conviction relief from a state or federal court that materially changes their amenability to removal. It may also be under-inclusive because, for example, a ground of removability listed in 8 U.S.C. § 1226(c)(1)(A)-(D) does not need to be charged as the basis of removal in order to trigger mandatory detention. *See Matter of Kotliar*, 24 I&N Dec. 124, 126-27 (BIA 2007). And, because a criminal charge alone (as opposed to a conviction) will not generally trigger 8

U.S.C. § 1226(c), noncitizens with pending criminal charges may shift from being subject to 8 U.S.C. § 1226(a) to § 1226(c) upon being convicted.

24. Additionally, the changes proposed here would likely take weeks to fully implement. Additional quality checks and guidance would be required, particularly at the outset, to ensure that compliant data entry is performed for retrieval of relevant reporting information. While the additional time afforded in the Court's August 23, 2021 modification order is a means to that end, it does not provide sufficient time to collect, consolidate, and perform quality control on data, to include identifying and removing information prohibited from disclosure pursuant to 8 U.S.C. § 1367 (prohibiting the disclosure of information, even to a court, of "any information" relating to certain noncitizens, including victims of certain criminal activity or severe forms of trafficking), before submitting to the Court. Increasing the time in which ICE may provide its monthly report from the first business day after the 5th of each month to the first business day after the 15th of the month would likely enable ICE to provide responsive and accurate data. Even so, I expect that the quality of the data will improve as officials have more time to internalize applicable guidance.

### 8 U.S.C. § 1231(a)

25. Similar to determinations regarding whether a noncitizen is subject to mandatory custody pursuant to 8 U.S.C. § 1226(c), ICE officers do not assess detention or commencement of the "removal period" under 8 U.S.C. § 1231(a)(1) until after the noncitizen is taken into ICE custody. A determination of whether the "removal period" under § 1231(a)(1) has commenced for any noncitizen requires an assessment of the facts pertinent to each individual and cannot be completed solely by a review of ICE data systems. Rather, this assessment may require an interview of the noncitizen and a manual review of DHS official

11

records including the paper A-File. ERO databases do not automatically update when an order of removal is issued by DOJ's Executive Office for Immigration Review (EOIR) or when it becomes administratively final.. The analysis therefore also requires manual review of court records due to the fact that the filing of a petition for review and issuance of a judicial stay issued by a federal court operates to delay commencement of the removal period, and ascertaining whether a petition for review was filed or a judicial stay of removal was issued requires case-by-case manual review by ERO personnel.

26. Although compliance with the terms of the Court's original reporting order are likely impossible for ERO, the following modifications may help the agency comply while also providing the Court with the kind of information it seeks. Specifically, ICE should be able to introduce system modifications to draw from reasonably accessible ICE data that may be collected through automated queries to identify individuals: (1) for whom an immigration detainer had been lodged by ICE; (2) who were at the time of release from criminal custody subject to an administratively final removal order; (3) for whom ICE had actual knowledge the previous month that he or she was released from criminal custody; and (4) who were not detained by ICE immediately upon their release from criminal custody.

27. This approach will undoubtedly result in over-inclusive reporting because it will include individuals with an administratively final removal order, but who would not yet be in the statutory removal period even if taken into ICE custody in light of a pending petition for review and the issuance of a judicial stay of removal.

This declaration is based upon my personal and professional knowledge, information obtained from other individuals employed by ICE, and information obtained from various records and

systems maintained by DHS.  I provide this declaration based on the best of my knowledge, information, belief, and reasonable inquiry for the above captioned case.

Signed on the 1st day of September, 2021

MARC A RAPP
Digitally signed by MARC A RAPP
Date: 2021.09.01 22:10:14 -04'00'

Marc A. Rapp
Assistant Director for Law Enforcement Systems and Analysis
ICE Enforcement and Removal Operations