United States Courts
Southern District of Texas
FILED
September 15, 2021
Nathan Ochsner, Clerk of Court

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
September 15, 2021
Lyle W. Cayce
Clerk

No. 21-40618

STATE OF TEXAS; STATE OF LOUISIANA,

        *Plaintiffs—Appellees*,

*versus*

UNITED STATES OF AMERICA; ALEJANDRO MAYORKAS, SECRETARY, U.S. DEPARTMENT OF HOMELAND SECURITY; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TROY MILLER, ACTING COMMISSIONER, U.S. CUSTOMS AND BORDER PROTECTION, IN HIS OFFICIAL CAPACITY; UNITED STATES CUSTOMS AND BORDER PROTECTION; TAE D. JOHNSON, ACTING DIRECTOR, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, IN HIS OFFICIAL CAPACITY; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; TRACY RENAUD, SENIOR OFFICIAL PERFORMING THE DUTIES OF THE DIRECTOR OF THE U.S. CITIZENSHIP AND IMMIGRATION SERVICES, IN HER OFFICIAL CAPACITY; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES,

        *Defendants—Appellants*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 6:21-CV-16

Before SOUTHWICK, GRAVES, and COSTA, *Circuit Judges*.

Gregg Costa, *Circuit Judge*:

A district court issued a nationwide preliminary injunction preventing the United States from relying on immigration enforcement priorities outlined in memos from the Department of Homeland Security and Immigration and Customs Enforcement. The United States seeks a stay of that injunction pending appeal. For the reasons discussed below, we grant a partial stay.

I.

On Inauguration Day for the new President, the Acting Secretary of DHS issued a memo titled "Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities." Memorandum from David Pekoske (Jan. 20, 2021) (DHS Memo). It announced that the Department would undergo a comprehensive review of enforcement policies, announced the DHS's interim enforcement priorities, and directed an immediate 100-day pause on removals.[1]

This case is about the memo's interim enforcement priorities. Noting DHS's limited resources and inability to "respond to all immigration violations or even remove all persons unlawfully in the United States," the memo announces the following civil enforcement priorities:

1. **National security**. Individuals who have engaged in or are suspected of terrorism or espionage, or whose apprehension, arrest and/or custody is otherwise necessary to protect the national security of the United States.
2. **Border security**. Individuals apprehended at the border or ports of entry while attempting to unlawfully enter the United States on or

---

[1] Texas initially brought a separate suit challenging the 100-day pause. The district court issued a temporary restraining order and eventually a preliminary injunction against enforcement of that pause. *See Texas v. United States*, -- F. Supp. 3d --, 2021 WL 2096669 (S.D. Tex. May 24, 2021). The United States did not appeal that ruling.

2

after November 1, 2020, or who were not physically present in the United States before November 1, 2020.
3. **Public safety**. Individuals incarcerated within federal, state, and local prisons and jails released on or after the issuance of this memorandum who have been convicted of an "aggravated felony," as that term is defined in section 101(a)(43) of the Immigration and Nationality Act at the time of conviction, and are determined to pose a threat to public safety.

DHS Memo at 2.

The memo notes that these priorities will influence "not only the decision to issue, serve, file, or cancel a Notice to Appear, but also to a broad range of other discretionary enforcement decisions, including deciding: whom to stop, question, and arrest; whom to detain and release; whether to settle, dismiss, appeal, or join in a motion on a case; and whether to grant deferred action or parole." *Id.* The memo also announces that it does not "prohibit[] the apprehension or detention of individuals unlawfully in the United States who are not identified as priorities herein." *Id.* at 3.

ICE issued a memo on February 18, 2021 that incorporates the same three interim priorities. Memorandum from Tae Johnson, Acting Director of ICE, on Civil Immigration Enforcement and Removal Priorities (Feb. 18, 2021) (ICE Memo). Like the DHS memo, the ICE version notes that "the interim priorities do not require or prohibit the arrest, detention, or removal of any noncitizen." ICE Memo at 3. But the ICE memo requires, with limited exceptions, that agents seek approval before pursuing an action against a person who is not included in the prioritized categories. *Id.* at 6.

