

*Secretary*
U.S. Department of Homeland Security
Washington, DC 20528

September 30, 2021

MEMORANDUM TO:     Tae D. Johnson
    Acting Director
    U.S. Immigration and Customs Enforcement

CC:     Troy Miller
    Acting Commissioner
    U.S. Customs and Border Protection

    Ur Jaddou
    Director
    U.S. Citizenship and Immigration Services

    Robert Silvers
    Under Secretary
    Office of Strategy, Policy, and Plans

    Katherine Culliton-González
    Officer for Civil Rights and Civil Liberties
    Office for Civil Rights and Civil Liberties

    Lynn Parker Dupree
    Chief Privacy Officer
    Privacy Office

FROM:     Alejandro N. Mayorkas
    Secretary

SUBJECT:     Guidelines for the Enforcement of Civil Immigration Law

This memorandum provides guidance for the apprehension and removal of noncitizens.

I am grateful to you, the other leaders of U.S. Immigration and Customs Enforcement, and our frontline personnel for the candor and openness of the engagements we have had to help shape this guidance.  Thank you especially for dedicating yourselves – all your talent and energy – to the noble law enforcement profession.  In executing our solemn responsibility to enforce immigration

1

www.dhs.gov

law with honor and integrity, we can help achieve justice and realize our ideals as a Nation. Our colleagues on the front lines and throughout the organization make this possible at great personal sacrifice.

**I. Foundational Principle: The Exercise of Prosecutorial Discretion**

It is well established in the law that federal government officials have broad discretion to decide who should be subject to arrest, detainers, removal proceedings, and the execution of removal orders. The exercise of prosecutorial discretion in the immigration arena is a deep-rooted tradition. The United States Supreme Court stated this clearly in 2012:

> "A principal feature of the removal system is the broad discretion exercised by immigration officials. Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all."

In an opinion by Justice Scalia about twelve years earlier, the Supreme Court emphasized that enforcement discretion extends throughout the entire removal process, and at each stage of it the executive has the discretion to not pursue it.

It is estimated that there are more than 11 million undocumented or otherwise removable noncitizens in the United States. We do not have the resources to apprehend and seek the removal of every one of these noncitizens. Therefore, we need to exercise our discretion and determine whom to prioritize for immigration enforcement action.

In exercising our discretion, we are guided by the fact that the majority of undocumented noncitizens who could be subject to removal have been contributing members of our communities for years. They include individuals who work on the frontlines in the battle against COVID, lead our congregations of faith, teach our children, do back-breaking farm work to help deliver food to our table, and contribute in many other meaningful ways. Numerous times over the years, and presently, bipartisan groups of leaders have recognized these noncitizens' contributions to state and local communities and have tried to pass legislation that would provide a path to citizenship or other lawful status for the approximately 11 million undocumented noncitizens.

The fact an individual is a removable noncitizen therefore should not alone be the basis of an enforcement action against them. We will use our discretion and focus our enforcement resources in a more targeted way. Justice and our country's well-being require it.

By exercising our discretionary authority in a targeted way, we can focus our efforts on those who pose a threat to national security, public safety, and border security and thus threaten America's well-being. We do not lessen our commitment to enforce immigration law to the best of our ability. This is how we use the resources we have in a way that accomplishes our enforcement mission most effectively and justly.

## II. Civil Immigration Enforcement Priorities

We establish civil immigration enforcement priorities to most effectively achieve our goals with the resources we have. We will prioritize for apprehension and removal noncitizens who are a threat to our national security, public safety, and border security.

### A. Threat to National Security

A noncitizen who engaged in or is suspected of terrorism or espionage, or terrorism-related or espionage-related activities, or who otherwise poses a danger to national security, is a priority for apprehension and removal.

### B. Threat to Public Safety

A noncitizen who poses a current threat to public safety, typically because of serious criminal conduct, is a priority for apprehension and removal.

Whether a noncitizen poses a current threat to public safety is not to be determined according to bright lines or categories. It instead requires an assessment of the individual and the totality of the facts and circumstances.

There can be aggravating factors that militate in favor of enforcement action. Such factors can include, for example:

- the gravity of the offense of conviction and the sentence imposed;
- the nature and degree of harm caused by the criminal offense;
- the sophistication of the criminal offense;
- use or threatened use of a firearm or dangerous weapon;
- a serious prior criminal record.

Conversely, there can be mitigating factors that militate in favor of declining enforcement action. Such factors can include, for example:

- advanced or tender age;
- lengthy presence in the United States;
- a mental condition that may have contributed to the criminal conduct, or a physical or mental condition requiring care or treatment;
- status as a victim of crime or victim, witness, or party in legal proceedings;
- the impact of removal on family in the United States, such as loss of provider or caregiver;
- whether the noncitizen may be eligible for humanitarian protection or other immigration relief;
- military or other public service of the noncitizen or their immediate family;

- time since an offense and evidence of rehabilitation;
- conviction was vacated or expunged.

The above examples of aggravating and mitigating factors are not exhaustive. The circumstances under which an offense was committed could, for example, be an aggravating or mitigating factor depending on the facts. The broader public interest is also material in determining whether to take enforcement action. For example, a categorical determination that a domestic violence offense compels apprehension and removal could make victims of domestic violence more reluctant to report the offense conduct. The specific facts of a case should be determinative.

