# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | |
|---|---|
| STATE OF TEXAS; STATE OF LOUISIANA, | Civ. Action No. 6:21-cv-16 |
| *Plaintiffs*, | |
| v. | |
| The UNITED STATES OF AMERICA; ALEJANDRO MAYORKAS, Secretary of the United States Department of Homeland Security, in his official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TROY MILLER, Senior Official  Performing the Duties of the Commissioner of U.S. Customs and Border Protection, in his official capacity; U.S. CUSTOMS AND BORDER PROTECTION; TAE JOHNSON, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TRACY RENAUD, Senior Official Performing the Duties of the Director of the U.S. Citizenship and Immigration Services, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES, | |
| *Defendants*. | |

# FIRST AMENDED COMPLAINT

1.      The Biden Administration is refusing to take custody of criminal aliens despite federal statutes requiring it to do so. Instead, Defendants have issued and implemented a series of unlawful agency memoranda that allow criminal aliens already convicted of felony offenses to roam free in the United States. Such aliens belong in federal custody, as Congress required.

2.      When the Texas Department of Criminal Justice ("TDCJ") incarcerates an alien already convicted of a felony criminal offense, it informs U.S. Immigration and Customs Enforcement ("ICE"). If, pursuant to federal law, the alien should be removed from the United States when his sentence expires, ICE can send TDCJ a detainer request. Upon receiving such a request, TDCJ will hold an alien instead of releasing him into the community.

3.      But since the inauguration, the Biden Administration has rescinded at least 150 detainer requests previously issued to TDCJ, and ICE has declined to take custody of dangerous criminal aliens that it had previously sought.

4.      In Louisiana, an alien convicted of a felony criminal offense may be held in a State prison operated by the Louisiana Department of Public Safety and Corrections ("LDPSC") or may be held pursuant to an agreement with the State in a local Parish prison. Upon receiving an ICE detainer request, the LDPSC or the local Sheriff will hold an alien pending retrieval by ICE instead of releasing him into the community. The Federal Government also operates federal detention facilities in Louisiana, where federal detainees are held pending removal and thereafter deported. ICE also has a Field Office in New Orleans, Louisiana, where decisions are made and

policies are implemented resulting in the failure to remove illegal aliens subject to mandatory removal. Upon information and belief, ICE is not removing individuals subject to mandatory deportation, causing individuals in facilities in Louisiana to be released in local communities in Louisiana.

5.      That is indicative of a broader shift in federal policy that began on the first day of the Biden Administration and has resulted in a "crisis on the border."[1]  The detainer releases themselves are directly attributable to "interim guidance" issued by the United States Department of Homeland Security ("DHS") (the "January 20 Memorandum") and ICE (the "February 18 Memorandum") in memoranda issued earlier this year. As a result of those memoranda, ICE is now failing to issue detainer requests for other dangerous criminal aliens in Texas.

6.      Federal law requires Defendants to take custody of many criminal aliens, including those with final orders of removal, those convicted of drug offenses, and those convicted of crimes of moral turpitude. By refusing to take these criminal aliens into custody, Defendants have disregarded non-discretionary legal duties.

7.      Defendants' actions violate the Immigration and Nationality Act, the Administrative Procedure Act ("APA"), binding agreements DHS negotiated with the State of Texas and the State of Louisiana (the "Agreements," described *infra* at III.D.), and the United States Constitution.

---

[1]  *See, e.g.,* Steven Nelson, *Psaki says 'crisis on the border" after Biden officials rejected term*, N.Y. Post (March 18, 2021), available at https://nypost.com/2021/03/18/psaki-says-crisis-on-the-border-after-biden-officials-rejected-term/.

8.      DHS has now issued a third memorandum on this issue (the "September 30 Memorandum"). It suffers from the same legal infirmities as the Administration's first two attempts and will have the same effect of reducing enforcement, including the issuance of detainers for criminal aliens who have committed aggravated felonies, crimes of moral turpitude, and drug crimes, as well as aliens with final orders of removal.

9.      This Court can and should set aside the agency actions leading Defendants to violate federal law.

## I. PARTIES

10.      Plaintiff State of Texas is a sovereign State. *See* Tex. Const. art. I, § 1. Texas has the authority and responsibility to protect the health, safety, and welfare of its citizens.

11.      Plaintiff State of Louisiana is a sovereign State. *See* La. Const. Preamble; art. I, § 26. Louisiana has the authority and responsibility to protect the health, safety, and welfare of its citizens.

12.      Defendants are officials of the United States government, United States governmental agencies responsible for the issuance and implementation of the challenged memorandum, and the United States.

13.      Defendant the United States of America is sued under 5 U.S.C. sections 702–703 and 28 U.S.C. section 1346.

14.     Defendant Alejandro Mayorkas is the Secretary of the United States Department of Homeland Security. He administers the January 20 Memorandum and issued the September 30 Memorandum. He is sued in his official capacity only.

15.     Defendant DHS implements the January 20 Memorandum and the September 30 Memorandum. DHS oversees Defendants U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and ICE.

16.     Defendant Troy Miller is the Senior Official Performing the Duties of the Commissioner of CBP. He received the January 20 Memorandum and the September 30 Memorandum. He is sued in his official capacity only.

17.     Defendant Tae Johnson is the Acting Director of ICE. He received the January 20 Memorandum and the September 30 Memorandum and issued the February 18 Memorandum. He is sued in his official capacity only.

18.     Defendant Tracy Renaud is the Senior Official Performing the Duties of the Director of USCIS. She received the January 20 Memorandum and the September 30 Memorandum. She is sued in her official capacity only.

