**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | |
|---|---|
| STATE OF TEXAS, STATE OF LOUISIANA | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. 6:21-cv-00016 |
| UNITED STATES OF AMERICA, *et al.* | ) ) ) |
| Defendants. | ) ) ) |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES**
**IN OPPOSITION TO PLAINTIFFS' MOTION TO POSTPONE THE EFFECTIVE**
**DATE OF AGENCY ACTION OR, IN THE ALTERNATIVE,**
**FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ............................................................................................................... 3

I.     Statutory Framework ................................................................................... 3

II.    Interim Guidance on Immigration Enforcement ................................................. 6

     A.    Issuance of Interim Guidance ................................................................. 6

     B.    Litigation on Interim Guidance ............................................................... 7

III.   The Secretary's New Guidance of September 30, 2021 .................................... 10

ARGUMENT ................................................................................................................... 13

I.     The States Have Not Demonstrated A Likelihood Of Success On The Merits. ............... 13

     A.    Texas and Louisiana cannot establish standing, let alone irreparable harm. ........ 14

     B.    The States cannot clear three threshold obstacles to their claims. ..................... 18

           1.    The challenged action is "committed to agency discretion by law." ........ 18

           2.    The challenged action is not "final agency action" subject to APA review. ........................................................................................... 22

           3.    Congress has precluded judicial review of these types of decisions. ....... 25

               a.    APA challenges to DHS's application of enforcement priorities are precluded from review. .......................................................... 25

               b.    The States' § 1226(c) challenge is specifically precluded from review. ................................................................................. 27

               c.    The States' § 1231(a)(2) challenge is likewise specifically precluded. .............................................................................. 28

     C.    The States' APA claims fail on the merits. ................................................. 30

           1.    The New Guidance is not "contrary to law." ............................................. 30

               a.    The statutory provisions at issue only govern detention requirements. ........................................................................... 30

               b.    The New Guidance does not violate § 1226(c). ............................. 32

   c. The New Guidance does not violate § 1231(a)..........................35

  2. DHS's new enforcement guidance is a reasonable effort to prioritize limited resources in enforcing immigration laws......................................36

  3. DHS's and ICE's internal guidance on enforcement prioritization is exempt from notice and comment..............................................41

 D. Texas and Louisiana fail to state a viable claim under the Take Care Clause.....................................................................................45

II. An Injunction Restraining Core Article II Authority Outweighs Any Harm to the States and Undermines the Public Interest.........................................................47

III. Any Relief Ordered Should Be Narrow...........................................................49

CONCLUSION.................................................................................................51

# TABLE OF AUTHORITIES

## CASES

*Adefemi v. Gonzales,*
 228 F. App'x 415 (5th Cir. 2007) ...................................................................... 36

*Aguilar v. ICE,*
 510 F.3d 1 (1st Cir. 2007) ............................................................................... 26

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
 458 U.S. 592 (1982) ........................................................................................ 17

*Ali v. Fed. Bureau of Prisons,*
 552 U.S. 214 (2008) ........................................................................................ 29

*Ariz. Dream Act Coal. v. Brewer,*
 855 F.3d 957 (9th Cir. 2017) .......................................................................... 33

*Arizona v. U.S. Dep't of Homeland Sec.,*
 No. CV-21-00186-PHX-SRB, 2021 WL 2787930 (D. Ariz. June 30, 2021),
 *appeal filed*, *Arizona v. United States*, No. 21-16118 (9th Cir. Sept. 3, 2021) ................... 9, 19

*Arizona v. United States,*
 567 U.S. 387 (2012) ................................................................................ *passim*

*Armstrong v. Exception Child Center, Inc.,*
 575 U.S. 320 (2015) ........................................................................................ 46

*AT&T Co. v. EEOC,*
 270 F.3d 973 (D.C. Cir. 2001) ........................................................................ 23

*Ayuda, Inc. v. Reno,*
 7 F.3d 246 (D.C. Cir. 1993) ............................................................................ 27

*Baker v. Carr,*
 369 U.S. 186 (1962) ........................................................................................ 46

*Bennett v. Spear,*
 520 U.S. 154 (1997) ........................................................................................ 22

*Block v. Cmty. Nutrition Inst.,*
 467 U.S. 340 (1984) ................................................................................. 25, 27

*Brogan v. United States,*
 522 U.S. 398 (1998) ........................................................................................ 29

*Burlington Truck Lines v. United States,*
 371 U.S. 156 (1962) ........................................................................................ 38

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ................................................................................................ 49

*Camp v. Pitts*,
411 U.S. 138 (1973) ................................................................................................ 39

*Cent. & S.W. Servs., Inc. v. U.S. EPA*,
220 F.3d 683 (5th Cir. 2000) ................................................................................. 49

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979) ................................................................................................ 41

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. Consumer Fin. Prot. Bureau*,
No. 1:18-CV-00295-LY, 2021 WL 4132272 (W.D. Tex. Aug. 31, 2021) ............... 13

*Commonwealth of Massachusetts v. Mellon*,
262 U.S. 447 (1923) ................................................................................................ 16

*Cook Cnty. v. Wolf*,
962 F.3d 208 (7th Cir. 2020), *cert. dismissed*,
*Mayorkas v. Cook Cnty.*, 141 S. Ct. 1292 (2021) ................................................. 13

*Crane v. Johnson*,
783 F.3d 244 (5th Cir. 2015) ........................................................................... 20, 27

*Dalton v. Spector*,
511 U.S. 462 (1994) ......................................................................................... 45, 46

*Demore v. Kim*,
538 U.S. 510 (2003) ................................................................................................ 28

*Dep't of Homeland Sec. v. New York*,
140 S. Ct. 599 (2020), *denying modification*, 140 S. Ct. 2709 (2020) ................... 50

*Digital Realty Tr., Inc. v. Somers*,
138 S. Ct. 767 (2018) .............................................................................................. 29

*El Paso Cnty. v. Trump*,
982 F.3d 332 (5th Cir. 2020) ................................................................................. 15

*Escoe v. Zerbst*,
295 U.S. 490 (1935) ................................................................................................ 21

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985) ................................................................................................ 39

*Florida v. United States*,
No. 8:21-CV-541-CEH-SPF, 2021 WL 1985058 (M.D. Fla. May 18, 2021) ....... 9, 19

*Fraihat v. U.S. Immigr. & Customs Enf't*,
445 F. Supp. 3d 709 (C.D. Cal. 2020), *reversed & remanded*,
___4th___, 2021 WL 4890884 (9th Cir. Oct. 20, 2021)........................................ 48

*Franklin v. Massachusetts*,
505 U.S. 788 (1992).......................................................................................... 46

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000).......................................................................................... 14

*Giddings v. Chandler*,
979 F.2d 1104 (5th Cir. 1992) ........................................................................... 34

*Gov't of Manitoba v. Bernhardt*,
923 F.3d 173 (D.C. Cir. 2019)........................................................................... 18

*Harris v. Wilters*,
596 F.2d 678 (5th Cir. 1979) ............................................................................. 34

*Heckler v. Chaney*,
470 U.S. 821 (1985)..................................................................................... *passim*

*Hernandez-Avalos v. INS*,
50 F.3d 842 (10th Cir. 1995) ........................................................................ 28, 30

*Hussein S.M. v. Garland*,
No. 21-348, 2021 WL 1986125 (D. Minn. May 18, 2021)................................... 24

*Hyde v. Selene Fin. LP*,
Civ. A. No. 4:17-cv-00993, 2017 WL 11552846 (N.D. Tex. Dec. 29, 2017) ......... 34

*J.E.F.M. v. Lynch*,
837 F.3d 1026 (9th Cir. 2016) ........................................................................... 26

*Jama v. ICE*,
543 U.S. 335 (2005).......................................................................................... 36

*Jennings v. Rodriguez*,
138 S. Ct. 830 (2018)..................................................................................... 4, 28

*John Doe # 1 v. Veneman*,
380 F.3d 807 (5th Cir. 2004) ............................................................................. 49

*Johnson v. Guzman Chavez*,
141 S. Ct. 2271 (2021)................................................................................. 21, 31

*Jordan v. Fed. Bureau of Prisons*,
  Civ. A. No. 20-01478 (CKK), 2021 WL 4148549 (D.D.C. Sept. 13, 2021),
  *appeal filed*, No. 21-5217 (D.C. Cir. Oct. 7, 2021) ................................................................ 42

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
  335 F.3d 357 (5th Cir. 2003) ................................................................................................ 13

*Knapp v. U.S. Dep't of Agric.*,
  796 F.3d 445 (5th Cir. 2015) ................................................................................................ 36

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ............................................................................................................... 30

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ........................................................................................................ 19, 41

*Linda R.S. v. Richard D.*,
  410 U.S. 614 (1973) ............................................................................................................... 15

*Louisiana v. U.S. Army Corps of Eng'rs*,
  834 F.3d 574 (5th Cir. 2016) ................................................................................................ 25

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ............................................................................................................... 14

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ............................................................................................................... 30

*Luminant Generation Co. v. EPA*,
  757 F.3d 439 (5th Cir. 2014) ................................................................................................ 23

*Make the Rd. N.Y. v. Pompeo*,
  475 F. Supp. 3d 232 (S.D.N.Y. 2020) ................................................................................. 46

*Make The Rd. N.Y. v. Wolf*,
  962 F.3d 612 (D.C. Cir. 2020) .............................................................................................. 41

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989) ............................................................................................................... 37

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) ............................................................................................................... 17

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) ............................................................................................................... 30

*Mathews v. Diaz*,
  426 U.S. 67 (1976) ................................................................................................................. 36

*Mississippi v. Johnson*,
    71 U.S. (4 Wall.) 475 (1866) .................................................. 46

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)................................................................ 38

*National Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) ............................................... 22

*Nielsen v. Preap*,
    139 S. Ct. 954 (2019), *remanded*,
    *Preap v. McAleenan*, 922 F.3d 1013 (9th Cir. 2019)............................ 21, 28, 33, 35

*Niz-Chavez v. Garland*,
    141 S. Ct. 1474 (2021)........................................................... 27

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004)................................................................ 34

*ODonnell v. Harris Cnty.*,
    892 F.3d 147 (5th Cir. 2018) ................................................. 49

*ODonnell v. Salgado*,
    913 F.3d 479 (5th Cir. 2019) ................................................. 2, 19

*Pension Benefit Guar. Corp. v. Wilson N. Jones Mem'l Hosp.*,
    374 F.3d 362 (5th Cir. 2004) ................................................. 36

*Peoples Nat. Bank v. Off. of Comptroller of Currency of U.S.*,
    362 F.3d 333 (5th Cir. 2004) ................................................. 25

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015)................................................................ 41

*Preap v. McAleenan*,
    922 F.3d 1013 (9th Cir. 21019) ............................................. 21

*Professionals & Patients for Customized Care v. Shalala*,
    56 F.3d 592 (5th Cir. 1995) .................................................. 43

*Reno v. American-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999)......................................................... *passim*

*Richbourg Motor Co. v. United States*,
    281 U.S. 528 (1930)............................................................. 21

vii

*Santoyo v. United States*,
Civ. No. 5:16-CV-855-OLG, 2017 WL 6033861 (W.D. Tex. Oct. 18, 2017),
*appeal dismissed*, *Santoyo v. Bexar Cnty.*, 2019 WL 11706155 (5th Cir. Nov. 8, 2021) ........ 35

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) ...................................................................................................... 39

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .................................................................................................... 14

*Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
989 F.3d 368 (5th Cir. 2021) ...................................................................................... 49

*Tex. Democratic Party v. Abbott*,
978 F.3d 168 (5th Cir. 2020) ........................................................................................ 2

*Texas v. Rettig*,
987 F.3d 518 (5th Cir. 2021) ............................................................................... 23, 24

*Texas v. United States*,
14 F.4th 332 (5th Cir. 2021) .............................................................................. *passim*

*Texas v. United States*,
809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015),
*aff'd by equally divided court*, 136 S. Ct. 2271 (2016) ........................................... 16, 18, 19, 44

*Texas v. United States*,
106 F.3d 661 (5th Cir. 1997) ...................................................................................... 47

*Texas v. United States*,
___F. Supp. 3d___, 2021 WL 3683913 (S.D. Tex. Aug. 19, 2021) ................................ *passim*

*Texas v. United States*,
No. 6:21-cv-00003, 2021 WL 2096669 (S.D. Tex. Feb. 23, 2021) ........................................ 29

*The Wilderness Soc'y v. Norton*,
434 F.3d 584 (D.C. Cir. 2006) .................................................................................... 23

*Thompson v. N. Am. Stainless, LP*,
562 U.S. 170 (2011) .................................................................................................... 30

*Town of Castle Rock v. Gonzales*,
545 U.S. 748 (2005) ........................................................................................... 3, 20, 21

*Town of Chester v. Laroe Estates, Inc.*,
137 S. Ct. 1645 (2017) ................................................................................................ 50

*Trevino v. Davis*,
    861 F.3d 545 (5th Cir. 2017) ................................................................. 19

*United States v. Fausto*,
    484 U.S. 439 (1988) .................................................................. 25, 26

*United States v. Vasquez-Benitez*,
    919 F.3d 546 (D.C. Cir. 2019) ...................................................... 36

*Valley v. Rapides Parish Sch. Bd.*,
    118 F.3d 1047 (5th Cir. 1997) ...................................................... 47

*Wayte v. United States*,
    470 U.S. 598 (1985) .................................................................. 18, 19

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) ...................................................................... 14

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .......................................................................... 13

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) .................................................................. 5, 36

*Zolicoffer v. U.S. Dep't of Justice*,
    315 F.3d 538 (5th Cir. 2003) ...................................................... 34

## STATUTES

5 U.S.C. § 553 ....................................................................................... 41, 44

5 U.S.C. § 701 ......................................................................................... *passim*

5 U.S.C. § 702 ............................................................................................. 29

5 U.S.C. § 704 ....................................................................................... 18, 22

5 U.S.C. § 705 ....................................................................................... 13, 15

5 U.S.C. § 706 ....................................................................................... 34, 38

6 U.S.C. § 202 ....................................................................................... 22, 27

8 U.S.C. § 1101 ....................................................................................... 4, 29

8 U.S.C. § 1182 ............................................................................................. 8

8 U.S.C. § 1187 ............................................................................................. 3

8 U.S.C. § 1225 ................................................................................................. 3, 26

8 U.S.C. § 1226 ................................................................................................. *passim*

8 U.S.C. § 1227 ................................................................................................. 8

8 U.S.C. § 1228 ................................................................................................. 3

8 U.S.C. § 1229 ................................................................................................. 3, 25, 27

8 U.S.C. § 1229a ............................................................................................... 3

8 U.S.C. § 1231 ................................................................................................. *passim*

8 U.S.C. § 1252 ................................................................................................. 4, 5, 25, 26

8 U.S.C. § 1357 ................................................................................................. 35

## UNITED STATES CONSTITUTION

U.S. Const. art. II .............................................................................................. 45

## REGULATIONS

8 C.F.R. § 239.1 ............................................................................................... 3

8 C.F.R. § 287.7 ............................................................................................... 5, 35

8 C.F.R. § 1003.1 ............................................................................................. 4

8 C.F.R. § 1003.6 ............................................................................................. 4

8 C.F.R. § 1208.31 ........................................................................................... 3

8 C.F.R. § 1240.12 ........................................................................................... 3

8 C.F.R. § 1240.15 ........................................................................................... 4

*Continued Detention of Aliens Subject to Final Orders of Removal*,
   66 Fed. Reg. 56,967 (Nov. 14, 2001) ....................................................... 36

