# Exhibit E

DRAFT—For Official Use Only—Pre-Decisional—Deliberative


U.S. Immigration and Customs Enforcement

September 24, 2021

MEMORANDUM FOR:   Alejandro N. Mayorkas
                  Secretary
                  Department of Homeland Security

SUBJECT:          Conclusions Drawn from "AART" Data

---

This memorandum draws high-level conclusions about ICE enforcement guidance based on data generated by the Arrest Authorization Request Tool (AART).

## Arrests and Removals

Between February 18 and September 16, 2021, ICE has authorized arrests in:

- 9,918 public safety cases
- 7,157 other priority cases
- 3,696 border security cases
- 57 national security cases

ICE has authorized removals in similar proportions. Several inferences can be drawn from these statistics:

- A plurality of cases meets the criteria of the public safety presumed priority
    - Because this category depends largely on the definition of aggravated felony, it has channeled ICE enforcement efforts toward the arrest and removal of aggravated felons
    - Between February 18 and August 31, 2021 ICE arrested 6,046 individuals with aggravated felony convictions compared to just 3,575 in the same period in 2020

- "Other priority" cases represent the second-most common type of arrest
    - Generally, field offices have become more liberal in authorizing this type of case as time has gone by
    - These "other priority" cases typically feature three kinds of criminal history: sexual assault and other sex offenses; DUIs; and assault, particularly domestic violence. These crimes roughly track serious conduct that does not qualify as aggravated felony conduct.

DRAFT—For Official Use Only—Pre-Decisional—Deliberative

DRAFT – For Official Use Only – Pre-Decisional – Deliberative

- - "Dangerous drugs" crimes (an NCIC term that covers everything from possession to distribution, regardless of substance) also feature heavily in ICE enforcement actions but have been distributed across the "other priority" and "public safety" categories

- "Border security" cases have increased as ICE has surged personnel to support southwest border operations. Most of these arrests reflect assistance to CBP rather than traditional interior actions

- The ongoing pursuit of "national security" cases—in essence, noncitizens associated with terrorism or espionage—do not appear affected by the interim guidance

- There are variations among field offices in the proportion of cases pursued across these categories:
  - Southwest border field offices show a higher proportion of border cases:
    - 45% of the El Paso Field Office cases are border security cases, 32% public safety cases, and 13.5% other priorities
    - The Houston Field Office saw 42% border security cases, 37% public safety cases, and 20% other priorities
  - Two of the larger offices show a high rate of other priorities:
    - In the Chicago Field Office, fully 59% of cases reflected other priorities, 28% public safety cases, and 12% border security cases
    - The New York Field Office had a similar profile: 56% other priorities, 17% public safety cases, and 25% border security cases
  - Some interior offices had essentially no border security priorities, and higher rates of public safety cases:
    - The Atlanta Field Office had less than half of one percent dedicated to border security, but 52% public safety cases and 48% other priorities
    - In the Los Angeles Field Office, 74% of cases were public safety cases, and 25% were other priorities
    - In San Francisco, 76% of cases were public safety cases, and 23% were other priorities

- Some of these variations appear driven by local circumstances. For example, the border field offices handle more border security cases

- However, other variations—such as the larger proportion of other priorities in Chicago/New York relative to Los Angeles/San Francisco—suggest that FOD enforcement preferences also play a role. This should not be surprising because the February 18 guidance delegates significant discretion to the

~~DRAFT – For Official Use Only – Pre-Decisional – Deliberative~~

FODs themselves, thus "building in" to operational guidance a tolerance for variation at the field office level

### Approvals and Denials

The February 18 guidance requires ICE officers to obtain FOD approval for "other priority" enforcement actions. According to data on approvals:

- At least 90% of requests are approved

- This approval rate depends to some extent on the nature of the request. For instance, requests to pursue an action against a noncitizen with a conviction for a sex offense are approved at a rate greater than 99%

- The approval rate also depends on the field office
    - Several offices approve more than 99% of all requests
    - The lowest approval rate is seen at the New York (82%) and Denver (89%) field offices
    - The median approval rate is 98%

- While these high approval rates may suggest a permissive approach to "other priority" cases, it appears that many offices have a practice of pre-vetting cases so that officers and their supervisors reach some level of consensus on a case's viability before the officer submits it for approval
    - In this way, the approval regime appears to reinforce a dialogue between officers and supervisors about what cases are worthy of pursuing

- It typically takes 1 hour and 9 minutes for a FOD to authorize a request, suggesting that the approval regime does not unduly delay enforcement actions

### Decisions by Senior Reviewing Official

After implementing the February 18 guidance, ICE created a process by which advocates could appeal FOD denials of requests for relief—predominantly requests for release and stays of removal—to a headquarters-based Senior Reviewing Official (SRO). Although not technically derived from AART, data on SRO decision-making sheds further light on implementation of the February 18 guidance.

- The SRO has reversed 18% of FOD denials of requests for release

- The SRO has reversed 20% of FOD denials of requests for a stay of removal

~~DRAFT – For Official Use Only – Pre-Decisional – Deliberative~~

- Some field offices are reversed at a higher rate than others
    - The SRO reversed the New Orleans field office the most, at a rate of approximately 30%
    - The Baltimore, San Diego, and Chicago field offices are reversed at a rate of 27-28%
    - The San Francisco (9%) and Buffalo (10%) field offices are reversed at the lowest rate

- These range of reversal rates across jurisdictions suggest that FOD preferences play a role in the granting of releases and stays. As noted above, this should not be surprising because the February 18 guidance delegates significant discretion to the FODs themselves, thus "building in" a tolerance for variation at the field office level