# Exhibit F

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

|  |  |
|---|---|
| STATE OF TEXAS, STATE OF LOUISIANA<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, *et al.*<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  No. 6:21-cv-00016<br>)<br>)<br>)<br>)<br>) |

**DECLARATION OF PETER B. BERG**

I, Peter B. Berg, declare the following under 28 U.S.C. § 1746:

**I.    Personal Background**

1. I am currently employed by the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as the Acting Deputy Executive Associate Director. I have held this position since October 4, 2020. As Acting Deputy Executive Associate Director, I oversee the mission of ERO's eight headquarters divisions: Enforcement, Removal, Non-Detained Management, Custody Management, Field Operations, ICE Health Service Corps, Law Enforcement Systems and Analysis, and Operations Support.

2. Prior to this position, I served as the Assistant Director for Field Operations beginning on June 21, 2020 and had been acting in that role since January 31, 2020. In these capacities, I was responsible for the oversight, direction, and coordination of immigration enforcement activities, programs, and initiatives carried out by ERO's 24 Field Offices and 188 sub-

offices. I further managed ERO Headquarters components, including Domestic Operations, Special Operations, and Law Enforcement Systems and Analysis.

3. I have been a career law enforcement officer since 1996, serving in various capacities with both ICE and the former Immigration and Naturalization Service (INS). Other leadership positions I have held within ICE include: Field Office Director and Deputy Field Office Director for the St. Paul Field Office, Acting Deputy Assistant Director for the ERO Headquarters Criminal Alien Division, and Acting Deputy Assistant Director for the ERO Headquarters Field Operations Division.

4. This declaration is based on my personal knowledge and experience as a law enforcement officer and information provided to me in my official capacity.

## II.   Overview of ERO

5. Following enactment of the Homeland Security Act of 2002, ICE was created from elements of several legacy agencies, including INS and the U.S. Customs Service. ICE is the principal investigative arm of DHS, and its primary mission is to promote homeland security and public safety through the enforcement of criminal and civil federal laws governing border control, customs, trade, and immigration. Within ICE, ERO oversees programs and conducts operations to identify and apprehend removable noncitizens, to detain these individuals when necessary, and to remove noncitizens with final orders of removal from the United States. ERO manages and oversees all aspects of the removal process within ICE, including domestic transportation, detention, alternatives to detention programs, bond management, supervised release, and removal to more than 170 countries around the world. As part of the removal process, ERO manages a non-detained docket of more than 3.2 million cases, which

includes noncitizens currently in removal proceedings and those who have already received removal orders and are pending physical removal from the United States.

### III. Guidance for Immigration Enforcement and Removal Actions

6. On February 18, 2021, ICE's Acting Director, Tae D. Johnson, issued interim guidance titled, *Civil Immigration Enforcement and Removal Priorities* (Johnson Memorandum) (Feb. 18, 2021), which implements with revisions the priorities set forth in DHS's January 20, 2021 Memorandum titled, *Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities* (January 20 Memorandum). The Johnson Memorandum lays out a process to allocate ICE's limited law enforcement resources to achieve its mission by focusing on cases that fall within three "presumed priority" categories: national security, border security, and public safety.

7. Further, the Johnson Memorandum emphasizes that the priorities do not prohibit the arrest, detention, or removal of any noncitizen; to the contrary, the memorandum presumes and sets out a process with respect to actions involving cases that fall outside the three priority categories. As a result, under the Johnson Memorandum, ICE has continued to arrest and remove individuals who meet the three presumed priorities, as well as those who constitute "other priority cases." Under the memorandum, no immigration enforcement action or removal is categorically prohibited. Rather, actions that do not meet the presumed priority criteria require preapproval by the appropriate ERO Field Office Director or Homeland Security Investigations Special Agent in Charge except where exigent circumstances and public safety make preapproval impracticable. Pursuant to this guidance, ICE took approved enforcement actions against individuals with serious and violent pending criminal charges, non-aggravated felon sexual predators, individuals with a nexus to national security threats to

the United States, individuals who are identified as members of Transnational Organized Crime groups, individuals with warrants from foreign governments identified by an INTERPOL issued "Red Notice," and individuals with a range of violent criminal convictions.

### IV. Irreparable Harm to ICE from Issuance of the Preliminary Injunction

8. I have read and am familiar with the preliminary injunction issued by the U.S. District Court for the Southern District of Texas in this case.

