# Exhibit G



**Significant Considerations in Developing Updated Guidelines for the
Enforcement of Civil Immigration Law**

**September 30, 2021**

<u>Introduction</u>

On January 20, 2021, President Biden issued Executive Order 13993, 86 Fed. Reg. 7051,
*Revision of Civil Immigration Enforcement Policies and Priorities.*[1] The Executive Order
established that the policy of the Biden-Harris Administration is to "protect national and border
security, address the humanitarian challenges at the southern border, and ensure public health
and safety." The Executive Order also committed to adhering to "due process of law as we
safeguard the dignity and well-being of all families and communities." In order to better align
with these values and priorities, the Executive Order revoked Executive Order 13768, 82 Fed.
Reg. 8799, promulgated on January 25, 2017, and called for a "reset" of the "policies and
practices for enforcing civil immigration laws."[2]

Also on January 20, 2021, then-Acting Secretary David Pekoske issued a memorandum (the
"Pekoske Memorandum") calling for a comprehensive review of the Department of Homeland
Security's (the "Department" or "DHS") immigration enforcement policies and priorities and
establishing civil immigration enforcement guidelines.[3] By its terms, the Pekoske Memorandum
contemplated issuance of revised policies following such a review. On February 18, 2021, U.S.
Immigration and Customs Enforcement ("ICE") Acting Director Tae Johnson issued interim
guidance (the "Johnson Memorandum") to all ICE employees in support of the interim priorities
contained in the Pekoske Memorandum and making certain approved revisions.[4]

The Pekoske and Johnson Memoranda have been challenged in four different lawsuits, two of
which were dismissed by district courts on the grounds that the memoranda are not subject to
judicial review and one of which remains pending in the Southern District of Texas.[5] In the
fourth suit brought by the states of Texas and Louisiana, a federal judge in the Southern District
of Texas on August 19, 2021, issued a preliminary injunction enjoining the Department from

---

[1] Exec. Order 13993, *Revision of Civil Immigration Enforcement Policies and Priorities,* 86 Fed. Reg. 7051 (Jan. 20,
2021), available at https://www.federalregister.gov/documents/2021/01/25/2021-01768/revision-of-civil-
immigration-enforcement-policies-and-priorities.
[2] *Id.*
[3] Memorandum from David Pekoske, Acting Sec'y of Homeland Sec., *Review of and Interim Revision to Civil
Immigration Enforcement and Removal Policies and Priorities* (Jan. 20, 2021).
[4] Memorandum from Tae Johnson, Acting Dir. of U.S. Immigr. and Customs Enf't, *Interim Guidance: Civil
Immigration Enforcement and Removal Priorities* (Feb. 18, 2021).
[5] *Arizona v. Dept. of Homeland Sec.,* Case No. 21-cv-186 (D. Ariz.); *Florida v. United States*, Case No. 21-cv-541
(M.D. Fla.); *Coe v. Biden*, Case No. 21-cv-168 (S.D. Tex.).

AR_DHSP_00000001

enforcing and implementing the enforcement guidelines contained in both memoranda. *Texas v. United States*, --- F. Supp. 3d ---, 2021 WL 3683913 (S.D. Tex. Aug. 19, 2021). On September 15, 2021, the Fifth Circuit Court of Appeals stayed the district court's injunction in most respects while the government's appeal is pending but left the injunction in place insofar as it "prevents DHS and ICE officials from relying on the memos to refuse to detain aliens described in [8 U.S.C. §] 1226(c)(1) against whom detainers have been lodged or aliens who fall under section 1231(a)(1)(A) because they have been ordered removed." *Texas v. United States*, --- F.4th ---, 2021 WL 4188102, *7 (5th Cir. Sept. 15, 2021).

In so ruling, the Fifth Circuit emphasized the "deep-rooted tradition of enforcement discretion when it comes to decisions that occur before detention, such as who should be subject to arrest, detainers, and removal proceedings," *id.* at *6, and reaffirmed the Supreme Court's holding that law enforcement discretion extends throughout the removal process, including to the discretionary decision of whether to "abandon the endeavor." *Id.* at *4 (citing *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999)).

Over the past seven months, the Secretary and Department personnel have held numerous engagements with internal and external stakeholders and have closely monitored the implementation of the Pekoske and Johnson Memoranda. The Secretary's *Guidelines for the Enforcement of Civil Immigration Law*, issued today on September 30, 2021, reflect the information collected throughout this period as well as the Secretary's own experience as a career public servant, including 12 years as a federal prosecutor, three years of which as the United States Attorney for the Central District of California, and more than 7 years as Deputy Secretary of Homeland Security and Director of U.S. Citizenship and Immigration Services. This document contains a summary of the considerations informing the guidelines being issued today.

**Prosecutorial and Enforcement Discretion in the Immigration Context**

*History of Immigration Enforcement Policies and Priorities*

"A principal feature" of the Nation's immigration laws "is the broad discretion exercised by immigration officials." *Arizona v. United States*, 567 U.S. 387, 396 (2012). This discretion derives not only from the U.S. Constitution, which vests enforcement authority in the Executive Branch, but also from the immigration laws themselves. *See, e.g.*, 6 U.S.C. § 202(5) (expressly directing the Secretary to "[e]stablish national immigration enforcement policies and priorities").

For over a century, the Executive has exercised discretion to prioritize which noncitizens to arrest, detain, or remove. For example, as far back as 1909, the Immigration and Naturalization Service ("INS"), which then handled many of the immigration-enforcement functions now handled by DHS, had a prosecutorial-discretion policy directing that officers generally would not have good cause to initiate proceedings to cancel a fraudulent or illegally procured naturalization certificate "unless some substantial results are to be achieved thereby in the way of betterment of

2

the citizenship of the country."[6] And in 1976, the INS General Counsel issued a legal opinion providing broader policy guidance on the exercise of prosecutorial discretion.[7]

In 2000, INS Commissioner Doris Meissner issued a memorandum to senior INS officials on the exercise of prosecutorial discretion (the "Meissner Memorandum").[8] The Meissner Memorandum adopted a "totality of the circumstances" approach to immigration enforcement that was guided by a non-exhaustive list of both positive and negative factors (*e.g.*, immigration status, length of residence in the United States, criminal history, current or future eligibility for relief from removal).[9] The memorandum expressly provided that "service officers are not only authorized by law but expected to exercise discretion in a judicious manner at all stages of the enforcement process" and that it is "appropriate and expected that the INS will exercise [prosecutorial discretion] authority in appropriate cases."[10] It also directed officers to "take into account the principles described [in the memorandum] in order to promote the efficient and effective enforcement of the immigration laws and the interests of justice."[11] Ultimately, determinations were committed to "the exercise of judgment by the responsible officer" who was "encouraged," but not required, to seek supervisor input in "questionable cases."[12]

The Meissner Memorandum provided the primary guidance for immigration officers' exercise of prosecutorial discretion for nearly a decade.[13] In June 2010, ICE Director John Morton issued a memorandum to all ICE employees (the "Morton Memorandum") identifying categories of individuals who should be prioritized for enforcement, with the highest priority being noncitizens who pose a danger to national security or public safety (including individuals convicted of crimes, with a particular emphasis on violent criminals, felons, and repeat offenders, as well as those who otherwise pose a serious risk to public safety), and the secondary priorities being recent illegal entrants and individuals with prior orders of removal.[14] With respect to prioritizing the removal of individuals with criminal convictions, the national security and public safety priority identified three priority levels: (1) aggravated felons and noncitizens with multiple felonies; (2) noncitizens with a single felony or three or more misdemeanors; and (3) noncitizens with a misdemeanor conviction.[15]

In June 2011, Director Morton issued a second memorandum on the exercise of prosecutorial discretion that eschewed the priorities-based approach in his earlier memorandum and instead followed the same basic structure as the Meissner Memorandum: vesting line officers with broad discretion and instructing them to consider the totality of the circumstances, guided by a long list

---

[6] *Department of Justice Circular Letter Number 107*, dated Sept. 20, 1909.

[7] *See* Sam Bernsen, INS General Counsel, *Legal Opinion Regarding Service Exercise of Prosecutorial Discretion* (July 15, 1976).

[8] Memorandum from Doris Meissner, Comm'r, INS, *Exercising Prosecutorial Discretion* (Nov. 17, 2000).

[9] *Id.* at 7–8.

[10] *Id.* at 5–7.

[11] *Id.*

[12] *Id.* at 5, 9, 11.

[13] In 2005, the ICE Principal Legal Advisor issued a memorandum providing guidance for when ICE attorneys within the Office of the Principal Legal Advisor could join in or file motions to dismiss proceedings without prejudice in immigration court to permit noncitizens to request adjustment of status before USCIS.

[14] Memorandum from John Morton, ICE Dir., *Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens* (Jun 30, 2010), 1–2.

[15] *Id.* at 2.

AR_DHSP_00000003

of positive and negative equities.[16] This memorandum also included a second list of positive and negative factors requiring "particular care."[17]

In 2014, Secretary of Homeland Security Jeh Johnson issued a memorandum (the "Jeh Johnson Memorandum") that exercised discretion at the policymaking level of the Secretary and additionally vested significant authority in the hands of field office leadership to direct exercises of prosecutorial discretion.[18] The Jeh Johnson Memorandum established three priority categories:

1. Threats to national security, border security, and public safety;

2. Misdemeanants and new immigration violators; and

3. Other immigration violations.

With respect to individuals who fell within these priority categories, the memorandum encouraged the exercise of prosecutorial discretion based on a "totality of the circumstances" approach guided by an enumerated list of considerations.[19] The Jeh Johnson Memorandum further specified that immigration officers may pursue removal of individuals outside the established priorities where, "in the judgment of an ICE Field Office Director, removing such [a noncitizen] would serve an important federal interest."[20] This requirement echoes language provided in the Meissner Memorandum, which referenced the Principles of Federal Prosecution governing the conduct of U.S. Attorneys to explain that "[a]s a general matter, INS officers may decline to prosecute a legally sufficient immigration case if the Federal immigration enforcement interest that would be served by prosecution is not substantial."[21] The Jeh Johnson Memorandum excluded from the priority categories: (1) individuals with one or two misdemeanor convictions, with the exception of those described as "significant misdemeanors" based on the nature of the offense and length of time the individual was sentenced to serve in custody; and (2) individuals with prior orders of removal entered before 2014.[22]

At the beginning of the last Administration, President Trump issued Executive Order 13768, *Enhancing Public Safety in the Interior of the United States*,[23] which purported to diverge from the longstanding use of prioritization schemes to guide the exercise of enforcement discretion. Contrary to prior guidance, Executive Order 13768 stated that, with limited exceptions, "[i]t is the policy of the executive branch to … ensure the faithful execution of the immigration laws … against *all removable aliens*," and specifically directed "agencies to employ all lawful means to

---

[16] Memorandum from John Morton, ICE Dir., *Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens* (June 17, 2011).
[17] *Id.* at 5.
[18] Memorandum from Jeh Charles Johnson, Sec'y of Homeland Sec., *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants* (Nov. 20, 2014).
[19] *Id.* at 5–6.
[20] Jeh Johnson Memorandum at 5.
[21] Meissner Memorandum at 5.
[22] *Id.* at 3–4.
[23] Exec. Order 13768, *Enhancing Public Safety in the Interior of the United States*, 59 Fed. Reg. 8799 (Jan. 25, 2017).

AR_DHSP_00000004

ensure the faithful execution of the immigration laws … against *all removable aliens*."[24] Insofar as the Executive Order established enforcement priorities, it identified large categories of people subject to inadmissibility and deportability grounds, as well as an expansive list of characteristics that effectively described all removable noncitizens. The same "enforcement priorities" were contained in an implementation memorandum issued on February 20, 2017, by Secretary of Homeland Security John Kelly (the "Kelly Memorandum"), which officially rescinded the Jeh Johnson Memorandum.[25]

In short, the prior Administration did away with notable features of enforcement priorities memoranda from the prior two decades, including: (1) tiered priority groups; (2) positive and negative factors guiding discretionary deviations from the priorities; (3) distinctions among different criminal convictions and records based on seriousness and similar considerations; (4) the general focus on individuals convicted of crimes, as opposed to those merely charged with crimes or who may have "committed acts which constitute a chargeable criminal offense;"[26] and (5) some degree of supervisory review of exercises of prosecutorial discretion. At the same time, however, the prior Administration did not actually initiate or pursue removal proceedings against all removable noncitizens, arrest or detain all potentially detainable noncitizens, or remove all noncitizens with final orders of removal—nor could the Administration have done so, in light of available resources. Instead, the prior Administration effectively delegated prioritization decisions to individual line agents, without necessary training or guidance to steer the exercise of this discretion, raising the potential for contradictory and unfair enforcement of the immigration laws across the system and undermining the Executive's ability to focus resources on a systemwide level on pursuing enforcement against the noncitizens who pose the greatest threats to safety and security.

*Resource Limitations Necessitating Enforcement Priorities*

The need to make smart and strategic choices about how to utilize the limited resources provided by Congress is a common theme in many of the Department's prosecutorial discretion and enforcement priorities guidelines across administrations.[27] DHS has insufficient resources to

---

[24] *Id.* (emphases added).

[25] Memorandum from John Kelly, Sec'y of Homeland Sec., *Enforcement of the Immigration Laws to Serve the National Interest* (Feb. 20, 2017).

[26] *Id.* at 2.

[27] Meissner Memorandum at 4 ("Like all law enforcement agencies, the INS has finite resources, and it is not possible to investigate and prosecute all immigration violations. The INS historically has responded to this limitation by setting priorities in order to achieve a variety of goals."); Morton Memorandum at 1 ("In light of the large number of administrative violations the agency is charged with addressing and the limited enforcement resources the agency has available, ICE must prioritize the use of its enforcement personnel, detention space, and removal resources to ensure that the removals the agency does conduct promote the agency's highest enforcement priorities, namely national security, public safety, and border security."); Jeh Johnson Memorandum at 2 ("Due to limited resources, DHS and its Components cannot respond to all immigration violations or remove all persons illegally in the United States. As is true of virtually every other law enforcement agency, DHS must exercise prosecutorial discretion in the enforcement of the law. And, in the exercise of that discretion, DHS can and should develop smart enforcement priorities, and ensure that use of its limited resources is devoted to the pursuit of those priorities."); Kelly Memorandum at 2 ("The Director of ICE, the Commissioner of CBP, and the Director of USCIS may, as they determine is appropriate, issue further guidance to allocate appropriate resources to prioritize enforcement activities within these categories—for example, by prioritizing enforcement activities against removable aliens who are convicted felons or who are involved in gang activity or drug trafficking.").

AR_DHSP_00000005

conduct immigration enforcement against *all* of the more than 11 million undocumented or otherwise removable noncitizens estimated to be in the country today or to efficiently and effectively remove the more than one million noncitizens who already have final orders of removal. Further, immigration enforcement often touches upon foreign affairs, which must be taken into account in certain enforcement contexts. This consideration is especially salient in the context of executing removal orders, where there is a need to work with foreign countries to accept the return of individuals ordered removed. Foreign-affairs concerns often necessitate expending significant resources when trying to remove certain noncitizens who pose serious threats to public safety and national security. But while prioritization is a long-standing practice in immigration and law enforcement, the resource constraints DHS and its components face in the civil immigration enforcement context have increased dramatically over the years. As a result, the need for thoughtful enforcement priorities that effectively focus the Department's resources on the cases most important to the national interest is especially vital today.

In recent years, the United States has faced a significant, ongoing enforcement and humanitarian challenge at the border. Even before this, the government agencies involved in immigration enforcement, including ICE, CBP, and the Executive Office for Immigration Review (EOIR) within the Department of Justice, were faced with significant resource challenges. For example, while the number of removal proceedings pending in immigration court grew from 262,757 cases in 2010 to 1,328,413 at the end of the third quarter in fiscal year 2021—an increase of more than 400% in a little over a decade—the annual number of case completions has remained largely flat.[28] Much of the growth in the immigration court backlog took place over the course of the last Administration, when the Department operated under that Administration's stated policy that all removable noncitizens should be removed. Between the end of Fiscal Year 2016 and the end of Fiscal Year 2020, the number of pending cases increased from 521,526 to 1,260,039.[29]

ICE, too, faces significant resource challenges for myriad reasons. At present, ICE's approximately 6,500 Enforcement and Removal Operations officers manage a docket of more than 3 million noncitizens either in removal proceedings or subject to orders of removal. Beyond funding constraints, ICE's detention capacity is currently limited by pending litigation and COVID-19 considerations. In total, ICE has sufficient appropriations to fund approximately 34,000 detention beds; in light of those additional constraints, however, ICE presently has the ability to detain approximately 26,800 noncitizens at any given time—less than 1% of the number in removal proceedings or subject to orders of removal.

The ICE Office of the Principal Legal Advisor (OPLA), which is responsible for representing DHS in removal proceedings, is similarly resource-constrained, further illustrating the need for resource prioritization in enforcement. Although the immigration court docket has grown dramatically in the last decade (as discussed above), OPLA has not received sufficient additional appropriations to grow with that docket. Consequently, OPLA currently has hundreds fewer attorneys than it would need to adequately support the workload associated with the current number of pending removal proceedings. As a result, OPLA faces serious constraints on its ability to meaningfully prepare for all cases set for hearings or even attend every such hearing.

---

[28] Executive Office for Immigration Review Adjudication Statistics, Pending Cases, New Cases, and Total Completions, available at www.justice.gov/eoir/workload-and-adjudication-statistics.
[29] *Id.*

AR_DHSP_00000006

These challenges and limitations, particularly in light of the lack of meaningful prioritization during the previous Administration that contributed to the significant growth in both ICE and EOIR's caseloads, make it impossible for OPLA to effectively manage its work without thoughtful prioritization policies and the exercise of discretion.

These severe constraints underscore the importance of exercising enforcement discretion in a manner that focuses the agency's efforts on those noncitizens who pose the greatest threat to national security, public safety, and border security. These prioritization decisions should also be informed by the values of the enforcement agency and the Nation. In remarks delivered at the Second Annual Conference of United States Attorneys more than 80 years ago, Attorney General Robert H. Jackson said:

> Nothing better can come out of this meeting of law enforcement officers than a rededication to the spirit of fair play and decency that should animate the federal prosecutor. Your positions are of such independence and importance that while you are being diligent, strict, and vigorous in law enforcement you can also afford to be just. Although the government technically loses its case, it has really won if justice has been done.[30]

On his first day in office, President Biden affirmed that "advancing equity, civil rights, racial justice, and equal opportunity is the responsibility of the whole of our Government."[31] In the immigration enforcement context, scholars and professors have observed that prosecutorial discretion guidelines are essential to advancing this Administration's stated commitment to "advancing equity for all, including people of color and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality."[32]

The use of prosecutorial discretion to advance the interests of justice is built upon years of precedent. As mentioned above, the Meissner Memorandum in 2000 instructed that "[s]ervice officers are not only authorized by law but expected to exercise discretion in a judicious manner at all stages of the enforcement process" and directed that "officers *must* take into account the principles described [in the memorandum] in order to promote the efficient and effective enforcement of the immigration laws *and the interests of justice*."[33] As mentioned above, the Jeh Johnson Memorandum in 2014 authorized enforcement outside the established priorities where, "in the judgment of an ICE Field Office Director, removing such [a noncitizen] would serve an important federal interest."[34] The Meissner Memo 14 years earlier referenced the Principles of Federal Prosecution governing the conduct of U.S. Attorneys to explain that "[a]s a general matter, INS officers may decline to prosecute a legally sufficient immigration case if the Federal immigration enforcement interest that would be served by prosecution is not substantial."[35]

---

[30] Robert H. Jackson, *The Federal Prosecutor*, 24 J. AM. JUD. SOC'Y 18, 18–19 (1940).
[31] Exec. Order 13985, *Advancing Racial Equity and Support for Underserved Communities Through the Federal Government* (Jan. 20, 2021).
[32] *Id.*
[33] Meissner Memorandum at 1 (emphasis added).
[34] Jeh Johnson Memorandum at 5.
[35] Meissner Memorandum at 5.

AR_DHSP_00000007

More recently, ICE Principal Legal Advisor John Trasviña issued guidance to trial attorneys aptly explaining that

> Prosecutorial discretion is an indispensable feature of any functioning legal system. The exercise of prosecutorial discretion, where appropriate, can preserve limited government resources, achieve just and fair outcomes in individual cases, and advance the Department's mission of administering and enforcing the immigration laws of the United States in a smart and sensible way that promotes public confidence.[36]

Moreover, the Board of Immigration Appeals explained in an en banc decision that "[i]mmigration enforcement obligations do not consist only of initiating and conducting prompt proceedings that lead to removals at any cost. Rather, as has been said, the government wins when justice is done."[37]

These sentiments are also reflected in recommendations on prosecutorial discretion advanced by NGO advocates for noncitizens. For example, the We Are Home Campaign[38] has encouraged the exercise of prosecutorial discretion to ensure that the interests of justice are met for people exercising workplace rights or serving as witnesses in labor disputes; people engaged in civil, faith, housing, First Amendment, and other human rights activities; and victims and witnesses in civil, administrative, or criminal proceedings, among others. Advocates argue that strict application of our immigration laws without considerations such as these risks perverse outcomes, unjust results, and diminished confidence in the rule of law.

### The Biden-Harris Administration's Approach to Immigration-Enforcement Priorities

*Interim Civil Immigration Enforcement Policies and Priorities*

In line with historical practice and in full recognition of the resource constraints that require the use of civil immigration enforcement priorities to guide the workforce, on January 20, 2021, Acting Secretary David Pekoske issued a memorandum, *Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities*. The Pekoske Memorandum called for a comprehensive review of enforcement policies and priorities and immediately rescinded and superseded several prior policies, including a February 20, 2017, memorandum establishing the Department's previous enforcement priorities, as well as various implementing memoranda issued by components. The memorandum additionally established and defined three Department-wide priorities:

1. **National security.** Individuals who have engaged in or are suspected of terrorism or espionage, or whose apprehension, arrest and/or custody is otherwise necessary to protect the national security of the United States.

---

[36] Memorandum from John Trasviña, ICE Principal Legal Advisor, *Interim Guidance to OPLA Attorneys Regarding Civil Immigration Enforcement and Removal Policies and Priorities* (May 27, 2021).
[37] *Matter of S-M-J-*, 21 I&N Dec. 722, 727 (BIA 1997) (en banc).
[38] We Are Home Campaign, *Recommendations for the Use of Prosecutorial Discretion* (June 16, 2021).

AR_DHSP_00000008

2. **Border security.** Individuals apprehended at the border or ports of entry while attempting to unlawfully enter the United States on or after November 1, 2020, or who were not physically present in the United States before November 1, 2020.

3. **Public safety.** Individuals incarcerated within federal, state, and local prisons and jails released on or after the issuance of this memorandum who have been convicted of an "aggravated felony," as that term is defined in section 101(a)(43) of the Immigration and Nationality Act at the time of conviction, and are determined to pose a threat to public safety.[39]

Although the memorandum directed that resources be allocated to address these enumerated priorities, it specified that "nothing in this memorandum prohibits the apprehension or detention of individuals unlawfully in the United States who are not identified as priorities herein," and explicitly disclaimed any notion that the guidelines and priorities may be relied upon to create any enforceable right or benefit.[40]

On February 18, 2021, Acting ICE Director Tae Johnson issued a memorandum that both supported the interim priorities laid out in the Pekoske Memorandum and modified them in certain respects. Importantly, the Johnson Memorandum made clear that at-large enforcement actions of presumed-priority individuals could be taken without prior approval,[41] and that individuals who are not presumed priorities may nevertheless be subject to apprehension and removal—under some circumstances, even in the absence of prior approval—if they pose a threat to public safety. The Johnson Memorandum directed ICE field offices to collect data on enforcement and removal actions, both to promote compliance with the guidance and consistency across geographic areas of responsibility, and to inform the development of new Departmental enforcement guidance. Some of the findings from that data are discussed further below.

*Litigation Challenging Immigration Enforcement Guidance in the Pekoske and Johnson Memoranda*

The immigration enforcement guidance contained in the Pekoske and Johnson Memoranda have been challenged in four separate lawsuits.[42] One suit, which was filed by Texas and Louisiana, contends that the memoranda run afoul of the Administrative Procedure Act (APA) because they violate the Department's duty to detain certain individuals pursuant to 8 U.S.C. §§ 1226(c) and 1231(a)(2), are arbitrary and capricious, and are agency rules that must be adopted following notice and comment. Other lawsuits filed by Florida, Arizona, and Montana, and various local

---

[39] *Id.* at 2. The Pekoske Memorandum additionally announced a 100-day pause on certain removals that was enjoined.

[40] *Id.* at 3-4.

[41] The Johnson Memorandum expanded the category of presumed public safety threats to include certain individuals who are qualifying members of criminal gangs or transnational criminal organizations.

[42] *See Arizona, et al. v. United States, et al.*, No. 2:21-cv-186 (D. Ariz.); *Coe, et al. v. Biden, et al.*, No. 3:21-cv-168 (S.D. Tex.); *Florida v. United States, et al.*, No. 8:21-cv-541 (M.D. Fla.); *Texas, et al. v. United States, et al.*, 6:21-cv-00016 (S.D. Tex.).

AR_DHSP_00000009

governments and an association of ICE officers raise similar claims focusing on a variety of detention provisions, including 8 U.S.C. §§ 1225(b), 1226(c), and 1231(a)(1).

On August 19, 2021, a federal district court issued an opinion ruling in favor of Texas and Louisiana on their APA claims and preliminarily enjoining the Department from enforcing and implementing Section B of the Pekoske Memorandum and the operative part of the Johnson Memorandum, which provide guidance on the implementation of the Department's civil immigration enforcement and removal priorities. On September 15, 2021, the Fifth Circuit Court of Appeals largely stayed the district court injunction pending appeal in an opinion that reaffirmed the "broad discretion" entrusted to immigration officials—including with respect to "who should face enforcement action in the first place," *Texas*, 2021 WL 4188102 at \*3 (quoting *Arizona*, 567 U.S. at 396)—that was, with limited exceptions, left unencumbered by the detention authorities found at 8 U.S.C. §§ 1226(c) and 1231(a)(2). The court's decision was grounded in the fact that policies such as these that are entrusted to agency discretion by law are generally nonreviewable under the APA. And district courts in the Florida and Arizona and Montana lawsuits similarly concluded that the States' claims were unreviewable because the prioritization of enforcement actions is committed to agency discretion by law.

In arguing that the adoption of the Pekoske and Johnson Memoranda violated the APA because they were arbitrary and capricious and ignored statutory mandates, the plaintiffs in these suits have focused on a series of concerns that they alleged the Department failed to consider when crafting the policies. The district court that enjoined the memoranda similarly pointed to a number of these considerations in its analysis. These concerns ranged from the adequacy of the Department's consideration of whether the memoranda would enhance public safety and appropriately address the risk of recidivism by noncitizens convicted of criminal offenses; the costs that states would allegedly bear as a result of enforcement decisions made in reliance on the memoranda (e.g., costs related to additional incarceration, post-release supervision, and education, health care, and social services); how deciding not to detain certain individuals during the pendency of removal proceedings could affect future removal efforts, adding costs tied to delays and increasing the rate of abscondment; and how the priorities would interact with various statutory enforcement and detention mandates.

*Listening Sessions to Help Evaluate Interim Priorities and Develop Updated Guidance*

Throughout the past year, Department officials engaged in multiple discussions with leadership from ICE, USCIS, and CBP, as well as ICE personnel in the multiple field locations. Department officials also met with external stakeholders, including law enforcement groups, state and local government representatives, and non-governmental entities, including immigrant advocacy organizations. These conversations helped the Department evaluate its interim immigration enforcement and removal priorities and properly understand and consider the various interests of both internal and external stakeholders, thereby ensuring that the Department's development of new priorities was informed by all of the relevant evidence and interests.

Over the course of four listening sessions with representatives from the National Sheriffs' Association, the Southwest Border Sheriffs' Coalition, the Major Cities Chiefs Association, the U.S. Conference of Mayors, the National Association of Counties, and others, participants talked

10

about the types of criminal offenses that pose threats to public safety and should be prioritized by ICE. Many suggested replacing the "aggravated felony" language in the interim priorities. Some suggested a list that was untethered to the definition of "aggravated felony" and could include sexual assault crimes, crimes against children, gang and drug activities, violent crimes, and property crimes for repeat offenders. Several participants recommended that the recency of the offense should also be a factor.

Internal engagements similarly revealed interest from some ICE personnel to have greater discretion to arrest a wider range of individuals. Some appeared to understand the "presumed priority" categories in the interim enforcement guidance as restrictive mandates rather than presumptions that can be overcome. Other personnel expressed a desire for more specificity – for instance, by defining "border security" using parameters that are clearly identifiable (e.g. "entered the United States within two years").

Conversely, NGO advocates for noncitizens, representatives of state and local governments, and other stakeholders observed that under the existing framework, individuals falling outside the presumed priority categories are frequently arrested and removed. The resulting uncertainty, created by the possibility of enforcement outside of the presumed priorities, meant that individuals were fearful. Many warned that such fear can chill victim participation in law enforcement investigations and deter noncitizens from COVID-19 testing and vaccination. Some of these stakeholders also expressed concern that DHS personnel are determining individuals to be "public safety" threats based on single interactions with the criminal justice system, sometimes many years ago, without additional derogatory information or further assessment.

Finally, representatives of immigrant workers and labor unions observed that employers in certain industries sometimes seek to leverage immigration-enforcement actions (or the threat of them) to quash worker organizing or to dissuade workers from asserting their rights. These views were echoed by some mayors and police chiefs, who expressed concerns that ICE's enforcement activities and reputation may deter victims and witnesses from contacting public safety authorities. These groups suggested that ICE could ameliorate this problem by engaging in better public communication, curtailing certain enforcement practices, or a combination of both.

**Discussion of Key Considerations**

*Public Safety Considerations*

Public safety has long been a central focus of DHS (and, previously, INS), and it has been a key feature of multiple past guidance memoranda on enforcement priorities. Under the Pekoske Memorandum, the public safety threat category includes "individuals incarcerated within federal, state, and local prisons and jails released on or after the issuance of this memorandum who have been convicted of an 'aggravated felony,' as that term is defined in section 101(a)(43) of the Immigration and Nationality Act at the time of conviction, and are determined to pose a threat to public safety." The Johnson Memorandum expands that presumed priority category to apply more generally to noncitizens who pose a threat to public safety and who have been convicted of an aggravated felony, convicted of an offense involving participation with a criminal street gang, or who have certified specified ties to criminal street gangs or transnational criminal

AR_DHSP_00000011

organizations. The Johnson Memorandum additionally clarifies that, generally with prior approval, any noncitizen who poses a threat to public safety may be deemed an enforcement priority even if they do not fall within the categories of individuals presumed to be such a priority, and specifies a variety of relevant factors to be considered, including "the nature and recency of the noncitizen's convictions, the type and length of sentence imposed, [and] whether the enforcement action is otherwise an appropriate use of ICE's limited resources."

In the Department's engagements with internal and external stakeholders, including with the ICE workforce, concerns were raised about whether the focus on individuals convicted of "aggravated felonies" was both over- and under-inclusive. The aggravated felony definition can be challenging to administer in many instances; its various elements are subject to evolving definition by the Board of Immigration Appeals and the federal courts. Moreover, the "aggravated felony" category is an imperfect proxy for severity of offense. On the one hand, aggravated felonies may include certain crimes unlikely to be indicative of a public safety threat, such as certain drug possession offenses or filing a false tax return. On the other hand, certain offenses more likely to support a public safety threat finding—including, for example, certain murder and sex offenses—may not qualify as aggravated felonies based on the specific way in which a particular criminal statute is worded. In designing a new public safety enforcement priority category, the Department considered these concerns and chose to place greater emphasis on the totality of the facts and circumstances that inform whether an individual poses a current threat to public safety—typically because of serious criminal conduct—including by looking at key aggravating factors related to the individual's criminal offense and history as well as various mitigating factors.

The approach taken in the guidelines to public safety threats also addresses a central concern raised by the Texas district court in its ruling that the Pekoske and Johnson Memoranda were unlawfully arbitrary and capricious because they chose to focus enforcement efforts on "merely *some* criminal illegal aliens—those with aggravated felonies and criminal gang affiliations." *Texas*, 2021 WL 3683913 at *47. The district court stated that the Department ignored a supposed "well-established concept that *all* criminal illegal aliens or 'deportable aliens pose high risks of recidivism.'" *Id.* (citing *Demore v. Kim*, 538 U.S. 510, 518 (2003)). The updated guidance addresses the district court's concern by calling for a context-specific consideration of aggravating and mitigating factors, the seriousness of an individual's criminal record, the length of time since the offense, and evidence of rehabilitation. These factors are to be weighed in each case to assess whether a noncitizen poses a current threat to public safety, including through a meaningful risk of recidivism.

There is no question that enhancing public safety is an appropriate priority for the Department. In fact, it is an imperative, given the Department's mission. Executive Order 13993 directed DHS to issue enforcement guidance, in alignment with the Administration's policy to "protect national and border security, … and ensure public health and safety." This aim is furthered by a prioritization scheme that directs civil immigration enforcement resources towards apprehending and removing those individuals who are likely to present the greatest risks to public safety: individuals who are convicted of particularly grave offenses that cause significant harm, individuals who commit an offense while using or threatening to use a firearm or other dangerous weapon, individuals who have a serious prior criminal record, and individuals who, in

AR_DHSP_00000012

light of their actions and circumstances, are unlikely to rehabilitate. While it is impossible to predict with certainty in each case whether a particular individual will re-offend, the Department has exercised its expert judgment and experience to identify those factors that make an offender particularly more likely or less likely to recidivate. And the Department's judgments regarding these factors are further supported by evidence developed by the United States Sentencing Commission, which demonstrates that reconviction rates drop off significantly for individuals who are crime-free for 5 years post-release, those sentenced to 6 months or less of imprisonment, and those who were 40 or older when released.[43]

In working to achieve its public safety goal, the Department has frequently made distinctions between individuals based on the nature of their convictions and conduct. This approach is further supported by the academic literature, which points to a negative relationship between immigration and crime (i.e., that as immigration increases, crime rates decrease).[44] These findings are further bolstered by micro-level research that generally finds lower criminal involvement by foreign-born individuals, relative to their native-born counterparts.[45] The Texas district court's reference to the "well-established" propensity for certain removable noncitizens to recidivate does not appear to be grounded in empirical data, at least in part because legal status is not generally collected by law enforcement agencies. Where status information has been made available—including in the state of Texas itself—the evidence indicates that undocumented noncitizens are *less* likely to recidivate.[46]

Additionally, it is a mistake to assume that the threat that an individual poses to public safety can be reduced to simply the question of whether the individual is likely to recidivate. Not all offenses present the same risk to public safety. As a result, while an individual with a substance abuse addiction may be highly likely to recidivate and be convicted again for a simple controlled substance offense, that individual may pose a smaller risk to public safety than an individual who has committed a recent violent assault. Law enforcement decisions such as these require consideration of the totality of circumstances, looking at the individual facts presented and both aggravating and mitigating circumstances and weighing all of those facts and circumstances in light of agency officials' informed judgment and experience.

### *Deconfliction Considerations*

The Department has long recognized that civil immigration enforcement activity may have adverse effects on the enforcement of other laws. Law enforcement officials may have difficulty engaging noncitizen victims and witnesses in criminal investigations, if such victims and witnesses are potentially subject to removal. Likewise, efforts of agencies enforcing our labor

---

[43] United States Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview*, (Mar. 2016) Table 2, Figure 10, Figure 6, respectively, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf.
[44] Graham C. Ousey and Charis E. Kubrin, *Immigration and Crime: Assessing a Contentious Issue*, Annual Review of Criminology, https://www.annualreviews.org/doi/abs/10.1146/annurev-criminol-032317-092026.
[45] Jacob Stowell and Stephanie DiPietro, *Ethnicity, Crime, and Immigration in the United States Crimes By and Against Immigrants*, The Oxford Handbook of Ethnicity, Crime, and Immigration, 2014.
[46] Michael T. Light, et al., *Comparing crime rates between undocumented immigrants, legal immigrants, and native-born US citizens in Texas*, Proceedings of the National Academy of Sciences of the USA, (Dec. 12, 2020), available at https://www.pnas.org/content/117/51/32340.

AR_DHSP_00000013

laws may be frustrated if noncitizen workers are disinclined to report violations of wage, workplace safety and other standards. It does not serve the public interest when these rights go unvindicated, or when crimes go unprosecuted. The Department has, over the years, adopted some policies to address elements of these challenges, some applicable to certain contexts, and some to specific components of the Department. In 2011 the Department entered into a memorandum of understanding with the Department of Labor to ensure that the Departments work together to ensure that their respective civil worksite enforcement activities do not conflict.[47] Consistent with those concerns, the Department believes it is important that the guidelines being issued today convey clearly to various stakeholders, including the public generally and agencies that conduct investigations, that a particular noncitizen's use of, or cooperation with, civil and criminal enforcement authorities will generally be considered a mitigating factor in connection with enforcement decisions (even though such a mitigating factor may be outweighed by aggravating factors based on the particular facts and circumstances of the particular case).

*Impact on States*

The State-plaintiffs in several of the lawsuits alleged that the Department failed to consider the additional costs that States would incur as a result of the Pekoske and Johnson Memoranda and failed to consider whether the States had any reliance interests on the previous Administration's prioritization scheme. For instance, Texas alleged that it would incur additional criminal incarceration costs due to the Department's change in enforcement priorities because some noncitizens who would otherwise have been detained will now be released and may commit new criminal violations. *Texas*, 2021 WL 3683913 at *12. Texas additionally asserted that because some noncitizens are released from detention and, as a result, are less likely to be removed from the country, the state would bear additional healthcare costs such as those provided through Emergency Medicaid, the Texas Family Violence Program, and the Texas Children's Health Insurance Program, as well as additional educational costs for educating the children of such noncitizens. Louisiana alleged that it would incur similar costs. In its order enjoining the implementation and enforcement of the memoranda, the federal district court concluded that "the Memoranda bear no thought or indication as to whether the new prioritization scheme minimizes and limits state costs due to crime." *Id.* at *50.

In the Department's considered judgment, none of the asserted negative effects on States—either in the form of costs or the form of undermining reliance interests—from adopting a prioritization scheme outweighs the benefits of the scheme. As an initial matter, any immigration policy may have indirect, downstream impacts on a significant number of actors—including, potentially, State governments, businesses, and individual citizens—and the Department, regardless of Administration, cannot provide an exhaustive analysis of all of these potential impacts every time it adopts a change in immigration policy. The Department endeavors to consider the predictable (and measurable) impacts that its policies may have on those most directly affected by those policies.

---

[47] Revised Memorandum of Understanding between the Departments of Homeland Security and Labor Concerning Enforcement Activities at Worksites, Dec. 7, 2011, available at https://www.dol.gov/sites/dolgov/files/OASP/DHS-DOL-MOU_4.19.18.pdf.

AR_DHSP_00000014

Further, an assessment of any potential impacts on State governments is uniquely difficult to conclude with certainty. As the Department explained recently in the Notice of Proposed Rulemaking regarding the Deferred Action for Childhood Arrivals policy, it is challenging to measure the overall fiscal effects of enforcement priorities guidance on state and local governments.[48] This is in large part due to those governments' budgetary control, and the reality that any fiscal consequences are driven by policy decisions that state and local governments are themselves making. The 2017 National Academy of Sciences report canvassed studies of the fiscal impacts of immigration as a whole, and described such analysis as extremely challenging and dependent on a range of assumptions.[49]

In addition, while second-order effects also clearly occur, analysis of such effects similarly presents methodological and empirical challenges. For example, as with the native-born population, the age structure of the noncitizen demographic plays a major role in assessing any fiscal impacts. Children and young adults contribute less to society in terms of taxes and draw more in benefits by using public education, for example. As people age and start participating in the labor market they become net contributors to public finances; those in post-retirement again could become net users of public benefit programs. Compared to the native-born population, noncitizens also can differ in their characteristics in terms of skills, education levels, income levels, number of dependents in the family, the places they choose to live, etc., and any combination of these factors could have varying downstream fiscal impacts. As noted above, local and state economic conditions and laws that govern public finances and availability of public benefits also vary and can influence the fiscal impacts of immigration.

Based on the information presented in the 2017 NAS report, DHS has approached the question of state and local fiscal impacts as follows. First, it is clear that the fiscal impacts of proposed policies to state and local governments would vary based on a range of factors, such as the demographic characteristics of the affected population within a particular jurisdiction at a particular time (or over a particular period of time). In addition, fiscal effects would vary significantly depending on local economic conditions and the local rules governing eligibility for public benefits, detention costs, and other laws and practices. These costs to states and localities will be highly location-specific and are, therefore, difficult to quantify.

Second, in the Department's experience and judgment, there is good reason to believe that any effects from implementation of priorities guidance are unlikely to be significant, and could have a net positive effect. Under no circumstance—including under a framework that effectively sets no enforcement priorities—will DHS be able to arrest, detain, or remove more than a fraction of the overall removable population. Without a dramatic change in the level of resources, most

---

[48] *Deferred Action for Childhood Arrivals*, 86 Fed. Reg. 53,736, 53,801–02 (Sept. 28, 2021).
[49] *See* NAS, *The Economic and Fiscal Consequences of Immigration* (2017), 28, available at https://www.nap.edu/catalog/23550/the-economic-and-fiscal-consequences-of-immigration ("[E]stimating the fiscal impacts of immigration is a complex calculation that depends to a significant degree on what the questions of interest are, how they are framed, and what assumptions are built into the accounting exercise. The first-order net fiscal impact of immigration is the difference between the various tax contributions immigrants make to public finances and the government expenditures on public benefits and services they receive. The foreign-born are a diverse population, and the way in which they affect government finances is sensitive to their demographic and skill characteristics, their role in labor and other markets, and the rules regulating accessibility and use of government-financed programs.").

15

noncitizens who are removable will likely remain in the country. This is, of course, not a new phenomenon. According to 2018 estimates by the Migration Policy Institute, approximately three-in-five undocumented noncitizens in the United States had lived in the country for at least 10 years.[50] Additionally, as the Department heard from multiple stakeholder engagements, including with law enforcement partners and local government officials, a civil immigration enforcement framework that lacks clear priorities is likely to increase fear and sow mistrust between noncitizens and government. Such an environment can breed "hesitancy in accessing services, relief, and even vaccines during the COVID-19 pandemic."[51] Likewise, states and localities benefit from civil immigration enforcement policies that are more likely to lead to the arrest and removal of individuals who are threats to public safety.

Finally, even if the Department's guidelines for the enforcement of civil immigration laws have indirect fiscal impacts on states, that is no different from countless other policy decisions that Federal agencies make every day, including decisions by other law enforcement entities regarding where to focus their limited enforcement resources. Enforcement decisions made by the Department of Justice Civil Rights Division and the Environmental Protection Agency can have profound fiscal impacts on states and localities, but those actions are nevertheless pursued when they advance the important mission of those Federal agencies. For the Department of Homeland Security to achieve its critical mission, it similarly must set sensible priorities for the enforcement of the Nation's civil immigration laws and to guide the exercise of prosecutorial discretion.

Similarly, with respect to reliance interests, the Department has considered whether any States or other third parties may have valid reliance interests invested in the previous Administration's priorities scheme or in the scheme developed by the interim guidance. In the Department's view, no such reasonable reliance interests exist, both because the Department is unaware of any State that has materially changed its position to its detriment as a result of those previous policies and because any such change by any party would be unreasonable in light of the long history of the Executive's use of evolving enforcement priority schemes in this area. In addition, to the extent that any marginal reliance interests do exist, the Department believes that the benefits of the prioritization scheme outweigh those interests.[52]

In short, while any set of priorities may result in some indirect fiscal effects on state and local governments (both positive and negative), such effects are extremely difficult to quantify fully, are highly localized, and would vary based on a range of factors, including policy choices made by such governments and outside our control. Moreover, they would be a necessary consequence of the Department carrying out its congressionally mandated duties in service to the national interest. The Department further believes that previous prioritization schemes have not engendered any reasonable or substantial reliance interests. Therefore, the Department has

---

[50] Migration Policy Institute, *Profile of the Unauthorized Population: United States*, available at https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/US.

[51] E-mail from Nora Preciado, Director, Immigrant Affairs, to Kamal Essaheb, Counselor to the Secretary, DHS (Sept. 23, 2021, 05:42) (on file with author).

[52] The Department is aware that several states purported to enter into "agreements" with the Department at the end of the previous Administration. As the Department has explained in litigation, those documents were void ab initio and unenforceable. Any reliance on those documents is therefore unreasonable. To the extent those documents were ever valid, the Department has since terminated them.

AR_DHSP_00000016

determined that, even in light of the potential for such indirect fiscal effects or the theoretical possibility of reliance interests, the enforcement priorities articulated by the Department are an appropriate exercise of the Department's discretion.

*Resource Considerations*

Resource considerations have long justified the necessary application of enforcement policies and priorities. Nevertheless, the *Texas* district court in its injunction expressed skepticism over the Department's reference to resource limitations in the Johnson Memorandum, noting that the Government produced no evidence that "the resources it previously used for enforcement of the deprioritized categories are now being allocated to boost enforcement of the prioritized categories." *Texas*, 2021 WL 3683913 at *17. Rather, the Court cited anecdotal evidence presented by the States that, according to the Court, suggested that the Johnson Memorandum only resulted in a drop in enforcement actions against certain categories of noncitizens, but not a corresponding increase in enforcement actions against other categories of noncitizens.

Based upon data collected between the issuance of the Johnson Memorandum on February 18 and August 31, 2021, the interim priorities focus on public safety, national security and border security proved to be effective in channeling ICE officers' and agents' efforts toward cases these priorities. For instance, as the Johnson Memorandum defined the "public safety" category to include, in part, noncitizens convicted of aggravated felony offenses, ICE during this period arrested 6,046 individuals with such convictions compared to just 3,575 in the same period in 2020. Similarly, consistent with the Johnson Memorandum's border security prioritization of any noncitizen who entered the United States "on or after November 1, 2020" or who "was not physically present" in the United States before that date, ICE allocated enforcement resources to the southwest border to assist CBP in transporting, processing, transferring, and removing recently-arrived migrants, particularly through June, July, and August of 2021. These facts show that the guidance to the field matters; resource allocation shifted to focus on what the guidance required.

More generally, the Texas district court questioned whether the enforcement prioritization scheme would actually increase costs by delaying deportations of individuals who may not be deemed a priority, thereby increasing their incentives to file frivolous and time-consuming appeals and to ultimately abscond. This criticism is based on the misconception that if the Department did not prioritize its enforcement efforts—or if it prioritized enforcement in some different way—a significantly greater number of people could be arrested, detained, moved through removal proceedings, and processed for removal. But that is false. Resource limitations make that an impossibility, as has been the case since the Department was formed (and before that as well). Moreover, such an approach ignores the  reality that the Department's overall safety and security mission is not best served by simply pursuing the greatest overall number of enforcement actions but is rather best advanced by directing resources to prioritize enforcement against those noncitizens who most threaten the safety and security of the Nation.

*Relationship Between Enforcement Priorities and Statutory Mandates*

17

Implicit in the notion of prosecutorial discretion is the idea that discretion only may be exercised within the bounds of the law. As discussed above, courts have long recognized that immigration officials possess broad discretion over immigration enforcement, including "whether to pursue removal at all." *Arizona*, 567 U.S. at 396. These concerns are "greatly magnified in the deportation context." *Crane v. Johnson*, 783 F.3d 244, 247 n.6 (5th Cir. 2015) (quotation omitted). Indeed, the Supreme Court has never required law enforcement officers to bring charges against an individual or group of individuals. *See Texas v. United States*, --- F.4th ---, 2021 WL 4188102, *4 (5th Cir. Sept. 15, 2021).  In recent challenges to the Department's interim immigration enforcement and removal priorities, litigants have argued that various detention provisions within the INA constrain the Department's discretionary authority and even create affirmative duties to arrest, detain, and seek to remove broad categories of noncitizens. But the fact that many INA provisions state that the Executive Branch "shall" take certain actions does not eliminate the Department's discretion. To the contrary, longstanding Supreme Court precedent "hold[s] that the use of 'shall' . . . does not limit prosecutorial discretion." *See Texas*, 2021 WL 4188102, at *5 (listing cases). Indeed, the Fifth Circuit Court of Appeals recently rejected such an argument, explaining that although the two detention states at issue in the case before it—8 U.S.C. §§ 1226(c) and 1231—contained the word "shall," it ultimately concluded that provisions "override the deep-rooted tradition of enforcement discretion when it comes to decisions that occur before detention, such as who should be subject to arrest, detainers, and removal proceedings." *Id.* at *6.

The Executive Branch has also long recognized this discretion.  For example, the 2000 Meissner Memorandum explicitly contrasted the "specific limitation on releasing certain criminal aliens in" 8 U.S.C. § 1226(c)(2) with the general direction "that the INS 'shall' remove removable aliens" to illustrate how Congress can effectively limit agency discretion by statute.[53] But recognizing that even the limitation on release authority contained in § 1226(c)(2) did not override the agency's general prosecutorial discretion to decide whether to pursue removal of an individual or to abandon the endeavor entirely, that memorandum reaffirmed the authority of immigration officers—even with respect to noncitizens who would be subject to mandatory detention under a provision like § 1226(c)(2)—to cancel a Notice to Appear prior to filing with the immigration court or move for dismissal in immigration court.[54] That same principle would apply to the decision to cancel a detainer and choose not to pursue removal of such an individual in the first place. The Jeh Johnson Memorandum similarly recognized that although mandatory detention provisions may limit the authority of immigration officers to release individuals who would generally not be priorities for detention (e.g., noncitizens "who are known to be suffering from serious physical or mental illness, who are disabled, elderly, pregnant, or nursing, who demonstrate that they are primary caretakers of children or an infirm person, or whose detention is otherwise not in the public interest"), field office directors could consult with local ICE attorneys for guidance when confronted with such cases.[55]

Having said that, the Department does recognize that certain provisions within the INA place constraints on its authority to release noncitizens from ICE custody while the Department is pursuing their removal or during the statutory removal period. For instance, once ICE arrests a

---

[53] Meissner Memorandum at 3.
[54] *Id.* at 6.
[55] Jeh Johnson Memorandum at 5.

18

noncitizen who is subject to the custody provisions of 8 U.S.C. § 1226(c)(1), that noncitizen generally must remain in custody during the pendency of removal proceedings unless otherwise eligible for release pursuant to § 1226(c)(2), or as required to comply with a court order. Likewise, all noncitizens in ICE custody who are subject to the mandatory custody provisions of 8 U.S.C. § 1231(a)(2)—those who have been found inadmissible under 8 U.S.C. § 1182(a)(2) or 1182(a)(3)(B) or deportable under § 1227(a)(2) or 1227(a)(4)(B)—must remain detained for the duration of the removal period unless release is required to comply with a court order. The Department's updated *Guidelines for the Enforcement of Civil Immigration Law* are fully consistent with these constraints and do not purport to override them.

*Consideration of Alternative Approaches*

The Department's focus on national security, public safety, and border security remains unchanged. The numerous stakeholder engagements, internal discussions, and reviews of policies, protocols, and priorities make clear that these are and should remain the overriding Departmental priorities.

The new guidelines however will mark a significant shift in how those priorities are operationalized. Specifically, they—reflecting lessons learned from numerous engagements and internal reviews—reject a categorical approach to the definition of public safety threat. They will reject as both under- and over-inclusive the interim guidelines' focus on whether an individual was convicted of an "aggravated offense" under immigration law, or an offense for which an element was active participation in a criminal street gang. In its place, the new guidelines will require the workforce to engage in an assessment of each individual case and make a case-by-case assessment as to whether the individual poses a public safety threat, guided by a consideration of aggravating and mitigating factors.

More specifically, the guidelines will provide general direction that a noncitizen found to pose a current threat to public safety—typically because of serious criminal conduct—is a priority for apprehension and removal. But the specific determination as to who presents a public safety threat is delegated to the field, which is instructed and empowered to make individualized decisions based on a case-by-case analysis and taking into consideration aggravating factors—such as the gravity of the offense of conviction and the sentence imposed, the nature and degree of harm of the offense, the sophistication of the criminal offense, the use or threatened use of a firearm or dangerous weapon, and a serious prior criminal record, and mitigating factors—including advance or tender age, lengthy presence in the United States, impact of removal on family in the United States, and other relevant considerations. Bottom line: these factors should be used to ensure that officer and agents are focusing on actual threats, rather than making on pre-conceived determinations of the nature or a threat. Meanwhile, the grandmothers, clergy, teachers, and farmworkers who have lived and worked in the United Sates, contributing to the country without causing harm, should not be a priority based solely on the fact that they are removable.

The Department also recognizes that implementation will require significant training, guidance, and effective review of decisions. But it reflects a determination that officers and agents need the

AR_DHSP_00000019

discretion to make case-by-case determinations to identify who poses a threat. Any catch-all definition or bright-line rule runs the risk of being both over- and under-inclusive.

The guidelines also will differ from the interim priorities by dispensing with the pre-approval process in the exercise of this discretion. This decision was based largely on feedback from members of the workforce, who sought additional flexibility in the exercise of their judgment. The guidelines will be coupled with extensive and continuous training program on the new guidelines, the creation of short- and long-term processes to review enforcement decisions to achieve quality and consistency, and comprehensive data collection and analysis. Each of these will be critical to ensuring that discretion is being exercised consistent with the guidelines and in furtherance of the Department's highest priorities. Importantly, implementation won't begin until 60 days after issuance to ensure that there is time to do this training—and do it well. The first 90 days will also be subject to particularly rigorous review, to allow for adjustments as needed, so as to ensure that discretion is exercised as intended—to focus on those who pose a threat to national security, public safety, and border security.

But at its core, the priorities reflect a determination that officers and agents need the discretion to make case-by-case determinations to identify who poses a threat. Conversely, they are guided by a determination that the many noncitizens that have been contributing members of our communities for years—including teachers, clergy, farmworkers, and nannies—generally should not be an enforcement priority.

In adopting this approach, the Department also considered several alternatives, including a so-called "checklist" approach, in which officers' and agents' discretion would have been more tightly controlled by strict lists of what types of actions to pursue. The so-called checklist approach has the advantage of predictability; it relies least on officers' and agents' discretionary decision-making, and it most strictly predetermines which noncitizens will be subject to an enforcement action. However, this approach has the disadvantage of foreclosing a nuanced, individualized assessment of each noncitizen's aggravating and mitigating attributes, and therefore risks overinclusive and underinclusive decisionmaking, which yield unjust or unwise outcomes.

Another alternative approach that was considered was the delineation of certain categories for which no discretion should be exercised (i.e., where enforcement actions are mandated). The legal claims hinge in part on the theory that Congress commanded that certain individuals be arrested, detained, and removed. For the reasons discussed above, it is the Department's position that its enforcement discretion is not circumscribed by the enactment of these provisions. That said, the Department could adopt such a requirement as a matter of policy. But the Department has concluded that doing so would be counterproductive. It would undermine the Department's ability to effectively prioritize its limited resources to focus on the particular noncitizens who pose the greatest threat to safety and security. For instance, were the Department to choose to pursue removal of all individuals encountered who would, upon being taken into custody, be subject to mandatory detention under § 1226(c), the Department's detention capacity would quickly be exhausted. The same is true with respect to those whose detention would be mandatory during the removal period and those subject to various detention authorities in 8 U.S.C. § 1225. Without a set of priorities to guide the exercise of enforcement discretion, where

20

legally permissible, the Department would have little to no control over how its resources were being spent and would be unable to achieve its highest national security, public safety, and border security priorities.

After much consideration and deliberation, the Department has chosen a path that couples priorities with discretion, training and oversight. This approach is founded in a steadfast focus on national security, public safety and border security, coupled with a steadfast commitment to the interest of justice and individualized assessment of threat.

AR_DHSP_00000021