# Exhibit I

U.S. Immigration and Customs Enforcement

~~DRAFT — For Official Use Only — Pre-Decisional — Deliberative~~

September 17, 2021

MEMORANDUM FOR: Alejandro N. Mayorkas
Secretary
Department of Homeland Security

SUBJECT: Stakeholder Outreach in Furtherance of Department Civil Immigration Enforcement Guidance

This memorandum summarizes a series of "listening sessions" with, and written recommendations from, internal and external stakeholders on the topic of department-wide civil immigration enforcement guidance.

We have conducted outreach with, among others:

- ICE Field Office Directors and Special Agents in Charge
- ICE ERO headquarters leadership
- Senior leadership of USCIS and CBP
- National Sheriffs' Association
- Southwest Border Sheriffs' Coalition
- National Association of Police Organizations
- International Association of Chiefs of Police
- Major Cities Chiefs Association
- U.S. Conference of Mayors
- National Association of Counties
- National Council of State Legislators
- National Association of Attorneys General
- National Hispanic Caucus of State Legislators
- National Governors Association
- Department of Justice
- Law Enforcement Immigration Task Force
- Alliance for Immigrant Survivors
- American Constitution Society
- National Immigrant Justice Center
- American Civil Liberties Union
- American Immigration Council
- International Refugee Assistance Project
- Public Defenders Association
- Mothers Against Drunk Driving
- Public Defender Coalition for Immigrant Justice
- Members of the National Qualified Representative Program
- Representatives of the AAPI community, including the Southeast Asia Resource Action Center and Asian-Americans Advancing Justice
- Advocates for victim/survivors of domestic violence
- Black immigrant leaders
- Law Enforcement Action Partnership
- Advocates for Victims of Illegal Alien Crime (AVIAC)

DRAFT — For Official Use Only — Pre-Decisional — Deliberative

Among many other groups, you have personally met with:

- ICE personnel in New York, Atlanta, Chicago, Los Angeles, New Orleans, San Antonio, and Philadelphia
- All ICE Field Office Directors, Special Agents in Charge, and Assistant Directors, on multiple occasions
- Members of the academic community
- Leaders from prominent Immigrant advocacy organizations, such as Make the Road NY, CASA, and the Coalition for Humane Immigrant Rights of Los Angeles (CHIRLA),
- Domestic violence advocates and specialists

The sessions have yielded wide-ranging discussion, but some common themes have emerged:

- The "aggravated felony" definition is difficult to apply and yields inconsistent results. Some say it is overinclusive; others say it is underinclusive.
- There is a general recognition that the current "border security" category must be revisited because it depends on a static date (Nov. 1, 2020).
- ICE Field Office Directors generally, but not universally, argue for the ability to arrest and remove a wider range of noncitizens.
- CBP personnel argue in favor of using categorized negative factors (i.e., "national security," "border security," and "public safety") to help organize their missions.
- CBP personnel express a desire for clear guidance on how to address cases on which ICE and CBP may differ in their interpretation of whether they fall within the guidance.
- CBP personnel express the need to define "border security" using parameters that are clearly identifiable—whether through time frames (e.g. "within two years"), or other metrics.
- USCIS personnel express a desire to retain flexibility to issue notices of appearance consistent with USCIS's mission to promote due process of noncitizens' immigration requests through immigration courts.
- Some USCIS employees argue in favor of specifying immigration fraud as a priority.
- Some ICE personnel appear to regard the "presumed priority" categories as restrictive mandates rather than presumptions that can be overcome. They argue for broader discretion to make arrests.
- Some ICE personnel see their role as nondiscretionary—to arrest any noncitizen, deferring questions of relief to lawyers and judges downstream.

DRAFT — For Official Use Only — Pre-Decisional — Deliberative

~~DRAFT – For Official Use Only – Pre-Decisional – Deliberative~~

- Mayors, police chiefs, and advocates describe what might be called "the 911 problem." In short, they express the concern that ICE's enforcement activities and reputation may deter victims and witnesses from contacting local emergency and public safety authorities. These groups suggest that ICE could ameliorate this effect by engaging in better public communication, by curtailing enforcement practices, or a combination.
- Sheriffs argue that ICE should expand enforcement, particularly along the border. One suggestion is that ICE implement a kind of arrest quota.
- There is a general recognition that the current guidance does not effectively prompt assessment of mitigating factors. Below is a list of mitigating factors. The factors in bold are the weightiest and most often cited.
    - **Lawful permanent residents**
    - **Long term residents**
    - **People who arrived in the U.S. as a minor**
    - **Primary caretakers and breadwinners**
    - **Availability of affirmative pathways for relief, such as pending applications for lawful status or relief from removal (including DACA)**
    - **"Stale" removal grounds, such as criminal conduct that occurred more than 10 years ago or when the individual was of young age**
    - **Vulnerable populations, particularly victims of violence or a history of trauma**
    - **Military service**
    - **The exercise of civil, labor, or other rights**
    - **Victims or witnesses to law enforcement, labor agency, or other government investigations**
    - **Pardons, clemency, and expungements**
    - Public service, other than military
    - Essential workers
    - Effect of action on future admissibility
    - Community engagement
    - Demonstrable rehabilitative measures
    - Bonds granted in pending criminal cases
- Advocates argue that the "presumed priority" categories have calcified into mandates. They suggest incorporating "presumed non-priority" categories or "safe harbors," or some other protection-oriented safeguards, for balance.
- Advocates argue that ICE officers misuse the guidance's catch-all language as a "priority four" or a "blank check" to implement broad, de facto priority categories that differ by field office. Advocates claim that, as part of this pattern, ICE officers categorize a person as a public safety risk based on any interaction with the criminal justice system, no matter how minor.

DRAFT – For Official Use Only – Pre-Decisional – Deliberative

- Advocates express concern that the border security category is used to penalize those who seek asylum. The current definition also may not adequately account for earlier periods of stay, and strong ties to the U.S., for those who are reentering after November 1, 2020.
- Advocates note that the immigration system lags behind the criminal justice system in reforms related to controlled substance convictions.
- Advocates say that methods for identifying an individual's gang affiliation are marked by racial bias. Gang databases, they argue, are unreliable.
- Advocates are concerned about the risk of overbroad application of "national security" priorities.
- Advocates point to what they see as the low rate of reversal of negative decisions by ICE senior review officials (approximately 20%), the absence of any institutionalized mechanism to effectively escalate release requests, and lack of transparency in the decision making, as weaknesses.

There are also a series of "hard questions" that repeatedly arise, although there is no clear consensus on how to address them. These include:

- How can we avoid importing the biases of local policing into the civil immigration enforcement system? How do we ensure that our own enforcement actions do not lead to discriminatory outcomes?
- In domestic violence cases, how can we avoid chilling victims and witnesses from coming forward?
- In domestic violence cases, how can we account for convictions (and allegations) that arise from self-defense?
- How should we treat DUIs, particularly aged DUIs?
- How should we treat charges that are pending? How should we treat past arrests that did not result in a conviction? How should we weigh conduct described in a police report?
- What is the right level of deference to pending process in the immigration system, such as pending USCIS petitions, motions to reopen, and petitions for review?
- Should the exercise of 1st Amendment rights count as a "positive factor"?
- Should "community support" be a positive factor?
- Should there be retroactive relief for those affected by previous policies, i.e., dismissal of cases or return of previously removed individuals?
- Should there be additional accountability mechanisms for officers who do not follow the guidance?
- Should there be a "repeat low-level criminal" category?
- Should the fact of a prior removal make someone a priority?
- How should we treat prior convictions under 8 U.S.C. §§ 1325 and 1326(a)?
- How do we address the different approaches of DHS component agencies, with CBP examining through the lens of admissibility and ICE examining through the lens of deportability?

DRAFT – For Official Use Only – Pre-Decisional – Deliberative

- How should we treat convictions stemming from conduct appurtenant to status (unlawful work, document fraud, driving without a licenses, etc.)?
- How does the "border security" priority intersect with the right to seek asylum and other forms of humanitarian relief at the border?

These sessions have also shed light on some "anterior" or "foundational" questions—that is, questions that must be answered before the drafting process begins:

- Should we use a "category" framework? Should we use a more laissez-faire framework of guiding principles with illustrative examples? Should we use something else—and if so, what?
- If use a more laissez-faire "principles" framework, how can we ensure the workforce applies those principles as attended? How do we assure the quality of supervisors' decisionmaking?
- Should the memo's scope include "special topics" like sensitive locations?
- Should the memo's scope include an appellate process, e.g., an "independent advisory panel" or "justice review board"?
- Should there be presumed *non*-priority categories or safe harbors?
- Is the current public safety definition overinclusive or underinclusive?
- If not "aggravated felony," then what?
- How should we redefine "border security"?
- How should we define and appropriately weight different mitigating factors and ensure they are considered?
- What metrics will we use to assess the success of the guidance's implementation?

AR_DHSP_00000094