# Exhibit L

For Official Use Only—Deliberative



# DHS Enforcement Priorities
## Stakeholder Outreach April 14-May 20, 2021

From April 8-29, ICE Chief of Staff Timothy Perry held five stakeholder outreach "listening sessions", with a combination of governmental and non-governmental organizations.

These listening sessions involved: on April 8, the American Constitution Society; on April 14, the Alliance for Immigration Survivors; on April 20, the Department of Justice; April 29, the National Association of Attorneys General, the National Council of State Legislators; the National Hispanic Caucus of State Legislators, the National Governors Association, the National Immigrant Justice Center, the American Civil Liberties Union, the American Immigration Counsel, and the International Refugee Assistance Center; and on May 20, the Black Alliance for Just Immigration, the Brooklyn Community Bail Fund, the Vera Institute for Justice, the Leadership Conference on Civil and Human Rights, and the Center for Constitutional Rights.

At the beginning of these listening sessions, ICE Chief of Staff Timothy Perry proffered open-ended prompts to spur discussion:

- In your communities, what is the most important public safety issue?

- Have you noticed anything about our current enforcement practices that you would want to see changed?

- If you were drafting the final guidelines, what would you include and what would you take out?

While offering these prompts, Mr. Perry emphasized that all comments or reactions were welcome, whether encompassed by the prompts or not. This memorandum consolidates the most salient points raised in all the discussions.

**VULNERABLE POPULATIONS**

Most participants pointed out that humanitarian cases are best managed by USCIS since that agency offers more consistency in decision-making. Most groups pointed to the removal of U and T visa applicants as particularly troubling and pointed out that ICE could establish criteria for individuals that exempt U and T visa applicants from enforcement. This stance would better protect survivors from further unnecessary trauma by the U.S. government. Instead, the U.S. government should transition to a protector of victims and safeguard their rights, apply the waivers for criminal activity by victims proactively, and maintain a victim-centered approach throughout the immigration process. Participants pointed out that when crime victims are able to access deferred action benefits early in the process, cooperation with law enforcement increases 114%. Thus, early deferred action grants lead to an increase in the ability of victims to access

For Official Use Only—Deliberative

justice through the American court systems, instead of over-reliance on removal of the perpetrator which does not equate to safety for the victim.

A common concern included the difficulty noncitizens face in obtaining an agreement for OPLA to terminate proceedings once USCIS issued a prime fascia determination for U and T visa applicants. Many groups opined that OPLA attorneys should also be required to attend training on survivor-based determinations. There was a consensus that OPLA attorneys need to create space to engage with the advocacy partners to better manage the litigation process for vulnerable people, including families, domestic violence survivors, and other crime survivors.

Some participants identified a growing concern with state and local convictions of the victims of domestic violence (DV). These participants pointed to a pattern in which state and local police agencies lacked appropriate language access for victims and an over-reliance on obtaining information from the perpetrators, thereby rendering the police reports non-probative in many instances. Moreover, some DV perpetrators are actively involved in attempts to get their victim remove, most especially those with language access issues. These groups pointed out that DHS should refrain from taking an immigration action until the finalization of any criminal case, and also pointed out that the recidivism rate for noncitizens removed before the criminal case is complete is actually higher than for those noncitizens who complete the criminal case and then are placed in immigration proceedings.

The groups pointed out the racial disparity in policing in the United States which leads to disproportionate convictions. Some of the participants pointed out use of "race" case law is prejudicial; ICE should align with the DOJ memo from 2014. There was a consensus that ICE should work with the Office of Civil Rights and Civil Liberties and nongovernmental organizations to address racial disparities in future and past practices and procedures. There were concerns raised as well in the context of state and local law enforcement agencies with inordinate prosecution rates for Black and brown people and how those actions could affect the immigration status of noncitizens. The participants pointed out that statistically throughout the life cycle of criminal cases, black and brown people are over-represented in the arrest, prosecution, and sentencing phases of the criminal process. Over-representation in the criminal justice system leads to more interactions with immigration authorities and an overrepresentation in the immigration policing.

Most participants pointed out that the disparate application of criminal law for black and brown people lead to a higher likelihood of immigration interaction with ICE via 287(g) agreements. Many participants also pointed out that when the criminal justice system and the immigration system collides (e.g., local authorities release a noncitizen to ICE before the outcome of the criminal case), there lies concerns with continued equal access to the criminal justice system. ICE normally requires a writ for someone to be turned over to local authorities for trials, which is time-consuming and difficult if the person is not represented. Additionally, ICE will sometimes remove a noncitizen even if the criminal case is still ongoing.

The groups pointed out that the racial disparity concerns are threaded through the historical records as it pertains to criminal prosecution under 8 U.S.C. 1325 and 1326. The groups pointed out that the framers of the 1924 National Origins Act intended to reduce the immigration of undesirable immigrants based on their own nativists and eugenics ideology in manner that

AR_DHSP_00000103

criminalized the irregular crossing of black and brown people. The law did not address the nonimmigrant overstays since those individuals were largely of Northern and Central European nationalities. The 1965 Hart-Cellar act repealed most of the national origins formula but did not address prosecution under 1325 or 1326.

Participants pointed out that 1325 and 1326 prosecutions represent a statistical anomaly with 96% of Latino descent. Fewer of these cases go to trial and have harsher sentencing than similar statutes. Some group members identified 1325 and 1326 cases since January 2021 did not appear to be consistent with priorities or the intent of the Administration's immigration goals, pointing to prosecutions of individuals with little to no criminal backgrounds for which ICE and CBP pursued prosecution. Some of the groups pointed out that there is an increase in the number of public defenders who are winning 1325 and 1326 cases at jury trials.

Because of the disparate application of 1325 and 1326 prosecutions to black and brown people, the groups recommended that DOJ and DHS conduct a review of the inherent bias identified in the law and refrain from using either section of law for prosecutions until that review is complete. If an overall prohibition on 1325 and 1326 is inappropriate, the group members requested DHS stop pursuing the prosecution for people who are claiming asylum; for people with underlying removal orders that are not a current priority; for people with a removal order that is improvidently issued; and for people with in absentia removal orders. The groups also recommended that DHS refrain from reinstituting Operation Streamline. The groups also requested DHS stop pursuing prosecution for noncitizens who provide false names who are seeking asylum under 8 U.S.C. 1001.

Many participants requested ICE identify methods to identify noncitizens with special vulnerabilities who may be eligible for reinstatement of removal orders. ICE should include a requirement to evaluate if the issuance of a Notice to Appear would be more appropriate, given the vulnerabilities the noncitizen presents with.

A shared area of concern was that ICE should identify mechanisms to captures a way to address cases in which harm occurred by the U.S. government, specifically referring to the zero-tolerance policy and the separation of families.

Many group members pointed to deferred enforced departure as an appropriate avenue for vulnerable populations from designated countries and regions that endure political or civic conflict or natural disasters to remain in the United States. The President can identify criteria in a directive format with additional requirements that individuals would need to fulfil, including demonstration of continuous presence in the United States.

**PRIORITIES**

Prosecutorial discretion should be better defined and is most effective when executed at the earliest moment possible. ICE must follow through on the guidance to refrain from automatically arresting everyone as the result of an arrest or who is in jail. This is especially important for victims of domestic violence since many policy agencies will arrest both the perpetrator and the victim. This creates a chilling effect for noncitizen domestic violence victims to seek assistance from law enforcement. All the participants pointed out that ICE needs to ensure space is given

for all people to seek assistance from state and local law enforcement without the fear of an immigration action.

Participants pointed out the public safety priority is overly inclusive. "Gang membership" may be too broad as it is flawed and racialized. Instead, ICE should focus on crimes with an element of violence and personal harm. Another common theme revolved around the element of aged crimes, even if a crime of violence or an aggravated felony. Some suggested following the five-year timeline as set by the crimes involving moral turpitude.

Of note in the racial disparity concerns is the concept that to reach true racial equity in immigration enforcement, ICE should enforce immigration law by focusing on the disparate experience of black immigrants in the U.S. criminal justice system. The participants identified ongoing harm in the black community based on 1990s laws rooted in racism, both in the criminal and immigration realms. The participants pointed out that over-policing of black communities results in higher arrest and prosecution rates, as well as longer sentences compared to white people who commit the same types of crimes. The interim priorities do not address this over-policing paradigm. In fact, the participants pointed out that the priorities contribute to continued harm within the black communities as an extension of the disparate treatment within the criminal justice system. The current priorities reinforce the racial injustice in criminal justice system which arrests, convicts, and penalizes black defendants at greater rates. This is especially concerning for those noncitizens who meet the definition of an aggravated felony based on the longer sentences imposed on black and brown people.
The groups identified concerns with making driving under the influence or controlled substance convictions a priority due to the over-policing of black and brown people. Also, the groups deemed these types of convictions as substance abuse and addiction issues that should be managed through treatment not punishment.

Most participants agreed, based on systemic racism identified above, that DHS must adhere to the Executive Order on Advancing Racial Equity issued on January 20, 2021. The participants pointed out the variety of studies and statistical analysis bears out that DHS must address the disparate treatment of black and brown immigrants by centering future policy on justice for those harmed by governmental tactics related to systemic racism. Participants stated that centering reforms on justice for black noncitizens will ensure the just application of immigration law for all noncitizens.

Some group members recommended that the border security priority was overly broad and should be better framed to address the concerns relating to *refoulement*. These members identified concerns from the 1996 Illegal Immigration Reform and Immigrant Responsibility Act (IIRRIRA), which expanded the aggravated felony definition and provided an avenue for the U.S. government to remove refugees to persecution (*refoulement*), even if their crime did not fit the "particularly serious crime" definition as required under the UN Convention relating to the Status of Refugees, which the United States is bound by through its ratification of the UN Protocol relating to the Status of Refugees in 1967. The group members pointed out that IIRIRA made it impossible for any noncitizen convicted of an aggravated felony with a five-year sentence to obtain protection from return to persecution. This means the U.S. cannot adhere to international standards in which only refugees who have been convicted of a "particularly

4

serious crime" *and* who "constitute a danger to the community" of the United States can be returned to places where they would be persecuted.

The groups requested that ICE identify groups of people who should be categorically protected from immigration actions. The groups pointed out that this stance may better address the current paradigm in which ICE looks to criminality as the principal factor driving decisions.
The groups pointed out concerns with how ICE and CBP point to individuals who frequently enter the United States without inspection as an someone who is openly flouting U.S. law. They pointed out that understand that parents who have children in the United States and had to return to their home country have no recourse on legal ways to get back to their children. These people are desperate to reunite their family. The groups recommended DHS cease the use of Operation Streamline and referencing the consequence delivery system.

Many of the participants pointed to the memorandum entitled "Exercising Prosecutorial Discretion" issued in 2000 by former INS Commissioner Doris Meissner (Meissner Memo) as a document ICE should look to when drafting the updated enforcement priorities. The Meissner memo details the cost-related arguments behind prosecutorial discretion. The Meissner memo also included a mandatory review of all factors to maximize the likelihood the serious offenders would be identified, while also identifying a host of humanitarian factors for consideration. The Meissner memo also pointed out a noncitizen did not need to show every factor to qualify for prosecutorial discretion; rather, a review must be based on the totality of the circumstances and not any one factor considered in isolation. Most notably, the Meissner memo advised officers that they were expected to exercise discretion in a judicious manner at all stages of the enforcement process, including planning investigations and enforcing final orders of removal, with appropriate caveats for supervisory approval.

Many participants also pointed to the "particular care" language included in the memorandum entitled "Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens" issued on June 17, 2011 by John Morton. The Morton Memo outlined the ICE's enforcement priorities; however, it further stated that when ICE staff encountered potentially deportable noncitizens, an ICE assessment will include a review of the length of time in the United States, presence in the country since a very young age, education, military service, social ties to the United States, and age. In addition, this memo emphasized that "particular care" be taken with cases involving veterans, long-time LPRs, children and elderly individuals, victims of domestic violence or trafficking, and people with serious health conditions.

Many participants pointed to the patchwork of decisions regarding auto-stays in U.S. circuit courts. Instead of relying on the court decisions. ICE should consider establishing policy to stay removals for those who file motions to reopen, motions to reconsider, or petitions for review, regardless of the circuit court's stance on auto-stays.

**TRANSPARENCY**

The groups recommended that ICE strengthen policy and training for 1367 protections. The groups recommended increasing transparency for the accountability of ICE staff who do not adhere to 1367 protections, the priorities, and law enforcement tactics. ICE should include

AR_DHSP_00000106

language to ensure transparency in policing by providing statistical data to the public. This data should include race, gender, and nationality.

Some of our partner agencies expressed concern with the issuance of the Tae Johnson memo without suitable notification. These partners identified unintended consequences related to ICE lifting detainers for non-priority individuals which affected the release plans for those individuals. This group requested ICE better coordinate with our law enforcement partners. Many identified a gap in communication from ICE on matters that affect their operations.
ICE should engage in a robust public engagement campaign to ensure external stakeholders are informed about the changes at ICE.

Participants raised concerns with the immigration bond system. Their concerns revolved around the increase in bond amounts set by immigration judges and DHS, pointing out there seems to be no particular requirements in place. The groups pointed out that bond amounts are different from immigration judge to immigration judge for cases with very similar fact patterns. Further, there is no clear policy available to the public to better understand how bond amount decisions are made, highlighting that in some instances bonds are set at high amounts with little justification. These high bond amounts frequently mean that families are forced to seek assistance from immigration bond companies, who charge exorbitant rates and may require the released noncitizen to pay for ankle monitoring (at a cost of $400 a month) and agree to random home and office visits. Participants identified concerns with these immigration bond companies being largely unregulated. Finally, members pointed out that even when bonds are issued, the logistical hurdles to pay cash bonds are such that many families struggle to be able to report to the ICE office in the limited times the office accepts bonds because the ICE office may be far from their homes or the family is unable to take off work.

**Participants**
Alliance for Immigration Survivors
American Constitution Society
Department of Justice
National Council of State Legislators
National Association of Attorneys General
National Hispanic Caucus of State Legislators
National Governors Association
National Immigrant Justice Center
American Civil Liberties Union
American Immigration Counsel
International Refugee Assistance Center
Public Defenders Association
Mothers Against Drunk Driving
Public Defender Coalition for Immigrant Justice
UCLA Center for Immigration Law and Policy
Black Alliance for Just Immigration
Brooklyn Community Bail Fund
Vera Institute of Justice
National Immigration Project
Center for Constitutional Rights