# Exhibit M

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | |
|---|---|
| STATE OF TEXAS, STATE OF LOUISIANA<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, *et al.*<br><br>Defendants. | No. 6:21-cv-00016 |

DECLARATION OF THOMAS DECKER

I, Thomas Decker, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

I.  **Personal Background**

1. I am currently serving as the Acting Assistant Director (AD) for Field Operations for the Enforcement and Removal Operations (ERO) component of U.S. Immigration and Customs Enforcement (ICE) within the U.S. Department of Homeland Security (DHS). In this capacity, I oversee, direct, and coordinate all ERO Field Operations activities throughout the nation's field offices and sub-offices in an effort to enhance national security and public safety while ensuring such activities further ERO goals and comply with policies and initiatives set forth by the DHS Secretary, ICE Director, and ICE Health Service Corps.

2. Since January 2017, I have held the position of Field Office Director for the ICE ERO in New York City Field Office. I have operational responsibility for the five Boroughs of New York City (Manhattan, Brooklyn, Bronx, Queens and Staten Island), Long Island (Nassau and Suffolk counties), and the upstate counties of Dutchess, Putnam, Sullivan, Orange, Rockland, Westchester and Ulster. In addition to the Field Office in New York, the office maintains personnel at the Varick Street Processing Facility, Newburgh, NY Sub-office, and Long Island, NY Sub-office.

3. I began my federal career in 1993 with the Immigration and Naturalization Service where I served as a District Adjudications Officer in New York. After transferring to the Newark, New Jersey office in 1994, I accepted a position as a Deportation Officer in April 1996 and was then promoted to Supervisory Deportation Officer in September 2001. I was selected as the Deputy Field Office Director in Philadelphia and served as the Acting Field Office Director for Philadelphia from November 2004 until March 2006 when I was appointed to the position permanently.

4. I have participated in several detail assignments—a temporary posting to another position within DHS—including that of Acting Assistant Director of Operations for HQ Detention and Removal Operations, Acting Deputy Field Office Director for the New York Field Office, in addition to the most recent details to ERO Chicago Field Office to serve as the interim Field Office Director in January 2021, then to Washington, D.C., as the Acting Deputy Assistant Director for Field Operations East.

5. This declaration is based on my personal knowledge and experience as a law enforcement officer and on information provided to me in my official capacity.

## II.  Harm to ICE from Grant of Preliminary Injunction

6. I am aware of this litigation in which Plaintiffs seek a preliminary injunction enjoining enforcement and implementation of the policies described in DHS's January 20 Memorandum in Section B entitled "Interim Civil Enforcement Guidelines" and ICE's February 18 Interim Guidance which implemented, among other things, the Section B priorities of national security border security, and public safety. I am also aware that Plaintiffs seek the Court to issue a mandatory injunction requiring DHS and ICE to take into custody, and refrain from releasing, any noncitizen who is covered by 8 U.S.C. § 1226(c)(1) or 8 U.S.C. § 1231(a)(2)).

*Inability to Prioritize Use of Finite Resources*

7. Implementing the terms of Plaintiffs' requested relief would be unreasonably and unduly burdensome, if not entirely impossible. Moreover, Plaintiffs' requested relief would adversely impact ICE—and the agency's critical public safety and national security mission—in a number of ways. First, there could be a substantial number of noncitizens who would fall within the categories identified by Plaintiffs and enforcement actions against this population would require significant ICE bedspace and personnel which does not currently exist. ERO is currently appropriated sufficient funding for 34,000 detention beds to support its mission to enforce immigration law. Due to this finite number of detention beds, ERO needs to prioritize its detention resources to support the detention of certain noncitizens, especially those who are convicted criminals, subject to mandatory detention under immigration law, and/or recent border entrants. Compliance with the proposed injunction would likely require expansion of these resources beyond those currently budgeted and

allocated by Congress; additional Congressional approval is not guaranteed and beyond ICE's control.

8. Second, compliance with such an order could adversely impact the ability of ICE to take immediate enforcement action against noncitizens who pose a security threat or other real harm to U.S. communities. There are commonly believed to be approximately 11 million noncitizens in the United States who do not have authorization to reside here. In addition, lawful permanent residents and other noncitizens who are authorized to be in the United States may be removable for a variety of reasons, including those connected to national security and public safety concerns. At present, ICE ERO officers follow the February 18 ICE Interim Guidance to determine whether a noncitizen is a civil immigration enforcement and removal priority for the Department and, if so, whether to place a detainer on someone who is currently in federal, state, or local custody or make an arrest. Officers determine first whether the noncitizen is removable, and if so, which charge(s) of removability apply. If an officer encounters a noncitizen in a state or local jail who has been convicted of a crime, determining whether that individual is subject to 8 U.S.C. § 1226(c)(1) or 8 U.S.C. § 1231(a)(2) requires legal analysis secondary to the determination that probable cause exists as to removability. In order to comply with Plaintiffs' requested relief, ICE would have to first determine the immigration and criminal history status, or lack thereof, of each noncitizen it encounters; second, ICE would have to determine whether these noncitizens subject to detention under either section 1226(c) or section 1231(a)(2); and then, ICE would have to execute the appropriate enforcement action. Each step would require a massive influx of investigative and operational resources.

9. Further, an attempt to initiate enforcement actions indiscriminately among this population, instead of against certain prioritized noncitizens, would not be an efficient or reasonable apportionment of ICE limited resources and would likely prevent ICE from effectively focusing on those noncitizens who pose the greatest and most imminent threat to public safety. Indeed, implementation of ICE's interim priority structure has enabled the agency to focus resources on ensuring the most dangerous noncitizens are not released back into the community.

10. Third, the requested relief would significantly curtail ICE's prosecutorial discretion. The Immigration and Naturalization Service (INS), one of the Department of Homeland Security's (DHS) predecessor agencies, has exercised prosecutorial discretion and had policies guiding such exercise since as early as 1909 to maximize use of scarce agency resources, to protect the United States from national security threats and to protect our citizens and communities from harm. *See Department of Justice Circular Letter Number 107*, dated September 20, 1909, dealing with the institution of proceedings to cancel naturalization; *see also, e.g.,* Sam Bernsen, INS General Counsel, *Legal Opinion Regarding Service Exercise of Prosecutorial Discretion* (July 15, 1976).

11. The implementation of the enforcement priorities set forth in the DHS January 20 Memorandum and the ICE February 18 Interim Guidance has assisted ERO in re-tasking personnel to support operations in the Southwest Border and address the current situation at the border. The support ERO provides at the Southwest Border includes but is not limited to: transporting; processing; enrollment in alternatives to detention; removals; bedspace management of those taken into custody; and transfers of those taken into custody. This support has significantly increased over the past few months.

*Lack of Clear Guidance for Nationwide Workforce*

12. Without the nationwide perspective and guidance issued by HQ Enforcement and Removal Operations (ERO), individual immigration officers may prioritize cases differently based upon only their local experiences, which will of course vary. This could force ICE to revert to a policy that is not tailored to the current operational realities faced by ICE and the resources available to the agency. An injunction would also cause further confusion among the nearly 6,000 immigration officers employed by ERO regarding whether, and to what extent, any specific policy guidance applies. Absent clear priorities, ERO immigration officers may be left with only very general guidance—or no guidance at all—on the exercise of their discretion, leading to disparate prioritization across the country and a lack of consistency in enforcement actions. This could result in an undesirable shift in enforcement away from those that present the greatest risk to public safety and further undermine public confidence in the nation's immigration enforcement efforts.

13. Any potential policy or operational confusion due to an injunction could additionally harm ICE's relationship with state and local stakeholders. In particular, ICE must cultivate relationships with numerous state and local partners. To allow individual states to impose their individual preferences on all stakeholders, as Texas and Louisiana seek to do here, could not only irreparably harm ICE's relationships with its state and local partners, but also encourage other states to use the judicial process to bring additional lawsuits to further impose their individual judgment of how federal immigration enforcement should be conducted not just in their respective states, but across the entire country.

AR_DHSP_00005785

14. This confusion could, in turn, also undermine the authority of career leadership within ICE. To manage a nationwide workforce, these leaders must balance consistency in operations with changing operational needs. An injunction would impair the ability of leadership to adjust to changing conditions.

*Adverse Impact on Agency's Deliberative Process*

15. The injunction of the February 18 Interim Guidance sought by Plaintiffs could interfere with the agency's ongoing deliberative process. The Interim Guidance issued by Acting Director Johnson seeks to facilitate a dialogue between ICE's field offices, senior leadership, and DHS HQ, about what DHS's immigration enforcement priorities should be, and how they should be implemented. This dialogue will be informed by data, which ICE is gathering through internal approval and tracking tools that are keyed to the Interim Guidance. Requiring ICE to revert to previous policies could frustrate the agency's ability to evaluate certain enforcement priorities.

This declaration is based upon my personal and professional knowledge, information obtained from other individuals employed by ICE, and information obtained from various records and systems maintained by DHS. I provide this declaration based on the best of my knowledge, information, belief, and reasonable inquiry for the above captioned case.

Signed on this 18th day of May, 2021.

_____
Thomas Decker, Acting Assistant Director for Field Operations
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement