# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

|  |  |  |
|---|---|---|
| STATE OF TEXAS, STATE OF LOUISIANA | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 6:21-cv-00016 |
| v. | ) ) | |
| UNITED STATES OF AMERICA, *et al.* | ) ) | |
| Defendants. | ) ) | |

**DEFENDANTS' POST-TRIAL MEMORANDUM OF LAW**

# TABLE OF CONTENTS

I.  The September Guidance Is Not Final Agency Action. ...................................................... 1

II.  The September Guidance is Consistent with 8 U.S.C. §§ 1226(c) and 1231(a)(2). ........... 8

    A.  Reconciling *Demore* and *Castle Rock*. ................................................................ 8

    B.  The difference between "detention" and "take into custody.".............................. 17

    C.  The September Guidance would not contradict even the States'
        interpretation of the statutes.................................................................................. 19

III.  Judgment Should Enter for Defendants on the States' Purported Breach of
      Contract Claim, Count V. ............................................................................................... 21

    A.  If the contract ever existed, DHS terminated it in February of 2021.................... 22

    B.  This Court would lack jurisdiction to consider Louisiana's contract claim. ........ 23

    C.  Alternatively, the alleged agreement is not enforceable....................................... 25

        i.   DHS cannot contract away its sovereign discretion over
             immigration enforcement.......................................................................... 25

        ii.  DHS lacked statutory authority to enter into the purported
             agreement. ................................................................................................. 26

IV.  Should the States Prevail in this Action, Any Remedy Should be Narrow. ..................... 27

    A.  The Court should issue only limited relief............................................................ 27

    B.  If the Court grants any relief to Plaintiffs, it should stay its judgment
        pending appeal. ...................................................................................................... 30

# TABLE OF AUTHORITIES

## CASES

*Ala. Rural Fire Ins. Co. v. Naylor,*
  530 F.2d 1221 (5th Cir. 1976) ......................................................................... 24

*Alejos-Perez v. Garland,*
  991 F.3d 642 (5th Cir. 2021) ...................................................................... 5, 12

*Amino Bros. Co. v. United States,*
  178 Ct. Cl. 515, 372 F.2d 485, *cert. denied*, 389 U.S. 846 (1967) .......................................... 25

*Arizona v. United States,*
  567 U.S. 387 (2012).......................................................................................... 12

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta,*
  785 F.3d 710 (D.C. Cir. 2015) ............................................................................ 4

*Biodiversity Assocs. v. Cables,*
  357 F.3d 1152 (10th Cir. 2004) ........................................................................ 25

*Borden v. United States,*
  141 S. Ct. 1817 (2021).......................................................................................... 10

*Bowen v. Pub. Agencies Opposed to Social Security Entrapment,*
  477 U.S. 41 (1986).............................................................................................. 25

*CACI, Inc. v. Stone,*
  990 F.2d 1233 (Fed. Cir. 1993).......................................................................... 26

*CASA de Maryland, Inc. v. Trump,*
  971 F.3d 220 (4th Cir. 2020), *reh'g en banc granted*, 981 F.3d 311 (4th Cir. 2020).............. 28

*Cent. & S.W. Servs., Inc. v. EPA,*
  220 F.3d 683 (5th Cir. 2000) ............................................................................ 28

*Contributors to Pa. Hosp. v. City of Phila.,*
  245 U.S. 20 (1917)............................................................................................... 26

*Crane v. Johnson,*
  783 F.3d 244 (5th Cir. 2015) ............................................................................ 16

*Davidson v. Glickman,*
  169 F.3d 996 (5th Cir. 1999) ............................................................................ 26

*Dayton Bd. of Educ. v. Brinkman,*
  439 U.S. 1358 (1978)........................................................................................... 35

*Demore v. Kim*,
  538 U.S. 510 (2003) ................................................................................. 10, 11, 14, 15

*DHS v. New York*,
  140 S. Ct. 599 (2020), *denying modification*, 140 S. Ct. 2709 (2020) ..................................... 29

*Dolic v. Barr*,
  916 F.3d 680 (8th Cir. 2019) ............................................................................ 13

*E.T. v. Paxton*,
  19 F.4th 760 (5th Cir. 2021) ............................................................................ 36

*Freedom From Religion Found., Inc. v. Mack*,
  4 F.4th 306 (5th Cir. 2021) ............................................................................. 31

*Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. DHS*,
  490 F.3d 940 (Fed. Cir. 2007) .......................................................................... 24

*Holmes v. United States*,
  657 F.3d 1303 (Fed. Cir. 2011) ......................................................................... 24

*Illinois v. Lidster*,
  540 U.S. 419 (2004) .................................................................................... 10

*In re Deepwater Horizon*,
  732 F.3d 326 (5th Cir. 2013) ....................................................................... 31, 36

*Jennings v. Rodriguez*,
  138 S. Ct. 830 (2018) ............................................................................... 10, 15

*Judd v. Billington*,
  863 F.2d 103 (D.C. Cir. 1988) ........................................................................... 4

*Lane v. Pena*,
  518 U.S. 187 (1996) .................................................................................... 24

*Louisiana v. U.S. Army Corps of Eng'rs*,
  834 F.3d 574 (5th Cir. 2016) ............................................................................ 7

*Merrion v. Jicarilla Apache Tribe*,
  455 U.S. 130 (1982) .................................................................................... 26

*Moncrieffe v. Holder*,
  569 U.S. 184 (2013) ..................................................................................... 4

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) .................................................................................... 28

*Nielsen v. Preap,*
  139 S. Ct. 954 (2019)......................................................................... 10, 16, 17, 20

*Nken v. Holder,*
  556 U.S. 418 (2009)...................................................................................... 31

*North Side Lumber Co. v. Block,*
  753 F.2d 1482 (9th Cir.1985) ....................................................................... 25

*O'Donnell v. Harris Cnty.,*
  892 F.3d 147 (5th Cir. 2018) *overruled on other grounds by*
  *Daves v. Dallas Cnty.*, 22 F.4th 522 (5th Cir. 2022) ............................... 28

*Price v. Keisler,*
  251 F. App'x 703 (2d Cir. 2007) ................................................................. 13

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n,*
  324 F.3d 726 (D.C. Cir. 2003) ...................................................................... 7

*Reno v. Am-Arab Antidiscrimination Comm. ("AADC"),*
  525 U.S. 471 (1999)................................................................................. 18, 19

*Sanders v. United States,*
  252 F.3d 1329 (Fed. Cir. 2001) .................................................................... 24

*Stone v. Mississippi,*
  101 U.S. (11 Otto) 814 (1879) ..................................................................... 26

*Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.,*
  480 F.3d 1116 (Fed. Cir. 2007) .................................................................... 24

*Tex. All. for Retired Am. v Hughs,*
  976 F.3d 564 (5th Cir. 2020) ....................................................................... 31

*Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n,*
  989 F.3d 368 (5th Cir. 2021) ....................................................................... 27

*Texas v. Biden,*
  20 F.4th 928 (5th Cir. 2021), *cert. granted,*
  ---S. Ct.---, 2022 WL 497412 (U.S. Feb. 18, 2022)................................... 1

*Texas v. Biden,*
   --- F. Supp. 3d ---, 2:21-CV-067-Z, 2021 WL 3603341 (N.D. Tex. Aug. 13, 2021)
  *enforcement granted in part*, No. 2:21-CV-067-Z, 2021 WL 5399844 (N.D. Tex.
  Nov. 18, 2021), *aff'd*, 20 F.4th 928 (5th Cir. 2021), *as revised* (Dec. 21, 2021), and
  *cert. granted*, Order, *Biden v. Texas*, ---S. Ct.---,  No. 21-954, 2022 WL 497412
  (Feb. 18, 2022)............................................................................................... 23

*Texas v. Equal Employment Opportunity Commission,*
  933 F.3d 433 (5th Cir. 2019) ................................................................ 3

*Texas v. United States,*
  14 F.4th 332 (5th Cir.), *vacated*, 24 F.4th 407 (5th Cir. 2021)........................................... *passim*

*Texas v. United States,*
  352 F. Supp. 3d 665 (N.D. Tex. 2018) *aff'd in part, vacated in part, remanded,*
  945 F.3d 355 (5th Cir. 2019), *as revised* (Dec. 20, 2019), *as revised* (Jan. 9, 2020),
  *rev'd and remanded sub nom. California v. Texas,* 141 S. Ct. 2104 (2021) .......................... 30

*Texas v. United States,*
  549 F. Supp. 3d 572 (S.D. Tex. 2021), *appeal filed,*
  No. 21-40680 (5th Cir. Sept. 16, 2021) ................................................. 30

*Texas v. United States,*
  809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015)........................................ 32

*Texas v. United States,*
  ---F. Supp. 3d---, 2021 WL 3683913 (S.D. Tex. Aug. 19, 2021)................................ 2

*The Floyd Acceptances,*
  74 U.S. (7 Wall.) 666 (1868) .......................................................... 26

*Town of Castle Rock v. Gonzales,*
  545 U.S. 748 (2005)............................................................ 8, 9, 10, 16

*Town of Chester v. Laroe Ests., Inc.,*
  137 S. Ct. 1645 (2017)............................................................... 29

*Tucson Airport Auth. v. Gen. Dynamics Corp.,*
  136 F.3d 641 (9th Cir. 1998) ....................................................... 25

*U.S. Telecom Ass'n v. FCC,*
  359 F.3d 554 (D.C. Cir. 2004) ...................................................... 27

*U.S. Tr. Co. of N.Y. v. New Jersey,*
  431 U.S. 1 (1977)................................................................ 25, 26

*United States v. Duran-Gomez,*
  984 F.3d 366 (5th Cir. 2020), *cert denied,* 142 U.S. 133 (2021)............................... 13

*United States v. Jones,*
  131 U.S. 1 (1889)................................................................... 24

*United States v. King,*
  395 U.S. 1 (1969)................................................................... 25

*United States v. Winstar Corp.*,
  518 U.S. 839 (1996) ........................................................................... 24

*Warth v. Seldin*,
  422 U.S. 490 (1975) ........................................................................... 28

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ........................................................................... 27

**STATUTES**

5 U.S.C. § 704 ................................................................................. 1, 24

6 U.S.C. § 202 ............................................................................... 20, 31

8 U.S.C. § 1182 ................................................................................... 13

8 U.S.C. § 1226 ............................................................................ *passim*

8 U.S.C. § 1227 ................................................................................... 13

8 U.S.C. § 1231 ............................................................................ *passim*

28 U.S.C. § 1346 ................................................................................. 24

Colo. Rev. Stat. § 18-6-803.5 (Lexis 1999) ............................................ 8, 9

Pub. L. No. 100-690,
  102 Stat. 4470 (1988) ......................................................................... 11

Pub. L. No. 104-208,
  110 Stat. 3009 (1996) ......................................................................... 14

Pub. L. No. 116-260,
  134 Stat. 1182 (2020) ......................................................................... 14

Texas Health & Safety Code § 481.1161 ................................................... 5

**OTHER AUTHORITIES**

1 ABA Standards for Criminal Justice (2ed. 1980) ................................... 16

166 Cong. Rec. H8311 (daily ed. Dec. 21, 2020) ..................................... 14

Ninth Circuit General Order 6.4(c) (adopted Apr. 1, 2019),
  https://cdn.ca9.uscourts.gov/datastore/uploads/rules/general_orders/General%20
  Orders.pdf ........................................................................................... 5

Third Circuit Standing Order Regarding Immigration Cases,
    https://www.ca3.uscourts.gov/sites/ca3/files/BIA%20Standing%20Order%20final.pdf.......... 5

Thomas Homan Responses to QFRs,
https://www.judiciary.senate.gov/imo/media/doc/Homan%20Responses%20to%
20QFRs1.pdf........................................................................................................................ 13

Defendants provide this memorandum to address (1) areas on which this Court has sought elaboration, and (2) matters not fully addressed in earlier briefing related to the States' challenge to the Secretary of Homeland Security's *Guidelines for the Enforcement of Civil Immigration Law* (Sept. 30, 2021) ("September Guidance") (ECF No. 122-1). Otherwise, Defendants incorporate their previous arguments, including their opposition to the States' motion to enjoin the September Guidance. *See* Defs.' Mem. of P.&A. in Opp'n to Pls.' Mot. to Postpone the Effective Date of Agency Action or, in the Alternative, for Prelim. Inj., ECF No. 122 ("Defs.' PI Opp'n").

## I.  The September Guidance Is Not Final Agency Action.

In answer to this Court's question whether the challenged policy constitutes "final agency action" under the Administrative Procedure Act ("APA"), *see* Order, ECF No. 219, it does not. Rather, the September Guidance is "a nonbinding priority memo," and is thus a quintessential example of an "agency memo[] [that is] not final agency action under 5 U.S.C. § 704." *Texas v. Biden*, 20 F.4th 928, 986 (5th Cir. 2021), *cert. granted*, ---S. Ct.---, 2022 WL 497412 (U.S. Feb. 18, 2022) (mem.).

The September Guidance is nonbinding: it leaves the exercise of prosecutorial discretion to the judgment of DHS personnel on a case-by-case basis. *See* September Guidance at 3-5. By its express terms, it "does not compel an action to be taken or not taken." *Id.* at 5. Further, the September Guidance moves away from the class-based presumed priority groups from the previous interim enforcement guidance; it authorizes DHS personnel to exercise their discretion on a case-by-case basis after considering the totality of the circumstances. *See id*. at 3 (enforcement based on a "totality of the facts and circumstances" approach); *id.* at 4 ("[O]ur personnel must evaluate the individual and the totality of the facts and circumstances and exercise their judgment accordingly."); *id.* at 5 ("[This] guidance leaves the exercise of prosecutorial discretion to the

1

judgment of our personnel."). The use of a case-by-case approach is consistent with longstanding DHS practice. *See, e.g.,* Memorandum from John Kelly, Sec'y of Homeland Sec., *Enforcement of the Immigration Laws to Serve the National Interest* ("Kelly Memo") (Feb. 20, 2017), AR_DHSP_00000059, at AR0062 ("The exercise of prosecutorial discretion with regard to any alien who is subject to arrest, criminal prosecution, or removal in accordance with law shall be made on a case-by-case basis . . .").

While any law enforcement process involves officers interacting with their supervisors, the September Guidance does not impose any requirement for supervisory approval of officers' individual enforcement decisions that this Court previously found pertinent in its final agency action analysis. *See Texas v. United States*, ---F. Supp. 3d---, 2021 WL 3683913, at *25 (S.D. Tex. Aug. 19, 2021) (identifying the previous interim enforcement guidance's requirement that "other priority" actions receive preapproval by the Field Office Director as a reason the policy was final agency action, notwithstanding Defendants' arguments to the contrary). To the extent that subordinates consult with their supervisors in the exercise of their authority, that is no different from how ICE has historically operated. *See, e.g.,* Kelly Memo at AR0062 ("The exercise of prosecutorial discretion . . . shall be made on a case-by-case basis *in consultation with the head of the field office component*.") (emphasis added); *see also* Memorandum from John Morton, ICE Dir., *Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens* ("Morton 2011 Memo") (June 17, 2011), AR_DHSP_00000047, at AR0049 ("Prosecutorial discretion in civil immigration enforcement matters is held by the Director and may be exercised, with appropriate supervisory oversight, by the following ICE employees according to their specific responsibilities and authorities . . ."). In fact, the States acknowledge the propriety of supervisory review. 2/24

2

AM Trial Tr. at 2-90:13-16 ("[W]e're not saying that there's some sort of right of the lowest level decisionmaker within DHS to do what they want. We're saying—you know, there could be supervisory control").

Thus, the September Guidance is unlike the guidance at issue in *Texas v. Equal Employment Opportunity Commission,* 933 F.3d 433, 443-44 (5th Cir. 2019), in which the Fifth Circuit found EEOC guidance to constitute final agency action. In that case, Texas challenged "EEOC's guidance on employers' use of criminal records in hiring." *Id*. at 437. First, the Fifth Circuit found EEOC's guidance was binding because it left "no room for EEOC staff *not* to issue referrals to the Attorney General when an employer uses a categorical felon-hiring ban." *Id*. at 443 (emphasis in original). But, here, the core feature of the September Guidance is the discretion it leaves to line officers to make individual enforcement decisions. Second, the Fifth Circuit found that EEOC's multi-factor test for employers to use in place of a categorical federal-hiring ban dictated rights and obligations by serving as a "playbook for employers to use to avoid liability." *Id*. at 443-44. Here, there is no multi-factor test for a regulated party to use as a safe harbor. Rather, the September Guidance describes a totality of the circumstances approach for ICE officers to exercise their judgment that is necessarily case- and fact-specific, and removable noncitizens remain subject to removal even if the officer declines to take an immediate enforcement action.

The States have suggested that one phrase—DHS "personnel should not rely on the fact of conviction or the result of a database search alone" to decide whether a noncitizen is a threat to public safety—restricts the authority of officers, such that the September Guidance is final agency action. *See* 2/24 AM Trial Tr. at 2-126:19-23 (referring to September Guidance at 4). This theory is wrong for a number of reasons. First, this phrase in context merely explains the meaning of a totality-of-circumstances approach, as this approach differs from the presumed priority categories

under the interim enforcement guidance. In fact, confirming this context, the very next sentence of the September Guidance further explains: "our personnel should, to the fullest extent possible, obtain and review the entire criminal and administrative record and other investigative information to learn of the totality of the facts and circumstances of the conduct at issue." *Id*. Next, neither this phrase, nor any part of the September Guidance, prevents a fact of conviction or a database search from being the determinative factor in a decision to take an enforcement action—officers should just consider the complete set of reasonably available information in making that decision.

Additionally, the plain language of the September Guidance does not *require* officers to abstain from making an enforcement decision based on a conviction or a database search. Language like "should," as in the phrase singled out by the States, "suggests that the provisions that follow are meant to be 'precatory, not mandatory.'" *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 718 (D.C. Cir. 2015) (quoting *Judd v. Billington,* 863 F.2d 103, 106 (D.C. Cir. 1988)). "Even if the [September Guidance] arguably inclines [line officers] towards certain outcomes when evaluating [enforcement decisions], it does not constrain their discretion enough to create a binding norm." *See id.* The September Guidance thus does not dictate the outcome in any particular case. *See id.* at 118-19 (agency guidance to safety inspectors "on what to look for" was not "final agency action" because it "preserves the aviation safety inspectors' discretion" in "an individual case," "[e]ven if [it] arguably inclines aviation safety inspectors towards certain outcomes").

In any event, the States' apparent focus on this phrase is odd because consideration of information beyond the mere fact of conviction would be necessary *even under their theory of the case*, due to the categorical approach for the application of state criminal statutes in the federal context. *See, e.g., Moncrieffe v. Holder*, 569 U.S. 184 (2013) (outlining the categorical approach

that must be applied to state convictions for immigration consequences). That is, the question of whether a noncitizen is potentially covered by § 1226(c) generally cannot be determined by the fact of conviction or a database search alone. As discussed during closing arguments, DHS officials generally have to engage in a categorical or modified categorical analysis of the state statute under which the noncitizen was convicted—and often must examine underlying documents about the noncitizen's state court proceeding—to determine whether § 1226(c) even applies. *See, e.g.*, 2/24 PM Trial Tr. at 2-19-2-24 (citing *Alejos-Perez v. Garland*, 991 F.3d 642 (5th Cir. 2021)) as an example of the application of the categorical approach); *see also* Decl. of Thomas Decker ("Decker Decl.") ¶ 8, AR_DHSP_00005780 ("[D]etermining whether [an] individual is subject to 8 U.S.C. § 1226(c)(1) or 8 U.S.C. § 1231(a)(2) requires legal analysis secondary to the determination that probable cause exists as to removability."); *see generally Alejos-Perez*, 991 F.3d at 647 (conviction for violating Texas Health & Safety Code § 481.1161(a), Penalty Group 2-A is not a categorical match to federal controlled substance statute; remanding case to Board of Immigration Appeals to apply modified categorical approach in first instance).

Determining whether a noncitizen is within the removal period defined in § 1231 also often requires more than a simple database search, including a review of underlying court cases and court procedures. For example, the Ninth Circuit, in which a large percentage of petitions for review (PFR) are filed, automatically stays the removal of any noncitizen with a pending PFR and stay motion until the Court rules on the motion. *See* Ninth Circuit 6.4(c) (adopted Apr. 1, 2019), available at https://cdn.ca9.uscourts.gov/datastore/uploads/rules/general_orders/ General%20Orders.pdf;; *see also* Third Circuit Standing Order Regarding Immigration Cases, available at https://www.ca3.uscourts.gov/sites/ca3/files/BIA%20Standing%20Order %20final.pdf (outlining procedures in the Third Circuit).

In the end, the September Guidance is clear on its face that it does not impact rights or obligations. To the extent that the Court goes outside the four corners of the policy document itself and outside the administrative record, the next-most probative evidence is the ICE training for officers about how to apply the September Guidance. *See Guidelines for the Enforcement of Civil Immigration Law, Foundational Training*, Pls.' Trial Ex. Y. The training reinforces that the purpose of the September Guidance is "thoughtful consideration of the totality of the facts and circumstances in each and every case," *id.* at 11, and that the Secretary has delegated his "discretionary power . . . to YOU, as [ICE] officers," *id.* at 10. *See also id.* at 23 ("Judgment belongs in law enforcement decisions. That decision, no matter how complicated, warrants thoughtful consideration of the totality of the facts and circumstances in each case.").

At trial, the States directed the Court to the testimony of Thomas Homan, *see* 2/24 PM Trial Tr. at 2-126: 13-15, but the Court should give zero weight to Mr. Homan's speculation about the impact of the September Guidance. Mr. Homan did not review the training that officers received about implementing the September Guidance, despite acknowledging that such trainings were critical to understanding how officers would implement a given priority scheme. *See* 2/23 PM Trial Tr. at 170-172, Testimony of Thomas Homan (acknowledging both that training was important to understanding how a policy would be implemented and understood, and also that he did not review Plaintiffs' Trial Exhibit Y, the training document, in reaching his conclusions). Moreover, a similar prediction that Mr. Homan made about the Interim Guidance was incorrect. *Compare* Decl. of Thomas Homan, ECF No. 19-4 at ¶ 29 ("ICE officers are likely to treat the 'priorities' as categorical rules rather than presumptions to be rebutted on a case-by-case basis."), *with* Memorandum regarding Conclusions Drawn from "AART" Data (Sept. 24, 2021), AR_DHSP_00000108 (second-most-frequent type of enforcement actions were against

noncitizens in the "other priority" category; over 90% of requests for preapproval of enforcement actions against "other priority" noncitizens were granted). At best, Mr. Homan's prior prediction was wrong, and he is under-informed about the current policy, so the Court should disregard his speculation that the September Guidance has a binding effect.

Nor does the September Guidance determine rights or obligations or cause legal consequences with respect to noncitizens or the States. Noncitizens with no legal right to remain in the United States still have no legal right to remain, just as before. Defs.' PI Opp'n at 24-25. Noncitizens subject to arrest and detention remain subject to arrest and detention, just as before. Nothing in the September Guidance exempts, or purports to exempt, any person or class of persons from enforcement. Indeed, the guidance is explicit that it does not "create any right or benefit." September Guidance at 7. Thus, noncitizens cannot invoke the September Guidance to avoid removal or obtain release from detention. Instead, it is only later actions by government officials—culminating in a final order of removal, for example—that determine any noncitizen's legal rights. To be sure, the September Guidance may have downstream consequences, perhaps resulting in DHS taking enforcement action against one noncitizen it otherwise would not have, or deferring enforcement action against a different noncitizen it otherwise might not have. But "any such consequences are practical, as opposed to legal, ones." *Louisiana v. U.S. Army Corps of Eng'rs*, 834 F.3d 574, 583 (5th Cir. 2016); *see also Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 732 (D.C. Cir. 2003). And it is only *legal* consequences that establish finality for purposes of the APA.

As to the States, Texas and Louisiana have the same legal obligations today to, for example, provide a public education on equal terms to noncitizen children, as they did before the priorities became effective and as they did in the previous administration. Defs.' PI Opp'n, at 24 (noting that

the States did not rely on this theory of final agency action). That is because it is the Constitution, not the September Guidance, that "set[s] forth" the States' "right and obligations" in this regard. *Id.* Or, in the case of Medicaid payments or other expenses the States allegedly incur, it is other state or federal statutes that require the action.

For all of these reasons, the September Guidance is not final agency action.

## II.     The September Guidance is Consistent with 8 U.S.C. §§ 1226(c) and 1231(a)(2).

### A.  Reconciling *Demore* and *Castle Rock*.

The Court also asked the Parties to address "[t]he relationship between *Town of Castle Rock v. Gonzales*. . ., and *Demore v. Kim* . . ., including whether there is 'some stronger indication' from Congress that 'shall' under 8 U.S.C. §§ 1226(c) and 1231(a)(2) means must." ECF No. 219 (citations omitted).

In *Town of Castle Rock*, the Supreme Court examined a Colorado statute that provided, among other things, that police "shall arrest, or . . . seek a warrant for the arrest" of any person whom the officer had probable cause to believe was violating a protective order. *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 759 (2005) (quoting Colo. Rev. Stat. § 18-6-803.5(3) (Lexis 1999)). The plaintiff in that case contended that the statutory provision—reiterated in the text of a protective order issued by a court—imposed a mandatory duty on the town's police department and its officers to arrest or seek a warrant for the arrest of any person the police had probable cause to believe was violating a protective order, just as the statutory text provided. *Id.* at 756. The Supreme Court rejected the plaintiffs' mandatory reading of the state statute, holding that the "deep-rooted" discretion afforded to law enforcement authorities to decide how and in what circumstances to exercise their authority persisted "even in the presence of seemingly mandatory

legislative commands."[1] *Id.* at 761. For a statute actually to displace that discretion, the Supreme Court held, would require "some stronger indication" than presented by the statute at hand. *Id.*

The Supreme Court held that the state statute did not impose a mandatory duty even though there were many "indication[s]" that the state legislature wanted the provision to be a "true mandate." *Id.* Justice Stevens, writing in dissent, recounted at length the specific legislative history for the Colorado statute, observing that Colorado had "joined a nationwide movement of States that took aim at the crisis of police underenforcement in the domestic violence sphere by implementing 'mandatory arrest' statutes." *Id.* at 780 (Stevens, J., dissenting). "The purpose of these statutes," Justice Stevens explained, "was precisely to counter police resistance to arrests in the domestic violence cases by removing or restricting police officer discretion." *Id.* at 781 (citation omitted); *see also id.* at 780 n.7 (citing a Colorado legal journal describing the statute as "mandat[ing] the arrest of . . . restraining order violaters [sic]"). Justice Stevens also noted that "the same statute, at other times, tellingly employs different language that suggests police discretion"—that is, other provisions in the same statute contrast "shall" with "may." *Id.* at 775 (quoting Colo. Rev. Stat. § 18-6-803.5(6)(a)). In light of this evidence, in Justice Stevens' view, "it is clear that the elimination of police discretion was integral to Colorado and its fellow States' solution to the problem of underenforcement in domestic violence cases." *Id.* at 782.

But the *Castle Rock* majority rejected all those arguments. Faced with a statute that (1) used the word "shall," (2) contrasted that use with "may" elsewhere in the same statute, and (3) was supported by legislative history that indicated a clear legislative purpose to increase enforcement (and according to Justice Stevens to cabin executive discretion), the Supreme Court held still that

---

[1] The Supreme Court had to interpret the Colorado statute because "[r]esolution of the federal issue," that is, whether there was a valid federal constitutional claim, "begins . . . with a determination of what it is that state law provides." *Town of Castle Rock*, 545 U.S. at 757.

"some stronger indication" was required. *Id.* at 761 (majority op.). Thus, faced here with two statutory provisions (8 U.S.C. §§ 1226 and 1231) that similarly relate to law enforcement's traditional area of discretion—whom to arrest under what circumstances—the Court should follow *Castle Rock* and conclude that neither the statutory language ("shall"), structure (shall/may), legislative history (a desire to increase enforcement), nor all three together, are sufficient to overcome that inherent discretion.

The Supreme Court's decision a few years earlier in *Demore* does nothing to undermine this analysis. *Demore v. Kim*, 538 U.S. 510 (2003). First, *Demore* and other cases (such as *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018) and *Nielsen v. Preap*, 139 S. Ct. 954 (2019)) that discuss § 1226 or § 1231 addressed an entirely different context, and any broad pronouncements therein properly should be limited to that context. *See Illinois v. Lidster*, 540 U.S. 419, 424 (2004) (Courts "must read . . . general language in judicial opinions [ ] as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering."); *Borden v. United States*, 141 S. Ct. 1817, 1833 n.9 (2021) (observing that even the Supreme Court "sometimes" does "not paraphrase complex statutory language as well as we might" and that "[w]hat matters . . . is not a one-line description, but a pages-long analysis."). Those cases arose in the context of a detained noncitizen challenging his *continued* detention. Those cases did not address (much less decide) whether § 1226 or § 1231 imposed a mandatory duty on the executive branch to "take custody" of all noncitizens described in those provisions. *See generally Demore*, 538 U.S. 510; *Preap*, 139 S. Ct. 954; *Jennings*, 138 S. Ct. 830; *see also* Defs.' PI Opp'n, at 31 (citing *Texas v. United States*, 14 F.4th 332, 338-39 (5th Cir.), *vacated*, 24 F.4th 407 (5th Cir. 2021) (finding that "[t]hose cases do not consider whether the statutes eliminate the government's traditional prerogative to decide who to charge in

enforcement proceedings (and thus who ends up being detained)," because the cases "are ones in which detainees subject to enforcement action were seeking their release").[2]

But even setting aside the distinct contexts of those cases that render them generally unhelpful in *this* context, they do not identify any stronger indication that would displace traditional law enforcement discretion as to who to arrest in the first instance. In *Demore* itself, the noncitizen challenged the "absolute prohibition on his release from detention" in § 1226(c). 538 U.S. at 523; *see also id.* at 514 n.2. The Supreme Court observed that the statute "mandates detention" during removal proceedings for noncitizens such as the respondent. *Id.* at 517-18. The Supreme Court then described the Attorney General's previously held "broad discretion to conduct individualized bond hearings and to release criminal aliens from custody during their removal proceedings," 538 U.S. at 519, and described Congress's efforts in 1988 legislation to "limit[] the Attorney General's discretion over custody determinations," *id.* at 520-21 (citing Pub. L. No. 100-690 § 7343(a), 102 Stat. 4470 (1988)). *See also id.* at 519 (citing Senate report criticizing former Immigration and Naturalization Service's ("INS") "release determinations"). The 1988 provision to which the Supreme Court referred was titled "Retention in Custody by the Attorney General," and, similar to § 1226, provided that the Attorney General "shall not release" certain noncitizens. Pub. L. No. 100-690 § 7343(a). The Supreme Court then briefly described the "wholesale reform" of immigration laws that included the "mandatory detention" provisions that categorically prohibited the respondent's release. *Demore*, 538 U.S. at 521.

*Demore* therefore does not upset the ordinary application of *Castle Rock*'s analysis to the States' statutory claim for three principal reasons. First, as noted, *Demore* did not confront the

---

[2] As Defendants have previously argued, this Court should give the Fifth Circuit's panel stay decision persuasive weight notwithstanding it was later vacated following the rescission of the interim priorities. *See* Resp. to Pls.' Notice of Suppl. Auth. (ECF No. 131).

question of whether § 1226(c) eliminated immigration officials' otherwise preexisting and "broad discretion," which the Supreme Court later underscored is "a principal feature of the removal system," to "decide whether it makes sense to pursue removal at all." *Arizona v. United States*, 567 U.S. 387, 396 (2012). The question whether Congress had displaced the longstanding and "deep-rooted" enforcement discretion to decide who to arrest in the first place was not briefed or argued. The Supreme Court also did not discuss or consider the practical implications of such an interpretation, which are vast.

For one, the requirement to make individual determinations whether a noncitizen is described in § 1226(c)(1) *before* taking that person into custody would place a huge burden on line officers. Line officers are ill-equipped to perform the necessary legal analysis; Mr. Homan, with 32 years of experience enforcing immigration laws including time in key leadership roles in Enforcement and Removal Operations ("ERO") and as Acting Director of ICE itself, did not appear to be familiar with *either* § 1226 or § 1231—even after reviewing the statutes. *See* 2/23 PM Trial Tr. at 108:19-21; 110:4-16; 125:19-22, Testimony of Thomas Homan. Nor was he familiar with the basic contours of the categorical approach. *Id.* at 113:16-114:2. As explained by Peter Berg, serving in the role of Acting Deputy Director of ERO, "the complexities of the immigration laws" mean that ICE officials typically can make a 1226(c) determination only after taking an individual into custody, since such a determination "may require obtaining and reviewing criminal records and ever-evolving developments in caselaw." *See* Decl. of Peter Berg ("Berg Decl.") ¶ 22, AR_DHSP_00006029; *see, e.g.*, *Alejos-Perez*, 991 F.3d 642 (applying the modified categorical approach to a Texas drug-related conviction). And the attorneys qualified to advise on those judgments are already swamped by massive caseloads representing DHS in immigration court. *See Significant Considerations in Developing Updated Guidelines for the Enforcement of Civil*

*Immigration Law* ("Considerations Memo"), AR_DHSP_00000001, at AR006. It would thus place an additional strain on those attorneys' resources to shift them to advising officers and agents in making § 1226(c) determinations for every individual encountered, whether or not in DHS custody.

For another, the Supreme Court in *Demore* did not confront the breadth of such an inferred mandate, or how to reconcile such a mandate with Congress's limited appropriations. Section 1226(c)(1) describes a wide range of conduct—not just noncitizens who are inadmissible for having been convicted of a law "relating to a controlled substance," 8 U.S.C. § 1182(a)(2)(A)(i)(II), or deportable for having been convicted of an "aggravated felony," *id.* § 1227(a)(2)(A)(iii), but also any noncitizen convicted of any of a number of undeniably less serious offenses, such as passing a bad check, *see Dolic v. Barr*, 916 F.3d 680, 684-85 (8th Cir. 2019) (holding that Missouri "crime of passing bad checks" is a crime "involving moral turpitude" under the INA); *United States v. Duran-Gomez*, 984 F.3d 366, 371 n.3 (5th Cir. 2020) ("misdemeanor shoplifting conviction" was a crime involving moral turpitude), *cert. denied*, 142 U.S. 133 (2021); *Price v. Keisler*, 251 F. App'x 703, 705 (2d Cir. 2007) (similar); 8 U.S.C. § 1182(a)(2)(A)(i)(I).[3] In addition, Mr. Homan estimated there were around 700,000 noncitizens with final orders of removal in 2013, and would not have been shocked to hear there were as many as 900,000. *See* 2/23 PM Trial Tr. at 127:8-19, Testimony of Thomas Homan; *see also* Thomas Homan Responses to QFRs, https://www.judiciary.senate.gov/imo/media/doc/

---

[3] In closing argument, counsel for Defendants suggested that § 1226(c) would apply to certain conduct, such as prostitution or drug addiction, even without a conviction. *See, e.g.*, 2/24 PM Tr. at 2-82:14-22. However, in light of § 1226(c)(1)(A) through (c)(1)(C) applying when a noncitizen has "committed an offense" described in the cross referenced statutes, determinations of § 1226(c)(2)'s mandatory detention provisions are generally made using the fact of a conviction.

Homan%20Responses%20to%20QFRs1.pdf, at 2 (last accessed Mar. 16, 2022) ("As of May 21, 2016, there were 950,062 aliens with final orders of removal on [ICE's] national docket").[4]

For DHS to take into custody and detain all such individuals pending removal proceedings would require an immense increase in ICE resources, not to mention the resource implications of the States' reading of § 1231(a)(2). Mr. Homan speculated that ICE could increase detention capacity to "maybe" 184,000 at most, at a cost of $6 billion. 2/23 PM Trial Tr. at 200:20, 202:2-9, Testimony of Thomas Homan.[5] In Fiscal Year 2021, Congress appropriated approximately $8 billion for *all* ICE operations—and only $4,118,902,000 specifically "for enforcement, detention, and removal operations, including transportation of unaccompanied minor aliens." Pub. L. No. 116-260, 134 Stat. 1182, 1452 (2020). The Joint Explanatory statement further clarifies that Congress appropriated just $2,836,128,000 for Custody Operations. *See* 166 Cong. Rec. H8311, H8494 (daily ed. Dec. 21, 2020). Even in adopting these new statutory provisions in 1996, Congress provided funding only to support an increase in detention "to at least 9,000 beds" during Fiscal year 1997. *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208 § 386(a), 110 Stat. 3009-653. Had Congress truly intended the statutes to mandate that DHS detain every noncitizen they described, it would have appropriated vastly more funding—or at the least, the Supreme Court in *Demore* would have had to confront that anomaly.

Second, *Demore* does not displace *Castle Rock*'s application here because it dealt narrowly with the "absolute prohibition" on *release* from custody in § 1226(c)(2). *Demore*, 538 U.S. at 514

---

[4] Although not all individuals with final orders of removal are necessarily within the removal period as defined in 8 U.S.C. § 1231(a)(1), the number would still be substantial given case flows in both immigration courts and reviewing Article III courts. *See supra* at 5 (referring to processes in the Ninth and Third Circuits as examples of automatic administrative stays).

[5] Mr. Homan appears to have extrapolated from a current cost of $2 billion for 34,000 beds. 2/23 Trial Tr. at 202:24-203:1. Even if costs increase linearly, without any basis for such a presumption, an additional 150,000 beds would cost closer to $9 billion.

n.2. That was the statutory provision actually at issue and the context in which the Supreme Court described the statute as "mandatory." *Cf. id.* at 513 n.1 (describing § 1226(c)(1), the "shall take into custody" provision, as "authoriz[ing]" detention). As Defendants have explained, DHS and its predecessors have long understood both § 1226 and § 1231 to constrain their traditional discretion to *release* certain noncitizens once in custody. *See, e.g.*, Memorandum from Doris Meissner, Comm'r, INS, *Exercising Prosecutorial Discretion* ("Meissner Memo") (Nov. 17, 2000), AR_DHSP_00000030, at AR0032; Considerations Memo at AR0018-AR0019. The "stronger indication" in those provisions—what the Supreme Court in *Demore* refers to as "mandatory detention" provisions—appears in the statutory text itself: release for certain noncitizens during removal proceedings is authorized "only if" certain conditions are met, 8 U.S.C. § 1226(c)(2), and, for certain noncitizens during the removal period release, is authorized "[u]nder no circumstance," *id.* § 1231(a)(2). *See also Jennings*, 138 S. Ct. at 846 (emphasizing the "only if" language as limiting discretion to release); *id.* at 846-47 ("By expressly stating that the covered aliens may be released 'only if' certain conditions are met, 8 U.S.C. § 1226(c)(2), the statute expressly and unequivocally imposes an affirmative *prohibition* on releasing detained aliens under any other conditions."). Indeed, DHS has made clear that the September Guidance is consistent with this interpretation. *See* Considerations Memo at AR0019 ("The Department's updated *Guidelines for the Enforcement of Civil Immigration Law* are fully consistent with these constraints and do not purport to override them.").

Third, the reference in *Demore* to Congress's broad intent to increase immigration enforcement as to criminal noncitizens, in particular reference to concerns of recidivism and absconding, is no stronger—and indeed is weaker—than the legislative intent considered, and rejected as inadequate, in *Castle Rock*. Even if Congress sought to constrain the discretion to

15

release certain noncitizens once in custody, that is a long way from a specific intent to make *arrest* mandatory. *Cf. Crane v. Johnson*, 783 F.3d 244, 247 (5th Cir. 2015) ("the concerns justifying criminal prosecutorial discretion are 'greatly magnified in the deportation context'"). Such an intent is belied by Congress's repeated failure to appropriate sufficient funds for such a mandate—including in the 1996 amendments themselves. *Cf.* 1 ABA Standards for Criminal Justice 1–4.5, commentary, pp. 1–124 to 1–125 (2d ed.1980) (noting "insufficient resources" and "physical impossibility" emanating principles of prosecutorial discretion even with seemingly mandatory commands), *accord Town of Castle Rock*, 545 U.S. at 761. And even if some legislative history did indicate that some members of Congress had such an intent, such legislative history would still be insufficient under the Supreme Court's analysis in *Castle Rock*. To be a "true mandate," there must be a "stronger indication" than was present in *Castle Rock*: (1) the use of the word "shall," (2) the contrast of "shall" with "may," and (3) clear legislative intent to confine discretion. Even all three of those is not enough; there must be something more—as is found in the text of the provisions prohibiting release.

This understanding of § 1226(c) is buttressed by the Supreme Court's decision in *Preap*. In *Preap*, some plaintiffs were arrested "several years" after they were released from state criminal confinement. *Preap*, 139 S. Ct. at 961. There, as in *Demore*, the noncitizens challenged their continued "mandatory detention"—that is, their detention without the opportunity or possibility of release. The noncitizens' specific argument was that § 1226(c)(1) required DHS to, as the statute reads, take them "into custody" at the time when they were "released" from state custody. Because their later arrests did not comply with § 1226(c)(1)'s "when . . . released" provision, they argued, DHS could not detain them subject to § 1226(c)(2)'s "mandatory detention" provisions. The Supreme Court rejected the noncitizens' argument that § 1226(c)(1) imposed a judicially

16

enforceable mandate. Rather, the Supreme Court explained, the "shall take into custody . . . when the alien is released" provision only "exhorted" the Secretary to act quickly. *Id.* at 978. And it rejected the dissent's insistence that any obligation § 1226(c)(1) imposed on DHS could be judicially enforced: that "Congress *expects* the Executive to meet a deadline" is not "proof that Congress wanted the deadline *enforced by courts*." *Id.* at 969 n.6 (emphasis in original). Put otherwise, the Supreme Court would not require the Executive to "take into custody" noncitizens "when . . . released" from state custody. But the restriction on release in § 1226(c)(2) did in fact prohibit the noncitizens' release in *Preap*, just as it had in *Demore*.

In sum, *Castle Rock* requires "some stronger indication" than was present in that case, and nothing in *Demore* or anywhere else identifies any such stronger indication with regard to § 1226(c)(1) or § 1231(a)(2).

### B.  The difference between "detention" and "take into custody."

Additionally, the Court asked the parties to address the "difference, if any, between 'custody' and 'detention' under 8 U.S.C. §§ 1226 and 1231 and how that impacts the present case." ECF No. 219.

It is Defendants' position that any distinction between the term "custody" and the term "detention," as applied to ICE's actions under §§ 1226(c) and 1231(a)(2), has no bearing on the issues in this case. A noncitizen is in ICE's "custody" or in "detention" once ICE takes physical control of the individual, such as by putting on the handcuffs, putting the individual into a DHS vehicle, or processing the individual at a DHS immigration detention facility. Defendants do not believe that any distinctions between those two terms, "detention" and "custody," bear on the issues in this case.

Rather, Defendants draw a distinction between the status of being "in custody" or "in detention" (which implicates the question of whether and when release from custody or detention

may be considered) and the predicate act to "take into custody" or to "detain" the noncitizen in the first place. Section 1226(c)(1) provides that DHS "shall take into custody" certain noncitizens. Section 1231(a)(2) provides that DHS "shall detain" certain noncitizens. These provisions, however, do not displace the traditional law enforcement discretion in this context. Separately, § 1226(c)(2) provides that DHS "may release" certain noncitizens "only if" described conditions are met, and the second sentence of § 1231(a)(2) provides that "[u]nder no circumstance" shall DHS "release" certain noncitizens during the removal period. DHS has long understood these provisions to limit their discretion to *release* certain noncitizens *after* they are already in DHS custody or detention. *See Texas v. United States*, 14 F.4th at 337-40 (contrasting Executive's "deep-rooted tradition of enforcement discretion" over "who should be subject to arrest, detainers, and removal proceedings," with statutory restrictions on who can be released from detention).

This distinction between, on the one hand, the predicate act to "take into custody" or to "detain" a noncitizen, and on the other, to release someone *already* "in custody" or "in detention" does matter. DHS understands the relevant provisions of the INA to limit its discretion as to who it can release once a noncitizen is already in detention. The September Guidance before the Court does not speak to questions of "release" from detention. *See* September Guidance at 1 ("This memorandum provides guidance for the apprehension and removal of noncitizens."); Considerations Memo at AR0019 (stating that the September Guidance does "not purport to override" these statutory provisions).

The INA does not, by contrast, limit DHS's discretion to decide who to "take into custody" or who to "detain" in the first instance. This reflects immigration officials' longstanding understanding of the statutory provisions, as established in, for example, the Meissner Memo from shortly after these provisions were adopted. *See* Meissner Memo at AR0032; *see also Reno v. Am.-*

*Arab Anti-Discrimination Comm., ("AADC")*, 525 U.S. 471, 483 (1999) (noting that "[a] each stage the Executive has discretion to abandon the endeavor" of removal). It also reflects ICE's longstanding practice, as described by the States' three witnesses, and by Mr. Homan in particular. *See* 2/23 AM Trial Tr. at 68:9-20, Testimony of Jason Clark (testifying that detainers could be dropped for medical reasons, because the individual was a juvenile, or because of difficulties in effectuating removal); 2/23 PM Trial Tr. at 37:2-10, Testimony of Robert Moore (testifying that detainers could be dropped for medical reasons or because of difficulties in effectuating removal); 2/23 PM Trial Tr. at 148:23-151:1, Testimony of Thomas Homan (describing examples where he would exercise prosecutorial discretion to decline to take an individual into custody, including where the individual was subject to a final order of removal).

### C.  The September Guidance would not contradict even the States' interpretation of the statutes.

The Court also asked the Parties to address "[w]hether and how the challenged guidance is contrary to law under the APA if 'shall' in 8 U.S.C. §§ 1226 and 1231 is mandatory." ECF No. 219. The September Guidance would not violate any mandatory statutory duty to "take into custody" or to "detain" certain noncitizens, even if such duties existed. As an initial matter, the September Guidance touches upon a wide range of circumstances unrelated to these provisions. For example, it covers the apprehension of dangerous noncitizens not covered by 8 U.S.C. § 1226(c), such as the hypothetical rapist released from state custody on bail before a conviction. *See* 2/23 PM Trial Tr. at 77:2-9, Testimony of Thomas Homan (discussing perceived flaws in the Interim Guidance). And it relates to other matters, such as how ICE trial attorneys, faced with massive immigration court caseloads and backlogs, must use their discretionary authority to effectively and efficiently pursue removal of the highest priority individuals. But, regardless, nothing in the September Guidance precludes DHS officials from complying with such purported

mandates; indeed, the September Guidance is explicit that it "does not compel an action to be taken or not taken." September Guidance at 5.

Immigration officers may still arrest any noncitizen they determine to be a worthy use of resources, guided by consideration of aggravating and mitigating circumstances. *See generally* September Guidance. Nothing in § 1226(c) or § 1231(a)(2) prevents the Secretary from exercising his explicit statutory authority to set national immigration enforcement priorities or prohibits him from exercising that authority with respect to noncitizens described in those statutes. *See* 6 U.S.C. § 202(5). As the administrative record demonstrates, and as Mr. Homan confirmed, immigration officials have long prioritized enforcement against more dangerous individuals in light of limited resources. *See, e.g.*, Kelly Memo at AR0060 ("The Director of ICE, the Commissioner of CBP and the Director of USCIS may, as they determine is appropriate, issue further guidance to allocate appropriate resources to prioritize enforcement activities within these categories—for example, by prioritizing enforcement activities against removable aliens who are convicted felons or who are involved in gang activity or drug trafficking."); 2/23 PM Trial Tr. at 142:19-20, Testimony of Thomas Homan ("[P]rioritization is important in any law enforcement agency."); *id.* at 143:10-11 ("Law enforcement officers need to enforce their job, they need to enforce the law in a prioritized way."); *id.* at 143:15 ("Prioritization is always important."); *id.* at 155:20-23 (Mr. Homan agreeing that "it's wise to prioritize an action against someone who is convicted of homicide over someone who was engaged in prostitution").

As *Preap* illustrates, DHS is not always able to effectuate an arrest at the time a noncitizen is released from state or local custody. Indeed, Justice Kavanaugh expressly recognized that "resource constraints" might prevent DHS from doing so. *Preap*, 139 S. Ct. at 973 (Kavanaugh, J., concurring). The September Guidance, like the enforcement priorities of previous

administrations, instructs DHS personnel to focus their limited resources on the most serious threats to national security, border security, and public safety. Nothing in § 1226 or § 1231, even as interpreted by the States, prohibits those sensible priorities.

Moreover, the September Guidance differs in important ways from the previous interim enforcement guidance that this Court previously examined. The interim enforcement guidance, as this Court knows, created a "pre-approval" process for enforcement actions against a large category of noncitizens, including many described within the provisions of § 1226(c)(1) or § 1231(a)(2). Although Defendants believe that the preapproval process did not unduly encumber officers from acting in compliance with these supposed mandates, that putative barrier to enforcement has been eliminated from the Secretary's guidance now in effect. *See* Considerations Memo at AR0020 ("The guidelines also will differ from the interim priorities by dispensing with the pre-approval process in the exercise of this discretion."). Relatedly, the September Guidance now under review does not use the bright-line category of "aggravated felon" to define presumed priorities. *Id*. at AR0019 (finding such a presumption "both under- and over-inclusive").

In the end, the September Guidance does not exclude any noncitizen from enforcement, whether that individual falls within one of the supposed "mandatory" categories or not.

### III.  Judgment Should Enter for Defendants on the States' Purported Breach of Contract Claim, Count V.

One matter not previously addressed in the parties' briefing on the States' motion to enjoin the September Guidance was Count V of the First Amended Complaint (ECF No. 109), the States' claim that contracts between the States and the Department of Homeland Security required DHS to provide them with a 180-day comment period before changing immigration enforcement priorities. The Court should grant judgment to Defendants on Count V. If valid, such agreements would present grave constitutional and practical problems by effectively granting states a pocket

veto over the Executive's duty to set immigration policy. No binding, enforceable contract was ever formed, but to the extent one was, DHS cancelled the pact pursuant to the document's termination provision.

### A.  If the contract ever existed, DHS terminated it in February of 2021.

For the reasons explained below, no enforceable contract existed between the States and DHS and, if one did, this Court would lack jurisdiction to enforce it. But Defendants also prevail for a more straightforward reason: DHS followed the purported agreements' termination provisions by providing written notice more than 180 days before the September Guidance became effective. *See, e.g.*, Louisiana Agreement, AR_DHSP_00005501, at AR5508 (termination provision providing for termination upon 180 days notice).

In letters dated February 2, 2021, signed by Acting Secretary of Homeland Security David Pekoske and addressed to Texas and Louisiana (as well as other states and local government entities), DHS stated that the purported agreements were unenforceable and non-binding, as DHS had noted in litigation filings. Ex. C, AR_DHSP_00005763; Ex. D, AR_DHSP_00005766. In addition, in each of those letters, Acting Secretary Pekoske stated that, "[n]otwithstanding that the [purported agreement] is void, not binding, and unenforceable—and preserving all rights, authorities, remedies, and defenses under the law—this letter also provides notice, on behalf of DHS, U.S. Customs and Border Protection (CBP), ICE, and U.S. Citizenship and Immigration Services (USCIS), that DHS, CBP, ICE and USCIS rescinds, withdraws, and terminates the Document, effective immediately." AR5763; AR5766. The purported agreements were thus terminated no more than 180 days later, on August 1, 2021. *See* AR5763; AR5766.

Texas admits that it received the termination letter and that the alleged agreement terminated by August 1, 2021. Am. Compl. ¶ 76. The alleged agreement with Louisiana terminated the same day, 180 days after the termination letter. Even if the Court accepts Louisiana's

contention—that when DHS drafted and mailed termination letters to other states, including Texas, which admits receipt of the letter, DHS failed to mail Louisiana's letter even though the letter was dated the same day, *see* AR5763; AR5766—Louisiana received notice of the termination no later than May 18, 2021, the date on which Defendants served the termination letter on Louisiana as an attachment to their opposition to the States' motion for preliminary injunction against the interim enforcement guidance. AR5763; AR5766. Thus, this filing gave Louisiana at least constructive knowledge of a termination dated February 2, 2021. Any agreement with Louisiana terminated no later than 180 days after that filing—on November 14, 2021. Because the operative enforcement guidance now under review did not take effect until November 29, 2021—that is, since there was no change in DHS enforcement policy until that date—the September Guidance does not implicate any purported contract with Louisiana. *See* AR5766. Louisiana's claim fails and accordingly judgment should enter for Defendants on Count V. *See Texas v. Biden*, No. --- F. Supp. 3d ---, 2:21-CV-067-Z, 2021 WL 3603341, at *23 (N.D. Tex. Aug. 13, 2021) (finding claim based on since-terminated agreement moot), *enforcement granted in part*, No. 2:21-CV-067-Z, 2021 WL 5399844 (N.D. Tex. Nov. 18, 2021), *aff'd*, 20 F.4th 928 (5th Cir. 2021), *as revised* (Dec. 21, 2021), and *cert. granted*, Order, *Biden v. Texas*, --- S. Ct. ---, No. 21-954, 2022 WL 497412 (Feb. 18, 2022) (mem.).[6]

### B.   This Court would lack jurisdiction to consider Louisiana's contract claim.

Even if the purported agreement were still in effect when the September Guidance became operative, this Court would lack jurisdiction to void the guidance on that basis. Louisiana seeks

---

[6] To the extent the States suggest that DHS failed to account for the alleged agreements under the APA, that argument is belied by the record. *See* Considerations Memo at AR0016 n.52 (explaining that any reliance on the purported agreements is unreasonable because those documents were void ab initio and unenforceable).

specific performance of the purported requirement that DHS abstain from making any policy adjustments until a 180-day period of conferral has lapsed. But specific performance is unavailable against the federal government. A waiver of sovereign immunity must be enacted by statute, be construed in the Government's favor, and unambiguously extend to the type of relief sought. *Lane v. Pena*, 518 U.S. 187, 192 (1996). The Fifth Circuit, and others, have recognized that the United States has not waived sovereign immunity for contract claims seeking specific performance. *Ala. Rural Fire Ins. Co. v. Naylor,* 530 F.2d 1221, 1229-30 (5th Cir. 1976); *see Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. DHS*, 490 F.3d 940, 945 (Fed. Cir. 2007); *see also United States v. Jones*, 131 U.S. 1, 18 (1889) (Tucker Act did not authorize specific performance against the federal government).

Louisiana cannot rely on the APA to circumvent this basic principle. For agency action to be subject to APA review, there must be "no other adequate remedy in a court." 5 U.S.C. § 704. Here, to the extent the purported agreement was in effect and enforceable at all, the Tucker Act provides the proper and only remedy for a contract claim—in the Court of Federal Claims. *See Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 480 F.3d 1116, 1128 (Fed. Cir. 2007).[7] At most, if there were a valid contract, Louisiana might possess a claim for money damages, because "damages are always the default remedy for breach of contract." *Sanders v. United States*, 252 F.3d 1329, 1334 (Fed. Cir. 2001) (quoting *United States v. Winstar Corp.*, 518 U.S. 839, 885 (1996) (plurality opinion)); *accord Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011). The Tucker Act "'impliedly forbids' declaratory and injunctive relief and precludes a § 702 waiver of sovereign immunity" under the APA, as any duty to consult the States,

---

[7] *Contra* 28 U.S.C. § 1346(a)(2) (allowing plaintiff to bring claims for breach of contract against the United States in district court only if plaintiff alleges damages not more than $10,000).

24

"if it exists, derives from the contract[s]." *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 646-47 (9th Cir. 1998) (quoting *North Side Lumber Co. v. Block,* 753 F.2d 1482, 1485 (9th Cir.1985)); *see also United States v. King*, 395 U.S. 1, 3 (1969) (recognizing that the Supreme Court has repeatedly acknowledged that the Court of Federal Claims only has jurisdiction over claims for monetary relief).

### C.  Alternatively, the alleged agreement is not enforceable.

If this Court had jurisdiction to consider Louisiana's claim, and even if the document had not been terminated, judgment would properly enter for Defendants because the purported agreement would be unenforceable.

### i.  DHS cannot contract away its sovereign discretion over immigration enforcement.

The provision that Louisiana tries to rely upon, abstaining from making changes to immigration enforcement priorities until a State has exercised a 180-day comment period, lies beyond the power of contract. An outgoing administration cannot contract away the federal government's plenary power over the enforcement of immigration law. *See Biodiversity Assocs. v. Cables*, 357 F.3d 1152, 1172 (10th Cir. 2004) ("The executive branch does not have authority to contract away the enumerated constitutional powers of Congress or its own successors . . . ."); *see also U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 23 (1977) ("[T]he Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty.").

A long line of authority establishes that "[t]he Government cannot make a binding contract that it will not exercise a sovereign power." *Amino Bros. Co. v. United States*, 178 Ct. Cl. 515, 525, 372 F.2d 485, 491, *cert. denied*, 389 U.S. 846 (1967). In *Bowen v. Pub. Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 52 (1986), the Supreme Court reaffirmed that "we have declined in the context of commercial contracts to find that a 'sovereign forever waives the right

to exercise one of its sovereign powers unless it expressly reserves the right to exercise that power in' the contract." (quoting *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148 (1982)); *see also Contributors to Pa. Hosp. v. City of Phila.*, 245 U.S. 20 (1917). Despite the assertion that DHS contracted away the sovereign's right to alter Federal immigration policy, DHS could not and did not do so.

### ii.   DHS lacked statutory authority to enter into the purported agreement.

No statutory authority authorizes DHS to enter into a contract to grant states such power to delay and review agency policy decisions. It has long been a principle of federal government contract law that contracts on behalf of the federal government must be consistent with legal requirements: "Our statute books are filled with acts authorizing the making of contracts with the government through its various officers and departments, but, in every instance, the person entering into such a contract must look to the statute under which it is made, and see for himself that his contract comes within the terms of the law." *The Floyd Acceptances*, 74 U.S. (7 Wall.) 666, 680 (1868); *see also CACI, Inc. v. Stone*, 990 F.2d 1233, 1237 (Fed. Cir. 1993) ("[T]here cannot be a contract when the government agent lacks actual authority to create one."); *U.S. Tr. Co. of N.Y.*, 431 U.S. at 23 ("[T]he Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty."); *Stone v. Mississippi*, 101 U.S. (11 Otto) 814, 817 (1879) ("[T]he legislature cannot bargain away the police power of a State."). None of the statutory authorities cited in the agreement provides the authority for the agreement that the States purportedly entered with DHS; all applicable statutes preserve federal prerogatives.[8]

---

[8] Relatedly, an agency cannot use its contracting authority to circumvent the constraints of the APA by constraining the agency from making future changes to immigration policy. Any such constraint would be a legislative rule that binds an agency, subject to the requirements of the APA. *See, e.g.*, *Davidson v. Glickman*, 169 F.3d 996, 999 (5th Cir. 1999).

Not only was the alleged agreement executed without statutory authority, but it also runs afoul of the subdelegation doctrine. *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004), ("subdelegations to outside parties are assumed to be improper absent an affirmative showing of congressional authorization"). Had Congress intended to authorize such extraordinary agreements, it certainly would have done so expressly with unmistakable clarity. *Cf. Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). The purported agreements are therefore unauthorized by statute.

**IV.    Should the States Prevail in this Action, Any Remedy Should be Narrow.**

Finally, to the extent the Court is inclined to award the States any relief, that relief should be limited and, regardless of the scope of relief, the Court should stay its judgment pending appeal.

**A.  The Court should issue only limited relief.**

In their October 22, 2021 preliminary injunction motion, the States asked the Court to "preliminarily enjoin Defendants from implementing the September 30 Memorandum nationwide." Pls.' Mot. to Postpone at 49 (ECF No. 111). Defendants, in turn, argued that if the Court found that the States were likely to prevail on any of their claims, the Court should (i) remand the September Guidance to DHS without enjoining it to avoid disrupting DHS's operations and inviting the public safety harms that could follow, or, at the very least, (ii) issue only a geographically limited injunction if the Court found that some injunction was appropriate. Defs.' PI Opp'n, at 47-51 (ECF No. 122). Those two arguments apply in even greater force to the States' request for a *final judgment* that would set aside the September Guidance.

In the Fifth Circuit, for APA suits such as this one, "[r]emand, not vacatur," is "generally appropriate." *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389-90 (5th Cir. 2021) (finding remand without vacatur appropriate after finding the agency "fail[ed] to allow proper notice-and-comment" and "fail[ed] to consider" a certain type of cost); *see also id.*

27

("only in rare circumstances is remand for agency reconsideration not the appropriate solution") (alterations and citations omitted). Remand without vacatur is particularly the proper form of relief where vacatur or injunctive relief "would be disruptive." *Cent. & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000). As explained in Defendants' preliminary injunction response brief (and below), an order vacating the September Guidance would be highly disruptive to DHS's operations. At the very least, this Court should reject the States' request for a permanent injunction. As the Supreme Court has indicated, a permanent injunction is inappropriate in an APA suit when a partial or complete vacatur is sufficient. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (finding the district court erred in entering nationwide injunction in APA action). Accordingly, even if this Court were to rule in the States' favor on the merits, it should follow the norm in APA actions and remand the matter to the agency without vacatur.

Second, the Court may only award relief—either preliminary or final—sufficient to redress the injuries imposed on the particular plaintiffs involved. *O'Donnell v. Harris Cnty.,* 892 F.3d 147, 163 (5th Cir. 2018) (a "district court abuses its discretion if it does not narrowly tailor an injunction to remedy the specific action which gives rise to the order") (internal quotations omitted), *overruled on other grounds by Daves v. Dallas Cty*., 22 F.4th 522 (5th Cir. 2022); *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally."). This limitation applies even when a party is seeking relief pursuant to § 706 of the APA. *See CASA de Maryland, Inc. v. Trump*, 971 F.3d 220, 262 n.8 (4th Cir. 2020) ("the position that § 706 [of the APA] even authorizes, much less compels, nationwide injunctions is baseless"), *reh'g en banc granted*, 981 F.3d 311 (4th Cir. 2020). Thus, even if the Court enters final judgment for the States, it should only vacate the September Guidance insofar as it applies in

28

Texas and Louisiana. *Town of Chester v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1650 (2017); *DHS v. New York*, 140 S. Ct. 599, 600-01 (2020) (mem.) (Gorsuch, J. concurring), *denying modification*, 140 S. Ct. 2709 (2020); *see also Texas v. United States*, 14 F.4th at 341 (noting that Fifth Circuit law does not require nationwide injunctions, even in immigration cases). A nationwide injunction here would be especially improper because there are other lawsuits concerning the September Guidance,[9] and a nationwide injunction by this Court would render any determination in those cases—one of which concerns three other States that are not parties here and has a separate preliminary injunction motion currently pending—obsolete. *See DHS. v. New York*, 140 S. Ct. at 600 (Gorsuch, J. concurring) (limiting "[u]niversal injunctions" would "encourage[] multiple judges and multiple circuits to weigh in only after careful deliberation, a process that permits the airing of competing views that aids [the Supreme Court's] own decisionmaking process).

To support their request for a nationwide injunction, the States hypothesize that there may be noncitizens (i) who live in other States, (ii) who would have been removed but for the September Guidance, *and* (iii) who may ultimately travel to Texas and commit crimes. But the States presented evidence only of fourteen noncitizens from the Texas Department of Criminal Justice whom ICE did not take into custody because of the September Guidance. *See* Pls.' Trial Ex. C (identifying fifteen dropped detainers from November 29, 2021 to February 15, 2022); Defs.' Trial Ex. 5 (showing one of the fifteen was reinstated). The Court should not upend a carefully crafted nationwide policy based on such a speculative chain of possibilities.[10] Indeed, as noted below,

---

[9] *See* Complaint, *State of Arizona v. Biden*, 21-cv-314, ECF No. 1 (S.D. Ohio Nov. 18, 2021); Second Amended Complaint, *Coe v. Biden*, 21-cv-168, ECF No. 59 (S.D. Tex. Oct. 8, 2021).

[10] Furthermore, if, as the States suggest, immigration enforcement would become more rigorous absent the September Guidance, it is unclear why noncitizens living in other States (where the September Guidance would be in effect) would travel to Texas or Louisiana (where the September Guidance would *not* be in effect in the event an injunction is limited to those states).

abruptly vacating the September Guidance risks undermining public safety. Furthermore, the States also cannot justify a nationwide injunction by referring to the benefits of uniformity. As explained during oral argument, vacating the September Guidance would lessen uniformity, since different DHS officers across the country would proceed with immigration enforcement actions based on their own, different prioritization criteria. *See* 2/23 PM Trial Tr. at 157:20-158:3, Testimony of Thomas Homan ("Q. . . . Let's suppose there were no centralized guidance documents issued from the head of DHS . . . Based on your experience, would individual agents on the ground still exercise discretion to prioritize . . . based on . . . a prioritization framework that they discern on their own, that they create on their own? A. I think most would, but there's some that wouldn't."). Thus, the Court should not enter nationwide relief against the September Guidance.

### B.   If the Court grants any relief to the States, it should stay its judgment pending appeal.

Should this Court accept the States' invitation to either enjoin or vacate the September Guidance, it should stay its judgment during the pendency of any potential appeal. Indeed, Judge Hanen followed a similar course in the Deferred Action for Childhood Arrivals (DACA) litigation and Judge O'Connor likewise stayed his judgment over the Affordable Care Act. *Texas v. United States*, 549 F. Supp. 3d 572, 624 (S.D. Tex. 2021) ("the order of immediate vacatur as it applies to current DACA recipients (but not the order of remand) is temporarily stayed until a further order of this Court, the Fifth Circuit Court of Appeals, or the United States Supreme Court"), *appeal filed* No. 21-40680 (5th Cir. Sept. 16, 2021); *Texas v. United States*, 352 F. Supp. 3d 665, 690 (N.D. Tex. 2018) ("because many everyday Americans would otherwise face great uncertainty during the pendency of appeal, the Court finds that the December 14, 2018 Order declaring the Individual Mandate unconstitutional and inseverable should be stayed"), *aff'd in part, vacated in*

*part, remanded*, 945 F.3d 355 (5th Cir. 2019), *as revised* (Dec. 20, 2019), *as revised* (Jan. 9, 2020), *rev'd and remanded sub nom. California v. Texas*, 141 S. Ct. 2104 (2021).

"In deciding whether to grant a stay pending appeal," a court must generally consider "whether the stay applicant has made a strong showing that he is likely to succeed on the merits," and also consider equitable factors, such as "whether the applicant will be irreparably injured absent a stay," "whether issuance of the stay will substantially injure the other parties interested in the proceeding," and "where the public interest lies." *Freedom From Religion Found., Inc. v. Mack*, 4 F.4th 306, 311 (5th Cir. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 426 (2009)). "However, where there is a serious legal question involved and the balance of the equities heavily favors a stay . . . the movant only needs to present a substantial case on the merits." *In re Deepwater Horizon*, 732 F.3d 326, 345 (5th Cir. 2013) (internal quotation marks omitted). "A stay pending appeal 'simply suspend[s] judicial alteration of the status quo,' so as to allow appellate courts to bring 'considered judgment' to the matter before them and 'responsibly fulfill their role in the judicial process.'" *Tex. All. for Retired Am. v. Hughes*, 976 F.3d 564, 566 (5th Cir. 2020) (quoting *Nken*, 556 U.S. at 429).

A stay of any injunctive relief would be appropriate here. First, the equities would "heavily favor[] a stay." *Deepwater*, 732 F.3d at 345; *see also Texas v. United States*, 14 F.4th at 340-42 (discussing how the equities favored a stay of the injunction of the interim guidance).[11] The Secretary has explicit statutory authority to set immigration enforcement priorities, 6 U.S.C. § 202(5), and setting aside his guidance here would represent a remarkable departure from settled

---

[11] Again, this Court should give the Fifth Circuit's panel stay decision persuasive weight notwithstanding it was later vacated. *See* Defs.' Resp. to Pls.' Notice of Suppl. Auth. If anything, the panel's discussion on the question of equities should be given particular weight in light of the fact that the vacatur of the stay did not occur until after the September Guidance had superseded the interim guidance.

practice. As explained above, DHS has long understood, including when Mr. Homan was Acting ICE Director, the two statutory provisions to restrict discretion regarding the *release* from DHS custody or detention, but has *never* understood those provisions to restrict its "deep-rooted" discretion as to who to take into custody in the first place. *See* Meissner Memo at AR0032; 2/23 PM Trial Tr. at 148:23-151:1, Testimony of Thomas Homan. Nor has enforcement guidance of this type ever been subject to judicial review. *See Texas v. United States*, 809 F.3d 134, 166 (5th Cir. 2015), *as revised* (Nov. 25, 2015) ("importantly, the states have not challenged the priority levels [Secretary Jeh Johnson] has established" in their challenge to Deferred Action for Parents of Americans (DAPA)). Nor has any previous iteration of enforcement guidance been adopted through notice-and-comment procedures. *See* 2/23 PM Trial Tr. at 182:12-183:23, Testimony of Thomas Homan (conceding he was not aware of previous prioritization memoranda undergoing notice-and-comment). The disruptive consequences of such an unprecedented injunction or vacatur to the way in which immigration agencies have exercised their authority for decades is manifest.

Moreover, staying any vacatur or injunction would help avoid a pendulum effect whereby the Defendants are forced to attempt to adopt an interim policy as a result of the Court's judgment—which itself may be subject to litigation in district court—only to revert back to the September Guidance following a favorable ruling on appeal.[12] The more prudent course would be to allow Defendants to exhaust appellate review, and receive a final determination of their legal obligations, before DHS is forced to change its policy. Indeed, one of the reasons the Fifth Circuit panel found that a stay of the preliminary injunction of the interim guidance was appropriate was

---

[12] Alternatively, any appeal could become moot by virtue of a new policy adopted in response to an injunction or vacatur.

the concern of this pendulum effect. *Texas v. United States*, 14 F.4th at 341 ("Allowing the injunction to take effect could subject immigration agents to three separate directives in the span of a few weeks").

Further, requiring DHS to even momentarily comply with an order vacating the September Guidance would disrupt DHS's operations, and risk undermining public safety. An abrupt withdrawal of the September Guidance would create confusion among DHS officers over how they are to allocate their limited resources, likely resulting in those officers taking enforcement actions pursuant to their own (non-uniform) prioritization criteria. *See* Berg Decl. ¶ 20, AR6029; Decker Decl. ¶¶ 12, 14, AR5780. This would not only undermine DHS's efforts to maintain uniformity among its DHS officers, it could also compromise public safety. One benefit of the coherent, centralized prioritization criteria in the September Guidance is that they help ensure that officers are focusing on those who pose the greatest risk to public safety. *See* Considerations Memo at AR0011-0013; Berg Decl. ¶¶ 12-13, 15, AR6029; Decker Decl. ¶¶ 8-9, AR5780; *see also* 2/23 PM Trial Tr. at 157:20-158:3, Testimony of Thomas Homan (acknowledging that some officers would not prioritize).

Furthermore, if the Court vacates the September Guidance, the legal conclusions underlying its judgment could effectively require DHS to adopt a new policy that would severely strain DHS's resources. For example, if the Court concludes that § 1226(c) and/or § 1231(a)(2) impose unconditional mandates upon DHS to take into custody certain categories of noncitizens— mandates that the States acknowledge DHS cannot satisfy[13]—DHS could arguably be forced to adopt a policy under which it would quickly run through its detention capacity. *See* Berg Decl.

---

[13] *See* 2/24 AM Trial Tr. at 86:16-17 ("we recognize that [DHS] cannot detain everyone who is subject to th[e] requirement[s]" of the relevant statutory provisions, as the States read them).

¶¶ 11-12, AR6029. If DHS attempted to detain all noncitizens who, to DHS's knowledge, are either potentially covered by § 1226(c) or § 1231(a), DHS would likely quickly exceed its detention capacity. *See* Berg Decl. ¶¶ 10-11, 14, AR6029; Decker Decl. ¶ 7, AR5780. Critically, if DHS dedicated its detention capacity largely or wholly to those noncitizens covered by § 1226(c) or § 1231(a)(2), DHS could be prevented from detaining significant public safety threats who do *not* fall under those provisions or those who DHS currently prioritizes to ensure border security. *See* Berg Decl. ¶¶ 12-13, 15, AR6029; Decker Decl. ¶¶ 8-9, AR5780.

Moreover, if DHS were forced to increase its detention capacity, that alone would impose an extraordinary burden on DHS. Increasing detention capacity is costly and time-consuming. DHS would likely have to spend several months inspecting potential facilities, hiring additional staff, procuring additional supplies, and negotiating contracts with relevant third parties. Decl. of Monica Burke ¶¶ 6-8, AR_DHSP_00006074. Further, absent an additional appropriation from Congress, DHS would have to finance this expansion in detention capacity by transferring funds from other DHS components, like the Coast Guard or Secret Service, or reprogramming funds within ICE, thus harming other DHS missions that are crucial to national security. *See id*. ¶ 11, AR6074; 2/23 PM Trial Tr. at 89:15-24, 99:2-7, 203:2-4, Testimony of Thomas Homan. Importantly, even if, despite these burdens, DHS succeeded in increasing its detention capacity, it *still* could not comply with the States' reading of § 1226(c) and § 1231(a)(2). DHS cannot feasibly identify all noncitizens covered by § 1226(c), and DHS simply cannot increase its detention capacity to the point where it could hold all noncitizens who it knows are covered by § 1226(c)(2) or § 1231(a). *See* Considerations Memo, at AR0020; 2/23 PM Trial Tr. at 121:3-7, 199:13-200:4, Testimony of Thomas Homan.

In contrast, the States have shown limited harm, if any. In fact, since the September Guidance went into effect from November 29, 2021, through February 15, 2022, the State of Texas has identified only fifteen Texas Department of Criminal Justice inmates whose detainers were cancelled purportedly because of enforcement prioritization, with only three of those fifteen detainers being cancelled after December 29, 2021. *See* Pls.' Trial Ex. C. One of the three detainers cancelled after December 29, 2021, was reinstated. *See* Defs.' Trial Ex. 5; 2/23 PM Trial Tr. at 11:4-12:22, Testimony of Jason Clark; 2/23 PM Trial Tr. at 53:10-54:9, Testimony of Robert Moore. A witness for the States conceded that three dropped detainers for the period from December 29, 2021, through February 15, 2022—"a month and a half"—would "be a small number" of dropped detainers. 2/23 PM Trial Tr. at 52:17-53:4, Testimony of Robert Moore; *see also id.* at 51:13-52:3 (conceding that the number of detainers ICE picked up from the Texas Department of Criminal Justice from November 29, 2021, through February 15, 2022, potentially exceeded 200).

Staying any injunction would also preserve the status quo. *See Dayton Bd. of Educ. v. Brinkman*, 439 U.S. 1358, 1359 (1978) (preserving the status quo is factor to weigh in balance of equities). The September Guidance has been in effect for nearly four months, and DHS has been prioritizing threats to national security, public safety, and border security since January of 2021. *See* September Guidance; Memorandum from David Pekoske, Acting Sec'y of Homeland Sec., *Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities* (Jan. 20, 2021), AR DHSP_00000065; Memorandum from Tae Johnson, Acting Dir. of U.S. Immigration and Customs Enf't, *Interim Guidance: Civil Immigration Enforcement and Removal Priorities* (Feb. 18, 2021), AR_DHSP_00000070. "The status quo at this point is the continued use" of the September Guidance. *See* Order, *Louisiana v. Biden*, No. 22-30087, at 7 (5th

35

Cir., Mar. 16, 2022) (citing *E.T.*, *v. Paxton*, 19 F.4th 760, 770 (5th Cir. 2021) (determining that status quo was not disturbing order that had been in effect for almost four months)).

Accordingly, "the balance of the equities heavily favors a stay," and so Defendants "only need[] to present a substantial case on the merits" and show that "serious legal question[s] [are] involved" to secure a stay of any judgment. *Deepwater*, 732 F.3d at 345. Defendants have presented a substantial case "on the merits;" indeed, a Fifth Circuit panel agreed with Defendants that an injunction against the interim priorities—which, like the September Guidance, set enforcement priorities—should be stayed pending appeal to the extent that it altered DHS's practice. *Texas v. United States*, 14 F.4th at 336. And this case undoubtedly involves "serious legal question[s]" concerning DHS's operations in the sensitive area of immigration enforcement such that this Court requested supplemental briefing on certain complex legal questions. *See* ECF No. 219.

Thus, if the Court decides to vacate or enjoin the September Guidance, it should stay its judgment pending appeal, and ensure that DHS would incur the burdens identified above only *after* it has exhausted the appellate process. Even if the Court's judgment were affirmed in whole or in part, securing a final determination before any relief goes into effect would still be fruitful. For example, even if this Court's judgment was affirmed on appeal, it may be based on different grounds, such as perhaps a different interpretation of the statutory provisions at issue. The ultimate legal basis for any judgment against the September Guidance would inform what policy DHS would implement in its place. Accordingly, before there is any vacatur of the September Guidance—and thus before DHS must replace that policy—the Court should allow the appellate courts to first weigh in on the legal questions at issue.

36

At the very least, this Court should grant an administrative stay for 30 days to allow the question of a stay pending appeal to be duly considered.[14]

Dated: March 18, 2022                           Respectfully submitted,

                                                BRIAN M. BOYNTON
                                                Principal Deputy Assistant Attorney General


                                                BRIGHAM J. BOWEN
                                                Assistant Branch Director

                                                 */s/ Adam D. Kirschner*
                                                ADAM D. KIRSCHNER
                                                Attorney-in-charge
                                                IL Bar. No. 6286601
                                                Senior Trial Counsel
                                                BRIAN C. ROSEN-SHAUD
                                                ME Bar No. 006018
                                                MICHAEL F. KNAPP
                                                CA Bar No. 314104
                                                KUNTAL CHOLERA
                                                DC Bar No. 1031523
                                                Trial Attorneys
                                                United States Department of Justice
                                                Civil Division, Federal Programs Branch
                                                Tel: (202) 353-9265
                                                Fax: (202) 616-8460
                                                Email: Adam.Kirschner@usdoj.gov
                                                       Brian.C.Rosen-Shaud@usdoj.gov
                                                       Michael.F.Knapp@usdoj.gov
                                                       Kuntal.Cholera@usdoj.gov

                                                Mailing Address:
                                                Post Office Box 883
                                                Washington, D.C. 20044

---

[14] Although Defendants asked for a 7-day administrative stay upon this Court preliminarily enjoining the previous interim guidance, Defendants now respectfully ask for 30 days to provide for a more orderly course of action. Defendants note that this Court and the Fifth Circuit entered administrative stays of the injunction of the interim guidance that collectively lasted 23 days.

Courier Address
1100 L Street NW, Room 11020
Washington, D.C. 20005

EREZ REUVENI
CA Bar No. 264124
Assistant Director
U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
202-307-4293 (telephone)
Email: Erez.R.Reuveni@usdoj.gov

*Counsel for Defendants*


DANIEL DAVID HU
Assistant United States Attorney
Chief, Civil Division
State Bar No. 10131415
S.D. I.D. 7959
Southern District of Texas
1000 Louisiana, Suite 2300 Houston, TX 77002
Tel: (713) 567-9000
Fax: (713) 718-3300
Daniel.Hu@usdoj.gov

*Local Counsel*


## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically

(via CM/ECF) on March 18, 2022.

*/s/ Adam D. Kirschner*
ADAM D. KIRSCHNER


38