# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# VICTORIA DIVISION

| | |
|---|---|
| STATE OF TEXAS; STATE OF LOUISIANA,<br><br>  *Plaintiffs*,<br><br>v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>  *Defendants*. | Civ. Action No. 6:21-cv-16 |

## PLAINTIFFS' POST-TRIAL PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### PROPOSED FINDINGS OF FACT

**A. Parties.**

1.      The State of Texas is one of the plaintiffs in this case. It has quasi-sovereign interests in the health and well-being, both physical and economic, of its residents and in not being discriminatorily denied its rightful status within the federal system.

2.      The State of Louisiana is the other plaintiff in this case. It has quasi-sovereign interests in the health and well-being, both physical and economic, of its residents and in not being discriminatorily denied its rightful status within the federal system.

3.      Alejandro Mayorkas is the Secretary of the United States Department of Homeland Security. He administers the January 20 Memorandum and issued the September 30 Memorandum.

4.      Defendant Department of Homeland Security implements the January 20 Memorandum and the September 30 Memorandum. DHS oversees Defendants U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and Immigration and Customs Enforcement.

5.      Defendant Troy Miller is the Senior Official Performing the Duties of the Commissioner of CBP. He received the January 20 Memorandum and the September 30 Memorandum.

6.      Defendant Tae Johnson is the Acting Director of ICE. He received the January 20 Memorandum and the September 30 Memorandum and issued the February 18 Memorandum.

7.      Defendant Tracy Renaud is the Senior Official Performing the Duties of the Director of USCIS. She received the January 20 Memorandum and the September 30 Memorandum.

**B. Statutory text.**

8.      This case involves 8 U.S.C. § 1226(c). Paragraph 1 of that subsection states:

> The Attorney General shall take into custody any alien who—
>
> **(A)** is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,
>
> **(B)** is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,
>
> **(C)** is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence[d] to a term of imprisonment of at least 1 year, or
>
> **(D)** is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

8 U.S.C. § 1226(c)(1).

9.     Paragraph 2 of that subsection states:

The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides pursuant to section 3521 of title 18 that release of the from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.

8 U.S.C. § 1226(c)(2).

10.     This case also involves 8 U.S.C. § 1231. The relevant portions of that statute state:

Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the "removal period"). (8 U.S.C. § 1231(a)(1)(A))

During the removal period, the Attorney General shall detain the alien. Under no circumstance during the removal period shall the attorney General release an alien who has been found inadmissible under section 1182(a)(2) or 1182(a)(3)(B) of this title or deportable under section 1227(a)(2) or 1227(a)(4)(B) of this title. (*Id.* § 1231(a)(2))

**C. Aliens and detainers.**

11.    Part of the TDCJ intake process includes an initial interview with the inmate to gather information. That information includes the inmate's citizenship and birthplace. If either of those are not the United States, TDCJ enters that information into its inmate database and sends to ICE a packet on the inmate. The packet includes the inmate's fingerprints, biography, and family history. TDCJ sends and updates the packets on a daily basis. Moore test. 55:23–56:14.

12.    A detainer is a request sent by ICE to a local law-enforcement agency asking that the agency hold an inmate for up to 48 hours so ICE can take custody of that inmate. Homan test. 68:17–25. ICE obtains the data when an arrestee or inmate's fingerprints match a profile in the National Crime Information Center of a person who has, for instance, been deported or attested by the Border Patrol. *Id.* 69:5–22.

**D. Original memos and prioritization.**

13.    Acting DHS Secretary David Pekoske issued a memorandum on January 20, 2021, announcing changes to the enforcement of the nation's immigration laws.

14.    It was not issued following notice-and-comment procedures. Ex. A.

15.    Section B of the January 20 Memorandum stated three "interim enforcement priorities" that went into effect on February 1, 2021:

- **National security.** Individuals who have engaged in or are suspected of terrorism or espionage, or whose apprehension, arrest and/or custody is otherwise necessary to protect the national security of the United States.

- **Border security.** Individuals apprehended at the border or ports of entry while attempting to unlawfully enter the United States on or after November 1, 2020, or who were not physically present in the United States before November 1, 2020.

4

- **Public safety.** Individuals incarcerated within federal, state, and local prisons and jails released on or after the issuance of this memorandum who have been convicted of an "aggravated felony," as that term is defined in [the Immigration and Nationality Act] and are determined to pose a threat to public safety."

*Id.*

16.     Section B also stated that nothing in it "prohibit[ed] the apprehension or detention of individuals . . . who are not identified as priorities[.]" Among the non-priorities were aliens convicted of drug offenses, aliens convicted of crimes of moral turpitude, and criminal aliens with final orders of removal. *Id.*

17.     Section C of the January 20 Memorandum paused for 100 days removals of all noncitizens subject to final orders of removal. *Id.* The Court enjoined the operation of Section C in a January 26 temporary restraining order, *see* 515 F. Supp. 3d 627, and a February 23 preliminary injunction, *see* 524 F. Supp. 3d 598.

18.     On February 18, 2021, five days before the Court issued its preliminary injunction, Tae Johnson, the Acting Director of ICE, issued a memorandum containing "operational guidance" on the implementation of the January 20 Memorandum.

19.     It was not issued following notice-and-comment procedures. Ex. B.

20.     The February 18 Memorandum listed three types of "cases that are presumed to be priorities," giving instances when noncitizens were presumed to be removal priorities for each of the national security, border security, and public safety criteria listed in the January 20 Memorandum. *Id.*

21.     The February 18 Memorandum noted that agents did not need special "preapproval for enforcement or removal actions that [met] the above criteria for presumed priority cases[.]" With the exception of "situations where a noncitizen poses an imminent threat to life or an imminent substantial threat to property," however, they did need special preapproval for all other enforcement or removal actions. *Id.*

22.     The requirement to obtain preapproval before what had preciously been routine actions by ICE personnel imposed a significant barrier to the enforcement of immigration law. ICE officers treated the "priorities" in the February 18 Memorandum as categorical rules rather than presumptions to be applied on a case-by-case basis. Homan test. 78:17–80:16.

**E.  Effect of original memos.**

23.     As a result of the Defendants' adoption of the January 20 and February 18 Memoranda, the number of illegal aliens detained by ICE personnel fell, both as an absolute number and as a percentage of aliens eligible to be detained.

24.     As a result of the Defendants' adoption of the January 20 and February 18 Memoranda, the number of illegal aliens deported or removed from the United States fell, resulting in illegal aliens being present in Texas and Louisiana who otherwise would not have been.

25.     Some of these illegal aliens committed crimes in one or both of Texas and Louisiana, which would not have otherwise been committed. This imposes costs on the State corrections systems.

26.     As a result of the Defendants' adoption of the January 20 and February 18 Memoranda, some illegal aliens who otherwise would have been detained and deported or removed will instead use health care and public education services in Texas or be incarcerated in Texas.

27.     The Court on August 19, 2021, enjoined the enforcement of the Section B of the January 20 Memorandum and the relevant sections of the February 18 Memorandum. *See* 2021 WL 3683913. The Fifth Circuit partially stayed the operation of that injunction, *see* 14 F.4th 332 (2021), and later vacated that stay, *see* 2021 WL 5578015 (Nov. 30, 2021) (en banc). The appeal has been dismissed as moot in light of the September 30 Memorandum currently at issue. *See* Consent Mot. to Voluntarily

Dismiss Appeal, *Texas v. United States*, No. 21-40618 (filed Dec. 6, 2021); ECF 183 (order of dismissal).

**F. Current memorandum and prioritization.**

28.     On September 30, 2021, DHS Secretary Alejandro Mayorkas issued a memorandum to Johnson, copying, among others, Miller. By its own terms, the September 30 memorandum became effective on November 29, 2021. Ex. X.

29.     It was not issued following notice-and-comment procedures.

30.     The September 30 Memorandum identified the same three priority enforcement categories as the previous memoranda. *Id.*

31.     Unlike the February 18 Memorandum, under the September 30 Memorandum, even priority-category aliens are not presumptively subject to enforcement actions. *Id.*

32.     Because of this change, aliens convicted of aggravated felonies are no longer presumptively subject to enforcement actions. Rather, those aliens are lumped in with all other potential public-safety threats, whose status as a threat "is not to be determined according to bright lines or categories. The memo requires an assessment of the individual and the totality of the facts and circumstances." The Defendants' "personnel should not rely on the fact of conviction or the result of a database search alone." Instead, they "should, to the fullest extent possible, obtain and review the entire criminal and administrative record and other investigative information to learn of the totality of the facts and circumstances of" the alien's conviction. *Id.*

33.     Similarly, for aliens who may be a threat to border security, "there could be mitigating or extenuating facts and circumstances that militate in favor of declining enforcement action. [The Defendants'] personnel should evaluate the totality of the facts and circumstances and exercise their judgment accordingly." *Id.*

34.     As with the previous two memoranda, the September 30 Memorandum omits aliens convicted of drug offenses, aliens convicted of crimes of moral turpitude, and criminal aliens with final orders of removal as priorities. *Id.*

35.     The September 30 Memorandum was issued contemporaneously with another document titled "Significant Considerations in Developing Updated Guidelines for the Enforcement of Civil Immigration Law." *See* AR001 (the "Considerations Memo"). However, the September 30 Memorandum itself nowhere refers to this document, its contents, or its conclusions.

36.     The September 30 Memorandum purports not to "compel an action to be taken or not taken" and instead "leave[] the exercise of prosecutorial discretion to the judgment of [the Defendants'] personnel." Ex. X at 5. In reality, field officers will be extremely cautious about taking enforcement actions and will feel compelled to not act, rather than act, out of concern for possible disciplinary action. This "hands-off" approach has already been instilled in field offices. Homan test. 84:4–85:4, 86:9–19, 163:7–14.

37.     The practical effect is reduced enforcement because of the requirement that personnel undertake an intensive investigation involving consideration of a large number of factors not accessible in a quick database search before they can take routine enforcement action. Homan test. 78:17–80:16.

38.     This practical effect is magnified by the requirement that of onerous review processes by the officer's chain of command for every routine enforcement action. In particular, this language sends a clear message to field agents that they do not actually have discretion to enforce immigration laws and that attempts to do so will be subject to criticism by superiors and outside lobbying groups:

> We will meet regularly to review the data, discuss the results to date, and assess whether we are achieving our goals effectively.

> Our assessment will be informed by feedback we receive from our
> law enforcement, *community, and other partners*.

Ex. X at 7.

39.     The burdens placed on enforcement at the front end and the implicit threat of discipline or negative performance reviews at the back end have led to significantly reduced enforcement, a significant number of rescinded detainers, and numerous alien offenders not being taken into custody. *See, e.g.,* Clark test. 69:2–14; 73:16–74:6; Moore test. 37:25–39:24; Ex. C; Exs. D-2, Q–S.

## G. Rescissions.

40.     From FY2017–FY2020, ICE rescinded no detainers for reasons of enforcement priorities. Clark test. 69:2–14; Moore test. 37:2–10; Ex. C. Rather, they were rescinded for reasons such as discovering the inmate was a U.S. citizen, medical complications, or inability to be repatriated. Moore test. 37:5–10. Indeed, until February 2021, TDCJ did not have a way to track on a daily basis the number of detainers that ICE had been dropped because there hadn't been a need for such a tool—ICE dropped so few detainers that the numbers could be tracked on a monthly or other periodic basis. Moore test. 42:2–19. TDCJ is currently revamping its inmate-tracking system to indicate whether alien inmates have had detainers dropped (or refused) due to the Memoranda. Moore test. 46:16–47:13.

41.     From January 20 through February 15, 2022, ICE rescinded detainers for 170 aliens detained within TDCJ facilities for reasons of enforcement priorities. It later took custody of or reissued the detainer for 29 of those inmates. Clark test. 69:2–14; Ex. C.

42.     Of the 141 aliens whose detainers were rescinded, 55 were serving a sentence for a drug offense. None of those were convicted of only a single offense involving possession of 30 grams or less of marijuana for one's own use. *Id.* In

addition, at least 22 of those aliens were subject to a final order of removal from the United States. *Id.*

43.     From November 29, 2021, to February 15, 2022, ICE rescinded detainers for 14 aliens detained within Texas facilities. Ex. C. At least one of those aliens, Ruben DeLeon, was subject to a final order of removal from the United States, but because of the dropped detainer was released into the public rather than ICE's custody. Clark test. 80:23–82:3. Ex. C.

44.     Since January 20, 2021, TDCJ has received 225 inmates whom ICE has identified being in the country illegally but who have not been issued a detainer. 74 of those inmates have been released. 96 of those inmates have been received since November 29, 2021. Ex. C. 17 of those released aliens have failed to comply with the terms of their parole supervision. Another 4 have committed new crimes. Clark test. 83:12–18.

45.     ICE officials have confirmed to TDCJ that these detainers were rescinded, and detainers were not issued, due to the Enforcement Memoranda. Moore test. 37:25–39:24, 42:20–45:24; Exs. FF1–FF22; Clark test. 77:6–78:6, 83:19–25.

46.     There has been no practical difference between the way ICE handled detainers and rescissions under the February Memorandum and the way it currently handles them under the September Memorandum. Moore test. 40:7–19; Clark test. 78:17–79:9, 85:5–11.

**H. Costs.**

**1. Incarceration.**

47.     The average cost of incarcerating in TDCJ facilities an inmate who qualifies for reimbursement under the federal government's State Criminal Alien Assistance Program ("SCAAP") was $62.34 per day for the period of July 1, 2017– June 30, 2018. Ex. F ¶ 6. During that period, TDCJ incarcerated 8,951 eligible

inmates for a total of 2,439,110 days. The total cost of incarcerating these inmates for that period was $152,054,117. Of that amount, the SCAAP program reimbursed only $14,657,739. ECF 115-6 ¶¶ 4–7. Thus, for each day that a criminal alien was incarcerated in TDCJ facilities, the net cost to the State of Texas was approximately $56.33.

48.     For the most recently completed period, July 1, 2018–June 30, 2019, TDCJ incarcerated 8,893 eligible inmates for a total of 2,385,559 days at a total cost of $165,247,672. The average per-inmate, per-day cost of incarceration for those inmates was $69.27. SCAAP has not yet reimbursed any of that amount. Ex. F ¶ 6.

49.     When ICE rescinds a detainer for an inmate in TDCJ custody, the Board of Pardons and Parole considers that new information relating to a previously approved parole and will revoke parole, leading to continued custody in TDCJ. Clark test. 85:20–87:14, 88:17–89:5; Ex. C.

50.     To the extent the number of aliens in TDCJ custody increases, the net cost to the State of Texas of detaining those aliens will increase. Ex. F ¶ 8.

51.     TDCJ also incurs costs to keep aliens in custody or add them to mandatory parole or supervision programs when those aliens are not detained or removed by federal immigration authorities. For Fiscal Year 2020, the average per-day cost of these programs for each inmate not detained or removed is $4.64, which would total $11,068,994, based on the number of inmates for the most recently completed SCAAP application. *Id.* ¶¶ 6, 9.

52.     The Louisiana Department of Public Safety and Corrections has identified four specific examples of inmates who were released to ICE and then returned after ICE rescinded their detainer or whose detainers were rescinded before release. Ex. L ¶¶ 8–15.

53.     One of those was convicted of indecent behavior with juveniles and sexual battery. His detainer was rescinded, and he was released to supervised release. *Id.* ¶¶ 8–11.

54.     Two others, one convicted of possessing Fentanyl and the other of aggravated second-degree battery, were released to ICE but almost immediately returned for supervised release rather than removed. *Id.* ¶¶ 12–14.

55.     A third, convicted of aggravated assault with a firearm, was released to ICE but later returned to Louisiana's custody for supervised release. *Id.* ¶ 15.

56.     Louisiana incurs costs to supervise these aliens while they are on supervised release. *Id.* ¶ 18.

**2. Education.**

57.     The estimated average per-student, per-year funding entitlement for a student in Texas public schools in Fiscal Year 2022 will be $9,211. For a student who qualifies for Bilingual and Compensatory Education weighted funding, that amount is $11,500.

58.     While Texas does not have information on the total number of illegal alien children attending public schools in the State, there is available data for a subset of those children.

59.     Data from the U.S. Health and Human Services Office of Refugee Resettlement indicates how many UAC were released to sponsors in Texas during annual October–September periods. Most, if not all, unaccompanied minor children (UAC) detained by Defendants and released to sponsors in Texas qualify for such education. Ex. H, ¶ 3.

60.     If each of those children was educated in the Texas public school system the fiscal year following release to a sponsor and qualified for Bilingual and

Compensatory Education weighted funding, it cost the State and local governments the amount indicated.

| Period | UAC released | Cost |
|--------|--------------|------|
| 2014–15 | 3,272 | $31.32 million |
| 2015–16 | 6,550 | 63.13 million |
| 2016–17 | 5,391 | 53.05 million |
| 2017–18 | 4,136 | 42.73 million |
| 2018–19 | 9,900 | 112.10 million |
| 2019–20 | 2,336 | $26.95 million |
| 2020–21 | 15,341 | $176.42 million |

These numbers are not cumulative—that is, they give the cost of educating each UAC only for the fiscal year following the UAC's release to a sponsor, not for each year of the UAC's enrollment in school. *Id.* ¶ 4.

61.    The total costs to Texas of providing public education to illegal alien children will rise as the number of such children increases. *Id.*

62.    The Texas Juvenile Justice Department has custody of juvenile offenders who have committed felony-level offenses. When those juveniles are released, they attend public schools. *Id.* ¶¶ 4–5.

63.    ICE has in the past sent detainers to TJJD for juvenile non-citizens. However, at least one non-citizen juvenile in TJJD custody as of April 26, 2021, had not had a detainer issued. That juvenile upon release will attend a Texas public school. *Id.* ¶¶ 6–8.

**3. Social services.**

64.    The Texas Health and Human Services Commission provides three principal categories of services and benefits to undocumented immigrants in Texas: (i) Texas Emergency Medicaid; (ii) the Texas Family Violence Program (FVP); and

(iii) Texas Children's Health Insurance Program (CHIP) Perinatal Coverage. Undocumented immigrants also receive uncompensated medical care from public hospitals in the State. Ex. G, ¶ 5.

65.     The Emergency Medicaid program is a federally required program jointly funded by the federal government and the states. It provides Medicaid coverage, limited to emergency medical conditions including childbirth and labor, to undocumented immigrants living in the United States. *Id.* ¶ 6.

66.     Because HHSC Medicaid claims data do not conclusively identify an individual's residency status, HHSC must estimate the portion of Emergency Medicaid payments attributable to undocumented immigrant. *Id.*

67.     The Family Violence Program contracts with non-profit agencies across the State to provide essential services to family violence victims, including undocumented immigrants, in three categories: shelter centers, non-residential centers, and Special Nonresidential Projects. The FVP does not ask individuals about their residency status, so HHSC estimates the portion of FVP expenditures attributable to undocumented immigrants. *Id.* ¶ 7.

68.     Texas CHIP Perinatal Coverage provides prenatal care to certain low-income women who do not otherwise qualify for Medicaid. HHSC cannot definitively report the number of undocumented immigrants served by CHIP Perinatal Coverage because the program does not require citizenship documentation. *Id.* ¶ 8.

69.     This chart shows HHSC's estimates of the total cost to the State to furnish coverage under each program to undocumented immigrants.

| FY | Emerg. Medicaid | Family Violence | CHIP Perinatal |
|----|-----------------|-----------------|----------------|
| 2009 | $62 million | $1.2 million | $33 million |
| 2011 | $71 million | $1.3 million | $35 million |
| 2013 | $90 million | $1.4 million | $38 million |

| FY | Emerg. Medicaid | Family Violence | CHIP Perinatal |
|---|---|---|---|
| 2015 | $73 million | $1.0 million | $30 million |
| 2017 | $85 million | $1.2 million | $30 million |
| 2019 (est.) | $80 million | $1.0 million | $6 million |

*Id.* ¶¶ 6–8.

70.    HHSC has in the past estimated of the amount of uncompensated medical care provided by state public hospital districts to undocumented immigrants. HHSC estimated that those districts incurred approximately $596.8 million in uncompensated care for undocumented immigrants in SFY 2006 and $716.8 million in SFY 2008. *Id.* ¶ 9.

71.    It is a certainty that each of these programs has some positive cost to the State of Texas due to their use by illegal immigrants. *Id.* ¶ 10.

### 4. Recidivism.

72.    A 2018 study from the United States Department of Justice's Bureau of Justice Statistics shows that state offenders generally recidivate at 44% within the first year following release, 68% within the first three, 79% within the first six, and 83% within the first nine. Ex. T at 1. The same study shows, during the nine-year period following release, there were on average five arrests per released prisoner. *Id.*

73.    Tarrant County averages 246 inmates with immigration detainers at any time. The Tarrant County Sheriff estimates the average cost of jailing those inmates to be $3,644,442 per year. Ex. E, ¶ 6.

74.    As of January 7, 2021, Tarrant County had 145 such inmates out of a total population in custody of 3,855. *Id.*

75.    The 145 immigration-detainer inmates had 246 pending charges among them. They included:

- 7 charges of murder,

- 1 charge of attempted murder,

- 26 charges of aggravated assault with a deadly weapon,

- 4 charges of intoxication manslaughter,

- 3 charges of intoxication assault with a vehicle causing serious bodily injury,

- 16 charges of aggravated robbery,

- 12 charges of various forms of burglary,

- 16 charges for possession or delivery of controlled substances,

- 4 charges of aggravated sexual assault,

- 2 charges of aggravated kidnapping with sexual abuse,

- 8 charges of aggravated sexual assault of a child,

- 8 charges of sexual contact with a child,

- 3 charges of possession of child pornography,

- 2 charges of online solicitation of a minor,

- 27 charges of aggravated sexual assault of a child,

- 37 charges of sexual abuse of a child under 14,

- 11 charges of sexual abuse of a child under 17,

- 1 charge of employing a child for sexual performance,

- 3 charges of trafficking of a child, and

- 2 charges of trafficking a person.

*Id.* ¶ 7.

76.     The Tarrant County Sheriff's Office examined the recidivism rates for inmates with immigration detainers by examining the criminal-history files of every such inmate jailed as of that date. In January 2022, it found a recidivism rate

(indicated by prior jail time) of roughly 90% for that population, compared to 69% in October 2021. *Id.* ¶ 8.

77.     This is consistent with what the Supreme Court and Congress have acknowledged: "deportable criminal aliens who remain[] in the United States often commit[] more crimes before being removed." *Demore v. Kim*, 538 U.S. at 510, 518 (2003) (citing Hearing on H.R. 3333 before the Subcommittee on Immigration, Refugees, and International Law of the House Committee on the Judiciary, 101st Cong., 1st Sess., 54, 52 (1989)); *see also Zadvydas v. Davis*, 533 U.S. 678, 713–14, (2001) (Kennedy, J., dissenting) (warning of the "risk to the community posed by the mandatory release" of criminal aliens when accounting for "statistical studies showing high recidivism rates for released aliens").

78.     There is no evidence that illegal aliens recidivate at rates lower than the general population. A preponderance of the evidence leads to the conclusion that illegal aliens who commit crimes are at least as likely to recidivate as are citizens and those who are legally present.

## I.  The Louisiana agreement.

79.     Louisiana, though its Department of Justice, and DHS entered into an agreement stating that Louisiana "will provide information and assistance to help DHS perform its border security, legal immigration, immigration enforcement, and national security missions in exchange for DHS's commitment to consult [Louisiana] and consider its views before taking" certain administrative actions. Ex. K at 2.

80.     For example, DHS must consult with Louisiana before "taking any action or making any decision that could reduce immigration enforcement" or "increase the number of removable or inadmissible aliens in the United States." *Id.* § III.A.2. That "includes policies, practices, or procedures which have as their purpose

or effect . . . decreasing the number of or criteria for detention of removable or inadmissible aliens from the country." *Id.* § III.A.2.d.

81.    The Agreement requires DHS to provide Louisiana with "180 days' written notice . . . of any proposed action" subject to the consultation requirement. *Id.* § III.A.3. That gives Louisiana "an opportunity to consult and comment on the proposed action." *Id.* DHS will then "in good faith consider [Louisiana]'s input and provide a detailed written explanation of the reasoning behind any decision to reject [that] input before taking any action" covered by the consultation requirement. *Id.*

82.    The Defendants did not consult with Louisiana regarding, or notify Louisiana of, the January 20 Memorandum, the February 18 Memorandum, or the September 30 Memorandum before they were issued.

83.    Defendants did not terminate the Agreement with Louisiana in conformity with the provisions for termination.

## PROPOSED CONCLUSIONS OF LAW

### A. Jurisdiction.

84.    This case arises under the Constitution and laws of the United States, the federal government is a defendant, and the States seek to compel federal officials to perform their duties. The Court therefore has subject matter jurisdiction. 28 U.S.C. §§ 1331, 1346, 1361.

85.    Further, the States' allegations that they are suffering a legal wrong because of the Agency Defendants' actions entitles them to judicial review of those actions before the Court. 5 U.S.C. §§ 702–703.

86.    The Court has jurisdiction to declare the rights and legal relations among the parties and to decree an injunction supporting that declaration. 28 U.S.C. §§ 2201–2202.

87.     The Court has jurisdiction to compel the Agency Defendants to fulfill their duties under the law and to hold unlawful and set aside their actions and conclusions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right or power; in excess of statutory jurisdiction, authority, or limitations; or without observance of procedure required by law. 5 U.S.C. § 706.

## B. Standing.

88.     Texas and Louisiana have standing to bring this action.

### 1. Traditional standing.

89.     The States have demonstrated each of the three elements required to have standing to bring their claims: (a) an injury in fact (b) fairly traceable to the challenged actions (c) that will likely be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

#### a. Injury in fact.

90.     The States have suffered an injury in fact—concrete and particularized injuries attributable to the Defendants' actions. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

91.     The financial injury to the States—they must spend money on government programs and services for illegal aliens whom they otherwise would not due to the Defendants' policy of not detaining and deporting or removing them—is an injury to a legally protected interest. *Texas v. United States*, 809 F.3d 134, 152–54 (5th Cir. 2015). "For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017).

92.     "Federal law affirmatively requires the States to make some of these expenditures." *Texas v. Biden*, 20 F.4th 928, 969 (2021) ("*Texas MPP*") (citing 42 C.F.R. § 440.255(c) (Emergency Medicaid).

93.     That injury is concrete because Texas incurs actual costs to operate its detention, educational, and social-services programs, and Louisiana incurs actual costs to operate its detention and supervision programs, due to the need to serve illegal aliens who, due to the Defendants' policy, have not been detained and deported or removed.

94.     That injury is particular because it is Texas and to Louisiana that are doing the spending. *Texas v. United States*, 524 F. Supp. 3d 598, 619 (S.D. Tex. 2021)

95.     That injury is imminent, and is actually occurring, because Texas and Louisiana actually operate the programs at issue now and intend to continue doing so in the future. *Texas v. United States*, 524 F. Supp. 3d at 619 ("alleged injuries to its detention and education costs are sufficiently concrete and actual or imminent" in challenge to 100-day pause in removals).

96.     The injury the States allege as *parens patriae*—that the Defendants' policy of not detaining and deporting or removing certain illegal aliens harms their residents' physical and economic well being by increasing crime committed by illegal aliens—is an injury to a legally protected interest. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982).

97.     *Parens patriae* standing allows a state to sue a defendant to protect the interests of its citizens at large. *Texas*, 328 F. Supp. 3d at 694. It applies when the state has its own specific type of interest, separate from that of its citizens, that has been injured—what is known as a "quasi-sovereign" interest. *Id*.

98.     The courts recognize two general categories of quasi-sovereign sufficient to confer *parens patriae* standing: a state's interest "in the health and well-being—both physical and economic—of its residents" and a state's "interest in not being discriminatorily denied its rightful status within the federal system." *Id*. (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592, 607 (1982)).

99.   Texas and Louisiana, "if [they] could, would likely attempt to address through [their] sovereign lawmaking powers" the harm they suffer from an increase of criminal illegal aliens arriving within their borders. *Id.* at 607. The States' powers over immigration, however, are limited. *See generally Arizona v. United States*, 567 U.S. 387 (2012) (discussing the ways in which federal immigration law preempts state law). Texas and Louisiana therefore "rely on the federal government to protect their interests." *Texas*, 328 F. Supp. 3d at 694.

100.   Texas and Louisiana "are not barred outright from suing the federal government based on a *parens patriae* theory"; rather, because "the [S]tates are seeking to enforce—rather than prevent the enforcement of—a federal statute a *parens patriae* suit between these parties may be maintained." *Texas v. United States*, 86 F. Supp. 3d 591, 626 (S.D. Tex. 2015) (citing *Texas DAPA*, 809 F.3d at 154).

101.   Among the quasi-sovereign interests the States hold as *parens patriae* are the protection of residents from crime, including crime caused by illegal aliens.

102.   This injury is concrete—crimes committed by aliens who otherwise would have been detained and deported or removed but for the Defendants' policies are not abstractions but acts imposing actual costs on both the States and their residents.

103.   This injury is particular because it happens within, and impinges upon the quasi-sovereign interests of, Texas and Louisiana.

104.   The injury is imminent, and occurring, because the Defendants are at this moment not detaining and deporting or removing illegal aliens, some of whom have already committed, and will commit, crimes that they would not have been able to commit had they been deported or removed.

**b. Traceability.**

105.   The States' injuries are fairly traceable to the Defendants.

106.    The States' spending money on programs to serve illegal aliens who would have been detained and deported or removed but for the Defendants' policies is directly traceable to the Defendants' policy of not detaining and deporting or removing those aliens. *See Texas DAPA*, 809 F.3d at 161; *Texas v. Biden*, No. 2:21-cv-67-Z, 2021 WL 3603341, *8 (N.D. Tex. Aug. 13, 2021) (fiscal injuries to States fairly traceable to agency action that "necessarily increases the number of aliens released . . . into the United States and the plaintiff States specifically")

107.    The increase in crime arising from the increased presence of illegal aliens who otherwise would not be present in Texas and Louisiana is not so tenuously connected to the Enforcement Memoranda that it cannot be traced to the Defendants' actions. Illegal aliens' future behavior can be traced to the Defendants' policies where it is likely that aliens who have historically behaved in a certain way will continue to do so. That is not speculation, but a predictable effect of Defendants' policies. *See Dept. of Commerce v. New York*, 139 S. Ct. 2251, 2566 (2019). The recidivism rates of criminal illegal aliens, and the costs that those recidivists impose on the States, are such predictable effects.

108.    Further, increased crime and its attendant costs can be traced to Defendants' policies because the evidence shows the general propensity of criminal illegal aliens to recidivate at rates that impose non-trivial costs on the States, and there is no suggestion that illegal aliens who currently would be detained and deported or removed but for Defendants' policies behave differently than other illegal aliens who commit crimes. *See Davis v. FEC*, 554 U.S. 724 (2008).

109.    Even if this were not the case, the "standing analysis is not an accounting exercise." *Texas DAPA*, 809 F.3d at 156 (internal quotation omitted). That some illegal aliens recidivate and therefore impose costs on the States, and that some illegal aliens require the expenditure of public funds that would otherwise not be spent, is sufficient to create standing.

110.    The effects of the September 30 Memorandum will increase the States' healthcare costs, education costs, and enforcement and correctional costs, inflicting on the States an actual and imminent financial injury. *See California v. Texas*, 141 S. Ct. 2104, 2118 (2021) (using both "logic and "intuition" to conclude that practical "benefits" gave individuals sufficient "incentive" to enroll in government programs).

### c.  Redressability.

111.    The relief the States seek would redress the harms they allege. Were the Defendants' policies set aside and they were required to detain and deport or remove the illegal aliens they currently do not, those illegal aliens would no longer be present in Texas or Louisiana to recidivate or otherwise require the public services that they would otherwise receive. *Texas DAPA*, 809 F.3d at 161; *DeOtte v. Azar*, 332 F.R.D. 173, 179 (N.D. Tex. 2019). At the very least, enjoining the change in policy would authorize line-level officers to take into custody illegal aliens that are currently being released or remaining in incarceration by the States. Based on past practice, providing line-level officers with that authority will significantly reduce the number of illegal aliens that enter each State or that impose costs on their corrections systems.

### 2.  Special solicitude.

112.    Even if the States could not satisfy the traditional standing inquiry, they would have standing due to the special solicitude they are due as sovereign States.

113.    Special solicitude has two requirements: (1) the State must have a procedural right to challenge the action in question, and (2) the challenged action must affect one of the State's quasi-sovereign interests." *Texas MPP*, 20 F.4th at 969 (citation omitted). Texas and Louisiana satisfy the first prong because they are "asserting a procedural right under the APA to challenge an agency action," *id*. (citation omitted), something they can do for all of their claims. *See* 5 U.S.C. § 706.

114.    As stated above, the Defendants' actions affect the States' quasi-sovereign interests. By pressuring "Texas to change its detention or education budgets," the September 30 Memorandum is affecting a quasi-sovereign interest. *Texas v. United States*, 524 F. Supp. 3d at 630.

115.    "Thus, Texas [and Louisiana] [are] entitled to special solicitude in the standing inquiry. If nothing else, that means imminence and redressability are easier to establish here than usual." *Texas MPP*, 20 F.4th at 970 (citation omitted).

116.    The remaining prong of the standing analysis—causation (or traceability)—is also subject to the special solicitude doctrine. *See Texas v. United States*, No. 1:18-CV-00068, 2021 WL 3025857, at *9 (S.D. Tex. July 16, 2021) (Hanen, J.) ("The Fifth Circuit has explicitly interpreted special solicitude to lower the level of certainty required in the traditional causation and redressability analysis.").

## C. Administrative Procedure Act claims.

### 1. The September 30 Memorandum is susceptible of judicial review.

117.    The APA establishes a basic presumption of judicial review for one suffering legal wrong because of agency action." *Dept. of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (cleaned up). "That presumption can be rebutted by a showing that the relevant statute precludes review, or that the agency action is committed to agency discretion by law." *Id.* (cleaned up). Neither exception applies in the current action.

118.    Establishing unreviewability is a heavy burden, and where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling." *Texas*, 809 F.3d at 164 (cleaned up). "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the

administrative action involved." *Id.* (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984)).

### a. The Memorandum is final agency action.

119.   The September 30 Memorandum is susceptible of judicial review because it constitutes final agency action. *See* 5 U.S.C. § 704. It marks the consummation of the Defendants' decisionmaking process, and it is one from which legal consequences flow or by which rights or obligations are determined. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997); *U.S. Army Corps of Engrs. v. Hawkes Co.*, 578 U.S. 590, 597 (2016).

120.   The September 30 Memorandum is definitive, rather than advisory, and there is no indication that it is tentative or interlocutory. It therefore marks the consummation of the decisionmaking process. *Bennett*, 520 U.S. at 178; *Hawkes*, 578 U.S. at 597–98. Defendants concede the September 30 Memorandum satisfies this first prong. ECF No. 122 at 24 n.10.

121.   As with the earlier Memoranda, the content of the September 30 Memorandum indicates that it is the consummation of DHS's decision-making process. It sets a definite date upon which it takes effect, Ex. X § VI, and says nothing about being only an interim or temporary document. It directs that particular actions be undertaken and particular processes put into place before the effective date. *Id.* § V. It applies "Department-wide." *Id.* § VI. It was released contemporaneously with a document purporting to "contain[] a summary of the considerations informing" the September 30 Memorandum following "numerous engagements with internal and external stakeholders" and "information collected throughout [a seven-month] period as well as the Secretary's own experience. . . ." AR001 at 2. There are no indications that the Memorandum is interlocutory or tentative; it bears all the marks of a final decision. *See Hawkes Co.*, 578 U.S. at 596–97.

122.     The September 30 Memorandum also affects substantive rights, and legal consequences flow from it. "Courts consistently hold that an agency's guidance documents binding it and its staff to a legal position produce legal consequences or determine rights and obligations, thus meeting the second prong of *Bennett*." *Texas v. EEOC*, 933 F.3d 433, 442 (5th Cir. 2019).

123.     The September 30 Memorandum is final agency action because it binds the agency to a multi-factor analysis of aggravating and mitigating factors: "a guidance document requiring agency staff to use a multi-factor analysis in deciding whether a regulated entity's activity complied with governing law [is] a final agency action." *Texas v. EEOC*, 933 F.3d at 443 (citing *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000)); *see also id.* at 443 ("The Guidance indicates that it binds EEOC staff to an analytical method in conducting Title VII investigations and directs their decisions about which employers to refer for enforcement actions.").

124.     Whether an action binds the agency is evident if it "appears on its face to be binding." *Id.* at 441. In some cases, "the mandatory language of a document alone can be sufficient to render it binding." *Id.* at 441–42 (cleaned up); *see also Iowa League of Cities v. EPA*, 711 F.3d 844, 846 (8th Cir. 2013) (language expressing an agency's position that speaks in mandatory terms is "the type of language we have viewed as binding" (internal quotation marks and citation omitted)).

125.     The September 30 Memorandum so appears on its face, as it mandates that "our personnel must evaluate the individual and the totality of the facts and circumstances," Ex. X at 4, and its "guidance is Department-wide[;] agency leaders as to whom this guidance is relevant to their operations will implement this guidance accordingly." Ex. X at 7.

126.     Also, as described below, 8 U.S.C. § 1226(c) obligates DHS to detain all aliens who fall within the ambit of that provision when they are "released" from state custody, and 8 U.S.C. § 1231(a)(2) requires DHS to detain all aliens with final orders

of removal "during the removal period." By substituting a prioritization scheme in place of these enforcement mandates, the Memorandum requires DHS to enforce the law in a different way that prescribed by Sections 1226(c) and 1231(a)(2), altering its legal obligations.

127.    The Memorandum also alters the rights and obligations of the States. Illegal aliens are eligible to participate in Texas's Emergency Medicaid program, which "is a *federally required* program *jointly funded* by the federal government and the *states*." Finding No. 54 (emphases added). Illegal aliens are eligible to participate in this program. *See id.*; 8 U.S.C. § 1611(b)(1)(A). A criminal illegal alien who is released from custody in Texas but not taken into custody by ICE is eligible for Emergency Medicaid, and Texas is legally obligated to bear part of the cost of furnishing him with that program.

128.    The Memorandum also affects Texas's legal obligation to provide a public-school education. Texas is required by both federal and state law to provide noncitizen children with a public-school education. *See generally Plyler v. Doe*, 457 U.S. 202 (1982); *Texas v. United States*, 106 F.3d 661, 666 (5th Cir. 1997) ("[T]he State's public education expenditures for the children of undocumented aliens are required by the equal protection clause[.]"). This obligation includes juveniles released from the custody of TJJD who are not detained by ICE because of the Memoranda, or children of criminal aliens who remain in the State. Just as the Memorandum requires Texas to bear the medical costs of non-detained illegal aliens, it requires Texas to bear the cost of educating illegal alien minors who would otherwise be detained and deported or removed.

### b.  No statute bars the Court's review.

129.    An agency action cannot be challenged under the APA if another statute precludes judicial review. 5 U.S.C. § 701(a)(1). No such bar exists here.

130.    First, 8 U.S.C. § 1252(a)(5) and (b)(9) do not bar review here. Rather, they preclude illegal aliens from challenging their own removal proceedings bar review only of an order of removal under § 1252(a)(1). *See Nielsen v. Preap*, 139 S. Ct. 954, 962 (2019). "[W]here, as here, the parties are not challenging any removal proceedings," the INA "is certainly not a bar." *Id.*

131.    Moreover, Plaintiffs' claims do not "aris[e] from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien." 8 U.S.C. § 1252(g). Their claims instead arise from Defendants' unlawful generally applicable policy. *See Regents*, 140 S. Ct. at 1907 (rescission of DACA reviewable); *Texas DAPA*, 809 F.3d at 164 (DAPA reviewable).

132.    Second, 8 U.S.C. § 1231(h), which states that "[n]othing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States," does not bar review here. That language applies only to parties to the removal proceedings described in Section 1231. *See Texas v. United States*, 524 F. Supp. 3d 598, 633–638 (S.D. Tex. 2021).

133.    Third, 8 U.S.C. § 1226(e) does not bar review here. It bars review of "discretionary decisions about the application of § 1226 to particular cases;" it "does not block lawsuits over the extent of the Government's detention authority under the statutory framework as a whole. *Preap*, 139 S. Ct. at 962 (internal quotation marks omitted).

### c.  The decision to issue the Memorandum is not absolutely committed to agency discretion.

134.    Agency action is presumptively reviewable under the APA. *See Lincoln v. Vigil*, 508 U.S. 182, 190 (1993). But judicial review is not available when the decision is absolutely committed to the agency's judgment. *Id.* at 191 (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). One such instance is "an agency's decision not

to institute enforcement proceedings," *id.*, which is "presumptively unreviewable." *Heckler*, 470 U.S. at 832–33.

135.    But *Heckler* does not apply to rules. *Texas MPP*, 20 F.4th at 978.

136.    The September 30 Memorandum is a rule because it is "the whole or a part of an agency statement of general . . . applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." *Texas MPP*, 20 F.4th at 982–83 (quoting 5 U.S.C. § 551(4)).

137.    The two memoranda that the September 30 Memorandum superseded as "undisputedly rules." *Texas MPP*, 20 F.4th at 985.

138.    Even if *Heckler* applied, "the presumption may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers. In other words, the executive *cannot* look at a statute, recognize that the statute is telling it to enforce the law in a particular way or against a particular entity, and tell Congress to pound sand." *Texas MPP*, 20 F.4th at 982 (cleaned up).

139.    Congress provided guidelines for DHS to follow "when it phrased [Sections 1226(c) and 1231(a)(2)] in mandatory terms." *Id.* (discussing another mandatory detention provision of the INA, 8 U.S.C. § 1225(b)(2)(A)).

140.    Sections 1226(c) and 1231(a)(2) respectively state that the Attorney General "*shall* take into custody" certain aliens and "*shall* detain the alien" during the removal period (emphasis added). "Shall" in these instances means "must," meaning that the Defendants have no discretion as to whether to detain covered aliens. *See Johnson v. Guzman-Chavez*, 141 S. Ct. 2271, 2280 n.2., 2281 (2021) (citing 8 U.S.C. §§ 1226(c), 1231(a)(2)). *See also Preap*, 139 S. Ct. at 959; *Jennings*, 138 S. Ct. at 835; *Zadvydas*, 533 U.S. at 683; *Demore*, 538 U.S. at 521). The federal government itself has acknowledged this, arguing to the Supreme Court that while the general

rule in immigration enforcement is that detention is discretionary, Section 1226(c) "makes an exception to that general rule, providing that the government 'shall' take into custody and not release certain criminal aliens," Br. for Petr., *Guzman-Chavez*, No. 19-897, 2020 WL 4938065, at \*5, and that it has "long read" Section 1231(a)(2) "to require the detention of terrorist and criminal aliens." Reply Br. for Petr., *Guzman-Chavez*, No. 19-897, 2020 WL 7249055, at \*17 & fn.

141.    Section 1226(c)(1) refers to 8 U.S.C. § 1182(a)(2), which covers "any alien convicted of . . . a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance." *Id*. § 1182(a)(2)(A)(i)(II); *see also id.* § 1226(c)(1)(B) (citing *id*. § 1227(a)(2)(B)).

142.    Additionally, Section 1226(c) requires Defendants to detain aliens convicted of crimes of moral turpitude. Section 1226(c)(1) refers to 8 U.S.C. § 1182(a)(2), which covers "any alien convicted of . . . a crime involving moral turpitude (other than a purely political offense)." *Id*. § 1182(a)(2)(A)(i)(I); *see also id.* § 1226(c)(1)(B) (citing *id*. § 1227(a)(2)(A)).

143.    "Crimes including dishonesty or lying as an essential element involve moral turpitude." *Omagah v. Ashcroft*, 288 F.3d 254, 260 (5th Cir. 2002); *see also Jordan v. De George*, 341 U.S. 223, 227 (1951) ("Without exception, federal and state courts have held that a crime in which fraud is an ingredient involves moral turpitude.").

144.    Evading arrest with a vehicle is a crime of moral turpitude. *See Pulido-Alatorre v. Holder*, 381 F. Appx. 355, 358–59 (5th Cir. 2010) (per curiam) (upholding INS's determination that "intentional flight with a vehicle" is a crime involving moral turpitude because of the "conscious disregard of a substantial and unjustifiable risk").

145.    The Fifth Circuit "agree[s] with the BIA's conclusion that the failure to stop and render aid after being involved in an automobile accident is the type of base

behavior that reflects moral turpitude." *Garcia-Maldonado v. Gonzales*, 491 F.3d 284, 290 (5th Cir. 2007).

146.    Similarly, "the crime of theft is one involving moral turpitude." *Okoro v. INS*, 125 F.3d 920, 926 (5th Cir. 1997).

147.    The September 30 Memorandum contravenes these mandates and thus cannot be considered a proper use of discretion committed to the defendant agencies.

148.    "Neither 'enforcement discretion' nor *Heckler v. Chaney* empowers an agency to disregard Congress's statutes." *Univ. of Texas M.D. Anderson Cancer Ctr. v. United States Dept. of Health & Human Servs.*, 985 F.3d 472, 481 (5th Cir. 2021) (cleaned up).

149.    The September 30 Memorandum is more than a structuring of enforcement priorities. As with the previous Memoranda—and previous actions by these agency defendants—the September 30 Memorandum "facially purports to confer discretion," but "nothing about [it] genuinely leaves the agency and its employees free to exercise discretion." *Texas DAPA*, 809 F.3d at 171–72 (cleaned up).

150.    Sections 1226(c) and 1231(a)(2) require Defendants to detain certain aliens "when the alien is released" or "during the removal period." Yet, as with the earlier Enforcement Memoranda, the September 30 Memorandum wades into areas that are not committed to agency discretion. Because "shall" means "must" in Section 1226(c), the Executive Branch is required to detain criminal aliens who have committed "any offense covered in section 1182(a)(2)," "any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D)," or any alien who "is deportable under section 1227(a)(2)(A)(i)," "inadmissible under section 1182(a)(3)(B)," or "deportable under section 1227(a)(4)(B)." 8 U.S.C. § 1226(c)(1)(A)–(D). This leaves no room for a determination of whether a particular alien's criminal conduct is "serious" enough to constitute a threat to public safety or to weigh non-statutory aggravating and mitigating factors in making that determination. *See* Ex. X at § II.B.

151.    Further, to protect the public, Congress mandated that aliens falling under any of these categories be detained "when . . . released" from state custody. 8 U.S.C. § 1226(c). Likewise, Congress mandated the detention of both aliens under orders of removal and aliens who have been found "inadmissible under section 1182(a)(2)," "1182(a)(3)(B)," or "deportable under section 1227(a)(2) or 1227(a)(4)(B)." *Id.* § 1231(a)(2).

152.    Determining whether and when an alien should be detained is not a decision committed to agency discretion. By prioritizing the detention of some aliens over others, the September 30 Memorandum assumes a discretionary power that Congress has explicitly foreclosed. Such a maneuver is impermissible. *See Util. Air Regul. Grp., v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes laws and the President, acting at times through agencies like EPA, 'faithfully execute[s]' them. The power of executing the laws necessarily includes both authority and responsibility to resolve some questions left open by Congress that arise during the law's administration. But it does not include a power to revise clear statutory terms that turn out not to work in practice." (alteration in original) (citation omitted) (citing U.S. Const. art. II, § 3).

153.    Nor does the exercise of prosecutorial discretion permit the Defendants to exceed the limits placed upon the Executive by Congress. "Whatever 'inherent authority' the Executive may have in the area of immigration, that authority—along with the executive Power—does not include the authority to 'suspend' or 'dispense with' Congress's exercise of legislative Powers in enacting immigration laws." *Texas v. United States*, 524 F. Supp. 3d at 649. "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Vigil*, 508 U.S. at 193. And the President's duty to "'take care that the laws be faithfully executed' means that the president is not permitted to dispense with or suspend statutes the way King James II did before the Glorious Revolution of 1688."

Michael Stokes Paulsen *et al.*, The Constitution of the United States 317 (Robert C. Clark *et al.*, eds., 2d ed. 2013).

### d. Within the zone of interests.

154.    The States may challenge the September 30 Memorandum under the APA only if their injury is arguably within the zone of interests protected by the underlying statutes, a test that is "not especially demanding." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224–25 (2012) (quoting *Clarke v. Secs. Indus. Assn.*, 479 U.S. 388, 399 (1987).

155.    The States' injuries are within the zone of interests protected by Sections 1226(c) and 1231(a)(2), which, as with the rest of the Immigration and Nationality Act, were enacted to protect and benefit the States, the nation's citizens, and the nation's legal immigrants. In particular, one reason it was enacted was the "concern that 'aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates'"—benefits such as the ones Texas must furnish under the Emergency Medicaid program and its obligation to furnish a public education. *See Texas DAPA*, 809 F.3d at 163 (quoting 8 U.S.C. § 1601).

156.    The States fall within the zone of interests of the INA as a whole, which is the proper reference for actions under the APA, rather than any particular section. *Texas MPP*, 20 F.4th at 975–76.

157.    Texas and Louisiana's interests in not "spending millions of dollars to subsidize" illegal aliens are within the zone of interests protected by the INA. *Texas DAPA*, 809 F.3d at 163. By mandating that criminal aliens be taken into custody, Sections 1226(c) and 1231(a)(2) ensure that aliens are not released into the United States to impose costs on American citizens and taxpayers. The States' injuries flow from just that problem.

### 2.  Action in contradiction of law.

158.   As described above, "shall" in Sections 1226(c) and 1231(a)(2) means "must." *See Texas MPP*, 20 F.4th at 975–76  (Section "1225(b)(2)(A) [of the INA] uses mandatory language ('the alien shall be detained') to require DHS to detain aliens pending removal proceedings").

159.   For the same reasons that this means that the September 30 Memorandum is not a proper exercise of agency discretion that would free it from judicial review, it means that the September 30 Memorandum contradicts the law that the Defendants are bound to follow. The September 30 Memorandum and the policies it adopts are thus not in accordance with law and in excess of statutory jurisdiction, authority, and limitation. 5 U.S.C. § 706(2)(A), (C).

160.   Because the Defendants are not taking custody of criminal aliens and aliens subject to final orders of removal as required by Sections 1226(c) and 1231(a)(2), they are unlawfully withholding and unreasonably delaying agency action, which the Court can compel them to perform. 5 U.S.C. § 706(1).

### 3.  Lack of reasoned decisionmaking.

161.   The APA's prohibition of agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), requires agencies to engage in reasoned decisionmaking. *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

162.   An agency rule is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs

counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. "Because the central focus of the arbitrary and capricious standard is on the rationality of the agency's 'decisionmaking,' rather than its actual decision, '[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'" *United States v. Garner*, 767 F.2d 104, 116–17 (5th Cir. 1985) (quoting *State Farm*, 463 U.S. at 50).

163.    The September 30 Memorandum does not analyze—does not even mention—the harms, social and financial, that failing to detain removable aliens impose on Texas, Louisiana, or any other State, "entirely fail[ing] to consider [that] important aspect of the problem." *Regents*, 140 S. Ct. at 1913 (quoting *State Farm*, 463 U.S. at 51) (alteration in *Regents*). Failing to consider important costs of a policy renders that policy arbitrary and capricious. *See Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015) ("[A]gency action is lawful only if it rests 'on a consideration of the relevant factors.'").

164.    The September 30 Memorandum also failed to consider alternative approaches that would allow at least some additional mandatory detentions—of aliens convicted of drug offenses, crimes of moral turpitude, or aggravated felonies, or of aliens with final orders of removal—to continue. As with another DHS policy recently rejected by the Supreme Court, issuing the September 30 Memorandum "'without any consideration whatsoever' of a [more limited] policy" was arbitrary and capricious. *Regents*, 140 S. Ct. at 1912 (quoting *State Farm*, 463 U.S. at 51).

165.    Even if there were some way to explain or justify the decisions that led to the September 30 Memorandum, it would be irrelevant because the Defendants did not provide any such explanation or justification in the September 30 Memorandum itself.

166.    While the Defendants filed a voluminous administrative record including the Considerations Memo, the September 30 Memorandum itself does not incorporate or even refer to the Considerations Memo that purportedly explains the reasons the Memorandum was issued.

167.    And even if it did, the Considerations Memo does not reveal a consideration of the costs the September 30 Memorandum would impose on the States or their residents or the consideration of more-limited policies that might have allowed for the mandatory detention of at least some of the aliens that Congress has mandated the Defendants detain. "Stating that a factor was considered . . . is not a substitute for considering it." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986); *see also Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1226 (5th Cir. 1991) ("The EPA's failure to consider the regulatory alternatives, however, cannot be substantiated by conclusory statements."). DHS's *assertions about explanations* [cannot be substituted] with *explanations* themselves." *Texas MPP*, 20 F.4th at 993 (5th Cir. 2021).

168.    Nor does the mere presence of documents in the administrative record permit an inference that the Defendants actually considered those documents in formulating the September 30 Memorandum. *See Texas v. Biden*, 2021 WL 3603341, *2, 18–19 (finding agency action arbitrary and capricious for failing to consider a document—a previous assessment by the same agency on the benefits of the terminated program—contained in the administrative record).

169.    Even if the Considerations Memo were evaluated to determine the rationality of the agency action here, it would still be arbitrary and capricious.

170.    The Considerations Memo relies on factors Congress did not intend the agency to consider, including evaluating recidivism risks of criminal aliens on a case-by-case basis rather than by the categories mandated by Congress, and treating employment of illegal aliens in the country as positive rather than negative factors.

171.  An agency rule is "arbitrary and capricious if it the agency has relied on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983).

172.  The Considerations Memo also failed to consider a relevant factor than falls within the ambit of the existing policy. DHS has often used the authority granted by Congress to reprogram and transfer funds to increase detention capacity for criminal aliens.

173.  DHS is currently authorized to reprogram and transfer funds to ICE "to ensure the detention of aliens prioritized for removal." Consolidated Appropriations Act of 2021, Pub. L. No. 116-120, 134 Stat. 1182, 1457 (2020). Congress reauthorized this provision with a continuing resolution for FY2022. *See* The Extending Government Funding and Delivering Emergency Assistance Act, Pub. L. No. 117-43, 135 Stat. 344-45 (2021).

174.  The failure to even mention such an "alternative within the ambit" of the challenged policy relating to detention of criminal aliens also "fails to account for relevant factors." *Texas MPP*, 20 F.4th at 989 (quotation omitted). It is therefore arbitrary and capricious.

175.  Because it does not reveal the consideration of any of the factors described above, adopting the September 30 Memorandum was arbitrary and capricious, and it must be set aside. 5 U.S.C. § 706(2).

176.  And in fact, the September 30 Memorandum shows that the Defendants did not consider important factors such as recidivism. Nothing in the Memorandum establishes that the Defendants considered the costs imposed by recidivism. Indeed, despite listing roughly a dozen other aggravating and mitigating factors agents should consider when determining whether an illegal alien is a threat to public safety, the September 30 Memorandum says nothing about a risk to recidivate. Ex. X at § II.B. The Defendants either failed to consider recidivism as a factor in their

decision-making or dismissed its relevance without explanation. Either option renders the Memorandum arbitrary and capricious. *See State Farm*, 463 U.S. at 43, 103 S. Ct. at 2867.

177.    The Defendants' decision-making "must be tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system." *Judulang v. Holder*, 565 U.S. 42, 55 (2011).   One broad purpose of immigration law and policy is to minimize the costs and expenses related to the presence of illegal aliens in the country. *See Demore*, 538 U.S. at 530 n.14; *Hernandez-Avalos v. INS*, 50 F.3d 842, 847 (10th Cir. 1995) (8 U.S.C. § 1252(i) (1986) was enacted "to ease financial burdens on federal, state and local prisonsresulting from lengthy detention of aliens awaiting deportation"); *Giddings v. Chandler*, 979 F.2d 1104, 1109 (5th Cir. 1992) (main purpose of Section 1252(i) was to"reduc[e] prison overcrowding and cost to the government"); *Prieto v. Gluch*, 913 F.2d 1159, 1165 (6th Cir. 1990) (Section 1252(i) was enacted due to concerns of overcrowding in "local and State jails"). There is no evidence that the September 30 Memorandum did so.

### 4.  Lack of notice and comment

178.    The September 30 Memorandum was a substantive or legislative rule that was subject to notice-and-comment rulemaking. Because it did not go through that process, it must be set aside.

179.    Rules are exempt from the APA's notice-and-comment requirement if they are "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice[.]"  5 U.S.C. § 553(b). This exemption is "narrowly construed." *Texas DAPA*, 809 F.3d at 171.

### a. Policy statement.

180.  Two criteria distinguish a policy statement from a substantive rule: whether it imposes rights and obligations, and whether it genuinely leaves the agency and its decisionmakers free to exercise discretion. *Texas DAPA*, 809 F.3d at 171.

181.  For the same reasons as discussed above in analyzing whether the September 30 Memorandum is final agency action, the Memorandum imposes rights and obligations.

182.  The key inquiry in determining whether a rule genuinely leaves the agency and its personnel free to exercise discretion is the extent to which the agency and its personnel have the freedom to follow or not to follow that rule in an individual case—or, on the flip side, whether it so dominates the consideration that "one need only determine whether a given case is within the rule's criteria." *Profls. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 596–97 (1995). As long as personnel remain free to consider individual facts in various cases, the action is not a substantive rule. *Id.*

183.  The September 30 Memorandum does not genuinely leave the agency and its personnel free to exercise discretion.

184.  As described above, Defendants' personnel interpret the Memorandum as setting forth an obligation rather than describing the discretion they are free to exercise. Further, the practical effect of the front-end and back-end procedures is to so constrain discretion that even formerly routine enforcement actions require extraordinary investigative effort and post-enforcement review.

185.  As with the earlier Enforcement Memoranda, the September 30 Memorandum is hampering enforcement actions and will continue to deter agents and officers from exercising their discretion in determining whether to conduct enforcement actions.

### b. Procedural rule.

186.   Nor is the September 30 Memorandum a procedural rule that is exempt from notice and comment.

187.   The first test used by the Fifth Circuit to determine whether a rule is procedural is the "substantial impact test." *See Texas DAPA*, 809 F.3d at 176. This test "is the primary means by which [the court] look[s] beyond the label 'procedural' to determine whether a rule is of the type Congress thought appropriate for public participation." *Id.* (citing *U.S. Dept. of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 (5th Cir. 1984)). "An agency rule that modifies substantive rights and interests can only be nominally procedural, and the exemption for such rules of agency procedure cannot apply." *Texas DAPA*, 809 F.3d at 176 (quoting *Kast Metals*, 744 F.2d at 1153). In making this determination, the question is not "whether the rule is 'substantive' or 'procedural,' but rather whether the rule will have a 'substantial impact' on those regulated." *Phillips Petroleum Co. v. Johnson*, 22 F.3d 616, 620 (5th Cir.), *modified on reh'g*, 36 F.3d 89 (table), 1994 WL 484506 (Sept. 7, 1994).

188.   In determining whether the rule will have a "substantial impact" on those regulated, the Court may consider whether the rule creates legal or financial obligations for the plaintiff and whether the rule restricts the discretion of agency officials. If the rule has a substantial impact on "the regulated industry, or an important class of the members or the products of that industry," then "notice and opportunity for comment should first be provided" because the exemption from the notice-and-comment requirement "does not extend to those procedural rules that depart from existing practice and have a substantial impact on those regulated." *Phillips*, 22 F.3d at 620. *See id.* (concluding the rule at issue was not procedural because, in part, "[t]he rule narrowly restrict[ed] the discretion of MMS officials in determining the value of NGLP's" and "[i]t foreclose[d] other valuation methods by prescribing binding valuation criteria"); *Texas DAPA*, 809 F.3d at 176 (concluding

DAPA "undoubtedly [satisfies the substantial impact] test—conferring lawful presence on 500,000 illegal aliens residing in Texas forces the state to choose between spending millions of dollars to subsidize driver's licenses and amending its statutes"). *See also Texas*, 328 F. Supp. 3d at 728 (concluding DACA is not a procedural rule, having found it "undoubtedly satisfies [the substantial impact] test because it has forced the states to spend money on various social services costs, which are clearly modif[ications] of substantive rights" (quotation omitted)).

189.    The September 30 Memorandum satisfies the substantial-impact test.

190.    First, as discussed above, the Memorandum affects at least one of Texas's legal obligations. Specifically, it affects Texas's legal and financial obligations to partially fund Emergency Medicaid and public education and corrections costs for aliens who fall within the ambit of Sections 1226(c) or 1231(a)(2) but, due to the Memoranda, are not detained by ICE when they are released from state custody or during the removal period.

191.    The Memorandum also has a substantial impact on the operations of the agencies it governs and the persons who are subject to the laws it purports to help enforce. As just described, it limits the discretion exercised by ICE field offices, agents, and officers to conduct routine civil immigration enforcement actions.

192.    The second test for determining whether a rule is procedural asks the Court to weigh two considerations.

193.    First, the Court must consider the "effect on those interests ultimately at stake in the agency proceeding." *Texas DAPA*, 809 F.3d at 176 (citing *Natl. Sec. Counselors v. CIA*, 931 F. Supp. 2d 77, 107 (D.D.C. 2013)) (quotation omitted). "Hence, agency rules that impose 'derivative,' 'incidental,' or 'mechanical' burdens upon regulated individuals are considered procedural, rather than substantive." *Texas DAPA*, 809 F.3d at 176 (citing *Natl. Sec. Counselors*, 931 F. Supp. 2d at 107). The

Memorandum affects the rights and obligations of Texas, DHS, and certain aliens, so this consideration weighs against characterizing it as procedural.

194.    Second, the Court must assess whether the Memorandum affects the substantive standards by which DHS determines whether to detain certain aliens. *See Texas DAPA*, 809 F.3d at 176–77 ("[R]ules are generally considered procedural so long as they do not 'change the substantive standards by which the [agency] evaluates' applications which seek a benefit that the agency has the power to provide." (quotation omitted)).

195.    By departing from the requirements in Sections 1226(c) and 1231(a)(2) and effectively replacing them with new standards for making such determinations, the September 30 Memorandum alters the substantive standards by which DHS determines whether and when to detain certain aliens. The Memorandum requires DHS to do something besides detain qualifying aliens, which is what the statute requires. That "something" is to engage in a lengthy investigatory process to determine whether to detain an alien whom the sections' plain language requires be detained.

196.    Further, as discussed above, Section 1226(c) requires DHS to detain qualifying aliens when they are released from state custody. Section 1231(a)(2) requires DHS to detain an alien with a final order of removal during the removal period. The Memorandum, however, sets forth a prioritization scheme that declares some aliens falling within the ambit of Section 1226(c) and 1231(a)(2) as enforcement "priorities," omitting others within those same statutory categories. Ex. X at § II.

197.    Sections 1226(c) and 1231(a)(2) contain no such prioritization scheme, instead requiring DHS to detain *all* aliens who meet the enumerated statutory criteria and requiring it to do so at a specified time. Thus, the Memoranda change the "substantive standards by which [DHS] evaluates" whether or not to detain an alien who falls within the ambit of Section 1226(c) and 1231(a)(2). *See Texas DAPA*,

809 F.3d at 177 ("DAPA establishes the substantive standards by which the agency evaluates applications which seek a benefit that the agency purportedly has the power to provide—a critical fact requiring notice and comment." (cleaned up)).

198.    Therefore, this test also weighs against classifying the Memoranda as procedural rules.

## D. Failure to Take Care that the Laws be Faithfully Executed

199.    The Take Care Clause commands that the President and those who work for him in the Executive Branch are obligated to "take Care that the Laws be faithfully executed." U.S. Const. art. II. § 3.

200.    A violation of the Constitution is also a violation of the APA. 5 U.S.C. § 706(2)(B).

201.    The September 30 Memorandum "affirmatively displaced a congressional [] mandate[.]" *Make the Rd. N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 258 (S.D.N.Y. 2020). It therefore implicates "constitutional separation of powers concerns not present in *Dalton [v. Specter*, 511 U.S. 462 (1994)]" and should be "appropriately considered as [a] constitutional claim[] subject to judicial review." *Id.* at 258–59.

202.    The September 30 Memorandum necessarily causes Defendants to violate the mandatory-detention obligations in Sections 1226(c) and 1231(a)(2) and claim "a dispensing power, which has no countenance for its support in any part of the constitution." *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 613 (1838). The President's obligation to see the laws faithfully executed cannot imply a power to forbid their execution. *Id.*

203.    In addition to their claim under the APA, the States have a cause of action "at equity." *Green Valley Spec. Util. Dist. v. City of Schertz*, 969 F.3d 460, 475 (5th Cir. 2020) (en banc). "Equity thus provides the basis for relief—the cause of action, so to speak"—when a plaintiff seeks prospective relief for a constitutional

violation committed by a federal official. *Simmat v. U.S. Bur. of Prisons*, 413 F.3d 1225, 1232 (10th Cir. 2005) (McConnell, J.). *See also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327-28 (2015) (discussing "a long history of judicial review of illegal executive action, tracking back to England"); *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902); *Stark v. Wickard*, 321 U.S. 288, 310 (1994).

204.    "When an executive acts ultra vires, courts are normally available to reestablish the limits on his authority." *Dart v. United States*, 848 F. 2d 217, 224 (D.C. Cir. 1988). "Nothing in the subsequent enactment of the APA altered the *McAnnulty* doctrine of review. It does not repeal the review of ultra vires actions that was recognized long before, in *McAnnulty*." *Id.*

205.    The States can bring a "non-statutory review action," and courts have authority to review federal executive action that violates statutory commands, *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327–32 (D.C. Cir. 1996). Such an action need not satisfy the requirements of proceeding under the APA. *See Simmat*, 413 F.3d at 1233 n.9 (allowing constitutional claim to proceed even though plaintiff "appear[ed] to concede that his claim does not satisfy the APA's requirement of 'final agency action'").

206.    Because the States do not seek an order directing the President's "exercise of judgment," *Mississippi v. Johnson* does not preclude review. 71 U.S. (4 Wall.) 475, 499 (1867). *Texas v. United States* does not apply because the Executive Branch cannot take steps that prevent its compliance with congressional mandates, which is a workable standard against which this Court may judge the agency's exercise of discretion. 106 F.3d at 667.

## E. Breach of the Agreement with Louisiana.

207.    Congress specifically authorized DHS to "develop a process for receiving meaningful input from State and local government to assist the development of the

national strategy for combating terrorism and other homeland security activities." 6 U.S.C. § 361(b)(4).

208.    The notice-and-consultation process created in the Agreement provides a legitimate mechanism for receiving that meaningful input.

209.    Agencies frequently adopt procedural rules not required by statute, and federal courts enforce those rules. *See, e.g., Morton v. Ruiz*, 415 U.S. 199, 235 (1974); *Singh v. U.S. DOJ*, 461 F.3d 290, 295–96 (2d Cir. 2006); *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 717 (8th Cir. 1979).

210.    The Agreement was not subject to notice-and-comment rulemaking because it does not "constrain[] the agency from making future changes to immigration policy," but merely sets "rules of agency organization, procedure, or practice." *See* 5 U.S.C. § 553(b)(A).

211.    Because Louisiana in its breach-of-contract claim is not seeking money damages but is seeking to enforce an obligation of the United States in its capacity as a sovereign, the Tucker Act does not apply and this case is therefore not within the jurisdiction of the Court of Federal Claims. *See Doe v. United States*, 37 Fed. Cl. 74, 77 (1996).

212.    The distinction between relief "ordering the cessation of the conduct complained of" and relief "requir[ing] affirmative action by the sovereign" is the basis for the long-standing rule that ultra vires suits against federal officers (and analogous *Ex parte Young* suits against state officers) do not implicate sovereign immunity. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689–90, 691 n.11 (1949).

213.    "[I]f the federal officer, against whom injunctive relief is sought, allegedly acted in excess of his legal authority, sovereign immunity does not bar a suit. There is no sovereign immunity to waive—it never attached in the first place." *Chamber of Commerce v. Reich*, 74 F.3d at 1329 (cleaned up).

214. The federal government can waive its sovereign immunity through contract. *Wells Fargo Bank, N.A. v. Se. N.M. Affordable Hous. Corp.*, 877 F. Supp. 2d 1115, 1140 (D.N.M. 2012); *see C&L Enters., Inc. v. Citizen Band of Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 423 (2001); *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999). Defendants did so here.

215. Under the Agreement, Louisiana was to "provide information and assistance to help DHS perform its border security, legal immigration, immigration enforcement, and national security missions in exchange for DHS's commitment to consult [Louisiana] and consider [its] views before taking" certain administrative actions. Ex. K at § II.

216. DHS was required to "[c]onsult with [Louisiana] before taking any action or making any decision that could reduce immigration enforcement" or "increase the number of removable or inadmissible aliens in the United States." Ex. K § III.A.2. That "includes policies, practices, or procedures which have as their purpose or effect . . . reducing, redirecting, reprioritizing, lessening, eliminating, or in any way modifying immigration enforcement[;] decreasing the number of or criteria for detention of removable or inadmissible aliens from the country [or] increasing or declining to decrease the number of lawful, removable, or inadmissible aliens residing in the United States." *Id.* § III.A.2.

217. DHS was required to give Louisiana "180 days' written notice . . . of any proposed action" subject to the consultation requirement. Ex. K § III.A.3. That was to give Louisiana "an opportunity to consult and comment on the proposed action." *Id.*

218. After Louisiana submitted its views, DHS was to "in good faith consider [Louisiana]'s input and provide a detailed written explanation of the reasoning behind any decision to reject [that] input before taking any action" covered by the Agreement. *Id.*

219.    DHS violated the Agreement when it issued the September 30 Memorandum without following these procedures.

220.    DHS never terminated the Agreement in accordance with its terms because it did not send a notice to the Louisiana Department of Justice Deputy Director of the Louisiana Bureau of Investigation at 1885 N. 3rd Street, Baton Rouge, Louisiana 70802, as required by the Agreement. Ex. K at §§ IV, XV.

221.    DHS's violation of the Agreement entitles Louisiana to injunctive relief. Ex. K. at § VI.

## F. Remedies.

### 1. Entitlement to permanent injunction.

222.    A permanent injunction is proper when a plaintiff has prevailed on the merits, there is no adequate remedy at law for the plaintiff's injury, the balance of the harms favors the plaintiff, and an injunction would serve the public interest. *See Calmes v. United States*, 926 F. Supp. 582, 591 (N.D. Tex. 1996). The States have satisfied each of these elements.

### a. Prevail on the merits.

223.    As described above, the States have prevailed on the merits of their claims.

### b. Irreparable harm.

224.    For an injury to be sufficiently "irreparable," the States need only show the injury "cannot be undone through monetary remedies." *Burgess v. FDIC*, 871 F.3d 297, 304 (5th Cir. 2017) (quoting *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981)); *Humana, Inc. v. Avram A. Jacobson, M.D., P.*A., 804 F.2d 1390, 1394 (5th Cir. 1986).

225.    Texas and Louisiana "bear[] many of the consequences of unlawful immigration" and will suffer irreparable harm absent an injunction. Arizona, 567

U.S. at 397. The increase in the presence of illegal aliens will inflict significant financial costs on the States, including but not limited to healthcare, education, as well as enforcement and correctional services.

226.    These financial injuries are irreparable. Sovereign immunity prevents them from recovering from the Defendants the money they have spent in the past and will have to spend in the future to furnish social and educational services to illegal aliens who would not have required those services had they been detained and removed or deported. Nor can they do so for the money they have spent in the past and will have to spend in the future to incarcerate illegal aliens who would have been detained and removed or deported but for the September 30 Memorandum. *See Texas DAPA*, 809 F.3d at 186. Indeed, the Fifth Circuit rebuffed an attempt by Texas in the late 1990s to force the federal government to pay medical, educational, and criminal justice expenditures caused by immigration. *See Texas*, 106 F.3d at 663–64.

227.    As for injuries to the States' interests as *parens patriae*, injuries to "law enforcement and public safety interests" can constitute irreparable harm. *See Maryland v. King*, 567 U.S. 1301, 1303, (2012) (granting a stay of a judgment after finding Maryland experienced ongoing irreparable harm because it was enjoined from effectuating a statute that assisted government officials in investigating crimes and arresting violent offenders) (Roberts, C.J., in chambers). Here, law-enforcement and public-safety interests underlie the States' *parens patriae* injuries. Accordingly, the States have demonstrated they are "likely to suffer irreparable harm in the absence of preliminary relief." *See Benisek v. Lamone*,  138 S. Ct. 1942, 1944 (2018).

### c.  Balance of hardships and public interest

228.    Because this case involves governments as the parties, the final two elements, the balance of hardships and the public interest, "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *accord Texas DAPA*, 809 F.3d at 187. The balance of the

hardships favors the States, and the public interest will be served by enjoining the Defendants' use of the September 30 Memorandum.

229.     Without an injunction, the States will suffer continued harm to their state budgets and interests as *parens patriae. See Franciscan Alliance, Inc. v. Burwell*, 227 F. 3d 660, 694 (N.D. Tex. 2016).

230.     The harms the Defendants assert do not outweigh these harms to the States and their residents.

231.     The reduction in the Defendants' discretion resulting from an injunction does not qualify as a harm as "Congress [has] mandate[d] that the Executive Branch detain certain noncitizens during removal proceedings or before removal." *Preap*, 139 S. at 973 (Kavanaugh, J., concurring). The discretion that will be constrained is not permitted by Sections 1226(c) and 1231(a)(2); should the Defendants wish to exercise discretion over the detention decisions addressed in the September 30 Memorandum, that is a matter for Congress, not the Court.

232.     The inefficiency the Defendants assert would result from an injunction is entitled to little weight. First, any inefficiency resulting from an injunction against the Defendants' September 30 Memorandum is "outweighed by the major financial losses [that] states face." *See Texas DAPA*, 809 F.3d at 187. Here, the Court, in its standing analysis, has already found the Memoranda will result in significant financial losses for the States. *See supra* II.A.1.a. Second, rather than dictate how they use scarce resources, the injunction precludes the Defendants from instructing other Executive Branch personnel to act in a manner contrary to a clear congressional mandate. The Defendants remains free to direct that resources be spent in accordance with the law.

233.     "[T]he public is served when the law is followed," *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013), including when the Defendants obey, rather than violate, a congressional command. An

injunction requiring to do the former and forbidding the latter is thus in the public interest. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."); *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981) (collecting cases) ("[T]he public interest in enforcement of the immigration laws is significant."); *cf. Nken*, 556 U.S. at 436 ("There is always a public interest in prompt execution of removal orders[.]"). The public interest is particularly strong here because Sections 1226(c) and 1231(a)(2) are statutes that Congress enacted for the benefit of the United States, its citizens, and its legal immigrants. *Demore*, 538 U.S. at 518–21; *Zadvydas*, 533 U.S. at 697.

### 2. Scope of injunctive relief.

#### a. Geographic scope.

234.   A federal district court, under "appropriate circumstances," has authority "to issue a nationwide injunction." *Texas DAPA*, 809 F.3d at 188. One such appropriate circumstance is when a nationwide injunction is necessary is to ensure uniformity in immigration policies as prescribed by federal law. *Id.* at 187–88; *see also E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 987 (9th Cir. 2020) ("[C]ases implicating immigration policy have a particularly strong claim for uniform, nationwide relief." (citation omitted)). Another such circumstance is when "there is a substantial likelihood that a geographically-limited injunction would be ineffective because [the] beneficiaries [of the unlawful policy] would be free to move among states." *Texas DAPA*, 809 F.3d at 188.

235.   Both circumstances exist here.

236.   First, the September 30 Memorandum affects national immigration policy, which is designed to be uniform. *See id.* at 187–88.

237.    Second, a geographically limited injunction is insufficient to protect the States from irreparable harm because aliens not detained in other states are able to move to Texas and Louisiana. *See Texas DAPA*, 809 F.3d at 188. More than 50,000 noncitizens moved into Texas from another state in 2019—roughly half of all net immigration to the state. Ex. U at 4–5; Ex. W. This is consistent with data showing that tens of thousands of foreign-born persons moved to Texas from another state each year from 2006–2013. Ex. V at 6.

### b.  Substantive scope.

238.    "[T]he scope of injunctive relief is dictated by the extent of the violation established." *ODonnell v. Harris Cnty.*, 892 F.3d 147, 163 (5th Cir. 2018) (quoting *Califano v. Yamaski*, 442 U.S. 682, 702 (1979)). An injunction must be "narrowly tailor[ed] . . . to remedy the specific action which gives rise to the order." *ODonnell v. Goodhart*, 900 F.3d 220, 224 (5th Cir. 2018) (quoting *Doe v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004)).

239.    "[T]he scope of injunctive relief is dictated by the extent of the violation established." *ODonnell v. Harris Cnty.*, 892 F.3d 147, 163 (5th Cir. 2018) (quoting *Califano v. Yamaski*, 442 U.S. 682, 702 (1979)). An injunction must be "narrowly tailor[ed] . . . to remedy the specific action which gives rise to the order." *ODonnell v. Goodhart*, 900 F.3d 220, 224 (5th Cir. 2018) (quoting *Doe v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004)).

240.    Here, the States' injuries are being specifically caused by the non-detention and deportation or removal of illegal aliens, as required by Sections 1226(c) and 1231(a)(2), due to the September 30 Memorandum. The specific portions of the September 30 Memorandum causing those aliens not to be detained and deported or removed are Sections II and VI, which announce and implement the policies that

directly contravene the mandates in Sections 1226(c) and 1231(a)(2). *See Util. Air Reg. Grp.*, 573 U.S. at 327; *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 462 (2002).

241.    It is therefore appropriate to enjoin the Defendants from implementing and enforcing the September 30 Memorandum. Specifically, the Court should enjoin the Defendants; their agents, attorneys, and employees; and all those acting in concert with them, either directly or indirectly: (1) from enforcing Sections II and VI of the September 30 Memoranda and (2) to in good faith: (a) identify aliens who satisfy one of the criteria listed in Section 1226(c)(1)(A)–(D) and take into custody any such aliens as required by Section 1226(c)(1), (b) refrain from releasing any such aliens except as permitted by 8 U.S.C. § 1226(c)(2), and (c) detain aliens with final orders of removal during the removal period as required by Section 1231(a)(2).

242.    The Defendants have argued against enjoining the enforcement of the September 30 Memorandum based on ill-founded concerns that doing so might interfere with other DHS and ICE functions. The Memorandum, they contend, covers agency functions beyond the issuance of detainers to state and local law-enforcement agencies, and barring them from enforcing or implementing it will disrupt their attempt to set priorities for agents responsible, for example, for investigations or pursuing fugitives. To the extent that is true, it is irrelevant.

243.    First, an injunction would not bar the agency from issuing an interpretive rule or statement of policy stating how agents should prioritize their efforts. *See Nat. Res. Def. Council v. Wheele*r, 955 F.3d 68, 85–86 (D.C. Cir. 2020) (listing examples to "highlight that EPA had several options by which it could have attempted to address the perceived difficulties" and that "promulgating a legislative rule without abiding by notice-and-comment requirements" was not one of them). The Defendants themselves furnished examples of in the administrative record. *See* AR 4–7 (ECF 146-4–146-7). Second, should the Court believe that an injunction against Sections II and IV in their entirety would go too far, it can limit its decree to prohibit

their enforcement and implementation only to the extent that they apply to decisions to issue or rescind detainers. "As the Supreme Court has explained, when a court encounters statutory or regulatory text that is 'invalid as applied to one state of facts and yet valid as applied to another,' it should 'try to limit the solution to the problem' by, for instance, enjoining the problematic applications 'while leaving other applications in force.'" *Wheeler*, 955 F.3d at 81–82 (quoting *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006) and citing *Greater New Orleans Broadg. Assn. v. United States*, 527 U.S. 173, 195–96 (1999)). *See also*, *e.g.*, *Mexichem Fluor, Inc. v. EPA*, 866 F.3d 451, 464 (D.C. Cir. 2017) (Kavanaugh, J.) (vacating EPA rule "to the extent it requires manufacturers to replace HFCs with a substitute substance").

244.    The Defendants have argued that they should not be required to comply with Section 1226(c) and 1231(a)(2) because there is not sufficient detention capacity in their agencies to do so. This concern, too, is ill-founded. When Congress mandated "increased detention to ensure removal," it provided "budget enhancements." INS & EOIR, *Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures*, 62 FR 10312-01, 10,323 (Mar. 6, 1997); *see* ECF 18 at 3. In any event, the States seek not an injunction requiring immediate compliance, but a good-faith attempt to comply. The Fifth Circuit has upheld a similar injunction that required far more than the States ask for here, affirming a decree that required the federal government to negotiate in good faith with a foreign state to reinstitute a program that the federal government had cancelled. *See Texas MPP*, 20 F.4th at 1002. The "good faith" qualifier, that is, prevents the injunction from requiring the impossible. *Id.* at 1001–02.

245.    More, the federal government is familiar with the obligation to act in good faith; for example, it placed upon itself "the duty to bargain [with government-employee unions] in good faith," 5 U.S.C. § 7117, and federal-government contracts

carry with them an implied obligation that the government will deal with the counterparty fairly and in good faith. *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014). The Defendants therefore know how to comply with an injunction requiring them to comply with Sections 1226(c) and 1231(a)(2) "in good faith"—by honestly and faithfully pursuing the obligations set forth in those statutes in a manner that does not undermine those obligations; by pursuing those obligations with an open mind and a view to complying with the Court's order. *See, e.g.,* "good faith," Black's Law Dictionary 836 (11th ed. 2019); "good-faith bargaining," *id.* 836–37; *Metcalf*, 742 F.3d at 991.

### 3. Vacatur is warranted.

246.    The September 30 Memorandum is unlawful and invalid and should be vacated in its entirety as a result.

247.    A "reviewing court shall . . . hold unlawful and set aside agency action" that violates the APA. 5 U.S.C. § 706(2) (emphasis added). "[D]istrict courts have a duty to vacate unlawful agency actions." *Franciscan Alliance*, 414 F. Supp. 3d at 945.

248.    Because the Defendants have violated the APA, the Court will issue a decree vacating their invalid action.

### 4. Declaratory relief is warranted.

249.    "The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ. P. 57.

250.    The States have established that the September 30 Memorandum was issued in violation of the APA and are entitled to a declaration delineating the rights and legal relations among themselves and the Defendants. The Court will issue such a declaration.

## CONCLUSION AND PRAYER

Texas and Louisiana respectfully request that the Court, following its trial of this matter, find the facts and reach the conclusions of law described in this filing. They further request all other relief to which they may be entitled.

Dated: March 18, 2022

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney
General

JUDD E. STONE II
Solicitor General

RYAN D. WALTERS
Special Counsel
*Attorney-in-Charge*
Texas Bar No. 24105085
Southern District of Texas Bar No. 3369185
ryan.walters@oag.texas.gov

PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation
Texas Bar No. 00798537
Southern District of Texas Bar No. 1829509

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
Texas Bar No. 24088531
Southern District of Texas Bar No. 3053077

ERIC A. HUDSON
Senior Special Counsel
Texas Bar No. 24059977
Southern District of Texas Bar No. 1000759

*/s/ Leif A. Olson*
LEIF A. OLSON
Special Counsel
Texas Bar No. 24032801
Southern District of Texas Bar No. 33695

OFFICE OF THE ATTORNEY GENERAL
SPECIAL LITIGATION UNIT

P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 936-0545

**COUNSEL FOR PLAINTIFF STATE OF TEXAS**

JEFF LANDRY
LOUISIANA ATTORNEY GENERAL

*/s/ Elizabeth B. Murrill*
ELIZABETH B. MURRILL
Solicitor General
JOSEPH S. ST. JOHN
Deputy Solicitor General
BENJAMIN WALLACE
Assistant Solicitor General

LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third St.
Baton Rouge, LA 70804
(225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

**COUNSEL FOR PLAINTIFF STATE OF LOUISIANA**

**CERTIFICATE OF SERVICE**

I certify that on March 18, 2022, this document was filed through the Court's CM/ECF system, which automatically serves all counsel of record.

*/s/ Leif A. Olson*

56