UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | |
|---|---|
| STATE OF TEXAS; STATE OF LOUISIANA,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>*Defendants*. | Case No. 6:21-cv-16 |

**PLAINTIFFS' POST-TRIAL BRIEF IN RESPONSE**

Texas and Louisiana believe that their initial post-trial brief adequately [p]rebuts most of the arguments set forth by Defendants in their brief. However, they will address a few discrete issues.

I. **The categorical approach is irrelevant to this case.**

In both their discussion of final agency action and the reconciliation of *Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005), and *Demore v. Kim*, 538 U.S. 510 (2003), Defendants raise an issue they first raised at trial. ECF 223 at 4–5, 12–13. They argue that the "the categorical approach for the application of criminal statutes in the federal context" means that "the question of whether a noncitizen is potentially covered by § 1226(c) generally cannot be determined by the fact of conviction or a database search alone." *Id.* at 4–5.

Two things sink this argument. First, as Defendants acknowledge, the fact of conviction or a database search alone can, in fact, determine whether some aliens are covered by Section 1226(c). Second, the cases Defendants rely on involve final determinations of removal based on state-court convictions. *Id.* (citing *Moncrieffe v.*

*Holder*, 569 U.S. 184, 187 (2013) and *Alejos-Perez v. Garland*, 991 F.3d 642, 646 (5th Cir. 2021)). But this case relates not to final determinations, but to detainers—the initial determinations to "take into custody" or "detain" criminal aliens "*pending* a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a) (emphasis added).

Detainers are issued not based on legal certainty that a criminal alien's conviction falls within a mandatory detention category, but on "probable cause" to believe an alien is removable on those grounds. *See* U.S. Immigration & Customs Enforcement, *Issuance of Immigration Detainers by ICE Immigration Officers* 2 (Apr. 2, 2017), available at https://www.ice.gov/sites/default/files/documents/Document/2017/10074-2.pdf. "According to the regulations and the commentary accompanying them, an authorized ICE agent may detain an alien if there is 'reason to believe that this person was convicted of a crime covered by the statute.'" *Diop v. ICE/Homeland Sec.*, 656 F.3d 221, 230 (3d Cir. 2011) (citing 63 Fed. Reg. 27444; 8 C.F.R. § 236.1; *In re Joseph I*, 22 I. & N. Dec. 660, 668 (B.I.A.1999)). Immigration judges then have the authority to review the ICE agent's initial determination that a person is subject to detention at a *Joseph* hearing. *See In re Joseph II,* 22 I. & N. Dec. 799, 800 (B.I.A.1999); *see also Demore*, 538 U.S. at 514 n. 3, (*Joseph* hearing gives an alien the opportunity to avoid mandatory detention by establishing that he is not an alien, was not convicted of a crime requiring mandatory detention, or is otherwise not subject to mandatory detention). An alien who wishes to avoid the reach of Section 1226(c) must show that ICE is "substantially unlikely to establish … the charge or charges that would otherwise subject the alien to mandatory detention." *Joseph II*, 22 I. & N. Dec. at 806.

ICE staff are not required to use the categorical approach when determining whether criminal aliens are within a mandatory detention category. They need only "probable cause" or "reason to believe" that the state-court conviction falls within

such a category—certainty is not required. "If the statute required certitude that an alien was deportable before that alien could be detained, then no alien could ever be detained because the question of removability cannot be answered until after proceedings in the immigration courts are resolved." *Diop*, 656 F.3d at 230; *id.* at 231 (upholding "pre-removal detention because 'there is reason to believe'—even if we do not know for sure—that the 2005 conviction was for a crime involving moral turpitude."). *See also Ojo v. Warden Elizabeth Detn. Ctr.*, 808 F. App'x 61, 64 (3d Cir. 2020) ("[T]he Government had 'reason to believe' that Ojo was convicted of a crime that subjected him to § 1226(c)(1)(B) mandatory detention pending removal proceedings. Whether his conviction constitutes an aggravated felony 'as a definitive legal matter' is irrelevant for purposes of the pre-removal mandatory detention statute.") (citing *Diop*, 656 F.3d at 230)); *In re Joseph I*, 22 I. & N. Dec. at 668 ("in the bond and custody context, being 'subject to' the applicable detention statute is not tied to a decision by an Immigration Judge on the merits as to whether or not the criminal alien is in fact deportable").

The Supreme Court has explained why ICE officers are not required to await a conclusive determination on removability before detaining an alien:

> Immigration officials must also determine on a daily basis whether there are grounds for removing any of the aliens who are already present inside the country. The vast majority of these determinations are quickly made, but in some cases deciding whether an alien should be admitted or removed is not as easy. As a result, Congress has authorized immigration officials to detain some classes of aliens during the course of certain immigration proceedings. Detention during those proceedings gives immigration officials time to determine an alien's status without running the risk of the alien's either absconding or engaging in criminal activity before a final decision can be made.

*Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018).

3

## II. The Supreme Court has agreed that these statutes are mandatory.

### A. The Supreme Court has directly confronted these statutes.

Contrary to Defendants' argument that the Supreme Court's seminal cases in this area did not address DHS's duty to arrest certain aliens, ECF 223 at 10, *Nielsen v. Preap* held that criminal aliens who have committed the criminal offenses covered by Section 1226(c)(1) "*must* be arrested 'when [they are] released' from custody on criminal charge." 139 S. Ct. 954, 959 (2019) (emphasis added). *See also id.* at 960 ("Congress *mandated* that aliens who were thought to pose a heightened risk *be arrested* and detained without a chance to apply for release on bond or parole.") (emphases added). And the Court reiterated its point: Section 1226(c)(1)'s job "is to subtract some of [Defendants'] discretion when it comes to the arrest and release of criminal aliens. Thus, subsection (c)(1) limits subsection (a)'s first sentence by curbing the discretion to arrest: The Secretary *must arrest* those aliens guilty of a predicate offense." *Id.* at 966 (emphasis added).

The States have thoroughly addressed why the Defendants are wrong to construe *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 757 (2005), as a get-out-of-mandate-free card. *See* ECF 225 at 6–13. At base, the Defendants cannot be right that *Castle Rock* allows them to interpret "shall" as "may" for a simple reason: *Castle Rock* was more than a decade old when the Supreme Court in *Jennings v. Rodriguez* interpreted "shall" in 8 U.S.C. § 1225(b) to "*unequivocally mandate* that aliens falling within [its] scope" be detained. 138 S. Ct. 830, 844 (2018) (emphasis added). Indeed, the Court found, that "*requirement* of detention *precludes* a court from finding ambiguity[.]" *Id.* (emphasis added). What's more, the Court found that Section 1226(c)—one of the laws at issue here—"is even clearer." *Id* at 846. That is due to the distinction in Section 1226 between grants of discretion and impositions of mandates: While "Section 1226(a) creates a default rule for [certain] aliens by permitting—but not requiring— the Attorney General to issue warrants for their arrest and detention," Section

4

1226(c) supplants that default rule by stating "that the Attorney General '*shall* take into custody any alien' who falls into one of the enumerated categories involving criminal offenses and terrorist activities." *Id*. (emphasis added). Indeed, Section 1226(c) "*obligates* the Attorney General to" take those aliens into custody. *Id*. at 849 (emphasis added).

Defendants ignore this language from *Jennings* when they posit that that case relied on the "only if"[1] language—rather than "shall"[2]—for a mandate only to refrain from releasing criminal aliens already detained. ECF 223 at 15. They are wrong to do so. As the Court itself has noted, "it would be very strange for Congress to forbid the release of aliens who need not be arrested in the first place," *Preap*, 139 S. Ct. at 970, which is what Defendants argue Section 1226(c) does. And *Jennings* only relied on the "only if" language to "reinforce[]" its "earlier "conclusion" that the use of "shall" created a mandatory duty. *Id*. at 846.

Finally, Defendants attempt to twist *Preap* into supporting their argument that their detention obligations are not judicially enforceable. *See* ECF 223 at 16–17. To the contrary: *Preap* recognized that Section 1226(c)'s "when … released" language means exactly what it says; "it clarifies when *the duty to arrest* is triggered: upon release from criminal custody." 139 S. Ct. at 969 (emphasis added). *Preap*'s concession that the statute allows the federal government to effect an arrest later if it doesn't

---

[1] The Attorney General may release aliens in mandatory detention categories "*only if* the Attorney General decides ... that release of the alien from custody is necessary" for witness-protection purposes and "the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding." 8 U.S.C. § 1226(c)(2) (emphasis added).

[2] The "Attorney General *shall* take into custody any alien" who falls into one of several enumerated categories involving criminal offenses and terrorist activities. 8 U.S.C. § 1226(c)(1) (emphasis added).

satisfy its arrest obligation immediately, *id.* at 965, doesn't mean that the obligation doesn't exist.

*Preap* rejected an attempt to limit mandatory detention where DHS had failed to immediately fulfill its duty to take into custody of criminal aliens upon their release from state custody. It relied on the principle that "if a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction." *Id.* at 967 (citation omitted). The Defendants' attempt to twist *Preap*'s better-late-than-never approach into an excuse from their mandate to arrest and detain does exactly what the Supreme Court rejected in that case— "confuses what the Secretary is obligated to do with the consequences that follow if the Secretary fails (for whatever reason) to fulfill that obligation." *Id.* at 969.

**B. The Supreme Court's decisions should not be disregarded.**

Defendants assert that the Supreme Court could not have held that Congress mandated that they arrest and detain certain aliens because it "did not confront the breadth of such an inferred mandate, or how to reconcile such a mandate with Congress's limited appropriations." ECF 223 at 13–14. But the Court knew when it decided *Preap* and its other cases that ICE's budget is not infinite. Defendants' contention that *Preap* and the other Supreme Court opinions in this field should not be taken at face value, ECF 223 at 10–11, discounts the Supreme Court's grasp of common sense. Moreover, even if Defendants' discounting right, they would be wrong: in the Fifth Circuit, Supreme Court dicta is binding. *See Peake v. Ayobami (In re Ayobami)*, 879 F.3d 152, 154 n.3 (5th Cir. 2018).

At any rate, the States have never argued that Defendants must do the impossible, only that they follow Congress's commands in good faith. *See, e.g.*, ECF 225 at 27–30.

6

The undisputed evidence is that the Defendants are not doing so. They do not contest that they have the ability to increase detention capacity through reprogramming and transferring funds. *See* ECF 225 at 21–22. And news reports post-dating the trial indicate that their behavior is in fact worse than that—that they are reducing, rather than expanding, their detention capacity. For one, ICE has canceled contracts with detention centers. Pricilla Alvarez, *Biden administration to close two immigration detention centers that came under scrutiny*, CNN (May 20, 2021), https://perma.cc/DW3T-5GGR. For two, the Biden Administration has asked Congress to *decrease* ICE's funding for detention from 34,000 to 25,000 beds. Eileen Sullivan, *Biden to Ask Congress for 9,000 Fewer Immigration Detention Beds*, N.Y. Times (Mar. 25, 2022), *a*vailable at https://web.archive.org/web/20220326162537/ https://www.nytimes.com/2022/03/25/us/politics/biden-immigration-detention-beds.html. Their arguments bemoaning a lack of detention capacity should be understood in this context.

## C. A vacated Fifth Circuit opinion does not trump these holdings— especially when the Fifth Circuit has repudiated it.

Defendants have quite a different view of the reasoning of the Fifth Circuit motions panel's opinion that partially stayed this Court's preliminary injunction against a previous version of the prioritization guidance. ECF 223 at 11 n.2. But that partial stay was vacated by the full Fifth Circuit. *See Texas v. United States*, 14 F.4th 332 (5th Cir. 2021), *vacated by* 24 F.4th 407 (5th Cir. Nov. 30, 2021) (en banc) (mem.) When a court decision is vacated, its "ruling and guidance" are "erased" and of no precedential value. *United States v. Windsor*, 570 U.S. 744, 761 (2013); *see also United States ex rel. Marcy v. Rowan Companies, Inc.*, 520 F.3d 384, 389 (5th Cir. 2008) (noting that the "panel opinion upon which Marcy relies was automatically vacated when it was reheard *en banc*," so the "panel opinion is not precedent").

7

Not only is the motions panel's reasoning not binding—subsequent Fifth Circuit precedent explicitly disavowed the reasoning of the motions panel:

> Our cases [] apply *Heckler*, if at all, to one-off agency enforcement decisions rather than to agency rulemakings. … Apparently, the lone exception in this centuries-old line of cases was the now-vacated *Texas v. United States (Interim Enforcement)*, 14 F.4th 332 (5th Cir. 2021).… There, a combination of memos from DHS and its subagency Immigration and Customs Enforcement ("ICE") had established new "interim enforcement priorities." *Id.* at 334. Those memos effectively created a class-based priority scheme governing agency decisions to arrest, detain, and remove aliens. *See id.* at 334–35. After the district court enjoined those memos' operation, a panel of our court granted the Government a partial stay pending appeal. *Ibid.* The panel, among other holdings, characterized the relevant part of the memos as mere nonenforcement and therefore held that part nonreviewable under *Heckler*. See *id.* at 336–40. It did so even though the memos in question were undisputedly rules.… And it did so without any discussion of that fact or any recognition of its significance.

*Texas v. Biden (MPP)*, 20 F.4th 928, 984–85 (2021).

※

In the end, the Defendants invite the Court to both (1) ignore binding Supreme Court language holding that they have obligations, not discretion, and (2) adopt the reasoning of a vacated opinion that was criticized by name by the Fifth Circuit. The Court should decline.

### III. The challenged guidance is final agency action because it binds the agency.

The States have set forth in detail the mandatory language in both Defendants' memoranda and their procedures and training materials—including language that staff "must," "should not," "will," are "require[d]," and "need" to make decisions in a

particular way—that suffices to make the Defendants' policy final agency action.[3] *See* ECF 225 at 1–4. In addition, an agency action can be binding "if it is applied by the agency in a way that indicates it is binding." *Texas v. United States (DAPA)*, 809 F.3d 134, 171 (5th Cir. 2015).

The evidence here—a dramatic drop in immigration enforcement—demonstrates that the Defendants believe themselves to be bound. In December 2021, ICE detained an average of only 4,296 aliens per day with criminal convictions or pending criminal charges resulting from interior enforcement. FY2022 ICE Detention Statistics, available at https://perma.cc/D6ST-RYSQ (Detention FY22 tab, rows 73 and 74). Compare that to December 2019, when ICE averaged 16,388 detentions per day or December 2020—in the midst of a global pandemic that strained agency resources—when the daily rate was 10,336. FY2020 ICE Detention Statistics, https://perma.cc/636D-CXMS (Detention EOFY2020 tab, rows 56 and 57); FY2021 ICE Detention Statistics, available at https://perma.cc/3M3X-DZ7D (Detention FY21 YTD tab, rows 73 and 74). The current guidance and its functionally equivalent precursors have led to the lowest number of removals in three decades: In FY2021, removals fell 70 percent compared to FY2020. James Remsen, *Deportations fell to 26-*

---

[3] Even the case that Defendants cite (at 4) for the proposition that "should" is "precatory, not mandatory," *Assn. of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 718 (D.C. Cir. 2015), contrasts "should" with "must," finding the latter word mandatory. *Id*. The challenged agency action uses that term, Ex. X. at 4 ("Our personnel *must* evaluate the individual and the totality of the facts and circumstances and exercise their judgment accordingly.") (emphasis added), as does ICE's training for its staff, Ex. Y at 43 ("[E]very case *must* be addressed individually based on the totality of its specific facts and circumstances.") (emphasis added). Regardless, the Fifth Circuit has approvingly cited a case holding that "[t]he language used to express 'the EPA's position'— '*should not* be permitted'—is the type of language we have viewed as binding because it 'speaks in mandatory terms.'" *Iowa League of Cities v. EPA*, 711 F.3d 844, 864 (8th Cir. 2013) (emphasis added); *see Texas v. EEOC*, 933 F.3d 433, 442 n.17 (5th Cir. 2019) (citing *Iowa League of Cities* for this proposition).

9

*year low last year, ICE report reveals*, N.Y. Post (Mar. 11, 2022), available at https://perma.cc/SQW4-W6XM.

Defendants repeat their invocation of an analysis of supervisory approval of enforcement requests as evidence that agency staff retained discretion. ECF 223 at 6–7. The States already addressed this point at trial, and Defendants have done nothing to contradict them: As the administrative record itself states, "While these high approval rates may suggest a permissive approach to 'other priority' cases, it appears that many offices have a practice of pre-vetting cases so that officers and their supervisors reach some level of consensus on a case's viability before the officer submits it for approval." AR00110. This is consistent with the testimony of former ICE Director Tom Homan. Tr. 84–86. The officers "do not, that is, even bother asking when they know [a request is] going to be denied." Tr. 2-135.

Defendants also argue that the challenged agency action does not prevent "a fact of conviction or a database search from being the determinative factor in a decision to take an enforcement action—officers should just consider the complete set of reasonably available information in making that decision." ECF 223 at 4. But the problem with the challenged agency action is not that it makes enforcement literally impossible; instead, the problem is that it allows officials to take actions that Congress made mandatory only if they first determine that extra-statutory factors are satisfied. While officers might consider those factors and still take action, the agency action at issue here unlawfully limits their discretion to take actions— arresting an alien subject to § 1226(c), or removing an alien subject to § 1231(a)— that Congress has already stated are *always* permissible.

Defendants attempt to distinguish *Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019) by pointing to several features of the EEOC guidance challenged there that do not apply here. ECF 223 at 3. But none of those distinctions were independently necessary to the finding of final agency action there. *See, e.g., EEOC*, 933 F.3d at 443

10

("*And* … the Guidance leaves no room for EEOC staff *not* to issue referrals to the Attorney general wen an employer uses a categorical felon-hiring ban.") (first emphasis added); *id.* ("[t]he Guidance, *moreover* … [acts as] a safe harbor.") (emphasis added). The dispositive fact was that "[t]he Guidance indicates that it binds EEOC staff to an analytical method in conducting Title VII investigations." *Id.*[4] And the challenged agency action here does the same thing.

Finally, Defendants argue that increasing the number of aliens present in the States who would be eligible for government benefits is not sufficient to impose rights or obligations. ECF 223 at 7–8. But Fifth Circuit precedent rejects this view. *See* ECF 225 at 4–5.

## IV. The challenged agency action violates DHS's agreement with Louisiana.

Defendants make no attempt to argue that the challenged guidance does not violate the terms of the agreement with Louisiana, instead arguing that (1) they terminated the agreement pursuant to its terms, and (2) the Agreement itself is illegitimate. They are wrong on both counts.

### A. Defendants failed to properly terminate the Agreement.

The Agreement states that "[a]ll notices required hereunder shall be given by certified United States mail, postage prepaid return receipt requested, and addressed to the relative parties at their addresses set forth below," which, for Louisiana, is specified as "Louisiana Department of Justice, Deputy Director of the Louisiana Bureau of Investigation, 1885 N. 3rd Street, Baton Rouge, Louisiana 70802." Pls. Tr. Ex. K at IV.

---

[4] The Fifth Circuit shares this view of the analysis in *EEOC*. *See Texas v. Biden (MPP)*, 20 F.4th 928, 949 (5th Cir. 2021) ("[the *EEOC*] court based its holding ("that the Guidance binds EEOC") largely on the fact that the "Guidance" in question, despite its name, bound EEOC staff. *See id.* at 443. The court *also* discussed the Guidance's de facto creation of safe harbors for private parties. *Ibid.*") (emphasis added).

The Defendants, despite asserting that they sent a letter terminating the Agreement, *see* ECF 223 at 22–23, have no evidence (1) that it was sent via certified mail or (2) of a return receipt. Their back-up argument, that they notified Louisiana when they made the letter an exhibit to their opposition to the preliminary injunction motion, *see* ECF 223 at 23, also fails. Attaching a document to a court pleading does not comply with the sole method for such notice specified in the parties' contract. The Agreement therefore remains in effect.

### B. DHS legitimately entered into the Agreement.

Defendants maintain that DHS lacked statutory authority to enter into the Agreement. ECF 223 at 26–27. But this is not so: Congress has granted DHS broad authority to implement cooperative policies with the States. Congress specifically authorized DHS to "develop a process for receiving meaningful input from State and local government to assist the development of the national strategy for combating terrorism and other homeland security activities." 6 U.S.C. § 361(b)(4). The notice-and-comment process for receiving input created in the Agreement provides a legitimate mechanism for receiving that meaningful input. It should be no surprise that DHS's chosen process for receiving "meaningful input" mirrors the notice-and-comment process that Congress created for members of the public to provide meaningful input in analogous situations. *See* 5 U.S.C. § 553.

More generally, the Secretary of DHS is empowered to "perform such other acts as he deems necessary for carrying out his authority…." 8 U.S.C. § 1103(a)(3). The Defendants do not address why the Agreement wouldn't qualify.

Nor does the Agreement DHS contracted away DHS's sovereign authority to Louisiana. *See* ECF 223 at 25–26. The federal government maintains its authority over immigration policy. The Agreement does not grant Louisiana a veto over federal immigration policy or substantively limit Defendants' authority. It is analogous to

the APA's notice-and-comment requirements, which no one contends are an abdication of federal sovereignty to States, interest groups, and individuals merely because those procedures delay agency action.

Defendants also cite *U.S. Telecom Assn. v. FCC* as prohibiting agency "subdelegations to outside parties." ECF 223 at 27 (citing 359 F.3d 554 (D.C. Cir. 2004)). But the Agreement at issue here does not subdelegate agency authority. Cooperative arrangements are not illicit subdelegations of agency authority, as the D.C. Circuit recognized in acknowledging "three specific types of legitimate outside party input into agency decision-making processes: (1) establishing a reasonable condition for granting federal approval; (2) fact gathering; and (3) advice giving." *U.S. Telecom Assn.*, 359 F.3d at 566. "[A] federal agency may turn to an outside entity for advice and policy recommendations, provided the agency makes the final decisions itself." *Id.* at 568. Under the Agreement, DHS continues to "make[] the final decisions itself." It simply follows a process for receiving "advice and policy recommendations" from Louisiana.

Agencies frequently adopt procedural rules not required by statute, and these are enforced by the federal judiciary. *See, e.g., Morton v. Ruiz*, 415 U.S. 199, 235 (1974) (overturning agency action in part because it failed to comply with an informal rule detailing internal procedures that agency was to follow); *Singh v. U.S. Dept. of Justice*, 461 F.3d 290, 295 (2d Cir. 2006) (INS regulations that permitted agency to consider factors relevant to extreme hardship that statute did not make relevant); *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 717 (8th Cir. 1979) (Bureau of Indian Affairs personnel decision reversed when agency failed to consult with tribe before transferring federal agent from one area office to another in violation of agency commitment to engage in such consultation). Agencies can legitimately bind themselves to more rigorous procedures, including by agreeing to consult with

relevant stakeholders. And when an agency fails to live up to its commitments, federal courts enforce them.

The manner that DHS entered into the Agreement was also consistent with the APA. Defendants' drive-by assertion, mentioned only in a footnote, *see* ECF 223 at 26 n.8, that the Agreement itself was required to be subject to notice-and-comment rulemaking is wrong because the Agreement does not "constrain[] the agency from making future changes to immigration policy." It is instead a procedural rule exempt from the requirements of notice-and-comment rulemaking.

### C. The Agreement is Valid and Enforceable in this Court.

Defendants contradictorily claim both (1) that Louisiana has an "adequate remedy" in the Court of Federal Claims—a claim under the Tucker Act's waiver of sovereign immunity—and (2) that the Tucker Act would not allow Louisiana to file its claim—that is limited to relief other than money damages—in the Court of Federal Claims. ECF 223 at 24–25. Defendants are only partly right: Louisiana could not sue in the Court of Federal Claims. As a result, it has no adequate remedy without the APA, and nothing precludes this Court from hearing its claim.

Under the Tucker Act, contract actions against the federal government seeking money damages over $10,000 are within the exclusive jurisdiction of the Court of Federal Claims. 28 U.S.C. § 1491. However, that court's "jurisdiction over contract claims turns on whether the Government was acting in its sovereign or proprietary capacity when it entered into the contract or agreement at issue." *Doe v. United States*, 37 Fed. Cl. 74, 77–78 (1996). "The contract liability which is enforceable under the Tucker Act consent to suit does not extend to every agreement, understanding, or compact which can semantically be stated in terms of offer and acceptance or meeting of minds." *Kania v. United States*, 650 F.2d 264, 268 (Ct. Cl. 1981). "[T]he principal class of contract case" covered by the Tucker Act is limited to "the instances where

the sovereign steps off the throne and engages in purchase and sale of goods, lands, and services, transactions such as private parties, individuals or corporations also engage in among themselves." *Id.* The Agreement at issue here is nothing like an agency's contract with a vendor of office supplies. It involves DHS receiving input on the exercise of the federal government's sovereign authority over immigration. This case is not within the jurisdiction of the Court of Federal Claims.

Sovereign immunity is not a bar here. Louisiana is not seeking money damages at all. Nor, contrary to Defendants' assertion, *see* ECF 223 at 23–24, is it seeking specific performance to affirmatively require DHS to provide notice and follow the procedures in the Agreement. Rather, it seeks the standard remedies for unlawful agency action, holding unlawful and setting aside the challenged memoranda.

The distinction between relief "ordering the cessation of the conduct complained of" and relief "requir[ing] affirmative action by the sovereign" is the basis for the long-standing rule that *ultra vires* suits against federal officers (and analogous *Ex parte Young* suits against state officers) do not implicate sovereign immunity. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 691 n.11 (1949). "[I]f the federal officer, against whom injunctive relief is sought, allegedly acted in excess of his legal authority, sovereign immunity does not bar a suit.… [T]here is no sovereign immunity to waive—it never attached in the first place." *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996).

The remedies sought here—setting aside as null the agency actions that failed to comply with the terms of the Agreement—are the standard remedies for unlawful agency action. Defendants present no valid reason this Court cannot consider them.

## V. In addition to vacatur and remand, the States are entitled to a permanent injunction.

### A. A permanent injunction is appropriate.

As the States explained in their post-trial brief, as "prevailing plaintiffs," they are "entitled to the remedies afforded by the particular type of claim they bring, 'including actions for declaratory judgments or writs of prohibitory or mandatory injunction.'" ECF 225 § 6.A (citing 5 U.S.C. § 706(2)). And while "the States have sought an injunction" that does more than "prohibit[] the Defendants from implementing" the policies embodied in "the September 30 Memorandum," which vacatur alone could conceivably prohibit, they also seek an injunction that redresses their injuries by "requiring [the Defendants] to comply with section[s] 1226(c) and 1231(a)(2)," which vacatur could not achieve. *Id.*

The Defendants ignore this in their post-trial brief. They argue only that "a permanent injunction is inappropriate in an APA suit when a partial or complete vacatur is sufficient." ECF 223 § IV.A, at p.28 (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)). But here, that is not sufficient, as the Court already implicitly found when it issued an injunction against the enforcement of the previous version of the prioritization policy rather than simply stay or postpone its effective date. *See* ECF 79 at 146 (concluding that States were "'likely to suffer irreparable harm'" to their "interests as *parens patriae*" in the absence of an injunction) (quoting *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018)).

### B. A nationwide injunction is appropriate.

Further, this remains a case where a nationwide injunction is appropriate, and the Defendants' repetition of arguments that the Court has already rejected on that score, does not change that. The need for a uniform national immigration policy has not changed. *See* ECF 79 at 152 (citing *Texas DAPA*, 809 F.3d at 187–88, and *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 987 (9th Cir. 2020)). The likelihood

16

that a geographically limited injunction would be ineffective due to the ability to move among the states has not changed. *Id*. (citing *Texas DAPA*, 809 F.3d at 187–88). Only one thing that has changed: the Defendants now assert that because the States identified only 14 rescinded detainers since the September 30 Memorandum went into effect, the potential that criminal aliens might travel from other states is speculative. ECF 223 at 29–30.

Wrong. First, the number of rescinded detainers does not mean what the Defendants claim; the challenged agency action here has also resulted in many detainers not being placed at all. *See* Tr. 1-82 (testimony of Jason Clark). And as the States have already explained, the sharp change in the number of rescissions is a litigation tactic, not a policy tack. It is attributable to the Court's preliminary injunction and the Defendants' attempts to paint a more appealing picture of their behavior on what amounts to a re-do of the Court's evaluation of them—and given the lack of evidence to explain otherwise, especially given the Defendants' strong incentives to explain otherwise, that is the inference the Court should draw. Second, it does not address what the "evidence … regarding the migration patterns of aliens to Texas and from other states" that was introduced at trial, which the Court has referred to as "buttress[ing]" the likelihood that a "'geographically limited injunction would be ineffective[.]'" ECF 79 at 155 (citing *Texas DAPA*, 809 F.3d at 188); *see* Exs. T–W. About that evidence, the Defendants say nothing.

### C. A stay would be inappropriate.

Finally, little needs to be said about the request for a stay beyond this: The *en banc* Fifth Circuit has already decided that the Defendants' arguments don't merit one. Each of the Defendants' arguments for a stay is an argument that the Fifth Circuit considered when the Defendants sought a stay of the Court's preliminary injunction. *Compare* ECF 223 at 31–32 (Secretary's authority to set priorities) *with*

17

14 F.4th at 339 (same); ECF 223 at 31–32 (restraint on discretion) *with* 14 F.4th at 341 (same); ECF 223 at 32 ("pendulum effect") *with* 14 F.4th at 341 (same); ECF 223 at 33 (disruption & public safety) *with* 14 F.4th at 335 (same); ECF 223 at 33–34 (strain on resources) *with* 14 F.4th at 336, 341 (same). Each argument the Defendants make for a stay, therefore, is an argument that the *en banc* Fifth Circuit rejected as entitling them to a stay. *Texas v. United States*, 24 F.4th 407 (5th Cir. 2021). While rulings on stays and injunctions are not ordinarily precedential, most requests for stays do not occur after the *en banc* circuit court has *in that same case* already denied to the same party the same type of stay sought on the same basis. The Defendants have pressed repeat; the song should not sound different on the second play.

## Conclusion

The States respectfully request that the Court render judgment in their favor.

Dated: April 6, 2022                    Respectfully submitted,

KEN PAXTON                              WILLIAM T. THOMPSON
Attorney General of Texas               Deputy Chief, Special Litigation Unit
                                        Texas Bar No. 24088531
BRENT WEBSTER                           Southern District of Texas Bar No. 3053077
First Assistant Attorney
General                                 */s/ Ryan D. Walters*
                                        RYAN D. WALTERS
PATRICK K. SWEETEN                      Special Counsel
Deputy Attorney General                 *Attorney-in-Charge*
for Special Litigation                  Texas Bar No. 24105085
                                        Southern District of Texas Bar No. 3369185
                                        ryan.walters@oag.texas.gov

                                        ERIC A. HUDSON
                                        Senior Special Counsel
                                        Texas Bar No. 24059977
                                        Southern District of Texas Bar No. 1000759

                                        LEIF A. OLSON
                                        Special Counsel
                                        Texas Bar No. 24032801
                                        Southern District of Texas Bar No. 33695

                                        OFFICE OF THE ATTORNEY GENERAL
                                        SPECIAL LITIGATION UNIT
                                        P.O. Box 12548 (MC-009)
                                        Austin, Texas 78711-2548
                                        Tel.: (512) 936-1414
                                        Fax: (512) 936-0545

                                        **COUNSEL FOR PLAINTIFF STATE OF TEXAS**

>JEFF LANDRY
>LOUISIANA ATTORNEY GENERAL
>
>*/s/ Elizabeth B. Murrill*
>ELIZABETH B. MURRILL
>Solicitor General
>JOSEPH S. ST. JOHN
>Deputy Solicitor General
>
>LOUISIANA DEPARTMENT OF JUSTICE
>1885 N. Third St.
>Baton Rouge, LA 70804
>(225) 326-6766
>murrille@ag.louisiana.gov
>stjohnj@ag.louisiana.gov

**COUNSEL FOR PLAINTIFF STATE OF LOUISIANA**

**CERTIFICATE OF SERVICE**

I certify that on April 6, 2022, this document was filed through the Court's CM/ECF system, which automatically serves all counsel of record.

>*/s/ Ryan D. Walters*
>RYAN D. WALTERS