United States District Court
Southern District of Texas
**ENTERED**
June 10, 2022
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| The STATE OF TEXAS and the STATE OF LOUISIANA, | § § § | |
| Plaintiffs, | § § § | |
| v. | § § | Civil Action No. 6:21-CV-00016 |
| The UNITED STATES OF AMERICA; ALEJANDRO MAYORKAS, Secretary of the United States Department of Homeland Security, in his official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TROY MILLER, Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection, in his official capacity; U.S. CUSTOMS AND BORDER PROTECTION; TAE JOHNSON, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TRACY RENAUD, Senior Official Performing the Duties of the Director of the U.S. Citizenship and Immigration Services, in her official capacity; and U.S. CITIZENSHIP AND IMMIGRATION SERVICES, | § § § § § § § § § § § § § § § § § § § § § § § § § § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

This case is the culmination of a series of challenges to immigration-related memoranda issued within the Department of Homeland Security. The legal issues are varied and complicated. But the core of the dispute is whether the Executive Branch may

require its officials to act in a manner that conflicts with a statutory mandate imposed by Congress.  It may not.

This past September, the Secretary of the Department of Homeland Security issued a rule—self-styled as a memorandum—governing civil immigration enforcement.  The States of Texas and Louisiana say this memorandum conflicts with detention mandates under federal law.  The Federal Government, in response, tries to reconcile the apparent contradiction between its memorandum and federal law.  The Federal Government's explanations fall short.

Lawmaking is vested by the People in Congress.  Congress has long used its legislative power to craft immigration law which will ultimately be enforced by the Executive Branch.  The Executive Branch's *statutorily* authorized discretion on civil immigration enforcement has historically ebbed and flowed.  In the 1990s, Congress reigned in the Executive Branch's discretion by mandating detention of criminal aliens[1] or aliens with final orders of removal.  The wisdom of the statute passed by Congress and signed into law by the President has no bearing here.  The passions of the present sometimes conflict with the views of the past.  But the law remains unless it is repealed or replaced.  And the two statutes at issue in this case are still the law of the land.

---

[1]    "Criminal alien" is the term used by Congress in the statute.  8 U.S.C. § 1226(c); *see also Johnson v. Guzman Chavez*, ____ U.S. ____, ____ n.2, 141 S.Ct. 2271, 2280 n.2, 210 L.Ed.2d 656 (2021) (discussing detention of "certain criminal aliens" under Section 1226(c)).  When used in this opinion, the Court refers to criminal aliens as those who have committed the offenses articulated in the statute.

That brings us to the relevant immigration statutes.  This case is not about aliens in general, or even aliens who are in the United States illegally.  Sections 1226(c) and 1231(a)(2) of Title 8 of the United States Code state that the Executive Branch "shall" detain aliens convicted of specific types of crimes or who have final orders of removal. The Federal Government acknowledges that *some* immigration statutes mandate detention.  But it disputes that Sections 1226(c) and 1231(a)(2) are among those statutes. In support, the Federal Government offers an implausible construction of federal law that flies in the face of the limitations imposed by Congress.  It also invokes discretion and prioritization in an effort to evade meaningful judicial review.

True, the Executive Branch has case-by-case discretion to abandon immigration enforcement as to a particular individual.  This case, however, does not involve individualized decisionmaking.  Instead, this case is about a rule that binds Department of Homeland Security officials in a generalized, prospective manner—all in contravention of Congress's detention mandate.

It is also true that the Executive Branch may prioritize its resources.  But it must do so within the bounds set by Congress.  Whatever the outer limits of its authority, the Executive Branch does not have the authority to change the law.

Using the words "discretion" and "prioritization," the Executive Branch claims the authority to suspend statutory mandates.   The law does not sanction this approach. Accepting the Executive Branch's position would have profound consequences for the separation of powers.

It is worth repeating that the Federal Government agrees that certain immigration statutes contain mandatory detention provisions.  The question, then, is whether the statutes here are mandatory.  The answer is yes: Sections 1226(c) and 1231(a)(2) mandate detention.  All of this matters because the Administrative Procedure Act compels federal courts to set aside agency rules that are contrary to law, are arbitrary and capricious, or failed to observe the requisite procedure.  After a trial on the merits, the States have shown that the Secretary's memorandum is all three.  For the reasons that follow, the Court vacates the memorandum.[2]

---

[2]    The Court understands that some may find the terms "alien" and "illegal alien" offensive, and the Court's intent is certainly not to offend.  These terms are used in this opinion because they are contained in the statutes as well as official government documents quoted by the Supreme Court in a seminal immigration case.  *See Arizona v. United States*, 567 U.S. 387, 397, 132 S.Ct. 2492, 2500, 183 L.Ed.2d 351 (2012).  Moreover, "alien" and "immigrant" are different and defined statutory terms.  *Compare* 8 U.S.C. § 1101(a)(3) *with Id.* § 1101(a)(15).  Furthermore, the Fifth Circuit explained why "illegal alien" is a preferable (and not pejorative) term in a case like this:

> The usual and preferable term in [American English] is *illegal alien*. The other forms have arisen as needless euphemisms, and should be avoided as near-gobbledygook. The problem with *undocumented* is that it is intended to mean, by those who use it in this phrase, "not having the requisite documents to enter or stay in the country legally."  But the word strongly suggests "unaccounted for" to those unfamiliar with this quasi-legal jargon, and it may therefore obscure the meaning.

> More than one writer has argued in favor of *undocumented alien* . . . [to] avoid[ ] the implication that one's unauthorized presence in the United States is a crime . . . .  Moreover, it is wrong to equate illegality with criminality, since many illegal acts are not criminal. *Illegal alien* is not an opprobrious epithet: it describes one present in a country in violation of the immigration laws (hence "illegal").

*Texas v. United States*, 809 F.3d 134, 148 n.14 (5th Cir. 2015) (quoting Bryan A. Garner, Garner's Dictionary of Legal Usage 912 (Oxford 3d ed. 2011)); *see also* Matthew R. Salzwedel, *The Lawyer's Struggle to Write*, 16 Scribes Journal of Legal Writing 69, 76 (2015) ("[I]llegal alien has going for it both history and well-documented, generally accepted use.").

## I.     FINDINGS OF FACT

The Court finds that the following facts have been established by a preponderance of the evidence.[3]

### A.     THE PARTIES

1.     The States of Texas and Louisiana are the plaintiffs in this case.

2.     Defendant Alejandro Mayorkas is the Secretary of the United States Department of Homeland Security ("DHS").  He issued and currently administers the memorandum titled *Guidelines for the Enforcement of Civil Immigration Law* (the "Final Memorandum").  (Dkt. No. 109-5 at 2–8).

3.     Defendant DHS implemented the Final Memorandum, which became effective on November 29, 2021.  (*Id.* at 7).

4.     DHS oversees Defendants United States Citizenship and Immigration Services ("USCIS"), United States Customs and Border Protection ("CBP"), and United States Immigration and Customs Enforcement ("ICE").

5.     Defendant Troy Miller is the Deputy Commissioner of CBP.

6.     Defendant Tae Johnson is the Acting Director of ICE.

7.     Defendant Tracy Renaud is currently employed by USCIS and has worked in various capacities, including as the Acting Director of USCIS.

### B.     THE RELEVANT STATUTES

8.     Certain statutes are at issue in this case.  The first is 8 U.S.C. § 1226(c). Paragraph 1 of that subsection states:

(1) Custody

The Attorney General shall take into custody any alien who—

(A)  is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,

---

[3]     The Court consolidated the hearing on the States' Motion to Postpone the Effective Date of Agency Action or, in the Alternative, for Preliminary Injunction with the trial on the merits in this case.  *See* Fed. R. Civ. P. 65(a)(2).

(B)  is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,

(C)  is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence [sic] to a term of imprisonment of at least 1 year, or

(D)  is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

8 U.S.C. § 1226(c)(1).

9.     Paragraph 2 of that subsection states:

(2) Release

The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides pursuant to section 3521 of Title 18 that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.

8 U.S.C. § 1226(c)(2).

10.     This case also implicates 8 U.S.C. § 1231.  The relevant portions of that statute state:

> Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the "removal period").

8 U.S.C. § 1231(a)(1)(A).

> During the removal period, the Attorney General shall detain the alien. Under no circumstance during the removal period shall the Attorney General release an alien who has been found inadmissible under section 1182(a)(2) or 1182(a)(3)(B) of this title or deportable under section 1227(a)(2) or 1227(a)(4)(B) of this title.

*Id.* § 1231(a)(2).

### C.    CIVIL IMMIGRATION ENFORCEMENT PRINCIPLES

11.     Enforcement of U.S. immigration law by United States executive branch agencies such as USCIS, CBP, ICE, and DHS ("Immigration Enforcement Authorities") is also at issue in this case.

12.     In light of resource constraints, Immigration Enforcement Authorities must decide how to focus their immigration enforcement actions.  This is done regardless of whether there is express agency-wide guidance or not.[4]  (Dkt. No. 146-2 at 1); (Dkt. No. 146-3 at 4); (Dkt. No. 146-7 at 2).

13.     Since it began operations in 2003, DHS has never apprehended and removed all removable aliens.

14.     As of August 2021, the Enforcement and Removal Operations ("ERO") division of ICE had approximately 34,000 detention beds nationwide.  (Dkt. No. 153-21 at 15).

15.     At these resource levels, it would be impossible to detain all aliens covered in Section 1226(c) or Section 1231(a)(2) at one time.  (Dkt. No. 153-21 at 14–16).

---

[4]     Throughout this opinion, all docket-entry cites are to the ECF-imposed "Page ID."

16.     Despite this, DHS has requested a dramatic reduction in detention bed capacity.[5]  Most recently, DHS's 2023 budget request asks for a reduction to 25,000 detention beds.  This amounts to a requested reduction of 26% over the course of the two years of the current administration.  DHS's 2023 budget request also seeks to eliminate funding for family detention beds.

17.     ICE has also persistently underutilized its existing resources since 2021.  For example, an April 2022 Office of Inspector General Report regarding one of ICE's outside contractors found that "none of the [contractor's] facilities used more than half of the number of beds ICE paid for under its contract. For example, usage ranged from an average of 21 percent at one hotel in El Paso to an average of 45 percent at one hotel in Phoenix. As a result, ICE spent $16.98 million[] for unused beds at the hotels between April and June 2021."[6]

18.     DHS's detention capacity is elastic.  That is, DHS can reallocate resources based on existing needs.  (Dkt. No. 153-10 at 6); (Dkt. No. 210 at 89, 92–93).

19.     For example, from Fiscal Year 2019–present, ICE had an average daily population by month that peaked at 55,238 in August 2019 and reached a low of 14,084 in February 2021.  The April 2022 average daily population was 19,176.[7]

20.     Shifting resources is not without cost.  For example, reallocating resources to the border may come at the expense of interior enforcement, and vice-versa.  (Dkt. No. 153-10 at 6); (Dkt. No. 210 at 176, 178).

21.     There is also velocity to DHS's detention capacity.  (Dkt. No. 210 at 200–01).  That is, DHS's detention capacity is not just a function of the number of "beds" DHS possesses, but also how quickly it removes aliens.  For example, from fiscal year 2019–present, the ICE average length of stay by month peaked at 91.5 days in September 2020

---

5      *U.S. Immigration and Customs Enforcement Budget Overview*, Department of Homeland Security at p. 19, 29, https://www.dhs.gov/sites/default/files/2022-03/U.S.%20Immigration%20and%20Customs%20Enforcement_Remediated.pdf (last visited June 9, 2022); *U.S. Immigration and Customs Enforcement Budget Overview*, Department of Homeland Security at p. 17, https://www.dhs.gov/sites/default/files/publications/u.s._immigration_and_customs_enforcement.pdf (last visited June 9, 2022).

6      *ICE Spent Funds on Unused Beds, Missed COVID-19 Protocols and Detention Standards while Housing Migrant Families in Hotels*, Office of Inspector General at p. 6, https://www.oig.dhs.gov/sites/default/files/assets/2022-04/OIG-22-37-Apr22.pdf (last visited June 9, 2022).

7      *Detention Management*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/detain/detention-management (last visited June 9, 2022) (download Detention FY 2022 YTD (Detention FY22 tab, line 76); FY 2021 Detention Statistics (Detention FY 2021 YTD tab, line 76); FY 2020 Detention Statistics (Detention EOFY2020 tab, line 59); and FY 2019 Detention Statistics (Detention FY19 tab, line 59)).

and reached a low of 21.1 days in September 2021.  The April 2022 average length of stay was 23.8 days.[8]

22.     As referenced in paragraphs 19 and 21 above, 55,238 total beds coupled with an average length of stay of 21.1 days equates to a total annual detention capacity of approximately 955,539 individuals.  In contrast, 14,084 total beds coupled with an average length of stay of 91.5 days equates to a total annual detention capacity of approximately 56,182 individuals.   This demonstrates that DHS's discretionary decisions have significant aggregate consequences.

23.     Also relevant is the process by which DHS takes custody of aliens with criminal convictions, which often happens through the use of a "detainer."

24.     A detainer is an administrative notice from DHS to a Federal, state, or local law enforcement agency.  A detainer informs the law enforcement agency that DHS intends to take custody of a removable alien detained by the jurisdiction upon their release.  A detainer asks the law enforcement agency to (1) notify DHS of the alien's release date and (2) hold the alien for up to 48 hours, so that DHS can take custody.  8 C.F.R. § 287.7.

25.     In Texas, the Texas Department of Criminal Justice ("TDCJ") administratively interviews every inmate at intake.  If an inmate indicates that either his citizenship or place of birth is not the United States, TDCJ enters that information into its database and sends a packet on the inmate to ICE.  The packet includes the inmate's fingerprints, biography, and family history.  TDCJ regularly sends and updates the packets.  ICE relies on these packets to determine whether a detainer should be issued. (Dkt. No. 210 at 54–55).

**D.     DHS Officials Issued Immigration Enforcement Memoranda**

**1.     The January Memorandum**

26.     On January 20, 2021, then-Acting Secretary of Homeland Security David Pekoske issued a memorandum titled *Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities* (the "January Memorandum").  By its own terms, it took effect on February 1, 2021.  (Dkt. No. 146-8).

---

[8]     *Detention Management*, U.S. Immigration and Customs Enforcement, https://www.ice. gov/detain/detention-management (last visited June 9, 2022) (download Detention FY 2022 YTD (Detention FY22 tab, line 93); FY 2021 Detention Statistics (Detention FY 2021 YTD tab, line 93); FY 2020 Detention Statistics (Detention EOFY2020 tab, line 76); and FY 2019 Detention Statistics (Detention FY19 tab, line 75)).

27.     The January Memorandum announced substantial changes to the enforcement of the Nation's immigration laws.  (*Id.*).

28.     The January Memorandum identified three enforcement priorities: national security, border security, and public safety.  (*Id.* at 2).

29.     The January Memorandum defined the national security priority as pertaining to those "[i]ndividuals who have engaged in or are suspected of terrorism or espionage, or whose apprehension, arrest and/or custody is otherwise necessary to protect the national security of the United States."  (*Id.* at 2).

30.     The January Memorandum defined the border security priority as pertaining to those "[i]ndividuals apprehended at the border or ports of entry while attempting to unlawfully enter the United States on or after November 1, 2020, or who were not physically present in the United States before November 1, 2020."  (*Id.* at 2).

31.     Finally, the January Memorandum defined the public safety priority as pertaining to those "[i]ndividuals incarcerated within federal, state, and local prisons and jails released on or after the issuance of this memorandum who have been convicted of an 'aggravated felony,' as that term is defined in section 101(a)(43) of the Immigration and Nationality Act at the time of conviction, and are determined to pose a threat to public safety."  (*Id.* at 2).

32.     The January Memorandum did not instruct officers to prioritize aliens convicted of crimes of moral turpitude,[9] aliens convicted of drug offenses,[10] aliens convicted of multiple offenses with an aggregate sentence of confinement of five years or more,[11] aliens who are traffickers of controlled substances,[12] aliens who participate in the commercialized sex industry,[13] aliens who served in foreign governments and committed "particularly severe violations of religious freedom,"[14] aliens who participate in the human trafficking industry,[15] aliens who engage in money laundering,[16] aliens convicted of certain firearms offenses,[17] and aliens with final orders of removal.[18]

---

[9]     *See* 8 U.S.C. §§ 1182(a)(2)(A)(i)(I), 1227(a)(2)(A)(i)–(ii).

[10]    *See* 8 U.S.C. § 1182(a)(2)(A)(i)(II).

[11]    *See* 8 U.S.C. § 1182(a)(2)(B).

[12]    *See* 8 U.S.C. § 1182(a)(2)(C).

[13]    *See* 8 U.S.C. § 1182(a)(2)(D).

[14]    *See* 8 U.S.C. § 1182(a)(2)(G).

[15]    *See* 8 U.S.C. § 1182(a)(2)(H).

[16]    *See* 8 U.S.C. § 1182(a)(2)(I).

[17]    *See* 8 U.S.C. § 1227(a)(2)(C).

[18]    *See* 8 U.S.C. § 1231(a)(1)(A).

33.     The January Memorandum further stated that its "guidelines and priorities are not intended to, do not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter."  (Dkt. No. 146-8 at 4).

34.     The January Memorandum called on the Acting Director of ICE to "issue operational guidance on the implementation of" the priority framework.  (*Id.* at 3).

35.     The January Memorandum stated that it did not "prohibit[] the apprehension or detention of individuals unlawfully in the United States who are not identified as priorities" in the memorandum.  (*Id.*).

36.     The January Memorandum was not issued following notice-and-comment procedures.  (Dkt. No. 211 at 69).

## 2.     The February Memorandum

37.     As required by the January Memorandum, on February 18, 2021, Acting ICE Director Tae Johnson issued a memorandum titled *Interim Guidance: Civil Immigration Enforcement and Removal Priorities* (the "February Memorandum").  (Dkt. No. 146-9).

38.     The February Memorandum noted that it provided only "interim guidance" and would "remain in effect until Secretary Mayorkas issue[d] new enforcement guidelines."  (*Id.* at 1).

39.     The February Memorandum acknowledged that the January 20 Memorandum "established interim civil immigration enforcement priorities," and it restated those priority categories: national security, border security, and public safety.  (*Id.* at 2, 4–5).

40.     The February Memorandum defined the national security priority as pertaining to those aliens who have engaged in, or are suspected of engaging, in terrorism or espionage.  (*Id.* at 4).

41.     The February Memorandum defined the border security priority as pertaining to those aliens "apprehended at the border or a port of entry while attempting to unlawfully enter the United States on or after November 1, 2020" or who were "not physically present in the United States before November 1, 2020."  (*Id.* at 4).

42.     Finally, the February Memorandum defined the public safety priority as pertaining to those aliens who "pose[] a threat to public safety" and have been "convicted of an 'aggravated felony'" or are involved with criminal gangs.  (*Id.* at 4–5).

43.     The February Memorandum did not instruct officers to prioritize aliens convicted of crimes of moral turpitude,[19] aliens convicted of drug offenses,[20] aliens convicted of multiple offenses with an aggregate sentence of confinement of five years or more,[21] aliens who are traffickers of controlled substances,[22] aliens who participate in the commercialized sex industry,[23] aliens who served in foreign governments and committed "particularly severe violations of religious freedom,"[24] aliens who participate in the human trafficking industry,[25] aliens who engage in money laundering,[26] aliens convicted of certain firearms offenses,[27] and aliens with final orders of removal.[28]

44.     The February Memorandum stated that it would generally not require "[o]fficers and agents . . . [to] obtain preapproval for enforcement or removal actions" against those who fall within the three "presumed priority" categories.  But it generally required "preapproval" for enforcement actions, which includes detention, against other criminal aliens.  The February Memorandum noted, "[i]f preapproval is impractical, an officer or agent should conduct the enforcement action" and then seek approval within 24 hours.  (Dkt. No. 146-9 at 5–6).

45.     The approval rate for "other priority" enforcement actions varied by ICE field office.  Several offices approved more than 99% of all requests.  The lowest approval rates were in the New York (82%) and Denver (89%) field offices.  The median approval rate was 98%.  (Dkt. No. 146-15 at 1, 3).

46.     However, under the February Memorandum, many ICE offices had a practice of pre-vetting cases so that officers obtained informal approval from their supervisors before they formally submitted an approval request.  This made the approval rate for non-priority cases appear deceptively high.  (*Id.* at 3).

47.     This practice artificially inflated the approval rate for "other priority" enforcement actions.  It is unlikely that officers would seek preapproval for an

---

[19]   *See* 8 U.S.C. §§ 1182(a)(2)(A)(i)(I), 1227(a)(2)(A)(i)–(ii).

[20]   *See* 8 U.S.C. § 1182(a)(2)(A)(i)(II).

[21]   *See* 8 U.S.C. § 1182(a)(2)(B).

[22]   *See* 8 U.S.C. § 1182(a)(2)(C).

[23]   *See* 8 U.S.C. § 1182(a)(2)(D).

[24]   *See* 8 U.S.C. § 1182(a)(2)(G).

[25]   *See* 8 U.S.C. § 1182(a)(2)(H).

[26]   *See* 8 U.S.C. § 1182(a)(2)(I).

[27]   *See* 8 U.S.C. § 1227(a)(2)(C).

[28]   *See* 8 U.S.C. § 1231(a)(1)(A).

enforcement action, let alone take an enforcement action, that did not survive this informal pre-vetting process. (*Id.*); (Dkt. No. 210 at 79–80).

48.     To "ensure compliance" and "consistency" across the country and to allow for an assessment of the effectiveness of the priority framework, the February Memorandum required field offices to "collect data on the nature and type of enforcement and removal actions they perform." (Dkt. No. 146-9 at 5).

49.     The February Memorandum stated that it did "not require or prohibit the arrest, detention, or removal of any noncitizen" and that "officers and agents are expected to exercise their discretion thoughtfully, consistent with ICE's important national security, border security, and public safety mission." (*Id.* at 3).

50.     The February Memorandum further stated that its "guidelines and priorities are not intended to, do not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." (*Id.* at 7).

51.     The February Memorandum was not issued following notice-and-comment procedures. (Dkt. No. 211 at 69).

### 3.     **The Final Memorandum**

52.     On September 30, 2021, Secretary Mayorkas issued the Final Memorandum from DHS. (Dkt. No. 109-5).

53.     Secretary Mayorkas provided that the Final Memorandum would become effective on November 29, 2021, and that, upon its effective date, the Final Memorandum would "serve to rescind" the January and February Memoranda. (*Id.* at 7).

54.     In developing the Final Memorandum, Secretary Mayorkas and DHS received input from certain individuals and groups. (Dkt. No. 145-1).

55.     Secretary Mayorkas and DHS considered issues raised in litigation and the views of members of Congress and state and local officials. *See*, *e.g.*, (Dkt. No. 148-9); (Dkt. No. 148-8); (Dkt. No. 148-15); (Dkt. No. 150-1).

56.     The Final Memorandum by its terms sets out "guidance for the apprehension and removal of noncitizens." (Dkt. No. 109-5 at 2). The Final Memorandum expressly applies to detainers. (*Id.* at 3).

57.     The Final Memorandum identifies the same three priority enforcement categories as the previous two memoranda: national security, border security, and public safety. *Compare* (*Id.* at 4–5) *with* (Dkt. No. 146-8 at 2) *and* (Dkt. No. 146-9 at 4–5).

58.     Unlike the February Memorandum, the Final Memorandum's priorities are not presumptively subject to enforcement action.  *Compare* (Dkt. No. 109-5 at 4–5) *with* (Dkt. No. 146-9 at 4–5).

59.     For example, under the "border security" priority, the Final Memorandum admonishes "there could be mitigating or extenuating facts and circumstances that militate in favor of declining enforcement action.  [DHS] personnel should evaluate the totality of the facts and circumstances and exercise their judgment accordingly." (Dkt. No. 109-5 at 5).

60.     Unlike the February Memorandum, the Final Memorandum's "public safety" priority no longer presumptively subjects aliens convicted of aggravated felonies to enforcement action, including detention.  *Compare* (Dkt. No. 109-5 at 4–5) *with* (Dkt. No. 146-9 at 4–5).

61.     DHS's explanation for removing the "aggravated felony" category is that it was "both over- and under-inclusive," is "an imperfect proxy for severity of offense," and because the "aggravated felony definition can be challenging to administer in many instances[.]"  (Dkt. No. 146-1 at 12).

62.     The statute, however, specifically provides that the Defendants ("the Government") "shall take into custody any alien" that has committed an aggravated felony.  8 U.S.C. §§ 1226(c)(1)(B), 1227(a)(2)(A)(iii).

63.     Under the "public safety" priority, the Final Memorandum instructs DHS personnel that enforcement, including detention, "is not to be determined according to bright lines or categories." (Dkt. No. 109-5 at 4–5).

64.     The Final Memorandum "requires an assessment of the individual and the totality of the facts and circumstances."  It states, DHS "personnel should not rely on the fact of conviction or the result of a database search alone," when deciding to enforce the law.  Rather, they "should, to the fullest extent possible, obtain and review the entire criminal and administrative record and other investigative information to learn of the totality of the facts and circumstances of the [alien's] conduct at issue."  (*Id.*).

65.     As with the January and February Memoranda, the Final Memorandum does not instruct officers to prioritize aliens convicted of crimes of moral turpitude,[29] aliens convicted of drug offenses,[30] aliens convicted of multiple offenses with an aggregate sentence of confinement of five years or more,[31] aliens who are traffickers of

---

[29]     *See* 8 U.S.C. §§ 1182(a)(2)(A)(i)(I), 1227(a)(2)(A)(i)–(ii).

[30]     *See* 8 U.S.C. § 1182(a)(2)(A)(i)(II).

[31]     *See* 8 U.S.C. § 1182(a)(2)(B).

controlled substances,[32] aliens who participate in the commercialized sex industry,[33] aliens who served in foreign governments and committed "particularly severe violations of religious freedom,"[34] aliens who participate in the human trafficking industry,[35] aliens who engage in money laundering,[36] aliens convicted of certain firearms offenses,[37] and aliens with final orders of removal.[38]

66.     The Final Memorandum states that a "review process should be put in place to ensure the rigorous review of our personnel's enforcement decisions" and "should seek to achieve quality and consistency in decision-making across the entire agency and the Department."  (Dkt. No. 109-5 at 7).

67.     The Final Memorandum also states that DHS "will work to establish a fair and equitable case review process to afford noncitizens and their representatives the opportunity to obtain expeditious review of the enforcement actions taken."  (*Id.*).  That case review process has been implemented.  This "ICE Case Review (ICR)" process allows aliens to challenge enforcement actions taken against them if they believe they do not meet the Final Memorandum's priorities.[39]  The ICR process allows aliens to request further review of their initial determination by "a Senior Reviewing Official, who, where appropriate, will communicate the ultimate resolution" with the requesting alien.[40]  The ICR process states that cases "involving individuals detained in ICE custody or pending imminent removal will be prioritized" and permits legal counsel to undertake the ICR process on behalf of aliens.[41]

68.     The Final Memorandum further states that it "does not compel an action to be taken or not taken" and "is not intended to, does not, and may not be relied upon to

---

[32]     *See* 8 U.S.C. § 1182(a)(2)(C).

[33]     *See* 8 U.S.C. § 1182(a)(2)(D).

[34]     *See* 8 U.S.C. § 1182(a)(2)(G).

[35]     *See* 8 U.S.C. § 1182(a)(2)(H).

[36]     *See* 8 U.S.C. § 1182(a)(2)(I).

[37]     *See* 8 U.S.C. § 1227(a)(2)(C).

[38]     *See* 8 U.S.C. § 1231(a)(1)(A).

[39]     *ICE Case Review*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/ICEcasereview (last visited June 9, 2022).

[40]     *ICE Announces Case Review Process*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/news/releases/ice-announces-case-review-process (last visited June 9, 2022).

[41]     *ICE Case Review*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/ICEcasereview (last visited June 9, 2022).

create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." (Dkt. No. 109-5 at 6, 8).

69.     The Final Memorandum was issued contemporaneously with another document titled *Significant Considerations in Developing Updated Guidelines for the Enforcement of Civil Immigration Law* (the "Considerations Memo"), in which DHS summarized the key aspects informing the Final Memorandum. (Dkt. No. 146-1).

70.     In the Considerations Memo, DHS included a section on potential alternative approaches to the Final Memorandum. (*Id.* at 19–21).

71.     DHS has coupled the Final Memorandum "with [an] extensive and continuous training program on the new guidelines, the creation of short- and long-term processes to review enforcement decisions to achieve quality and consistency, and comprehensive data collection and analysis." (*Id.* at 20).

72.     DHS's Activity Analysis and Reporting Tool ("AART") is used to collect data on whether enforcement actions adhere to the Final Memorandum. (Dkt. No. 217-18 at 4). The AART requires agents to report which of the three priority categories from the Final Memorandum applies to an enforcement action. (*Id.* at 8). Agents may only choose from the three categories when logging an enforcement action.

73.     Agents must also certify that they "considered all relevant case specific information" available at the time of the enforcement action. The submissions are reviewed by the agent's supervisors to verify that "all necessary information has been provided." (*Id.* at 12–13).

74.     The Final Memorandum was not issued following notice-and-comment procedures. (Dkt. No. 211 at 69).

**E.     THE FINAL MEMORANDUM INCREASES THE NUMBER OF CRIMINAL ALIENS AND ALIENS WITH FINAL ORDERS OF REMOVAL RELEASED INTO TEXAS, LOUISIANA AND THE UNITED STATES**

75.     In Texas, from fiscal year 2017 to fiscal year 2020, detainers were rescinded for various reasons such as discovering that the individual was a U.S. citizen, medical complications, or an inability to be repatriated. (Dkt. No. 203 at 68–69); (Dkt. No. 210 at 37).

76.     However, no more than a dozen detainers were dropped per year during that time period. (Dkt. No. 203 at 68–69).

77.     Before February 2021, TDCJ did not track daily the number of detainers that ICE dropped because there was no need. Before February 2021, ICE dropped so few detainers that the number could be tracked on a periodic basis. (Dkt. No. 210 at 42).

78.     Because of the increase in dropped detainers, TDCJ is currently updating its inmate-tracking system to indicate whether criminal alien inmates have had detainers dropped—or never issued in the first place—due to the Final Memorandum.  (*Id.* at 46–47).

79.     From January 20, 2021 through February 15, 2022, ICE rescinded detainers on 170 criminal aliens in TDCJ facilities.  It later reissued the detainer or took custody of 29 of those inmates.  (Dkt. No. 203 at 69); (Dkt. No. 217 at 19–23).

80.     ICE took custody of some aliens with rescinded detainers because TDCJ raised questions about the cancelation of their detainers.  (Dkt. No. 210 at 8, 51).

81.     Of the 141 criminal aliens whose detainers remained rescinded, 55 were serving a sentence for a drug offense.  These were serious drug offenses; none were for a single offense involving possession of 30 grams or less of marijuana for one's own use.  (Dkt. No. 217 at 19–23).

82.     Of the 141 criminal aliens whose detainers remained rescinded, 95 were released on parole supervision.  (Dkt. No. 203 at 83).  At the time this case was tried, 17 of those 95 had failed to comply with their parole supervision and four had committed new criminal offenses.  At least one remains at large in Texas with a warrant for his arrest.  (*Id.*).

83.     In the months since the Final Memorandum became effective, ICE has continued to rescind detainers placed on criminal aliens in TDCJ custody because of the Final Memorandum.  (Dkt. No. 217 at 23); (Dkt. No. 210 at 45); (Dkt. No. 203 at 85); *see also* (Dkt. No. 217-23).

84.     From November 29, 2021 to February 15, 2022, ICE rescinded detainers for at least 15 aliens detained within Texas facilities.  (Dkt. No. 217 at 23).  At least one of those aliens was subject to a final order of removal from the United States, but because of the dropped detainer, he was released into the public rather than ICE's custody.  (Dkt. No. 203 at 80–81); (Dkt. No. 217 at 23).

85.     Between approximately March to April 2021, the Louisiana Department of Public Safety and Corrections had at least four criminal aliens who were either (1) subject to detainers that were canceled; or (2) released to ICE custody only to later be returned to Louisiana.  (Dkt. No. 217-1 at 13–15).  These four individuals were thereafter placed on "supervised release" or "supervision by probation and parole."  (*Id.*).

86.     One of those was convicted of indecent behavior with juveniles and sexual battery.  His detainer was rescinded, and he was released subject to supervised release.  (*Id.* at 13–14).

87.     Two others, one convicted of possessing Fentanyl and the other of aggravated second-degree battery, were released to ICE but almost immediately returned for supervised release rather than removed.  (*Id.* at 14).

88.     A fourth, convicted of aggravated assault with a firearm, was released to ICE but later returned to Louisiana's custody for supervised release.  (*Id.* at 15).

89.     The number of convicted criminal aliens in ICE custody per day has dropped dramatically in the months since the January Memorandum was issued and has continued through today under the subsequent Memoranda.  There has been little variation in custody numbers since the January Memorandum was issued.[42]

90.     There has been little practical difference between ICE's detention of aliens with criminal convictions under the February Memorandum and under the Final Memorandum.  (Dkt. No. 203 at 85); (Dkt. No. 210 at 40).

91.     The average daily number of aliens with pending criminal charges in ICE custody has also dropped in the months since the Final Memorandum was issued.[43]

---

[42]  *Detention Management*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/detain/detention-management (last visited June 7, 2022) (download Detention FY 2022 YTD (Detention FY22 tab, line 73); FY 2021 Detention Statistics (Detention FY 2021 YTD tab, line 73); FY 2020 Detention Statistics (Detention EOFY2020 tab, line 56); and FY 2019 Detention Statistics (Detention FY19 tab, line 57)).

[43]  *Detention Management*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/detain/detention-management (last visited June 7, 2022) (download Detention FY 2022 YTD (Detention FY22 tab, line 74); FY 2021 Detention Statistics (Detention FY 2021 YTD tab, line 74)).

92.     A similar pattern exists with respect to convicted criminal aliens in CBP custody.[44]



93.     Even as COVID-19 conditions have improved, detentions of aliens with criminal convictions have remained considerably lower than prior years.

94.     As the detention data indicate, officers do not have discretion to go outside the enforcement priorities.  The data are not consistent with officers having the ability to disregard the admonitions in the Memoranda.  Instead, they demonstrate that officers are expected to only take an enforcement action within much narrower circumstances.

---

[44] *Detention Management*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/detain/detention-management (last visited June 7, 2022) (download Detention FY 2022 YTD (Detention FY22 tab, line 69); FY 2021 Detention Statistics (Detention FY 2021 YTD tab, line 69)).

95.     The same decline is also evident in removals carried out by ICE, since DHS was created:[45]



96.     These removal numbers—over three-fold below the removals carried out at the height of the pandemic—make clear that the Final Memorandum is dramatically impacting civil immigration enforcement and are a further indication that agents consider the Memoranda to contain mandatory directives that limit the discretion that was available to them in years' past.

97.     The Final Memorandum subjects every enforcement action to review for compliance with its priorities and terms.  (Dkt. No. 109-5 at 7–8); (Dkt. No. 217-18 at 12–13).  DHS personnel are required to consider the priorities and other factors outlined in the Final Memorandum and are precluded from relying on a conviction, no matter how

---

[45]     *Detention Management*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/detain/detention-management (last visited June 7, 2022) (download FY 2021 Detention Statistics (Detention FY 21 YTD tab, line 29) (for fiscal year 2021); FY 2020 Detention Statistics (Detention EOFY2020 tab, line 29) (for fiscal year 2020)); (Dkt. No. 153-10 at 22) (for fiscal years 2017–2019); *FY 2016 ICE Immigration Removals*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/remove/removal-statistics/2016 (last visited June 7, 2022) (for fiscal years 2008–2016); *FY2003 – 2016 Removal by AOR Stats*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/doclib/foia/immigration_statistics/Removals-AOR-FY 2003-2016.xlsx (last visited June 7, 2022) (for fiscal years 2003–2007).

serious, or the result of a database search alone before taking an enforcement action.  (Dkt. No. 109-5 at 5, 7–8); (Dkt. No. 217-18 at 8, 12); (Dkt. No. 217-26 at 8–15, 18).

98.    Based on the dramatic decrease in detentions of aliens with criminal convictions, the Final Memorandum and its priorities—particularly when viewed in light of the previous Memoranda and how they were implemented and enforced by DHS supervisors—are perceived by many ICE officers and agents as substantially limiting if not eliminating their discretion to make detention decisions. (Dkt. No. 109-5 at 7–8); (Dkt. No. 210 at 46, 163); *see supra* (F.F. No. 89); (F.F. Nos. 91–93); (F.F. No. 95).

99.    The result is that an ostensibly permissive Final Memorandum is effectively mandatory at the most important level: the agents and officers who are tasked with enforcing the law.

100.    The Memoranda have resulted in ICE officers rescinding detainers and declining to take aliens into custody who are covered by the statutes.  (Dkt. No. 203 at 68–69, 73–74); (Dkt. No. 210 at 37–39, 80, 84–85, 87, 161); (Dkt. No. 217 at 19–23).

101.    The Final Memorandum has led to the rescission of detainers, which has at least in part contributed to fewer criminal aliens being detained by ICE.  (Dkt. No. 217 at 23); (Dkt. No. 210 at 45); (Dkt. No. 203 at 85); *see supra* (F.F. No. 89); (F.F. Nos. 91–93); (F.F. No. 95).  It has also led to the release of aliens with final orders of removal.  (Dkt. No. 203 at 80–81); (Dkt. No. 217 at 23).

102.    The Final Memorandum increases the number of aliens with criminal convictions and aliens with final orders of removal released into the United States.

**F.    INCREASED NUMBERS OF CRIMINAL ALIENS LEAD TO INCREASED STATE COSTS**

**1.    Costs of Incarcerating Criminal Aliens**

103.    The average cost to TDCJ for incarcerating an inmate who qualifies for reimbursement under the federal government's State Criminal Alien Assistance Program ("SCAAP") was $62.34 per day for the period of July 1, 2017 through June 30, 2018.  (Dkt. No. 115-6 at 3).  During that period, TDCJ incarcerated 8,951 eligible inmates for a total of 2,439,110 days. (*Id.*).  The total estimated cost of incarcerating these inmates for that period was $152,054,117.    (*Id.* at 3-4).  Of that amount, the SCAAP program reimbursed only $14,657,739.    (*Id.*).    Thus, the estimated net cost to the State of Texas was approximately $56.33 per person per day.

104.    For the most recently completed period, July 1, 2018 through June 30, 2019, TDCJ incarcerated 8,893 eligible inmates for a total of 2,385,559 days at an estimated total cost of $165,247,672. The average per-inmate, per-day cost of incarceration for those

inmates was $69.27.  As of January 2022, SCAAP had not reimbursed any of that amount. (Dkt. No. 217 at 112 ¶¶ 6–7).

105.    When ICE rescinds a detainer for an inmate in TDCJ custody, the Board of Pardons and Paroles considers that new information and has revoked parole for aliens who were previously approved for parole, leading to continued custody in TDCJ.  (Dkt. No. 203 at 85–89); (Dkt. No. 217 at 19–23).

106.    As the number of aliens in TDCJ custody increases, the net cost to the State of Texas of detaining those aliens increases.  (Dkt. No. 217 at 112 ¶ 8).

107.    TDCJ also incurs costs to keep aliens in custody or add them to parole or mandatory supervision programs when those aliens are not detained or removed by federal immigration authorities.  For Fiscal Year 2020, the average per-day cost of these programs for each inmate not detained or removed is $4.64, which would total $11,068,994.  (*Id.* at 113 ¶ 9).

108.    Louisiana incurs costs to supervise aliens not detained by ICE while they are on supervised release.  (Dkt. No. 217-1 at 15).

## 2.    Recidivism of Criminal Aliens

109.    A 2018 study from the United States Department of Justice's Bureau of Justice Statistics shows that state offenders generally recidivate at a 44% level within the first year following release, 68% within the first three, 79% within the first six, and 83% within the first nine.  The same study shows that during the nine-year period following release, there were on average five arrests per released prisoner.  (Dkt. No. 217-10 at 2).

110.    Tarrant County, Texas averages 246 inmates with immigration detainers at any given time. The Tarrant County Sheriff estimates the average cost of jailing those inmates to be $3,644,442 per year.  (Dkt. No. 217 at 107).

111.    As of January 7, 2022, Tarrant County had 145 of these inmates out of a total population in custody of 3,855.  (*Id.* at 107–08).

112.    The 145 immigration-detainer inmates had 246 pending charges among them.  They included, among other crimes, seven charges for murder, twenty-six charges for aggravated assault with a deadly weapon, and eight charges for aggravated sexual assault of a child.  (*Id.*).

113.    The Tarrant County Sheriff's Office examined the recidivism rates for inmates with immigration detainers by examining the criminal-history files of every such inmate jailed as of that date.  In January 2022, it found a recidivism rate (indicated by prior jail time) of roughly 90% for that population, compared to 69% in October 2021.  (*Id.* at 108).

114.    DHS itself found that "[o]f the 123,128 ERO administrative arrests in FY 2019 with criminal convictions or pending criminal charges, the criminal history for this group represented 489,063 total criminal convictions and pending charges as of the date of arrest," which equates to "an average of *four* criminal arrests/convictions *per alien*, highlighting the recidivist nature of the aliens that ICE arrests."  (Dkt. No. 153-10 at 15) (emphases added).

### 3.    Education Provided to Criminal Aliens

115.    The estimated average per-student, per-year funding entitlement for a student in Texas public schools in Fiscal Year 2022 will be $9,211. For a student who qualifies for English as a second language weighted funding, that amount is $11,500. (Dkt. No. 217 at 140).

116.    While Texas does not have information on the total number of school-aged aliens attending public schools in the State, there is data for a subset of those children. (*Id.*).

117.    Data from the U.S. Health and Human Services Office of Refugee Resettlement shows how many unaccompanied children were released to sponsors in Texas during annual October–September periods.   Most unaccompanied children detained by the Government and released to sponsors in Texas qualify for English as a second language weighted funding.  (*Id.*).

118.    For each of those children educated in the Texas public school system the fiscal year following release to a sponsor and who qualified for English as a second language weighted funding, the State and local governments would incur millions of dollars in costs.  Since fiscal year 2015, those costs have been as high as $176.42 million per year and as low as $26.95 million per year.  (*Id.* at 140–41).

119.    The total costs to Texas of providing public education to alien children will rise as the number of such children increases.  (Dkt. No. 217 at 141).

120.    The Texas Juvenile Justice Department ("TJJD") has custody of juvenile offenders who have committed felony-level offenses.  When those juveniles are released, they attend public schools.  (*Id.* at 155).

121.    ICE previously sent detainers to TJJD for juvenile aliens.  However, as of April 26, 2021, at least one alien juvenile in TJJD custody for committing aggravated robbery was not issued a detainer.  That juvenile will attend a Texas public school upon release. (*Id.* at 155–56).

122.    Some aliens with criminal convictions who are not detained by ICE because of the Final Memorandum will cause the Texas public school system to incur additional costs.

4.     **Healthcare Provided to Criminal Aliens**

123.     The Texas Health and Human Services Commission ("HHSC") provides three principal categories of services and benefits to aliens in Texas: (i) Texas Emergency Medicaid; (ii) the Texas Family Violence Program; and (iii) Texas Children's Health Insurance Program ("CHIP") Perinatal Coverage.  Aliens also receive uncompensated medical care from public hospitals in the State.  (*Id.* at 118).

124.     The Emergency Medicaid program is a federally required program jointly funded by the federal government and the states.  It provides Medicaid coverage to aliens living in the United States.  (*Id.*).

125.     Because HHSC Medicaid claims data do not conclusively identify an individual's residency status, HHSC must estimate the portion of Emergency Medicaid payments attributable to aliens.  (*Id.*).

126.     The Family Violence Program contracts with non-profit agencies across Texas to provide essential services to family violence victims, including aliens, in three categories: shelter centers, non-residential centers, and Special Nonresidential Projects. The Family Violence Program does not ask individuals about their residency status, so HHSC estimates the portion of Family Violence Program expenditures attributable to aliens.  (*Id.* at 119).

127.     Texas CHIP Perinatal Coverage provides perinatal care to certain low-income women who do not otherwise qualify for Medicaid. HHSC cannot definitively report the number of aliens served by CHIP Perinatal Coverage because the program does not require citizenship documentation.  (*Id.*).

128.     The following chart shows HHSC's estimates of the total cost to Texas to furnish coverage under each program to undocumented aliens.

| State Fiscal Year | Emergency Medicaid | Family Violence | CHIP Perinatal |
|---|---|---|---|
| 2009 | $62 million | $1.3 million | $33 million |
| 2011 | $71 million | $1.3 million | $35 million |
| 2013 | $90 million | $1.4 million | $38 million |
| 2015 | $73 million | $1.0 million | $30 million |
| 2017 | $85 million | $1.2 million | $30 million |
| 2019 | $80 million | $1.0 million | $6 million |

(*Id.* at 118–20).

129.     HHSC has in the past estimated the amount of uncompensated medical care provided by state public hospital districts to aliens.  HHSC estimated that those districts

incurred approximately $596.8 million in uncompensated care for aliens in State Fiscal Year 2006 and $716.8 million in State Fiscal Year 2008.  (*Id.* at 120).

130.    Some criminal aliens who are not detained by ICE because of the Final Memorandum will require these services, causing Texas to incur costs.

### G.    THE AGREEMENTS BETWEEN THE STATES AND DHS

131.    On January 8, 2021, an official in DHS, Ken Cuccinelli, signed agreements with the States of Texas and Louisiana.  (Dkt. No. 153-8 at 43–52, 53–56); (Dkt. No. 153-9 at 1–6).

132.    These agreements sought to provide individual states with 180-days' written notice before DHS took "any action or [made] any decision that could reduce immigration enforcement, increase the number of removable or inadmissible aliens in the United States, or increase immigration benefits or eligibility for benefits for removable or inadmissible aliens."  (Dkt. No. 153-8 at 46); *see also* (*id.* at 56).

133.    In letters dated February 2, 2021, signed by Acting DHS Secretary Pekoske and addressed to Texas and Louisiana, DHS stated that the agreements were unenforceable and non-binding.  (Dkt. No. 153-14 at 19–20, 22–23).  In addition, in each of those letters, Acting Secretary Pekoske stated that, "[n]otwithstanding that the Document is void, not binding, and unenforceable—and preserving all rights, authorities, remedies, and defenses under the law—this letter also provides notice . . . that DHS, CBP, ICE and USCIS rescinds, withdraws, and terminates the Document, effective immediately."  (*Id.*).

134.    Each of those agreements had a clause stating that termination of those agreements would take effect "180 days after the written termination request was submitted or upon a date agreed upon by all parties, whichever is earlier."  (Dkt. No. 153-8 at 50); (Dkt. No. 153-9 at 4).

135.    Texas's purported agreement with DHS was terminated as of August 1, 2021.  (Dkt. No. 109 at 20).

## II.    STANDING

The Court now turns to the legal analysis.  To bring a lawsuit in federal court, a plaintiff must have standing.  The Supreme Court has distilled the standing doctrine into an "irreducible constitutional minimum" whereby a plaintiff must demonstrate (1) that it suffered an "injury in fact" that is "concrete and particularized" and "actual or

imminent," (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338–39, 136 S.Ct. 1540, 1547–48, 194 L.Ed.2d 635 (2016). Both Texas and Louisiana maintain that they have standing, but only one state need have standing to proceed to the merits. *Texas v. Biden*, 20 F.4th 928, 969 (5th Cir. 2021) (hereinafter *Texas MPP*), *cert. granted*, 142 S.Ct. 1098, 212 L.Ed.2d 1 (2022). Since there was a final trial on the merits, the States must prove standing by a preponderance of the evidence. *Id.* The wealth of evidence at trial was as to Texas's claims, so the Court considers Texas's case for standing.[46]

---

[46]   Relevant to this controversy, the Court is mindful that the States are not typical litigants, especially for the purpose of invoking federal jurisdiction in this context. *Massachusetts v. EPA*, 549 U.S. 497, 518, 127 S.Ct. 1438, 1454, 167 L.Ed.2d 248 (2007). The Court holds that the States are entitled to "special solicitude" in their quest to establish standing. *Id.* at 520, 127 S.Ct. at 1454–55. This is not an alternative, state-specific track for them to prove standing, but rather lowers the burden for them to establish constitutional standing when the conditions for special solicitude are met. *Texas MPP*, 20 F.4th at 970.

Special solicitude has two requirements. First, the State must have a procedural right to challenge the action in question. *Id.* at 969. Second, the challenged action must affect one of the State's quasi-sovereign interests—that is, one of the "formerly sovereign prerogatives that are now lodged in the Federal Government." *Id.* (cleaned up). The first element is satisfied because the APA affords Texas a procedural right to challenge DHS's rules. *See Texas v. United States*, 809 F.3d 134, 152 (5th Cir. 2015) (citing 5 U.S.C. § 702) (hereinafter *Texas DAPA*); *see also Texas MPP*, 20 F.4th at 970. The second element is satisfied because at least two of Texas's quasi-sovereign interests are implicated here: Texas's interest in being free from "substantial pressure" from the federal government to change its laws, and Texas's interest in the enforcement of immigration law—the power to regulate immigration being a sovereign prerogative that Texas wholly ceded to the Government when it joined the Union. *Texas DAPA*, 809 F.3d at 152–54; *see also Texas MPP*, 20 F.4th at 970; *see generally Arizona*, 567 U.S. at 394–98, 132 S.Ct. at 2497–500. Indeed, special solicitude is especially apt in this case because of the States' inability to legislate on their own behalf in this area. *Texas DAPA*, 809 F.3d at 152–53; *see Arizona*, 567 U.S. at 394–98, 132 S.Ct. at 2497–500.

Since the States are entitled to special solicitude, at a minimum, this makes it easier for them to establish the imminence and redressability components of standing. *Texas MPP*, 20 F.4th at 970. The Court holds that the States have established standing without the need for special solicitude. But lest any doubt remain, special solicitude certainly pushes them over the line.

### A.    INJURY IN FACT

Texas's first task is to establish an injury in fact.  The Final Memorandum harms Texas in two ways: financially and as *parens patriae*.  As to its finances, Texas has suffered a concrete and particularized, actual injury.  (F.F. Nos. 103–30).  Texas has also suffered concrete and particularized, actual injuries to its interests as *parens patriae*.[47]  Texas possesses a quasi-sovereign interest in protecting its citizens from the criminal activity of aliens subject to mandatory detention under federal law.  *Texas v. United States*, 555 F. Supp. 3d 351, 378–79 (S.D. Tex. 2021) (collecting cases) (hereinafter *Texas II*).  And, at trial, Texas showed that aliens who are subject to mandatory detention, but that ICE declined to detain, have already committed, and are committing, more crimes in Texas.  (F.F. No. 82); (F.F. Nos. 109–14).

These harms are to legally protected interests under both the traditional and *parens patriae* inquiries.  *See Texas v. United States*, 809 F.3d 134, 155–56 (5th Cir. 2015) (hereinafter *Texas DAPA*); *see also Texas MPP*, 20 F.4th at 969–72.  And they are substantial.  (F.F. Nos. 103–04); (F.F. No. 107); (F.F. No. 118); (F.F. Nos. 128–29).

### B.    TRACEABILITY

Texas also established a "fairly traceable link" between its injuries and the Government's action.  For instance, when ICE rescinds a detainer for an inmate in TDCJ

---

[47]    As discussed at length in this Court's memorandum opinion and order granting a preliminary injunction, *Texas v. United States*, 555 F. Supp. 3d 351, 376–80 (S.D. Tex. 2021), *parens patriae* standing results from the existence of an injury to a "quasi-sovereign" interest.  There are "two general categories" in which a quasi-sovereign interest may fall.  *Id.* at 377.  First, a State has a quasi-sovereign interest in the health and well-being — both physical and economic — of its residents.  *Id.*  Second, a state has a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system.  *Id.*

custody, the Texas Board of Pardons and Paroles considers that new information and has revoked parole for aliens who were previously approved for parole. (F.F. No. 105). This has led to aliens remaining in TDCJ custody longer than they otherwise would, which imposes additional costs on the State of Texas. (F.F. No. 107). It has also caused, and continues to cause, increases in the number of criminal aliens and aliens with final orders of removal released into Texas. (F.F. No. 79); (F.F. Nos. 83–85); (F.F. No. 89); (F.F. Nos. 91–92); (F.F. No. 95); (F.F. Nos. 100–02). It has caused, and continues to cause, increases in Texas's expenditures on public services such as healthcare and education. (F.F. No. 118); (F.F. No. 128). When the Government declines to detain aliens subject to mandatory detention, either the States must pay to continue to detain them or they are released into the States. (F.F. No. 105); (F.F. No. 107). Upon release, some have consumed, and will continue to consume, social services that the States are required to provide. (F.F. No. 122); (F.F. No. 130). In addition, some have recidivated, and others will recidivate. (F.F. No. 82); (F.F. Nos. 109–14). *Cf. Texas DAPA*, 809 F.3d at 160; *see Texas MPP*, 20 F.4th at 972. "The causal chain is easy to see." *Texas MPP*, 20 F.4th at 972.

Here, there is no need to rely on appeals to human nature—that third parties "will likely react in predictable ways"—in response to the action of the Government, thereby causing a traceable harm to Texas. *See Dep't of Com. v. New York*, ____ U.S. ____, ____, 139 S.Ct. 2551, 2566, 204 L.Ed.2d 978 (2019). At trial, the States proved by a preponderance of the evidence that aliens with criminal convictions *have* reacted in specific ways that harm Texas.

### C.   REDRESSABILITY

Last, the Court can redress the States' injuries.  The APA empowers the Court to "set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  The Court finds that the Final Memorandum has led to more criminal aliens and aliens with final orders of removal being released into Texas and Louisiana.  (F.F. Nos. 79–80); (F.F. Nos. 82–85); (F.F. No. 90–92); (F.F. No. 95); (F.F. No. 102).  So vacatur of the Final Memorandum would directly contribute to the decrease in the number of criminal aliens in the States' prisons and the number of aliens who are subject to a final order of removal being released into the States.  This would decrease the financial injury and *parens patriae* injury that the States are suffering.  Indeed, detention of aliens with criminal convictions was substantially higher before DHS issued the series of memoranda in 2021.  (F.F. No. 92).

*** 

The Court holds that the States have standing.[48]

---

[48]   With the exception of the Sixth Circuit's stay opinion, *Arizona v. Biden*, 31 F.4th 469, 474–77 (6th Cir. 2022), every court to have considered challenges to the Final Memorandum and its predecessor memoranda has found standing.  *Arizona v. Biden*, ____ F. Supp. 3d ____, ____, 2022 WL 839672, at *14 (S.D. Ohio Mar. 22, 2022); *Texas II*, 555 F. Supp. 3d at 373–85; *Arizona v. DHS*, 2021 WL 2787930, at *8 (D. Ariz. June 30, 2021); *Florida v. United States*, 540 F. Supp. 3d 1144, 1156 (M.D. Fla. 2021), *vacated as moot*, No. 21-11715, 2021 WL 5910702 (11th Cir. Dec. 14, 2021) (per curiam).

Importantly, the Sixth Circuit noted that it did not have evidence that there was a connection between the decrease in enforcement actions and the Final Memorandum.  *Arizona*, 31 F.4th at 475.  The Sixth Circuit held that there was no evidence that removing the Final Memorandum would result in DHS "arresting more people, detaining more people, or removing more people."  *Arizona*, 31 F.4th at 475. In this case, the States' theory of injury is based on the Final Memorandum causing increased numbers of *criminal* aliens within their borders, and as shown above, the Final Memorandum has caused ICE to detain fewer criminal aliens.  (F.F. No. 79); (F.F. Nos. 82–85); (F.F. No. 90); (F.F. No. 92); (F.F. No. 95); (F.F. No. 102).

### III.    JUDICIAL REVIEW

The Court must determine whether the States' claims are judicially reviewable before turning to the merits.  There are four inquiries: final agency action, statutory bars to judicial review, committed to agency discretion, and zone of interests.  The Court addresses each in turn.

### A.    FINAL AGENCY ACTION

To be subject to judicial review under the APA, the Final Memorandum must be "final agency action for which there is no other adequate remedy in a court[.]"  *See* 5 U.S.C. § 704.  The Fifth Circuit considers this determination "a jurisdictional prerequisite of judicial review."  *Louisiana v. U.S. Army Corps of Eng'rs*, 834 F.3d 574, 584 (5th Cir. 2016).  "The Supreme Court has long taken a pragmatic approach to finality, viewing the APA's finality requirement as flexible."  *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) (cleaned up).  To constitute final agency action, two conditions must be satisfied.  *Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S.Ct. 1154, 1168–69, 137 L.Ed.2d 281 (1997).  "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature."  *Id.* (citations and quotations omitted).  Second, "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Id.* (quotations omitted).  The Parties do not dispute that the Final Memorandum marks the consummation of the agency's decisionmaking process, (Dkt. No. 122 at 36 n.10), and the Court agrees.  *See Bennett*, 520 U.S. at 177–78, 117 S.Ct. at 1168.

It is the second condition that is in dispute.  The Fifth Circuit has held that an agency guidance document produces legal consequences or determines rights and obligations when the document binds the agency and its staff to a legal position.  *EEOC*, 933 F.3d at 441–42; *Texas MPP*, 20 F.4th at 948–49.  A guidance document binds the agency and its staff when the document "either appears on its face to be binding or is applied by the agency in a way that indicates it is binding."  *EEOC*, 933 F.3d at 441 (cleaned up); *Texas MPP*, 20 F.4th at 948.  "[M]andatory language" in an agency's guidance document alone can be sufficient to render it binding.  *EEOC*, 933 F.3d at 441–42.  Likewise, "where agency action withdraws an entity's previously-held discretion," that action is binding. *Id.* at 442 (citation omitted); *see Texas MPP*, 20 F.4th at 948.

The Final Memorandum is final agency action.  First, the Final Memorandum is facially binding on DHS personnel.  Second, the Considerations Memorandum and other related evidence of DHS's internal practices demonstrate that the Final Memorandum is being applied in a way that makes it binding.  Third, detention data also demonstrate that the Final Memorandum is being applied in a way that makes it binding.  Finally, the Final Memorandum creates legal rights for aliens subject to enforcement action.

### 1.   Facially Binding

The Final Memorandum facially binds DHS personnel using mandatory language. The Final Memorandum states that DHS "personnel *must* evaluate the individual and the totality of the facts and circumstances and exercise their judgment accordingly" and that "[w]hether a noncitizen poses a current threat to public safety *is not to be determined* according to bright lines or categories, [but by] an assessment of the individual and the

totality of the facts and circumstances." (Dkt. No. 109-5 at 4–5) (emphases added). It also states that "[t]he fact an individual is a removable noncitizen [] *should not* alone be the basis of an enforcement action against them" and that DHS "personnel *should not* rely on the fact of conviction or the result of a database search alone."[49] (*Id.* at 3, 5) (emphases added). Additionally, it states that a "review process should be put in place to ensure the rigorous review of our personnel's enforcement decisions" and it "should seek to achieve quality and consistency in decision-making across the entire agency and the Department." (*Id.* at 7). Last, the Final Memorandum "is Department-wide" and states that "[a]gency leaders as to whom this guidance is relevant to their operations will implement this guidance accordingly." (*Id.* at 8). This mandatory language makes the Final Memorandum facially binding. *Cf. EEOC*, 933 F.3d at 443 (approving the holding in *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) ("a guidance

---

[49]   The Government argues that directing agents not to rely on the fact of conviction alone does not actually change anything because agents must still "engage in a categorical or modified categorical analysis" to determine whether a state-court conviction is covered by Section 1226(c), even absent any agency guidance. (Dkt. No. 223 at 12–13). But to detain someone under these statutes, agents only need "reason to believe" that the state-court conviction falls within the statutory categories—certainty is not required. *Diop v. ICE/Homeland Sec.*, 656 F.3d 221, 230 (3d Cir. 2011) (quoting Procedures for the Detention and Release of Criminal Aliens by the Immigration and Naturalization Service and for Custody Redeterminations by the Executive Office for Immigration Review, 63 Fed. Reg. 27,441, 27,444 (May 19, 1998)), *abrogated on other grounds by Jennings v. Rodriguez*, ____ U.S. ____, 138 S.Ct. 830, 200 L.Ed.2d 122 (2018); *Jennings*, ____ U.S. at ____, 138 S.Ct. at 836 ("Detention during [immigration] proceedings gives immigration officials time to determine an alien's status without running the risk of the alien's either absconding or engaging in criminal activity before a final decision can be made."). In addition, if that officer is mistaken, an alien can request a hearing to challenge the detention. *See Matter of Joseph*, 22 I. & N. Dec. 799 (BIA 1999). There are also constitutional limits on detention. *Zadvydas v. Davis*, 533 U.S. 678, 699, 121 S.Ct. 2491, 2503, 150 L.Ed.2d 653 (2001).

document requiring agency staff to use a multi-factor analysis in deciding whether a regulated entity's activity complied with governing law was a final agency action")).

This mandatory language is not diluted by other lines from the Final Memorandum, which state that it "does not compel an action to be taken or not taken" and leaves the exercise of discretion "to the judgment of our personnel."[50] (Dkt. No. 109-5 at 6). The Final Memorandum's inclusion of these select statements does not subvert the mandatory language throughout the document requiring agents to consider and apply certain priorities and factors and precluding them from relying on the fact of conviction alone. *Cf. Texas v. United States*, 549 F. Supp. 3d 572, 600 (S.D. Tex. 2021) ("The DACA Memorandum itself also includes mandatory language that contradicts its purported conferral of discretion."). The Final Memorandum facially binds DHS staff by using mandatory language to impose requirements on agency personnel. This satisfies the second *Bennett* prong. 520 U.S. at 177–78, 117 S.Ct. at 1168; *Texas MPP*, 20 F.4th at 949; *EEOC*, 933 F.3d at 442–43.

Further, because the Final Memorandum requires consideration and application of additional priorities and factors and precludes reliance on a conviction alone—requirements that would not exist in the Final Memorandum's absence—it binds the agency by "withdraw[ing] [agents'] previously-held discretion[.]" *See EEOC*, 933 F.3d at

---

[50]   The end of the Final Memorandum also states that this "guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." (Dkt. No. 109-5 at 8). But this kind of boilerplate language is given little weight in the final agency action analysis. *See Appalachian Power Co.*, 208 F.3d at 1023.

442.   As explained in greater detail below, Sections 1226(c) and 1231(a)(2) mandate detention for certain categories of aliens.   *See infra* III.C.1.   Prior to the Final Memorandum, agents could detain an alien with a criminal conviction listed in Section 1226(c) based on the simple fact of that conviction alone.   Or they could detain an alien based on the simple fact of a final order of removal.   Now they must consider the personal history of each covered alien and their family members for aggravating and mitigating circumstances before taking any enforcement action, including detention.   (Dkt. No. 217-26 at 12, 18).   If an officer determines that the *only* factor supporting detention is that the alien is covered by the mandatory provisions of Section 1226(c) or Section 1231(a)(2), the officer may not detain the alien.   This imposes additional requirements on DHS personnel that would not otherwise exist and is a separate reason that the Final Memorandum satisfies the second *Bennett* prong.[51]   *Texas MPP*, 20 F.4th at 951 ("The Termination Decision . . . created legal consequences by stripping preexisting discretion from DHS's own staff."); *see Bennett*, 520 U.S. at 177–78, 117 S.Ct. at 1168; *EEOC*, 933 F.3d at 442–43.

---

[51]   The Government also disputes that the Final Memorandum requires agents to consider its priorities and factors before taking an enforcement action.   The Government relies on a statistic that, under the February Memorandum, over 90% of requests to take an enforcement action outside of the three priorities were approved.   (Dkt. No. 122 at 19); (Dkt. No. 223 at 14–15).   This demonstrates, in the Government's view, that the priorities were not binding on DHS personnel. But the same document reporting the 90% statistic also notes that many ICE offices have a practice of pre-vetting cases before they are submitted for approval, which deceptively inflates the percentage.   (F.F. Nos. 46–47).   Additionally, under the Final Memorandum, the option to report an enforcement action outside the Final Memorandum's priority categories no longer exists.   (Dkt. No. 217-18 at 8).

## 2.    **Binding Based on Related Evidence**

Other evidence further supports the conclusion that the Final Memorandum is being applied in a way that binds DHS personnel.  *See EEOC*, 933 F.3d at 441; *see also Texas MPP*, 20 F.4th at 948.  The Considerations Memorandum states that "the new guidelines will *require* the workforce to engage in an assessment of each individual case and make a case-by-case assessment as to whether the individual poses a public safety threat, guided by a consideration of aggravating and mitigating factors."  (Dkt. No. 146-1 at 19) (emphasis added).

Additional insight comes from the Quick Reference Guide to ICE's Activity Analysis and Reporting Tool—the database in which it tracks enforcement actions.  (Dkt. No. 217-18).  When an agent takes an enforcement action (including issuing a detainer), the agent must report which of the three Final Memorandum priority categories applies. (Dkt. No. 217-18 at 8).  The Guide requires agents to categorize an enforcement action as falling under one of the priorities in the Final Memorandum—it only includes radio buttons for the three priority categories and contains the disclaimer "*'Other'* **Priority is no longer an option**."  (*Id.*) (emphasis in original).  When the "Public Safety" category is selected, agents must then select from a list each aggravating factor that applies.[52]  (*Id.* at 9).  Before submitting the information, the agent must certify that he or she has read and

---

[52]    The agent must consider whether the individual was convicted of an aggravated felony; charged with an aggravated felony; convicted of a felony; charged with a felony; convicted of multiple misdemeanors; charged with multiple misdemeanors; is a known or suspected gang member; or if the police report indicates "particularly heinous or dangerous behavior not reflected in charges or convictions"; or "other."  (Dkt. No. 217-18 at 9).  If "other" is selected, a narrative description is required.  (*Id.*).

complied with the directive to "consider[] all relevant case specific information" available at the time of the enforcement action "which may include but is not limited to the nature and degree of harm to any victim(s), the significance and the sophistication of the offense, the length of the resulting sentence, and the duration of time that has elapsed since the offense and or release." (*Id.* at 12).  Submissions are reviewed by the agent's supervisors "for review and confirmation" that "all necessary information has been provided." (*Id.* at 4, 13).

Furthermore, the mandatory "ICE Academy" training webinar on the Final Memorandum for DHS personnel reiterates that agents should apply the Final Memorandum's priorities and factors in decision-tree fashion.  (Dkt. No. 217-26 at 18). The training webinar details the inquiries officers are expected to make.  (Dkt. No. 217-16).  For instance, before an ICE officer takes an enforcement action under the "Threats to Public Safety" priority category, the officer should examine the following aggravating factors:

> Gravity of the offense of conviction and the sentence imposed; Nature and degree of harm caused by the criminal offense: [] both societal harm caused by a violent offense and other harms (e.g., victim impact, exploitation of vulnerable individuals); Sophistication of the criminal offense; Use, or threatened use, of a firearm or dangerous weapon; [and] a serious prior criminal record.

(*Id.* at 55).  The ICE officer should also examine the following mitigating factors:

> Advanced or tender age; Lengthy presence in the United States; A mental condition that may have contributed to the criminal conduct, or a physical or mental condition requiring care or treatment; Status as a victim of crime or victim, witness, or party in legal proceedings; Impact of removal on

36

family in the United States, such as loss of provider or caregiver; Whether the noncitizen may be eligible for humanitarian protection or other immigration relief; Military or other public service of the noncitizen or their immediate family; Time since an offense and evidence of rehabilitation; [and whether the] [c]onviction was vacated or expunged.

(*Id.* at 57).  The officer is then instructed that consideration of the totality of the facts and circumstances includes:

- Reviewing "the noncitizen's record and any specific aggravating factors."  (*Id.* at 61).

- Completing and understanding "the profile of the individual by identifying mitigating factors as well."  (*Id.*).

- Reviewing "the noncitizen's entire known criminal and administrative record, and other investigative information, before making a decision" and directing questions to "their colleagues [as to] how they might handle the case."  (*Id.*).

- Conducting "an investigation to identify the aggravating and mitigating factors that might be present and inform the assessment of the individual."  (*Id.*).

- Potentially going "beyond the contents of the record" and pursuing "interviews of individuals with relevant information," especially where "the noncitizen is not represented by counsel."  (*Id.*).

- Noting that the "record could include a range of official and unofficial documents with relevant information."  (*Id.*).

The Considerations Memorandum, the Quick Reference Guide to ICE's Activity Analysis and Reporting Tool, and the "ICE Academy" training webinar all demonstrate that the Final Memorandum is being applied in a way that is binding on DHS personnel. *See EEOC*, 933 F.3d at 441–42; *see also Texas MPP*, 20 F.4th at 948–49.  The result is that an ostensibly permissive Final Memorandum is effectively mandatory at the most important level: the agents and officers who are tasked with enforcing the law.  (F.F. No. 99).

### 3. Binding Based on Detention Data

Data on ICE's detention practices for aliens with criminal convictions further demonstrate that the Final Memorandum is being applied by the agency in a way that makes it binding. *See EEOC*, 933 F.3d at 441; *see also Texas MPP*, 20 F.4th at 948. DHS has detained significantly fewer aliens with criminal convictions or pending criminal charges since the January Memorandum was issued. (F.F. No. 92). This same pattern continued unabated through the issuance of the Final Memorandum and has continued since. (*Id.*). Further, the States' witnesses testified that since the Final Memorandum was implemented, DHS has continued to rescind detainers, and DHS officials attribute those rescissions to the Final Memorandum. (F.F. No. 83); (F.F. No. 100).

### 4. Creates Rights or Obligations

In addition to being binding on DHS and its employees, the Final Memorandum also confers rights on aliens subject to enforcement and is therefore an agency action "by which rights or obligations have been determined, or from which legal consequences will flow." *See Bennett*, 520 U.S. at 177–78, 117 S.Ct. at 1168. The Final Memorandum states that DHS will "work to establish a fair and equitable case review process to afford noncitizens and their representatives the opportunity to obtain expeditious review of the enforcement actions taken." (Dkt. No. 109-5 at 7). That case review process has been implemented, and it allows aliens to challenge an enforcement action if they believe it does not comply with the Final Memorandum. (F.F. No. 67).

Not only does this process demonstrate that the Government's characterization of the Final Memorandum as mere "guidance" is categorically false, it also shows that the

Final Memorandum provides a new basis on which aliens may avoid being subject to the enforcement of immigration law.  This creates new "rights or obligations," and it provides an additional basis on which the Court finds that the Final Memorandum is final agency action.  *See Bennett*, 520 U.S. at 177–78, 117 S.Ct. at 1168.

***

In sum, the Final Memorandum is final agency action.  It is facially binding on DHS and its staff because it uses mandatory language that requires DHS personnel to consider and apply certain priorities and factors before taking enforcement action, and it expressly disallows reliance on the fact of conviction alone, which removes agents' previously held discretion.  *See EEOC*, 933 F.3d at 441–42, 445; *see also Texas MPP*, 20 F.4th at 948.  It is also being applied in a way that makes it binding on DHS and its staff.  *See EEOC*, 933 F.3d at 441; *see also Texas MPP*, 20 F.4th at 948.   And it creates rights or obligations by providing a basis on which aliens can challenge enforcement actions that they believe are inconsistent with the Final Memorandum's priorities.  *See Bennett*, 520 U.S. at 177–78, 117 S.Ct. at 1169.   Accordingly, it is an action "by which rights or obligations have been determined, or from which legal consequences will flow," and it satisfies the second *Bennett* prong.  *Id*.  Because the Final Memorandum satisfies both *Bennett* prongs, the Court holds that it is final agency action under the APA.[53]

---

[53]    Additionally, the Court holds that the Final Memorandum is a legislative rule.  *See infra* IV.C.  Because legislative rules are necessarily final agency action, this holding is an alternative basis for the Court's conclusion that the Final Memorandum is final agency action.  *See Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 634–35 (D.C. Cir. 2019); *EEOC*, 933 F.3d at 441.

### B.    STATUTORY BARS TO JUDICIAL REVIEW

Under the APA, an action may not proceed when another statute precludes judicial review.  5 U.S.C. § 701(a)(1).  The Government contends that 8 U.S.C. §§ 1252, 1226(e), and 1231(h) bar review.  (Dkt. No. 122 at 37–41).  None do.

As an initial matter, the Fifth Circuit has already concluded that "the entirety of the text and structure of § 1252 indicates that it operates only on denials of relief for individual aliens." *Texas MPP*, 20 F.4th at 977; *see id.* at n.11; *see also J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031–32 (9th Cir. 2016).  A closer review of subsections (a)(5) and (b)(9), which the Government cites, confirms that neither provision bars review.

First, Section 1252(a)(5) provides that federal courts of appeal have exclusive jurisdiction for any petition for review "filed . . . in accordance with" Section 1252 itself. 8 U.S.C. § 1252(a)(5).  In plain language: an individual who has an order of removal affirmed by the Board of Immigration Appeals may appeal that decision directly to a federal circuit court.  *See Martinez v. Napolitano*, 704 F.3d 620, 622 (9th Cir. 2012); *see also* 8 U.S.C. § 1252(d).  The States are not challenging an order of removal or petitioning for judicial review of one.  Section 1252(a)(5) is therefore inapplicable.  *Texas v. United States*, 524 F. Supp. 3d 598, 640 (S.D. Tex. 2021) (hereinafter *Texas I*).

The same is true of 8 U.S.C. § 1252(b)(9).  Section 1252(b)(9) provides:

> Judicial review of all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section.

8 U.S.C. § 1252(b)(9).  This means that an individual subject to an order of removal must

consolidate judicial review of his or her immigration proceedings into one action.  *I.N.S.*

*v. St. Cyr*, 533 U.S. 289, 313–14, 121 S.Ct. 2271, 2286–87, 150 L.Ed.2d 347 (2001); *see also*

*Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 499, 119 S.Ct. 936, 951, 142

L.Ed.2d 940 (1999) (Stevens, J., concurring).  Again, the States are not challenging a final

order of removal, nor are they challenging any aspect of a removal proceeding that an

individual has undergone.  So, Section 1252(b)(9) is likewise inapplicable.  *Texas I*, 524 F.

Supp. 3d at 640–41; *see also Dep't of Homeland Sec. v. Regents of the Univ. of California*, ____

U.S. ____, ____, 140 S.Ct. 1891, 1907, 207 L.Ed.2d 353 (2020) ("§ 1252(b)(9) does not present

a jurisdictional bar where those bringing suit are not asking for review of an order of

removal, the decision to seek removal, or the process by which removability will be

determined." (cleaned up)).

Next, the Government contends that Section 1226(e) bars the States' claims as they

relate to Section 1226(c).  Section 1226(e) provides:

> The Attorney General's discretionary judgment regarding the
> application of this section shall not be subject to review.  No
> court may set aside any action or decision by the Attorney
> General under this section regarding the detention or release
> of any alien or the grant, revocation, or denial of bond or
> parole.

8 U.S.C. § 1226(e).  The Supreme Court has found that Subsection (e)'s limitation "applies

only to discretionary decisions about the application of § 1226 *to particular cases*."  *Nielsen*

*v. Preap*, ____ U.S. ____, ____, 139 S.Ct. 954, 962, 203 L.Ed.2d 333 (2019) (internal

quotations omitted) (emphasis added).  Section 1226(e), therefore, "does not block

lawsuits over the extent of the Government's detention authority under the statutory framework as a whole." *Id.* (internal quotations omitted); *see Parra v. Perryman*, 172 F.3d 954, 957 (7th Cir. 1999); *see also Demore v. Kim*, 538 U.S. 510, 517, 123 S.Ct. 1708, 1714, 155 L.Ed.2d 724 (2003); *Jennings v. Rodriguez*, ____ U.S. ____, ____, 138 S.Ct. 830, 839–41, 200 L.Ed.2d 122 (2018).  Further, Subsection (e) does not prevent plaintiffs from questioning the meaning of Section 1226(c).  *Preap*, ____ U.S. at ____, 139 S.Ct. at 961–62.

Here, the States' claims against the Government "dispute the extent of the statutory authority that the Government claims."  *See id.* at ____, 139 S.Ct. at 962.  In effect, "the general extent of the Government's authority under § 1226(c) is precisely the issue here."  *See id.*; *see also Jennings*, ____ U.S. at ____, 138 S.Ct. at 841.  Section 1226(e) does not bar review.  *Texas II*, 555 F. Supp. 3d at 387–88.

Finally, the Government argues that Section 1231(h) bars any claim pertaining to Section 1231(a)(2).  Section 1231(h) provides in full:

> Nothing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.

8 U.S.C. § 1231(h).  This Court, after conducting an extensive analysis, previously held that Section 1231(h) does not bar the States from challenging a rule under the APA that is purportedly contrary to Section 1231.  *Texas I*, 524 F. Supp. 3d at 633–39; *see also Texas II*, 555 F. Supp. 3d at 386–87.  The Government merely re-urges its previously rejected arguments.  The Court is not persuaded.

As a last resort, the Government argues that review is barred because there is a detailed scheme for claims pertaining to the INA.  Yet each of the limiting provisions that the Government cites is within a statutory section that deals with judicial review of an individualized decision in a suit brought by an alien him or herself.  *See* 8 U.S.C. §§ 1226, 1231, 1252.   None of these provisions bar review.  *Texas I*, 524 F. Supp. 3d at 641–42.

***

The Court holds that there are no statutory bars to review.

### C.   COMMITTED TO AGENCY DISCRETION

The APA embodies a "basic presumption of judicial review."  *Lincoln v. Vigil*, 508 U.S. 182, 190, 113 S.Ct. 2024, 2030, 124 L.Ed.2d 101 (1993) (citation omitted).  An agency action, however, is not reviewable if it "is committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  This exception to judicial review is narrow and confined "to those *rare* administrative decisions traditionally left to agency discretion."  *Regents*, ____ U.S. at, ____, 140 S.Ct. at 1905 (emphasis added) (cleaned up).  The exception is also limited to "those *rare* circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, ____ U.S. ____, ____, 139 S.Ct. 361, 370, 202 L.Ed.2d 269 (2018) (citation omitted) (emphasis added).  Here, the agency action is not committed to discretion by law.  To understand why, the Court begins with the applicable statutes.

1.   <u>**Mandatory Duties under Sections 1226(c) and 1231(a)(2)**</u>

The two relevant statutes are 8 U.S.C. §§ 1226(c) and 1231(a)(2).  Under Section

1226(c), "[t]he Attorney General shall take into custody" certain aliens when "released"

from state or local custody.  8 U.S.C. § 1226(c).  Likewise, Section 1231(a)(2) provides:

"During the removal period, the Attorney General shall detain the alien."  8 U.S.C.

§ 1231(a)(2).  Statutory interpretation, precedent, and more demonstrate that Sections

1226(c) and 1231(a)(2) impose mandatory duties to detain.

a.   <u>Statutory Interpretation</u>

Words matter, so the Court begins by examining the text of the statute.  *Artis v.*

*Dist. of Columbia*, ____ U.S. ____, ____, 138 S.Ct. 594, 603, 199 L.Ed.2d 473 (2018).  A court

gives those words their ordinary meaning when they are not defined.  *Taniguchi v. Kan*

*Pac. Saipan, Ltd.*, 566 U.S. 560, 566, 132 S.Ct. 1997, 2002, 182 L.Ed.2d 903 (2012).  The words

have "meaning only in context."  G*raham Cnty. Soil & Water Conservation Dist. v. U.S. ex*

*rel. Wilson*, 545 U.S. 409, 415, 125 S.Ct. 2444, 2449, 162 L.Ed.2d 390 (2005).  And "identical

words and phrases within the same statute should normally be given the same meaning."

*Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232, 127 S.Ct. 2411, 2417, 168

L.Ed.2d 112 (2007).  Finally, "policy concerns cannot trump the best interpretation of the

statutory text."  *Patel v. Garland*, ____ U.S. ____, ____, 142 S.Ct. 1614, 1627, ____ L.Ed.2d

____ (2022).

To begin, Section 1226 governs the apprehension and detention of aliens.[54]  Section 1226(a) provides as follows: "On a warrant issued by the Attorney General, an alien *may* be arrested and detained pending a decision on whether the alien is to be removed from the United States."  8 U.S.C. § 1226(a) (emphasis added).  The statute continues on:

> *Except as provided in subsection (c)* and pending such decision, the Attorney General—
>
>> (1) may continue to detain the arrested alien; and
>>
>> (2) may release the alien on—
>>
>>> (A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or
>>>
>>> (B) conditional parole; but
>>
>> (3) may not provide the alien with work authorization (including an "employment authorized" endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

*Id.* (emphasis added).  Put simply, Section 1226(a) provides the default rule: the Executive Branch has general discretion to detain aliens.  But there are limits to that discretion, as evidenced by the language "except as provided in subsection (c)."  Section 1226(c) thus cabins the general grant of discretion under Section 1226(a).  *Preap*, ____ U.S. ____, 139 S.Ct. at 966.

Section 1226(c), titled "Detention of criminal aliens," lists those limitations to the general discretion to detain:

---

[54]   "Section 1226 applies before an alien proceeds through the removal proceedings and obtains a decision; § 1231 applies after."  *Guzman Chavez*, ____ U.S. at ____, 141 S.Ct. at 2290; *see also Texas I*, 524 F. Supp. 3d at 611–17 (detailing the immigration removal process).

The Attorney General *shall* take into custody any alien who—

>    (A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,

>    (B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,

>    (C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence[d] to a term of imprisonment of at least 1 year, or

>    (D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

*when the alien is released*, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

8 U.S.C. § 1226(c)(1) (emphases added).   Section 1226(c)(2) continues on to list circumstances in which aliens described under Section 1226(c)(1) may be released: the Attorney General "may" release aliens described in Subsection (c)(1) "only if" certain circumstances are present. *Id.* § 1226(c)(2).

The contrast between "may" under Section 1226(a) and "shall" under Section 1226(c) is important.  "The word 'shall' usually connotes a requirement." *Maine Cmty. Health Options v. United States*, ____ U.S. ____, ____, 140 S.Ct. 1308, 1320, 206 L.Ed.2d 764 (2020) (citation omitted).   The word "may," by contrast, "customarily connotes discretion," particularly where "may" is juxtaposed with "shall." *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 346, 125 S.Ct. 694, 703, 160 L.Ed.2d 708 (2005).  Also note that Section 1226(c)(1) includes a temporal requirement: "when the alien is released."  The temporal requirement provides a trigger for when discretion must yield to a mandate.

46

For Section 1226(c)(2) to have any meaning, Section 1226(c)(1) must be a mandate: the Attorney General must detain aliens when released from state or local custody, and these aliens may then be released from detention *only if* certain situations call for it.  If Subsection (c)(1) is not interpreted in this way, then Subsection (c)(2) loses its significance. It would be superfluous for Congress to state the only circumstances in which certain aliens may be released—per Subsection (c)(2)—if the Government was meant to initially have the discretion to decide which criminal aliens to detain in the first place.  The Government could free itself from a requirement to detain merely by *choosing* not to detain in the first place.  *Cf. Preap*, ____ U.S. at ____, 139 S.Ct. at 970.  Reading a mandatory detention statute as actually meaning that the Government "has to detain" only when it "decides to detain" makes the statute inoperative.  A mandate that the Government can ignore at its own discretion is no mandate at all.

Now Section 1231.  Section 1231(a)(2) also contains the word "shall":

> During the removal period, the Attorney General *shall* detain the alien.  Under no circumstance during the removal period shall the Attorney General release an alien who has been found inadmissible under section 1182(a)(2) or 1182(a)(3)(B) of this title or deportable under section 1227(a)(2) or 1227(a)(4)(B) of this title.

8 U.S.C. § 1231(a)(2) (emphasis added).  Like Section 1226, Section 1231 contains a temporal requirement: during the removal period.  The "removal period" is defined as a period of 90 days when an alien is ordered removed.  *Id.* § 1231(a)(1)–(2).  The statute further provides that the removal period "shall" be extended beyond 90 days if certain circumstances arise, and the alien "may" remain in detention during that extended

period.  *Id.* § 1231(a)(1)(C).  It would be odd to read "shall detain" during the removal period as providing discretion when the statute also specifies discretion to detain—"may remain in detention"— *after* the initial 90-day removal period.  *See id.*  There would be no need to confer discretion to detain after the 90-day removal period expires if discretion was already built into this language—"During the removal period, the Attorney General shall detain the alien."

All of this makes even more sense considering that a court should interpret a "statute as a symmetrical and coherent regulatory scheme[.]"  *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 120 S.Ct. 1291, 1301, 146 L.Ed.2d 121 (2000) (quotations and citations omitted).  Section 1225, a companion statute to Section 1226, includes the same "may" versus "shall" juxtaposition and imposes a mandatory duty.  *Texas MPP*, 20 F.4th at 993–96.  "Shall" under Sections 1226(c) and 1231(a)(2), then, also mandates detention.

The Government offers a different reading.  In the Government's view, "shall" in both statutes means "may."[55]  This makes little sense.  Section 1226(a) provides discretion to detain aliens.  Section 1226(c), by contrast, lists certain criminal aliens that "shall" be

_____

[55]  At no point has the Government invoked *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).  Therefore, the Court does not pass "*Chevron* Step Zero."  *See generally* Cass R. Sunstein, *Chevron Step Zero*, 92 Va. L. Rev. 187 (2006).  The Government could have argued that "shall" is ambiguous and that the Court should defer to the Government's interpretation.  The Government may have declined to pursue this route because it has interpreted Section 1226(c) as mandatory for decades.  *See* Brief for Petitioners, *Albence v. Guzman Chavez*, 2020 WL 4938065, at *5; Reply Brief for Petitioners, *Albence v. Guzman Chavez*, 2020 WL 3124376, at *7; Oral Argument, *Nielsen v. Preap*, 2018 WL 4922082, at *9; Brief for Petitioners, *Reno v. Ma*, 2000 WL 1784982, at *26–28; *Matter of Garvin-Noble*, 21 I. & N. Dec. 672, 678 (BIA 1997).  It has also argued that other INA provisions impose mandates.  Brief for Petitioners, *Jennings v. Rodriguez*, 2016 WL 5404637, at *16–17 (8 U.S.C. § 1225(b)).

detained.  A similar structure exists in Section 1231(a)(2).  Section 1231(a)(2) mandates detention during the removal period.  It also *prohibits* the release of certain individuals if DHS *actually* detains those individuals.  None of these limitations in the statute would make sense if they were discretionary.  The Government's reading would invite the Court to erase the limitations under the INA, all in violation of "the cardinal principle of interpretation that courts must give effect, if possible, to every clause and word of a statute." *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, ____ U.S. ____, ____, 139 S.Ct. 1881, 1890, 204 L.Ed.2d 165 (2019) (internal quotations omitted).   The Government's interpretation would mean that it "can take the powers given to it by Congress" but "ignor[e] the limits Congress placed on those powers"—a dangerous result.  *Texas MPP*, 20 F.4th at 997.  Congress could have drafted a statute that gives general authority to detain.  But it was more specific.  And deliberately so.

The Government does not dispute that Congress *can* mandate detention.  In fact, the Government concedes that Congress *has* limited discretion by using the phrase "only if" under Section 1226(c) and "under no circumstance" under Section 1231(a)(2).  This language, so the Government reasons, is sufficiently clear to demonstrate a congressional mandate.  (Dkt. No. 211 at 103–04); (Dkt. No. 223 at 23).

But what about "shall"?  Section 1226, for example, does not include the same language "under no circumstance."  Section 1226, instead, contrasts "may" with "shall."  If "may" provides discretion and "shall" also provides discretion, the entire statutory scheme becomes redundant at best or nonsensical at worst.  Moreover, Section 1226(c)(1) would be superfluous.  *See Duncan v. Walker*, 533 U.S. 167, 174, 121 S.Ct. 2120, 2125, 150

L.Ed.2d 251 (2001).  Congress would not have enacted Section 1226(c) to be discretionary because Section 1226(a) already is.  Indeed, the Supreme Court has noted that "it would be very strange for Congress to forbid the release of aliens who need not be arrested in the first place." *Preap*, ____ U.S. at ____, 139 S.Ct. at 970.

The Government's contention that the "only if" clause in Section 1226(c) and the "under no circumstance" clause in Section 1231(a)(2) are mandatory, but the "shall" clauses are not, is untenable.  Of course, "only if" and "under no circumstance" are different words than "shall," just as "shall" and "may" are different words.  But the may-versus-shall distinction is not important just because they are different words; it is important because they are commonly used as antonyms.  Thus, their juxtaposition in the statutes accentuates their different meanings.  Unlike "shall" and "may," "shall" and "only if" or "under no circumstance" are commonly used as synonyms—even complements.  And they are used as complements here.  *See Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 540, 133 S.Ct. 1351, 1364, 185 L.Ed.2d 392 (2013) ("We are not aware . . . of any canon of interpretation that forbids interpreting different words used in different parts of the same statute to mean roughly the same thing.").  Indeed, federal courts remain mindful that "respect for Congress's prerogatives as policymaker means carefully attending to the words it chose rather than replacing them with others of our own." *Murphy v. Smith*, ____ U.S. ____, ____, 138 S.Ct. 784, 788, 200 L.Ed.2d 75 (2018); *see also Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328, 134 S.Ct. 2427, 2446, 189 L.Ed.2d 372 (2014) ("Agencies are not free to adopt unreasonable interpretations of statutory

provisions and then edit other statutory provisions to mitigate the unreasonableness." (cleaned up)).

> b.   Precedent

Lest any doubt remain, the Supreme Court has interpreted both Sections 1226(c) and 1231(a)(2) as mandatory.  In *Johnson v. Guzman Chavez*, the Supreme Court noted "detention is mandatory" during an alien's removal period, as prescribed by Section 1231(a)(2).  ____ U.S. ____, ____, 141 S.Ct. 2271, 2281, 210 L.Ed.2d 656 (2021).  And under Section 1226(c), "detention is mandatory and release is permitted in very limited circumstances" for "certain criminal aliens and aliens who have connections to terrorism."  *Id.* at ____ n.2, 141 S.Ct. at 2280 n.2.  Other Supreme Court cases read the statutes similarly.  *Preap*, ____ U.S. at ____, 139 S.Ct. at 959 (Section 1226(c)); *Jennings*, ____ U.S. at ____, 138 S.Ct. at 846 (Section 1226(c)); *Zadvydas v. Davis*, 533 U.S. 678, 683, 121 S.Ct. 2491, 2495, 150 L.Ed.2d 653 (2001) (Section 1231(a)(2)); *Demore*, 538 U.S. at 521, 123 S.Ct. at 1716 (Section 1226(c)).

The Government nevertheless argues that this precedent does not control because those cases did not address whether DHS, through a "rule" under the APA, has discretion to detain under those statutes.  This distinction in unpersuasive.

*Guzman Chavez*, for example, considered whether certain aliens could be released on bond while petitioning for relief from removal.  There, the Supreme Court analyzed Sections 1226(c) and 1231(a)(2).  It held that Section 1231 applied to these aliens because they had effectively been ordered removed through the reinstatement of their previous orders of removal.  *Guzman Chavez*, ____ U.S. at ____, 141 S.Ct. at 2287–91.

In reaching this conclusion, the Supreme Court compared Section 1226, which applies to the arrest and detention of an alien "pending a decision on whether the alien is to be removed from the United States," with Section 1231, which applies to an alien ordered removed.  *Id.* at ____, 141 S.Ct. at 2280–81.  The Supreme Court noted that "DHS," under Section 1226(a), "may arrest and detain the alien" pending that alien's removal decision.  *Id.*  Such an alien "may generally apply for release on bond or conditional parole."  *Id.*  Nevertheless, the Supreme Court stated "there is one exception" to this general rule: for certain criminal aliens, "detention is mandatory" under Section 1226(c).  *Id.* at ____ n.2, 141 S.Ct. at 2280 n.2.  Like Section 1226(c), the Supreme Court stated detention under Section 1231 is "mandatory" precisely because of Section 1231(a)(2).  *Id.* at ____, 141 S.Ct. at 2281.  As this analysis of the statutes makes clear, interpreting Sections 1226(c) and 1231(a)(2) was essential to the holding in *Guzman Chavez*.  Because the reasoning was essential to the holding, it is binding.  *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 67, 116 S.Ct. 1114, 1129, 134 L.Ed.2d 252 (1996).  This is unsurprising.  Other circuits have agreed that the INA mandates detention.  *See, e.g., Sylvain v. Attorney Gen. of U.S.*, 714 F.3d 150, 152, 154–55 (3d Cir. 2013).

c.   Castle Rock

The Government reads the statutes differently in light of *Town of Castle Rock v. Gonzales*.  There, the Supreme Court explained "the presence of seemingly mandatory legislative commands" like "shall" do not automatically impose a mandate against law enforcement.  *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 760–61, 125 S.Ct. 2796, 2805–06, 162 L.Ed.2d 658 (2005).  Instead, a mandate is found when there is "some stronger

52

indication" from the legislature.  *Id.* at 761, 125 S.Ct. at 2806.  *Castle Rock*, however, is distinguishable.  In *Castle Rock*, the question presented was "whether an individual who has obtained a state-law restraining order has a constitutionally protected property interest in having the police enforce the restraining order when they have probable cause to believe it has been violated."  *Id.* at 750–51, 125 S.Ct. at 2800.  This case, by contrast, involves a "contrary to law" claim under the APA against a federal agency that promulgated a rule.  *See Texas MPP*, 20 F.4th at 982–83.  In addition, "*Castle Rock* is relevant only where an official makes a nonenforcement decision."  *Id.* at 997.  That is, *Castle Rock* applies to individual decisions.  *Castle Rock* is irrelevant when DHS engages in "misenforcement" or suspension of the INA by issuing a rule under the APA, as it has done here.

And even if *Castle Rock* does apply, the Court finds that there *is* "some stronger indication" that Sections 1226(c) and 1231(a)(2) impose a mandate.  First, Congress included a grace period in the INA to provide time for the agency to make the change from a discretionary to a mandatory detention regime.  Second, the context surrounding the enactment of Sections 1226(c) and 1231(a)(2) shows that they are mandatory.

### i.    Transition Period Custody Rules

In 1996, President Clinton signed the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA).  *Matter of Garvin-Noble*, 21 I. & N. Dec. 672, 674 (BIA 1997).  Included in the IIRIRA are the Transition Period Custody Rules.  *Id.* at 675.  Enacted alongside the 1996 amendments to federal immigration law, the Transition Period

Custody Rules demonstrate that Sections 1226(c) and 1231(a)(2) mandate detention. *Compare* Act of Sept. 30, 1996, Pub. L. No. 104–208 § 303(a) *with id.* § 303(b)(3).

The Transition Rules were "designed to give the Attorney General a 1-year grace period, which [could] be extended for an additional year, during which mandatory detention of criminal aliens [under Section 1226(c)] would not be the general rule." *Matter of Garvin-Noble*, 21 I. & N. Dec. at 675. Congress included the Transition Rules because it knew that it could be difficult for the Attorney General (who oversaw the enforcement of immigration law before the creation of DHS) to immediately comply with its detention mandate. *See Preap*, ____ U.S. at ____, 139 S.Ct. at 969; *Matter of Garvin-Noble*, 21 I & N Dec. at 681 ("While practical constraints temporarily necessitated some flexibility, Congress, in keeping with prior concerns, enacted the transition rules with some restrictions on the release of criminal aliens pending removal, such as keeping those aliens dangerous to the community in detention.").

The Transition Rules themselves are found in Section 303(b)(3) of Public Law No. 104–208. Section 303(b)(2) contains the provision that allows the Attorney General to opt-in to the Transition Rules:

> If the Attorney General, not later than 10 days after the date of the enactment of this Act [i.e., September 30, 1996], notifies in writing [Congress] that there is *insufficient detention space* and [] *personnel* available to carry out section 236(c) of the Immigration and Nationality Act [codified at 8 U.S.C. § 1226(c)], [] the [Transition Period Custody Rules] shall be in effect for a 1-year period beginning on the date of such notification, instead of [8 U.S.C. § 1226(c)].

Pub. Law. No. 104–208 § 303(b)(2) (emphases added).   The Attorney General took advantage of the Transition Rules within the opt-in period.   *Matter of Garvin-Noble*, 21 I & N Dec. at 674.   But the Transition Rules had a maximum two-year lifespan.   *Id.* at 675; Pub. Law. No. 104–208 § 303(b)(2).   After invoking the Transition Rules for the full two-year period, INS asked Congress to extend the grace period further, but Congress refused.   *INS Issues Detention Guidelines After Expiration of TPCR*, 75 No. 42 Interpreter Releases 1508, 1508 (Westlaw Nov. 2, 1998).   Thus, as the INS recognized, the mandate under 8 U.S.C. § 1226 became the law of the land in October 1998.   *See id.*; *see also Saysana v. Gillen*, 590 F.3d 7, 10 n.2 (1st Cir. 2009); *Galvez v. Lewis*, 56 F. Supp. 2d 637, 641 (E.D. Va. 1999).

Two salient points about the Transition Rules.   First, Congress contemplated the precise situation the Government complains of in this case: a lack of resources and personnel.   Accordingly, Congress gave the Executive Branch a grace period as it transitioned to mandatory detention.   But a grace period is not a license to permanently disregard the law.   Congress expected that after two years, the Executive Branch would comply.   *Matter of Garvin-Noble*, 21 I & N Dec. at 681; *see also Matter of Valdez-Valdez*, 21 I. & N. Dec. 703, 719 (BIA 1997).   Indeed, the INS requested an extension of the grace period in the Transition Rules and Congress rejected that request.   The Transition Rules demonstrate, and the Constitution demands, that when it is difficult for the Executive Branch to comply with Congress's instructions, the proper course is to ask for more support or for the law to be changed.   *Cf. Alabama Dep't of Revenue v. CSX Transp., Inc.,*

575 U.S. 21, 31, 135 S.Ct. 1136, 1144, 191 L.Ed.2d 113 (2015) ("If the task . . . is 'Sisyphean,' . . . it is a Sisyphean task that the statute imposes.").

And on this point about insufficient resources and limited detention capacity, the Court finds that the Government has not acted in good faith.  Throughout this case, the Government has trumpeted the fact that it does not have enough resources to detain those aliens it is required by law to detain.  The Government blames Congress for this deficiency.  At the same time, however, the Government has submitted two budget requests in which it asks Congress *to cut* those very resources and capacity by 26%.  (F.F. No. 16).  Additionally, the Government has persistently underutilized existing detention facilities.  (F.F. No. 17).  To say that this is incongruous is to say the least.

Second, the Government's position "flouts the interpretive canon against surplusage—the idea that every word and every provision is to be given effect and that none should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence."  *See Preap*, ____ U.S. at ____, 139 S.Ct. at 969 (cleaned up).  As we have seen, the Government's reading violates this canon because it renders the word "shall" meaningless.  *See supra* III.C.1.a.  Now we see that the Government's reading doubly violates the canon, because it also makes the Transition Rules surplusage.  The Transition Rules were an intricate and thoughtful statutory regime that governed the detention of aliens in this country for the two years that they were in effect.  Pub. Law. No. 104–208 § 303(b).  The Government's reading is incorrect.

ii. IIRIRA was passed, in part, to take away the Government's general discretion in this context

The context of the IIRIRA amendments to the INA is a separate reason that *Castle Rock*'s call for "some stronger indication" is met here. To the extent that *Castle Rock* applies, the Supreme Court recognized that when the word "shall" is used in a statute and applied to law enforcement, there must be "some stronger indication" from the legislature that it is a mandate. *Castle Rock,* 545 U.S. at 761, 125 S.Ct. at 2806. The word "shall" alone might not be sufficient. In this case, however, one of the specific reasons that the statutes in question were amended was to take away the Government's discretion in this context. It is difficult to envision a stronger indication.

Section 1226(c) was enacted "against a backdrop of wholesale failure by the INS to deal with increasing rates of criminal activity by aliens." *Demore*, 538 U.S. at 518, 123 S.Ct. at 1714. The failure "to remove deportable criminal aliens" resulted in overpopulated prisons, monetary costs, and increased crime. *Id.* at 518–20, 123 S.Ct. at 1714–15. Crucially, "Congress also had before it evidence that one of the major causes of the INS' failure to remove deportable criminal aliens *was the agency's failure to detain those aliens* during their deportation proceedings." *Id.* at 519, 123 S.Ct. at 1715 (emphasis added). Before Section 1226(c) was enacted, the Attorney General had broad discretion on whether to detain aliens in this context. *Id.* Later, *and in response to these concerns*, Congress amended the law *to require* the Attorney General to detain a subset of deportable criminal aliens who committed the most serious crimes, pending a

determination of their removability. *Id.* at 521, 123 S.Ct. at 1716. In the Court's view, this is direct evidence of the stronger indication envisioned by *Castle Rock.*

Like Section 1226(c), Section 1231(a)(2) was enacted against the same backdrop. As the Supreme Court noted, "protecting the community from dangerous aliens" is a "statutory purpose" of that section. *Zadvydas*, 533 U.S. at 697, 121 S.Ct. at 2502. What is more, Section 1231 "is part of a statute that has as its basic purpose effectuating an alien's removal." *Id.* Section 1231(a)(2)'s mandatory nature is made more evident because it applies *after* an alien has proceeded through the removal proceedings and obtained a decision. *See Guzman Chavez*, _____ U.S. at _____, 141 S.Ct. at 2290.

The Court holds that "shall" under Sections 1226(c) and 1231(a)(2) unambiguously means "must."

### 2.   Whether Congress Can Mandate Detention

Sections 1226(c) and 1231(a)(2) mandate detention. But *can* Congress require the Executive to detain? Yes, it can. "It is undisputed that Congress may mandate that the Executive Branch detain certain noncitizens during removal proceedings or before removal."[56] *Preap*, _____ U.S. at _____, 139 S.Ct. at 973 (Kavanaugh, J., concurring).

That Congress can mandate detention makes sense when considering the broader scheme of immigration law. The Constitution provides that "Congress shall have Power . . . To establish an uniform Rule of Naturalization[.]" U.S. Const. art. I, § 8, cl. 4. The

---

[56]   Indeed, even the Government concedes that Congress *can* mandate detention but argues that Congress did not in Sections 1226(c) and 1231(a)(2). (Dkt. No. 211 at 103–04); (Dkt. No. 223 at 23).

Supreme Court has long recognized that the power of naturalization is exclusively vested in Congress.  *Chirac v. Lessee of Chirac*, 2 Wheat. 259, 269, 4 L.Ed. 234 (1817).  Congress's exclusive power extends "to the entry of aliens and their right to remain here[.]"  *Galvan v. Press*, 347 U.S. 522, 531, 74 S.Ct. 737, 743, 98 L.Ed. 911 (1954).  "[P]lenary congressional power to make policies and rules for exclusion of aliens has long been firmly established."  *Kleindienst v. Mandel*, 408 U.S. 753, 769–70, 92 S.Ct. 2576, 2585, 33 L.Ed.2d 683 (1972).  Congress, exercising its authority vested by the Constitution, long ago enacted federal statutes governing immigration.  In 1996, Congress charted a new course by amending federal immigration law.  *Demore*, 538 U.S. at 518–21, 123 S.Ct. at 1714–16.  Before, Congress provided the Executive Branch with broad general directives regarding the detention of aliens.  But in 1996, to address perceived harms, Congress withdrew that discretion.

Congress had the authority to reign in this discretion.  An administrative agency like DHS is a creature of statute.  As such, it possesses "only the authority that Congress has provided."  *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, ____ U.S. ____, ____, 142 S.Ct. 661, 665, 211 L.Ed.2d 448 (2022) (per curiam).  In the APA context, "an agency literally has no power to act . . . unless and until Congress confers power upon it."  *See Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374, 106 S.Ct. 1890, 1901, 90 L.Ed.2d 369 (1986).  Indeed, Congress may limit agency discretion by putting restrictions in the operative statutes.  *Lincoln*, 508 U.S. at 193, 113 S.Ct. at 2032.  As such, DHS "may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law."  *See Brown & Williamson Tobacco Corp.*, 529 U.S. at 125, 120 S.Ct. at 1297

(internal quotations omitted).  Congress may give, and Congress may take away.  *See Aviation & Gen. Ins. Co. v. United States*, 882 F.3d 1088, 1098 (Fed. Cir. 2018).  In 1996, Congress did just that.  *Demore*, 538 U.S. at 518–21, 123 S.Ct. at 1714–16.  Sections 1226(c) and 1231(a)(2) do not leave any room for agency discretion when the duty to detain is triggered.

For similar reasons, certain portions of the Final Memorandum do not fall under the Secretary of Homeland Security's general grant of authority to establish "national immigration enforcement policies and priorities."  *See* 6 U.S.C. § 202(5).  However broad the Secretary's authority in setting enforcement policies and priorities may be, it must be read in conjunction with statutory limits.  *Regents*, ____ U.S. at ____, 140 S.Ct. at 1925 (Thomas, J., concurring in part and dissenting in part).  The Government reads those limits out of the law and instead renders "shall" as a suggestion simply because Congress also delegated authority to enforce the law.  DHS, however, does not have "unreviewable and unilateral discretion to ignore statutory limits imposed by Congress and to remake entire titles of the United States Code to suit the preferences of the executive branch."  *Texas MPP*, 20 F.4th at 1004.

### 3.  *Heckler v. Chaney*

The Government also argues that the Final Memorandum is committed to agency discretion under *Heckler v. Chaney*.  Federal courts generally presume that "an agency's decision not to take enforcement action" is committed to agency discretion by law.  *Heckler v. Chaney*, 470 U.S. 821, 832, 105 S.Ct. 1649, 1656, 84 L.Ed.2d 714 (1985).  This presumption does not apply "to agency actions that qualify as rules under 5 U.S.C.

§ 551(4)." *Texas MPP*, 20 F.4th at 985.  All parties in this case have agreed, as does the Court, that the Final Memorandum is undisputedly a rule under 5 U.S.C. § 551(4).  (Dkt. No. 211 at 114).  The Court therefore holds that the Final Memorandum is not committed to agency discretion under *Heckler*.[57]

### 4.   The Government's Reliance on "Prosecutorial Discretion"

An overarching theme of the Government's argument in this case is that it has "prosecutorial discretion" to make these decisions, and this precludes judicial review. Some courts have observed that prosecutorial discretion stems from Article II of the Constitution.  *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1153 (D.C. Cir. 2006); *In re Aiken County*, 725 F.3d 255, 263 (D.C. Cir. 2013) (Kavanaugh, J., writing for himself). The precise scope of prosecutorial discretion is unclear.[58]  *See, e.g.*, Kimberly L. Wehle, *"Law and" the OLC's Article II Immunity Memos*, 32 Stan. L. & Pol'y Rev. 1, 32–36 (2021). Whatever its contours, prosecutorial discretion "does not encompass the discretion not to follow a law imposing a mandate or prohibition on the Executive Branch."  *In re Aiken County*, 725 F.3d at 266 (Kavanaugh, J., writing for himself).  In one scholar's words: "It is well settled, after all, that in interbranch constitutional relations, the executive power— whatever its inherent bounds—comes to an end in a clear Congressional command."

---

[57]   In *Texas MPP*, the Fifth Circuit concluded: "Even if *Heckler* could apply in theory, the statute's text would rebut it in actuality."  20 F.4th at 988.  So too here.  The substantive statutes have provided parameters within which DHS must enforce the law.  *Heckler*, 470 U.S. at 832–33, 105 S.Ct. at 1656.

[58]   Courts have recognized that prosecutorial discretion includes whom to prosecute, when to charge, what charges to bring, whether to dismiss charges, and plea bargaining.  *McCleskey v. Kemp*, 481 U.S. 279, 312, 107 S.Ct. 1756, 1778, 95 L.Ed.2d 262 (1987); *United States v. Batchelder*, 442 U.S. 114, 124, 99 S.Ct. 2198, 2204, 60 L.Ed.2d 755 (1979); *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 737 (D.C. Cir. 2016); *Newman v. United States*, 382 F.2d 479, 480 (D.C. Cir. 1967).

Daniel E. Walters, *Symmetry's Mandate: Constraining the Politicization of American Administrative Law*, 119 Mich. L. Rev. 455, 502 (2020); *see also id.* at 500–03.   The Government agrees that Congress can mandate detention of certain aliens under the INA, (Dkt. No. 211 at 103–04); (Dkt. No. 223 at 23), a point it would never have conceded if it believed this encroached upon the Executive's Article II authority.   *Cf. Preap*, ____ U.S. at ____, 139 S.Ct. at 973 (Kavanaugh, J., concurring).   Otherwise, the Government would argue that any detention mandate is an unconstitutional infringement on executive power.   *Cf. Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196, 132 S.Ct. 1421, 1428, 182 L.Ed.2d 423 (2012).   The Government does not so argue.[59]

This discussion about prosecutorial discretion in the abstract falls by the wayside after recognizing the Final Memorandum is a "rule" that is subject to judicial review under the APA; it is not an exercise of prosecutorial discretion on a case-by-case basis. Individualized decisions to abandon law enforcement are outside the reach of judicial review: a litigant cannot demand that DHS enforce the law against a particular person. *Texas MPP*, 20 F.4th at 982.   In contrast, a "rule" that is contrary to law is subject to judicial review.   *See* 5 U.S.C. § 706(2)(A).   The States here are challenging a generalized and

---

[59]   It is worth noting that "Congress can explicitly or implicitly cabin executive enforcement discretion, reducing it to the constitutional minimum (*Youngstown* Category 3)." Louis W. Fisher, *Executive Enforcement Discretion and the Separation of Powers: a Case Study on the Constitutionality of DACA and DAPA*, 120 W. Va. L. Rev. 131, 138 (2017).   *Youngstown* Category 3 is as follows: "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter."   *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637–38, 72 S.Ct. 863, 871, 96 L.Ed. 1153 (1952) (Jackson, J., concurring).

prospective policy in the form of a "rule" under the APA.   Generally invoking

prosecutorial discretion does not shield this rule from judicial review.

To hold otherwise would elevate form over substance.  Under *Heckler v. Chaney*,

rules under 5 U.S.C. § 551(4) are not "committed to agency discretion."  *Texas MPP*, 20

F.4th at 985.  This is because "the English Bill of Rights, followed by the Constitution,

explicitly forbade the executive from nullifying whole statutes by refusing to enforce

them on a *generalized* and *prospective* basis."  *Id.* at 983 (emphasis in original).  This is also

because "the Supreme Court and Fifth Circuit have consistently read *Heckler* as sheltering

one-off nonenforcement decisions rather than decisions to suspend entire statutes."  *Id.*

As such, "*Heckler*'s progeny never has allowed the executive to affirmatively enact

prospective, class-wide rules without judicial review."[60]  *Id.*  It would be odd to hold that

the Final Memorandum is committed to agency discretion simply because it incants

prosecutorial discretion when, in fact, the Final Memorandum is a prospective, class-

wide rule under 5 U.S.C. § 551(4).  The Government seeks the benefit of generally

invoking prosecutorial discretion without adequately explaining how the concept

squarely applies to rules under 5 U.S.C. § 551(4).  The Court remains unpersuaded.

***

In sum, the statutory scheme provides bright-line rules as to the timing and

identity of certain aliens who must be detained.   The States are challenging the

---

[60]  "If judicial involvement is based on a statutory violation by the executive, review promotes rather than undermines the separation of powers, for it helps to prevent the executive branch from ignoring congressional directives."  Cass R. Sunstein, *Reviewing Agency Inaction After Heckler v. Chaney*, 52 U. Chi. L. Rev. 653, 670 (1985).

Government's compliance with that statutory scheme via a rule under the APA.  The Court holds that the agency action is not committed to agency discretion.

### D.   ZONE OF INTERESTS

Congress, through the APA, has provided a cause of action for those seeking redress against the federal government for violations of other federal laws.  *See* 5 U.S.C. §§ 702, 706.  But Congress has limited the availability of an APA cause of action to those who allege an injury that is "arguably" within the "zone of interests" for which the statutes exist to protect.  *Collins v. Mnuchin*, 938 F.3d 553, 573–74 (5th Cir. 2019), *aff'd in part, vacated in part, rev'd in part sub nom. Collins v. Yellen*, ____ U.S. ____, 141 S.Ct. 1761, 210 L.Ed.2d 432 (2021).

The zone of interests test is not "especially demanding."  *Id.* at 574.  Indeed, "the benefit of any doubt goes to the plaintiff[.]"  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130, 134 S.Ct. 1377, 1389, 188 L.Ed.2d 392 (2014).  The zone of interests test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue."  *Collins*, 938 F.3d at 574 (internal quotations omitted).  Importantly, the relevant statute in whose zone of interests the plaintiff's injury must reside "is to be determined not by reference to the overall purpose of the Act in question," but, rather, "by reference to the particular provision of law upon which the plaintiff relies."  *Bennett*, 520 U.S. at 175–77, 117 S.Ct. at 1167.  In other words, a court must review those "substantive provisions" of law that the plaintiff relies on for "the gravamen" of its complaint.  *Id.* at 175, 117 S.Ct. at 1167.

The Government solely argues that the States do not fall within the zone of interests because no entity can enforce Section 1231 in light of subsection (h).  (Dkt. No. 122 at 40–42).  As an initial matter, the States' injuries are within the zone of interests of Sections 1226(c) and 1231(a)(2) based on the Court's discussion of *Demore* and other Supreme Court precedent regarding the development and purpose of those statutes.  The statutes were enacted to protect and benefit the states, citizens, and legal immigrants.  Indeed, the INA was enacted for this exact purpose.  *See Texas DAPA*, 809 F.3d at 163 & n.80.  As such, the injuries the States suffer due to the Final Memorandum fall within the relevant statutes' zone of interests.  *See id.* at 163.  Moreover, as the Court explained, the Government is mistaken that Section 1231(h) bars relief.  *See supra* III.B.  Thus, the sole argument that the Government offers fails.

The Court holds that the States' injuries fall within the zone of interests of Sections 1226(c) and 1231(a)(2).

## IV.    CLAIMS

### A.    CONTRARY TO LAW (COUNTS I AND II)

Because shall means must, the Government generally must detain aliens subject to Sections 1226(c) and 1231(a)(2) at specific points in time: when released from custody under Section 1226(c) and during the removal period under Section 1231(a)(2).  The Court now considers whether the Final Memorandum is contrary to law.

By its terms, the Final Memorandum provides "Guidelines for the Enforcement of Civil Immigration Law."  (Dkt. No. 109-5 at 2).  It begins by discussing prosecutorial discretion.  (*Id.* at 3).  The Final Memorandum then acknowledges that DHS does "not

have the resources to apprehend and seek the removal of every" removable noncitizen. (*Id*.).   Thus, DHS must "determine whom to prioritize for immigration enforcement action." (*Id*.).   These priorities do not discuss mandatory detention obligations.   Instead, they focus on three categories that have distinct definitions under the Final Memorandum: national security, public safety, and border security.   (*Id*. at 3–5).   The Final Memorandum states, "[t]he fact an individual is a removable noncitizen therefore should not alone be the basis of an enforcement action against them." (*Id*. at 3).   It continues: "We will prioritize for apprehension and removal noncitizens who are a threat to our national security, public safety, and border security." (*Id*. at 4).

The Final Memorandum defines "public safety" as follows: "A noncitizen who poses a current threat to public safety, typically because of serious criminal conduct, is a priority for apprehension and removal." (*Id*.).   But it clarifies that "a current threat to public safety is not to be determined according to bright lines or categories.   It instead requires an assessment of the individual and the totality of the facts and circumstances." (*Id*.).   The Final Memorandum continues on by listing "aggravating factors that militate in favor of enforcement action" and "mitigating factors that militate in favor of declining enforcement action." (*Id*.).   Later, it instructs personnel that they "must evaluate the individual and the totality of the facts and circumstances and exercise their judgment accordingly." (*Id*. at 5).   Whatever that discretion looks like, however, "personnel should not rely on the fact of conviction or the result of a database search alone." (*Id*.).   "Rather, [DHS] personnel should, to the fullest extent possible, obtain and review the entire

criminal and administrative record and other investigative information to learn of the totality of the facts and circumstances of the conduct at issue." (*Id.*).

The Final Memorandum flatly contradicts the detention mandates under Sections 1226(c) and 1231(a)(2).    It replaces those statutes by conferring discretion to independently decide who will be detained and when—if ever.  And it clearly provides that a conviction alone cannot be the basis for placing an alien in removal proceedings. This plainly contradicts the language of  the statutes and removes the discretion of agents and officers.  The result?  Agents and officers do not have the discretion they once had because of the Final Memorandum.  The Final Memorandum supplants Congress's clear commands with an extra-statutory balancing scheme of aggravating and mitigating factors that agency personnel must apply.  At times, agents and officers on the ground are forced to make quick decisions as they encounter individuals, and this scheme ties their hands and changes the standard under which they make decisions on whom to detain and when.  Recall that the statutes prescribe the timing of detention: "when the alien is released," per Section 1226(c), or "during the removal period," per Section 1231(a)(2).  The release language clarifies when the duty to detain is triggered and who is covered. *See Preap*, ____ U.S. at ____, 139 S.Ct. at 969.  The Final Memorandum displaces that statutory language in favor of current policy considerations.

Consider that, under the Final Memorandum, an officer who has reason to believe that an alien was convicted of one of the serious crimes implicated by Section 1226(c) can no longer detain him upon release on that basis alone.  Rather, that officer must first undertake extensive research and analysis of a variety of factors before detention.  So too

for aliens with final orders of removal under Section 1231(a)(2).   Perhaps most problematic is that an officer cannot "rely on the fact of conviction or the result of a database search alone." *See* (Dkt. No. 109-5 at 5).  Yet that is precisely what Section 1226(c) demands: the mandatory detention of certain criminal aliens who are convicted of certain crimes.  The Final Memorandum says otherwise; staff can no longer follow the statute's categorical command.  This flips the presumption of detention on its head by starting from the premise than an official should *not* enforce the law.  In doing so, the Government has assumed a discretionary power that Congress has explicitly foreclosed.  All of this matters because the statutes contain mandates and are not generally applicable laws.  *Cf. Morton v. Ruiz*, 415 U.S. 199, 230–31, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974).  Simply put, the Final Memorandum is contrary to Sections 1226(c) and 1231(a)(2).

The practical implications of finding the Final Memorandum contrary to law do not alter the Court's decisionmaking.  "It would be dangero[u]s in the extreme, to infer from extrinsic circumstances, that a case for which the words of an instrument expressly provide, shall be exempted from its operation."  *Sturges v. Crowninshield*, 4 Wheat. 122, 202, 4 L.Ed. 529 (1819) (opinion for the Court by Marshall, C.J.).  Courts must not avoid their obligation to say what the law is simply because the results of that decision may pose practical difficulties.  *See, e.g., McGirt v. Oklahoma*, ____ U.S. ____, ____, 140 S.Ct. 2452, 2482, 207 L.Ed.2d 985 (2020).  Moreover, Congress—not the judiciary or the executive—amends the Nation's laws under such circumstances.  *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 462, 122 S.Ct. 941, 956, 151 L.Ed.2d 908 (2002).

To be sure, DHS has limited resources.[61]  Thus, it "may adopt policies to prioritize its expenditures *within the bounds established by Congress*."  *Util. Air Regul. Grp.*, 573 U.S. at 327, 134 S.Ct. at 2446 (emphasis in original).  But DHS may not "modify unambiguous requirements imposed by a federal statute."  *Id.*  The Final Memorandum does not simply prioritize DHS's expenditures within the bounds of the statutes.  Instead, and stated plainly, DHS has substituted its own categories for those mandated by Sections 1226(c) and 1231(a)(2).  For instance, Section 1226(c)(1)(B) mandates that the Attorney General take into custody any alien who has committed an aggravated felony.  8 U.S.C. §§ 1226(c)(1)(B), 1227(a)(2)(A)(iii).   But in its Considerations Memorandum, DHS explained that it removed the category of "aggravated felonies" from the Final Memorandum because it found the category "both over- and under-inclusive."  (Dkt. No. 146-1 at 12).  But that is not its decision to make.  The language included in the statutes was passed by both the House of Representatives and the Senate and signed into law by the President after extensive investigation, hearings, review, and negotiations—DHS is not free to cavalierly toss that aside.  DHS further found that the "aggravated felony definition can be challenging to administer in many instances; its various elements are subject to evolving definition by the Board of Immigration Appeals and the federal

---

[61]    DHS chiefly relies on enforcement discretion, not resource constraints, to justify the Final Memorandum.  In fact, as noted above, DHS requested that Congress appropriate funding for 26% *fewer* beds as compared to August 2021—not more.  (F.F. No. 16).  In effect, the Government is making it harder to comply with the statutory mandate it complains it doesn't have the resources to comply with.  It then asks this Court to re-fashion the law to accommodate that behavior.

courts" and also that "the 'aggravated felony' category is an imperfect proxy for severity of offense." (*Id.*).

That does not just prioritize the statutory categories; it alters them. To conclude otherwise would allow resource constraints to displace statutory mandates—an impermissible result. *See In re Aiken*, 725 F.3d at 260–61. The inability to fully comply is not a license to ignore the boundaries imposed by law. Indeed, as the Supreme Court has stated, an agency has no "power to revise clear statutory terms that turn out not to work in practice." *Util. Air Regul. Grp.*, 573 U.S. at 327, 134 S.Ct. at 2446. None of this should come as a surprise. Prior administrations have made clear that their priorities do not displace "mandatory detention." (Dkt. No. 146-4 at 3); (Dkt. No. 146-6 at 5).

In sum, DHS "went well beyond the bounds of its statutory authority." *Util. Air Regul. Grp.*, 573 U.S. at 326, 134 S.Ct. at 2445 (internal quotations omitted). A plea to prioritization and discretion cannot alter this reality.

***

The Court holds that the Final Memorandum is contrary to law under the APA. Accordingly, the Court will enter judgment in favor of the States on Counts I and II of the Amended Complaint. *See* (Dkt. No. 109 at 26–30).

## B.   ARBITRARY AND CAPRICIOUS (COUNT III)

The APA directs courts to "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, ___ U.S.

____, ____, 141 S.Ct. 1150, 1158, 209 L.Ed.2d 287 (2021).  This standard is "deferential."
*Id.*  The Court must "not substitute its own policy judgment for that of the agency."  *Id.*
But the Court must also ensure "that the agency has acted within a zone of reasonableness
and, in particular, has reasonably considered the relevant issues and reasonably
explained the decision."  *Id.*

Agency action is arbitrary and capricious

> if the agency has relied on factors which Congress has not
> intended it to consider, entirely failed to consider an
> important aspect of the problem, offered an explanation for
> its decision that runs counter to the evidence before the
> agency, or is so implausible that it could not be ascribed to a
> difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856,
2866–67, 77 L.Ed.2d 443 (1983).  Indeed, the agency action must rise or fall on the reasons
the agency gave when it acted,[62] *see Regents*, ____ U.S. at ____, 140 S.Ct. at 1909, and the
Court must not consider *post hoc* rationalizations.  *State Farm*, 463 U.S. at 50, 103 S.Ct. at

---

[62]  Known as the "record rule," evaluation of an agency's actions are generally confined to
the administrative record alone.  *Medina Cnty. Envir. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d
687, 706 (5th Cir. 2010).  For good reason.  Absent this rule, "there would be little hope that the
administrative process could ever be consummated in an order that would not be subject to
reopening."  *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 555,
98 S.Ct. 1197, 1217, 55 L.Ed.2d 460 (1978).  While there are exceptions to the record rule, *see Medina*,
602 F.3d at 706, supplementation of the administrative record is only allowed in "unusual
circumstances."  *Id.*  The Parties have disputed the need for extra-record evidence.  *See, e.g.*, (Dkt.
No. 189) (Government's brief in opposition); (Dkt. No. 191) (States' brief in favor).  They agree
that the record rule does not apply to issues such as standing or remedies.  (Dkt. No. 189 at 8);
(Dkt. No. 191 at 5).  The Court has not based its review of the States' arbitrary and capricious
claim on any evidence outside the administrative record, except where evidence is judicially
noticeable.

2870.  But arbitrary and capricious review "is not toothless."  *Texas MPP*, 20 F.4th at 989 (citation omitted).  "In fact, after *Regents*, it has serious bite."  *Id.* (citation omitted).

DHS points the Court to the Considerations Memorandum to supplement its reasoning in the Final Memorandum despite not referencing it in the Final Memorandum. (Dkt. No. 146-1).  A review of the Considerations Memorandum reveals that there was important information that DHS did not consider.

### 1.    <u>Recidivism and Abscondment</u>

Congress's concerns about the high rates of abscondment and recidivism among criminal aliens and aliens with final orders of removal animated the passage of IIRIRA. DHS's failure to consider recidivism and abscondment are some of the reasons why the Court enjoined the February Memorandum.  The Court has gone to great pains to make clear that only a subset of aliens is implicated by the statutes at issue in this litigation: those covered by Sections 1226(c) and 1231(a)(2).  Those, in turn, are aliens who have been convicted of or are implicated in serious crime and aliens who have received a final order of removal.  Notwithstanding, the Considerations Memorandum reveals that DHS still did not substantively consider recidivism and abscondment for these classes of aliens. The Considerations Memorandum relies on studies about criminality among all aliens, not to studies about aliens who have already been convicted of a serious crime.[63]  (Dkt.

---

[63]   The Considerations Memorandum references three sources.  First, it maintains "academic literature [] points to a negative relationship between immigration and crime."  (Dkt. No. 146-1 at 13).  Second, it asserts "[t]hese findings are further bolstered by micro-level research that generally finds lower criminal involvement by foreign-born individuals, relative to their native-born counterparts."  (*Id.*).  Last, it concludes "[w]here status information has been made
(continue)

No. 146-1 at 13).   The studies cited may indeed be correct, but DHS's analysis misunderstands its obligation.

The only study that was both cited *and* included in the record examines crime rates among U.S. citizens, legal immigrants, and illegal immigrants.  (Dkt. No. 149-15).  But the study does not examine recidivism at all, let alone examine recidivism specifically among aliens—again, both legal and illegal—who have already been convicted of one of the serious crimes for which Congress imposed mandatory detention upon DHS.  Nor does DHS assert that the criminality of *aliens in general* has a connection to recidivism and abscondment rates of *aliens who have already been convicted of crimes*.  This decision, accordingly, is not an examination of "the relevant data" and is not a "rational connection between the facts found and the choice made."  *See Dep't of Com.*, ____ U.S. at ____, 139 S.Ct. at 2569 (citation omitted).

The best case for DHS's reasoning would be the inference that because aliens commit less crimes, they recidivate at lower rates.  But this inference, without more, is improper because the data include *all* aliens, not just criminal aliens covered by the statute.  In fact, DHS has already found that criminal aliens recidivate and abscond at alarmingly high rates.  As recently as 2019, DHS found:

> Of the 123,128 ERO administrative arrests in FY 2019 with criminal convictions or pending criminal charges, the criminal history for this group represented 489,063 total

---

available—including in the state of Texas itself—the evidence indicates that undocumented noncitizens are *less* likely to recidivate."  (*Id.*) (emphasis in the original).

As a separate matter, neither of the first two sources are actually included in the administrative record.  *See* (Dkt. No. 149-12); (Dkt. No. 149-22).  Moreover, the Considerations Memorandum blanket-cites both, frustrating meaningful review.

criminal convictions and pending charges as of the date of arrest, which equates to *an average of four criminal arrests/convictions per alien*, highlighting the recidivist nature of the aliens that ICE arrests.

(Dkt. No. 153-10 at 15) (emphasis added).  Equally relevant are DHS's findings about absconding in the same report.  DHS noted that aliens who were permitted to participate in its "alternatives to detention" program absconded at a rate of 26.9% for families and 12.3% for non-family unit participants.[64]  (*Id.* at 14).  This was one of the primary reasons Congress *mandated* detention in this circumstance.  *Demore*, 538 U.S. at 519–20, 123 S.Ct. at 1715–16.  Given that aliens are only enrolled in the alternatives to detention program after they have been "thoroughly vetted" and ICE determines they are *unlikely* to abscond,[65] and the absconding rate was still that high, the onus was on DHS to carefully consider absconding in the Final Memorandum.

When an agency changes course, it should "ordinarily" "display awareness that it is changing position" and "show that there are good reasons for the new policy."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16, 129 S.Ct. 1800, 1811, 173 L.Ed.2d 738 (2009).  DHS does neither and fails to offer "a reasoned explanation" "for disregarding

---

[64]   ICE's website describes the alternatives to detention program as follows: "On a case by case basis, local ICE ERO Deportation Officers determine the type and manner of monitoring that is appropriate for each participant, including the specific type of technology – global positioning system (GPS) tracking devices, telephonic reporting (TR), or a smartphone application (SmartLINK) – and case management levels, which include frequency of office or home visits." *Detention Management*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/detain/detention-management (last visited June 8, 2022).

[65]   "Adults age 18 and over may be eligible for participation in ATD but must be thoroughly vetted by ERO officers, who review an alien's criminal, immigration, and supervision history, family and/or community ties, status as a caregiver or provider, and humanitarian or medical considerations when making enrollment determinations in order to determine whether a candidate is likely to comply with the terms of the program."  (Dkt. No. 153-10 at 14).

facts and circumstances that underlay or were endangered by the prior policy." *See id.* at 516, 129 S.Ct. at 1811.  DHS was required to consider criminal alien recidivism and abscondment *and* to show its work.  It either failed or refused to do so.  This was arbitrary and capricious.  *Texas MPP*, 20 F.4th at 991 ("DHS nonetheless failed to discuss *any* of its prior factual findings—much less explain why they were wrong.  That failure provides another basis for our conclusion that the [decision] was arbitrary and capricious." (emphasis in original)).

### 2.      Costs to the States and Reliance Interests

"When an agency changes course it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Texas MPP*, 20 F.4th at 990 (cleaned up).  But DHS does not demonstrate that it actually considered the costs its decision imposes on the States, nor their reliance interests on mandatory detention.  "That alone is fatal." *Id*. at 989.

The Final Memorandum itself has no discussion of the harms to the States that may be implicated by its directives.  DHS purports to address those concerns in the Considerations Memorandum. (Dkt. No. 146-1 at 14–17).  But DHS only pays lip service to the States' concerns.  DHS undersells the States' interests as being concerned with "indirect" and "downstream" effects, in contrast to the "predictable (and measurable) impacts" that DHS "endeavors to consider." (*Id.* at 14).  In place of a good-faith attempt to measure costs and benefits, DHS points the Court to a single study and argues that it is *difficult* to measure the fiscal cost of its policy—therefore, DHS doesn't have to. (*Id.* at 15).  Further, DHS conjectures "there is good reason to believe that any effects from

implementation of priorities guidance are unlikely to be significant, and could have a net positive effect," (*id.*), such as increasing compliance with U.S. labor laws by encouraging illegal immigrants to come forward with violations, (*id.* at 14) ("It does not serve the public interest when [worker] rights go unvindicated or when crimes go unprosecuted."), or decreasing COVID-19 vaccine hesitancy among illegal immigrants, (*id.* at 16).

The same goes for reliance interests.  In the section of the Considerations Memorandum devoted to reliance interests, DHS writes that it "has considered" reliance interests, but that "no such reasonable reliance interests exist" because DHS "is unaware of any State that has materially changed its position to its detriment" in reliance and because "any such change by any party would be unreasonable[.]" (*Id.*).  Further, as with costs imposed on the States, DHS maintains that it is "extremely difficult to quantify" the reliance interests of the States.  Therefore, DHS does not have to.  (*Id.*).  This cannot be true.  Litigation (in which DHS is a party) has demonstrated that there are quantifiable reliance interests.  *See*, *e.g.*, *Texas v. Biden*, 554 F. Supp. 3d 818, 848–49 (N.D. Tex. 2021), *aff'd*, *Texas MPP*, 20 F.4th at 928, *cert. granted*, 142 S.Ct. 1098, 212 L.Ed.2d 1 (2022).  Moreover, the contention that DHS had no obligation to consider the States' reliance interests "is squarely foreclosed by *Regents*." *Texas MPP*, 20 F.4th at 990 (citation omitted).

Thus, DHS's cursory acknowledgement of various concerns violates a foundational principle of administrative law: "[s]tating that a factor was considered . . . is not a substitute for considering it."  *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986); *see also Texas MPP*, 20 F.4th at 993 ("As an overarching matter, the June 1 Memorandum sometimes baldly asserted that DHS considered this or that factor—

76

in lieu of showing its work and actually considering the factor on paper . . . . [T]o the extent they rely on substituting DHS's *assertions about explanations* with *explanations* themselves, we reject those arguments with redoubled vigor." (emphasis in original)). Here, DHS did not meet its obligation to consider reliance interests by simply citing to one study that asserts that measuring the fiscal effects of a policy is just too difficult. *See* (Dkt. No. 146-1 at 14–16); *cf. Dep't of Com.*, ____ U.S. at ____, 139 S.Ct. at 2576 ("Accepting contrived reasons would defeat the purpose of the enterprise.  If judicial review is to be more than an empty ritual, it must demand something better than the explanation offered for the action taken in this case.").

In light of *Regents*, DHS had a duty to consider the reliance interests of the States *and* to show its work.  *Texas MPP*, 20 F.4th at 990 ("[A]gencies must consider reliance interests, and [the] failure to do so is arbitrary and capricious.").  It failed to do so.

***

The Court holds that the Final Memorandum is arbitrary and capricious. Accordingly, the Court will enter judgment in favor of the States on Count IV of the Amended Complaint.  *See* (Dkt. No. 109 at 30–32).

### C.    NOTICE AND COMMENT (COUNT IV)

The last APA claim raised by the States is that the Final Memorandum had to undergo the notice and comment requirements of the APA.  *See* 5 U.S.C. § 553.  The APA's notice and comment requirements apply to "substantive" or "legislative" rules, but the APA makes exceptions for certain categories of "non-legislative" rules, to which the notice and comment requirements do not apply.  *Texas DAPA*, 809 F.3d at 170–71; *Dep't.*

*of Lab. v. Kast Metals Corp.*, 744 F.2d 1145, 1152 (5th Cir. 1984). "[I]f a rule is 'substantive,' the exemption is inapplicable, and the full panoply of notice-and-comment requirements must be adhered to scrupulously." *Texas DAPA*, 809 F.3d at 171. Importantly, "the APA's notice and comment exemptions must be narrowly construed." *Id.* (cleaned up).

The Government does not dispute that the Final Memorandum is an APA rule under 5 U.S.C. § 551(4), nor does it claim to have complied with the APA's notice and comment requirements. Rather, the Government contends that the Final Memorandum is not a legislative rule, invoking two of the exceptions to the notice and comment requirement. *See* 5 U.S.C. § 553(b)(A). First, the Government claims the Final Memorandum is a general statement of policy. Alternatively, it claims the Final Memorandum is a rule of agency procedure, or "procedural rule."

### 1.    General Statement of Policy

A general statement of policy advises "the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln*, 508 U.S. at 197, 113 S.Ct. at 2034 (citation omitted). The Fifth Circuit distinguishes general statements of policy from legislative rules using two criteria: "whether the rule (1) imposes any rights and obligations and (2) genuinely leaves the agency and its decision-makers free to exercise discretion." *Texas DAPA*, 809 F.3d at 171 (cleaned up). Courts should note that there "is some overlap in the analysis of those prongs" and also be "mindful but suspicious of the agency's own characterization" of its action. *Id.* (citations omitted). But most importantly, the Court should focus "primarily on whether the rule has binding effect on agency discretion or severely restricts it." *Id.* (citation omitted). "An agency

pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding." *Id.* (cleaned up).

That should sound familiar.  As discussed above, the Fifth Circuit also uses this inquiry to determine whether an agency action is final.  *See supra* III.A.  The Court has already determined that the Final Memorandum is facially binding and being applied by DHS in a way that makes it binding in its final agency action analysis above. *See supra* III.A.   Recall that the Final Memorandum binds DHS personnel to consider and apply certain priorities and factors and forecloses reliance on the fact of conviction or a database search alone when taking enforcement action. *See generally* (Dkt. No. 109-5).  DHS personnel do not have discretion to ignore the Final Memorandum's priority categories, and but for the Final Memorandum, DHS personnel would have discretion to take enforcement action based on the fact of conviction alone without considering additional factors and priorities.  Put simply, the Final Memorandum is both facially binding and applied in a way that demonstrates it is binding. *See Texas DAPA*, 809 F.3d at 171.  Furthermore, the Final Memorandum imposes rights and obligations by allowing aliens to challenge enforcement actions taken against them if they believe they do not fall within the Final Memorandum's priorities.  (F.F. No. 67).[66]

---

[66]    The Court recognizes that this is extra-record evidence.  The Government contends that extra-record evidence cannot be considered for the States' APA merits claims, including their notice and comment claim.  (Dkt. No. 189 at 8).  But the Court concludes that consideration of extra-record evidence for the States' notice and comment claim is proper.  First, the Fifth Circuit's tests for determining whether an agency rule is covered by the APA's exceptions to the notice and comment requirements make evaluation of the rule's *effects* necessary. *See Texas DAPA*, 809
(continue)

This is consistent with the Fifth Circuit's holding in *Texas DAPA*.  809 F.3d at 171–76.  There, the Fifth Circuit held that the DAPA Memo did not "genuinely leave the agency and its employees free to exercise discretion."  *Id.* at 176.  This holding was based on the Fifth Circuit's determination that even though the DAPA Memo purportedly conferred discretion on DHS personnel, that "discretionary language was pretextual."  *Id.* at 171–76.   Similarly here, the ostensibly discretionary language in the Final Memorandum does not change the effect.  As explained above, *see supra* III.A., the smattering of discretionary language in the Final Memorandum is inconsistent with the mandatory language throughout the document, making clear that the priorities and factors are not optional.  This makes the Final Memorandum binding on DHS personnel.  Because the Final Memorandum has a binding effect on agency discretion and severely restricts it, the exception to the APA's notice and comment requirement for general statements of policy does not apply.  *See Texas DAPA*, 809 F.3d at 171.

## 2.    Procedural Rule

Even if an agency rule is binding and therefore not a general statement of policy, it can still be exempt from the notice and comment requirement "if it is one 'of agency organization, procedure, or practice.'"  *Texas DAPA*, 809 F.3d at 176 (quoting 5 U.S.C.

---

F.3d at 171 (explaining that whether a rule is a general statement of policy turns on whether it "has binding effect"); *Id.* at 176 (whether a rule is procedural turns on whether it has a "substantial impact").  Thus, the rule against extra-record evidence cannot apply.  Alternatively, the third *Medina* exception allows for consideration of extra-record evidence when "the agency failed to explain administrative action so as to frustrate judicial review."  *Medina Cnty.*, 602 F.3d at 706.  Because consideration of the effects of the Final Memorandum is necessary to determine whether the Final Memorandum is a general statement of policy or a procedural rule, *see Texas DAPA*, 809 F.3d at 171–76, excluding that evidence would "frustrate judicial review"; thus, it is admissible under the third *Medina* exception.  *See Medina Cnty.*, 602 F.3d at 706.

§ 553(b)(A)).  In the Fifth Circuit, this exception is governed by the "substantial impact test."  *Id.*; *Phillips Petroleum Co. v. Johnson*, 22 F.3d 616, 620 (5th Cir. 1994).  This test "is the primary means by which [the court] look[s] beyond the label 'procedural' to determine whether a rule is of the type Congress thought appropriate for public participation." *Texas DAPA*, 809 F.3d at 176 (citation omitted).  Under this test, an agency rule is actually legislative and not procedural when it "has a *substantial* impact on the regulated industry, or an important class of the members or the products of that industry[.]"  *Phillips Petroleum Co.*, 22 F.3d at 620 (emphasis in original).  To determine if an agency rule has a substantial impact on the regulated industry, the Court asks whether the agency rule "modifies substantive rights and interests."  *Texas DAPA*, 809 F.3d at 176.  "An agency rule that modifies substantive rights and interests can only be nominally procedural, and the exemption for such rules of agency procedure cannot apply."  *Id.* (citation omitted).

In *Texas DAPA*, the Fifth Circuit applied the substantial impact test to DHS's DAPA Memo, which conferred "lawful presence" on a particular class of illegal aliens. *Id.*  The Fifth Circuit held that the DAPA Memo had a substantial impact because, by granting lawful presence to the covered class of illegal aliens, the DAPA Memo forced Texas "to choose between spending millions of dollars to subsidize driver's licenses and amending its statutes."  *Id.*  Accordingly, the DAPA Memo was not a procedural rule.  *Id.*

In *Phillips Petroleum Co.*, the Fifth Circuit applied the substantial impact test to an action by the Department of Interior.  22 F.3d at 618.  That action created "new criteria for valuing natural gas liquid products" used to calculate royalties owed to the government by oil and gas lessees.  *Id.*  Instead of calculating values using "the range of the various

types of prices prescribed in the governing regulation," the Department's action directed its personnel to rely on only "one type of price, the spot market price." *Id.* The Fifth Circuit held that the action was not a procedural rule because, even though it "plainly relate[d] to the internal practices" of the agency, the action had "a substantial impact on those regulated in the industry." *Id.* at 620. The Fifth Circuit reasoned that the action "narrowly restricts the discretion of [agency] officials in determining the value of" natural gas liquid products and, consequently, it "dramatically affects the royalty values of all oil and gas leases." *Id.* at 620–21. The Fifth Circuit also noted that the valuation criteria in the agency action required the use of different criteria than what the governing regulation required. *Id.*

The Final Memorandum also modifies substantive rights and interests such that it has a substantial impact. It modifies the substantive rights and interests of criminal aliens as demonstrated by the significant decrease in ICE's detention of aliens with criminal convictions under the Final Memorandum and its precursors. (F.F. No. 92); (F.F. No. 102). The Final Memorandum's impact on criminal aliens' rights and interests is further manifest by the fact that the Texas Board of Pardons and Paroles has revoked parole for some aliens with criminal convictions whom ICE does not detain, leading to continued custody in the Texas criminal justice system. (F.F. No. 105). Plus, as has been discussed, the Final Memorandum modifies aliens' substantive rights and interests by giving them the right to challenge enforcement actions taken against them by invoking their non-priority status. (F.F. No. 67). And just as the DAPA Memo forced Texas to "choose between spending millions of dollars to subsidize driver's licenses and amending its

statutes," *Texas DAPA*, 809 F.3d at 176, the Final Memorandum has forced the States to incur significant costs to the tune of millions of dollars.  (F.F. Nos. 103–04); (F.F. No. 107); (F.F. No. 118); (F.F. Nos. 128–29).  Additionally, just as in *Phillips Petroleum Co.*, the Final Memorandum "narrowly restricts the discretion of [agency] officials" (as has been discussed at length) and similarly deviates from the requirements of Sections 1226(c) and 1231(a)(2).  *See Phillips Petroleum Co.*, 22 F.3d at 620–21.  Because the Final Memorandum satisfies the substantial impact test, it is not a procedural rule.

***

The Final Memorandum is neither a general statement of policy nor a procedural rule.  *See* 5 U.S.C. § 553(b)(A).  It is a legislative rule.  This holding is consistent with some of the central purposes of notice of comment, including "to subject agency decisionmaking to public input and to obligate the agency to consider and respond to the material comments and concerns that are voiced," and "to ensure the parties develop a record for judicial review."  *See, e.g.*, *Make the Road New York v. Wolf*, 962 F.3d 612, 634 (D.C. Cir. 2020) (citations omitted).  Accordingly, the Court holds that the Final Memorandum was required to comply with the APA's notice and comment provisions. *See Texas DAPA*, 809 F.3d at 171.  Thus, the Court will enter judgment in favor of the States on Count IV of the Amended Complaint.  *See* (Dkt. No. 109 at 32).

### D.    AGREEMENTS BETWEEN THE STATES AND GOVERNMENT (COUNT V)

Louisiana raises an additional claim based on its January 8, 2021 agreement with DHS.[67]   Louisiana claims that DHS violated the terms of the agreement by failing to consult Louisiana and consider its views before issuing the Final Memorandum.  *See* (Dkt. No. 153-8 at 56); (Dkt. No. 153-9 at 1).   It appears that Louisiana's claim is not one for breach-of-contract,[68] rather, Louisiana contends the Government's failure to comply with the terms of the agreement is an additional basis on which the Court should find the Final Memorandum arbitrary and capricious and contrary to law under the APA.  Louisiana's claim turns on whether the agreement is valid, and Louisiana has failed to show that it is.

This agreement is a new phenomenon.  Despite Louisiana's assurances that this agreement takes nothing away from the federal government's authority, Louisiana understates the magnitude of what it asks the Court to find.  Establishing the Nation's immigration laws is a power of Congress, and enforcing those laws is a power vested in the Executive Branch.  U.S. Const. art. I, § 8, cl. 4; U.S. Const. art. II, § 1, cl. 1; *Arizona*, 567 U.S. at 396–97, 132 S.Ct. at 2499.  Louisiana would have the Court hold that an outgoing DHS official from a lame-duck administration can significantly constrain the incoming administration by giving individual states an enforceable right to weigh in before the

---

[67]    Texas concedes that its nearly identical agreement with DHS was terminated before the Final Memorandum was issued.  (Dkt. No. 109 at ¶ 76); (Dkt. No. 231 at 11).

[68]    Louisiana states that it is not seeking monetary damages or "specific performance to affirmatively require DHS to provide notice and follow the procedures in the Agreement.  Rather, it seeks the standard remedies for unlawful agency action, holding unlawful and setting aside the challenged memoranda." (Dkt. No. 231 at 15); *see also* (Dkt. No. 109 at ¶ 139).  Because Louisiana's claim is an APA claim, not a breach of contract claim, the Court does not address the Parties' arguments concerning the Tucker Act and sovereign immunity.  *See* (Dkt. No. 223 at 31–33); (Dkt. No. 231 at 14–15).

incoming administration makes changes.   Such a holding would have profound constitutional implications.   Louisiana has provided insufficient support for its claim to an enforceable right of such consequence.

First, Louisiana points to statutes that direct DHS to develop processes for receiving input from states and empower DHS to perform acts necessary to carrying out its responsibilities.   *See* 6 U.S.C. § 361(b)(4); 8 U.S.C. § 1103(a)(3).   To be sure, these statutes authorize DHS to *seek* Louisiana's input.   But they do not permit DHS to *surrender* power to Louisiana by subjecting itself to an enforceable consultation requirement.   In the Court's view, reading these statutes as authorizing this type of surrender of authority is a bridge too far.   *See Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468, 121 S.Ct. 903, 909–10, 149 L.Ed.2d 1 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

The caselaw Louisiana relies on is not sufficient to support its position.   Louisiana cites three cases for the proposition that agencies can choose to commit themselves to "more rigorous" procedures such as a consultation requirement with Louisiana and that such a commitment is enforceable in court.   Two of Louisiana's cases stand for, at most, the proposition that agencies must follow their own internal procedures.   *See Morton*, 415 U.S. at 235, 94 S.Ct. at 1074; *Singh v. U.S. Dep't of Justice*, 461 F.3d 290, 295 (2d Cir. 2006).   Neither addresses the question of whether an agency may subject its decision-making to consultation with an outside party.

Louisiana's strongest case is *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707 (8th Cir. 1979).  There, the Court held that an action taken by the Bureau of Indian Affairs violated the APA because it did not to comply with the Bureau's internal requirement of consulting the Tribe before making Bureau employment decisions.  *Id.* at 721.  But the DHS agreement requiring consultation with Louisiana before making nearly *any* immigration enforcement decision, *see* (Dkt. No. 153-8 at 54–56); (Dkt. No. 153-9 at 1–6), is on a completely different scale than the Bureau of Indian Affairs' internal policy of consulting the tribes before making its own employment decisions.  *See Andrus*, 603 F.3d at 717–18.  This is particularly true given the Bureau's longstanding preference for hiring tribal members—a preference expressly authorized by Congress and unanimously approved by the Supreme Court.  *See Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974).

DHS's alleged failure to comply with this agreement cannot provide a basis for finding that the Final Memorandum violated the APA.  *Cf. Biodiversity Assocs. v. Cables*, 357 F.3d 1152, 1172 (10th Cir. 2004) ("The executive branch does not have authority to contract away the enumerated constitutional powers of Congress or its own successors[.]").  In reaching this conclusion, the Court does not downplay Louisiana's considerable interest in the enforcement of immigration law, but that interest cannot circumvent the fact that the Constitution vests the enactment and enforcement of immigration law in the federal government.  *Arizona*, 567 U.S. at 394, 132 S.Ct. at 2498 ("The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens."); *Chy v. Freeman*, 92 U.S. 275, 280, 23 L.Ed. 550 (1875)

("The passage of laws which concern the admission of citizens and subjects of foreign nations to our shores belongs to Congress, and not to the States. . . . [T]he responsibility for the character of those regulations, and for the manner of their execution, belongs solely to the national government.").   But despite Louisiana's important interest, immigration law remains a federal prerogative.  *Cf. Arizona*, 567 U.S. at 416, 132 S.Ct. at 2510 ("Arizona may have understandable frustrations with the problems caused by illegal immigration while that process continues, but the State may not pursue policies that undermine federal law.").

The Court holds that DHS's alleged failure to comply with the agreement cannot provide a basis for finding that the Final Memorandum violated the APA.  Accordingly, the Court will enter judgment in favor of the Government on Count V of the Amended Complaint.  *See* (Dkt. No. 109 at 32–33).

### E.   TAKE CARE CLAUSE (COUNT VI)

The States assert a claim under the Take Care Clause of the Constitution.  *See* U.S. Const. art. II, § 3 ("he shall take Care that the Laws be faithfully executed").  A federal court normally does not reach a constitutional question if it can dispose of the case on another ground.  *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205, 129 S.Ct. 2504, 2513, 174 L.Ed.2d 140 (2009); *United States v. Johnson*, 956 F.3d 740, 743 (5th Cir. 2020).  Indeed, courts "ought not to pass on questions of constitutionality unless such adjudication is unavoidable."  *Matal v. Tam*, ____ U.S. ____, ____, 137 S.Ct. 1744, 1755, 198 L.Ed.2d 366 (2017) (cleaned up).  Accordingly, the Court will not reach Count VI of the

Amended Complaint raising the States' Take Care Clause claim in this case. *See* (Dkt. No. 109 at 33–34); *Texas*, 549 F. Supp. 3d at 622; *see also Texas DAPA*, 809 F.3d at 146 n.3.

## V.   REMEDY

The States ask the Court to hold unlawful and set aside the Final Memorandum, issue a permanent injunction, and award declaratory relief.

### A.   HOLD UNLAWFUL AND SET ASIDE

The States ask the Court to vacate the Final Memorandum in its entirety. Under the APA, a court "shall . . . hold unlawful and set aside agency action" that is contrary to law, arbitrary and capricious, or without observance of procedure. 5 U.S.C. § 706(2). "Agency action" includes a "rule." 5 U.S.C. § 551(13). Again, it is undisputed that the Final Memorandum is a "rule" under the APA. Thus, the Court must decide to what extent it will set aside the Final Memorandum.

Under existing precedent, there are two options when awarding relief under Section 706(2): remand with vacatur or remand without vacatur. The default approach is to remand the agency action *with* vacatur. *Texas MPP*, 20 F.4th at 1000; *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). This is especially true when there is a procedural violation. *See Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020). Remand with vacatur "restores the status quo before the invalid rule took effect," leaving the agency free to consider the problem anew. *Envtl. Def. v. Leavitt*, 329 F. Supp. 2d 55, 64 (D.D.C. 2004).

Unlike remand with vacatur, remand *without* vacatur leaves the rule in place during remand. *Am. Forest Res. Council v. Ashe*, 946 F. Supp. 2d 1, 43 (D.D.C. 2013). For

this reason, "remand without vacatur creates a risk that an agency may drag its feet and keep in place an unlawful agency rule." *EME Homer City Generation, L.P. v. E.P.A.*, 795 F.3d 118, 132 (D.C. Cir. 2015). Remand without vacatur is "generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Texas MPP*, 20 F.4th at 1000 (citation omitted). It is an "exceptional remedy." *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020).

### 1.    Remand with Vacatur

When deciding whether to remand *with* vacatur, a federal court considers two factors. First, "the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand." *Texas MPP*, 20 F.4th at 1000. Second, "the disruptive consequences of vacatur." *Id.* "A strong showing of one factor may obviate the need to find a similar showing of the other." *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 674 (D.C. Cir. 2019).

Regarding the first factor, the Final Memorandum is deficient in more than one way: it is contrary to law, arbitrary and capricious, and failed to observe procedure. *See Texas MPP*, 20 F.4th at 1000. DHS knew of these failings when it issued the Final Memorandum. For almost a year and a half, the Government has litigated three separate memoranda but has failed to cure fundamental defects in its civil immigration enforcement priorities. Each of this Court's opinions placed the Government on notice about the problems with its decisionmaking. "And it still failed to correct them." *See id.* Moreover, any post-remand memorandum may constitute "an impermissible *post hoc*

rationalization under *Regents*."  *See id.* at 1001.  This factor alone warrants remand with vacatur.

Regarding the second factor, vacatur is disruptive to the extent that DHS will no longer have nationwide immigration enforcement guidance.  But "disruptive consequences matter only insofar as the agency may be able to rehabilitate its rationale." *Long Island Power Auth. v. FERC*, 27 F.4th 705, 717 (D.C. Cir. 2022) (internal quotations omitted).  It is doubtful that an agency can offer a post-hoc rationalization following remand when the rule itself is arbitrary and capricious.  *See Texas MPP*, 20 F.4th at 1000-01.

Nonetheless, the second factor does not warrant remand without vacatur either. The disruption to DHS is largely the "uncertainty that typically attends vacatur of any rule."  *See Wheeler*, 955 F.3d at 85.  To be sure, the most compelling argument is that DHS has already trained its agents on the Final Memorandum.  But that training is premised on a fundamental misunderstanding of federal law.  For over a year, DHS has not treated "shall" as mandatory under Sections 1226(c) and 1231(a)(2).  And that interpretation has resulted in irreparable harm to the States.  *Cf. Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 80 (D.D.C. 2010) ("[V]acatur is appropriate in order to prevent significant harm resulting from keeping the agency's decision in place.").  In any event, DHS has shown the ability to refine its immigration enforcement priorities in response to litigation over

the last year.  DHS can, for example, draw upon its prior immigration enforcement priorities that contemplate mandatory detention.[69]

In sum, the "limited circumstances" in which remand without vacatur is the proper remedy do not apply here.  *See Am. Great Lakes Ports Ass'n*, 962 F.3d at 518.  Any disruption does not outweigh the seriousness of DHS's fundamental error.  Accordingly, the Court takes the normal approach and remands with vacatur.

Further, vacatur applies to the entire Final Memorandum.  Recall that the Final Memorandum is only self-styled as such.  As the Government openly acknowledges, it is really a rule under the APA.  (Dkt. No. 211 at 114).  Section 706 governs the "scope of review" of agency action.  A federal court "shall . . . hold unlawful and set aside agency action" that is unlawful.  5 U.S.C. § 706(2).  "Agency action" includes "the whole or part of an agency rule."  5 U.S.C. § 551(4), (13).  Thus, the APA contemplates wholesale vacatur of entire rules.

While the Government urges the Court to limit relief, it makes no compelling argument regarding how the Court can practically vacate and remand portions of this rule rather than the entire rule.  *See Chamber of Com. v. U.S. Dep't of Lab.*, 885 F.3d 360, 388 (5th Cir. 2018).  Unlike some agency rules, which may include a severability provision or "sensibly be given independent life," *Catholic Soc. Serv. v. Shalala*, 12 F.3d 1123, 1128 (D.C.

---

[69]   DHS is, of course, free to either craft a memorandum that is not subject to review under the APA or cure the fundamental defects in a subsequent memorandum that is subject to review.  Indeed, not all self-styled "guidance" is subject to judicial review.  *See, e.g., Texas MPP*, 20 F.4th at 986–87.  And of course, DHS is not required to issue a new memorandum.  This opinion should not be construed as ordering DHS to act.  The only remedy is vacatur of the Final Memorandum.

Cir. 1994), the Final Memorandum is arbitrary and capricious, contains language that is contrary to law throughout the document, is being applied in a way that violates federal statutes, and failed to observe procedure.  Consequently, the Final Memorandum is not like other cases in which partial vacatur was appropriate because the rules "were plainly divisible."[70]  *Cf. Am. Waterways Operators v. Wheeler*, 507 F. Supp. 3d 47, 78 (D.D.C. 2020). There is no workable path to afford the States meaningful relief other than setting aside the complete Final Memorandum.  *Cf. Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 291–92, 80 S.Ct. 332, 335, 4 L.Ed.2d 323 (1960).

### 2.    Scope of Relief

Next, the scope of relief.  When a federal court vacates a rule, relief is not limited to prohibiting the rule's application to the named plaintiffs.  *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998).  This means that, by necessity, vacating a rule applies universally.  *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *see also Texas MPP*, 20 F.4th at 985, 1000–01.  The APA itself "contemplates nationwide relief from invalid agency action."  *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, ____ U.S. ____, ____ n.28, 140 S.Ct. 2367, 2412 n.28, 207 L.Ed.2d 819 (2020) (Ginsburg, J., dissenting).  Courts across the country interpret the APA the same way.  *See*, *e.g.*, *Make the Rd. New York v. McAleenan*, 405 F. Supp. 3d 1, 66–72 (D.D.C. 2019) (Jackson, J.) (explaining that limited relief under Section 706 is inconsistent with text and

---

[70]    The Final Memorandum could not, for instance, be vacated only as to detentions.  This is because vacatur requires actual revocation of the agency's rule or portions of it.  Leaving an agency rule in place but limiting its application would be enjoining its enforcement, not vacatur.

precedent, would not work in practice, and reflects "a spirit of defiance of judicial authority"), *rev'd and remanded on other grounds*, 962 F.3d 612 (D.C. Cir. 2020); *New York v. Dep't of Com.*, 351 F. Supp. 3d 502, 672 (S.D.N.Y. 2019), *aff'd in part, rev'd in part on other grounds*, ____ U.S. ____, 139 S.Ct. 2551, 204 L.Ed.2d 978 (2019).

Here, the Government makes little effort at proposing an alternative path forward other than citing cases that discuss crafting injunctive relief—an entirely different exercise because this is not an injunction. *See Pennsylvania v. President United States*, 930 F.3d 543, 575–76 (3d Cir. 2019), *rev'd and remanded on other grounds*, ____ U.S. ____, 140 S.Ct. 2367, 207 L.Ed.2d 819 (2020). Simply put, the contention that vacatur should be limited to the States of Texas and Louisiana is in conflict with the overwhelming weight of authority. *O.A. v. Trump*, 404 F. Supp. 3d 109, 153–54 (D.D.C. 2019) (collecting cases); *see also* Mila Sohoni, *The Power to Vacate A Rule*, 88 Geo. Wash. L. Rev. 1121 (2020).

Universal relief when setting aside an agency action under the APA is only magnified in the immigration context. Universal relief can be appropriate to ensure uniformity in immigration policies as prescribed by federal law. *See Texas DAPA*, 809 F.3d at 187–88; *see also Trump v. Hawaii*, ____ U.S. ____, ____ n.13, 138 S.Ct. 2392, 2446 n.13, 201 L.Ed.2d 775 (2018) (Sotomayor, J., dissenting). The Final Memorandum governs immigration, which is designed to be uniform across the Nation. U.S. Const. art. I, § 8, cl. 4; Pub. L. No. 99-603, § 115(1). Moreover, the States are irreparably harmed when aliens with certain criminal convictions or aliens with final orders of removal inevitably move to Texas and Louisiana after those aliens are released, have detainers rescinded, or are otherwise not detained under the Final Memorandum. *See Texas DAPA*, 809 F.3d at

188; (Dkt. No. 217-12 at 5–6); (Dkt. No. 217-13 at 7); (Dkt. No. 217-15 at 2); (Dkt. No. 203 at 82).

None of this is to say that universal relief is appropriate in all cases.  Unlike normal cases, in which courts determine whether the *application* of a law to the named plaintiffs is lawful, the APA tasks courts with determining whether the rule *itself* is lawful.  As such, the standard debate about nationwide or universal relief under Article III is not directly implicated here; "the Court is vacating an agency action pursuant to the APA, as opposed to enjoining it as a violation of the Constitution or other applicable law." *NAACP v. Trump*, 315 F. Supp. 3d 457, 474 n.13 (D.D.C. 2018).

***

The Court holds unlawful and sets aside the Final Memorandum.[71]

### B.    INJUNCTIVE RELIEF

The States also request a permanent injunction.  If vacatur is sufficient to address the injury, it is improper to also issue an injunction.  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66, 130 S.Ct. 2743, 2761, 177 L.Ed.2d 461 (2010).  The only justification that the States offer for granting relief other than vacatur is that vacatur does not order the Government to detain under Sections 1226(c) and 1231(a)(2).  (Dkt. No. 109 at 34);

---

[71]    The Court is mindful that the Supreme Court recently requested supplemental briefing on, among other issues, "Whether 8 U.S.C. § 1252(f)(1) imposes any jurisdictional or remedial limitations on the entry of injunctive relief, declaratory relief, or relief under 5 U.S.C. § 706." *Biden v. Texas*, ____ S.Ct. ____, ____, No. 21-954, 2022 WL 1299971, at *1 (May 2, 2022). Section 1252(f) does not apply here because, among other reasons, the Court vacates a rule.  *Capital Area Immigrants' Rights Coal. v. Trump*, 471 F. Supp. 3d 25, 60 (D.D.C. 2020); *see also Texas MPP*, 20 F.4th at 1003–04; *Preap*, ___ U.S. at ____, 139 S.Ct. at 962; *Texas I*, 524 F. Supp. 3d at 641.

(Dkt. No. 231 at 16).  The purported source for the Court's authority to order detentions is 5 U.S.C. § 706(1).  (Dkt. No. 111 at 39).

Under Section 706, a "reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed[.]"  5 U.S.C. § 706(1).  A court can grant relief under Section 706(1) "only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63–64, 124 S.Ct. 2373, 2379, 159 L.Ed.2d 137 (2004) (emphases in original).  As such, Section 706(a) precludes a broad programmatic attack.  *Id.* at 63, 124 S.Ct. at 2379–80.  The APA is designed "to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve."  *Id.* at 66, 124 S.Ct. at 2381.  Moreover,

> If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved—which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management.

*Id.* at 66–67, 124 S.Ct. at 2381.  The Court declines that approach.

The States spend less than a page of briefing in support of their request for a positive injunction and do not grapple with *Norton*.  In addition, district courts routinely decline to issue an injunction after vacating a rule while also leaving the door open for additional relief if future events require it.  *See, e.g., Franciscan All., Inc. v. Azar*, 414 F.

Supp. 3d 928, 946 (N.D. Tex. 2019).  The Court sees no reason to depart from this well-reasoned approach.[72]  The Court denies the request to issue injunctive relief.

### C.    DECLARATORY JUDGMENT

The States also request a declaratory judgment.  (Dkt. No. 224 at 22–23, 30).  The States, however, do not explain how vacatur does not award them complete relief.  *See Monsanto Co.*, 561 U.S. at 165–66, 130 S.Ct. at 2761.  The Court has already held unlawful and set aside the Final Memorandum.  The Court denies this request for relief.

## VI.    CONCLUSION

The Court finds that the States have proven Counts I, II, III, and IV by a preponderance of the evidence.  The Court finds that the States have not proven Count V by a preponderance of the evidence.  The Court declines to reach Count VI.  The Court **VACATES** the Final Memorandum as arbitrary and capricious, contrary to law, and failing to observe procedure under the Administrative Procedure Act.  The Court **DENIES** all other requested relief.  The Court will enter a final judgment, including a seven-day administrative stay, by separate order.

It is SO ORDERED.

Signed on June 10, 2022.

DREW B. TIPTON
**UNITED STATES DISTRICT JUDGE**

---

[72]    The Government urges the Court to limit any relief to remand without vacatur or, in the alternative, remand with vacatur.