Immigration authorities have followed these priorities since the memos issued at the beginning of the year. The government contends the memos' effect can be seen in arrest statistics for the February-July period. Overall administrative arrests are down from 39,107 in 2020 to 25,916 this

3

No. 21-40618

year. But arrests of those with aggravated felonies—priority #3 (public safety)—are up by roughly 2,000 from the prior year; they now account for one in five arrests.

Texas and Louisiana filed this lawsuit seeking to enjoin portions of the DHS and ICE Memos, most significantly its enforcement priorities. In a comprehensive opinion issued last month, the district court rejected a number of justiciability challenges and then concluded that the memos violated the Administrate Procedure Act in the following ways: they are contrary to law—specifically two statutes requiring detention of certain individuals; arbitrary and capricious; and issued without notice and comment. *See* 5 U.S.C. §§ 706(2)(A), (D), 553. It thus enjoined the government "from enforcing and implementing" the civil enforcement guidelines described in the DHS and ICE memos. It also ordered the defendant agencies to file reports with the court documenting compliance. Although the district court expressed reluctance about issuing an injunction that went beyond the parties before it, it believed Fifth Circuit precedent required it do so in a case involving federal immigration policy. *See Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) (stating that "in appropriate circumstances" a court may "issue a nationwide injunction"), *aff'd by equally divided vote*, *United States v. Texas*, 577 U.S. 1101 (2016) As a result, even though district courts have rejected challenges to the same enforcement priorities brought by Florida and Arizona,[2] the district court's preliminary injunction applies to federal immigration authorities in those states and all others.

---

[2] *Arizona v. U.S. Dep't of Homeland Sec.*, No. CV-21-00186, 2021 WL 2787930 (D. Ariz. June 30, 2021); *Florida v. United States*, -- F. Supp. 3d. --, 2021 WL 1985058 (M.D. Fla. May 18, 2021).

4

No. 21-40618

The district court delayed the effective date of its injunction until August 30 to allow the United States to seek a stay from this court. We granted a temporary administrative stay and heard oral argument. The United States tells us that the "interim" guidance this case considers will be superseded by new guidance expected by the end of this month. Despite the possibility of an imminent expiration date on the memos challenged in this case, we perform our duty to consider the motion before us.

II.

In deciding whether to grant a stay, we consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). We conclude that the United States has shown a likelihood of success at least to the extent the injunction prevents immigration officials from relying on the memos' enforcement priorities before an immigration proceeding is commenced.

"A principal feature of the removal system is the broad discretion exercised by immigration officials. Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all." *Arizona v. United States*, 567 U.S. 387, 396 (2012). The challenged memos prioritize removal of those who are a threat to national security, those who entered the country this year, and those convicted of an aggravated felony. The central merits issue is whether Congress has interfered with immigration officials' traditional discretion to decide when to remove someone. If not, then the interim priorities are the type of enforcement decisions that are "committed to agency discretion by law" and not reviewable (for substance or procedure)

5

under the APA. *See* 5 U.S.C. § 701(a)(2); *Heckler v. Chaney*, 470 U.S. 821, 828–35 (1985); *see also Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) ("[A]n agency's decision not to institute enforcement proceedings [is] presumptively unreviewable under § 701(a)(2).").

The reasons that charging decisions are presumptively unreviewable echo the rationales the memo cites for focusing on three priorities: in deciding when to enforce a law, "[a]n agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another . . . whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all." *Heckler*, 470 U.S. at 831. These concerns that underlie the unreviewability of enforcement decisions are "greatly magnified in the deportation context." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999).

While recognizing this general discretion law enforcement enjoys, the district court concluded that two immigration statutes limit it. They are both part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). One provision governs the custodial status of aliens facing removal proceedings. The general rule is that the Attorney General "may" detain the individual pending the removal proceeding or "may" release that person on bond. 8 U.S.C. § 1226(a). But the Attorney General "*shall* take into custody any alien" who is deportable or inadmissible for specific reasons. *Id.* § 1226(c)(1) (emphasis added). This category includes the aggravated felons who are a focus of the interim enforcement priorities, as well individuals not on the priority list such as those with certain drug convictions or convictions for crimes of moral turpitude. *Id.* The statute further explains that such an arrest shall occur "when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for

the same offense." *Id.*[3] As the district court explained, section 1226(c) arrests usually come into play when ICE places a detainer on an alien who is serving a sentence; the detainer results in a transfer to ICE custody once the sentence is served. Once the person is in ICE custody, a notice to appear commencing removal issues.

The other law that, in the district court's view, eliminates discretion applies after a removal order has issued. During the removal period that follows, which is supposed last no more than 90 days, *see* 8 U.S.C. § 1231(a)(1)(A), "the Attorney General shall detain the alien," *id.* § 1231(a)(2). This law applies across the board; it is not limited to certain categories of aliens as section 1226(c) is. If removal does not happen within 90 days, then other rules allowing for release under certain conditions govern. *See id.* § 1231(a)(3).

Our main concern with the injunction is that we believe these IIRIRA provisions do not eliminate immigration officials' "broad discretion" to decide who should face enforcement action in the first place. *Arizona*, 567 U.S. at 396. They address a separate question: the custodial status of individuals who are facing removal proceedings or who have been removed. *See* 8 U.S.C. § 1226(a),(c); § 1231(a)(2). To the extent the injunction prevents the Attorney General from relying on the memos to release those who are facing enforcement actions and fall within the mandatory detention provisions—for example, prisoners with qualifying convictions against whom ICE has lodged a detainer (8 U.S.C. § 1226(c)(1)) or individuals

---

[3] The statute provides that the Attorney General "may release" such a person in limited circumstances, *see id.* § 1126(c)(2), which the district court believed buttressed its view of the otherwise mandatory nature of section 1126(c)(1).

Case 2:24-cv-00160 Document 005106015057 on Page 15/81 in TXSD Filed 09/05/2023
Case 21-40618 Document 00516015057 on Page 15/81 in TXSD Filed 09/05/2023

No. 21-40618

subject to removal orders (*id.* § 1231(a)(2))—we see no basis for upsetting it at this stage as that is what the statutes govern.

The district court's injunction, however, is not limited to detention decisions of aliens the United States has decided to remove. It is much broader. It enjoins reliance on memos that guide decisions on, among other things, "whether to issue a detainer," "whether to issue, reissue, serve, file, or cancel a Notice to Appear," and "whether to stop, question, or arrest a noncitizen." ICE Memo at 3. We see the United States likely succeeding on this core foci of the interim enforcement priorities—immigration officials' ability to prioritize who is subject to investigative and enforcement action in the first place. *See Reno*, 525 U.S. at 483 (recognizing that law enforcement discretion extends to "initiation or prosecution of various stages in the deportation process," including the "discretion to abandon the endeavor").

The likelihood of success factor requires a prediction. The first building block of our prediction is the strong background principle that the "who to charge" decision is committed to law enforcement discretion, including in the immigration arena. *Id.* at 483; *Arizona*, 567 U.S. at 396. It is quite telling that neither the States nor the district court have cited a single Supreme Court case requiring law enforcement (state nor federal, criminal nor immigration) to bring charges against an individual or group of individuals.[4]

---

[4] Of course, as the district emphasized, its injunction does not compel ICE to arrest or remove any particular person. But the linchpin of its analysis—the reason it concluded that the memos were subject to APA review and then contrary to law—was its holding that the IIRIRA mandatory detention laws overcome the ordinary presumption that law enforcement discretion is unreviewable. So the overriding legal question is whether matters discussed in the memos, such as who to arrest and charge, are committed to law

What is more, in the quarter century that IIRIRA has been on the books, no court at any level previously has held that sections 1226(c)(1) or 1231(a)(2) eliminate immigration officials' discretion to decide who to arrest or remove. The Supreme Court has recognized that detention under section 1226(c)(1) is mandatory "pending the outcome of removal proceedings." *Jennings v. Rodriguez*, 138 S. Ct. 830, 838 (2018).[5] But its cases considering the statute are ones in which detainees subject to enforcement action were seeking their release. *See id.* at 846; *Nielsen v. Preap*, 139 S. Ct. 954, 960 (2019); *Demore v. Kim*, 538 U.S. 510, 513 (2003). The same is true of the recent case involving section 1231 in which already-removed detainees sought release. *Guzman Chavez*, 141 S. Ct. 2271, 2281 (2021). Those cases do not consider whether the statutes eliminate the government's traditional prerogative to decide who to charge in enforcement proceedings (and thus who ends up being detained).

---

enforcement discretion. To answer that question, it is instructive that the Supreme Court has never allowed judicial oversight of such decisions.

Relatedly, Texas's counsel suggested at oral argument that the injunction is limited to the question of who to detain and does not prevent reliance on the memos' priorities in determining who to remove. But if that is the case then the injunction is overbroad because it is a blanket prohibition on officials' reliance on the interim priorities.

[5] *Jennings* explains that section 1226(a) sets forth the "default rule" that "governs the process of arresting and detaining that group of aliens pending their removal." 138 S. Ct. at 837. Section 1226(c) then "carves out a statutory category of aliens who may not be released under 1226(a)." *Id*. Because section 1226(c) is an exception to section 1226(a), both address the detention of "aliens already in the country pending the outcome of removal proceedings." *Id*. at 838; *see also* 8 U.S.C. § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the aliens is to be removed from the United States. Except as provided in subsection(c) . . . .").

Texas's suggestion at oral argument that 1226(c)(1) requires detention even for aliens who will never face removal proceedings thus is at odds with the text and *Jennings*'s reading of it. There would, of course, be other concerns with indefinite detention for someone not facing removal.

Case 6:24-cv-00001 Document 05160150517 on 06/15/20 in TXSD Filed 09/05/2031
Case 21-40618 Document 00516015057 Page 15/10 in TXSD Page 9/05/2031

No. 21-40618

And while the district court's interpretation of these statutes is novel, executive branch memos listing immigration enforcement priorities are not. *See* Peter Markowitz, *Prosecutorial Discretion Power at its Zenith: The Power to Protect Liberty*, 97 B.U. L. REV. 489, 508 & n.96 (2017) (listing seven DHS, ICE, or INS memos issued from 1997 through 2014 that "set forth basic guidelines . . . to follow in making prosecutorial discretion determinations"). Yet no court has previously held that the detention statutes prevent such guidance. Indeed, in holding unlawful the Deferred Action for Parents of Americans and Lawful Permanent Residents, we recognized that the same policy also set "priority levels" for enforcement. *Texas*, 809 F.3d at 166. Yet Texas did not even argue that the United States had to "alter [its] enforcement priorities." *Id.* Because the state challenged only the deferred action policy that "affirmatively confer[red]" status and benefits on a class, that case involved "much more than nonenforcement" decisions. *Id.*

Against this absence of any authority limiting the executive's discretion in deciding whether to bring a removal proceeding is longstanding precedent holding that the use of "shall" in arrest laws does not limit prosecutorial discretion. *See Cairo & F.R. Co. v. Hecht*, 95 U.S. 168, 170 (1877). The most recent Supreme Court case involved a Colorado law providing that a "peace officer shall arrest, or, if an arrest would be impractical under the circumstances, seek a warrant for the arrest" of a person violating a protective order. *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 759 (2005) (citing Colo. Rev. Stat § 18-6-803.5(3)). Despite the mandatory "shall"—the same word in the immigration detention statutes that the district court concluded meant enforcement decisions were no longer committed to agency discretion by law—the Court held that the law did not eliminate police discretion in deciding whether to arrest a violator. *Id.* at 760. The reason, Justice Scalia explained, is the "deep-rooted nature of law-enforcement discretion, even in the presence of seemingly mandatory

legislative commands." *Id*. at 761. As another opinion had put it, it is "simply 'common sense that *all* police officers must use some discretion in deciding when and where to enforce'" the law. *Id.* (quoting *City of Chicago v. Morales*, 527 U.S. 41, 62 n.32 (1999)).

The district court concluded that "common sense" observation does not apply here, but none of its attempted distinctions are convincing. First, the district court noted that the IIRIRA detention laws "protect third-party interests." True, but that is also true of Colorado's protective order law, which protects domestic violence victims like the children the *Castle Rock* defendant murdered. *See* 545 U.S. at 754; *id.* at 779 (Stevens, J., dissenting) (noting the law protected "beneficiaries of domestic restraining orders"). To the extent legislative purpose is relevant, that the IIRIRA's inclusion of mandatory language in the detention provisions was meant to address a concern about lenient release policies makes the laws no different from the Colorado protective order statute: it too was enacted against concerns about underenforcement. *Id*. at 779–81. The district court noted that *Castle Rock* involved a strong tradition of "police discretion," but the same tradition exists—in "greatly magnified form"—for immigration enforcement. *Reno*, 525 U.S. at 489–90; *see also Arizona*, 567 U.S. at 396. And the fact that the mandatory "shall" contrasts with other uses of the permissive "may" in the immigration detention laws is also true for the Colorado protective order statute. *See* Colo. Rev. Stat. § 18-6-803.5(3)(d), (6)(a)-(b), (7), (9).

That brings us to the two older Supreme Court cases that the district court thought supported its view that "shall" in the IIRIRA provisions overrode the tradition of enforcement discretion. One is a Prohibition Era case in which the government was seeking forfeiture of vehicles used for bootlegging. *Richbourg Motor Co. v. United States*, 281 U.S. 528 (1930). The question was which of two forfeiture laws governed the proceedings that the government had elected to pursue. The Court answered that a "shall" in

11

Case 6:21-cv-00016 Document 155 Filed 09/15/22 in TXSD Page 12 of 31
Case: 21-40618 Document: 00516015057 Page: 12 Date Filed: 09/15/2021

No. 21-40618

one of the statutes (the one giving lienholders to the vehicle a right to forfeiture proceeds) controlled, rejecting the idea that the government could decide which forfeiture law applied. *Id.* at 533. But that ruling is akin to the routine judicial task of deciding which penalty provision applies to an action. Nothing in *Richbourg Motor* says that the "shall" forfeiture law limited the discretion of prohibition agents to decide which bootleggers to arrest and which of their cars to put in forfeiture proceedings. The second case is even further afield. It held that a law requiring that a defendant accused of violating probation "shall forthwith be taken before the court" for a revocation proceeding meant what it said—the defendant had to be given the opportunity to appear in court and refute the charge. *Escoe v. Zerbst*, 295 U.S. 490, 492 (1935) (citing 15 U.S.C. § 725). Interpreting "shall" to be mandatory outside the context of purported limits on enforcement discretion is standard fare. *Richbourg Motor* and *Escoe* thus say nothing about when "seemingly mandatory legislative commands" can uproot the "deep-rooted nature of law-enforcement discretion." *Castle Rock*, 545 U.S. at 761. It makes sense that *Castle Rock* did not bother to cite them.

For these reasons, we do not see a strong justification for concluding that the IIRIRA detention statutes override the deep-rooted tradition of enforcement discretion when it comes to decisions that occur before detention, such as who should be subject to arrest, detainers, and removal proceedings. That means the United States has shown a likelihood of prevailing on appeal to the extent the preliminary injunction prevents officials from relying on the memos' enforcement priorities for nondetention decisions.

III.

The remaining factors also support a partial stay. Judicial interference with a government agency's policies often constitutes irreparable injury. *See*

12

*Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020). And prosecutorial discretion is a core power of the Executive Branch, so its impairment undermines the separation of powers. *United States v. Nixon*, 418 U.S. 683, 693 (1974); *Heckler*, 470 U.S. at 832; *United States v. Ream*, 491 F.2d 1243, 1246 n.2 (5th Cir. 1974) (explaining that the enforcement "discretion flows not from a desire to give carte blanche to law enforcement officials but from recognition of the constitutional principle of separation of powers"). As soon-to-be Chief Justice John Marshall remarked when serving in Congress: prosecutorial discretion is "'an indubitable and a Constitutional power' which permitted [the President] alone to determine the 'will of the nation' in making decisions about when to pursue and when to forego prosecutions." Markowitz, *supra*, at 497 (quoting 10 ANNALS OF CONG. 615 (1800)).

The injury to the executive's daily exercise of this historic discretion is irreparable in the basic sense of the word; there is no way to recover the time when its exercise of discretion is being enjoined during the pendency of the appeal. *Contrast Texas*, 787 F.3d at 768 (finding no irreparable injury during appeal because the United States could continue to "choose whom to remove first" during appeal as injunction did not eliminate enforcement discretion but instead addressed whether individuals could be granted status and benefits, the temporary denial of which was reparable after appeal). Indeed, in recent years the Supreme Court has repeatedly stayed nationwide injunctions that prevented the Executive Branch from pursuing its immigration policies. *See, e.g.*, *Wolf v. Innovation Law Lab*, 140 S. Ct. 1564 (2020) (mem.); *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599 (2020) (mem.); *Barr v. East Bay Sanctuary Covenant*, 140 S. Ct. 3 (2019) (mem.);

*Trump v. Sierra Club*, 140 S. Ct. 1 (2019) (mem.); *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080 (2017).[6]

The balance of equities also favors a stay. For close to nine months, DHS has been following the enforcement priorities listed in its January 2021 memo. "[T]he maintenance of the status quo is an important consideration in granting a stay." *Barber v. Bryant*, 833 F.3d 510, 511 (5th Cir. 2016) (quoting *Dayton Bd. of Educ. v. Brinkman*, 439 U.S. 1358, 1359 (1978)). Even more so here when the release of new guidance is imminent. Allowing the injunction to take effect could subject immigration agents to three separate directives in the span of a few weeks. Moreover, eliminating DHS's ability to prioritize removals poses a number of practical problems given its limited resources. One of those problems, which highlights the potential for nationwide injunctions to conflict, is that ICE is subject to another nationwide injunction that limits the number of beds it can use in detention centers. *Fraihat v. U.S. Immigration & Customs Enf't*, 445 F. Supp. 3d 709 (C.D. Cal. 2020).

The United States has shown that the injunction will cause irreparable injury and that the equities favor a stay.

---

[6] The injury to the United States is not "self-inflicted" in the sense we recently found potential injuries to be in *State v. Biden*, -- F.4th --, 2021 WL 3674780, at *14 (Aug. 19, 2021). There Texas had filed suit two months before DHS had officially terminated the Migration Protection Protocols (MPP) program, so "DHS could have avoided this problem by waiting to unwind MPP until the litigation was resolved." *Id*. But this lawsuit was not filed until April, more than two months after DHS announced its new enforcement priorities. And there can be no argument here that the new Administration started implementing the new enforcement priorities and only later memorialized them in a memo. *Id*. (noting that DHS suggested it started "unwinding MPP four or more months *before* the June 1 Memorandum"). The DHS memo challenged here issued on day one of the new Administration.

No. 21-40618

* * *

We therefore GRANT IN PART and DENY IN PART the motion to stay the preliminary injunction.  The injunction will go into effect to the extent it prevents DHS and ICE officials from relying on the memos to refuse to detain aliens described in 1226(c)(1) against whom detainers have been lodged or aliens who fall under section 1231(a)(1)(A) because they have been ordered removed.  The injunction is STAYED pending appeal in all other respects including the reporting requirements.