Again, our personnel must evaluate the individual and the totality of the facts and circumstances and exercise their judgment accordingly. The overriding question is whether the noncitizen poses a current threat to public safety. Some of the factors relevant to making the determination are identified above.

The decision how to exercise prosecutorial discretion can be complicated and requires investigative work. Our personnel should not rely on the fact of conviction or the result of a database search alone. Rather, our personnel should, to the fullest extent possible, obtain and review the entire criminal and administrative record and other investigative information to learn of the totality of the facts and circumstances of the conduct at issue. The gravity of an apprehension and removal on a noncitizen's life, and potentially the life of family members and the community, warrants the dedication of investigative and evaluative effort.

### C. Threat to Border Security

A noncitizen who poses a threat to border security is a priority for apprehension and removal.

A noncitizen is a threat to border security if:

(a) they are apprehended at the border or port of entry while attempting to unlawfully enter the United States; or

(b) they are apprehended in the United States after unlawfully entering after November 1, 2020.

There could be other border security cases that present compelling facts that warrant enforcement action. In each case, there could be mitigating or extenuating facts and circumstances that militate in favor of declining enforcement action. Our personnel should evaluate the totality of the facts and circumstances and exercise their judgment accordingly.

4

### III. Protection of Civil Rights and Civil Liberties

We must exercise our discretionary authority in a way that protects civil rights and civil liberties. The integrity of our work and our Department depend on it. A noncitizen's race, religion, gender, sexual orientation or gender identity, national origin, or political associations shall never be factors in deciding to take enforcement action. A noncitizen's exercise of their First Amendment rights also should never be a factor in deciding to take enforcement action. We must ensure that enforcement actions are not discriminatory and do not lead to inequitable outcomes.

This guidance does not prohibit consideration of one or more of the above-mentioned factors if they are directly relevant to status under immigration law or eligibility for an immigration benefit. For example, religion or political beliefs are often directly relevant in asylum cases and need to be assessed in determining a case's merit.

State and local law enforcement agencies with which we work must respect individuals' civil rights and civil liberties as well.

### IV. Guarding Against the Use of Immigration Enforcement as a Tool of Retaliation for the Assertion of Legal Rights

Our society benefits when individuals – citizens and noncitizens alike – assert their rights by participating in court proceedings or investigations by agencies enforcing our labor, housing, and other laws.

It is an unfortunate reality that unscrupulous employers exploit their employees' immigration status and vulnerability to removal by, for example, suppressing wages, maintaining unsafe working conditions, and quashing workplace rights and activities. Similarly, unscrupulous landlords exploit their tenants' immigration status and vulnerability to removal by, for example, charging inflated rental costs and failing to comply with housing ordinances and other relevant housing standards.

We must ensure our immigration enforcement authority is not used as an instrument of these and other unscrupulous practices. A noncitizen's exercise of workplace or tenant rights, or service as a witness in a labor or housing dispute, should be considered a mitigating factor in the exercise of prosecutorial discretion.

### V. The Quality and Integrity of our Civil Immigration Enforcement Actions

The civil immigration enforcement guidance does not compel an action to be taken or not taken. Instead, the guidance leaves the exercise of prosecutorial discretion to the judgment of our personnel.

To ensure the quality and integrity of our civil immigration enforcement actions, and to achieve consistency in the application of our judgments, the following measures are to be taken before the effective date of this guidance:

A. Training

Extensive training materials and a continuous training program should be put in place to ensure the successful application of this guidance.

B. Process for Reviewing Effective Implementation

A review process should be put in place to ensure the rigorous review of our personnel's enforcement decisions throughout the first ninety (90) days of implementation of this guidance. The review process should seek to achieve quality and consistency in decision-making across the entire agency and the Department. It should therefore involve the relevant chains of command.

Longer-term review processes should be put in place following the initial 90-day period, drawing on the lessons learned. Assessment of implementation of this guidance should be continuous.

C. Data Collection

We will need to collect detailed, precise, and comprehensive data as to every aspect of the enforcement actions we take pursuant to this guidance, both to ensure the quality and integrity of our work and to achieve accountability for it.

Please work with the offices of the Chief Information Officer; Strategy, Policy, and Plans; Science and Technology; Civil Rights and Civil Liberties; and Privacy to determine the data that should be collected, the mechanisms to collect it, and how and to what extent it can be made public.

D. Case Review Process

We will work to establish a fair and equitable case review process to afford noncitizens and their representatives the opportunity to obtain expeditious review of the enforcement actions taken. Discretion to determine the disposition of the case will remain exclusively with the Department.

## VI. Implementation of the Guidance

This guidance will become effective in sixty (60) days, on November 29, 2021. Upon the effective date, this guidance will serve to rescind (1) the January 20, *2021 Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities* issued by then-Acting Secretary David Pekoske, and (2) the *Interim Guidance: Civil Immigration Enforcement and Removal Priorities* issued by Acting ICE Director Tae D. Johnson.

We will meet regularly to review the data, discuss the results to date, and assess whether we are achieving our goals effectively. Our assessment will be informed by feedback we receive from our law enforcement, community, and other partners.

This guidance is Department-wide. Agency leaders as to whom this guidance is relevant to their operations will implement this guidance accordingly.

## VII. Statement of No Private Right Conferred

This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.