## II. JURISDICTION AND VENUE

19.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. sections 1331, 1346, 1361 and 5 U.S.C. sections 702–703.

20.     The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. section 705, 5 U.S.C. section 706, 28 U.S.C. section 1361, and 28 U.S.C. sections 2201–2202.

5

21.     Venue lies in this district pursuant to 28 U.S.C. section 1391 because the State of Texas is a resident of this judicial district, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Venue is also proper under Section VIII of the Texas Agreement. *See* Ex. C § VIII.

### III. FACTUAL BACKGROUND

#### A.     The January 20 Memorandum

22.     On the first day of the Biden Administration, the acting Secretary of DHS issued a memorandum announcing three changes. *See* Ex. A ("January 20 Memorandum"). First, it called for a "Department-wide review of policies and practices concerning immigration enforcement." *Id.* at 2. Second, it established "interim enforcement priorities." *Id.* at 2–3. Third, it "direct[ed] an immediate pause on removals . . . for 100 days." *Id.* at 3.

23.     The January 20 Memorandum's interim enforcement priorities "apply not only to the decision to issue, serve, file, or cancel a Notice to Appear, but also to a broad range of other [supposedly] discretionary enforcement decisions, including deciding . . . whom to detain or release." *Id.* at 2.

24.     Under the January 20 Memorandum, DHS lists its interim enforcement priorities as follows:

> 1. **National security**. Individuals who have engaged in or are suspected of terrorism or espionage, or whose apprehension, arrest and/or custody is otherwise necessary to protect the national security of the United States.
>
> 2. **Border security.** Individuals apprehended at the border or ports of entry while attempting to unlawfully enter the United States on or after November 1, 2020,

or who were not physically present in the United States before November 1, 2020.

3. **Public safety.** Individuals incarcerated within federal, state, and local prisons and jails released on or after the issuance of this memorandum who have been convicted of an "aggravated felony," as that term is defined in section 101(a) (43) of the Immigration and Nationality Act at the time of conviction, and are determined to pose a threat to public safety.

*Id.* at 3.

25.     The January 20 Memorandum did not prioritize detention of criminal aliens with final orders of removal, criminal aliens convicted of drug offenses, or criminal aliens convicted of crimes of moral turpitude.

26.     The January 20 Memorandum was issued without notice and comment under the APA.

27.     The January 20 Memorandum did not consider any of the significant harms that Texas and Louisiana face as a result of DHS failing to detain criminal aliens subject to removal.

## B.     The February 18 Memorandum

28.     On February 18, 2021, ICE issued a memorandum providing "interim guidance" on the interim enforcement priorities from the January 20 Memorandum. *See* Ex. B (the "February 18 Memorandum").

29.     The February 18 Memorandum provides that it "shall be applied to all civil immigration enforcement and removal decisions," including "whether to issue a detainer," "whether to assume custody of a noncitizen subject to a previously issued

detainer," and "whether to detain or release from custody subject to conditions." *Id.* at 3.

30.     The February 18 Memorandum amended the January 20 Memorandum's interim enforcement priorities in part, but it did not prioritize detention of criminal aliens with final orders of removal, criminal aliens convicted of drug offenses, or criminal aliens convicted of crimes of moral turpitude. *Id.* at 1–2.

31.     On its face, the February 18 Memorandum establishes a two-tier system. First, it establishes three "priority categories": National Security, Border Security, and Public Safety (including aliens convicted of aggravated felonies). *Id.* at 4–5. Aliens in those categories are "presumed" to be proper subjects of enforcement action.

32.     Second, aliens outside the "priority categories" are "presumed" not to be proper subjects of enforcement action. *Id.* at 3. According to the February 18 Memorandum, "[a] civil enforcement or removal action that does not meet the above criteria for presumed priority cases will require preapproval" from supervisors. *Id.* at 5. Thus, honoring any existing detainer or imposing a new one on a "non-priority" alien requires preapproval from the Field Office Director or Special Agent in Charge. *Id.* at 6.

33.     The February 18 Memorandum was issued without notice and comment under the APA.

34.     The February 18 Memorandum did not consider nor address any of the significant harms that Texas and Louisiana face as a result of ICE failing to detain removable illegal aliens.

### C.     The Application of the Two Memoranda

35.     These two memoranda, as subsequently applied by Defendants, have led federal immigration authorities to rescind detainer requests relating to incarcerated criminal aliens, to not issue detainer requests even for individuals subject to mandatory removal, and to release individuals from federal detention facilities such as those located in Louisiana and Texas. As a consequence, dangerous criminal aliens are being released into local communities.

36.     Contrary to 8 U.S.C. § 1226(c), Defendants are refusing to take custody of aliens convicted of serious crimes. Congress specifically requires detention of aliens who commit drug offenses or crimes of moral turpitude. But despite that requirement, Defendants have rescinded detainer requests for aliens convicted of those offenses.  As a result, many convicted criminal aliens have been released to society after their sentences, contrary to Congress's mandate that they be detained pending their removal from the United States. Of course, the States of Texas and Louisiana must do what they can to protect their citizens, so some of these criminal aliens have remained in state custody at the State's expense.

37.     The February 18 Memorandum justifies the prioritization of aliens who have committed "aggravated felonies" as "track[ing] Congress's prioritization of aggravated felonies for immigration enforcement actions." Ex. B at 4 n.6.

38.     Congress did prioritize aggravated felonies: it mandated detention of aliens who have committed such crimes. Section 1226(c) provides that "[t]he Attorney General shall take into custody any alien who . . . is deportable by reason of having committed any offense covered in section 1227(a)(2) . . . (A)(iii)."  8 U.S.C.

9

§ 1226(c)(1)(B). And Section 1227(a)(2)(A)(iii) covers "[a]ny alien who is convicted of an aggravated felony at any time after admission."

39.     But "Congress's prioritization" for detention is not limited to aggravated felonies. It similarly mandated detention for aliens convicted of many other categories of crimes. The very reason the February 18 Memorandum provides for prioritizing aggravated felonies also supports prioritizing drug offenses and crimes of moral turpitude. But without explanation, ICE excluded both of those categories from its list of priorities.

40.     Section 1226(c)(1) refers to 8 USC § 1182(a)(2), which covers "any alien convicted of . . . a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance." *Id.* § 1182(a)(2)(A)(i)(II); *see also id.* § 1226(c)(1)(B) (citing *id.* § 1227(a)(2)(B)).

41.     Despite this, Defendants have refused to take custody of numerous dangerous drug offenders. In the wake of the January 20 Memorandum and the February 18 Memorandum, ICE has rescinded detainer requests for at least 150 of criminal aliens in TDCJ custody. Many of them were convicted of drug offenses ranging from possession of various controlled substances (cocaine, methamphetamines, marijuana) to manufacture and delivery of them. Defendants are not simply ignoring low-level drug offenses related to personal use: at least six of the convictions for marijuana possession involved at least *fifty pounds* of the drug.

10

42.     Section 1226(c) also requires Defendants to detain aliens convicted of crimes of moral turpitude. Section 1226(c)(1) refers to 8 USC § 1182(a)(2), which covers "any alien convicted of . . . a crime involving moral turpitude (other than a purely political offense)." *Id.* § 1182(a)(2)(A)(i)(I); *see also id.* § 1226(c)(1)(B) (citing *id.* § 1227(a)(2)(A)).

43.     Crimes involving moral turpitude include evading arrest with a vehicle, failing to stop and render aid after being involved in an automobile accident, theft, and crimes in which fraud is an ingredient. But Defendants—despite the clear requirements of Section 1226(c)(1)—have refused to take custody of many aliens convicted of these crimes.

44.     Under the January 20 Memorandum and the February 18 Memorandum, Defendants are also refusing to take aliens with final orders of removal into custody. By releasing detainer requests (or simply never issuing them) for aliens with final orders of removal, Defendants are violating a non-discretionary duty.

45.     Instead, Section 1231(a)(2) provides that Defendants "shall detain" aliens "[d]uring the removal period." 8 U.S.C. § 1231(a)(2). For aliens in criminal custody with final orders of removal that have not been stayed by a court, the removal period beings on "the date the alien is released from detention or confinement." 8 U.S.C. § 1231(a)(1)(B).

46.     Thus, Defendants are obligated to detain aliens with final orders of removal when they are released from custody. But instead of detaining criminal aliens

with final orders of removal, Defendants have *rescinded* detainer requests for at least 21 such aliens in custody of the TDCJ since the February 18 Memorandum.

47.     Defendants' violation of Section 1231(a)(2) establishes a substantive violation of the APA. *See* 5 U.S.C. § 706(2)(A), (C).

48.     Defendants did not notify Texas or Louisiana that they were considering the changes set forth in the memoranda, nor did they consult with Texas or Louisiana about such changes. Defendants did not follow the procedures outlined in the Agreement with either State.

### D.     The September 30 Memorandum

49.     On September 30, 2021, DHS issued yet another memorandum, this one titled "Guidelines for the Enforcement of Civil Immigration Law." *See* Ex. E (the "September 30 Memorandum").

50.     The September 30 Memorandum stated that it would take effect on November 29, 2021 and would on that date rescind the January 20 Memorandum and the February 18 Memorandum. *See* Ex. E at 6. However, the September 30 Memorandum mandates several categories of requirements for DHS and its component agencies to implement "before the effective date of this guidance." *Id*. at 6.

51.     The September 30 Memorandum identified the same three priority enforcement categories found in the previous memoranda: threats to national security, threats to public safety, and threats to border security. Ex. E at 3-4. However, the September 30 Memorandum modified the February 18 Memorandum so that even priority category aliens cannot presumptively face enforcement actions.

52.     The September 30 Memorandum places enormous practical burdens before any enforcement action can be undertaken, even in the priority category of threats to public safety:

> The decision how to exercise prosecutorial discretion can be complicated and requires investigative work. Our personnel should not rely on the fact of conviction or the result of a database search alone. Rather, our personnel should, to the fullest extent possible, obtain and review the entire criminal and administrative record and other investigative information to learn of the totality of the facts and circumstances of the conduct at issue.

Ex. E at 4.  The same is true for the priority category of border security:

> There could be other border security cases that present compelling facts that warrant enforcement action. In each case, there could be mitigating or extenuating facts and circumstances that militate in favor of declining enforcement action. Our personnel should evaluate the totality of the facts and circumstances and exercise their judgment accordingly.

*Id.* at 4.

53.     As with the previous two memoranda, the September 30 Memorandum omits (1) criminal aliens convicted of drug offenses; (2) criminal aliens convicted of crimes of moral turpitude; and (3) criminal aliens with final orders of removal as priorities. But it further omits an enforcement priority that the prior memoranda included: criminal aliens convicted of aggravated felonies. Each of these categories is specifically addressed by provisions contained in the Immigration and Nationality Act, including 8 U.S.C. § 1226(c)(1), which states, "The Attorney General shall take into custody" aliens who meet specified conditions, including criminal aliens convicted of drug offenses, crimes involving moral turpitude, and aggravated felonies.

13

54. The September 30 Memorandum makes clear that a conviction for an aggravated felony would not in itself justify taking an enforcement action against an alien. It states that "[w]hether a noncitizen poses a current threat to public safety is not to be determined according to bright lines or categories." Ex. E at 3. Instead, "mitigating factors that militate in favor of declining enforcement action" would have to be considered." The September 30 Memorandum lists the following examples of such factors:

- advanced or tender age;

- lengthy presence in the United States;

- a mental condition that may have contributed to the criminal conduct, or a physical or mental condition requiring care or treatment;

- status as a victim of crime or victim, witness, or party in legal proceedings;

- the impact of removal on family in the United States, such as loss of provider or caregiver;

- whether the noncitizen may be eligible for humanitarian protection or other immigration relief;

- military or other public service of the noncitizen or their immediate family;

- time since an offense and evidence of rehabilitation;

- conviction was vacated or expunged.

Ex. E at 3-4. But even these "are not exhaustive." *Id*. at 4.

55.     The September 30 Memorandum also lists a smaller number of aggravating factors that could be considered in cases where an alien was convicted of a crime:

> • the gravity of the offense of conviction and the sentence imposed;
>
> • the nature and degree of harm caused by the criminal offense;
>
> • the sophistication of the criminal offense;
>
> • use or threatened use of a firearm or dangerous weapon;
>
> • a serious prior criminal record.

Ex. E at 3.

56.     The September 30 Memorandum provides that "[t]he civil immigration enforcement guidance does not compel an action to be taken or not taken. Instead, the guidance leaves the exercise of prosecutorial discretion to the judgment of our personnel." Ex. E at 5. However, as a practical matter, requiring an intensive investigation—discovering and evaluating a large number of factors not easily accessible through a quick database search—before undertaking routine enforcement action is not feasible to an officer on the street facing a need to make an immediate decision.

57.     This practical effect on enforcement by field officers is magnified by the September 30 Memorandum's onerous review processes that ultimately involve the chain-of-command in every routine enforcement action:

> To ensure the quality and integrity of our civil immigration enforcement actions, and to achieve consistency in the

application of our judgments, the following measures are to be taken before the effective date of this guidance:

A. Training Extensive training materials and a continuous training program should be put in place to ensure the successful application of this guidance.

B. Process for Reviewing Effective Implementation A review process should be put in place to ensure the rigorous review of our personnel's enforcement decisions throughout the first ninety (90) days of implementation of this guidance. The review process should seek to achieve quality and consistency in decision-making across the entire agency and the Department. It should therefore involve the relevant chains of command. Longer-term review processes should be put in place following the initial 90-day period, drawing on the lessons learned. Assessment of implementation of this guidance should be continuous.

C. Data Collection We will need to collect detailed, precise, and comprehensive data as to every aspect of the enforcement actions we take pursuant to this guidance, both to ensure the quality and integrity of our work and to achieve accountability for it. Please work with the offices of the Chief Information Officer; Strategy, Policy, and Plans; Science and Technology; Civil Rights and Civil Liberties; and Privacy to determine the data that should be collected, the mechanisms to collect it, and how and to what extent it can be made public.

D. Case Review Process We will work to establish a fair and equitable case review process to afford noncitizens and their representatives the opportunity to obtain expeditious review of the enforcement actions taken. Discretion to determine the disposition of the case will remain exclusively with the Department.

Ex. E at 6. Combined with the following provision, the September 30 Memorandum

sends a clear message to field agents that they do not actually have discretion to fully

enforce the immigration laws and their actions will be scrutinized after the fact,

leading to reduced enforcement on the front end:

> We will meet regularly to review the data, discuss the results to date, and assess whether we are achieving our goals effectively. Our assessment will be informed by feedback we receive from our law enforcement, community, and other partners. This guidance is Department-wide. Agency leaders as to whom this guidance is relevant to their operations will implement this guidance accordingly.

*Id.* at 7.

58.     Combined, these provisions of the September 30 Memorandum will have a similar effect as the February 18 Memorandum's preapproval process. It will result in a significant decrease in ICE enforcement actions. The September 30 Memorandum effectively instructs ICE enforcement staff to forgo undertaking a large number of enforcement actions and will result in a significant increase in released detainers and the failure to issue detainers.

59.     The September 30 Memorandum does not prioritize detention of criminal aliens with final orders of removal, criminal aliens convicted of drug offenses, criminal aliens convicted of crimes of moral turpitude, or criminal aliens convicted of aggravated felonies.

60.     The September 30 Memorandum was issued without notice and comment under the APA.

61.     The September 30 Memorandum did not consider any of the significant harms that Texas and Louisiana face as a result of DHS failing to detain criminal aliens subject to removal.

**E.     The Agreements**

62.     Cooperation and coordination between federal and state officials are essential to the effective enforcement of federal immigration law.

63.     To promote such cooperation and coordination, Texas and DHS entered into a mutually beneficial agreement, as did Louisiana and DHS. *See* Ex. C (the "Texas Agreement"); Ex. D (the "Louisiana Agreement"). The Texas Agreement establishes a binding and enforceable commitment between DHS and Texas. Ex. C § II. The Louisiana Agreement establishes a binding and enforceable commitment between DHS and Louisiana. Ex. D § II.

64.     The Agreements also apply to several constituent agencies within DHS: ICE, CBP, and USCIS. *Id.* at 1 & n.1.

65.     Generally, the Texas Agreement provides that "Texas will provide information and assistance to help DHS perform its border security, legal immigration, immigration enforcement, and national security missions in exchange for DHS's commitment to consult Texas and consider its views before taking" certain administrative actions. Ex. C § II.

66.     The Louisiana Agreement contains virtually identical language. *See* Ex. D § II.

67.     For example, DHS must "[c]onsult with Texas before taking any action or making any decision that could reduce immigration enforcement" or "increase the number of removable or inadmissible aliens in the United States." Ex. C § III.A.2. That "includes policies, practices, or procedures which have as their purpose or effect . . . "decreasing the number of or criteria for detention of removable or inadmissible aliens from the country." Ex. C § III.A.2.d; *see also* Ex. D § III.A.2.d (same consultation requirement as to Louisiana).

18

68.     To enable this consultation process, the Agreement requires DHS to "[p]rovide Texas with 180 days' written notice … of any proposed action" subject to the consultation requirement. Ex. C § III.A.3. That gives Texas "an opportunity to consult and comment on the proposed action." *Id.* After Texas submits its views, "DHS will in good faith consider Texas's input and provide a detailed written explanation of the reasoning behind any decision to reject Texas's input before taking any action" covered by the consultation requirement. *Id.*

69.     Louisiana is likewise entitled to the same notice. *See* Ex. D § III.A.3.

70.     Defendants did not provide Texas or Louisiana with notice of the January 20 Memorandum, the February 18 Memorandum, or the September 30 Memorandum.

71.     Defendants did not consult with Texas or Louisiana about the January 20 Memorandum, the February 18 Memorandum, or the September 30 Memorandum.

72.     Neither the January 20 Memorandum, the February 18 Memorandum, nor the September 30 Memorandum considered the existence of, or the requirements of, the Agreements.

73.     The Texas Agreement authorizes adjudication of disputes about the Agreement "in a United States District Court located in Texas." Ex. C § VIII.

74.     The Louisiana Agreement authorizes adjudication of disputes judicially if a resolution cannot be reached through "consultation and communication." Ex. D § VIII. Defendants, however, have breached the Louisiana Agreement by failing to comply with its plain terms of notice and consultation, rendering any further requirement of consultation and communication futile. Moreover, Defendants' conduct

regarding the Texas Agreement also shows Defendants' refusal to consult and renders any further communication and attempt to resolve the matter amicably a vain and useless act that would only delay resolution and cause Louisiana further irreparable harm.

75.    To the extent DHS fails to comply with its obligations, the Agreements expressly provide for injunctive relief. It would "be impossible to measure in money the damage that would be suffered if the parties fail[ed] to comply with" the Agreement. Ex. C § VI; Ex. D § VI. "[I]n the event of any such failure, an aggrieved party [would] be irreparably damaged and [would] not have an adequate remedy at law." *Id.* "Any such party shall, therefore, be entitled (in addition to any other remedy to which it may be entitled in law or in equity) to injunctive relief, including specific performance, to enforce such obligations, and if any action should be brought in equity to enforce any of the provisions of this Agreement, none of the parties hereto shall raise the defense that there is an adequate remedy at law." *Id.*

76.    The Agreements provide mechanisms by which they can be modified or terminated. *See* Ex. C §§ XIV–XV; Ex. D §§ XIV–XV. DHS purported to terminate the Texas Agreement "effective immediately" by letter on February 2, 2021, but it did not provide the requisite 180 days' notice required for termination under the terms of the Agreement. Texas therefore treats DHS's letter as notice of intent to terminate, which became effective after 180 days (*i.e.*, on August 1, 2021). The Texas Agreement remained binding up to that point. To the best of its knowledge, Louisiana has not received a similar termination letter; however, even if DHS sent one then, the

Louisiana Agreement would remain binding until the requisite notice provisions provided therein are satisfied.

### F.   Defendants' Actions Cause Texas Irreparable Injury

77.   Defendants' failure to detain criminal aliens as required by federal law significantly injures Texas.

78.   Texas spends hundreds of millions of dollars per year providing services to illegal aliens. Those services include education services and healthcare, as well as many other social services broadly available in Texas.

79.   By increasing the number of illegal aliens present in Texas, or in the care of TDCJ, the January 20 Memorandum, the February 18 Memorandum, and the September 30 Memorandum will necessarily increase these costs in multiple ways.

### 1.   State Detention

80.   Detaining criminal aliens imposes significant costs on Texas. These costs include the financial cost of detention, mandatory supervision, or parole, and the use of scarce state resources.

81.   In 2019, Texas housed almost 9,000 undocumented criminal aliens. Texas's cost to do so was over 152 million dollars.

82.   Those detention costs will increase as a result of Defendants' failure to detain criminal aliens as it increases the number of criminal aliens that Texas must detain.

83.   Further, the sudden nature of the shift in Defendants' actions and policies exacerbates the harm to Texas.

### 2.   Release

84.     In addition, the release of criminal aliens into Texas communities imposes significant costs on Texas. These costs include the effects of crimes they commit while free, the cost of investigating and prosecuting those crimes, the costs of monitoring or supervising criminal aliens, and the costs of social services criminal aliens utilize when not detained.

85.     Defendants' failure to detain criminal aliens increases the number of criminal aliens that are released into Texas communities.

86.     The sudden nature of the shift in Defendants' actions and policies exacerbates the harm to Texas.

### 3.     Healthcare and Education Costs

87.     The aliens Defendants are failing to detain are eligible for certain healthcare and educational programs in Texas.

88.     The State funds multiple healthcare programs that cover illegal aliens. The provision of these services—utilized by illegal aliens—results in millions of dollars of expenditures per year. These services include the Emergency Medicaid program, the Texas Family Violence Program, and the Texas Children's Health Insurance Program.

89.     The Emergency Medicaid program provides health coverage for low-income children, families, seniors and the disabled. Federal law requires Texas to include illegal aliens in its Emergency Medicaid program. The program costs the State tens of millions of dollars annually.

90.     Additionally, the Texas Family Violence Program provides emergency shelter and supportive services to victims and their children in the State of Texas.

Texas spends over a million dollars per year on the Texas Family Violence Program for services to illegal aliens.

91.     Finally, the Texas's Children's Health Insurance Program offers low-cost health coverage for children from birth through age 18. Texas spends tens of millions of dollars each year on coverage for illegal aliens.

92.      Further, Texas faces the costs of uncompensated care provided by state public hospital districts to illegal aliens which results in expenditures of hundreds of millions of dollars per year.

93.     Defendants' failure to detain criminal aliens increases their use of those programs and therefore increases the cost to the State of Texas.

94.     Defendants' failure to detain criminal aliens reduces the likelihood that any particular criminal alien will be removed and reduces the number of criminal aliens who will be removed. It therefore causes an increase in the number of criminal aliens in Texas. A higher number of criminal aliens in Texas increases healthcare and education costs for the State of Texas.

95.     Federal law requires Texas to include illegal aliens in some of these programs.

96.     Some of the criminal aliens Defendants are obligated to detain were lawful aliens but became subject to mandatory detention and removal after committing certain crimes. Those aliens are eligible for a broader array of programs.

### 4.      Education Costs

97.     The failure of Defendants to follow federal law and detain criminal aliens also results in additional educational expenditures by the State of Texas. Aliens and

the children of those aliens receive education benefits from the State at significant taxpayer expense. Defendants' failure to detain criminal aliens increases education expenditures by the State of Texas each year for children of those aliens.

98.     These imminent and irreparable harms have forced Texas to seek relief in this Court.

99.     DHS has already acknowledged the effect that its decisions have on Texas. "Texas, like other States, is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement. Such changes can impact Texas's law enforcement, housing, education, employment, commerce, and healthcare needs and budgets." Ex. C § II.

100.    Indeed, DHS has specifically admitted that "an increase in releases from detention" and "relaxation of the standards for granting release from detention" would "result in concrete injuries to Texas." Ex. C § II.

101.    Texas's interests fall within the zone of interests protected by federal immigration statutes and the APA. "The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States," which "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012).

### G.     Defendants' Actions Cause Louisiana Irreparable Injury

102.    Louisiana, like Texas, is harmed in the same manner and with the same harms outlined above regarding costs of detention, healthcare, and education, specifically including but not limited to coverage in the Louisiana Children's Health Insurance Program ("LaCHIP"). Defendants' arbitrary and unlawful actions—if not

set aside—will burden Louisiana with expending these and other funds on aggravated felons and other aliens subject to mandatory removal.

103.   Louisiana is also faced with a specific harm due to the presence and imminent release of illegal aliens subject to mandatory removal being from detention facilities located in Louisiana, including in the Bossier Parish Medium Security Facility in Plain Dealing; Jackson Parish Correctional Center in Jonesboro; the LaSalle ICE Processing Center in Jena; the Pine Prairie ICE Processing Center in Pine Prairie; the Richwood Correctional Center in Monroe; the River Correctional Center in Ferriday; the South Louisiana ICE Processing Center in Basile; the federal Oakdale Detention Facility in Oakdale; the Natchitoches Parish Detention Center in Natchitoches; and the Winn Correctional Center in Winnfield.

104.   Moreover, the first duty of any sovereign is protecting its citizens. But Louisiana and Texas have been placed at the arbitrary and capricious mercy of federal immigration officials with regard to alien detention and removal. *See Arizona v. United States*, 567 U.S. 387 (2012). Louisiana and Texas have an overriding interest in federal officials executing their mandatory duty to remove criminal aliens. *Compare Massachusetts v. EPA*, 549 U.S. 497, 519 (2007) (recognizing that a State is entitled to "special solicitude" in seeking to enforce statutory provisions that implicate aspects of sovereignty), *with Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601–02 (1982) (recognizing sovereign interests "in exercise of sovereign power over individuals" and "the maintenance and recognition of borders" and quasi-sovereign interest "in the well-being of [the State's] populace"). That interest will be critically

impaired if Defendants are permitted to continue refusing to remove criminal aliens, particularly if Defendants can do so without complying with the Administrative Procedure Act.

### H.    Related Litigation

105.    On January 22, 2021, the State of Texas challenged the 100-day moratorium on removals established by Section C of the January 20 Memorandum. *See State of Texas v. United States*, No. 6:21-cv-3 (S.D. Tex. Jan. 22, 2021).

106.    This Court issued a temporary restraining order on January 26, 2021. *See Texas v. United States*, No. 6:21-cv-3, 2021 WL 247877 (S.D. Tex. Jan. 26, 2021). It issued a preliminary injunction on February 23, 2021. *See Texas v. United States*, No. 6:21-cv-3, 2021 WL 723856 (S.D. Tex. Feb. 23, 2021). As a result of these orders, Defendants have been prohibited from implementing the 100-day moratorium on removals.

107.    The Court's rulings from that case, including its reasoning about standing, reviewability, the meaning of Section 1231, irreparable injury, and injunctive relief, are highly relevant to this case.

## IV. CLAIMS

## <u>COUNT I</u>

**Failure to Take Custody of Inadmissible or Deportable Illegal Aliens in Violation of 8 U.S.C. § 1226(c)**

108.    Plaintiffs incorporate by reference all preceding paragraphs.

109.     The January 20 Memorandum, the February 18 Memorandum, and the September 30 Memorandum are agency actions reviewable under the APA. *See* 5 U.S.C. § 701(a).

110.     The January 20 Memorandum, the February 18 Memorandum, and the September 30 Memorandum are unlawful because they violate 8 U.S.C. § 1226. Section 1226(c) provides that

> The Attorney General shall take into custody any alien who—
>
> **(A)** is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,
>
> **(B)** is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,
>
> **(C)** is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence[d] to a term of imprisonment of at least 1 year, or
>
> **(D)** is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,
>
> when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

8 U.S.C. § 1226(c)(1).

111.     This mandatory duty to take criminal aliens into custody applies to those completing their sentences for crimes relating to controlled substances, those involving moral turpitude, aggravated felonies, and others.

112.   Section 1226(c) provides the only authorization for release from this mandatory detention:

> The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides pursuant to section 3521 of title 18 that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.

8 U.S.C. § 1226(c)(2).

113.   The January 20 Memorandum, the February 18 Memorandum, and the September 30 Memorandum unlawfully violate Defendants' non-discretionary duty to "take into custody any alien" who is inadmissible or deportable for the reasons contained in Section 1226(c).

114.   The January 20 Memorandum, the February 18 Memorandum, and the September 30 Memorandum violate the APA because they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

115.   Section 1226(c) requires Defendants to take custody of the specified criminal aliens. By authorizing immigration enforcement officials to disregard their mandatory duties to take custody of criminal aliens, the January 20 Memorandum,

the February 18 Memorandum, and the September 30 Memorandum all violate this provision.

116.    By failing to take custody of criminal aliens, Defendants are unlawfully withholding and unreasonably delaying agency action. *See* 5 U.S.C. § 706(a).

## COUNT II

### Failure to Take Custody of Illegal Aliens Subject to Final Orders of Removal in Violation of 8 U.S.C. § 1231(a)(2)

117.    Plaintiffs incorporate by reference all preceding paragraphs.

118.    The January 20 Memorandum, the February 18 Memorandum, and the September 30 Memorandum are agency actions reviewable under the APA. *See* 5 U.S.C. § 701(a).

119.    The January 20 Memorandum, the February 18 Memorandum, and the September 30 Memorandum are unlawful because they violate the statutory requirement that Defendants "shall detain" aliens "[d]uring the removal period." 8 U.S.C. § 1231(a)(2). For aliens in criminal custody with final orders of removal that have not been stayed by a court, the removal period begins on "the date the alien is released from detention or confinement." 8 U.S.C. § 1231(a)(1)(B).

120.    Defendants are violating a non-discretionary duty to take aliens with final orders of removal into custody, by releasing (or never issuing) detainer requests for aliens with final orders of removal.

121.    The January 20 Memorandum, the February 18 Memorandum, and the September 30 Memorandum preclude the agencies from complying with Section 1231(a)(2). They therefore violate the APA. They are both "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

122.   Section 1226(c) requires Defendants to take custody of the specified criminal aliens. By failing to take custody of criminal aliens, Defendants are unlawfully withholding and unreasonably delaying agency action. *See* 5 U.S.C. § 706(a).

## COUNT III

### Arbitrary and Capricious Agency Action

123.   Plaintiffs incorporate by reference all preceding paragraphs.

124.   The January 20 Memorandum, the February 18 Memorandum, and the September 30 Memorandum are agency actions reviewable under the APA. *See* 5 U.S.C. § 701(a).

125.   The APA prohibits agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

126.   The January 20 Memorandum, the February 18 Memorandum, and the September 30 Memorandum do not represent reasoned decisionmaking.

127.   DHS has previously recognized the importance of removing illegal aliens subject to a final order of removal. *See, e.g.*, Ex. C § II. Indeed, it committed to "enforcing the immigration laws of the United States to prohibit the entry into, and promote the return or removal from, the United States of inadmissible and removable aliens." *Id.* § III.A.1.a.

128.   The January 20 Memorandum, the February 18 Memorandum, and the September 30 Memorandum represent a sharp departure from previous policy on

30

detainers. Because they do not sufficiently explain that sudden departure, the memoranda are arbitrary and capricious.

129.   DHS and ICE ignored the harms that failing to detain removable aliens will cause. The memoranda did not analyze those costs. Failing to consider important costs of a new policy renders that policy arbitrary and capricious. *See Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015) ("[A]gency action is lawful only if it rests 'on a consideration of the relevant factors.'").

130.   The memoranda also failed to analyze the requirements in the Agreements. They "entirely failed to consider [that] important aspect of the problem." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983)).

131.   The memoranda also failed to consider alternative approaches that would allow at least some additional mandatory detentions—of aliens convicted of drug offenses, crimes of moral turpitude, or aggravated felonies, or of aliens with final orders of removal—to continue. The Supreme Court recently held that a DHS immigration action was arbitrary and capricious because it was issued "'without any consideration whatsoever' of a [more limited] policy." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1912 (quoting *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 51).

132.   Even if there were some way to explain or justify the decisions of DHS and ICE, it would be irrelevant because the agencies did not provide any such explanation or justification in the January 20 Memorandum, the February 18

Memorandum, or the September 30 Memorandum. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

## COUNT IV

### Failure to Follow the Requirements of Notice-and-Comment Rulemaking

133.    Plaintiffs incorporate by reference all preceding paragraphs.

134.    The January 20 Memorandum, the February 18 Memorandum, and the September 30 Memorandum are agency actions reviewable under the APA. *See* 5 U.S.C. § 701(a).

135.    The January 20 Memorandum, the February 18 Memorandum, and the September 30 Memorandum are substantive or legislative rules that required notice-and-comment rulemaking under the APA. *See* 5 U.S.C. § 553. They are not exempt from the APA's notice-and-comment requirements as interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice. *See id.* § 553(b)(A).

136.    Because DHS and ICE failed to use notice-and-comment procedures, the January 20 Memorandum, the February 18 Memorandum, and the September 30 Memorandum are invalid. *See* 5 U.S.C. § 706.

## COUNT V

### Failure to Provide Notice to and Consult with Texas and Louisiana pursuant to the Agreements

137.    Plaintiffs incorporate by reference all preceding paragraphs.

138.   Defendants issued the January 20 Memorandum, the February 18 Memorandum, and the September 30 Memorandum without following the notice and consultation requirements contained in the Agreements.

139.   Because they do not comply with the terms of the Agreements, the January 20 Memorandum, the February 18 Memorandum, and the September 30 Agreement are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

140.   As a result of the January 20 Memorandum and the February 18 Memorandum, Texas and Louisiana "will be irreparably damaged and will not have an adequate remedy at law," and are therefore "entitled . . . to injunctive relief . . . to enforce [DHS's] obligations" under the Agreements. Ex. C § VI; Ex. D § VI. As a result of the September 30 Memorandum, Louisiana is similarly harmed and entitled to injunctive relief under the Louisiana Agreement.

## COUNT VI

### Failure to Take Care that the Laws be Faithfully Executed

141.   Plaintiffs incorporate by reference all preceding paragraphs.

142.   The Constitution requires the President to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

143.   This constitutional limitation is binding on agencies and officers exercising executive power. *See* U.S. Const. art. II, § 1, cl. 1 (vesting "[t]he executive Power" in the President).

144. The January 20 Memorandum, the February 18 Memorandum, and the September 30 Memorandum are unconstitutional because they direct executive officials not to enforce federal law regarding mandatory detention of certain aliens.

145. Unconstitutional agency action or inaction violates the APA. *See* 5 U.S.C. § 706.

146. This constitutional violation is also actionable independent of the APA. Federal courts have long exercised the power to enjoin federal officers from violating the Constitution. *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327–28 (2015) (discussing "a long history of judicial review of illegal executive action, tracing back to England").

## V. DEMAND FOR JUDGMENT

Wherefore, Plaintiffs request that the Court:

    a.    Postpone the effective date of the September 30 Memorandum;

    b.    Hold unlawful and set aside Section B ("Interim Civil Enforcement Guidelines") of the January 20 Memorandum, the February 18 Memorandum, and the September 30 Memorandum;

    c.    Declare that Section B of the January 20 Memorandum, the February 18 Memorandum, and the September 30 Memorandum are unlawful;

    d.    Issue preliminary and permanent injunctive relief enjoining Defendants from enforcing or implementing Section B of the January 20 Memorandum, the February 18 Memorandum, and the September 30 Memorandum;

    e.    Compel Defendants to take custody of criminal aliens as required by statute;

    f.    Award Texas and Louisiana the costs of this action and reasonable attorney's fees; and

g.    Award such other and further relief as the Court deems equitable and just.

Date: October 22, 2021          Respectfully submitted.

KEN PAXTON                PATRICK K. SWEETEN
Attorney General of Texas      Deputy Attorney General for Special Litigation
                              *Attorney-in-Charge*
BRENT WEBSTER           Texas Bar No. 00798537
First Assistant Attorney General   Southern District of Texas Bar No. 1829509

JUDD E. STONE II           WILLIAM T. THOMPSON
Solicitor General           Deputy Chief, Special Litigation Unit
                              Texas Bar No. 24088531
                              Southern District of Texas Bar No. 3053077

                              */s/ Ryan D. Walters*
                              RYAN D. WALTERS
                              Special Counsel, Special Litigation Unit
                              Texas Bar No. 24105085
                              Southern District of Texas Bar No. 3369185

                              OFFICE OF THE ATTORNEY GENERAL
                              SPECIAL LITIGATION UNIT
                              P.O. Box 12548 (MC-009)
                              Austin, Texas 78711-2548
                              Tel.: (512) 936-1414
                              Fax: (512) 936-0545
                              patrick.sweeten@oag.texas.gov
                              will.thompson@oag.texas.gov
                              ryan.walters@oag.texas.gov

                              **COUNSEL FOR PLAINTIFF STATE OF TEXAS**

36

JEFF LANDRY
LOUISIANA ATTORNEY GENERAL

*/s/Elizabeth B. Murrill*
ELIZABETH B. MURRILL
Solicitor General
JOSEPH S. ST. JOHN
Deputy Solicitor General

LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third St.
Baton Rouge, LA 70804
(225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

COUNSEL FOR PLAINTIFF STATE OF LOUISIANA

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on October 22, 2021, which automatically serves all counsel of record who are registered to receive notices in this case.

*/s/Ryan D. Walters*
RYAN D. WALTERS