## OTHER AUTHORITIES

H.R. Rep. No. 104-828 (1996) ......................................................................... 29

PARTY, *Black's Law Dictionary* (11th ed. 2019) ........................................... 29

## EXHIBITS

| A. | *Guidelines for the Enforcement of Civil Immigration Law* (Sept. 30, 2021) ("New Guidance") |
|---|---|
| B. | ICE Policy No. 10074.2: Issuance of Immigration Detainers by ICE Immigration Officers, *available at* https://www.ice.gov/sites/default/files/documents/Document/2017/10074-2.pdf ("ICE Policy No. 10074.2") |
| C. | Memorandum from David Pekoske, Acting Sec'y of Homeland Sec., *Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities* (Jan. 20, 2021) (the "Pekoske Memo"), AR_DHSP_00000065 |
| D. | Memorandum from Tae Johnson, Acting Dir. of U.S. Immigration and Customs Enf't, *Interim Guidance: Civil Immigration Enforcement and Removal Priorities* (Feb. 18, 2021) (the "Interim Guidance"), AR_DHSP_00000070 |
| E. | Memorandum Regarding Conclusions Drawn from "AART" Data (Sept. 24, 2021), AR_DHSP_00000108 |
| F. | Declaration of Peter B. Berg, ("Berg. Decl.") AR_DHSP_00006029 |
| G. | *Significant Considerations in Developing Updated Guidelines for the Enforcement of Civil Immigration Law* (Sept. 30, 2021) ("Considerations Memo"), AR_DHSP_00000001 |
| H. | Administrative Record Index, ECF No. 117-2 |
| I. | Memorandum regarding Stakeholder Outreach in Furtherance of Department Civil Immigration Enforcement Guidance (Sept. 17, 2021), AR_DHSP_00000090 |
| J. | Memorandum from Cammilla Wamsley, Principal Policy Advisor, Listening Sessions for Final Priorities, AR_DHSP_00000095 |
| K. | Memorandum regarding DHS Enforcement Priorities Stakeholder Outreach April 6-9, 2021, AR_DHSP_00000097 |
| L. | Memorandum regarding DHS Enforcement Priorities Stakeholder Outreach April 14,- May 20, 2021, AR_DHSP_00000102 |
| M. | Declaration of Thomas Decker, AR_DHSP_00005780 |
| N. | Declaration of Monica Burke, AR_DHSP_00006074 |

The Secretary of Homeland Security is responsible for allocating the Department of Homeland Security's limited resources in a manner that best protects the Nation and promotes its values. Consistent with that responsibility and with Congress's charge—and with the historical practice of every prior administration dating back decades—the Secretary has established enforcement priorities to guide his subordinates in carrying out their duties. Texas and Louisiana ask this Court to usurp, for itself, the Secretary's duty and authority, on the meritless claim that this exercise of discretion is lawless. The States' assault on the separation of powers is contrary to law, in this Circuit and elsewhere. Their attempts to distract with cherry-picked anecdotes do not defeat the reasoned lawfulness of the priorities. Likewise, months of Departmental experience operating under the Interim Guidance—backed by data—undermines the States' claims of harm arising from purported, but unproven, inaction relating to immigration enforcement. The relief the States seek would effectively scrap the Secretary's prioritization framework and force local officials again to devise their own patchwork prioritization schemes—potentially *decreasing* immigration enforcement actions directed toward the most dangerous individuals. Consistent with the recent pronouncements by the Fifth Circuit, the relief the States seek is unavailable: the States' claims are unreviewable, meritless, and wholly contrary to the public interest.

## INTRODUCTION

In early 2021, the Department of Homeland Security ("DHS") and U.S. Immigration and Customs Enforcement ("ICE") adopted interim immigration enforcement priorities to focus their limited enforcement resources on those noncitizens who posed the greatest risk to national security, border security, and public safety. These interim priorities were to remain in effect, pending Department-wide review of policies and practices, until DHS instituted a revised immigration enforcement priority system. After conducting listening sessions with dozens of groups, the Secretary of Homeland Security issued a new "memorandum [that] provides guidance for the apprehension and removal of noncitizens." *See Guidelines for the Enforcement of Civil Immigration Law* at 1 (Sept. 30, 2021) ("New Guidance"), attached as Exhibit A. The New Guidance retains the three priorities of national security, border security, and public safety, but

1

gives greater discretion to line officers to assess "the individual and the totality of the facts and circumstances," including aggravating and mitigating factors, in determining whether an individual "poses a current threat to public safety." *Id.* at 3. Further, unlike the interim enforcement priorities, there is no supervisory pre-approval requirement for officers to take certain enforcement actions. *Id*. at 5-6.

The States of Texas and Louisiana previously brought suit, arguing that DHS's interim enforcement priorities conflicted with two statutory provisions that, in their view, unconditionally require the arrest and detention of entire classes of noncitizens. This Court granted a preliminary injunction, which the Fifth Circuit stayed in large part. The States now renew their arguments and ask the Court to enjoin the New Guidance.

In its stay decision, the Fifth Circuit concluded that the United States was likely to prevail on appeal in establishing that decisions about "who should be subject to arrest, detainers, and removal proceedings" are committed to agency discretion by law and that the two statutory provisions the States rely on do not displace that discretion. *Texas v. United States*, 14 F.4th 332, 340 (5th Cir. 2021) ("*Texas* Stay Op."). Although the Fifth Circuit concluded, consistent with DHS's longstanding practice, that the statutory provisions likely require DHS to continue detaining certain noncitizens in the Department's custody, the issue of detention is not implicated by the New Guidance, which addresses only apprehension and removal. The States' only response to the Fifth Circuit's decision is to tell this Court that it is not bound by the published Court of Appeals decision. But, unlike a merits panel of the Court of Appeals, *see Tex. Democratic Party v. Abbott*, 978 F.3d 168, 176 (5th Cir. 2020), this Court *is* bound by the Fifth Circuit's decision: "the published opinion granting the stay is this court's last statement on the matter and, like all published opinions, binds the district courts in this circuit." *ODonnell v. Salgado*, 913 F.3d 479, 482 (5th Cir. 2019). The Fifth Circuit found that the States could not show a likelihood of success on the merits in challenging the interim enforcement priorities and that the balancing of equities favored DHS in staying this Court's preliminary injunction. The same applies to the States' challenge to the New Guidance.

2

Even if this Court were not bound by the Fifth Circuit's determination that the United States is likely to prevail on the merits, it is at the least heavily persuasive authority. Regardless, the States have not demonstrated that they are likely to prevail on the merits. The States fail to engage with the Supreme Court precedent on prosecutorial discretion, including, most importantly, *Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005), which was at the heart of this Court's statutory analysis, *Texas v. United States*, ___F. Supp. 3d___, 2021 WL 3683913, at *30-*34 (S.D. Tex. Aug. 19, 2021) ("*Texas* D. Ct. Op."), and that of the Court of Appeals, *Texas* Stay Op., 14 F.4th at 340-41. At bottom, the States ask this Court to issue an injunction based on an extraordinary interpretation of the Immigration and Nationality Act ("INA"), which no other court has endorsed and which would mean that every administration has violated those provisions since their enactment in 1996. The Court should deny the motion.

## BACKGROUND

### I.    Statutory Framework

The INA establishes the framework for arresting, detaining, and removing noncitizens who are unlawfully present in or otherwise removable from the United States. A "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona v. United States*, 567 U.S. 387, 396 (2012).[1]

The removal process typically begins when DHS, in its discretion, initiates a removal proceeding against a noncitizen. *See* 8 U.S.C. § 1229(a); 8 C.F.R. § 239.1; *see also, e.g.*, 8 U.S.C. §§ 1225(b)(1); 1228(b); 1187(b)(2); 1231(a)(5); 8 C.F.R. § 1208.31(e) (instances of more limited proceedings in specific circumstances). DHS has discretion both to initiate proceedings and to choose which charges of removability to pursue, *see* 8 U.S.C. § 1229a(a)(2), and an immigration judge ultimately determines whether the noncitizen is removable on those grounds, and if so, whether to enter an order of removal, *see* 8 U.S.C. § 1229a(a); 8 C.F.R. § 1240.12. A noncitizen subject to such a removal order may file an appeal before the Board of Immigration Appeals

---

[1] Internal quotation marks and citations are omitted throughout this brief, unless otherwise stated.

("BIA"), 8 C.F.R. §§ 1003.1(b), 1240.15, and the removal order is stayed pending the appeal, 8 C.F.R. § 1003.6(a). If the BIA dismisses the appeal, the noncitizen may then petition for review in a federal court of appeals and request a further stay of removal pending review. 8 U.S.C. § 1252(a)(5). Once an order of removal is final, *see id.* § 1101(a)(47)(B), and absent a stay, the noncitizen is subject to removal, *see id.* §§ 1231(a)(1)(A), (a)(1)(B)(ii). "At each stage" of this removal process, "the Executive has discretion to abandon the endeavor." *Reno v. American-Arab Anti-Discrimination Comm.* ("*AADC*"), 525 U.S. 471, 483 (1999).

This case concerns 8 U.S.C. §§ 1226 and 1231. For both §§ 1226 and 1231, the Fifth Circuit explained that they "do not eliminate immigration officials' 'broad discretion' to decide who should face enforcement action in the first place." *Texas Stay Op.*, 14 F.4th at 337 (quoting *Arizona*, 567 U.S. at 396). Rather, they "address a separate question: the custodial status of individuals who are facing removal proceedings [*i.e.*, § 1226] or who have been [ordered] removed [*i.e.*, § 1231]." *Id.*

Thus, § 1226 sets forth the framework for "arresting and detaining" noncitizens present in the United States once removal proceedings have commenced. *Jennings v. Rodriguez*, 138 S. Ct. 830, 837 (2018). Section 1226 "distinguishes between two different categories of aliens." *Id.* Section 1226(a) applies generally to all removable noncitizens and allows the government "to issue warrants for their arrest and detention pending removal proceedings." *Id.* at 846. Section 1226(c) specifically covers noncitizens "who fall[] into one of [several] enumerated categories involving criminal offenses and terrorist activities," *id.*, and notes that DHS "shall take" these noncitizens "into custody . . . when [they are] released" from criminal confinement. 8 U.S.C. § 1226(c)(1).[2]

Once a removal order becomes final, § 1231(a) sets out DHS's detention authority. 8 U.S.C. § 1231(a). Section 1231 sets a "removal period" of 90 days that begins when the removal

---

[2] This provision also states that DHS "may release [these] alien[s]" in circumstances not relevant here. 8 U.S.C. § 1226(c)(2). The States are not claiming that noncitizens apprehended under § 1226(c) would be released due to DHS's New Guidance, which does not even address detention, and so § 1226(c)(2) is not implicated in this case.

order becomes "administratively final," judicial review staying the removal concludes, or the noncitizen "is released from [criminal or non-immigration] detention or confinement," whichever comes latest. *Id.* §1231 (a)(1)(B)(i)-(iii). Section 1231(a)(2) authorizes detention during the removal period and mandates it for noncitizens removable on certain criminal and terrorism-related grounds. *Id.* § 1231(a)(2). Congress, however, "doubt[ed]" that "all reasonably foreseeable removals could be accomplished" within the 90-day period, *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001), and so § 1231 permits—but does not require—detention and removal after the expiration of the removal period. *Id*.; *see* 8 U.S.C. § 1231(a)(1)(C), (a)(6); *but see Zadvyadas*, 533 U.S. at 682 ("Based on our conclusion that indefinite detention of aliens in the former category would raise serious constitutional concerns, we construe the statute to contain an implicit 'reasonable time' limitation, the application of which is subject to federal-court review."). Generally, beyond the removal period, noncitizens with final orders of removal may be released on an order of supervision.  8 U.S.C. § 1231(a)(3).

To take custody of removable noncitizens, DHS may use a number of enforcement tools, including immigration detainers. Through a detainer, DHS notifies a State or locality that DHS intends to take custody of a removable noncitizen detained by the State or locality upon his or her release, and asks the State or locality to (1) notify DHS of the noncitizen's release date; and (2) hold the noncitizen for up to 48 hours, until DHS can take custody. *See* 8 C.F.R. § 287.7(a) (describing notification of release), (d) (describing temporary detention request); ICE Policy No. 10074.2: Issuance of Immigration Detainers by ICE Immigration Officers ¶ 2.7, *available at* https://www.ice.gov/sites/default/files/documents/Document/2017/10074-2.pdf (last visited Nov. 12, 2021) ("ICE Policy No. 10074.2"), attached as Exhibit B. Since April 2, 2017, ICE detainers must now be accompanied by a signed administrative warrant of arrest issued under 8 U.S.C. §§ 1226 or 1231(a), and may be issued only to noncitizens arrested for criminal offenses and whom immigration officers have probable cause to believe are removable. *See* ICE Policy No. 10074.2 ¶¶ 2.4-2.6. The 2017 policy further provides that should ICE officers determine not to take custody of a noncitizen, the officers must immediately rescind the detainer. *Id.* ¶ 2.8.

## II.    Interim Guidance on Immigration Enforcement

### A.    *Issuance of Interim Guidance*

On January 20, 2021, then-Acting Secretary of Homeland Security David Pekoske issued a memorandum titled "Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities." *See* Memorandum from David Pekoske, Acting Sec'y of Homeland Sec., *Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities* (Jan. 20, 2021) (the "Pekoske Memo"), AR DHSP_00000065, attached as Exhibit C. The Pekoske Memo made note of DHS's inherent resource limitations and the "significant operational challenges" it faces due to the COVID-19 pandemic, and, in light of these considerations, called upon DHS "components to conduct a review of policies and practices concerning immigration enforcement." *Id.* at 1. Consistent with longstanding historical practice, Acting Secretary Pekoske instructed DHS components to develop recommendations concerning, among other things, "policies for prioritizing the use of enforcement personnel, detention space, and removal assets" and "policies governing the exercise of prosecutorial discretion." *Id.* at 2.

The Pekoske Memo also adopted two interim measures. First, the Pekoske Memo directed DHS to focus its enforcement efforts on individuals implicating (1) national security; (2) border security; or (3) public safety. *Id.* At the same time, it expressly authorized enforcement activities outside of those categories. *Id.* at 3. Second, the Pekoske Memo paused most removals for 100 days while DHS reviewed its policies. *Id.* This Court preliminarily enjoined this second measure, which has since expired on its own terms.

On February 18, 2021, ICE issued a memorandum to operationalize the enforcement priorities in the Pekoske Memo. *See* Memorandum from Tae Johnson, Acting Dir. of U.S. Immigration and Customs Enf't, *Interim Guidance: Civil Immigration Enforcement and Removal Priorities* (Feb. 18, 2021) (the "Interim Guidance"), AR_DHSP_00000070, attached as Exhibit D. The Interim Guidance confirmed that "ICE operates in an environment of limited resources," and "necessarily must prioritize" certain "enforcement and removal actions over others" in order to "most effectively achieve" its "critical national security, border security, and public safety

mission." *Id.* at 2-3. The Interim Guidance then catalogued the three priority groups identified in the Pekoske Memo, as slightly modified, and reiterated that the interim priorities do not "prohibit the arrest, detention, or removal of any noncitizen." *Id.* at 3. Enforcement actions outside the presumed priorities could proceed when warranted by the circumstances, and generally subject to a local supervisor's approval.

While the ICE Interim Guidance was in effect, DHS was able to shift resources to both focus on those posing greater public safety threats and other important agency missions, such as border security. For example, "[b]etween February 18 and August 31, 2021 ICE arrested 6,046 individuals with aggravated felony convictions compared to just 3,575 in the same period in 2020." *See* Memorandum Regarding Conclusions Drawn from "AART" Data (Sept. 24, 2021) ("AART Data Memo"), AR DHSP_00000108, attached as Exhibit E. Likewise, "field offices became more liberal in authorizing [other priority] cases"—"sexual assault and other sex offenses; DUIs; and assault, particularly domestic violence"—"as time [went] by." *Id.* In fact, the approval rate exceeded 90%, with "requests to pursue an action against a noncitizen with a conviction for a sex offense [] approved at a rate greater than 99%." *Id.* at 3. Meanwhile, border security cases increased as "ICE has surged personnel to support southwest border operations." *Id.* at 2; *see also* Declaration of Peter B. Berg ¶ 18 ("Berg Decl."), AR DHSP_00006035, attached as Exhibit F (identifying approximately 300 ICE officers "detailed to the Southwest Border to support CBP operations.").

B.    *Litigation on Interim Guidance*

Four lawsuits have been brought to challenge the Interim Guidance. In this Court, Texas and Louisiana brought a motion seeking to preliminary enjoin the interim guidance. This Court granted the preliminary injunction, but, in a unanimous published decision, the Fifth Circuit largely stayed that injunction pending appeal. *Texas Stay Op.*, 14 F.4th 332. In doing so, the Fifth Circuit disagreed with this Court's conclusion that two detention provisions "override the deep-rooted tradition of enforcement discretion when it comes to decisions that occur before detention, such as who should be subject to arrest, detainers, and removal proceedings." *Id.* at 340; *id.* at 338 ("What

is more, in the quarter century that IIRIRA has been on the books, no court at any level previously has held that sections 1226(c)(1) or 1231(a)(2) eliminate immigration officials' discretion to decide who to arrest or remove."). The Fifth Circuit stayed the injunction except to the extent it prevented DHS "from relying on the memos to *release* those who are facing enforcement actions and fall within the mandatory detention provisions," seeing "no basis for upsetting it at this stage as that is what the statutes govern." *Id.* at 337 (emphasis added). Consistent with longstanding DHS practice, that means DHS will not release individuals who are in ICE custody and who (i) are in removal proceedings and fall under 8 U.S.C. § 1226(c); or (ii) have final removal orders, are in the removal period, and, pursuant to 8 U.S.C. § 1231(a)(2), have been found inadmissible under 8 U.S.C. §§ 1182(a)(2) or 1182(a)(3)(B) or deportable under §§ 1227(a)(2) or 1227(a)(4)(B). *See Significant Considerations in Developing Updated Guidelines for the Enforcement of Civil Immigration Law* at 18-19, (Sept. 30, 2021) ("Considerations Memo"), AR DHSP_00000018-AR DHSP_00000019, attached as Exhibit G (explaining history and interpretation of statutory mandates).

The Fifth Circuit also found that the balance of the equities favored substantially staying the preliminary injunction while also expressing skepticism towards nationwide injunctions. Emphasizing that "prosecutorial discretion is a core power of the Executive Branch," the Fifth Circuit explained that "its impairment undermines the separation of powers." *Texas* Stay Op. at 340; *id.* at 341 ("The injury to the executive's daily exercise of this historic discretion is irreparable in the basic sense of the word; there is no way to recover the time when its exercise of discretion is being enjoined during the pendency of the appeal."). Further, the Fifth Circuit observed, "in recent years the Supreme Court has repeatedly stayed nationwide injunctions that prevented the Executive Branch from pursuing its immigration policies." *Id.* Finally, the Fifth Circuit concluded, "eliminating DHS's ability to prioritize removals poses a number of practical problems given its limited resources." *Id.* The States have petitioned the Fifth Circuit to rehear the stay decision en banc.

Three other suits also sought to preliminarily enjoin the Interim Guidance. In none has such relief been granted. A Florida district court denied Florida's motion for preliminary injunction, holding that the Interim Guidance is not final agency action and, in any event, is committed to agency discretion. *See Florida v. United States*, No. 8:21-CV-541-CEH-SPF, 2021 WL 1985058, at *9 (M.D. Fla. May 18, 2021) ("The policies do not change anyone's legal status nor do they prohibit the enforcement of any law or detention of any noncitizen."); *id*. at *10 ("Even if the Court were to conclude the agency action is final reviewable action, the Court agrees with Defendants that the memoranda reflect discretionary agency decisions related to the prioritization of immigration enforcement cases, which are presumptively not subject to judicial review."). Florida appealed, and the matter is fully submitted to the Eleventh Circuit after briefing and argument. Next, an Arizona district court dismissed Arizona and Montana's suit and denied their motion for preliminary injunction, finding that immigration enforcement priorities are committed to agency discretion and, therefore, not subject to judicial review. *See Arizona v. U.S. Dep't of Homeland Sec.*, No. CV-21-00186-PHX-SRB, 2021 WL 2787930, at *10 (D. Ariz. June 30, 2021) ("While the States may not agree with this prioritization scheme, the States' allegations in their Amended Complaint do not 'rise to a level that would indicate' that the Government is *abdicating* its responsibility to remove noncitizens with final orders of removal from the United States.") (emphasis in original).[3] The Ninth Circuit twice denied Arizona's and Montana's motions for an injunction pending appeal. *See Arizona v. United States*, Case No. 21-16118 (9th Cir. Sept. 3, 2021). Finally, several Texas sheriffs and counties, as well as a federation claiming ICE officers as members, have brought (1) a preliminary injunction motion in this District on the Interim Guidance; and (2) an amended complaint that also challenges the New Guidance. *See Coe v. Biden*, No. 3:21-cv-00168 (S.D. Tex.). That court has not yet ruled on the preliminary injunction motion.

---

[3] Both the Florida and Arizona district courts found the states in those cases had sufficiently established standing at the preliminary injunction stage.

### III.   The Secretary's New Guidance of September 30, 2021

On September 30, 2021, the Secretary issued the memorandum at issue here, "Guidelines for the Enforcement of Civil Immigration Law." *See* New Guidance. The seven-part "memorandum provides guidance for the apprehension and removal of noncitizens." *Id*. at 1. The first part explains the foundational principle of the exercise of prosecutorial discretion. *See, e.g., id.* at 2 (underscoring how it is "well established in the law that federal government officials have broad discretion to decide who should be subject to arrest, detainers, removal proceedings, and the execution of removal orders"). The next part provides the substantive provisions prioritizing national security, public safety, and border security. *Id*. at 3-4. The third part seeks to ensure that DHS exercises its "discretionary authority in a way that protects civil rights and civil liberties." *Id*. at 5. Fourth, the New Guidance guards against the "use of immigration enforcement as a tool of retaliation." *Id*. Fifth, through training, data collection, and quality review mechanisms, DHS seeks to ensure that line officers apply the New Guidance with integrity and quality while leaving "the exercise of prosecutorial discretion to [their] judgment." *Id*. at 5-6. Sixth, the New Guidance sets November 29, 2021, as the effective date, which will also serve to rescind the Pekoske Memo and the ICE Interim Guidance. *Id*. at 6-7. And, last, the New Guidance contains a statement that it confers no "right or benefit." *Id*. at 7.

For the substantive provisions in Part II, the New Guidance maintains the three categories from the Interim Guidance—national security, public safety, and border security—but the New Guidance functions in a distinctively different manner. *See id*. at 3-4. Rather than creating presumed priority categories or retaining the Interim Guidance's pre-approval process, the New Guidance avoids "bright lines or categories" and instead "requires an assessment of the individual and totality of the facts and circumstance." *Id*. at 3. With this as the backdrop, the New Guidance then includes a non-exclusive list of aggravating (*e.g.*, "the gravity of the conviction and sentence imposed" or "the sophistication of the criminal offense") and mitigating factors (*e.g.*, "military service" or "time since an offense and evidence of rehabilitation"). *Id*. Leaving discretion ultimately to line officers, the New Guidance emphasizes that "[t]he overriding question is whether

10

the noncitizen poses a current threat to public safety." *Id*. at 4. Likewise, for border security, the New Guidance underscores that "[DHS] personnel should evaluate the totality of the facts and circumstances and exercise their judgment accordingly." *Id*.

In developing the New Guidance, the Secretary and DHS received input from a wide range of individuals and groups. *See* Administrative Record Index (ECF No. 117-2), attached as Exhibit H. In particular, the "Department officials engaged in multiple discussions with leadership from ICE, USCIS, and CBP, as well as ICE personnel in the multiple field locations;" and "with external stakeholders, including law enforcement groups, state and local government representatives, and non-governmental entities, including immigrant advocacy organizations." *See* Considerations Memo at 10; *see also* Memorandum regarding Stakeholder Outreach in Furtherance of Department Civil Immigration Enforcement Guidance (Sept. 17, 2021), AR DHSP_00000090, attached as Exhibit I (identifying approximately 30 groups, including the National Sheriffs' Association and the Southwest Border Sheriffs' Coalition, and noting the Secretary's personal engagement with ICE personnel; ICE Field Office Directors, Special Agents in Charge, and Assistant Directors; members of the academic community; immigrant advocacy organizations; and domestic violence advocates and specialists); Memorandum from Cammilla Wamsley, Principal Policy Advisor, Listening Sessions for Final Priorities, AR DHSP_00000095, attached as Exhibit J (Field Office Directors and Special Agents in Charge); Memorandum regarding DHS Enforcement Priorities Stakeholder Outreach April 6-9, 2021, AR DHSP_00000097, attached as Exhibit K (Local Government and Law Enforcement Groups); Memorandum regarding DHS Enforcement Priorities Stakeholder Outreach April 14-May 20, 2021, AR DHSP_00000102, attached as Exhibit L (Governmental and Non-Governmental Organizations). "These conversations helped the Department evaluate its interim immigration enforcement and removal priorities and properly understand and consider the various interests of both internal and external stakeholders, thereby ensuring that the Department's development of new priorities was informed by all of the relevant evidence and interests." *See* Considerations Memo at 10.

Further, DHS summarized the key aspects informing the Secretary's guidance. *See id.* Besides emphasizing the various inputs the Secretary and the Department received from "internal and external stakeholders," the experiences in "the implementation of the" Interim Guidance, and "the Secretary's own experience," DHS also addressed other key "considerations informing the guidelines." *Id.* at 2. In doing so, DHS explained the role of prosecutorial and enforcement discretion in the immigration context (including its history and resource limitations necessitating enforcement discretion)*, id.* at 2-8; the current Administration's approach to immigration-enforcement priorities (including the Interim Guidance, the litigation challenging that guidance, and the listening sessions both to evaluate that Interim Guidance and to develop the New Guidance), *id.* at 8-11; and the key considerations underscoring the New Guidance (including public safety, deconfliction, impact on states, resources, statutory mandates, and alternative approaches), *id.* at 11-21. Although the entire Administrative Record was not ready at the time, Defendants served the States this memorandum, which is included in the Administrative Record, on October 19, 2021, to help streamline the briefing. Defendants served the States the full Administrative Record on November 4, 2021.[4]

On October 22, 2021, Texas and Louisiana amended their complaint to challenge the Secretary's New Guidance, and brought the instant motion to delay its effective date and/or to preliminarily enjoin it from being implemented. *See* Am. Compl. (ECF No. 109); Pls.' Mot. to Postpone (ECF No. 111) ("Pls.' Mem."). In their motion, the States bring five claims: (a) a statutory claim pursuant to 8 U.S.C. § 1226; (b) a statutory claim pursuant to 8 U.S.C. § 1231; (c); an arbitrary and capricious claim; (d) a notice-and-comment claim; and (e) a Take Care Clause claim. *See id.* at 23-41. They brought these same five claims in their challenge to the Interim Guidance for which the Fifth Circuit substantially stayed the preliminary injunction. *See* Pls.' Mot. for a Prelim. Inj., 12-26 (ECF No. 18) ("PI Mot.").

---

[4] Due to technical difficulties, Plaintiffs' counsel were not able to download the Administrative Record until November 5, 2021.

## ARGUMENT

To obtain preliminary injunctive relief, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that a balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "[A] preliminary injunction is 'an extraordinary remedy' which should only be granted if the party seeking the injunction has 'clearly carried the burden of persuasion' on all four requirements." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003). In this case, all four factors weigh heavily in Defendants' favor and this Court should deny the States' motion.

"The standard . . . for a stay under section 705 of the APA" is "the same" as the standard for "obtain[ing] a preliminary injunction." *Cook Cnty. v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020), *cert. dismissed sub nom. Mayorkas v. Cook Cnty.*, 141 S. Ct. 1292 (2021); *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. Consumer Fin. Prot. Bureau*, No. 1:18-CV-00295-LY, 2021 WL 4132272, at *12 (W.D. Tex. Aug. 31, 2021) (noting that the Fifth Circuit "appl[ies] standards for stay pending appeal to request[s] for stay of agency action under § 705 of the APA"). For such a stay under § 705, a court may, however, only issue such a stay "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. Again, the four factors strongly favor denying a stay but, regardless, the States cannot show such a stay is "necessary to prevent irreparable injury."

## I.     The States Have Not Demonstrated A Likelihood Of Success On The Merits.

The States cannot establish a likelihood of success on the merits. As an initial matter, they lack standing and, correspondingly, cannot show irreparable harm. But even if the States could establish standing, their claims are without merit. They fail to clear several APA threshold arguments and, regardless, cannot prevail even if they were to overcome those fatal limitations. Given that the States cannot show a likelihood of success on the merits, this Court should deny the States' motion on that basis alone.

*A. Texas and Louisiana cannot establish standing, let alone irreparable harm.*

To establish standing to "seek injunctive relief, a plaintiff must show that" it "is under threat of suffering" an "actual and imminent" injury caused by "the challenged action," and that "a favorable judicial decision will prevent" that injury. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). The "threatened injury must be *certainly impending* to constitute injury in fact"; allegations of "possible future injury do not satisfy . . . Art. III." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (emphasis added and citation omitted). "[W]hen the plaintiff is not [itself] the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). Additionally, to establish redressability, a plaintiff must show that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

As an initial matter, the States cannot show that a stay of the effective date of the New Guidance—and the preservation of the Interim Guidance—will redress any alleged injury inflicted on Plaintiffs. The interim enforcement guidance is now in effect, which the States contend injure them. *See* PI Mot., 28-30 (arguing that the interim priorities would increase costs relating to "detention," "public education," and "health care"). Deferring implementation of the New Guidance would prolong this interim guidance and the States have not made any showing why they need the interim guidance to remain in place to prevent any injury. Indeed, there is no reason to assume that the New Guidance is *more* likely to result in the alleged harms identified by the States. The New Guidance calls "for a context-specific" analysis "to assess whether a noncitizen poses a current threat to public safety, including through a meaningful risk of recidivism." *See* Considerations Memo at 12. Accordingly, the States have failed to establish that there is a "substantial likelihood" that an Order preserving the Interim Guidance at the expense of the New

Guidance will "remedy the alleged injury" inflicted upon the States.[5] *El Paso Cnty. v. Trump*, 982 F.3d 332, 341 (5th Cir. 2020). Relatedly, and for the same reason, Plaintiffs cannot show that a stay of the New Guidance is "necessary to prevent irreparable injury," as necessary for § 705 relief. 5 U.S.C. § 705.

In any event, the States fail to establish that the New Guidance will inflict any injury upon the States at all and, thus, the States' preliminary injunction motion likewise fails. Their injury theories again rely on a speculative chain of events: the New Guidance will result in a net decrease in enforcement actions against noncitizens covered by §§ 1226(c) and 1231(a)(2), and those precise noncitizens who will be spared from enforcement actions will either commit crimes or use public education and health resources in the Plaintiff States. *See* Pls.' Mem. 41-43. The States' theories again pile one layer of speculation onto another, and thus fall short of establishing standing. Even accepting this Court's previous finding of standing, which is the subject of appeal, the States are unable to establish that the New Guidance, with its changes from the Interim Guidance, would itself cause them injury.

The States' principal theory is that the New Guidance will increase crime in their States, resulting in an increase in associated costs. This theory relies on a speculative chain of events involving independent actions by third parties, and does not show that any injury is "*certainly impending.*" As a threshold matter, a litigant "lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). Regardless, the States' theory hinges on the unsupported allegation that the noncitizens spared

---

[5] To be sure, the States cannot even show that there is a "substantial likelihood" that an Order resulting in DHS abandoning both the New Guidance and the Interim Guidance would redress their alleged injuries. Due to resource constraints, *every* Administration must prioritize certain enforcement actions over others; the only question is *how* it prioritizes. *See Arizona v. United States*, 567 U.S. 387, 396 (2012) ("A principal feature of the removal system is the broad discretion exercised by immigration officials. . . . Federal officials . . . must decide whether it makes sense to pursue removal at all" based on the "equities of an individual case."). The States make no attempt to show that, if the Court enjoins the New Guidance, and DHS does not revert to the Interim Guidance, the resulting prioritization scheme would result in a decrease in crime levels within their States, or a decrease in the number of noncitizens who use health care or education resources at the States' expense.

from enforcement actions due to the New Guidance will not only commit crimes but will commit crimes that require *more* resources than those who are apprehended as priorities under the New Guidance but who would not otherwise have been apprehended. *See* New Guidance at 8-9. Relevant data, however, instead suggests that focusing resources through a prioritization framework will enable DHS to take action against a greater number of public safety threats. For example, while the Interim Guidance was in effect, it resulted in *more* arrests of noncitizens convicted of aggravated felonies. *See* Considerations Memo at 17 (from February 18 to August 21, 2021, "ICE . . . arrested 6,046 individuals with [aggravated felony] convictions compared to just 3,575 in the same period in 2020"); Berg Decl. ¶¶ 15-16.[6] Likewise, in light of the Interim Guidance, ICE was able to divert resources to assist with border security. *See id*. ¶ 18 (noting that ICE "detailed" approximately 300 ICE officers "to the Southwest Border to support CBP operations").

To support their theory, the States rely on the Court's order granting a preliminary injunction against the interim enforcement priorities. Pls.' Mem. 41-42 (citing *Texas* D. Ct. Op., 2021 WL 3683913). But that decision did not account for new data (showing that prioritization increases enforcement against dangerous noncitizens), nor does it account for important differences between the New Guidance and Interim Guidance (the New Guidance calls for enforcement action against public safety threats in general). The States also, in passing, invoke a *parens patriae* theory, *see id.* at 42-43, but states cannot bring a *parens patriae* action against the federal government.[7] *See Commonwealth of Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923)

---

[6] In *Texas v. United States*, the Fifth Circuit noted that a Court may consider "offsetting benefits that are of the same type and arise from the same transaction as the costs." 809 F.3d 134, 155 (5th Cir. 2015), *as revised* (Nov. 25, 2015), *aff'd by equally divided court*, 136 S. Ct. 2271 (2016). Here, the offsetting "benefits"—the apprehension, due to the New Guidance prioritization scheme, of certain noncitizens likely to pose a threat to society—is "of the same type" as Plaintiffs' alleged injury—the non-apprehension of other noncitizens who may commit crimes—and arise from the same event (the New Guidance).

[7] The States argue that they are not precluded from bringing such a claim under *Mellon* because they are purportedly "asserting rights under federal law rather than attempting to protect [their] citizens from the operation of federal statutes." *See* Pls.' Mem. 42-43. But in trying to establish standing based on injuries to

("[I]t is no part of" a State's "duty or power to enforce" its citizens' "rights in respect of their relations with the federal government. In that field it is the United States, and not the state, which represents them as *parens patriae*."). In any event, even if that claim were available against the federal government, it would still fail here because it is premised on the faulty suggestion that the New Guidance is a threat to public safety.

The States' injury theories regarding health care and education costs suffer from similar defects. *See* Pls.' Mem. 41-43. Namely, they again rely on an unsupported assertion that those who will be spared from enforcement actions will choose to utilize public health care and education resources to a degree greater than those who would otherwise have remained in Texas and Louisiana and utilized their resources, but for the New Guidance. To the contrary, according to the States, the amount Texas spent to "educat[e] unaccompanied [noncitizen] children" increased from FY 2019 to FY 2020 (jumping from $42.73 million to $112.10 million), but dropped to $26.71 million in FY 2021 (when the Interim Guidance was in effect). *Id.* at 19. Furthermore, the States assert that Texas expended a significant amount—hundreds of millions of dollars—on health care for noncitizens from 2007-2019. *See id.* at 20-21. But the States provide no supporting evidence to support their conclusory assertion that these significant costs will increase due to the New Guidance. They make little attempt to show that the specific noncitizens who may be spared from enforcement actions under the New Guidance will, for example, require medical care, will be unable to finance this medical care, and will specifically choose to rely on public health resources as a result—much less that those noncitizens will do so at a higher rate than the noncitizens who

---

their citizens, the States are not relying on their "rights" or "interests" under federal law. In *Massachusetts v. EPA*, in response to the Chief Justice's dissent that there is "significant doubt on a State's standing to assert a quasi-sovereign interest—as opposed to a direct injury—against the Federal Government," *Massachusetts v. EPA*, 549 U.S. 497, 539 (2007) (Roberts, C.J., *dissenting*), the majority responded that a state may bring suit against the federal government when it is "assert[ing] its rights under" federal law, rather than the rights of its citizens, *id*. at 520 n.17. Here, the States' *parens patriae* theory relies on alleged injuries inflicted on their citizens; it does not rely on any concrete injury to the States' legal interests. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,* 458 U.S. 592, 607 (1982) ("The State must express a quasi-sovereign interest").

17

are removed as a result of the New Guidance.[8] Nor do they make any attempt to address the impact of DHS's focus on border security, in terms of prioritizations but also in its ability to shift more resources to the Southwest Border, such as the approximately 300 ICE officers detailed there. *See* Berg Decl. ¶ 18.

Accordingly, none of the States' injury theories are sufficient to establish standing, much less an irreparable harm sufficient to justify the extraordinarily relief they seek here.

B.    *The States cannot clear three threshold obstacles to their claims.*

"Even the APA—potentially the most versatile tool available to an enterprising state— imposes a number of limitations." *Texas*, 809 F.3d at 161. Three of those limitations each independently bars the States' claims here. First, as the Fifth Circuit just observed in largely staying this Court's injunction, a court cannot review immigration enforcement priorities because such action is "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2). Second, the New Guidance is not "final agency action" subject to review under the APA because it does not alter legal rights or obligations. *See* 5 U.S.C. § 704. Third, numerous provisions of the INA narrowly circumscribe the mechanisms and procedures for judicial review of immigration policies and thereby "preclude judicial review" under the APA. *See* 5 U.S.C. § 701(a)(1). Given the Fifth Circuit's stay decision, this Court need not advance past the first argument.

1.    The challenged action is "committed to agency discretion by law."

As the Supreme Court has explained, the Executive's "broad discretion" in enforcement decisions is "particularly ill-suited to judicial review." *Wayte v. United States*, 470 U.S. 598, 607 (1985). The reasons for judicial modesty in this sphere "are greatly magnified in the deportation context." *AADC*, 525 U.S. at 490. Thus, as the Fifth Circuit just observed, immigration

---

[8] The States, again citing *Massachusetts v. EPA*, argue that states are entitled to special solicitude in the standing analysis. But *Massachusetts* did not relieve states of their obligation to establish a cognizable injury in fact. *See Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 182 (D.C. Cir. 2019) (noting that, in *Massachusetts v. EPA*, the State was "entitled to 'special solicitude' because" it had "a quasi-sovereign interest in 'preserv[ing] its sovereign territory,'" but it still demonstrated "its own harm to establish an injury-in-fact."). Even in *Texas v. United States*, on which the States rely, the Fifth Circuit found that Texas had shown that "DAPA would have a major effect on the states' fiscs." 809 F.3d at 152.

enforcement priorities are "'committed to agency discretion by law' and not reviewable (for substance or procedure) under the APA." *Texas* Stay Op., 14 F.4th at 336. District courts in Florida and Arizona reached the same conclusion in rejecting two other recent challenges to DHS's immigration enforcement priorities. *See Florida*, 2021 WL 1985058, at *10; *Arizona*, 2021 WL 2787930, at *11.

The States make no attempt to distinguish the Fifth Circuit's stay opinion. Instead, they contend that this Court is free to disregard it. The Court should reject this pernicious invitation. Again, Fifth Circuit law is itself clear on this point: "the published opinion granting the stay is this [circuit] court's last statement on the matter." *ODonnell*, 913 F.3d at 482. True enough that a motions panel decision does not bind a later merits panel, *see, e.g.*, *Trevino v. Davis*, 861 F.3d 545, 548 n.1 (5th Cir. 2017), much as a merits panel does not bind the en banc court. But this has no bearing on a *district court's* obligation to apply circuit precedent in addressing whether the States are likely to succeed on the merits.

The Fifth Circuit's analysis as to the Interim Guidance demonstrates why the States fail once again here in their challenge to the New Guidance. The APA precludes review "of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Texas*, 809 F.3d at 165 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)); *see* 5 U.S.C. § 701(a)(2). One such category which has long been recognized as unreviewable includes enforcement and nonenforcement decisions. *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985); *Wayte*, 470 U.S. at 607. That is because, as the Supreme Court has explained, such decisions inherently require "a complicated balancing of a number of factors which are peculiarly within [the Executive's] expertise," including "whether agency resources are best spent on this violation or another," "whether the particular enforcement action requested best fits the agency's overall policies," and "whether the agency has enough resources to undertake the action at all." *Chaney*, 470 U.S. at 831. There can be no doubt, and the States do not dispute, that this general presumption of nonreviewability applies. But the States renew, by reference, their argument that

19

§§ 1231(a)(2) and 1226(c) displace this presumption by using the word "shall." The argument failed in the Fifth Circuit, and it fails here.

As Defendants have previously explained, and as the Fifth Circuit just reiterated, the word "shall" in §§1231 and 1226 does "not eliminate immigration officials' 'broad discretion' to decide who should face enforcement action in the first place." *Texas Stay Op.*, 14 F.4th at 337. Rather, the "deep-rooted nature of law-enforcement discretion" persists "even in the presence of seemingly mandatory commands." *Castle Rock*, 545 U.S. at 761. Thus, in *Castle Rock*, a statute provided that law enforcement "shall arrest . . . or . . . seek a warrant" for the arrest of any violator of a restraining order, but the Supreme Court rejected the notion this imposed a mandatory duty because to be "a true mandate of police action would require some stronger indication" of legislative intent than the bare "shall." *Id.*

So too here. Nothing provides the "stronger indication" necessary to displace enforcement discretion. Quite the opposite: The statutory and practical context here confirm that neither § 1226(c) nor § 1231(a)(2) impose an enforceable mandate. *See Crane v. Johnson*, 783 F.3d 244, 247 (5th Cir. 2015) (explaining that "the concerns justifying criminal prosecutorial discretion are 'greatly magnified in the deportation context'") (quoting *AADC*, 525 U.S. at 490). For one, resource constraints, relations with local authorities, and the fundamental difficulty of determining *ex ante* whether a particular noncitizen's conviction triggers the statutory criteria all make it practically impossible to detain every noncitizen whose detention is directed by § 1231(a) or § 1226(c).

Respectfully, and as the Fifth Circuit recognized, this Court erred in two respects in its parsing of Supreme Court precedent on this issue. First, the doctrine set out in (and long predating) *Castle Rock* is not overcome by a statute's "manifest purpose . . . to protect the public or private interests of innocent third parties." *Texas* D. Ct. Op., 2021 WL 3683913, at *31. In *Castle Rock* itself the statute's manifest purpose was the protection of victims of domestic violence. *See Castle Rock*, 545 U.S. at 754; *Texas* Stay Op., 14 F.4th at 339. And the strong tradition of discretion in the police context is "greatly magnified" in the context of immigration enforcement, weighted as

it is with foreign affairs implications. *See Texas* Stay Op., 14 F.4th at 339. Older cases did not implicate prosecutorial discretion at all, and so have no bearing on this case. *See id.* at 340 (discussing *Richbourg Motor Co. v. United States*, 281 U.S. 528 (1930) and *Escoe v. Zerbst*, 295 U.S. 490 (1935)).

Second, in its prior decision this Court erred in its synthesis of Supreme Court and other courts' decisions such as *Nielsen v. Preap*, 139 S. Ct. 954 (2019), *remanded*, *Preap v. McAleenan*, 922 F.3d 1013 (9th Cir. 2019) and *Johnson v. Guzman Chavez*, 141 S. Ct. 2271 (2021). *See Texas* Stay Op., 14 F.4th at 338-39. Those cases arose in a wholly different context—detainees seeking relief, not a party seeking to compel government compliance. To be sure, those cases sometimes described the statutes as "mandatory," but they did not decide, as the issue was not remotely implicated, whether the statutes impose a *judicially enforceable* duty on the Secretary. It is not plausible that, without briefing and without acknowledgment, the Supreme Court silently adjudicated the wholly separate, and constitutionally significant, issue of a court's power to compel the executive to allocate its limited enforcement resources in a particular manner, sweeping aside longstanding doctrines concerning enforcement discretion both in the face of a statute using the word "shall," *see Castle Rock*, 545 U.S. at 748, and in the immigration context, *see AADC*, 525 U.S. at 483*; Arizona*, 567 U.S. at 396.

Indeed, the Supreme Court's holding in *Preap* is inconsistent with an enforceable mandate. There, the Supreme Court held that the authority to detain under § 1226(c) persisted beyond the initial release from state custody. *See* 139 S. Ct. at 969. The Supreme Court *expressly rejected* the argument the States have advanced, and this Court has endorsed, in this litigation: that "evidence that Congress *expects* the Executive to meet a deadline" (that is, § 1226(c)'s "shall . . . upon release" language) means that "Congress wanted the deadline *enforced by courts.*" *Id.* at 969 n.6. Thus, while those cases generally say nothing at all about whether a party can compel enforcement under § 1226(c) or § 1231(a)(2), the Supreme Court's statement that comes closest to the issue rejects the idea of judicial enforcement.

Finally, and contrary to the States' assertion, § 701(a)(2)'s application here precludes both their substantive challenges and their notice-and-comment claim. As the Fifth Circuit just explained, actions "committed to agency discretion by law" are "not reviewable (for substance *or procedure*)." *Texas* Stay Op., 14 F.4th at 336 (emphasis added). This follows naturally from the structure of the statute: the States' APA claims, both substantive and procedural, arise under 5 U.S.C. § 704, and are premised on the waiver of sovereign immunity in § 702. But as § 701 provides, § 704—and the rest of 5 U.S.C. chapter 7—no longer "applies" when agency action is committed to agency discretion by law. Because the "establish[ment of] national immigration enforcement priorities," 6 U.S.C. § 202(5), reflected in the New Guidance is "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), the States have no cause of action, and can point to no valid waiver of sovereign immunity, that would permit them to pursue *any* of their claims, including their notice-and-comment claim. *See generally Texas* Stay Op., 14 F.4th 332.

<blockquote>2.    The challenged action is not "final agency action" subject to APA review.</blockquote>

Only "final agency action" is subject to judicial review under the APA. 5 U.S.C. § 704. Like the Interim Guidance, the New Guidance is not "final agency action" because it does not create legal "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). To be sure, this Court previously found that the Interim Guidance was final agency action. But the New Guidance lacks two features that this Court thought important to that analysis. *Texas* D. Ct. Op., 2021 WL 3683913, at *25. First, there is no preapproval process; second, there is no categorical distinction between "presumed priorities" and "other priorities." Instead, line officers are simply instructed to exercise their discretion guided by the considerations set forth in the New Guidance. And the New Guidance does not apply to detention decisions at all.

In any event, this Court's previous analysis of whether the Interim Guidance create legal rights or obligations was mistaken. The Court conflated the legal correctness of the memorandum with its "finality" for purposes of § 704. Agency guidance that does not create legal rights for, or impose legal obligations on, third parties is nonfinal, even where that guidance provides "instruction[s] to [agency] staff," *National Mining Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C.

Cir. 2014), or expresses the agency's official "view of what the law requires," *AT&T Co. v. EEOC*, 270 F.3d 973, 975 (D.C. Cir. 2001). So long as the agency retains the discretion to alter or revoke the guidance at will—as DHS and ICE have expressly done here—the guidance is nonfinal notwithstanding any expectation that rank-and-file officers will comply with the guidance while it is in effect. *Cf. The Wilderness Soc'y v. Norton*, 434 F.3d 584, 596 (D.C. Cir. 2006) (explaining that a particular guidance document did not create rights or obligations because "the agency's top administrators clearly reserved for themselves unlimited discretion to order and reorder all management priorities," even though adherence was generally "mandatory" for rank-and-file staff).

It is not necessary, and indeed it is error, to assess the merits of an APA challenge in order to answer the threshold question whether the merits are reviewable. Under this Court's prior analysis, many agency actions that are patently not "final" under the APA would be final simply because they reflect the agency's view of applicable law and the agency's intent to act on that view. To take one example, in *Luminant Generation Co. v. EPA*, the Fifth Circuit considered whether EPA's issuing a notice of violation to a company, after over ten years of investigation, was "final" such that it was subject to judicial review. 757 F.3d 439, 442 (5th Cir. 2014). This notice plainly represented EPA's interpretation of the relevant law (the Clean Air Act's notice requirements), and the company thought that interpretation was erroneous. EPA was taking action—issuing the notice of violation, and later filing a civil action—based on that allegedly erroneous interpretation. But the Fifth Circuit held that the notices were not final agency action, in part because the "notice does not itself determine [the company's] rights or obligations, and no legal consequences flow from the issuance of the notice." *Id.* Rather it was the *statute* and related state regulations that "set forth" the company's "rights and obligations." *Id.* Legal consequences would arise only later in the process. To take another example, in *Texas v. Rettig*, the plaintiffs argued that 2013 HHS guidance "obligated the States to" structure their Medicaid programs in ways that the States contended violated the law. 987 F.3d 518, 530 (5th Cir. 2021). But the Fifth Circuit held that the 2013 guidance was not "final agency action" because it "did not create any

new obligations or consequences"; instead, it simply "restated" a "requirement [that] has existed since" 2002. *Id.*

Here, similarly, the New Guidance does not alter any individual's or entity's legal rights or obligations. Even the States do not embrace this Court's previous reasoning that enforcement priorities change the States' legal rights or obligations. *See* Pls.' Mem. 44. No surprise, as Texas and Louisiana have the same legal obligations today to, for example, provide a public education on equal terms to noncitizen children, as they did last year and as they will when the priorities become effective. That is because it is the Constitution, not the New Guidance, that "set[s] forth" the States' "right and obligations" in this regard. Or, in the case of Medicaid payments or other expenses the States allegedly incur, it is other state or federal statutes that require the action.[9]

As to noncitizens released because their removal is not reasonably imminent, it is, again, the statute, not the New Guidance, that creates the right to release. *See Hussein S.M. v. Garland*, No. 21-348, 2021 WL 1986125, at *3 (D. Minn. May 18, 2021) (applying *Zadvydas*). Every noncitizen who is potentially subject to removal or other enforcement action remains potentially subject to that enforcement action both before and after the New Guidance. Certain noncitizens may be less likely, as a practical matter, to be pursued for enforcement, but their legal right to remain in this country is determined by statute and regulation, not the enforcement priorities (which may, after all, be changed at any time).[10] In enjoining the Interim Guidance, this Court erred in concluding that the *practical* consequences of the priorities—such as an increase in expenses under preexisting legal duties—rendered the agency action "final" for purposes of the APA. As in *Luminant Generation* and *Rettig*, such downstream consequences of the priorities do

---

[9] To be clear, this is a wholly distinct question from whether the New Guidance "causes" the States' expenses for standing purposes. Even if (and Defendants doubt) any expenses, to the extent they exist, can be fairly traced to the challenged conduct, the challenged conduct is not the source of the legal obligation to incur those expenses.

[10] Defendants do not dispute that the New Guidance is the "consummation" of the agency process, thus satisfying the first prong of the *Bennett* test. Defendants do argue, however, that the right to change enforcement policies at any time undermines contention that they create legal rights or obligations.

not create "rights and obligations" sufficient to permit review under the APA, because "such consequences are practical, as opposed to legal, ones." *Louisiana v. U.S. Army Corps of Eng'rs*, 834 F.3d 574, 583 (5th Cir. 2016).

The States instead posit that the creation of a "case review process" to seek additional review renders the priorities final. Of course, in this regard, the New Guidance does not even represent the culmination of the agency's decisionmaking process, as it simply directs the creation of such a process without defining its contours. The New Guidance does not define or establish any noncitizen's rights or obligations in that case review process. In any event, such a process is procedural only—a mechanism to seek a subsequent alteration of legal rights or obligations. It is black letter law that such an "intra-agency procedural rule" should not be reviewed "until it has been utilized and resulted in a final agency action." *Peoples Nat. Bank v. Off. of Comptroller of Currency of U.S.*, 362 F.3d 333, 337 (5th Cir. 2004).

> 3.   Congress has precluded judicial review of these types of decisions.

Consistent with the broad discretion afforded DHS in immigration enforcement, Congress enacted "*many* provisions . . . aimed at protecting the Executive's discretion from the courts." *AADC*, 525 U.S. at 486. Those provisions preclude judicial review in this case.

> a.   *APA challenges to DHS's application of enforcement priorities are precluded from review.*

An action cannot proceed under the APA when another statute precludes judicial review. 5 U.S.C. § 701(a)(1). "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984). A detailed mechanism for review of some claims by some plaintiffs is "strong evidence that Congress intended to preclude [other types of plaintiffs] from obtaining judicial review." *United States v. Fausto*, 484 U.S. 439, 448 (1988).

Congress has set out a detailed statutory review scheme for claims pertaining to the INA. *See* 8 U.S.C. § 1252; *id.* § 1229. That review scheme is the exclusive means of judicial review and

precludes statutory claims that do not fall within its parameters. *See, e.g.*, *id.* § 1252(a)(5) ("For purposes of this chapter, in every provision that limits or eliminates judicial review or jurisdiction to review, [those terms] include . . . review pursuant to any other provision of law (statutory or nonstatutory)"). Section 1252(b)(9) channels judicial review of all "decisions and actions leading up to or consequent upon final orders of deportation," including "non-final order[s]," into one proceeding exclusively before a court of appeals. *AADC*, 525 U.S. at 483, 485. A separate—and even more limited—scheme governs judicial review of expedited orders of removal. *See* 8 U.S.C. § 1252(a)(2)(A); *id.* § 1252(e). These provisions circumscribe district court jurisdiction over "*any* issue—whether legal or factual—arising from *any* removal-related activity," which "can be reviewed *only* through the [statutorily defined] process." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1029–31 (9th Cir. 2016); *see Aguilar v. ICE*, 510 F.3d 1, 9 (1st Cir. 2007) (similar). That includes "policies-and-practices challenges," *J.E.F.M.*, 837 F.3d at 1035, arising from any "action taken or proceeding brought to remove an alien," 8 U.S.C. § 1252(b)(9), whether or not the challenge is to an actual final order of removal or whether there even is a final order at all, *J.E.F.M.*, 837 F.3d at 1032. Thus, § 1252(b)(9) is an "unmistakable 'zipper' clause" that means "no judicial review in deportation cases unless this section provides judicial review." *AADC*, 525 U.S. at 482-83.

The claims here "arise[] from" "action[s] taken or proceeding[s] brought to remove an alien." 8 U.S.C. § 1252(b)(9). The States challenge what they allege to be DHS's practice regarding (1) the initiation of either expedited removal proceedings, *id.* § 1225(b)(1), or full removal "proceeding[s] under section 1229a," *id.* § 1225(b)(2)(A); (2) detention of certain noncitizens "pending a decision" on removal, *id.* § 1226(a); and (3) the removal "at any time" of noncitizens with reinstated orders of removal, *id.* § 1231(a)(5). Because § 1252 provides the sole mechanism for review of all "decisions and actions leading up to or consequent upon final orders of deportation," *AADC*, 525 U.S. at 485, and because the States cannot invoke § 1252, their claims necessarily fail.

As Justice Scalia explained in *Fausto*, when Congress provides for review by specific plaintiffs, but not by others, the excluded plaintiffs cannot obtain judicial review. 484 U.S. at 448.

That is precisely what Congress did here. In *Block*, for example, Congress provided a specific review scheme for "dairy handlers" but said nothing at all about "consumers." 467 U.S. at 346-47. This did not mean that milk consumers could resort to the APA to challenge the agency action; it meant they could not challenge the action at all. *Id.* at 347. Here, by providing a detailed and limited review scheme for noncitizens' claims, Congress has implicitly precluded claims by other persons or entities, including by these the States, under the APA or otherwise. *Cf. Ayuda, Inc. v. Reno*, 7 F.3d 246, 250 (D.C. Cir. 1993) (holding that organizational plaintiff could not challenge INS policies "that bear on an alien's right to legalization").

      *b.*    *The States' § 1226(c) challenge is specifically precluded from review.*

In addition, Congress expressly precluded judicial review over the States' § 1226 claim. Congress provided that the Secretary's "discretionary judgment regarding application of this section shall not be subject to review." 8 U.S.C. § 1226(e). Here, the Secretary's determinations under § 1226(c) are discretionary since he may detain a noncitizen under § 1226—under either (a) or (c)—only "pending a decision" on removal. Detention authority is thus contingent on the Secretary's separate, predicate, and discretionary decision to commence removal proceedings in the first instance, by issuing a notice to appear. *See id.* § 1229(a); *Crane*, 783 F.3d at 249; *see also Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1482 (2021) ("A notice to appear serves as the basis for commencing a grave legal proceeding" and "is like an indictment in a criminal case"). As the Fifth Circuit observed, even crediting a judicially enforceable mandate in § 1226(c), it would not disrupt the Executive's "'broad' discretion to decide who should face enforcement action in the first place." *Texas* Stay Op., 14 F.4th at 337 (quoting *Arizona*, 567 U.S. at 396).

The policy the States challenge here—which does not dictate which noncitizens ICE may detain, but instead simply establishes internal procedures that help ICE target its resources—is still deeper within the Secretary's discretion. Put otherwise, Congress vested the Secretary with discretion to decide who to pursue for removal in the first instance, 8 U.S.C. § 1229(a), and derivatively whom to detain pending removal, *id.* § 1226(a); Congress also vested the Secretary with discretion to set "national immigration enforcement polices and priorities," 6 U.S.C. § 202(5);

and Congress also provided that such decisions "shall not be subject to judicial review," 8 U.S.C. § 1226(e). The Court therefore lacks jurisdiction to review the Secretary's discretionary decision to structure immigration enforcement priorities as he has here.

To be sure, the Supreme Court has held that this section does not preclude a habeas petitioner from challenging either the constitutionality of the statutory scheme or that his detention is not authorized by that scheme. *Demore v. Kim*, 538 U.S. 510, 517 (2003). That is so because Congress must speak more clearly when it seeks to preclude constitutional claims or habeas review. *Id.* In subsequent cases, a plurality of the Court similarly found jurisdiction over constitutional challenges to the statutory framework or to claims contending that detention was *not* authorized by that framework. *Preap*, 139 S. Ct. at 962 (plurality); *Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018) (plurality). *But see Preap*, 139 S. Ct. at 974-75 (Thomas, J., concurring in part) (finding that § 1226(e) bars even those claims); *Jennings*, 138 S. Ct. at 857 n. 6 (Thomas, J., concurring in part) (same). Here, the States' APA claims are neither constitutional claims nor habeas claims; nor are they arguing that the Secretary lacks the power to detain certain noncitizens under § 1226(c). The "text of the statute contains no [related] exception" for APA claims, *Preap*, 139 S. Ct. at 975 (Thomas, J., concurring in part). Because the claims here do not implicate the special rules of construction related to constitutional and habeas claims, § 1226(e) precludes review.

> c.    *The States' § 1231(a)(2) challenge is likewise specifically precluded.*

Section 1231 similarly precludes judicial review of the States' challenge based on that section. Congress provided, in no uncertain terms, that "nothing in [§ 1231] shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States." 8 U.S.C. § 1231(h). Section 1231 is simply not subject to judicial enforcement, by the States or by "any party." Section 1231(h), like its statutory ancestor, "makes clear that Congress intended that *no one* be able to bring suit to enforce" it. *Hernandez-Avalos v. INS*, 50 F.3d 842, 844 (10th Cir. 1995) (holding that, under the same zone of interests test applicable to APA actions, a plaintiff could not enforce the statute).

This Court has previously rejected the straightforward and plain meaning of the term "any party" to mean *any* party. *See* PARTY, *Black's Law Dictionary* (11th ed. 2019); *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218–19 (2008) (Thomas, J.) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'"). Instead, the Court, relying on its findings of statutory purpose derived from its reading of legislative history, construed the term to mean only an "alien in a removal proceeding." *Texas* D. Ct. Op., 2021 WL 3683913, at *21 (quoting *Texas v. United States*, No. 6:21-cv-00003, 2021 WL 2096669, at *23-*28 (S.D. Tex. Feb. 23, 2021)). But this reading conflicts with the provision's plain text. The statute is not limited to "parties to removal proceedings." Nor is the Court's reading supported by context. By using the term "any party" in § 1231(h) instead of "the alien," as is used throughout the rest of § 1231, Congress meant something broader than to preclude claims only of noncitizens. *See* 8 U.S.C. § 1101(a)(3) (defining "alien"); *see also Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 777 (2018). Further, in enacting § 1231(h), the relevant Conference Report noted that the provision "is intended, *among other things*, to prohibit the litigation of claims by aliens who have been ordered removed from the U.S. that they be removed at a particular time or to a particular place." *See Texas* D. Ct. Op., 2021 WL2096669, at *28 (emphasis added) (quoting H.R. Rep. No. 104-828, at 219) (Conf. Rep.) (1996)); *see also Brogan v. United States*, 522 U.S. 398, 403 (1998) ("[I]t is not, and cannot be, our practice to restrict the unqualified language of a statute to the particular evil that Congress was trying to remedy—even assuming that it is possible to identify that evil from something other than the text of the statute itself."). Accordingly, although § 1231(h) certainly does preclude a noncitizen in a removal proceeding from enforcing any provision of § 1231, § 1231(h) is not limited to that scenario. That provision thus applies here to bar the States' claims.

Finally, for similar reasons, the States do not come within the relevant zone of interests. An APA plaintiff must show that it is "aggrieved . . . within the meaning of a relevant statute," 5 U.S.C. § 702, meaning the plaintiff "may not sue unless he 'falls within the zone of interests sought to be protected by the statutory provision whose violation forms the legal basis for his

complaint,'" *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 177 (2011) (quoting *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 883 (1990)); *see also Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). Whether a plaintiff is within the zone of interests is a question answered "using traditional tools of statutory interpretation." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014). As explained above, Congress was clear that no entity can enforce § 1231, and therefore no entity is within the "zone of interests" of § 1231. *See* 8 U.S.C. § 1231(h); *Hernandez-Avalos*, 50 F.3d at 844.

> C.     The States' APA claims fail on the merits.

> > 1.     The New Guidance is not "contrary to law."

Even if the States could pursue their APA claims, they would fail on the merits. The States principally contend that DHS has a non-discretionary duty under §§ 1226(c)(1) and 1231(a)(2) to apprehend all noncitizens who have committed certain criminal offenses or who are subject to final orders of removal. Pls.' Mem. 24-32. In making these arguments, the States do not cite, much less apply, the Fifth Circuit's recent analysis of these provisions. Neither section displaces DHS's traditional prosecutorial discretion to decide which noncitizens to bring enforcement actions against. *Texas* Stay Op., 14 F.4th at 340. The statutes' limited mandate requires DHS to not release certain noncitizens who have already been arrested and taken into custody. *See id.* The New Guidance does not govern detention, so the statutes' limited mandate does not apply. Even if the stay opinion did not preclude the States' argument, the New Guidance would not violate any mandate in those statutes because it simply establishes guidelines for ICE officers to exercise their discretion, and it does not prohibit DHS from taking custody of any noncitizen.

> > a.     The statutory provisions at issue only govern detention requirements.

The States' arguments that the New Guidance is contrary to law fail because §§ 1226(c) and 1231(a)(2) require continued detention only of covered noncitizens already in custody. Section 1226(c) mandates that once a covered criminal noncitizen is arrested and detained, and in removal proceedings, DHS may release them "only if" narrow exceptions are met. Section 1231(a) provides that "[u]nder no circumstance" shall DHS release certain noncitizens who are detained during the

removal period. Longstanding DHS practice of detaining covered noncitizens who are taken into custody are consistent with these detention mandates.[11]

The New Guidance does not implicate these narrow detention mandates, because the New Guidance does not govern decisions related to detention and release. *See* New Guidance at 1. Rather, the "memorandum provides guidance for the apprehension and removal of noncitizens." *Id.* The States' arguments about §§ 1226(c) and 1231(a)(2) are therefore inapposite because the New Guidance does not touch upon detention, the sole action mandated in some circumstances by §§ 1226(c) and 1231(a)(2).

The States' statutory arguments are premised on their view that §§ 1226(c) and 1231(a)(2) require DHS to "take into custody" certain classes of noncitizens. *See* Pls.' Mem. 24, 31. The Fifth Circuit found that the statutes impose no such obligation: nothing in the provisions "override the deep-rooted tradition of enforcement discretion when it comes to decisions that occur before detention, such as who should be subject to arrest, detainers, and removal proceedings." *Texas Stay Op.*, 14 F.4th at 340. The decision to take into custody—that is, to arrest—noncitizens described in §§ 1226(c)(1) and 1231(a)(2) is committed to agency discretion and, therefore, any decision not to take a noncitizen into custody is not a statutory violation. *See id.* The Fifth Circuit analyzed the cases on which the States rely—*Jennings*, *Preap*, and *Demore*—and found that "[t]hose cases do not consider whether the statutes eliminate the government's traditional prerogative to decide who to charge in enforcement proceedings (and thus who ends up being detained)," because the cases "are ones in which detainees subject to enforcement action were seeking their release." *Id.* at 338-39.[12]

---

[11] DHS implemented the interim enforcement priorities in a manner consistent with the statutes' narrow detention mandates. *See* Considerations Memo.

[12] Though the States do not rely on the case in their motion, the Fifth Circuit also distinguished *Guzman Chavez*, where "already-removed detainees sought release," on the same grounds. *Texas* Stay Op., 14 F.4th at 338 (citing *Guzman Chavez*, 141 S. Ct. at 2281).

The States suggest that DHS violates the detention requirement of § 1226(c) when it rescinds a detainer that it previously issued for a noncitizen in state custody. *See* Pls.' Mem. 28-30. But issuing a detainer is not the same as arresting a noncitizen and taking them into custody. A detainer is simply an administrative tool of DHS's creation to facilitate its operations. ICE "issues detainers to federal, state, local, and tribal [law enforcement agencies] to provide notice of its intent to assume custody of a removable alien." ICE Policy No. 10074.2. A detainer, then, is a request to local law enforcement to hold a noncitizen so that ICE can arrive to arrest them. *See id.* The cancellation of a detainer does not implicate the detention requirement of § 1226(c), which only attaches after ICE takes the covered noncitizen into custody and removal proceedings are commenced, because a detainer is a pre-arrest decision. This conclusion is consistent with both the text of § 1226(c), *see supra* at 20-21 (explaining that, under *Castle Rock*, § 1226(c) does not mandate that DHS arrest all noncitizens potentially covered by the statute), and the Fifth Circuit's clear statement that the provision does not "override the deep-rooted tradition of enforcement discretion when it comes to decisions that occur before detention, such as who should be subject to arrest [and] detainers," *Texas* Stay Op., 14 F.4th at 340.

In sum, the New Guidance does not implicate either § 1226(c) or § 1231(a)(2), because the policy only directs ICE officers' exercise of pre-detention discretion. And the Fifth Circuit was clear: the Executive Branch retains its prosecutorial discretion over decisions before detention, including of arrest and whether to issue or cancel detainers. *Texas* Stay Op., 14 F.4th at 340. The States do not attempt to distinguish the Fifth Circuit's statutory analysis. Nor could they.

> b.   *The New Guidance does not violate § 1226(c).*

Of course, even if § 1226(c) did create a duty to take custody of noncitizens, the New Guidance still would not violate it. The New Guidance does not prohibit the arrest or detention of any noncitizen. It merely prioritizes enforcement actions against certain noncitizens based on public safety, border security, and national security considerations. Immigration officers may still arrest and detain any noncitizen they determine to be a worthy use of resources, guided by aggravating and mitigating circumstances. *See* New Guidance. The Supreme Court in *Preap*

recognized that, in § 1226(c), Congress did not expect DHS to immediately arrest all noncitizens covered by that provision. *See* 139 S. Ct. at 969; *see also id*. at 973 (Kavanaugh, J., concurring). Indeed, in *Preap* some plaintiffs were arrested "several years" after they were released from state criminal confinement. *Id.* at 961.

The States protest that the New Guidance prevents DHS from taking custody of noncitizens "convicted of serious crimes" covered by § 1226(c)(1). Pls.' Mem. 28. But, again, the New Guidance emphasizes that "[t]he overriding question is whether the noncitizen poses a current threat to public safety." New Guidance at 4. ICE officers are entrusted to conduct an "assessment of the individual and the totality of the facts and circumstance," including by weighing the non-exclusive list of aggravating (*e.g.*, "the gravity of the conviction and the sentence imposed" or "the sophistication of the criminal offense") and mitigating factors (*e.g.*, "military or other public service" or "time since an offense and evidence of rehabilitation"). *Id*. at 3. The New Guidance expressly permits apprehension of *all* criminal noncitizens—including those described in § 1226(c)(1).[13] Because the New Guidance simply creates a prioritization scheme and does not insulate noncitizens from enforcement actions, the New Guidance is consistent with § 1226(c).

If the States' concern is that ICE is not detaining *every* noncitizen covered by § 1226(c), then their issue is not with the New Guidance but with the very idea of prosecutorial discretion. Resource limitations mean that DHS has *never* been able to arrest all noncitizens and the States do not assert that DHS was accomplishing this insurmountable task before the New Guidance was issued. *Cf. Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 976 (9th Cir. 2017) ("Congress has not appropriated sufficient funds to remove all . . . undocumented aliens."). DHS will inevitably have to prioritize certain noncitizens over others, *see Chaney*, 470 U.S. at 831, and the New Guidance merely informs officers on how to prioritize their enforcement efforts. The States' contrary

---

[13] In one sentence, the States suggest that Defendants are releasing some noncitizens whose release is prohibited by § 1226(c)(2). Pls.' Mem. 30. But, the New Guidance does not govern detention decisions. Plus, DHS shares the States' view that once noncitizens are arrested and detained under § 1226(c)(1), they generally may not be released from DHS custody. *See* 8 U.S.C. § 1226(c)(2).

position would mandate that DHS detain low- and high-level priorities alike, rendering impossible the Secretary's ability to carry out Congress's charge that he establish national immigration enforcement policies and priorities and jeopardizing DHS's ability to prioritize enforcement actions against noncitizens posing the greatest threat.[14]

Last, the States' passing suggestions about relief under 5 U.S.C. § 706(1) are erroneous. Pls.' Mem. 30, 32. The States have not met their high burden for such a mandatory injunction. *See Harris v. Wilters*, 596 F.2d 678, 680 (5th Cir. 1979) ("Only in rare instances is the issuance of a mandatory preliminary injunction proper."), *accord Hyde v. Selene Fin. LP*, Civ. A. No. 4:17-cv-00993, 2017 WL 11552846, at *2 (N.D. Tex. Dec. 29, 2017) ("when a plaintiff seeks a preliminary injunction, there is a heavier burden on plaintiff to establish that injunctive relief is appropriate"). A "claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis in original). As the Fifth Circuit has affirmed, *Texas* Stay Op., 14 F.4th at 340, DHS retains prosecutorial discretion at every step of the removal process concerning whether to arrest, issue detainers to, or remove any specific noncitizen. *AADC*, 525 U.S. at 483-84. In addition to being contrary to law, a mandatory injunction is particularly inappropriate here because it "would likely require expansion of [ICE's] resources beyond those currently budgeted and allocated by Congress" and is otherwise "unreasonably and unduly burdensome, if not entirely impossible." *See* Declaration of Thomas Decker ¶ 7, ("Decker Decl.") AR DHSP_00005782, attached as Exhibit M.[15]

---

[14] The States' view that § 1226(c)(1) requires indefinite detention even for noncitizens "who will never face removal proceedings" is at odds with *Jennings. See Texas* Stay Op., 14 F.4th at 338 n.5.

[15] To the extent §§ 1226(c)(1) and 1231(a)(2) require some discrete agency action, they do not require DHS to issue detainers in particular. "Filing a detainer is an *informal* procedure in which [DHS] informs prison officials that a person is subject to deportation and requests that officials give [DHS] notice of the person's death, impending release, or transfer to another institution." *Zolicoffer v. U.S. Dep't of Justice*, 315 F.3d 538, 540 (5th Cir. 2003) (quoting *Giddings v. Chandler*, 979 F.2d 1104, 1105 n.3 (5th Cir. 1992) (emphasis added). Section 1357(d)—the only provision of the INA explicitly mentioning detainers—provides only that in certain circumstances involving noncitizens arrested for controlled substance violations, DHS should

      *c.*    *The New Guidance does not violate § 1231(a).*

The States' claim with respect to § 1231(a)(2) fails for similar reasons. Even if that provision could be read to impose an unconditional command to take custody of all noncitizens with final removal orders, the New Guidance does not prohibit the arrest or detention of any noncitizen, but merely instructs officers to exercise their discretion to focus on the most serious threats to public safety and national security, on a case-by-case basis. *See* New Guidance at 3-4.

The States nevertheless contend that the New Guidance will prevent the arrest and detention of certain noncitizens whose removal period begins "the date the alien is released from [state] detention or confinement," 8 U.S.C. § 1231(a)(1)(B)(iii), and who are covered by § 1231(a)(2). Pls.' Mot 31. The States contend that any such delay contravenes § 1231(a)(2)'s purported mandate of "immediate" detention without "delay," Pls.' Mem. 31-32. But just as with § 1226(c), § 1231(a)(2)'s provision stating that DHS "shall" detain covered aliens as of "the date the alien is released" does not realistically contemplate—and certainly does not command—the *immediate* arrest of all covered noncitizens. *See Preap*, 139 S. Ct. at 969; *see also id.* at 973 (Kavanaugh, J., concurring). The New Guidance directs officers to focus the agency's limited resources to "to most effectively achieve [DHS's] goals," including protecting against "threat[s] to public safety," New Guidance at 3, without prohibiting officers from seeking immediate detention in any case, when justified. *See id.* at 4 ("The overriding question is whether the noncitizen poses a current threat to public safety.").

DHS has thus long understood § 1231(a)(2) to require DHS to detain certain terrorist and criminal noncitizens during the removal period once arrested, and the first sentence to authorize but not require the detention of other noncitizens during the removal period. *See, e.g., Continued*

---

"promptly determine whether or not to issue such a detainer." *See* 8 U.S.C. § 1357(d). The regulation codifying DHS's detainer authority more broadly—provides only that authorized officers "*may* at any time issue a Form I-247, Immigration Detainer-Notice of Action, to any other Federal, State, or local law enforcement agency . . . ." 8 C.F.R. § 287.7(a) (emphasis added); *see also Santoyo v. United States*, Civ. No. 5:16-CV-855-OLG, 2017 WL 6033861, at *3 (W.D. Tex. Oct. 18, 2017) ("The statutory and regulatory authorities that regulate the issuance of ICE detainer requests do not mandate their issuance."), *appeal dismissed*, *Santoyo v. Bexar Cnty.*, 2019 WL 11706155 (5th Cir. Nov. 8, 2021).

*Detention of Aliens Subject to Final Orders of Removal*, 66 Fed. Reg. 56,967, 56,969 (Nov. 14, 2001). Consistent with that understanding, the Supreme Court has explained that § 1231(a) only "mandates detention of *certain criminal aliens*" during the removal period. *Zadvydas*, 533 U.S. at 698 (emphasis added). Were it otherwise, then DHS would have to detain every noncitizen during the removal period, even if removal ultimately proved impossible. "Removal decisions . . . implicate our relations with foreign powers and require consideration of changing political and economic circumstances." *Jama v. ICE*, 543 U.S. 335, 348 (2005) (quoting *Mathews v. Diaz*, 426 U.S. 67, 81 (1976). Congress thus intended for DHS to retain flexibility to account for the "dynamic nature of relations with other countries," *Arizona*, 567 U.S. at 397, and "to avoid removals that are likely to ruffle diplomatic feathers, or simply to prove futile." *Jama*, 543 U.S. at 348.[16] A corollary of that necessary flexibility is the authority to prioritize which cases DHS will pursue for actual removal, and accordingly those noncitizens that ICE will take into custody and detain pending removal. The New Guidance simply establishes guidelines for ICE officers to use in exercising their discretion; it does not violate any statutory mandate in § 1231.

2. DHS's new enforcement guidance is a reasonable effort to prioritize limited resources in enforcing immigration laws.

The States also cannot establish that the New Guidance is arbitrary and capricious. "The arbitrary and capricious standard is highly deferential." *Knapp v. U.S. Dep't of Agric.*, 796 F.3d 445, 453 (5th Cir. 2015) (quoting *Pension Benefit Guar. Corp. v. Wilson N. Jones Mem'l Hosp.*, 374 F.3d 362, 366 (5th Cir. 2004)). "[T]he reviewing court must consider whether the decision

---

[16] To name just two examples: no noncitizen can be removed without procuring travel documents from his or her native country, but many countries refuse to issue such travel documents until a noncitizen's judicial appeals are fully exhausted, which often is years after release from state or local custody. *See, e.g.*, *Adefemi v. Gonzales*, 228 F. App'x 415, 416 (5th Cir. 2007) (per curiam). Even with travel documents, removal may be inappropriate because "[t]he foreign state may be mired in civil war, complicit in political persecution, or enduring conditions that create a real risk that the alien or his family will be harmed upon return." *Arizona*, 567 U.S. at 396-97. But were the States correct, then DHS must detain such noncitizens even though foreign affairs concerns mean there is "no significant likelihood of removal in the reasonably foreseeable future." *Zadvydas*, 533 U.S. at 701. Section 1231(a)(2) does not require that perverse result, which would raise serious Constitutional concerns. *Id.* at 699-700; *see also United States v. Vasquez-Benitez*, 919 F.3d 546, 552 (D.C. Cir. 2019).

36

was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989). Here, Defendants reached a reasonable decision based on the relevant factors.

In issuing the New Guidance, the Secretary determined that DHS does not "have the resources to apprehend and seek the removal of every one of [the more than 11 million undocumented or otherwise removable noncitizens in the United States]," and, therefore, emphasized the "need to exercise our discretion and determine whom to prioritize for immigration enforcement action." *See* New Guidance at 2. Indeed, citing two Supreme Court decisions of the last quarter century, the Secretary noted that it "is well established in the law that federal government officials have broad discretion to decide who should be subject to arrest, detainers, removal proceedings, and the execution of removal orders." *Id*. (referring to *Arizona* and *AADC*); *see also Texas* Stay Op., 14 F.4th at 340 (underscoring "the deep-rooted tradition of enforcement discretion when it comes to decisions that occur before detention, such as who should be subject to arrest, detainers, and removal proceedings"). Thus, with this backdrop the Secretary concluded that DHS should prioritize those who pose the greatest risk to national security, border security, and public safety. *See* New Guidance at 3-4; *id*. at 2 (recognizing that the majority of noncitizens who could be subject to removal have been contributing members of our communities for years); *see also Arizona*, 567 U.S. at 396 ("Discretion in the enforcement of immigration law embraces immediate human concerns.").

But in articulating who to prioritize, Secretary still ensured that those categories were flexible enough for officers to take the totality of circumstances into consideration in determining those who pose the greatest threats and should be subject to enforcement actions. In particular, the Secretary's New Guidance instructs line officers to make an "assessment of the individual and the totality of the facts and circumstances," based on aggravating and mitigating factors, in determining whether an individual "poses a current threat to public safety." New Guidance at 3. Thus, in this context, officers must "exercise their judgment accordingly," with the understanding that "[t]he decision how to exercise prosecutorial discretion can be complicated and requires

investigative work." *Id*. at 4. Further, while "the guidance leaves the exercise of prosecutorial discretion to the judgment of [DHS] personnel," the New Guidance also seeks to "ensure the quality and integrity of [DHS's] civil immigration enforcement actions, and to achieve consistency in the application of our judgments," by relying on training, a review process, data collection, and individual case review. *Id*. at 5-6. This comprehensive, and yet flexible, system, is a reasonable determination of how best to exercise long-recognized enforcement discretion in the immigration context.

The Secretary's memorandum on its face is thus sufficient to survive arbitrary and capricious review. *See*, *e.g.*, *Chaney*, 470 U.S. at 842 (Marshall, J., concurring) ("a decision not to enforce that is based on valid resource-allocation decisions will generally not be arbitrary, [and] capricious") (quoting 5 U.S.C. § 706(2)(A)); *AADC*, 525 U.S. at 490-91 (discussing factors that may go into enforcement decisions). Nevertheless, in a lengthy memorandum summarizing the considerations informing the Secretary's memorandum, Defendants further explained the basis for the New Guidance. *See* Consideration Memo (explaining the various inputs from internal and external groups, the role of prosecutorial and enforcement discretion in the immigration context, the current Administration's approach, and key considerations underscoring the New Guidance— including public safety, deconfliction, impact on states, resources, statutory mandates, and alternative approaches). Thus, the new enforcement priorities must be upheld; DHS "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action," including a "rational connection between the facts found and the choice made." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

Notwithstanding DHS's comprehensive review, *e.g.*, listening sessions with dozens of groups, and in-depth analysis, the States still argue that the New Guidance is arbitrary and capricious. *See* Pls.' Mem. 32-36. In doing so, the States do not engage with DHS's Considerations Memo that directly contradicts their arguments, even though Defendants provided it to them three days before the States filed their motion. In their Amended Complaint, the States suggest that the

agency's considerations must be included in the operative document. *See* First Am. Compl. ¶ 132 (ECF No. 109) (citing the pre-APA decision of *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) that merely states that an agency's action should be judged on the agency's record). That is a misstatement of the law. Rather, under the APA, an agency's actions must generally "stand or fall" on the "propriety of [the agency's] finding" that is "sustainable on the administrative record." *See Camp v. Pitts*, 411 U.S. 138, 143 (1973). In other words, the court considers the entire administrative record. *See, e.g. id.* ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *accord Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985). Further, it makes little sense for a document providing operational guidance to include such details, much as the "operative documents" an agency publishes in the Code of Federal Regulations do not include the agency's analysis published separately in the Federal Register.

The arguments the States make in support of their arbitrary and capricious claim are indeed completely undermined by the Consideration Memo. First, the States claim that Defendants did not consider "the risks of recidivism among criminal aliens who are not detained." *See* Pls.' Mem. 33. But the Considerations Memo noted that the New Guidance addresses this concern "by calling for a context-specific consideration of aggravating and mitigating factors, the seriousness of an individual's criminal record, the length of time since the offense, and evidence of rehabilitation," and that "[t]hese factors are to be weighed in each case to assess whether a noncitizen poses a current threat to public safety, including through a meaningful risk of recidivism." *See* Considerations Memo at 12.

Next, the States argue that DHS did not address how non-detention will inhibit removal later. *See* Pls.' Mem. 33-34. Again, the Considerations Memo addressed this issue: "This criticism is based on the misconception that if the Department did not prioritize its enforcement efforts—or if it prioritized enforcement in some different way—a significantly greater number of people could be arrested, detained, moved through removal proceedings, and processed for removal." *See* Considerations Memo at 17. Rather, the agency explained, "[r]esource limitations make that an

impossibility, as has been the case since the Department was formed (and before that as well),"
and described how "such an approach ignores the reality that the Department's overall safety and
security mission is not best served by simply pursuing the greatest overall number of enforcement
actions but is rather best advanced by directing resources to prioritize enforcement against those
noncitizens who most threaten the safety and security of the Nation." *Id*.

The States' remaining critiques are similarly belied by the administrative record. The States
suggest that Defendants did not consider the impact of the New Guidance on the States, *see* Pls.'
Mem. 34-35; that Defendants did not consider any alternative approaches, *id*. at 35; and that
Defendants did not provide a statutory basis for what should be considered aggravating and
mitigating factors, *id*. at 35-36. But all of these are discussed at length in the Considerations Memo
and have their own sections: "*Impact on the States*," *see* Considerations Memo at 14-17;
"*Consideration of Alternative Approaches*," *see id*. at 19-21; "*Relationship Between Enforcement
Priorities and Statutory Mandates*, *see id*. at 17-19.[17] It may be that the States would disagree with
the way the Secretary resolved these issues. But it is not the States'—or the Court's—role to
determine policy for the Department of Homeland Security. At bottom, the Secretary expressly
considered each factor that the States contend he should have, and concluded that those
considerations supported the policy he adopted.

In the end, Defendants engaged in reasoned decision-making and the States' arguments to
the contrary should be rejected.

---

[17] The States also argue that Defendants have not explained why the new guidelines do not list an
"aggravated felonies" in its own right as a priority group. *See* Pls.' Mem. 35-36. But, in the Considerations
Memo, Defendants explained that "[i]n the Department's engagements with internal and external
stakeholders, including with the ICE workforce, concerns were raised about whether the focus on
individuals convicted of 'aggravated felonies' was both over- and under-inclusive." *See* Considerations
Memo at 12. Rather, the Department found that "[t]he aggravated felony definition can be challenging to
administer in many instances" and it "is an imperfect proxy for severity of offense." *Id*.; *see also id*. ("In
designing a new public safety enforcement priority category, the Department considered these concerns
and chose to place greater emphasis on the totality of the facts and circumstances that inform whether an
individual poses a current threat to public safety—typically because of serious criminal conduct—including
by looking at key aggravating factors related to the individual's criminal offense and history as well as
various mitigating factors.").

3. DHS's and ICE's internal guidance on enforcement prioritization is exempt from notice and comment.

The New Guidance is likewise exempt from the APA's notice-and-comment requirement. This requirement does not apply to "general statements of policy," 5 U.S.C. § 553(b)(A), which "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power," *Lincoln*, 508 U.S. at 197 (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979)). By contrast, rules that must generally be adopted through notice and comment are those that have the force and effect of law and create legally enforceable rights or obligations. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). Here, the New Guidance is quintessentially a policy statement: it announces how and when DHS components will pursue (or forbear from) enforcement—a decision "generally committed to an agency's absolute discretion." *Chaney*, 470 U.S. at 831. But it does not alter the rights or obligations of any person, nor does it create a binding norm on any individual enforcement decision.

Indeed, the Fifth Circuit's stay opinion applies here: the Court cannot review the States' procedural claim. *See, e.g., supra* at 22 (explaining how 5 U.S.C. § 701(a)(2) precludes judicial review of notice-and-comment claims). The logic of *Lincoln* itself underscores how agency guidance on matters committed to agency discretion is exempt from notice-and-comment requirements. In that case, the Supreme Court held a pronouncement of the exercise of discretion is a general statement of policy. In particular, the Supreme Court emphasized that "[w]hatever else may be considered a 'general statemen[t] of policy,' the term surely includes an announcement like the one before us, that an agency will discontinue a discretionary allocation of unrestricted funds from a lump-sum appropriation." *See Lincoln*, 508 U.S. at 196-97. As the D.C. Circuit has explained in rejecting a notice-and-comment claim to an action committed to agency discretion, "there is no need to create a record for judicial review where there is no cause of action for substantive judicial review of the designation decision." *Make The Rd. N.Y. v. Wolf*, 962 F.3d 612, 634-35 (D.C. Cir. 2020) ("Where Congress leaves the notice-and-comment process no work to do

and expressly authorizes the Executive Branch to exercise its unreviewable discretion 'at any time,' the APA does not require an agency to undertake the process for its own sake.").

This logic makes sense, especially when applied to the policy at issue here. Again, the Fifth Circuit recognized the "deep-rooted tradition of enforcement discretion when it comes to decisions that occur before detention, such as who should be subject to arrest, detainers, and removal proceedings." *Texas* Stay Op., 14 F.4th at 340. Here, the memorandum being challenged only concerns such decisions, *i.e.*, when it comes to apprehension and removal of noncitizens. *See* New Guidance at 1 ("This memorandum provides guidance for the apprehension and removal of noncitizens."). Thus, just as in *Lincoln*, guidance in how to exercise that discretion is not subject to notice and comment when the underlying substantive matter is not subject to judicial review. That is certainly true here. *See, e.g.*, *Texas* Stay Op., 14 F.4th at 338 (emphasizing the "strong background principle that the 'who to charge' decision is committed to law enforcement discretion, including in the immigration arena") (citation omitted); *id*. at 339 ("Against this absence of any authority limiting the executive's discretion in deciding whether to bring a removal proceeding is longstanding precedent holding that the use of 'shall' in arrest laws does not limit prosecutorial discretion.").

Nevertheless, even under this Court's previous logic that the Interim Guidance should have undergone notice and comment, the New Guidance would not require as such. As discussed above, the Secretary has instructed line offices to exercise their judgment and discretion in considering the totality of the circumstances. Likewise, no individual has any "right" to be exempt from enforcement based on the Secretary's guidance. Finally, the States cannot bootstrap an "obligation" to their claim that they are injured by the policy. *See* Pls.' Mem. 38 (claiming a financial injury is sufficient to establish that a policy creates binding obligations).  Whether a party is injured such that it has standing is entirely distinct from whether the policy that allegedly injures it creates obligations. *See, e.g.*, *Jordan v. Fed. Bureau of Prisons*, Civ. A. No. 20-01478 (CKK), 2021 WL 4148549, at *8-*11 (D.D.C. Sept. 13, 2021) (finding Bureau of Prisons policy for calculating monetary fines for disciplinary charges to be exempt from notice-and-comment

42

notwithstanding the plaintiffs had a monetary fine and established standing), *appeal filed*, No. 21-5217 (D.C. Cir. Oct. 7, 2021).

But, regardless, the question of whether a policy is a substantive rule subject to notice and comment must not be viewed through a formalistic lens of whether (1) rights and obligations flow from the policy, and (2) whether it genuinely leaves room for discretion; instead, a "matter of judgment is involved in distinguishing between rules however discretionary in form, that effectively circumscribe administrative choice." *Accord Texas* D. Ct. Op., 2021 WL 3683913, at *53 (citations omitted). Here, the New Guidance is a general statement of policy, exempt from notice-and-comment requirements, "issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.'" *See id.* at *54 (quoting *Lincoln,* 508 U.S. at 197, for what is considered a general statement of policy). Hence, "[t]he key inquiry . . . is the extent to which the challenged policy leaves the agency free to exercise its discretion to follow or not to follow that general policy in an individual case," and that "[a]s long as the agency remains free to consider the individual facts in the various cases that arise, then the agency action in question has not established a binding norm." *Accord id*. (quoting *Professionals & Patients for Customized Care v. Shalala*, 56 F.3d 592, 596-97 (5th Cir. 1995)). There can be no dispute that the New Guidance does just that.

Under the New Guidance, the agency is free to consider individual facts and consider the totality of the circumstances. *Contra* Pls.' Mem. 37-38 (claiming that the New Guidance does not allowed for individualized discretion notwithstanding that the guidance expressly states the opposite). In fact, the Secretary has made that a central underpinning of the entire guidance. *See* New Guidance at 3-4 (instructing line officers to make an "assessment of the individual and the totality of the facts and circumstances," in consideration of aggravating and mitigating factors, and that officers must "exercise their judgment accordingly"). Even under the interim priorities, that was the case in which the presumptions and pre-approval process still allowed for individual considerations. *See* AART Date Memo (approval rate exceeding 90% for "other priority" cases, with the median approval rate across field offices at 98%). But even if that was not the case for the

Interim Guidance, this new policy does not have a pre-approval process and, rather, it "dispens[es] with the pre-approval process in the exercise of [] discretion." *See* Consideration Memo at 20 (concluding that the decision to dispense with the pre-approval process "was based largely on feedback from members of the workforce, who sought additional flexibility in the exercise of their judgment"). Instead, "the specific determination as to who presents a public safety threat is delegated to the field, which is instructed and empowered to make individualized decisions based on a case-by-case analysis and taking into consideration aggravating factors—such as the gravity of the offense of conviction and the sentence imposed, the nature and degree of harm of the offense, the sophistication of the criminal offense, the use or threatened use of a firearm or dangerous weapon, and a serious prior criminal record, and mitigating factors—including advance or tender age, lengthy presence in the United States, impact of removal on family in the United States, and other relevant considerations." *Id.* at 19. Thus, the New Guidance must be considered a general statement of policy exempt from notice-and-comment requirements.

Similarly, even if it was binding in some fashion, the New Guidance should be considered a procedural rule. *See Texas*, 809 F.3d at 176 (a "binding rule is not required to undergo notice and comment if it is one 'of agency organization, procedure, or practice'") (quoting 5 U.S.C. § 553(b)(A)). This Court previously rejected this view. *See Texas* D. Ct. Op, 2021 WL 3683913, at *56-*58. But the analysis that the Interim Guidance violated the "substantial impact test" was premised on it affecting the "rights and obligations of Texas, DHS, and certain aliens." *Id*. at *57. As the Fifth Circuit, however, observed, the exercise of prosecutorial discretion in the decision of who to apprehend and remove does not affect any statutory obligation. *Compare Texas* Stay Op., 14 F.4th at 337 ("we believe [that 8 U.S.C. §§ 1226 and 1231] do not eliminate[s] immigration officials' 'broad discretion' to decide who should face enforcement action in the first place") (quoting *Arizona*, 567 U.S. at 396) *with* Pls.' Mem. 38-39 (claiming a statutory change without acknowledging the Fifth Circuit's decision). Thus, by its very nature, guidance for the exercise of that discretion does not affects anyone's rights and obligations. That was true with the Interim Guidance but there can be no doubt that it is true for the New Guidance, when any individual

enforcement decision must be viewed through the totality of the circumstances. *Contra* Pls.' Mem. 38-39 (arguing again that the New Guidance, notwithstanding its express terms, does not allow for individualized discretion).

Accordingly, in light of the Fifth Circuit's unanimous stay decision and the totality of the circumstances approach in the New Guidance, the States are unlikely to prevail on their notice-and-comment claim.

> D.    *Texas and Louisiana fail to state a viable claim under the Take Care Clause.*

The States also assert that the New Guidance violates the Take Care Clause, U.S. Const. art. II, § 3, because it violates §§ 1226(c) and 1231(a)(1)(A). *See* Pls.' Mem. 39-41. The States' Take Care claim fails for the same reasons as all the other claims fail: the Fifth Circuit has found that agency action such as this one is committed to agency discretion. *See Chaney*, 470 U.S. at 832 (recognizing "that an agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed'") (quoting U.S. Const. art. II, § 3). But, regardless, the States' assertion collapses into their argument that the Secretary's enforcement prioritization exceeds his statutory authority, and is flatly contradicted by the Supreme Court's admonishment in *Dalton v. Specter* that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." 511 U.S. 462, 473 (1994). As demonstrated above, the Secretary's New Guidance—far from being incompatible with the statute—is firmly supported by foundational principles concerning the exercise of enforcement discretion, as recognized by the Fifth Circuit's stay decision, and a long history recognized by the Supreme Court. *See, e.g., Arizona*, 567 U.S. at 396 ("A principal feature of the removal system is the broad discretion exercised by immigration officials. . . . Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all.") (internal citation omitted), *accord Texas* Stay Op., 14 F.4th at 338 ("The first building block of our prediction [that Texas and Louisiana are unlikely to prevail] is the strong

background principle that the 'who to charge' decision is committed to law enforcement discretion, including in the immigration arena.") (citing *AADC*, 525 U.S. at 483; *Arizona*, 567 U.S. at 396).

Regardless, the Take Care Clause cannot a furnish basis for affirmative relief in an Article III court. For the Judicial Branch to superintend how the President performs his executive functions would express a "lack of the respect due" to the Nation's highest elected official. *Baker v. Carr*, 369 U.S. 186, 217 (1962). Indeed, the Supreme Court has recognized that "the duty of the President in the exercise of the power to see that the laws are faithfully executed" "is purely executive and political," and not subject to judicial direction. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1866). And *Armstrong v. Exceptional Child Center, Inc.*, on which Texas inexplicably relies, *see* Pls.' Mem. 40, confirms that "the Supremacy Clause is not the source of any federal rights,. . . and certainly does not create a cause of action," *see* 575 U.S. 320, 324 (2015) (internal citation omitted).

The States try to circumvent this controlling authority by citing an out-of-circuit district court case that was not even addressing a Take Care Clause claim. *See* Pls.' Mem. 39-40 (citing *Make the Rd. N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 258 (S.D.N.Y. 2020)). There, the district court found that a presidential proclamation was reviewable as a potential constitutional separation of powers violation. But that decision contravenes the Supreme Court's decision in *Dalton*. As *Dalton* explained, almost any challenge to the President's exercise of power under a statute could be recast as an allegation that the President violated the Constitution by exceeding Congress's grant of authority. 511 U.S. at 472. The States also argue that they can bring the claim as an APA action for a constitutional claim or as an independent action, but both are unavailing. *See* Pls.' Mem. 26. The Take Care Clause is directed at the President. Yet, an APA action is unavailable against the President, and, independent of the APA, longstanding precedent stands for the straightforward proposition that an injunction cannot run against the President. *See Franklin v. Massachusetts*, 505 U.S. 788, 796, 800-01 (1992). In any event, the States' action is against other executive branch officials and they have already brought other statutory claims that these officials exceeded their statutory authority.

46

Regardless, the Secretary faithfully—and vigorously—executed the immigration laws by ensuring DHS's limited resources are utilized for the highest priority criminal noncitizens while still allowing for the exercise of discretion. *See* New Guidance at 3 (instructing line officers to make an "assessment of the individual and the totality of the facts and circumstances," based on aggravating and mitigating factors, in determining whether an individual "poses a current threat to public safety"); *id.* at 4 (emphasizing that, in this context, officers must "exercise their judgment accordingly," with the understanding that "[t]he decision how to exercise prosecutorial discretion can be complicated and requires investigative work"). "Real or perceived inadequate enforcement of immigration laws does not constitute a reviewable abdication of duty." *Texas v. United States*, 106 F.3d 661, 667 (5th Cir. 1997). This is a proper act of discretion, not a failure to enforce immigration law. *See id.*

## II. An Injunction Restraining Core Article II Authority Outweighs Any Harm to the States and Undermines the Public Interest.

Texas and Louisiana cannot establish that they will suffer an injury that outweighs the harm that their requested relief inflicts on the Defendants and the public interest. *See Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997). As discussed above, the States cannot show irreparable harm. *See supra* at 14-18. Their requested injunction, however, would impose a significant burden on the United States, and so the Court should deny the States' motion.

Indeed, the Fifth Circuit has already addressed this question: "The injury to the executive's daily exercise of this historic discretion is irreparable in the basic sense of the word; there is no way to recover the time when its exercise of discretion is being enjoined during the pendency of the appeal." *See Texas* Stay Op., 14 F.4th at 341. Such an injury also extends to the public. The New Guidance allows for DHS to focus on individuals who pose the greatest threat to the public. With the Interim Guidance, the agency was able to focus on more serious offenders, nearly doubling enforcement actions against aggravated felons, and shifting resources to the border. *See, e.g.,* AART Data Memo ("Between February 18 and August 31, 2021 ICE arrested 6,046 individuals with aggravated felony convictions compared to just 3,575 in the same period in

2020."); *see also* Berg Decl. ¶ 18 (identifying approximately 300 ICE officers "detailed to the Southwest Border to support CBP operations.").

Likewise, "eliminating DHS's ability to prioritize removals poses a number of practical problems given its limited resources." *See Texas* Stay Op., 14 F.4th at 341. DHS lacks the resources, including appropriated funds and bedspace, to detain all noncitizens the States would seek to have DHS to detain, as well as to protect the public by detaining and removing those individuals DHS has already identified as presenting safety threats and as deemed necessary for border security.[18] *See* Berg Decl. ¶¶ 9-19; Decker Decl. ¶¶ 7-8; Declaration of Monica Burke ¶¶ 6-11, AR DHSP_00006075-DHSP_00006076, attached as Exhibit N. Further, "[a]bsent clear priorities, [DHS] immigration officers may be left with only very general guidance—or no guidance at all—on the exercise of their discretion." Decker Decl. ¶ 12; *see also* Berg Decl. ¶ 20. Likewise, "[a]ny potential policy or operational confusion due to an injunction could additionally harm ICE's relationship with state and local stakeholders." *See, e.g.*, Decker Decl. ¶ 13. In particular, it would cause confusion for the agency to ping-pong between different guidance. *See Texas* Stay Op., 14 F.4th at 341. Here, the agency is already training its workforce on the New Guidance. *See* New Guidance at 6. Finally, any potential compliance with the injunction that the States seek here could interfere with Defendants' obligations in other court cases. *See Texas* Stay Op., 14 F.4th at 341 (identifying one practical "problem[], which highlights the potential for nationwide injunctions to conflict, is that ICE is subject to another nationwide injunction that limits the number of beds it can use in detention centers") (citing *Fraihat v. U.S. Immigr. & Customs Enf't*, 445 F. Supp. 3d 709 (C.D. Cal. 2020)).[19] Given these practical realities, an injunction would

---

[18] Although the States do not seek an affirmative injunction here, and instead seek an injunction against any reliance on the New Guidance, the "linchpin" of what they seek is that "mandatory detention laws overcome the ordinary presumption that law enforcement discretion is unreviewable." *See Texas* Stay Op., 14 F.4th at 338 n.4 (finding the legal question the same: "whether matters discussed in the [Interim Guidance], such as who to arrest and charge, are committed to law enforcement discretion").

[19] The Ninth Circuit has since overturned that injunction in a divided panel decision but the mandate has not yet issued and it is still subject to a potential rehearing petition. *See Fraihat v. U.S. Immigr. & Customs*

not be appropriate even if the Court considered the States likely to succeed on the merits. Rather, "[r]emand, not vacatur," and definitely not an injunction, is "generally appropriate" relief in an APA suit. *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389-90 (5th Cir. 2021). And remand without vacatur is particularly appropriate where vacatur or injunctive relief "would be disruptive." *Cent. & S.W. Servs., Inc. v. U.S. EPA*, 220 F.3d 683, 692 (5th Cir. 2000).

In the end, it may be that Texas and Louisiana disagree with DHS's prioritization of certain public safety threats and its utilization of its limited resources, but the federal government—not Texas or Louisiana—is charged with enforcing immigration laws. An injunction that interferes with that assessment is unwarranted.[20]

## III.   Any Relief Ordered Should Be Narrow.

"When crafting an injunction, district courts are guided by the Supreme Court's instruction that 'the scope of injunctive relief is dictated by the extent of the violation established.'" *ODonnell v. Harris Cnty.,* 892 F.3d 147, 163 (5th Cir. 2018) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Thus, a "district court abuses its discretion if it does not 'narrowly tailor an injunction to remedy the specific action which gives rise to the order.'" *Id.* (quoting *John Doe # 1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004)). Accordingly, even if this Court were to grant the States a preliminary injunction, it should limit the injunction. It should refuse the States' request to issue a nationwide injunction and, instead, it should limit any injunction to Texas and Louisiana.

Indeed, this Court has continually "expressed its substantial skepticism of nationwide injunctions," *Texas* Stay Op., 14 F.4th at 341, and should accordingly limit any relief here to

---

*Enf't,* ___ F.4th___, 2021 WL 4890884 (9th Cir. Oct. 20, 2021). Regardless, the point still applies: DHS is subject to other legal obligations, including court orders, that go beyond the instant case.

[20] The States claim that statements made in the purported Agreements that the last Administration entered into with Texas and Louisiana during its waning days support an injunction. But, besides considering how those Agreements were unenforceable as efforts to contract away sovereign rights, DHS also noted that the Agreements had been terminated by the time of issuance of the New Guidance. *See* Considerations Memo at 16 n. 52; *see also* ECF Nos. 42-3, 42-4 (copies of DHS's February 2, 2021, termination letters to Texas and Louisiana).

enforcement actions that take place in the plaintiff states: Texas and Louisiana. Notwithstanding this "substantial skepticism," this Court has previously granted nationwide relief because it determined it was "bound by applicable Fifth Circuit precedent in determining whether a nationwide scope for an injunction is appropriate." *Id*. But, in its unanimous stay decision, the Fifth Circuit emphasized that "in recent years the Supreme Court has repeatedly stayed nationwide injunctions that prevented the Executive Branch from pursuing its immigration policies." *Texas* Stay Op., 14 F.4th at 341. Further, it noted that the Fifth Circuit decision that this Court relied upon merely "stated that 'in appropriate circumstances' a court *may* 'issue a nationwide injunction,'" not that such relief would be necessary in every immigration case. *Id*. (emphasis added) (quoting *Texas v. United States*, 809 F.3d at 188). Thus, this Court must use its judgment in deciding whether to issue a nationwide injunction, because the Fifth Circuit made clear nationwide relief is not mandatory.

Here, especially in light of denials of preliminary injunctions in two other jurisdictions on the Interim Guidance, this Court should limit any injunction to the parties before it: Texas and Louisiana. *Texas* Stay Op., 14 F.4th at 336 (discerning that "even though district courts have rejected challenges to the same enforcement priorities brought by Florida and Arizona, the district court's preliminary injunction applies to federal immigration authorities in those states and all others"). As a general matter, nationwide relief that would affect those who are not parties to this case would exceed this Court's authority under Article III and violate longstanding equitable doctrine. "Article III of the Constitution limits the exercise of the judicial power to 'Cases' and 'Controversies.'" *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). Indeed, to grant a nationwide injunction here would make Justice Gorsuch's warning a reality: "If a single successful challenge is enough to stay the challenged rule across the country, the government's hope of implementing any new policy could face the long odds of a straight sweep, parlaying a 94-to-0 win in the district courts into a 12-to-0 victory in the courts of appeal." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600-01 (2020) (Gorsuch, J. concurring), *denying modification*, 140 S. Ct. 2709 (2020). In the end, Article III and equitable principles, including respect for sister

courts, dictate that any injunction should be no broader than necessary to address the purported harm that would occur absent a preliminary injunction.

## CONCLUSION

For the reasons stated herein, the States' motion for a delay of the effective date of agency action or, in the alternative, preliminary injunction should be denied. To the extent this Court issues relief for the States on this motion, Defendants ask that the Court enter an administrative stay for at least seven days to allow Defendants to consider further proceedings.


Dated: November 12, 2021                    Respectfully submitted,

                                            BRIAN M. BOYNTON
                                            Acting Assistant Attorney General

                                            BRIGHAM J. BOWEN
                                            Assistant Branch Director

                                            */s/ Adam D. Kirschner*
                                            ADAM D. KIRSCHNER
                                            Attorney-in-charge
                                            IL Bar. No. 6286601
                                            Senior Trial Counsel
                                            BRIAN C. ROSEN-SHAUD
                                            ME Bar No. 006018
                                            MICHAEL F. KNAPP
                                            CA Bar No. 314104
                                            KUNTAL CHOLERA
                                            DC Bar No. 1031523
                                            Trial Attorneys
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            Tel: (202) 353-9265
                                            Fax: (202) 616-8460
                                            Email: Adam.Kirschner@usdoj.gov
                                                   Brian.C.Rosen-Shaud@usdoj.gov
                                                   Michael.F.Knapp@usdoj.gov
                                                   Kuntal.Cholera@usdoj.gov

                                            Mailing Address:
                                            Post Office Box 883
                                            Washington, D.C. 20044

51

<u>Courier Address</u>
1100 L Street NW, Room 11020
Washington, D.C. 20005

EREZ REUVENI
CA Bar No. 264124
Assistant Director
U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
202-307-4293 (telephone)
Email: Erez.R.Reuveni@usdoj.gov

*Counsel for Defendants*


DANIEL DAVID HU
Assistant United States Attorney
Chief, Civil Division
State Bar No. 10131415
S.D. I.D. 7959
Southern District of Texas
1000 Louisiana, Suite 2300 Houston, TX 77002
Tel: (713) 567-9000
Fax: (713) 718-3300
Daniel.Hu@usdoj.gov

*Local Counsel*

## CERTIFICATE OF COMPLIANCE

I certify that the total number of words in this motion, exclusive of the matters designated for omission, is 19,454 as counted by Microsoft Word.

*/s/ Adam D. Kirschner*
ADAM D. KIRSCHNER

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on November 12, 2021.

*/s/ Adam D. Kirschner*
ADAM D. KIRSCHNER