*Inability to Prioritize Use of Finite Resources*

9. On August 19, 2021, the U.S. District Court for the Southern District of Texas enjoined DHS from enforcing and implementing the policies described in: Section B of the January 20 Memorandum entitled "Interim Civil Enforcement Guidelines." (Dkt. No. 1-1 at 3–4); the section entitled "Civil Immigration Enforcement and Removal Priorities" in the Johnson Memorandum. (Dkt. No. 1-2 at 4–6); and the section entitled "Enforcement and Removal Actions: Approval, Coordination, and Data Collection" in the Johnson Memorandum, with certain exceptions. (Dkt. No. 1-2 at 6–8). Implementing the terms of the injunction and the reporting requirements, discussed in more detail below, would be unreasonably and unduly burdensome, if not entirely impossible.

10. First, the number of noncitizens who likely would fall within the scope of the court's order and nationwide preliminary injunction significantly exceeds ICE's capacity to detain. In July of this calendar year alone, CBP apprehended a total of over 212,000 individuals seeking to cross the southwest border. *See* https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/title-8-and-title-42-statistics (last visited August 19, 2021). Even with over 95,000 expelled pursuant to the U.S. Centers for Disease Control and Prevention's (CDC) Title 42

authorities, over 116,000 were processed under Title 8. Another 64,000 Title 8 cases were apprehended in March; 66,000 in April; 67,000 in May; and 83,000 in June. Given these numbers and the Department's important border security mission, ERO's detention population is increasingly occupied by recent border crossers apprehended by CBP and processed pursuant to Title 8 of the U.S. Code.

11. Enforcement actions against the entire population covered by the court's order and preliminary injunction would require ICE bedspace, personnel, and other resources that simply do not exist. ERO is currently appropriated sufficient funding for approximately 34,000 detention beds nationwide, including approximately 31,500 single adult beds and approximately 2,500 family unit beds, to support its mission to enforce immigration law. ICE's access to its full inventory of bedspace is severely limited due to various court orders limiting the intake of noncitizen detainees, an increase in detention facility contract terminations, detention facility contract modifications, and the ongoing COVID-19 pandemic. Specifically, ICE's Pandemic Response Requirements (PRR) for its detention facilities, which are informed by the Centers for Disease Control and Prevention's COVID-19 guidelines, require that facilities undertake efforts to reduce populations to approximately 75% capacity.[1] Last year, the U.S. District Court for the Central District of California issued a nationwide preliminary injunction recognizing the 75% capacity limit, and ordering ICE to maintain additional strict standards to reduce the risk of COVID-19 infection. *See Fraihat v. ICE*, 445 F.Supp.3d 709 (C.D. Cal. Apr. 20, 2020). In light of these mandates, ICE's currently available bedspace inventory is only approximately 26,800 beds.

---

[1] ICE's Enforcement and Removal Operations COVID-19 Pandemic Response Requirements (PRR), Version 6.0 (March 16, 2021), https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf (last visited August 19, 2021).

12. Due to this finite number of detention beds, to meet the Department's important mission, ERO must prioritize its detention resources to facilitate the detention of certain noncitizens, including those who are convicted criminals, public-safety threats, and/or recent border entrants. According to data last viewed on August 20, 2021, the currently-detained population of 25,596 noncitizens constitutes more than 95% of the approximately 26,800 currently available beds. The court's order and the preliminary injunction would make it impossible for ICE to prioritize the use of its finite detention resources to carry out its public safety and national security mission in a fair, consistent, and effective manner. Specifically, the injunction and the order would likely result in the release of noncitizens ICE has deemed priorities for removal.

13. Second, the order and the preliminary injunction could adversely impact the ability of ICE to take immediate enforcement action against noncitizens who pose a security threat or other real harm to U.S. communities. Indeed, implementation of ICE's interim priority structure has enabled the agency to focus resources on arresting and detaining the most dangerous noncitizens.

14. If ICE were required to arrest, take into custody, and detain all known noncitizens subject to detention under section 1226(c) or section 1231(a)(2) without the ability to prioritize the most serious offenders, it would significantly curtail ERO's ability to protect communities from public safety threats. And given the limited detention capacity described above, detaining such individuals may well prevent ICE from detaining other individuals not subject to detention under section 1226(c) or section 1231(a)(2), even where those individuals present a danger to the community or a flight risk.

15. Third, compliance with the nationwide preliminary injunction would adversely impact ICE's ability to plan targeted enforcement operations focused on security or public safety threats. ICE's best understanding is that there are approximately 11 million noncitizens in the United States who do not have authorization to reside here. It is critical that ICE focuses its finite law enforcement resources on its public safety mission and targeted enforcement operations like Operation SOAR (Sex Offender Arrest and Removal), a coordinated enforcement operation that builds on ongoing efforts to arrest and remove noncitizen sex offenders from our communities. Historically, ICE has used targeted operations like Operation SOAR as a mechanism to focus agency resources on the most egregious offenders in the interest of public safety, even where those offenders may not be subject to the statutory provisions at issue in this case.

16. The Johnson Memorandum focuses agency resources on enforcement actions against the most serious offenders. From February 18, 2021, through July 31, 2021, ERO processed 25,916 administrative arrests. Almost 20% of those arrests were noncitizens convicted of aggravated felony offenses. For the same period in the year 2020, ERO processed 39,107 administrative arrests. However, less than 8% of those arrests were noncitizens convicted of aggravated felony offenses.

17. Fourth, compliance with the nationwide preliminary injunction would effectively eliminate the ability of the Secretary to "[e]stablish[] national immigration enforcement ... priorities" consistent with 6 U.S.C. § 202(5).. The former INS, one of DHS's predecessor agencies, exercised prosecutorial discretion and had policies guiding such exercise since as early as 1909 to maximize use of scarce agency resources, to protect the United States from national security threats and to protect our citizens and communities from harm. *See Department of*

*Justice Circular Letter Number 107*, dated September 20, 1909, dealing with the institution of proceedings to cancel naturalization; *see also, e.g.,* Sam Bernsen, INS General Counsel, *Legal Opinion Regarding Service Exercise of Prosecutorial Discretion* (July 15, 1976).

18. The implementation of the enforcement priorities set forth in the DHS January 20 Memorandum and the Johnson Memorandum has assisted ERO in re-deploying assets to meet the current threat and reality. Through effective prioritization of resources, ERO is better able to adjust in real time to pressing operational needs. For example, ERO re-tasked several field operations teams to assist CBP in responding to state and local requests for assistance in the Rio Grande Valley, Del Rio, and Tucson areas to address increasing activity along the Southwest Border. Additionally, to date, approximately 300 officers have been detailed to the Southwest Border to support CBP operations. The support ERO provides at the Southwest Border includes, but is not limited to: transporting; processing; enrollment in alternatives to detention; removals; bedspace management of those taken into custody, including those subject to expedited removal proceedings pursuant to 8 U.S.C. § 1225(b); and transfers of those taken into custody. This support has significantly increased over the past few months.

19. This flexibility has enabled ERO to prioritize border security, consistent with the Johnson Memorandum, by focusing its resources on targeting noncitizens who recently unlawfully entered the United States, while also targeting serious criminal elements operating in the United States. Implementing the terms of the court's order and the preliminary injunction would likely force ERO to realign field teams and other assets to allocate limited time and resources on non-criminal and other lower priority targets. Such a reallocation would likely disrupt ERO's ability to have a meaningful impact on important border security efforts.

AR_DHSP_00006036

*Lack of Clear Guidance for Nationwide Workforce*

20. Absent clear priorities, ERO immigration officers may be left with only very general guidance—or without guidance at all—on the exercise of their discretion, leading to disparate prioritization across the country and a lack of consistency in enforcement actions. This could result in an undesirable shift in enforcement away from those who present the greatest risk to public safety and undermine public confidence in the nation's immigration enforcement efforts. Further, an attempt to initiate enforcement actions indiscriminately among this population, instead of against certain prioritized noncitizens, would not be an efficient or reasonable apportionment of ICE's limited resources and would likely prevent ICE from effectively focusing on those noncitizens who pose the greatest and most imminent threat to public safety.

*Unduly Burdensome and Impossible Reporting Requirements*

21. The court's order requires ICE to produce monthly reports stating the number of noncitizens known to be "covered by or subject to 8 U.S.C. § 1226(c)(1)(A)-(D), who were released from custody during the previous month, and whom ICE did not detain immediately upon their release," and to include last known residence, the offense for which the noncitizen had been arrested, the reason why the noncitizen was not detained, and the individual who made that determination ("the 1226(c) reporting requirement"). The order further requires ICE to produce monthly reports stating the number of noncitizens "in their removal period as defined in 8 U.S.C. § 1231(a)(1)," along with the number of those "who were not detained pursuant to 8 U.S.C. § 1231(a)(2)," to include last known residence, the offense for which the noncitizen had been arrested, the reason why the noncitizen was not detained, and the individual who made that determination ("the 1231(a) reporting requirement").

22. ICE's ability to comply to the court's satisfaction with the 1226(c) reporting requirement, for instance, depends almost entirely on ICE's ability to determine whether a noncitizen is covered by or subject to § 1226(c) prior to a decision whether to take the noncitizen into custody, but that would be exceedingly burdensome or, in some instances, impossible to accomplish. When ICE receives information from a state or local law enforcement agency about a noncitizen in detention, the agency only needs probable cause of removability in order to lodge a detainer request. The probable cause standard constitutes neither a conclusive determination that a noncitizen is in fact removable nor a determination that the noncitizen may be covered by one of the statutes at issue in this case. It is only after ICE encounters the individual, assumes custody, and conducts an initial intake screening, that those formal determinations are currently made. In fact, in light of the complexities of the immigration laws, although a removability determination may be possible, a determination regarding the applicable detention authority may require obtaining and reviewing criminal records and ever-evolving developments in caselaw.

23. ICE's ability to determine whether a noncitizen in state or local custody would be covered by or subject to § 1226(c) is further limited by the fact that some states have enacted laws barring information sharing with ICE and/or prohibiting ICE access to facilities.

24. Additionally, even where ICE would be able to make determinations upfront that a noncitizen in state or local custody is covered by or subject to § 1226(c), ICE's ability to learn when a noncitizen may be released from custody is significantly limited in many jurisdictions. Many jurisdictions across the country neither honor ICE detainers nor notify ICE when inmates are released from custody. As of July 19, 2021, ICE had identified 463 jails or prisons that do not notify ICE prior to the release of a noncitizen, and 155 jails or

AR_DHSP_00006038

prisons that provide notification to ICE prior to a noncitizen's release from custody but do not provide adequate hold time for ICE to take an individual into custody. For many cases in these jurisdictions, ICE is not aware when noncitizens are released from criminal custody and has no knowledge of their last known residence. Some jurisdictions have also significantly limited ICE's access to state and local databases, which would include some of the information being sought by the court.

25. The 1231(a) reporting requirement similarly poses significant burdens for ICE and may, depending upon the court's interpretation of the requirement, apply to a very large class of individuals. There are currently an estimated 1.2 million noncitizens in the United States who have been issued final orders of removal. If the 1231(a) reporting requirement is intended to include both noncitizens who were detained at the time the order of removal became administratively final and those who were not detained, providing updated information on this population every month would significantly strain ICE's capacity to manage and track statistical data for any other purpose, including its mandatory congressional reporting requirements, statutory FOIA obligations, and myriad reporting requirements in this and other litigation.

26. The requirement that ICE make contemporaneous records of the decision not to detain will impose a serious administrative burden on the line officers making those decisions. Because of the constraints on available bedspace, the number of noncitizens subject to detention under either § 1231(a)(2) or § 1226(c) who will not be detained will likely be significant. Under the terms of the order, the line officers will be required to document that decision, thus diverting them from other important duties, including other enforcement efforts.

27. Simply put, it would be impossible for ICE to accurately and completely comply with these requirements. And it would pose extraordinary burdens on ICE to attempt to do so. ICE simply does not collect and retain data in the way that the court has requested. Moreover, with respect to noncitizens against whom no enforcement action has been taken, ICE's databases and systems do not (and cannot) capture information pertaining to the detention authority that would have applied to those noncitizens. In other words, ICE can only track the detention authority of individuals who are presently in ICE custody. Even then, ICE systems are not designed to capture the level of granularity needed to accurately report the number of noncitizens subject to § 1226(c) mandatory custody or the subset of noncitizens subject to § 1231(a) custody authority for whom custody is mandatory.

This declaration is based upon my personal and professional knowledge, information obtained from other individuals employed by ICE, and information obtained from various records and systems maintained by DHS. I provide this declaration based on the best of my knowledge, information, belief, and reasonable inquiry for the above captioned case.

Signed on this 20th day of August, 2021.

**PETER B BERG**
Digitally signed by PETER B BERG
Date: 2021.08.20 23:13:13 -04'00'

Peter B. Berg
Acting Deputy Executive Associate Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement